# PX0031 - PX0053
## (see exhibit stamps bottom right corner)

PX0031 (Pgs. 2-27)
PX0053 (Pgs. 28-152)

Plaintiff Federal Trade Commission
Civil Action No. 1:25-cv-02569-RC
Exhibit PX0031

**JenaValve Technology, Inc.**
**August 9, 2024**
**4(c)-3**



# JenaValve

Aortic Regurgitation Market Opportunity

December 2023

# Executive Summary



 **Unique Patient Population Only Treatable By Trilogy**

 **Large Untapped Opportunity in Aortic Regurgitation —**  **Global Market**

 **34,000+ Annual U.S. Natural Incidence of Severe Symptomatic AR**

 **~30% of Moderate AR Prevalence Mis-diagnosed Severe AR Patients**

 **Trilogy Seamlessly Leverages Established Structural Heart Ecosystem**

2    © 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-002

## Patients Deserve Better



**Aortic Regurgitation is a Deadly Disease**

Unfortunately, Most Patients <u>Don't Receive Treatment</u>

**Not Referred**

**56%**

of moderate-severe AR patients are not sent for additional evaluation within 2 years after diagnosis[1]

**Not Treated**

**74%**

of severe, symptomatic patients do not receive treatment within a year of diagnosis[2]

**Not Alive**

**24%**

1-year mortality rate for patients with NYHA 3-4 untreated severe, symptomatic AR[3]

1. Amoroso, Clinical journey for patients with aortic regurgitation: a retrospective observational study from a multicenter database. Presented at TVT, June 2023, Phoenix, AZ.
2. Thourani VH, Brennan JM, et al. Structural Heart 2021;5(6):608-618.
3. Contemporary Evaluation and Clinical Treatment Options for Aortic Regurgitation Mark Lebehn 1, Torsten Vahl 1,2, Polydoros Kampaktsis 1 and Rebecca T. Hahn

3    © 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-003

# How Common Is Aortic Regurgitation?



**Aortic regurgitation presents a real issue and it is severely underdiagnosed**

## OxVALVE Study (N: 2,500; Age: >65 yr)

**Table 2** New diagnosis of valvular heart disease

| | None/trivial | Mild | Significant (moderate/severe) | |
|---|---|---|---|---|
| Any VHD | 1231 (49.2%) | 1110 (44.4%) | 159 (6.4%) | |
| Left-sided VHD | | | | |
| Mitral regurgitation | 1948 (77.9%) | 494 (19.8%) | 58 (2.3%) | #2 |
| Mitral stenosis | 2491 (99.6%) | 7 (0.3%) | 2 (0.1%) | |
| Aortic regurgitation | 2118 (84.7%) | 341 (13.6%) | 41 (1.6%) | #3 (2x AS) |
| Calcific aortic valve disease—AoScl and stenosis | 1617 (64.7%) | 866 (34.6%)[a] | 17 (0.7%) | |

| | None/Trivial/Mild | Significant (moderate/severe) | |
|---|---|---|---|
| Right-sided VHD | | | |
| Tricuspid regurgitation | 2433 (97.3%) | 67 (2.7%) | #1 |
| Pulmonary regurgitation | 2493 (99.7%) | 7 (0.3%) | |

Number of study participants (% of total cohort) with newly diagnosed VHD (there were no cases of tricuspid or pulmonary stenosis). VHD, valvular heart disease.
[a] Mild calcific aortic valve disease refers to the combined number with AoScl and mild aortic stenosis.

d'Arcy JL et al. Eur Heart J. 2016;37(47):3515-22

## HONU Valve Study (N: 928 ; Median Age: 74)

**TABLE 1** Diagnosis of Valvular Heart Disease

| | None/Trivial | Mild | Significant | |
|---|---|---|---|---|
| Any valvular heart disease | 606 (65.0) | 175 (19.0) | 147 (16.0) | |
| Aortic stenosis | 892 (96.0) | 21 (2.3) | 15 (1.6) | |
| Aortic regurgitation | 825 (89.0) | 61 (6.6) | 42 (4.5) | #3 |
| Mitral regurgitation | 744 (80.0) | 120 (13.0) | 64 (6.9) | #2 |
| Tricuspid regurgitation | 757 (82.0) | 104 (11.0) | 67 (7.2) | #1 |
| New diagnosis atrial fibrillation | 8 (1.3) | 2 (0.9) | 4 (4.4) | |

Gössl M et al. JACC Imaging 2023 Aug;16(8):1118-1120 doi: 10.1016/j.jcmg.2023.02.009.

*"Significant AR is NOT uncommon,*
*but terribly underdiagnosed..."*

**João Cavalcante, MD**
**Minneapolis Heart Institute**
**London Valves, Nov. 2023**

4    © 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-004



© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-005





# Severe Symptomatic Aortic Regurgitation – U.S. TAM Model

**JENAVALVE**

| AR Patient Base - United States | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 |
|---|---|---|---|---|---|---|---|---|---|---|

## Key Model Drivers

**A** Prevalence

Hospitalized ssAR represents ███ of the prevalent patient base

**B** Treatment Method

2024 procedures based on historical penetration; forecasted mix informed by ███

**C** Incidence

Assumes implied 2024 incidence grows at ███ annually

**D** Misclassified Patients

~30% of msAR patients are misclassified ssAR patients

Note: Note: US Addressable Market Assumes Domestic ASP of ███ n 2025, declining to ███ n 2033
(1)  Assumes ███ of patients ineligible due to exclusions and comorbidities

© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-007

Prevalence Patient Population Illustration
(At Beginning of the Year)

JENAVALVE

8    © 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-008

# Historical Prevalence of Severe Aortic Regurgitation



**2019-2024 Average Change: 2,872**

Legend:
- Ambulatory Severe AR Patients (light gray)
- Hospitalized Severe AR Patients (dark blue)

| Beginning of Year Prevalence | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| Total | 100,738 | 103,604 | 106,361 | 109,365 | 112,215 | 115,147 | 117,968 |
| Ambulatory | 50,369 | 51,802 | 53,180 | 54,683 | 56,108 | 57,574 | 58,984 |
| Hospitalized | 50,369 | 51,802 | 53,180 | 54,683 | 56,108 | 57,574 | 58,984 |

Treated: 16,980
Mortality: 13,743
Natural Incidence: 33,544

**Beginning of Year Prevalence**

Note: 2019 used as baseline year to exclude impact of COVID related procedure trends
(1) Am J Cardiol. 2007 February 15; 99(4): 549–553. doi:10.1016/j.amjcard.2006.08.065.

## Key Assumptions

**58,850**
**AR Hospitalizations in 2019**
Per NIS and NRD Data

**50,369**
**Unique Patients in 2019**
Excludes patients readmitted
(estimated aged 50+ years)

**50%**
**ssAR Patients Hospitalized**
~1/2 of symptomatic prevalence
pool not hospitalized[1]

**Hospitalizations Forecasted
In Line with Population Growth**
Forecasted by age group
(based on data from U.S. Census Bureau)

9     © 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL,

PX0031-009

**B  Given the Similarities, We've Based the U.S. AVD-AR Adoption Off of** ███████████



**With Strong Clinical Efficacy, Clear Unmet Need and Established Structural Heart Infrastructure, We Believe AVD-AR Will** ████████████████████

Note: 2030-33 case growth assumptions per management estimates
(1)  Bavaria JE. TAVR Update: New Insights and Perspectives from the US National STS/ACC TVT Registry. Society of Thoracic Surgeons

© 2023 JENAVALVE TECHNOLOGY, INC,  ALL RIGHTS RESERVED,  CONTENT IS PROPRIETARY & CONFIDENTIAL,

PX0031-010



# Severe Aortic Regurgitation Incidence and Treatment

## Key Assumptions

### 2025 Prevalence
Based on estimated hospitalizations and percent of ssAR patients hospitalized

### Annual Incidence Growth + Gradual Improvement in Misclassified msAR to ssAR
(see next page)

### Untreated Mortality Rate[1]
Assumes ▮▮▮ from 2024 to 2029 then declines by ▮▮▮ per year to 2033

### AVD-AR Treatment Forecast
Assumes treatment growth for AVD-AR

### SAVR Treatment Forecast
Assumes treatment growth for SAVR AR

(1)   Dujardin, Karl S., et al. "Mortality and morbidity of aortic regurgitation in clinical practice." Circulation, vol. 99, no. 14, 1999, pp. 1851–1857, https://doi.org/10.1161/01.cir.99.14.1851.

11    © 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-011

## Annual ssAR Incidence Represents a ▮▮▮ U.S. Opportunity by 2033 ▮▮▮

JENAVALVE



### Key Assumptions

**34,383**
**2025 Natural Incidence**
Growing at an annual rate of ▮▮▮

**~30%**
**Misclassified**
Patients incorrectly classified with msAR instead of ssAR[2]

**2028**
First Year of msAR Patients Properly Classified as ssAR Patients
(In 4th year of commercialization)

**▮▮ Penetration in 2028 Growing to ▮▮ in 2033**
of Misclassified Patients as msAR Identified Properly as ssAR

**~30% of moderate AR patients are misclassified and actually have severe AR – João Cavalcante, MD**

(1) Net of exclusions and comorbidities; assumes ASP of ▮▮▮ in 2033
(2) Malahjfi et al. JACC 2023 Mar 3;S0735-1097(23)04582-5.

Confidential
Jungje.Choi Jungje.Choi

© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL,

PX0031-012

# 2025 Severe Symptomatic Aortic Regurgitation – U.S. TAM Summary



## Total Addressable Market Opportunity[1]

**All Patients with ssAR**

### 88K+ Eligible Patients live with ssAR
- ~26,000 patients have low surgical risk

**Intermediate + High / Extreme Risk**

## Near Term Market Opportunity[1]

### 63k+ Intermediate, High and Extreme Surgical Risk Patients
- ~30,000 patients have intermediate surgical risk

**High / Extreme Risk Patients**

## Immediate Market Opportunity[1]

### High and Extreme Surgical Risk
- ~33,000 eligible patients have high or extreme surgical risk creating a large immediate opportunity for AVD-AR

(1)  Net of exclusions and comorbidities; assumes ASP of ▮▮▮▮ 2025

### Key Assumptions

**Exclusions and Comorbidities:** ▮▮
*Per Company Estimates*

**Extreme / High Risk Patients: 37%**
*Based on TVT Registry Splits for AS Q3 2022*

**Intermediate Risk Patients: 34%**
*Based on TVT Registry Splits for AS Q3 2022*

**Low Surgical Risk Patients: 29%**
*Based on TVT Registry Splits for AS Q3 2022*

**Average Selling Price**
*Per Company Estimates*

13     © 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-013

# U.S. Opportunity for Additional Penetration Capture Beyond Extreme/High Risk Patients





## Key Assumptions

**2025 – 2033 Procedure CAGR Assumed in AVD-AR**

**US Addressable Market Stratified by Extreme / High Risk**

**33K** → **Assumed Extreme / High Risk**
2025         2033

**88K** → **Addressable Patient Population**
2025         2033

© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-014

# U.S. Aortic Regurgitation Commercialization

© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

## What Can We Expect?





**Martin Leon, MD**
Professor of Cardiology
Director, Columbia Interventional
Cardiovascular Care
Columbia University, Irving
Medical Center
(TCT 2023)

© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-016

# US Commercial Launch Targeting



| Key Launch Targets | | |
|---|---|---|
| High Volume Centers with ⬛ Annual Implants Per Site | | |

| | | |
|---|---|---|
| Total Accts Targeted for Activation | | |
| Target Site's TAVR Volume (2021) | ⬛ | |
| Average Annual TAVR Volume Per Site | | |



© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-017

# US Commercial Launch Assumptions



Confidential
Jungie.Choi Jungie.Choi
Ropes & Gray
Jul 24, 2024 7:10 PM EDT

## Trilogy Site and Operational Metrics by Year

|  | JVT | | Accelerated | |
|---|---|---|---|---|
|  | CY25 | CY26 | CY25 | CY26 |
| Forecasted New Site Activations |  |  |  |  |
| Active Sites (Rolling YOY) |  |  |  |  |
| Quarterly Site Activation Rate |  |  |  |  |
| Total Implants |  |  |  |  |
| Monthly Implants Per Site |  |  |  |  |
| Average Selling Price ($000's) |  |  |  |  |

| Assumptions |
|---|
|  |

- Adoption: ▉ Unit Increase Every 9 Months
- Adoption: ▉ Unit Increase Every 6 Months → Shifting to ▉ Every 9 Mo's after 6 Qtrs.

18     © 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

Confidential
Jungie.Choi Jungie.Choi

PX0031-018

# US Commercial Revenue Projection (CY2025-2029)



**US Commercial Forecast (JenaValve)**

|  | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|
| # US Commercial Accounts | | | | | |
| # Cumulative Accounts | | | | | |
| # Reps | | | | | |
| # New Accts/Rep | | | | | |
| Cumulative Accts/Rep | | | | | |
| US Commercial Unit Volume | | | | | |
| US ASP ($000's) | | | | | |
| US Commercial Revenues ($M) | | | | | |

**US Commercial Forecast (Accelerated)**

|  | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|
| # US Commercial Accounts | | | | | |
| # Cumulative Accounts | | | | | |
| US Commercial Unit Volume | | | | | |
| US ASP ($000's) | | | | | |
| US Commercial Revenues ($M) | | | | | |



© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-019

# 5-Year U.S. Revenue Forecast (Comparative)



© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-020



# Illustrative Mitral Pull-Through Opportunity

**The Trilogy System Will Drive Product Pull-Through Opportunities Across Accounts**



© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

(1) Source: Wall Street Equity Research Estimates
(2) Net Present Value calculates the present value of the respective market capture from 2024 to 2028, grown in perpetuity (assumes ▇ operating margins, ▇ discount rate and a ▇ perpetuity growth rate)

PX0031-021

# AR Patients Are There – How Do We Access Them?





Real-World Aortic Regurgitation Patient Population Data

August 2023

egnite

**Engagement Overview**

- Requested egnite target ▮ hospitals w/ current aortic AVR volume ▮▮▮

- Query each hospital's EHR, echo data base for patients diagnosed w/ moderate/severe or severe Aortic Regurgitation

  - Identify the average number of moderate/severe or severe Aortic Regurgitation patients in each hospital

© 2023 JENAVALVE TECHNOLOGY, INC.  ALL RIGHTS RESERVED.  CONTENT IS PROPRIETARY & CONFIDENTIAL.

PX0031-022

# Untreated Severe + M-S AR Pts. at Egnite's 4 Largest Ctrs.





■ Severe AR Symptomatic
■ Severe AR Unknown Symptoms
■ Mod To Sev AR Symptomatic
■ Mod To Sev AR Unknown Symptoms

Active Patients as of August 29, 2023

'Active' patients are:
- Diagnosed with severe AR on echo by a reading cardiologist (egnite NLP)
- Alive, untreated for AR
- Not on palliative care
- Engaging with the health system in the last 300 days

© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

Confidential
Jungie.Choi Jungie.Choi

PX0031-023

Confidential
Jungje.Choi Jungje.Choi
Ropes & Gray
Jul 24, 2024 7:10 PM EDT

# Aortic Regurgitation Untreated Patient Population
October 13th, 2023



Confidential
Jungje.Choi Jungje.Choi
Ropes & Gray
Jul 24, 2024 7:10 PM EDT

egnite

PX0031-024

Confidential
Jungle.Choi Jungle.Choi
Ropes & Gray
Jul 24, 2024 7:10 PM EDT

# Executive S...   JENAVALVE

 **Unique Patient Population Only Treatable By Trilogy**

 **Large Untapped Opportunity in Aortic Regurgitation —**  **Global Market**

 **34,000+ Annual U.S. Natural Incidence of Severe Symptomatic AR**

 **~30% of Moderate AR Prevalence Mis-diagnosed Severe AR Patients**

 **Trilogy Seamlessly Leverages Established Structural Heart Ecosystem**



Confidential
Jungle.Choi Jungle.Choi
Ropes & Gray
Jul 24, 2024 7:10 PM EDT



**BEFORE THE UNITED STATES FEDERAL TRADE COMMISSION**

In the Matter of the Proposed Acquisition by
Edwards Lifesciences Corporation of
JenaValve Technology, Inc.

FTC Trans. No. 241-0114

**CONFIDENTIAL TREATMENT REQUESTED**

RESPONSE OF EDWARDS LIFESCIENCES CORPORATION
TO THE REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY
MATERIALS

May 23, 2025

| Edwards Lifesciences Corporation | Jeremy Calsyn |
| One Edwards Way | Bruce Hoffman |
| Irvine, CA 92614 | Kelton Anderson |
| | Jonas Krull |
| | Kasey Clarke |
| | Stone Hunt |
| | |
| | Cleary Gottlieb Steen & Hamilton LLP |
| | 2112 Pennsylvania Avenue, NW |
| | Washington, DC 20037 |
| | |
| | *Antitrust Counsel for Edwards Lifesciences Corporation* |

**Confidential**

*General Responses*

This response, along with all related supporting documents and exhibits, constitutes the response of Edwards Lifesciences Corporation ("Edwards" or "the Company") to the Request for Additional Information and Documentary Material issued to the Company by the Federal Trade Commission (the "FTC" or the "Commission") on October 10, 2024, pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "October 10 Second Request" or "Second Request").

The Second Request has been modified by agreement with the Commission. Correspondence relating to such modifications is enclosed in the folder labeled Exhibit A. In certain cases, the Company's responses to particular specifications cite correspondence relevant to the modification of those specifications. There may be additional modifications that are not cited in the Company's responses or included in Exhibit A. Copies of additional correspondence between the Company or its counsel and Commission Staff are included in the folder labeled Exhibit B.

Edward's Privilege Log related to privileged documents completely or partially withheld from production in response to the October 10 Second Request is enclosed in the folder labeled "Privilege Log."

To the extent any privileged document or information has been inadvertently produced, the Company did not intend to waive and has not waived any privilege by such production, including the attorney-client privilege, attorney work-product doctrine, joint defense privilege, or any other privilege. Any inadvertently produced documents or information should be returned to the Company immediately and without further review.

PX0053-002

**Confidential**

*General Responses*

This response and its attachments contain confidential and proprietary

information of the Company and are submitted with the understanding that the Commission will

afford them confidential treatment pursuant to all applicable statutes and regulations.

PX0053-003

**Confidential**

*Specification No. 1*

**Specification No. 1**

Submit:

(a)     one copy of each organization chart in effect since January 1, 2022 for the Company as a whole and for each of the Company's facilities or divisions involved in any activity relating to any Relevant Product;

(b)     a list of all agents and representatives of the Company, including, but not limited to, all attorneys, consultants, investment bankers, product distributors, sales agents, and other Persons retained by the Company in any capacity relating to the Proposed Transaction or any Relevant Product (excluding those retained solely in connection with environmental, tax, human resources, pensions, benefits, ERISA, or OSHA issues);

(c)     for each Person identified in response to Specification 1(b) and (c), the agent's, representative's, or Person's title, business address, and telephone number, as well as a description of that Person's responsibilities in any capacity relating to the Proposed Transaction or any Relevant Product provided in any Relevant Area; and

(d)     an Information Systems Diagram for the Company.

**Response to Specification No. 1**

Response to Subpart (a)

Edwards does not regularly keep organizational charts in the ordinary course of business. To facilitate discussions about document custodians, organizational charts that were created for this matter and that Edwards otherwise had available were provided to the Commission on October 31, 2024, at EW-FTC-00000001 and on December 11, 2024, at EW-FTC-00000718. These organizational charts identify employees multiple layers deep in the organization. Edwards subsequently responded to all requests from Commission Staff for additional information related to the organization charts.

Response to Subparts (b)-(c)

Table 1 provides a list of agents and representatives retained by Edwards relating to the Proposed Transaction.

3

**Confidential**

*Specification No. 1*

## Table 1: Transaction Agents and Representatives

| Company | Business Address | Telephone Number | Related Responsibilities |
|---|---|---|---|
| Cleary Gottlieb Steen & Hamilton LLP | 2112 Pennsylvania Avenue, NW Washington, DC 20037 | (202) 974-1500 | Legal Services |
| Gibson, Dunn & Crutcher LLP | 1700 M St NW, Washington, DC 20036 | (202) 955-8500 | Legal Services |
| Holland & Knight LLP | One Arts Plaza, 1772 Routh St, Suite 1500, Dallas, TX 75201 | (214) 969-1700 | Legal Services |
| Moore & Van Allen PLLC | 100 North Tyron St, Suite 4700, Charlotte, NC 28202 | (704) 331-1000 | Legal Services |
| Charles River Associates | Oakland Office: 601 12th Street, Suite 1500, Oakland, CA 94607<br><br>Salt Lake City Office: 170 South Main Street, Suite 1150, Salt Lake City, UT 84101<br><br>HQ: 200 Clarendon Street, Boston, MA 02116 | Oakland Office: (510) 595-2700<br><br>Salt Lake City Office: (801) 536-1500<br><br>HQ: (617) 425-3000 | Economic Consultant Services |
| Lighthouse Global | 51 University Street, Suite 400 Seattle, WA 98101 | (206) 223-9690 | eDiscovery |

PX0053-005

**Confidential**

*Specification No. 1*

| Company | Business Address | Telephone Number | Related Responsibilities |
|---|---|---|---|
| Consilio LLC | 1828 L Street NY, Suite 1070, Washington, DC 20036 | (202) 407-5120 | eDiscovery |

Response to Subpart (d)

Documents responsive to this subpart can be found in Edwards's production of documents to the Commission at EW-FTC-11067685–EW-FTC-11067660.

PX0053-006

**Confidential**

*Specification No. 2*

**Specification No. 2**

List each Relevant Product researched, developed, manufactured, distributed, licensed, or sold by the Company in the Relevant Area, including products currently in development, and for each:

(a)     provide a detailed description of the product including, but not limited to, its brand name, project name, stock keeping unit ("SKU"), or internal product ID(s);

      (i)     Separately, for each SKU associated with a Relevant Product in the Relevant Area, provide monthly sales data from January 1, 2021 until the present which shows:

           (1) Total gross and net sales in units and dollars;

           (2) The total rebates, discounts, or promotional expenses associated with these sales;

           (3) The total costs of goods (COGS) associated with these sales, and any other costs attributed to these sales;

(b)     state the brand name and the division, subsidiary, or affiliate of the Company that manufactures or sells or will manufacture or sell the product;

(c)     provide a detailed description of the product's application status at the U.S. Food and Drug Administration ("FDA") and any other applicable regulatory agency for each of its indication(s) or end use(s), and intended indication(s) or end use(s), including, but not limited to, the date the application was filed and approved;

(d)     provide a detailed description of any registry, database, or other organizational tool used or created by Company of each Relevant Product, including, but not limited to, start date, reason for creation, number of participants, type of patients, Company's use of information, and who has access to the information;

(e)     provide the estimated launch date in the United States and estimated launch date for each other jurisdiction where the Company plans to launch its product prior to selling it in the United States;

(f)     provide a detailed list of all patents and patent applications relating to each product whether owned, licensed, or controlled by the Company or any other Person, including patent or patent application number, title, priority date, inventor, date filed, date issued, date of patent expiration, status, and provide a copy of all relevant claims;

(g)     state the cost of the program to date and the estimated cost to complete research or development of the product;

(h)     provide the current status of the Company's assessment of the clinical program,

6

**Confidential**

*Specification No. 2*

including, but not limited to, the Company's current assessment of the likelihood that the product in development will obtain regulatory approval and/or become commercialized in the United States;

(i)    for products no longer in active development, provide a detailed description of each reason and/or factor identified or discussed by any Company employee or consultant for terminating, placing on hold, pausing, or altering the product development program (or considering doing so); and

(j)    provide a detailed description of the production processes used to manufacture the product and the location(s) in which those processes occur.

**Response to Specification No. 2**

Pursuant to FTC Staff's Modification Letter dated February 5, 2025, for purposes of this Response, the definition of "Relevant Product" in Definition D. 16 is limited to TAVR-AR devices. The "Relevant Area," is defined in D. 17 as the United States.

Response to Subparts (a)-(c)

Through its acquisition of JC Medical, the Company is currently developing the J-Valve transfemoral ("TF") System, a pipeline Transcatheter Aortic Valve Replacement ("TAVR") system, which comprises of a TF aortic valve including biological materials, fabric, and shape-memory metal (nitinol), combined with the TF Delivery Device and Loading Accessories. In addition to these components, the J-Valve TF system will include related technical and procedural support services. All of these components, which will be described in more detail below, are designed as an overall system in which each part depends on the other components. The use of 'J-Valve TF System' throughout Edwards's responses refers to the overall system with all of its components as described above. The overall system is specifically designed to treat patients with symptomatic, severe Aortic Regurgitation ("AR"), and the components are designed, tested and validated to work with each other. For example, because there has not been appropriate testing, validation and verification of compatibility, it would not be appropriate to take one component

7

**Confidential**

*Specification No. 2*

such as the valve, and implant it via another delivery system, such as the SAPIEN™ delivery system. The TAVR can be performed through a minimally invasive transvascular procedure, without the need for open-heart procedure or extracorporeal circulation.

The J-Valve TF Bioprosthesis is a transcatheter heart valve which includes a ███

███████████████████████████████████████████████

███. The visual below shows the Bioprosthetic valve.

**FIGURE 2-1**



The J-Valve TF Delivery Device enables transvascular delivery of the J-Valve TF Bioprosthesis to the aortic annulus. Additionally, loading accessories including the ████

███████████████████, are used during the implantation procedure. An Edwards 16Fr eSheath+ or a commercially available sheath may be used for introduction and removal of the valve system. The visual below shows the delivery system.

8

**Confidential**

*Specification No. 2*

**FIGURE 2-2**



The J-Valve Bioprosthesis heart valve is a low-profile design TAVR device with U-shaped anchor rings, specifically designed to treat symptomatic, severe AR.  There are five valve sizes (22, 25, 28, 31, and 34 mm) to accommodate an array of aortic annular perimeters ranging from 57 to 104 mm.

9

**Confidential**

*Specification No. 2*

████████████████████████████.

████████████████████████████████████████████.  The J-Valve TF system is based on a legacy system that is currently used only in China, Taiwan, and Macau ("Greater China").  The legacy system is designed for transapical implantation (i.e., access via the left ventricular apex), whereas the J-Valve TF System being designed and tested by Edwards is designed for transfemoral implantation (i.e., access via the femoral artery).  Transfemoral implantation is the preferred access point in the United States and other markets.  Transapical and other access points are generally only used in the United States where transfemoral implantation is not viable for a particular patient.  The commercial rights to the legacy valve in the geographic area of Greater China are held by Genesis MedTech.

Edwards's version of the J-Valve TF System is not approved by the FDA for sale in the United States, nor is it approved by any other regulatory agency globally.  In August 2023, JC Medical received an Investigational Device Exemption ("IDE") from the FDA to conduct an Early Feasibility Study ("EFS"), which completed enrollment in July 2024 and is currently ongoing.[1] After the EFS, the J-Valve TF System received an IDE from the FDA on May 29, 2024, to conduct the JOURNEY pivotal trial to assess the safety and efficacy of the J-Valve TF System to treat symptomatic, severe, native AR and AR-dominant mixed aortic valve disease in patients who are at high risk for surgical aortic valve replacement ("SAVR").  In late 2024, Edwards commenced the JOURNEY pivotal trial for the J-Valve TF System in the United States, with the first patient being enrolled in October 2024, expanding to ten patients by December, at which time, under the study protocol, enrollment was temporarily paused to allow the FDA to evaluate the

---

[1] https://clinicaltrials.gov/study/NCT06034028.

PX0053-011

**Confidential**

*Specification No. 2*

initial ten cases and to allow for further engagement with the FDA. Since then, enrollment has

resumed. [2] The pivotal trial is designed to enroll 194 patients and has an estimated primary

completion date of September 2027. [3]

Assuming successful conclusion of the trials, Edwards will need to submit a Premarket

Approval ("PMA") application to the FDA. Edwards is targeting PMA submission as soon as

possible following the trial. Edwards estimates, based on the current schedule, that the PMA

application would likely be submitted in 2028, however, Edwards stresses that such timelines are

frequently extended if there are any unforeseen developments during the clinical trials. If the

FDA grants PMA approval, Edwards will be able to start commercialization in the United States.

The J-Valve TF System will be commercialized as part of the Transcatheter Heart Valve

("THV") business of Edwards.

The system currently has no SKU and is internally identified under the project name J-

Valve, with the intention of commercializing it under the brand name SOJOURN™. As the

system is still under development and in clinical trials, there have been no commercial sales from

January 1, 2021 to date and thus no commercial rebates, discounts, or promotional expenses.

Edwards has applied for and received a Category B reimbursement approval from the Centers for

Medicare & Medicaid ("CMS"), which allows participating sites to submit claims for

reimbursement under Medicare's Clinical Trial Coverage Policies. In addition, Edwards, as the

sponsor of the trial, pays the individual investigators and sites for the administrative aspects of

the trial (e.g., taking of patient history, lab tests, CT and other diagnostics, reviewing case files,

etc.). In turn, Edwards charges $35,000 for the study device itself, the J-Valve TF System,

---

[2] https://www.clinicaltrials.gov/study/NCT06455787. ®
[3] https://www.clinicaltrials.gov/study/NCT06455787. ®

**Confidential**

*Specification No. 2*

which comprises of a J-Valve TF aortic valve, combined with the TF Delivery Device and Loading Accessories.[4] This charge is set for R&D purposes only and does not determine commercial pricing. As the trial sponsor, Edwards also provides technical and procedural support services, such as instructing the site investigators in proper use of the system, to ensure the safety of the system and successful outcomes.

Currently, Edwards does not manufacture the J-Valve TF Bioprosthesis or the J-Valve TF Delivery Device but instead sources these through a contract manufacturer (discussed further in Subpart (j)) who is paid ████████████████████████████.[5] Additional costs associated with developing the J-Valve TF System are booked as R&D expenses and described in below in Subpart (g). Edwards has not allocated corporate expenses for the J-Valve TF System project at this time. The business unit that will sell the system after PMA is obtained is Edwards's THV division.

Response to Subpart (d)

The Company currently mainly uses third party databases to collect clinical trial information and technical documentation. For more details please refer to the Company's response to Specification 12.

Response to Subpart (e)

As noted above, Edwards does not expect to commercialize the J-Valve TF System in the United States until 2028 at the earliest. In addition to the clinical testing and FDA regulatory approval process discussed above, Edwards has two other key milestones it must meet prior to commercialization: (1) Edwards plans to transfer the manufacturing of J-Valve TF System

---

[4] Edwards did not charge for the devices for the initial ten patients enrolled into the Journey trial.
[5] Edwards notes that these contractually agreed costs might dramatically increase in the case that the current tariffs issued by the United States vis-à-vis China are not resolved.

PX0053-013

**Confidential**

*Specification No. 2*

components to the United States (J-Valve component devices are currently manufactured by a contract manufacturer in China, discussed in Subpart (j)); and (2) Edwards plans to streamline and simplify the J-Valve TF System preparation process to improve implant performance. Edwards hopes to accomplish these milestones in parallel to conducting the pivotal clinical trials.

The J-Valve <u>transapical</u> system was approved by the Chinese regulator in May 2017 and continues to be sold only in Greater China by Genesis MedTech. Edwards intends to pursue commercialization of the J-Valve TF System outside the United States following commercial entry in the United States. Edwards's <u>transfemoral</u> version of the J-Valve TF System remains under development and is not approved or sold anywhere to date. ████████████████ ██████████████████████████████████████ ████████████████████████. ██████████████████████ ████████████████████████████████████

<u>Response to Subpart (f)</u>

As part of the acquisition of JC Medical, Edwards acquired patents owned by JC Medical. A list of these are provided in Annex to Spec 2(f).

<u>Response to Subpart (g)</u>

Edwards cannot estimate the exact cost of development of the J-Valve TF System, given that a significant part of the cost was incurred before Edwards acquired JC Medical from Genesis in July 2024, and the uncertainty around ongoing R&D costs and the clinical trial process.

Edwards paid Genesis MedTech ████████ to acquire JC Medical. Going forward, Edwards estimates that the research and development costs, including the costs of the pivotal trial and FDA PMA preparation, of the J-Valve TF System until approval will be roughly ████ ████████, assuming the trial is successful. Depending on results of the trial, the costs could

**Confidential**

*Specification No. 2*

be considerably higher.

Response to Subpart (h)

As explained in the response to Subparts (a)-(c) of this specification, the pivotal clinical trial for the J-Valve TF System began enrolling patients in October 2024 and is expected to conclude by September 2027, assuming there are no delays. The pivotal clinical trial is a prospective, single arm, multi-center interventional pivotal study based on a sample size of 194 patients, of which, as of December 2024, 10 have been enrolled. Edwards does not prepare any assessment of the likelihood of success of its clinical trials.

Response to Subpart (i)

The Company has only had one prior AR program, internally called Project Helios, which was conducted over ten years ago and never proceeded beyond a select number of compassionate use cases. While an initial concept for a device was developed and preliminarily assessed, it was ultimately determined that a substantial redesign of the technology available at the time would be necessary to proceed with development. Moreover, at the time, Edwards did not believe there was an addressable market for AR treatments. There are many reasons for this conclusion at that time, including significant diagnostic challenges, healthcare providers indicated that they did not have enough AR patients requiring TAVR, and that those patients requiring TAVR would be treated surgically. In the decade since the Helios project was discontinued, diagnostic capabilities and medical assessment have evolved. Edwards is now committed to developing transcatheter solutions for patients with AR through the acquisitions of JenaValve and JC Medical.

Response to Subpart (j)

The J-Valve TF System components for the pivotal trial are currently being produced for

14

**Confidential**

*Specification No. 2*

the Company by a contract manufacturer (an affiliate of Genesis MedTech), Suzhou Jiecheng Medical Technology Co., Ltd. (the "Supplier") at a facility in Suzhou, China.  The Supplier is supplying Edwards the entirety of the valves and delivery systems necessary to run the pivotal clinical trial in the United States.  As noted above, Edwards is planning to transfer commercial production of Edwards's J-Valve System ██████████████ ████████████████. Edwards is still in the early phases of this process. In a first phase, Edwards's goal is to replicate the ability to manufacture the current first generation of the system in the United States in order to then be able to improve upon both the system and the manufacturing process.  The current phase thus includes██████████████ ██████████████████████████████. Edwards personnel have been on multiple trips to China to visit the Supplier's manufacturing site, and have received technical specifications, drawings, etc.

It is important to emphasize that at this stage, production is not yet established on a commercial scale; the goal is general production capability at the end of the technology transfer phase.  Current very early phase planning is for an initial production capacity of approximately ██ units per month or ██ units per year, none of which will be for commercial use until Edwards begins with commercial roll out in approximately 2028, assuming no delays or changes in the product.  All of these systems produced in the initial 2-3 years until PMA will be for R&D purposes (as all pivotal trial valves are produced by the Supplier).  In addition to the technology transfer phase, a related aspect is supply management.  Edwards needs to engage with every single vendor and assess if it wants to continue to use them or change to a different vendor.

15

**Confidential**

*Specification No. 3*

**Specification No. 3**

State the location of each facility that researches, develops, manufactures, distributes, licenses, or sells, or has researched, developed, manufactured, distributed, licensed, or sold, any Relevant Product for the Company, and for each such facility state or provide:

(a)     a list of all Relevant Products researched, developed, manufactured, distributed, licensed, or sold from that facility;

(b)     whether the facility is owned by the Company, and if not owned by the Company, the name of the Person who owns the facility;

(c)     whether the facility was leased, acquired, or built by or for the Company, and, if not built by the Company, the name of the Person who built the facility for the Company or from whom the facility was leased or acquired;

(d)     the date of the facility's opening or acquisition, the length of time and cost in dollars required to open the facility from initial plan to full production, and its current estimated replacement cost and time necessary to replace it;

(e)     the date of the facility's opening or acquisition, the length of time and cost in dollars required to open the facility from initial plan to full production, and its current estimated replacement cost and time necessary to replace it; and

(f)     the Company's dedicated and FDA-approved capacity for each Relevant Product manufactured at the facility and the annual capacity utilization rate for the production of each Relevant Product, specifying all factors used to calculate capacity, the number of shifts normally used at the facility, and the feasibility of increasing capacity by 10% or more, including the costs and time required.

(g)     The quantity of each SKU of each Relevant Product researched, developed, manufactured, licensed, or sold from that facility.

**Response to Specification No. 3**

Edwards does not yet have an FDA approved TAVR-AR product, and thus does not sell or manufacture the Relevant Product in the Relevant Area. Its J-Valve system remains under development and subject to the pivotal clinical trial. Currently, Edwards has not yet established dedicated facilities for any Relevant Product, as will be discussed below.

Edwards's Supplier is current producing the entirety of the J-Valve TF Systems necessary to run the pivotal clinical trial in the United States. The Supplier's facility is located at C21

16

**Confidential**

*Specification No. 3*

Building, 218, Suzhou Industrial Park, Suzhou, China. Given that Edwards does not own this facility, it has no information on the initial cost or the replacement cost of the facility, nor of the capacity of the facility, its opening date or other requested information.

Edwards is currently planning to transfer production of J-Valve to the United States ██████. Edwards is still in the early phases of the production transfer process. In the first phase, Edwards's goal is to replicate the ability to manufacture the current first generation of the system in the United States in order to then be able to improve upon both the system and the manufacturing process. To that end, Edwards ███████████████████████████████████████████████████████████████████████████████. Edwards estimates the cost ████████████████ to be approximately ███████. Edwards expects to ████████████████████████████████validate a Gen 1.5 device (valve and delivery system). Once validated, Edwards expects to transfer the manufacturing of the Gen 1.5 device to ████████████and begin treating clinical patients as an extension of the current pivotal trial mid-way through 2026. All units would then be provided out of █████until U.S. PMA and commercial roll out in 2028 at the earliest.

The Irvine corporate headquarters are located at One Edwards Way, Irvine, CA 92614. The corporate headquarters facilities are owned by Edwards and used as corporate headquarters, for research and development, regulatory and clinical affairs, manufacturing, marketing, and administration.

As regards capacity, current very early phase planning is for an initial production capacity of approximately ███ units per month or ███ units per year. All of the systems produced in the initial year or two until PMA will be for R&D purposes (as all pivotal trial valves are produced by the Supplier). At the current stage, given the project's early stage, Edwards has no

17

**Confidential**

*Specification No. 3*

further estimates on planned capacity or cost of establishing the production facilities ████████
███████████ .

      In addition, Edwards has inherited one facility via its acquisition of JC Medical, located at 1580 Gilbreth Road, Burlingame, CA 94010. This facility is not owned by Edwards; it is leased, and Edwards currently does not plan to renew the lease. Edwards has already transferred most activities of JC Medical at this facility to its Irvine corporate headquarters facilities, including distribution.

18

PX0053-019

**Confidential**

*Specification No. 4*

**Specification No. 4**

For each product that the Company claims competes, or will compete, in any Relevant Area with each Relevant Product listed in response to Specification 2 above, provide:

(a)    the name and address of each of the Company's competitors in the research, development, manufacture, distribution, license, or sale of each competing product; and

(b)    a detailed description of each competing product's application or regulatory status at the FDA and any other applicable regulatory agency for each of its indication(s) or end use(s) and intended indication(s) or end use(s);

**Response to Specification No. 4**

In the following, Edwards provides information compiled from publicly available sources, to respond to this specification. Currently, there are no FDA-approved medical device products for the treatment of AR in the United States. To Edwards's knowledge, the following companies are pursuing research and development efforts to commercialize AR treatments.

Response to Subpart (a)

The following contact details are based on publicly available information from competitor websites, competitor LinkedIn profiles, and SEC filings:

Laguna Tech, Inc.
30 Hughes, Suite 205
Irvine, CA 92618

Micro Port Cardioflow Medtech Corporation
No. 1661 Zhangdong Road
Zhanjiang Hi-Tech Park
Pudong New District
Shanghai, PRC

Jenscare Scientific Co. Ltd.
Block B-5
777 4th Binhai Road
Hangzhou Bay New Area
Ningbo Zhejiang Province, PRC

19

**Confidential**

*Specification No. 4*

Biosensors International Group, Ltd.
36 Jalan Tukang
Singapore 619266

Koka Life Science Co., Ltd.
Floor 5
Caohejing C5
2555 Xiupu Road
Shanghai, PRC

Shanghai INT Medical Instruments Co. Ltd.
925-929 1st Jinyuan Road
Jiading District
Shanghai, PRC

Cuspa Medical
Wadi el-Haj Street 13
Nazareth, Israel

SAT (Strait Access Technologies)
313 Chris Barnard Building
Anzio Road
Observatory
Cape Town, 7925 South Africa

Wuhan Vickor Medical Technology Co. Ltd.
Building 3-03
No. 16 Fozuling 3rd Road
Donghu New Technology Development Zone
Wuhan, PRC

Response to Subpart (b)

A summary of the competing products and their regulatory status in the European Union

and the United States is below.

20

**Confidential**

*Specification No. 4*

**Table 4**

| Supplier | Product | Regulatory status |
|---|---|---|
| Laguna Tech | Alpha | Reported on first-in-human clinical trial in January 2024.[6] |
| Laguna Tech | Zeta | Reported in first-in-human clinical trial in June 2023.[7] Announced in October 2024 plans to start U.S. EFS/EU study in Q1 2025.[8] |
| MicroPort Cardioflow | Vitaflow Liberty | Currently undergoing a multicenter study in China to test its suitability to the treatment of AR.[9] |
| Jenscare | Ken-Valve | Obtained NMPA registration approval in China in early 2025.[10] |
| Koka | Pioneer | Multi-center clinical trial started in late 2023.[11] Entered Chinese NMPA's special review process in August 2024.[12] |
| Shanghai INT | Hanchor Valve | Multi-center and confirmatory clinical trials completed in November 2023 in China.[13] |

---

[6] https://lagunatechmed.com/laguna-tech-usa-announces-site-record-number-of-transcatheter-heart-valves-implanted-at-single-center-on-same-day-in-first-in-human-clinical-trial/.
[7] https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system/.
[8] Laguna Tech announced in October 2024 at the Transcatheter Cardiovascular Therapeutics ("TCT") conference in Washington, D.C., that Early Feasibility Studies for Zeta in the United States and the EU are planned to start in 2025.
[9] https://pubmed.ncbi.nlm.nih.gov/36243693/.
[10] https://www.marketscreener.com/quote/stock/JENSCARE-SCIENTIFIC-CO-LT-145080809/news/Jenscare-Scientific-Co-Ltd-Announces-Ken-Valve-Obtains-Registration-Approval-from-National-Medica-49424150/?utm_source=copy&utm_medium=social&utm_campaign=share.
[11] https://cardiovascularbusiness.com/topics/clinical/structural-heart-disease/TAVI/new-TAVI-system-pure-aortic-regurgitation and Lulu Lio et al, A Novel Designed TAVI Syste for Pure Aortic Regurgitation: First-in-Human Experience https://www.jacc.org/doi/10.1016/j.jcin.2023.08.021.
[12] https://www.cmde.org.cn/xwdt/shpgzgg/cxyxgsh/20240802151857125.html and https://www.163.com/dy/article/J9GCJ0VT0514CG7L.html (in Chinese).
[13] See https://bydrug.pharmcube.com/news/detail/bb9355cab70f8e04a1eb1f0d866ce666 (in Chinese Language).

21

**Confidential**

*Specification No. 4*

| Supplier | Product | Regulatory status |
|---|---|---|
| Cuspa Medical | Cusper | Completed pre-clinical proof of concept with plans for first in-human trials in 2025.[14] |
| Strait Access Technologies ("SAT") | SAT AR Valve System | Received approval from the health regulator in South Africa to begin the first clinical implants in humans.[15] |
| Wuhan Vickor | DOCS Valve | First in-human implantation in July 2023 in China.[16] |

Based on publicly available information, Edward's understanding of the regulatory status and the intended indication(s) or end use(s) for each competing or potentially competing relevant product is described below:

Laguna Tech

According to Laguna Tech, the *Alpha* TAVR system is a self-expanding transcatheter aortic valve replacement system designed to treat aortic regurgitation.[17]

Laguna Tech's website states that the *Zeta* heart valve "leverages the advantages of both balloon-expandable and self-expanding systems by combining materials and features to achieve a design that can simplify positioning and placement with 'self-expanding' anchor arms, plus the benefits of balloon-expandable accurate positioning, low pacemaker rates, and low valve height for coronary clearance."[18] Laguna Tech claims that *Zeta's* self-anchoring design makes it suitable for patients with different levels of calcification, including those with no calcification.[19]

---

[14] Elad Sapir, Cuspa Medical - Artificial Cusp to Treat Aortic Insufficiency | LSI USA '24.
[15] https://straitaccesstechnologies.com/about-sat/#clinical-trials.
[16] https://www.drvoice.cn/v2/article/11642 (in Chinese Language).
[17] https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system/.
[18] https://lagunatechmed.com/technology/.
[19] https://www.youtube.com/watch?v=O-_-ee6G08Y and https://citoday.com/news/laguna-tech-reports-on-zeta-tavr-

22

PX0053-023

**Confidential**

*Specification No. 4*

The following pictures show Laguna Tech's *Alpha* and *Zeta* TAVR valves:

**FIGURE 4-1**



*Source:  https://citoday.com/news/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system and https://lagunatechmed.com/.*

According to its website, Laguna Tech is currently carrying out international clinical trials of its *Alpha* and *Zeta* TAVR systems for treating AR and AS.[20]  Laguna Tech also states on its website that they have acquired patents in the United States, "Strengthening the Company's Intellectual Property Position in the crowded TAVR Market."[21]

According to publicly available sources, (1) the first-in-human clinical trial of Laguna Tech's *Alpha* valve started in June 2023,[22] (2) the first successful treatment with the *Alpha* system occurred in June 2023 in Tbilisi, Georgia,[23] (3) the first-in-human trial of the *Zeta* valve occurred in October 2023.[24]  In Chile, feasibility studies have started, with five patients

---

systems-fih-feasibility-trial.
[20] https://lagunatechmed.com/.
[21] https://lagunatechmed.com/post-3/.
[22] https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system/.
[23] https://www.globenewswire.com/news-release/2023/10/24/2765560/0/en/Laguna-Tech-USA-Announces-Newly-Designed-Heart-Valves-with-Advanced-Engineering-Successfully-Implanted-in-First-in-Human-Clinical-Trial.html and https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-TAVI-system/.
[24] https://lagunatechmed.com/.

PX0053-024

**Confidential**

*Specification No. 4*

successfully treated with the *Zeta* system in a clinical trial in January 2024.[25]  Laguna Tech announced in October 2024 at the Transcatheter Cardiovascular Therapeutics ("TCT") conference in Washington, D.C., that Early Feasibility Studies for Zeta in the United States and the EU are planned to start in 2025.  There have been no further public updates from Laguna Tech about the status of its clinical trials.

**FIGURE 4-2**



*Source:   Early Experience with the LagunaTechZeta Balloon-Expandable TAVR for Non-Calcific Regurgitation and Calcific Stenosis, presented by Dr. D. Scott Lim.*

<u>MicroPort Cardioflow</u>

The following pictures show the CardioFlow's *VitaFlow Liberty* TAVI valve and delivery system:

---

[25] See https://lagunatechmed.com/laguna-tech-usa-announces-site-record-number-of-transcatheter-heart-valves-implanted-at-single-center-on-same-day-in-first-in-human-clinical-trial/.

PX0053-025

**Confidential**

*Specification No. 4*

**FIGURE 4-3**



*Source:  https://www.medicaldevice-developments.com/news/cardioflow-secures-ce-mark-approval-for-vitaflow-liberty-system/.*

The *VitaFlow Liberty* TAVI system has regulatory approval in China, the EU, India, and South Korea.[26]  In January 2022, MicroPort registered the AURORA study in the Chinese Clinical Trial Registry.[27]  The AURORA study is a "prospective, multicenter, single-arm cohort study to evaluate the safety and efficacy of transfemoral TAVR for severe AR in patients with high or prohibitive risk for surgery."[28]  Patients in the study "are ≥ 65 years and diagnosed with severe pure AR."[29]  The study is expected to be completed in May 2025.[30]

In September 2024, a medical team at Jiangxi Provincial People's Hospital implanted *VitaFlow Liberty* on three AR patients.[31]

---

[26] https://microport.com/news/vitaflow-liberty-flex-transcatheter-aortic-valve-implantation-system-receives-market-approval-from-nmpa; https://microport.com/news/microport-cardioflow-receives-approval-for-vitaflow-liberty-in-the-eu; https://microport.com/news/microport-cardioflows-vitaflow-liberty-obtains-marketing-approval-in-india; https://microport.com/news/microport-cardioflows-vitaflow-liberty-obtains-marketing-approval-in-south-korea.

[27] https://pubmed.ncbi.nlm.nih.gov/36243693/.

[28] https://pubmed.ncbi.nlm.nih.gov/36243693/.

[29] https://pubmed.ncbi.nlm.nih.gov/36243693/.

[30] https://clinicaltrials.gov/study/NCT04864145?a=4.

[31] https://mp.weixin.qq.com/s?__biz=MjM5OTM4NTUzMw==&mid=2653592211&idx=2&sn=f6914157a64141fbab967ef88c0cd37&chksm=bdcb4689b294c6308b6fb7b96236cc965337fea3c025a3045ddee91a5e61973438af82d81274&scene=27 (in Chinese Language).

25

**Confidential**

*Specification No. 4*

<u>Jenscare Scientific</u>

Jenscare's TAVR system, *Ken-Valve*, is designed to treat AR.[32]  The following images depict Jenscare's *Ken-Valve* and delivery system*:*

**FIGURES 4-4 & 4-5**



*Source:  https://www.jenscare.com/new/445.html.*



*Source:  https://en.jenscare.com/product/244.html.*

In its 2023 annual report, Jenscare provides the following description of Ken-Valve:

Ken-Valve, our Core Product and our proprietary first-generation transcatheter aortic valve replacement ("TAVR") system, is designed for the treatment of patients with severe aortic regurgitation or combined with aortic stenosis. Ken-Valve is a Class III medical device under the classification criteria of the NMPA.

---

[32] https://en.jenscare.com/product/244.html.

PX0053-027

**Confidential**

*Specification No. 4*

After the completion of the one-year follow up work of the confirmatory clinical trial in May 2023, the registration application for Ken-Valve was accepted by the NMPA in October 2023 and it is expected that we shall obtain the NMPA approval for the commercialization of Ken-Valve in the second half of 2024. In October 2023, the registration application for Ken-Valve was accepted in the priority approval process of the NMPA for medical devices. For details, please refer to the announcement of the Company dated 30 October 2023.[33]

In March 2025, Jenscare announced that *Ken-Valve* had obtained registration approval from the NMPA, and that it is actively promoting the commercialization of *Ken-Valve* at this time.[34]

Koka Lifesciences

Koka Lifesciences' *Pioneer* system is a self-expanding TAVR device designed to treat AR.[35]

The following image depicts the *Pioneer* system:

**FIGURE 4-6**



*Source:  https://cardiovascularbusiness.com/topics/clinical/structural-heart-disease/tavr/new-tavr-system-pure-aortic-regurgitation.*

---

[33] https://en.jenscare.com/upload/2024-04/171445540708192200.pdf, p. 15.
[34] https://en.jenscare.com/new/412.html.
[35] https://www.kokalife.com/en.php.

27

**Confidential**

*Specification No. 4*

According to a research letter published in the Journal of American College of Cardiology, between January and April 2023, ten patients were implanted with Pioneer as part of a first-in-human study in China.[36]  Koka Lifesciences claims that "the implantation of this novel TAVR-AR system is feasible and safe.  Short-term outcomes were described as excellent, with no mortality, and overall success rate was 100%."[37]  The research letter states that a "large multicenter clinical trial is currently being designed to further assess the mid-term safety and efficacy of this TAVR system."[38]  On August 2, 2024, *Pioneer* TAVR was approved to enter the NMPA's special review process for innovative medical devices.[39]

<u>Shanghai INT</u>

The *HanchorValve* system is a balloon-expandable TAVR product, designed to treat patients with severe AR and AS via a transfemoral approach.[40]

A slide deck shared at TCT 2024 includes a description of *HanchorValve*'s components:

---

[36] Liu, L, Qin, C, Shi, J. et al. A Novel Designed TAVR System for Pure Aortic Regurgitation: First-in-Human Experience. J Am Coll Cardiol Intv. 2023 Nov, 16 (21) 2690–2691,https://doi.org/10.1016/j.jcin.2023.08.021.
[37] https://www.jacc.org/doi/10.1016/j.jcin.2023.08.021.
[38] https://cardiovascularbusiness.com/topics/clinical/structural-heart-disease/TAVI/new-TAVI-system-pure-aortic-regurgitation and Lulu Lio et al, A Novel Designed TAVI Syste for Pure Aortic Regurgitation: First-in-Human Experience https://www.jacc.org/doi/10.1016/j.jcin.2023.08.021.
[39] https://www.cmde.org.cn/xwdt/shpgzgg/cxyxgsh/20240802151857125.html and https://www.163.com/dy/article/J9GCJ0VT0514CG7L.html (in Chinese).
[40] https://www.tctmd.com/slide/novel-transfemoral-aortic-valve-replacement-system-hanchor-valve-pure-native-aortic.

28

**Confidential**

*Specification No. 4*

**FIGURE 4-7**



*HanchorValve* is delivered via balloon inflation catheter, shown in the following picture:

**FIGURE 4-8**



*Source:  https://int-medical.com/en/col209/index.*

According to a CMB International report, the first in-human implantation of

*HanchorValve* was completed in January 2021.[41]  Subsequently, Shanghai INT Medical initiated

---

[41] See https://pdf.dfcfw.com/pdf/H3_AP202203221554154966_1.pdf.

29

**Confidential**

*Specification No. 4*

a multi-center clinical trial to evaluate *HanchorValve*'s effectiveness.[42]

In January 2023, Shanghai INT Medical launched confirmatory clinical trials in collaboration with Zhongshan Hospital, affiliated with Fudan University.[43] The trials were reported to be completed in November 2023.[44]

Cuspa Medical

The following images depict the *Cusper* repair device and delivery catheter as well as its repair mechanism:

**FIGURES 4-9, 4-10**



*Source:* *https://cuspamedical.com/.*

---

[42] See https://pdf.dfcfw.com/pdf/H3_AP202203221554154966_1.pdf.
[43] See https://www.cn-healthcare.com/articlewm/20230114/content-1498597.html (in Chinese Language).
[44] See https://bydrug.phamcube.com/news/detail/bb9355cab70f8e04a1eb1f0d866ce666 (in Chinese Language).

PX0053-031

**Confidential**

*Specification No. 4*



*Source:* *https://eurointervention.pcronline.com/article/transcatheter-aortic-valve-repair-for-aortic-regurgitation-with-the-cusper-device.*

**FIGURE 4-11**



*Source:* *https://cuspamedical.com/.*

      As stated on Cuspa Medical's website, *Cusper* repair device "merges with the native aortic valve and prevents backward blood flow into the left ventricle during diastole, ensuring comprehensive and effective repair."[45]  Cuspa Medical states that its device offers a solution that preserves future choices by enabling immediate AR repair while allowing for transcatheter aortic valve implantation options in the future.  At LSI USA 2024 Emerging Medtech Summit, Cuspa

---

[45] https://cuspamedical.com/.

31

**Confidential**

*Specification No. 4*

Medical CEO Elad Sapir presented on Cuspas's completion of initial *in vivo* studies and plans to have first in-human trial for its *Cusper* device in the first half of 2025.[46]  A slide deck shared at TCT reported that Cuspa is currently set to commence pivotal clinical trials in 2028.[47]

    Strait Access Technologies ("SAT")

    According to SAT's website, SAT's TAVI valve is designed to treat both AR and AS.[48] The following images depict the SAT's AR Valve and TAVR deployment device:

**FIGURES 4-12 & 4-13**



*Source:  https://straitaccesstechnologies.com/about-sat/.*



*Source:  https://straitaccesstechnologies.com/tavr-system/.*

    Following pre-clinical testing, SAT has received approval from SAHPRA, the healthcare regulator in South Africa and the Human Ethics Committee ("HEC") at Groote Schuur Hospital to begin the first clinical implants of its TAVR device.[49]  SAT's website states that, as of

---

[46] Elad Sapir, Cuspa Medical - Artificial Cusp to Treat Aortic Insufficiency | LSI USA '24.
[47] *See* Cuspa slide deck from TCT 2024.
[48] https://straitaccesstechnologies.com/the-medical-need/#aortic-stenosis-and-aortic-regurgitation.
[49] https://straitaccesstechnologies.com/about-sat/#clinical-trials.

PX0053-033

**Confidential**

*Specification No. 4*

November 2024, SAT's products are currently available for investigational use in selected countries.[50]

Wuhan Vickor

Wuhan Vickor develops the *DOCS VALVE® Transcatheter aortic Valve Replacement System*. The company states that system is suitable for the treatment of both AS and AR patients.[51]

The following image depicts the Wuhan Vickor DOCS delivery system and valve:

**FIGURE 4-14**



*Source*: *https://www.vickor.com.cn/news_xq/49.html*.

In July 2023, it was reported that Vickor Medical, in cooperation with Wuhan Union Hospital of China, completed the first implant of *DOCS VALVE* in a patient with AR.[52]

---

[50] https://straitaccesstechnologies.com/tavr-system/.
[51] https://en.vickor.com.cn/Product_xq/12.html.
[52] https://www.drvoice.cn/v2/article/11642 (in Chinese Language).

33

**Confidential**

*Specification No. 5*

**Specification No. 5**

For each Relevant Product manufactured, distributed, licensed, or sold in the Relevant Area, submit (a) one copy of all current selling aids and promotional materials and (b) all documents relating to advertising and marketing Plans and strategies.

**Response to Specification No. 5**

Response to Subpart (a)

Pursuant to FTC Staff's Modification Letter dated February 5, 2025, for purposes of this specification, the definition of "Relevant Product" in Definition D. 16 is limited to TAVR-AR devices. There are no TAVR-AR products approved for commercial sale in the Relevant Area. Nor does Edwards own or control any TAVR-AR products for sale in any jurisdiction, and Edwards does not have current selling aids or promotional materials for any TAVR-AR device. Documents responsive to this specification, to the extent they exist, are provided in Edwards's production of the documents to the Commission.

Response to Subpart (b)

Documents responsive to this specification are included in Edwards's production of documents to the Commission.

34

**Confidential**

## Specification No. 6

Submit all documents relating to the Company's or any other Person's Plans relating to any Relevant Product in the Relevant Area, including, but not limited to, business plans; short-term and long-range strategies and objectives; expansion or retrenchment plans; research and development efforts; presentations to management committees, executive committees, and boards of directors; plans to combine any Relevant Product with any other Relevant Product (whether or not currently researched, developed, manufactured, distributed, licensed, or sold by the Company); and budgets and financial projections. For regularly prepared budgets and financial projections, the Company need only submit one copy of final year-end documents for prior years, and cumulative year-to-date documents for the current year.

## Response to Specification No. 6

Documents responsive to this specification are included in Edwards's production of the documents to the Commission. For regularly prepared budgets and financial projections, Edwards incorporates by reference its response to Specification 13 at EW-FTC-11067661—EW-FTC-11071558.

PX0053-036

**Confidential**

*Specification No. 7*

**Specification No. 7**

Submit all documents relating to competition in the research, development, manufacture, distribution, license, or sale of any Relevant Product in the Relevant Area, including, but not limited to, market studies, forecasts and surveys, and all other documents relating to:

(a)     the Sales, market share, or competitive position of the Company or any of its competitors;

(b)     the relative strength or weakness of Persons researching, developing, manufacturing, distributing, licensing, or selling each Relevant Product;

(c)     the relative strength or weakness of each type of Relevant Product being researched, developed, manufactured, licensed, or sold by any company;

(d)     supply and demand conditions;

(e)     allegations by any Person that any Person that researches, develops, manufactures, licenses, or sells any Relevant Product is not behaving in a competitive manner, including, but not limited to, customer and competitor complaints; and threatened, pending, or completed lawsuits; and

(f)     any actual or potential effect on the supply, demand, cost, or price of any Relevant Product as a result of competition from any other possible substitute product, whether currently on the market or in development.

**Response to Specification No. 7**

Response to Subparts (a)-(f)

Documents responsive to this specification are included in Edwards's production of the documents to the Commission.

36

Case 1:25-cv-02569-RC   Document 182-8   Filed 02/11/26   Page 65 of 152

**Confidential**

*Specification No. 8*

<u>**Specification No. 8**</u>

Submit:

(a)  all documents relating to the Company's or any other Person's price lists, pricing plans, pricing policies, pricing forecasts, pricing strategies, price structures, pricing analyses, price zones, and pricing decisions relating to any Relevant Product in any Relevant Area; and

(b)  all studies, analyses, or assessments of the pricing or profitability of any Relevant Product sold or provided by the Company, or through other channels of trade in any Relevant Area.

<u>**Response to Specification No. 8**</u>

<u>Response to Subparts (a)-(b)</u>

Documents responsive to this specification are included in Edwards's production of the documents to the Commission.

PX0053-038

**Confidential**

*Specification No. 9*

**Specification No. 9**

Submit all documents relating to the Company's past acquisitions, mergers, partnerships or licensing agreements related to any Relevant Product (including, but not limited to, Edwards' acquisition of JC Medical, Inc.), including, but not limited to whether the transaction had or will have any impact on the Company's internal development programs, plans for the manufacture, distribution, license, or sale of any Relevant Product, or sales strategy.

**Response to Specification No. 9**

     Documents responsive to this specification are included in Edwards's production of the documents to the Commission.

PX0053-039

**Confidential**

*Specification No. 10*

**Specification No. 10**

Describe, and submit all documents relating to, the Company's plans to study, research, develop, manufacture, market, distribute, license, or sell any Relevant Product together or in combination with any other Relevant Product.

**Response to Specification No. 10**

 Pursuant to FTC Staff's Modification Letter dated February 5, 2025, for purposes of this specification, the definition of "Relevant Product" in Definition D. 16 is limited to TAVR-AR devices.  For the avoidance of doubt, Edwards has no plans to study, research, develop, manufacture, market, distribute, license, or sell any Relevant Product together or in combination with any other Relevant Product.  Documents responsive to this specification, to the extent they exist, are provided in Edwards's production of the documents to the Commission.

39

PX0053-040

**Confidential**

*Specification No. 11*

**Specification No. 11**

Identify the Person(s) at the Company responsible for creating or monitoring price strategy, price zones, pricing practices, and pricing policies for each Relevant Product in each Relevant Area. Describe in detail the Company's pricing strategy, pricing practices, and pricing policies, including, but not limited to:

(a)    a description regarding how, and how often, the prices for each Relevant Product in the Relevant Area are determined;

(b)    whether, and how, pricing based on Customer characteristics, presence of other competitors, or other factors are used by the Company in determining the prices for each Relevant Product in the Relevant Area; and

(c)    whether, and how, price zones and/or pricing based on geographic areas, the presence of local competitors, or other factors are used by the Company for each Relevant Product in the Relevant Area.

**Response to Specification No. 11**

Edwards does not currently have any commercial pricing strategies, pricing practices, or pricing policies related to the Relevant Product as the J-Valve system has yet to receive and is not close to receiving FDA approval. Typically, as is the case for TAVR-AR, Edwards will not develop any pricing strategies, practices, or policies until a product is close to receiving FDA approval and subsequent commercialization.

For the sake of completeness, Edwards notes that while there are no commercial sales, Edwards has applied for and received a Category B reimbursement approval from CMS, which allows participating sites to submit claims for reimbursement under Medicare's Clinical Trial Coverage Policies. In addition, Edwards, as the sponsor of the trial, pays the individual investigators and sites for the administrative aspects of the trial (e.g., taking of patient history, lab tests, CT and other diagnostics, reviewing case files, etc.). In turn, Edwards charges $35,000 for the study device, the J-Valve TF System, which comprises of a J-Valve TF aortic valve,

40

**Confidential**

*Specification No. 11*

combined with the TF Delivery Device and Loading Accessories.[53]  This charge is set for R&D purposes only and does not determine commercial pricing.  As the trial sponsor, Edwards also provides technical and procedural support services, such as instructing the site investigators in proper use of the system, to ensure the safety of the system and successful outcomes.

Larry Wood, Corporate Vice President of Transcatheter Heart Valves at Edwards, is expected to be responsible for creating or monitoring price strategy, pricing practices, and pricing policies for TAVR-AR product in the United States if, and when, an Edwards TAVR-AR system is approved and available for commercial sale.

---

[53] Edwards did not charge for the devices for the initial ten patients enrolled into the Journey trial.

41

**Confidential**

*Specification No. 12*

## Specification No. 12

Identify each electronic database used or maintained by the Company in connection with any Relevant Product at any time after January 1, 2021, that contains information concerning the Company's (i) products; (ii) facilities; (iii) production; (iv) shipments; (v) bids or sales proposals; (vi) sales; (vii) prices; (viii) margins; (ix) costs, including but not limited to production costs, distribution costs, standard costs, expected costs, and opportunity costs; (x) patents or other intellectual property; (xi) research or development projects; or (xii) Customers.  For each such database:

(a)     describe the (i) database type, i.e., flat, relational, or enterprise; (ii) fields, query forms, and reports available or maintained; (iii) software product(s) or platform(s) required to access the database;

(b)     for each Relevant Product in each Relevant Area, compile and submit one or more Data Sets from the database comprising data used or maintained by the Company at any time after January 1, 2021 that constitutes, records, or discusses:

    (i)     discount requests or approvals (including rebates and other promotions);

    (ii)     sales personnel call reports;

    (iii)     meeting competition requests or approvals;

    (iv)     win/loss reports;

    (v)     prices, quotes, estimates, or bids submitted to any Customer;

    (vi)     the results of any bid or quote submitted to any Customer or prospective Customer; and

    (vii)     customer relationships.

(c)     for each Data Set provided in response to Specification 10(b), provide a data dictionary that includes:

    (i)     a list of field names and a definition for each field contained in the Data Set;

    (ii)     the meaning of each code that appears as a field value in the Data Set; and

    (iii)     the primary key in the Data Set or table that defines a unique observation.

The Company should consult Instruction I 3 regarding the inclusion of Sensitive Personally Identifiable Information or Sensitive Health Information in a Data Set(s) responsive to Specification 10.

PX0053-043

**Confidential**

*Specification No. 12*

**Response to Specification No. 12**

Edwards does not market or sell any Relevant Product in the United States, as J-Valve is still in the pivotal trial phase.  Accordingly, Edwards does not have any database responsive to Specification 12(b).  As regards other databases, all relevant data and databases which in any way relate to Relevant Products at Edwards are essentially inherited through Edwards acquisition of JC Medical.  However, as Edwards will describe, there is very limited responsive data that Edwards is able to provide.

JC Medical was acquired by Edwards in July 2024.  At the time of acquisition, it was still a small start-up with less than 15 employees.  Its only product, J-Valve, was and still is in development and undergoing clinical trials.  The vast majority of databases and files that Edwards inherited as part of the JC Medical acquisition are files and data that is either entirely technical in nature, such as CAD-files and design specifications for J-Valve, or which concerns patient data in the context of the clinical trials, which both are not relevant to the investigation and would be extremely burdensome to produce.

As regards other databases, JC Medical was part of Genesis Medtech from 2022 until Edwards acquired it in July 2024.  During this time, JC Medical was integrated into Genesis Medtech's ERP system, which was SAP based.  As Edwards does not use SAP, and has no access or licenses to use SAP, the inherited data is essentially useless to Edwards, and is not being used going forward.  Edwards is currently working on integrating JC Medical into its own ERP systems, which are described further below.  However, this process, which initiated in January 2025, is still in a very early stage and will likely not be concluded for ████████.  J-Valve is currently in the pivotal trial stage and manufacturing of the valve systems for the clinical trial is being performed by the Supplier in Suzhou, China.  Edwards has no access to any database in China.

43

**Confidential**

*Specification No. 12*

The following is an overview of potentially responsive Edwards databases:

<u>JD Edwards ("JDE")</u>[54]: JDE is Edwards primary ERP system. All day-to-day business operations are managed through JDE, including finance, business operations, distribution, supply chain management, production, etc. After acquiring a business, such as JC Medical, Edwards works to integrate its acquisitions into its JDE ERP. However, as migration of JC Medical, is not yet complete, cost and research & development data (to the extent it is being tracked) is being consolidated through Edward's OneStream consolidation function.

<u>OneStream</u>: OneStream is a dedicated SaaS tool for financial consolidation. It pulls data from JDE and other systems and databases to report on consolidated financial statements. OneStream is used to generate regular financial reports, including P&L statements, balance sheets, and cash flow statements. Cost data responsive to Specification 12 (specifically, research & development costs associated with the J-Valve), have been reported through OneStream since approximately January 2025. This data, to the extent it is available, has been produced in response to Specification 13 at EW-FTC-11067661—EW-FTC-11071558.

<u>Medidata Rave Electronic Data Capture ("EDC") System ("Rave")</u>: For the sake of completeness, Edwards uses the Rave database as its clinical trial database. However, as indicated above, Edwards considers this and related databases and its contents which it uses for clinical trials not to be responsive to the investigation, as they are exclusively used for the purposes of the pivotal trial of J-Valve. ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[54] Despite the name, there is no relation between Edwards and the company providing this software.

**Confidential**

*Specification No. 12*



45

PX0053-046

**Confidential**

*Specification No. 13*

## Specification No. 13

Provide each financial statement, budget, profit and loss statement, cost center report, profitability report, and any other financial report regularly prepared by or for the Company on any periodic basis, since January 1, 2021, including, but not limited to, such statements and reports for the Company as a whole; for each of the Company's facilities, sales offices, and distribution facilities relating to the research, development, manufacture, license, sale, or provision of any Relevant Product in each Relevant Area; and for any product line or Customer for any Relevant Product in each Relevant Area. For each such statement, budget, or report, state how often it is prepared, and identify the Person responsible for its preparation; provide all such statements and reports on both a quarterly basis and a yearly basis. For each Relevant Product, provide all regularly prepared Customer profitability reports and product line profitability reports.

## Response to Specification No. 13

In the ordinary course of business, Edwards generates financial reports on a monthly, quarterly, and annual basis. JC Medical reports are integrated into Edwards's financial reporting. Table 13 lists the type, frequency, and person(s) responsible for regularly prepared financial reports prepared for Edwards as a whole or relating to any Relevant Product.

### Table 13: Categories of Regularly Prepared Financial Reports

| Document Category | Preparation Frequency | Person(s) Responsible for Preparation |
|---|---|---|
| 10K | Annually | Andy Dahl, Senior Vice President, Principal Accounting Officer / Tonya Jones, Edwards Vice President, Finance |
| 10Q | Quarterly | Andy Dahl, Senior Vice President, Principal Accounting Officer / Tonya Jones, Edwards Vice President, Finance |
| Management Reports | Monthly | Andy Dahl, Senior Vice President, Principal Accounting Officer / Tonya Jones, Edwards Vice President, Finance |

PX0053-047

**Confidential**

*Specification No. 13*

| Document Category | Preparation Frequency | Person(s) Responsible for Preparation |
|---|---|---|
| THV Management Reports | Monthly | Elaine Farrell, Formerly, Senior Vice President, THV Finance<br>Laura Egan, Senior Vice President, THV Finance |
| Budget Report | Annually | Andy Dahl, Senior Vice President, Principal Accounting Officer / Tonya Jones, Edwards Vice President, Finance |
| Budget Reports | Monthly | Andy Dahl, Senior Vice President, Principal Accounting Officer / Tonya Jones, Edwards Vice President, Finance |
| THV Budget Reports | Monthly | Elaine Farrell, Formerly, Senior Vice President, THV Finance<br>Laura Eagan, Senior Vice President, THV Finance |

*Monthly Management Reports*

Monthly management reports are companywide financial reports and are prepared using a bottom-up approach, where information is collected from each business unit and consolidated in the report. These reports are distributed to the CFO and each head of Edwards's business units.

Pursuant to FTC Staff's Modification Letter dated February 5, 2025, for purposes of this specification, the definition of "Relevant Product" in Definition D. 16 is limited to TAVR-AR products. THV is the only business unit at Edwards responsible for the research, development, manufacture, license, sale, or provision of TAVR-AR products. The THV monthly management reports reflect consolidated financial information within Edwards's THV business unit. The companywide and THV monthly management reports that have been prepared since January 1, 2021, are provided in Edwards's production to the Commission at EW-FTC-11067661—EW-

47

**Confidential**

*Specification No. 13*

FTC-11071558.

*Budget Reports*

Edwards prepares an annual budget.  In addition, the financial reporting team prepares monthly budget reports throughout the year.[55]  Budget reports are also prepared on a monthly basis within each business unit which are then consolidated at the corporate level into the companywide monthly budget reports.  The budget reports are not regularly provided to the Executive Leadership Team members other than the CFO, but may be provided upon request. The companywide annual budget reports and companywide and THV monthly budget reports that have been prepared since January 1, 2021, are provided in Edwards's production to the Commission at EW-FTC-11067661—EW-FTC-11071558.

---

[55] Although budget reports are generally prepared monthly, there are circumstances in which a monthly report is not prepared and skipped until the following month.

PX0053-049

**Confidential**

## Specification No. 14

State the name and address of each Person that has entered or attempted to enter into, or exited from, the provision of each Relevant Product in any Relevant Area from 2014 to the present. For each such Person, state:

(a)     the product(s) it sells or provides, sold or provided, or attempted to sell or provide in the Relevant Area;

(b)     the date of its entry into, attempted entry into, or exit from the market; and

(c)     whether such Person constructed a new facility, converted assets previously used for another purpose, or began using facilities that were already being used for the same purpose.

## Response to Specification No. 14

Currently, there are no FDA-approved medical device products for use to treat AR via transcatheter implantation in the United States. Edwards incorporates by reference its response to Specification 2 which provides details on the status of its own potential products.

Edwards incorporates by reference its response to Specification 4 which provides details on competitors who are developing competing transcatheter medical devices to treat AR and the current status of their potential products.

Edwards incorporates by reference its responses to Specifications 2-4 which provide details on capacity and facilities.

49

PX0053-050

**Confidential**

*Specification No. 15*

## Specification No. 15

For each Relevant Product, identify or describe (including the bases for your response) and submit all documents relating to:

(a)     requirements for entry into the production or sale of the Relevant Product in the Relevant Area including, but not limited to, research and development, planning and design, production requirements, distribution systems, service requirements, patents, licenses, Sales and marketing activities, and any necessary governmental and Customer approvals, and the time necessary to meet each such requirement;

(b)     the total costs required for entry into the sale of the Relevant Product; the amount of such costs that would be recoverable if the entrant were unsuccessful or elected to exit the manufacture or sale of the Relevant Product; the methods and amount of time necessary to recover such costs; and the total Sunk Costs entailed in satisfying the requirements for entry;

(c)     barriers to entry into the provision of the Relevant Product in the Relevant Area, including but not limited to network and Customer lock-in effects and regulatory or licensing requirements;

(d)     possible new entrants into the sale of the Relevant Product in the Relevant Area; and

(e)     the Minimum Viable Scale, the minimum and optimum plant size, production line size, capacity utilization rate, production volume, requirements for multi-plant, multi-product, or vertically integrated operations, or other factors required to attain any available cost savings or other efficiencies necessary to compete profitably in the manufacture or sale of the Relevant Product.

## Response to Specification No. 15

### Response to Subparts (a)–(c)

The requirements for entry, costs required for entry, and barriers to enter into the sale of the Relevant Product differ dramatically between (i) an effective first-mover that develops and commercializes a first-in-indication TAVR-AR system in a market that does not presently exist, and (ii) a follower that enters the market after it has been developed by a first-mover such as Edwards.  We will discuss these situations in turn.

50

**Confidential**

*Specification No. 15*

Entry into the market[56] for TAVR-AR systems requires, at minimum, the development of a TAVR-AR valve and delivery system, validation of the procedure through clinical testing and regulatory approval, as well as development of related services such as HCP training & support, treatment protocols, etc. However, because no TAVR-AR market presently exists, a first-mover entrant must also make certain additional investments necessary for the manufacture, distribution, and commercialization of a first-in-indication TAVR-AR system and procedure. Each entry requirement is described in response to Specification 21 (and incorporated herein by reference) and summarized below.

- **Product Development.** The development of a TAVR-AR system requires the creation of a valve capable of slotting within and replacing the native aortic valve. Such a valve must be capable of achieving several medically and mechanically challenging design specifications, including but not limited to: crimping (the valve must be able to be compressed so that it fits within the femoral artery or other a blood vessel); integration into a TAVR delivery system (the valve must be mountable on a catheter); delivery to the aortic valve (the delivery system with the crimped valve must be steerable so that it can travel from an incision in the leg, through the vasculature, up and over the aortic arch and positioned at the center and correct height of the native aortic valve); expansion (the valve must be able to expand within the aortic valve area, whether by balloon or other mechanism or feature, so that it can be correctly placed in the

---

[56] Edwards uses terms as defined in the Second Request solely for compliance purposes, but in doing so, does not necessarily agree that these terms are accurately defined, does not waive any right to dispute the meaning of these defined terms, and does not necessarily agree that any of them describe a relevant product or geographic market under the antitrust laws.

51

**Confidential**

patient's anatomy); and durability (the valve must be flexible enough to withstand crimping and expansion but strong enough to remain functional for the remainder of the patient's life). A developer must also create a protocol for performing the TAVR procedure.

Development of a valve, the related TAVR system, and the TAVR-AR procedure is a highly complex and iterative process that does not necessarily proceed in a linear fashion, and includes multiple failures along the way. Depending on a range of factors (including some within and others beyond a developer's control), the development of a TAVR-AR system takes at least several years but potentially a decade, or even more, with length of development time expected to be longer for an early pioneer vs. one or more fast followers as a market is developed. For illustrative purposes, development can be characterized into five phases: (i) initial concept development, (ii) product design, (iii) prototyping, (iv) device testing, and (v) design verification and validation. However, because development is an iterative and non-linear process, a device may not necessarily proceed through each phase in order and may remain in one phase for a substantial period of time. Similarly, research projects often fail or yield unexpected results, requiring the project to pivot and restart based on the learnings gathered thus far.

The product development stage of a TAVR-AR system can be significantly improved by combining technologies and/or know how in way that yields a higher functioning and scalable product. In the case of TAVR-AR, this could potentially take place through the acquisition of technology from a third

52

**Confidential**

*Specification No. 15*

party, including a number of TAVR-AR systems that are under development by a range of third parties around the world. Just as is the case for Edwards, which would benefit from combining technologies and iterating approaches of both the J-Valve TF System and the JenaValve system, such an approach could be beneficial for other players in the market. Specifically, the product development steps relating to a TAVR delivery system, which are specifically designed for the valve that is delivered, may be shortened by firms that already have experience in the development and design of TAVR delivery systems in use for other treatments.

- **Pre-market clinical trials.** Clinical trials are a necessary step for obtaining marketing approval for medical devices. As a Class III medical device, a TAVR-AR system must complete (at least) two clinical trials. First, it must demonstrate viability through a preliminary **Feasibility Study**. Then, it must progress to a larger, statistically driven trial designed to assess its safety and effectiveness for a specific intended use (a **Pivotal Study**). Execution of these clinical trials requires, inter alia, securing approvals from the FDA (e.g., an IDE for each trial), establishing clinical study sites and recruiting healthcare providers, enrolling (or recruiting) patients, supervising study execution, and data analysis. For example, the JOURNEY pivotal trial involves identifying, imaging, and analyzing information about each patient's condition, which allows Edwards to learn how to image patients and size valves appropriately. The size, duration, and cost of a study vary based on the characteristics of the study, device, patient population, endpoints, device efficacy, data analysis, and input

PX0053-054

**Confidential**

*Specification No. 15*

from the FDA. This also requires developing proper proctoring and procedural support capabilities to ensure the clinical trials can be run smoothly.

- **Regulatory Approval.** TAVR-AR systems are Class III medical devices and, therefore, require FDA PMA before being marketed within the United States. Securing a PMA requires the submission of an application demonstrating the device is safe, effective, and non-inferior to the prevailing standard of care through the results of clinical trials and other testing. The length and cost of PMA approval depends on several factors, including the strength of the application and the existence of any FDA concerns.

- **Production and Supply Chain.** To sell TAVR-AR systems at scale, an entrant must develop a supply chain and manufacturing infrastructure capable of producing the device and associated delivery systems reliably in a commercially viable quantity and at a profitable cost. This requires capital expenditure for manufacturing equipment, production facility(ies), raw materials, inventory, and operational personnel. The cost of establishing a supply chain and manufacturing infrastructure can vary significantly based on, inter alia, economies of scale, vertical integration, reliance on third-party fabricators, the complexity of the device, and material costs.

- **Commercialization.** Presently, no market exists for a TAVR-AR system. Therefore, any first-mover attempting to enter the TAVR-AR market will need to expend significant resources towards generating demand for a TAVR-AR system (i.e., "create the market" for TAVR-AR). Any first-mover entrant will need to invest in: educating healthcare professionals ("HCPs") on methods for AR

54

**Confidential**

*Specification No. 15*

diagnosis, developing treatment guidelines and protocols; establishing a network of Key Opinion Leaders ("KOLs") dedicated to raising awareness for AR and the TAVR-AR procedure; educating HCPs on the feasibility and effectiveness of the TAVR-AR system and procedure; training the interventional cardiologists who will perform the TAVR-AR procedure on the system; and negotiating reimbursement schemes with payors. For example, because of the lack of therapy options for AR, methods for diagnosing AR are underdeveloped. First-mover entrants need to be able to make the significant investment and have the expertise necessary to build trust in the TAVR-AR system and procedure among HCPs, KOLs, and patients. The Company's response to Specification 21 provides more detail on first mover challenges to creating the market for TAVR-AR.

- **Post-market clinical trials.** Following entry and initial commercialization, for the purposes of complying with FDA regulations, as well as the development of next-generation devices, a developer will need to closely monitor the performance of its device and collect valuable feedback from physicians. Additionally, FDA requires medical device manufacturers to track all devices.[57]

Critically, the barriers to entry posed by these entry requirements are not symmetric across all developers. Since no TAVR-AR market presently exists, the cost of product development, completing clinical trials, securing regulatory approval, building supply chains and manufacturing capabilities, establishing a reimbursement pathway, and ultimately

---

[57] https://www.fda.gov/medical-devices/postmarket-requirements-devices/medical-device-tracking.

55

**Confidential**

*Specification No. 15*

commercializing a TAVR-AR system will be substantially greater for a first-in-indication device than subsequent entrants. This is because follow-on devices will be able to free-ride on the first-mover's innovations, clinical discoveries, regulatory approvals, reimbursement pathways, physician education and adoption, and investments in supply chain development and demand generation. For further details regarding the costs associated with entry and creation of the TAVR-AR market and how the Transaction will reduce these barriers for followers, please see Edwards's response to Specification 21.

The practical consequence of these asymmetric entry barriers is that a first-mover, by making the investments necessary to create the TAVR-AR market, will ignite competition by enabling follow-on competitors to develop and commercialize competing systems faster, at a lower cost and into an established market.

Edwards, unlike JenaValve, has the resources and experience necessary to create the TAVR-AR market. Consequently, the Transaction will increase competition by empowering Edwards to immediately undertake the investments needed to create the TAVR-AR market, thereby creating the market, stimulating entry, and lowering the barriers to entry by follow-on devices. For further details regarding how the Transaction will increase competition, please see Edwards's response to Specification 21.

Response to Subpart (d)

Edwards refers to its response to Specification 4, which provides an overview of companies currently developing TAVR-AR systems. Established large players in the medical device industry, such as Medtronic, Abbot, or Boston Scientific, could also be able to develop their own TAVR-AR systems (or acquire a product now in development) and enter the market and will be more likely to do so if Edwards is able to successfully establish the market. For

56

**Confidential**

*Specification No. 15*

further details regarding the likelihood of entry once Edwards successfully creates the TAVR-AR market, please see the Edwards's response to Specification 21.

<u>Response to Subpart (e)</u>

Edwards is unable to estimate the information requested by Subpart (e) because Edward's internal TAVR-AR program is ███████████████████████████████

███████████████████████████████████████████ Likewise, as Edwards lacks information about other developers' costs, operations, or profitability, it cannot speak to these factors.

PX0053-058

**Confidential**

## Specification No. 16

State whether the Company has entered into the provision of any Relevant Product in the Relevant Area from January 1, 2019 to the present and provide date(s) of entry. For each Relevant Product in the Relevant Area, describe in detail the steps taken by the Company to enter, including but not limited to steps related to research and development, planning and design, production, distribution, patents, licenses, sales and marketing activities, and any necessary governmental and Customer approvals, and the time required to complete each step. For each entry event provide the costs associated with each step taken by the Company to enter.

## Response to Specification No. 16

### No Relevant Product on the Market

Edwards does not have an FDA approved TAVR-AR product, and thus does not sell a Relevant Product in the Relevant Area. Edwards's only TAVR-AR asset—the J-Valve TF System—was acquired through Edwards's July 2024 acquisition of JC Medical and remains in development.

As the J-Valve TF System has not received FDA commercial approval and is still undergoing clinical trials, Edwards has not taken any steps or made any plans relating to sales, distribution or marketing activities.

Edwards has not researched or developed any other TAVR device to treat AR patients besides the J-Valve TF System since 2019.

### Early Development of J-Valve by JC Medical

Before it was acquired by Edwards in July 2024, JC Medical was responsible for the initial development efforts for what would become the J-Valve TF System. Development began in 2009, when a cardiac surgeon and a mechanical engineer commenced development efforts and founded JC Medical. The product was originally designed for transapical implantation (i.e., access via the left ventricular apex in a much more invasive procedure), whereas Edwards is currently conducting

58

**Confidential**

*Specification No. 16*

clinical trials and continued R&D for a system using transfemoral implantation (i.e., access via the femoral artery in a less invasive procedure). Transapical TAVR and transfemoral TAVR differ by the point of access for the implantation procedure:

**FIGURE 16**



*Source:* *https://www.cardiosurgeon.co.uk/treatment-guide/aortic-valve/.*

As shown in the graphic above, a transapical TAVR system is inserted into the heart through a small incision in the left side of chest in between the ribs. This allows access to the apex (tip) of the heart. A catheter is inserted through the apex wall of the heart and into the left ventricle to reach the diseased aortic valve. The old valve is pushed aside and the new valve is expanded to take its place. By contrast, a transfemoral TAVR procedure does not require invasive incisions in the chest or in the heart. Instead, implantation in the transfemoral procedure is performed through a small incision in the groin, through which the delivery system is used to advance the catheter (carrying the valve) through the femoral artery and the vascular system, leading to the aorta, until it reaches the diseased aortic valve. Transapical and transfemoral TAVR delivery systems thus necessarily have different designs, and must be able to deliver the valve at different orientations to suit the procedure.

59

**Confidential**

*Specification No. 16*

Early design of the transapical J-Valve system took place in the United States with manufacturing established in China. In 2017, the transapical J-Valve system received commercial approval in China.

In 2018, JC Medical began design of a transfemoral system. First in-human implantation of this new transfemoral system took place in Canada in 2018.[58] Between 2019 and 2022, JC Medical experienced significant financial difficulties, resulting in a near-total shutdown of its business activities and operations. During this time, JC Medical's operations were limited to the sale of its legacy transapical J-Valve system in China. JC Medical was acquired by Genesis MedTech in 2022, and restarted further development efforts towards a transfemoral system. In order to transform J-Valve from transapical to transfemoral, JC Medical made a number of critical changes to the device to improve hemodynamic performance of the valve. These changes include changing the tissue material from porcine aortic root to bovine pericardium and changes in the fabric material, including to its thickness and production process.

In August 2023, JC Medical received IDE approval from the FDA to conduct an EFS. The study involved 25 patients and was successfully enrolled in July 2024, with an estimated completion date of August 2029.[59] JC Medical then planned and applied for a pivotal trial for the J-Valve TF System, which was approved by the FDA on May 29, 2024.

**Acquisition by Edwards – Pivotal study**

JC Medical was acquired by Edwards in July 2024. Following the acquisition by Edwards, JC Medical's pivotal study was initiated in late 2024, with the first enrollment in October 2024.

---

[58] https://www.businesswire.com/news/home/20180531005361/en/JC-Medical-Announces-First-in-Human-Treatment-with-the-Unique-Transfemoral-J-Valve-TAVI-Device-for-Aortic-Regurgitation#:~:text=About%20JC%20Medical,%2C%20Europe%2C%20Canada%20or%20Japan.
[59] https://clinicaltrials.gov/study/NCT06034028. In addition, around 34 compassionate use case patients were treated.

**Confidential**

*Specification No. 16*

The pivotal clinical trial will involve a sample size of 194 patients. By December 2024, the initial milestone of ten enrolled patients had been reached, after which, under the study protocol, enrollment was temporarily paused to allow the FDA to evaluate the initial ten cases and to allow for further engagement with the FDA. Since then, enrollment has continued. The estimated primary completion date of the pivotal study is September 2027.[60] Given the uncertainty with such trials, Edwards cannot at this time speculate about outcomes and results. If the trial is successful, the next step would be to seek a PMA from the FDA. Assuming a successful trial, Edwards is targeting PMA no earlier than 2028. If PMA is granted, Edwards will be able to start commercialization in the United States.

**Manufacturing Transfer**

The J-Valve TF System components for the pivotal trial are currently being produced for Edwards by the Supplier at a facility in Suzhou, China. The Supplier is providing Edwards the entirety of the J-Valve TF System components necessary to run the pivotal clinical trial in the United States. Edwards is planning to transfer production of the J-Valve TF System components to its ██████████████ ██████████████████████ in the next ████████████. See Edwards's response to Specification 3 for more details on the production facilities in the United States.

Edwards is still in the early phases of this production transfer process. In a first phase, Edward's goal is to replicate the ability to manufacture the current first generation of the system in the United States in order to then be able to improve upon both the system and the manufacturing process. The current phase thus consists in ████████████, which includes

---

[60] https://www.clinicaltrials.gov/study/NCT06455787?term=J%20Valve&rank=1.

PX0053-062

**Confidential**

*Specification No. 16*

a ████████████████████████████████████████████████████.

The tech transfer can be broken down into three aspects.

- <u>Managing clinical inventory:</u> ████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████.

- <u>Setting up production lines:</u> Edwards personnel have been on multiple trips to
  China to visits the Supplier's manufacturing site, and obtained from the Supplier
  and Genesis MedTech the necessary technical specifications, drawings, etc., and
  transferred these to ████. In ████, Edwards personnel must establish that they
  can build everything in-house and pass relevant testing. It is important to
  emphasize that at this stage, ████████████████████████
  ████████████. ████████████████████████
  ████████████████.

- <u>Supply Chain Management:</u> Edwards is currently working to engage with every
  single vendor and assess whether they will remain Edwards vendor or a new
  vendor should be secured.

**Improving the J-Valve TF System**

In addition to the clinical trial and the manufacturing transfer, to improve implant
performance and scalability, Edwards plans to streamline and simplify ████████████
████████████████████████████████████████
████████████████████████████.

- <u>Manufacturing:</u> Edwards aims to simplify the ████████████████

62

**Confidential**

*Specification No. 16*

███████████████████████████████████████████████

███████████████████████. Given that Edwards is just in the process of

technology transfer ████████████████████████████, it cannot yet

describe in detail how it will simplify the process. Significant R&D is necessary

to streamline this process.

- Procedural Improvements: Currently, the process of preparing the valve for

  implantation by attaching it to the delivery system is highly complex and time

  consuming. For example, █████████████████████████████

  ███████████████████████████████████████████████

  ███████████████████████████████. ███████████

  █████████████████████████████████

  ██████████████████████████████████████

  ██████████████████████. This time is acceptable in a clinical trial

  setting, it is not feasible for commercial use of the system, as the process is too

  slow and not scalable. ███████████████████████████

  ███████████████████████████████████████████████

  ████████████████████████████.

**Development Cost**

It is not possible for Edwards to give an accurate estimate of the total development costs

for the J-Valve TF System. A significant part of the development effort took place before

Edwards acquired JC Medical. Moreover, JC Medical itself went through different stages,

initially being a start-up company which was later acquired by Genesis Medtech. While being

part of Genesis MedTech, JC Medical was run as a start-up out of a larger company, submitting

63

**Confidential**

*Specification No. 16*

financial reports to Genesis MedTech. At the time that Edwards acquired JC Medical, it only had twelve employees and two consultants. Edwards does not have access to any financials of Genesis MedTech.

Based on information provided by former JC Medical employees, Edwards best estimate is that a total of around ███████ was spent by JC Medical to develop J-Valve until JC Medical was acquired by Genesis MedTech in 2022. After being acquired by Genesis MedTech, JC Medical internal estimates were that, assuming the ability to leverage manufacturing and other corporate resources of its new owner Genesis MedTech, it needed an additional ██████ to complete a pivotal trial in the United States.

Based on this information, Edwards estimates the total cost to develop J-Valve TF System prior to the JC Medical acquisition by Edwards was between ████████████ . Edwards paid Genesis MedTech ████████ to acquire JC Medical. Edwards estimates that the future cost for the pivotal trial and obtaining regulatory approval is approximately ████████ assuming the trial is successful. If unsuccessful, the costs could be considerably higher.

In addition, Edwards expects integration expenses of ██████ spread out over three to four years from 2024 onwards. Edwards also expects R&D expenses of approximately ██████ .

**IP Rights**

Edwards acquired IP rights and patents relevant to the J-Valve TF System as part of the JC Medical acquisition. Edwards incorporates by reference its response to Specification 2 Subparts (f)-(h) for more detailed information regarding the IP rights acquired.

64

Confidential

*Specification No. 17*

## Specification No. 17

Submit all documents (except engineering and architectural Plans and blueprints) relating to any Plans of the Company or any other person for the construction or leasing of new facilities, the closing of any existing facilities, or the expansion, conversion, or modification (if such modification has a planned or actual cost of more than $500,000) of current facilities for the sale of any Relevant Product.

## Response to Specification No. 17

Documents responsive to this specification are included in Edwards's production of the documents to the Commission.

65

PX0053-066

**Confidential**

*Specification No. 18*

<u>**Specification No. 18**</u>

Identify, and state whether the Company is a member of or subscribes to, all trade associations, information services, and other organizations relating to the provision of any Relevant Product. Submit one copy of all documents that discuss or describe production, sale, prices, competition, or entry conditions relating to the Relevant Product submitted by the Company or any other person to each such association, service and organization or its agents. Submit one copy of all documents that discuss or describe production, sale, prices, competition, or entry conditions relating to the Relevant Product received by the Company or any other person from each such association, service and organization or its agents.

<u>**Response to Specification No. 18**</u>

Edwards is not a member of any trade association, information service, or other organization specifically related to the production or sale of TAVR-AR. Edwards is a member of the following trade associations or other organizations which relate more generally to the production or sale of medical devices in the United States:

- Advanced Medical Technology Association ("AdvaMed")

- Medical Device Manufacturers Association ("MDMA")

- California Lifesciences ("CLS")

- BioUtah

- National Health Council

- iBIO

Documents responsive to this specification, to the extent they exist, are included in Edwards's production of the documents to the Commission, and are hereby incorporated by reference as responsive to this specification.

66

**Confidential**

**Specification No. 19**

Submit all documents relating to any plans of, interest in, or efforts undertaken by the Company or any other Person for any merger, acquisition, divestiture, joint venture, alliance, collaboration, license, research and development, manufacturing, supply, or marketing agreement, or litigation or patent interference settlement of any kind involving the research, development, manufacture, distribution, license, or sale of any Relevant Product other than the currently Proposed Transaction.  Provide a copy of all submissions provided to any regulatory agency relating to or in connection with any prior transaction involving the manufacture, distribution, license, or sale of any Relevant Product in the Relevant Area other than the Proposed Transaction.

**Response to Specification No. 19**

Documents responsive to this specification are included in the Company's production of the documents to the Commission.

67

**Confidential**

*Specification No. 20*

**Specification No. 20**

Identify each non-U.S. competition or antitrust authority that the Company has notified (or intends to notify) of the Proposed Transaction, and for each authority:

(a)     state the date (or expected date) the authority was (or is expected to be) notified;

(b)     provide copies of all documents (including draft filings) submitted to the authority, including but not limited to, notifications and appendices, remedies submitted to a reviewing authority or authorities for market testing, white papers, responses to requests for information, and competitive impact submissions;

(c)     state the date (or expected date) the authority completed (or will complete) its review; and

(d)     submit a copy of any draft or final order, decision to enter a new stage of investigation (e.g., a 6(1)(c) decision by the European Commission), Statement of Objections, or request for additional information, issued by the authority in connection with its review.

**Response to Specification No. 20**

Response to Subparts (a) & (c)

Edwards provides the following chart in response to Specification 20.

**Table 20**

| Country | Governmental Authority | Notification Date | Completion of Review/Estimated Approval Date |
|---|---|---|---|
| United Kingdom | Competition and Markets Authority ("CMA") | August 8, 2024 | September 26, 2024 – CMA's email notification of no further inquiry into the transaction. |
| Austria | **Phase 1 review:** Bundeswettbewerbsbehörde ("BWB") / Federal Competition Authority ("FCA"), AND Federal Cartel Prosecutor<br><br>**Phase 2 review:** Austrian Cartel Court<br><br>**Phase 2 appeal:** Austrian Supreme Court | September 11, 2024 | April 2, 2025 – Austrian Supreme Court held that BWB and FCA lacked jurisdiction to review the transaction. |

68

**Confidential**

*Specification No. 20*

| Country | Governmental Authority | Notification Date | Completion of Review/Estimated Approval Date |
|---|---|---|---|
| Germany | **Phase 1 & Phase 2 review:** Federal Cartel Office ("FCO") | September 11, 2024 | February 20, 2025 – FCO's official decision to close the case for lack of jurisdiction to review the transaction. |

Response to Subparts (b) & (d)

      Documents responsive to Subparts (b) and (d) have been included in Edwards's

production of documents to the Commission at EW-FTC-50000001—EW-FTC-50003300 and

EW-FTC-50008162—EW-FTC-50008209.

69

**Confidential**

*Specification No. 21*

**Specification No. 21**

Submit all documents (except documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues) relating to the Proposed Transaction and provide:

(a)     a timetable for the Proposed Transaction, a description of all actions that must be taken prior to consummation of the Proposed Transaction, and any harm that will result if the Proposed Transaction is not consummated or is delayed;

(b)     a detailed description of (including the rationale for) all Plans for changes in the Company's and JenaValve's operations, structure, policies, strategies, corporate goals, financing, business, officers, employees, or any other area of corporate activity as a result of the Proposed Transaction.  Identify all documents directly or indirectly used to prepare the Company's response to this subpart;

(c)     a detailed description of the reasons for the Proposed Transaction and the benefits, costs, and risks anticipated as a result of the Proposed Transaction; and

(d)     the effect of the Proposed Transaction on any research and development activities, including, but not limited to any plans to consolidate or terminate such efforts;

(e)     a detailed description of all statements or actions by any Person (identifying the Person by name, title, and business address) in support of, in opposition to, or otherwise expressing opinions about the Proposed Transaction or its effects.

**Response to Specification No. 21**

Response to Subpart (a)

Pursuant to the Agreement and Plan of Merger dated July 23, 2024 (the "Agreement"),

Edwards will acquire 100% of the voting securities of JenaValve Technology, Inc. (the

"Proposed Transaction") following satisfaction or waiver of the closing conditions ████████

████████████████████████████████████████████████████████████████

████████████████████████████████.[61]  Edwards anticipates closing the

Proposed Transaction in mid-2025.

Further delay in closing the Proposed Transaction will result in substantial and serious

---

[61] *See* HSR 3(b)-1.

70

**Confidential**

*Specification No. 21*

harm to the parties, as well as their employees, customers, shareholders, and, most critically, patients. The Proposed Transaction will expand the treatment options for patients suffering from AR, accelerate the timing and scale of the market entry of JenaValve's Trilogy TAVR-AR system in the United States, and increase the likelihood that such entry is successful. Critically, the Proposed Transaction will establish a market for TAVR treatment options for patients suffering from severe AR more quickly and comprehensively than would otherwise occur. The potential market is undeveloped and under-researched, and significant investment will be required to train physicians to properly diagnose and treat AR patients. Currently, JenaValve faces multiple challenges, as described in more detail below, in establishing a TAVR-AR market and will continue to face those challenges absent the Proposed Transaction.

Any further delay in the Proposed Transaction could slow and limit the scope of commercial entry of JenaValve's Trilogy system and thus delay care for tens of thousands of patients in the United States suffering from AR and cost thousands of lives. Delay and related uncertainty also distracts the companies involved in the Proposed Transaction and their employees from planning for the future as effectively and from running their business on a day-to-day basis.

This is further compounded by the fact that it is highly likely that once Edwards establishes the market as the first entrant, many other entrants will follow. This is because follow-on devices will be able to free-ride on the first-mover's innovations, clinical discoveries, regulatory approvals, reimbursement pathways, physician education and adoption, and investments in supply chain development and demand generation. This process of encouraging innovative competition in the space is delayed the longer it takes for Edwards to enter the market.

71

**Confidential**

*Specification No. 21*

Response to Subparts (b) – (d)

**Transaction Rationale**

The rationale for the Proposed Transaction can be best understood through the lens of the first-mover challenges any developer will face when bringing a first-in-indication medical device to a market of this nature.

At baseline, all Class III medical devices, including TAVR-AR devices, must receive FDA PMA to be commercialized in the United States. PMA is the most stringent type of device marketing application required by the FDA, requiring that a developer provide sufficient valid scientific evidence to assure that the device is safe and effective for the intended use.[62] Collection of the requisite scientific evidence requires volumes of non-clinical and clinical research, which can take decades to complete and cost hundreds of millions of dollars.[63] Even then, success is highly uncertain, with approximately 40% of devices that enter clinical trials ultimately failing to receive PMA approval.[64]

While all Class III medical devices require PMA approval, approval for follow-on systems is often faster and substantially less costly due to certain positive innovation externalities created by the first-in-indication device's approval. For example, a fast follower may be able to leverage scientific discoveries from earlier clinical trials to avoid costly redesigns; copy clinical trial design and diagnostics to create a more efficient and cost-effective clinical trial protocol; rely on industry expertise and familiarity with the new device and disease

---

[62] *See* Pre Market Approval, Food and Drug Administration, https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-approval-pma.
[63] *See* Alyn Sertkaya, Rebecca DeVries, Amber Jesup, Trinidad Beleche, *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US*, 1 JAMA Netw. Open. 5 (Sep. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9475382 (estimating the mean expected capitalized development cost per therapeutic complex Class III medical device was $522 million).
[64] *Id.* at Table 1.

PX0053-073

**Confidential**

*Specification No. 21*

state to spin up trial sites at lower cost; or leverage awareness built by the first device to find and attract eligible patients faster and with lower overhead. Due to these positive innovation externalities, first-to-market devices often incur significant costs not borne by follow-on devices.

Apart from PMA approval, a first-in-indication device cannot be successfully deployed at scale to patients (i.e., commercialized) without overcoming several additional non-regulatory hurdles. First, in the absence of viable treatments, a disease such as AR is typically underdiagnosed, and there is an absence of diagnostic guidelines and training for physicians. Second, and relatedly, HCPs are highly unlikely to recommend use of or adopt an unvalidated medical device with which they have little training or experience, especially if the new device is neither supported by KOLs nor authorized by payors (i.e., established reimbursement). Third, a first-mover entrant must not only supply its devices to the marketplace, but also must train HCPs on the diagnosis and use of a wholly novel system, which will require, *inter alia,* establishing a network of sales and support personnel. Fourth, the first-mover must incur the education and start-up costs associated with building a network of suppliers capable of producing the complex inputs for the novel system (i.e., develop a supply chain), knowledge and capabilities a follow-on developer can subsequently capitalize on by, *inter alia*, replicating proven infrastracture and best practices pioneered by the first mover, leveraging now-exisitng supply chains and knowhow, or competing for now-experienced labor. These first-mover costs are illustrated in the following graphic:

PX0053-074

Confidential

*Specification No. 21*

**FIGURE 21**



Specifically with respect to TAVR-AR and related procedures, these non-regulatory hurdles for a first-mover are particularly pronounced, with each hurdle heightening the risk of failure. To successfully commercialize a first-in-indication TAVR-AR device and procedure, a developer will need to:

- **Develop and educate professionals on methods for AR diagnosis.** At present, AR is incompletely understood and severely underdiagnosed. According to Edwards's research and estimates, AR occurs in approximately 0.4% of all adults, in 1% of individuals aged 65-74 years, and 2% of individuals over 70 years of age. AR is a condition where the aortic valve, which controls blood flow from the left ventricle to the aorta, does not close tightly, thus allowing blood to leak back into the left ventricle, causing the heart to work

74

**Confidential**

*Specification No. 21*

harder.  Although severe symptomatic AR is debilitating and progressive (24% of such patients die within one year when symptomatic AR is left untreated), AR is severely underdiagnosed because it is a "silent disease" (i.e., not easily detectable by standard screening procedures, such as a stethoscope) and only symptomatic at an advanced stage of development (i.e., at the onset of heart failure).  In other words, AR does not present in a manner easily detectable by standard screening methods.

Even in cases where AR is suspected, it is not easily diagnosed.  Unlike AS, which is mainly diagnosed via CT, the diagnosis of AR today is done primarily via echocardiogram.  This approach is unreliable, difficult, and prone to false negatives.  While more complex cases may be more easily diagnosed via MRI, only severely ill patients are, at this time, progressed from a simple echocardiogram to an MRI, which means many treatable patients are not identified or at least not identified early enough.

Due to the present limitations in AR awareness and diagnosis, an estimated 82% of patients aged 50 or older in need of just a simple echocardiogram for diagnosis do not receive one.  And even when an echocardiogram is ordered, 50% of echocardiograms fail to capture the correct measurements (left ventricular end-systolic volume index measurements) and 25% have not resulted in clear documentation of AR severity.  Edwards presently estimates that about 118,000 patients in the United States currently suffer from severe symptomatic AR, of which approximately 16,000–24,000 are likely at extreme or high surgical risk but are currently untreated.  These substantial numbers are likely an underestimate given the diagnostic challenges described above.

The underdiagnosis and late diagnosis also pose treatment challenges.  By the time many patients have progressed to the point that they are severly symptomatic and a

75

Confidential

*Specification No. 21*

diagnosis is made, they are no longer eligible for the current therapy, involving open heart surgical replacement of the aortic valve.  Current guidelines dictate that symptomatic patients with chronic severe AR should undergo SAVR.  SAVR is open heart surgery, performed under general anesthesia, that necessitates use of cardiopulmonary bypass as well as cardiac arrest.  SAVR is an extensive intervention that can jeopardize vital organ functions, particularly in older patients, potentially leading to increased morbidity and mortality.  Furthermore, due to the high incidence of complications, patient discomfort, and the presence of concomitant illnesses, many individuals do not qualify as suitable candidates for SAVR.

Successful commercialization of a TAVR-AR device will require investment to substantially improve the detection and diagnosis rate for AR.  This requires, *inter alia*, researching and developing better imaging protocols, creating a standardized diagnostic protocol, and raising HCP awareness of AR through education programs.

- **Establish a network of KOLs promoting publications on AR and available solutions.** KOLs are trusted and respected physicians, researchers, or other healthcare experts with specialized knowledge in a particular area who influence healthcare practices and decisions through their research, publications, and teaching.  KOLs play a crucial role in shaping clinical practice, influencing patient care, and contributing to the development and adoption of new medical technologies and therapies.  KOLs are a primary and foundational component for building awareness and trust in a medical device and procedure.  Within the highly complex and evolving healthcare knowledge space, it is not feasible for all practicing HCPs to remain abreast of all medical developments.  Instead, most HCPs rely on KOLs to assess novel devices, build trust in the procedure, and filter

76

**Confidential**

*Specification No. 21*

out those developments that should become a standard of care from those that are more niche. In this way, for commercialization of a device (and thus for the benefits of the device to be realized by patients), it is critical to invest the necessary resources to encourage KOLs to learn about, understand, and buy into a novel procedure's benefits. Without such buy-in, building HCP awareness and trust will be substantially more challenging (and may not be possible).

In Edwards's experience, while the development of a novel device for an untreated patient population organically generates some KOL interest, the level of KOL engagement necessary to accelerate HCP adoption of a novel device requires a significant investment of time and resources into KOL education and engagement, including: presenting research, preparing educational materials, investing in KOL training on the procedure, and funding KOL research and early adoption. Edwards, therefore, expects that any first-mover will need to have substantial expertise in new product introductions and expend significant resources to build KOL networks. KOL interest in a TAVR-AR procedure and the resulting knowledge advancements are necessary preconditions for the development of first-in-indication devices, but the benefits from building a robust KOL network are not exclusive to the first mover. For example, follow-on developers will be able to leverage existing networks and established protocols to accelerate their own devices' development, approval, and commercialization.

- **Develop treatment guidelines and protocols.** During and subsequent to PMA approval, developers of a first-in-indication therapy must develop and refine guidelines and protocols for (i) screening patients, (ii) pre-procedure set-up, (iii) performance of the procedure, and (iv) post-procedure monitoring and care. Development, testing,

77

**Confidential**

*Specification No. 21*

validation, and refining of these guidelines and protocols is necessary for building HCP trust in the procedure and ensuring optimal patient outcomes, yet it is expensive and requires significant experience with the disease, industry, and treatment landscape. Especially in incompletely understood diseases like AR, the development of new diagnosis and treatment protocols requires input from a broad network of experts and multiple rounds of iteration. Establishing networks of experts willing to invest their time and resources into refining a TAVR-AR device and procedure is, therefore, critical to the procedure's ultimate commercial success. The developer bears the cost of protocol development through funding the trials and procedures, maintaining a large staff of researchers and clinicians, analyzing procedure data, preparing educational materials, and promulgating findings.

In Edwards's experience, investment in the development of procedure guidelines and protocols is critical to the successful commercialization of a first-in-indication device, as inadequate protocols can slow PMA approval, hinder KOL buy-in, reduce physician trust in the procedure, and – in the worst case scenario – result in suboptimal patient outcomes that not only harm the affected patients but also can stunt the development and acceptance of a new treatment and procedure. Subsequent market entrants are able to avoid many of the associated development costs by free-riding on the first-mover's findings and best practices.

- **Educate HCPs on the feasibility and effectiveness of the TAVR-AR procedure.** While KOL publications and support are instrumental to building *awareness* and *familiarity* with a novel procedure, in Edwards's experience, developers must provide additional *education* and *training* to build HCP trust in the feasibility and effectiveness of

78

**Confidential**

*Specification No. 21*

TAVR-AR relative to existing alternatives (e.g., surgical valve replacement) to the extent such alternatives exist for some patients, and confidence in their own ability to, in this case, use the transcatheter system to successfully impant the valve to treat the AR patient.

Educating HCPs on highly complex procedures like TAVR-AR requires a large, high-touch field force able to closely engage with HCPs, including in-procedure case support for each TAVR-AR procedure by a clinical field specialist. This field force must have the training necessary to educate HCPs on AR diagnosis standards, demonstrate the procedure, address questions and concerns, proctor cases, and provide on-site support, especially for an HCP's initial procedures. While hiring, training, and maintaining a field force with these capabilities is expensive, the cost is necessary because HCPs are highly unlikely to invest in learning a novel procedure they do not understand, feel is inadequately supported, or are concerned may not achieve a risk-adjusted benefit for patients. This is especially the case for first-in-indication devices because, unlike follow-on devices, novel devices are not able to free-ride on a first-mover's prior investments in awareness and education.

- **Set up manufacturing and distribution for TAVR-AR devices at scale.**

Commercialization of any device requires manufacturing capabilities necessary to sustain market demand at scale. This is especially the case for first-in-indication devices, where HCPs may not undertake the costs of learning a new procedure if they are not confident in having a consistent supply or have concerns about quality control. Thus, in Edwards's experience, a developer cannot create a market for a first-in-indication device without first investing in a reliable, quality-controlled supply chain that is able to sustain the procedure at scale. This often requires a substantial investment of time and resources in

79

Confidential

*Specification No. 21*

developing suppliers' capability and know-how with respect to the efficient manufacture of the system and its inputs, especially for a complex medical device like a TAVR-AR system, which requires high levels of precision in manufacuring unique, bespoke, materials. Additionally, impending tariffs have increased supply chain uncertainty and would materially impact manufacturing costs. By comparison, follow-on developers do not require the same up-front investments in supply chains because they are able to compete with the first-mover for individual opportunities without needing to ensure supply to the entire market. Additionally, follow-on developers may be able to reduce their costs by imitating proven infrastructure and best practices pioneered by the first-mover, leveraging now-exisitng supply chains and knowhow, or competing for now-experienced labor.

- **Negotiate reimbursement schemes with payors**. A first-in-indication device cannot feasibly be commercialized until it is approved for reimbursement by payors. Typically, this requires, at minimum, a National Coverage Determination ("NCD") from CMS to provide reimbursement for the hospitals implanting the new device. In Edwards's experience, successfully securing an NCD from CMS and subsequently negotiating payor approval and reimbursement rates requires demonstrating to the satisfaction of the payor that the procedure to patients is safe and effective and achieves superior patient benefits relative to alternative treatments (including non-treatment). This poses a chicken-and-egg problem: while payors are unwilling to pay until a first-in-indication device has proven demand (i.e., well-diagnosed patients), demonstrated KOL and HCP buy-in, established treatment protocols, and a reliable supply chain, it is also the case that securing buy-in, developing diagnostic and treatment protocols, and fully investing in

80

**Confidential**

*Specification No. 21*

comprehensive supply chains is not possible without a likelihood of payor approval.

In Edwards's experience, a first-mover best resolves this challenge by simultaneously addressing all hurdles to commercialization. Although this approach requires a significant upfront investment, which may not be returned for a substantial period of time, it is the most reliable path to successful commercialization. This problem does not exist for follow-on devices, as they may free-ride on a first-mover's substantial up-front investment in securing payor approval.

**Development of Trilogy**

Edwards undertook the Proposed Transaction because it is better positioned than JenaValve (or anyone else) to progress Trilogy through the PMA process, overcome the first-mover challenges, and ultimately create a viable TAVR-AR market.

Unlike Edwards, which has decades of experience developing and commercializing first-in-indication TAVR and other structural heart devices, JenaValve is poorly capitalized (relative to what is needed for approval and successful commercialization), lacks experience in late-stage device development, including the necessary experience to address manufacturing challenges and optimize manufacuring processes, and has no track record of successfully commercializing medical devices – either as a first mover or in a follow-on capacity. Indeed, across each of the necessary preconditions for PMA approval and commercialization of the Trilogy device, JenaValve has no clear pathway to overcoming the difficult first-mover challenges to successfully launch and foster utilization of its device. Thus, by acquiring JenaValve, Edwards maximizes the likelihood Trilogy will be successfully and swiftly approved and broadly commercialized, thereby benefitting patients and enhancing competition by overcoming the barriers to first-mover entry that will make subsequent entry substantially easier for follow-on

81

**Confidential**

*Specification No. 21*

developers.  Despite being the first-mover in the European market, where JenaValve received a

CE mark in early 2021, JenaValve has achieved very few sales and surgeries over the nearly four

years it has had its mark.

The following section details how Edwards is better positioned than JenaValve to

overcome each of the above-described barriers to PMA approval and commercialization:

- **The Company has the engineering and clinical capabilities necessary to overcome the regulatory barriers presently delaying Trilogy's PMA approval.**  Edwards understands that JenaValve's application for PMA has been repeatedly delayed due to concerns about ███████████████████████████████████.  While Edwards understands that JenaValve is working to resolve these concerns and targets completion of the requisite testing in May 2025, successful resolution is not guaranteed, and in the event that the application is further delayed, Edwards will be well positioned to deploy substantially greater resources to address any outstanding or further FDA concerns.  For example, whereas JenaValve has limited in-house engineering resources and has outsourced most clinical activity to third-party organizations, Edwards has extensive experience with manufacturing heart valves and over 1,600 in-house engineers.  Edwards has an equivalently robust in-house clinical and regulatory teams with significant experience in securing approval for structural heart devices, including transcatheter aortic valves for the treatment of aortic stenosis.

- **The Company can expedite the development and promulgation of AR diagnostic and treatment protocols by leveraging its proven history of structural heart innovation and deep relationships with KOLs.**  JenaValve is a small company with no prior experience in the structural heart space that has never before sought to advance the

82

Confidential

state of the art for diagnosis protocols and disease awareness, let alone in a disease that has been chronically underdiagnosed and poorly understood. Edwards understands that JenaValve's barebones clinical team does not have the necessary robust connections to KOLs. With scarce financial resources, there is no feasible path for JenaValve to sustain the level of investment necessary to build the relationships and expertise required to develop new diagnostic and therapeutic protocols. Edwards has decades-long relationships with KOLs, which it can leverage to address the challenges of building and promulgating better diagnostic and therapeutic protocols, thereby identifying additional patients who would benefit from this novel device and growing the treatment population. In this way, Edwards will be able to leverage these same capabilities to develop and refine treatment protocols and guidelines.

- **The Company can rapidly build HCP trust in the Trilogy procedure through its broad network of KOLs and high-touch field force.** JenaValve is a small company with very little visibility among the thousands of surgeons, interventional cardiologists and other physicians who will ultimately decide whether to learn more about the Relevant Product and the implant procedure itself. Edwards understands that JenaValve does not have long-term, established relationships with the physicians who will drive the adoption of Trilogy. Nor does JenaValve have the substantial field force required to make the essential communications to HCPs, let alone provide in-person support for all procedures at launch. There is not a path for JenaValve to build such a field force. With its current capitalization, JenaValve cannot finance field force hiring or training. More importantly, training a field force of sufficiently skilled and credible support staff would take years, and would not be possible for JenaValve to complete within its current timeline for

83

PX0053-084

**Confidential**

*Specification No. 21*

commercial approval. In contrast, Edwards already has a field force capable of providing

support in all procedures. Through experience and investment, Edwards has connections

with thought leaders in cardiology, cardiac surgery, and interventional cardiology who

other HCPs rely on. These connections are necessary to validate and establish trust and

confidence in first-in-indication procedures. Edwards also has deep relationships and

goodwill with the HCPs who presently perform TAVR procedures using other Edwards

devices. Edwards likewise has an established, high-touch field team that is already

trusted by and integrated with HCP teams who will be able to provide hands-on support

for every TAVR-AR procedure. In this way, Edwards is vastly better positioned to

educate HCPs on the feasibility and effectiveness of TAVR-AR and the TAVR-AR

procedure.

- **The Company can expedite scaled production of the Trilogy device by integrating it
  into its existing supply chains and deploying engineering resources to optimize the
  Trilogy technology for production**. JenaValve's manufacturing facilities have supply

  problems and low yields, in part due to highly complex device designs that are not

  compatible with production at scale. For instance, Edwards understands that the Trilogy

  valve requires ███ stitches, takes between ███ hours to manufacture, and only

  ███ of Trilogy systems ultimately pass quality control inspections. JenaValve's

  supply chain also suffers from variability in porcine tissue harvesting (approximately

  only ███ of tissue yields are viable). Consequently, based on current capabilities,

  Edwards understands that JenaValve will be unable to achieve the production rates

  necessary to sustain its growth projections. By comparison, Edwards has extensive

  experience with manufacturing heart valves and will be well-positioned to develop and

84

**Confidential**

*Specification No. 21*

improve the Trilogy system further, including optimizing the design and supply chain for production at scale. Additionally, JenaValve is unable to hire enough sewers to increase the number of shifts, thus increasing production yields. As discussed above, Edwards has over 1,600 engineers with expertise in manufacturing heart valves who can be utilized to improve existing manufacturing or move manufacturing as needed. Edwards also has a significant number of highly-trained sewers with decades of experience to scale manufacturing. Edwards has global manufacturing facilities and decades of experience producing structural heart systems at scale. Even without optimizing the device and delivery system design, Edwards has the experience, capacity, resources, and engineers necessary to quickly build up vast production capacities, which JenaValve does not. Edwards will be able to apply this proven process to relieve bottlenecks and increase Trilogy production yields. Indeed, unlike JenaValve, Edwards is vertically integrated, allowing it to produce many of the required components in-house, making it less impacted by quality issues from third-party suppliers. This aspect of Edwards's business will allow it to increase tissue yields and improve the quality of tissue currently being used in Trilogy.

- **Edwards has the experience and resources necessary to negotiate reimbursement schemes with payors.** Presently, JenaValve is not positioned to engage in reimbursement negotiations with payors. It has no experience securing NCD determinations or negotiating reimbursement rates. JenaValve does not have an established reimbursement team at all. Edwards, on the other hand, has robust reimbursement and CMS regulatory teams with decades of experience negotiating reimbursement for first-in-indication devices.

85

**Confidential**

*Specification No. 21*

In sum, Edwards's rationale for acquiring JenaValve is driven by the opportunity to benefit patients by completing the development of the Trilogy device and establishing a market for a TAVR-AR procedure faster and with a substantially higher likelihood of success than JenaValve could feasibly achieve on its own.

**Future Competition**

By empowering Edwards to create a market for TAVR-AR, the Proposed Transaction will enhance competition by reducing barriers to entry for fast-followers and all future entrants.

As discussed above, the barriers to entry for a first-mover are substantially greater than those faced by subsequent entrants if a first-mover is able to successfully create the market. However, given its financial challenges, inexperience, and limited resources, the likelihood that JenaValve could undertake the investments necessary to create the TAVR-AR market is minimal, at best. Thus, for practical purposes, the elevated barriers to entry will remain if the Proposed Transaction is enjoined and JenaValve continues on its own. Moreover, if JenaValve continues on its own and fails in its efforts to develop the TAVR-AR market, the failure would likely be detrimental to the market creation efforts of subsequent entrants, including Edwards, in effect rasing the barriers of entry for the first entrant even further. For example, if HCPs are inadequately trained and/or JenaValve inadequately supports its market entry, the likelihood of adverse outcomes would be substantially greater, which could foster mistrust among HCPs and reluctance to adopt the treatments offered by later entrants. In a worst case scenario, this could permanently destroy the possibilty of establishing a TAVR-AR market, or at the very least delay it by many years, costing thousands of patients lives.

However, if the FTC allows the Proposed Transaction to close, there is a far greater likelihood the Trilogy device will be successfully commercialized and, in so doing, erode

86

**Confidential**

*Specification No. 21*

barriers to entry for follow-on devices. Indeed, based on its experience in other diseases, Edwards expects that other developers will rapidly accelerate the development of TAVR-AR devices shortly after Edwards's PMA and enter the market soon thereafter, thereby increasing competition in this space.

Consider, for example, Edwards's experience in the TAVR-AS market. There, Edwards created the TAVR-AS market through its launch of the SAPIEN system in 2011. To launch this program, which emerged from the combination of its internal development program and technology acquired from Percutaneous Valve Technologies ("PVT") in 2003, Edwards invested significantly in growing AS awareness, building KOL relationships, HCP education and training, training a robust field team, supply chain development, and other dimensions of market creation. In so doing, the Company created a market that is valued at $6.3 billion today.

Yet, despite being the first mover, Edwards does not compete in the marketplace alone. Shortly after it launched SAPIEN, other major medical device manufacturers leveraged Edwards's investments to rapidly develop and launch competing AS devices. These developers include:

- Boston Scientific, which launched its LOTUS system in 2013;
- Medtronic, which launched its CoreValve system in 2014;
- Biosensors, which launched its ALLEGRA system in 2017;
- SMT, which launched the HYRDA TAVR system in 2020;
- Abbott, which launched its Portico with FlexNav valve system in 2021; and
- MicroPort, which launched VitaFlow Liberty in 2021.

Put differently, any theoretical loss in competition from the Proposed Transaction pales in comparison to the competition that will be accelerated if Edwards is enabled to create the

87

**Confidential**

*Specification No. 21*

TAVR-AR market using the Trilogy device. What the above examples in the TAVR-AS market show is that even 15 years after establishing the TAVR-AS market, Edwards combined with the other entrants is still only able to treat less than 50% of all AS patients in any meaningful way (and this is combining surgical treatments and transcatheter treatments). A similar outcome is highly likely for AR.

Any concern that Edwards would not make an investment that would establish the market and thereby create a pathway to competition is misplaced. Because the AR disease is significantly underdiagnosed and treated, additional entry into the TAVR-AR market is to Edwards's advantage, as other developers will further contribute to disease knowledge, awareness, and education, thereby expanding the total addressable market. For example, AR is a differentiated disease, and the effect of differentiated patient anatomies, co-morbidities, and disease presentation is incompletely understood. Further research into these disease drivers and differentiators will enable Edwards to design better devices and expand the total addressable market. Indeed, uncertainty regarding the ideal treatment—or treatments—will strongly incent Edwards to aggressively develop both the JenaValve and Trilogy systems, as one system may prove more effective for one patient population than another.

**Procompetive Benefits**

The Transaction's procompetitive benefits are merger-specific. In a world without the Proposed Transaction, even if it secures PMA for Trilogy, JenaValve has no viable pathway for overcoming in a timely manner the substantial first-mover challenges it faces to create a robust TAVR-AR treatment market. JenaValve has extremely limited resources and is struggling financially and constrained in the scope of what it can do post-approval. Edwards understands that JenaValve has significant debt and accumulated operating losses, and will need an additional

88

**Confidential**

*Specification No. 21*

██████ cash injection to remain a going concern and more if it wishes to address any of the myriad of manufacturing and commercial issues facing the company.

With these resource constraints, as well as its limited experience and a dedicated but small team, it is infeasible that JenaValve will be able to simultaneously overcome the aforementioned first-mover challenges, which require substantial investment to overcome. Nor is it likely that JenaValve can sell Trilogy to another developer: the record shows that JenaValve's efforts to sell itself to alternative buyers were rebuffed several times over the past years. Thus, the likely outcome if the Proposed Transaction is not consummated is either that Trilogy fails to achieve PMA or achieves PMA but remains a fringe product with limited commercialization and patient reach. As a result, far fewer TAVR-AR procedures will be completed, the market will remain undeveloped, many patients will go without treatment for severe symptomatic AR (given their lack of candidacy for surgical intervention and the lack of a viable TAVR-AR therapy) and this will result in thousands or tens of thousands of patients suffering unnecessary and avoidable adverse health consequences, including death, and substantial barriers to entry will remain. In addition, if JenaValve's stand-alone entry is a failure, the entire treatment paradigm is put at risk, including Edwards's entry with its J-Valve TF system, resulting in a smaller marketplace and even higher entry barriers than if Edwards is able to complete its acquisition of JenaValve.

This but-for world is not speculative. JenaValve's experience in the European marketplace demonstrates what a potential future of Trilogy without Edwards looks like. There, the Trilogy system received a CE mark (the European equivalent of an FDA PMA) for TAVR-AR in May 2021. Despite being the first-mover in the European market, JenaValve has achieved very few sales and surgeries over the nearly four years it has had its mark. Edwards understands

PX0053-090

Confidential

*Specification No. 21*

these struggles are due to the same challenges JenaValve would face in the United States—limited relationships with KOLs, an inability to develop diagnosis and procedure protocols, failure to build trust in the procedure with HCPs, and sustained supply-chain challenges.

Edwards's ownership of JenaValve and JC Medical achieves the best outcomes for patients and competition. The preceding discussion explains not only the rationale for Edwards to acquire JenaValve (combining JenaValve's device with Edwards's capabilities and resources to develop the market sooner and more fully than it would otherwise), but also the rationale for Edwards to acquire JenaValve in light of Edwards's ownership of JC Medical and its J-Valve solution. As explained above, JenaValve lacks the capabilities and resources to develop the new market for TAVR-AR on its own. As a result, the market will only be developed adequately when Edwards brings its resources and capabilities to bear. In a but-for world in which Edwards is limited to its J-Valve TF system, those market-development steps will be delayed by years, until Edwards receives the necessary FDA approvals for the J-Valve TF system, assuming they are eventually able to receive PMA. In the meantime, a stand-alone JenaValve will lack the capabilities and resources to adequately develop the market, which will result in fewer devices being sold, adverse health consequences and deaths for patients who would otherwise benefit from Edwards's earlier development of the market, and the potential for an overall stunting of the TAVR-AR marketplace resulting from JenaValve's less-effective market entry as compared to a world in which Edwards acquires JenaValve.

In addition to this market-development rationale for acquiring JenaValve, Edwards will benefit from the acquisition and development of two TAVR-AR platforms because Edwards will have the opportunity to combine products, learnings, and clinical data from the JenaValve and JC Medical platforms to have multiple "shots on goal" to create the best treatment options for

90

**Confidential**

*Specification No. 21*

patients, who will need multiple options based on variability in anatomies. At this point, AR disease is poorly understood, and Edwards does not know whether one device is superior to the other for the disease generally or for any specific patient population given differentiation between the platforms. The potential of unlocking superior treatments and/or previously untreatable patient populations, therefore, provides a powerful incentive for Edwards to acquire and to continue to develop both devices.

   Relatedly, Edwards expects these two devices to have different characteristics that may have advantages or disadvantages for different patient populations. For example, based on available data, Edwards understands that the J-Valve TF System may have substantial differentiated advantages over Trilogy due to its larger size and design, especially with respect to manufacturing and for treating certain patient populations. Having access to both devices and the patient data from both devices will better position Edwards to develop products that will have improved characteristics for improved patient outcomes, either in general or for particular patient populations. In addition, by pursuing both devices in parallel, Edwards hopes to unlock additional data that will facilitate creating the market (e.g., insights with respect to disease diagnosis and variability) and the development of next-generation products. Furthermore, because complex medical device development is an uncertain and high risk-endeavor (as evidenced by the fact that 40% of devices to enter pivotal trials fail to ultimately receive PMA[65]), by pursuing both devices in parallel, Edwards can de-risk and more confidently make its investments in AR and maximize the likelihood that a highly effective device ultimately makes it to market. Indeed, Edwards has successfully utilized this "multiple shots on goal"

---

[65] *See Estimated Cost of Developing a Therapeutic Complex Medical Device in the US*, 1 JAMA Netw. Open. 5 at Table 1.

PX0053-092

**Confidential**

*Specification No. 21*

model to develop several other products, including SAPIEN (which resulted from the combination of an internal program and technologies acquired from PVT) and EVOQUE (which resulted from the combination an internal program and technologies acquired from CardiAQ).

Response to Subpart (e)

The following is a non-exhaustive list of persons who have made statements expressing opinions regarding the Proposed Transaction or its effects:  Bernard Zovighian the Chief Executive Officer of Edwards, Dr. David Daniels from Sutter Health Mills-Peninsula Medical Center, Dr. Santiago Garcia from The Christ Hospital, Dr. Vinod Thourani from Piedmont Heathcare, Dr. Mark Russo surgeon from Rutgers Robert Wood Johnson Hospital, and Dr. Firas Zahr from Oregon Health & Science University.  Additionally, investors, stakeholders, and analysts, among others, have expressed their opinion of the Proposed Transaction.  In response to outreach by the FCO in Germany, hospitals and physicians submitted comments to the Transaction.  The original statements can be found in the FCO's case summary under the section Dokumentation der Datenauswertung der qualitativen Antworten zur Befragung von Krankenhäusern vom 19.12.2025 (*sic*)(Exhibit 21-1.pdf and courtesy translation Exhibit 21-2.pdf).  Below are select quotations that have been machine translated:

- "Edwards is in a position to further develop the quality of JenaValve's product and produce sufficient quantities for the market."

- "Either another player (such as Edwards) takes over this system or it will disappear from the market sooner or later."

- "By joining forces with Edwards, [we] hope that the increase in production will lead to wider availability so that we can treat our patients with this method (instead of doing nothing)."

PX0053-093

**Confidential**

*Specification No. 21*

- "The availability of the Trilogy system as the only "on-label" system to date is likely to improve significantly as a result of the merger (JenaValve has had considerable supply difficulties to date)."

- "The JenaValve valve is currently de facto not available, therefore pure AR without calcification/AS can currently only be treated surgically or, in the event of rejection by cardiac surgery, conservatively with medication."

- "The heart valve was currently only available to a very limited extent in Germany (minimal production figures, very few centers that have implanted the product). With the takeover of JenaValve by a renowned company with reliable supply chains, there is hope that the product (required in rare cases) will become more accessible."

- "We currently don't have access to the JenaValve for the AR and don't have an alternative valve available. This could change as a result of the merger."

- "JenaValve's production capacity has so far been one of the limiting factors for limited availability. This will certainly improve with Edwards' expertise."

- "[The acquisition] will significantly improve access to urgently needed interventional therapy options."

Documents in custodial files containing statements responsive to this subpart, if any, are included in Edwards's production of documents to the Commission. In the ordinary course of business, Edwards does not collect or maintain detailed descriptions of such statements or actions by any person in support of, in opposition to, or otherwise expressing opinions about the Proposed Transaction.

PX0053-094

**Confidential**

*Specification No. 22*

**Specification No. 22**

Describe in detail, quantify (if possible), and submit all documents relating to the benefits, costs, and risks anticipated as a result of the Proposed Transaction, including, but not limited to, all cost savings, economies, or other efficiencies of any kind anticipated as a result of the Proposed Transaction, including:

(a)     a description of the steps the Company will take to achieve each benefit, cost saving, economy, or other efficiency;

(b)     the estimated time and cost required to achieve each benefit, cost saving, economy, or other efficiency and an explanation for how the cost was derived;

(c)     the estimated dollar value of each benefit, cost saving, economy, or other efficiency, stating separately the one-time fixed cost savings, recurring fixed cost savings, and variable cost savings in dollars per unit and dollars per year, and an explanation of how that value was derived;

(d)     an explanation of why the Company could not achieve each benefit, cost saving, economy, or other efficiency without the Proposed Transaction; and

(e)     the identity of each Person (including the Person's title and business address) employed or retained by the Company with any responsibility for achieving, analyzing, or quantifying each benefit, cost saving, economy, or other efficiency described.

**Response to Specification No. 22**

Response to Subparts (a)-(d)

Documents responsive to this specification are included in Edwards's production of documents to the Commission.  For a discussion of the benefits anticipated as a result of the Proposed Transaction, please see Edwards's response to Specification 21.

Because JenaValve's Trilogy is not yet approved by the FDA for sale in the United States and Edwards does not have detailed information regarding JenaValve's costs, Edwards has not been able to precisely model the cost savings that will result from the Proposed Transaction.  But, given the information available regarding JenaValve's production, manufacturing, and low yields, Edwards is confident that it will be able to reduce the unit costs of JenaValve's valve and delivery system.  Additionally, as explained in response to Specification 21, Edwards expects to

94

**Confidential**

*Specification No. 22*

increase investment in Trilogy to effectuate its PMA, refine its design, manufacturing process, and supply chain, and ultimately create the TAVR-AR market. Edwards expects that the capital required to make these investments will be less for Edwards than for JenaValve given Edwards's existing infrastructure and experience, and that these investments will achieve substantial cost savings in the immediate and long-term.

      Edwards also intends to incorporate lessons and design elements from Trilogy in building a second generation AR system. Edwards may realize cost savings in the design of the second generation valve by relying on prior testing done by JenaValve; however, Edwards does not have access to JenaValve's data and does not know to what extent these or any other savings may be realized. Edwards has not estimated the dollar value of any cost savings or efficiency from the transaction. Edwards expects to begin integration of JenaValve immediately after closing the Proposed Transaction.

      <u>Response to Subpart (e)</u>

      Larry Wood, Corporate Vice President of Transcatheter Heart Valves, is responsible for analyzing any benefits, cost saving, economy, or other efficiency resulting from the Proposed Transaction and may be contacted through counsel.

PX0053-096

**Confidential**

*Specification No. 23*

**Specification No. 23**

Describe and submit all documents related to any Relevant Product that discuss the Company's Plans or attempts to:

(a)    reduce its costs;

(b)    improve its products or services;

(c)    expand its sales or distribution efforts;

(d)    introduce new products or services;

(e)    integrate the Relevant Products in development by the Company with any products in development by JenaValve;

(f)    improve its operating performance, financial condition, or competitive viability;

(g)    close, consolidate or rationalize any facility;

(h)    discontinue the research, development, manufacture, license, or sale of any Relevant Product or product line; and

(i)    achieve any benefits as a result of any multi-plant, multi-product, or vertically integrated operation of the Company.

**Response to Specification No. 23**

Response to Subparts (a)-(d)

Edwards does not expect to reduce any costs in connection with the Proposed Transaction. To the contrary, Edwards expects to increase spending in R&D and other areas to ensure FDA PMA for a TAVR-AR system as explained in Specification 21. Edwards's explanation of any improvement, expansion, and introduction of any Relevant Product can also be found in its response to Specification 21.

Response to Subpart (e)

As described more fully in Specification 21, Edwards expects to use learnings and clinical data from products from both Edwards and JenaValve to improve both systems. Developing both therapies simultaneously and integrating learnings will provide Edwards with important insights on the development of valves and implantation devices for AR, including on

96

**Confidential**

*Specification No. 23*

how best to anchor AR valves, allowing it to learn from setbacks, and ultimately increasing its probability of eventual success. Edwards expects to bring both Trilogy and J-Valve to market.

Response to Subpart (f)

As described further in Specification 21, Edwards plans to improve its financial condition and competitive viability by establishing a market for TAVR-AR systems. Edwards plans to use its experience with TAVR-AS and in other transcatheter markets to establish a commercially viable TAVR-AR market.

Response to Subpart (g)

Edwards does not plan to close, consolidate, or rationalize any facility in the United States in connection with the Proposed Transaction.

Response to Subpart (h)

Edwards does not plan to discontinue the research, development, manufacture, license, or sale of any Relevant Product or product line in connection with the Proposed Transaction.

Response to Subpart (i)

As described in Specification 21, Edwards plans to use its already existent vertical integration to improve the manufacturing of the Trilogy system and decrease the issues JenaValve has faced is securing viable tissue and other third party components. Edwards does not plan on any achieving any other benefits in connection with the Proposed Transaction related to any vertical integration between the companies.

97

**Confidential**

*Specification No. 24*

**Specification No. 24**

Describe in detail (including the time and cost required to achieve), quantify (if possible), and submit all documents related to projected and actual cost savings, economies, or other efficiencies resulting or predicted to result from each previous merger, acquisition, or joint venture by the Company that is being relied upon by the Company to support any claim of predicted cost savings, economies, or other efficiencies expected to result from the Proposed Transaction. Provide a copy of all submissions provided to any regulatory agency relating to expected efficiencies with respect to any prior transaction.

**Response to Specification No. 24**

All documents related to projected and actual cost savings, economies, or other efficiencies resulting or predicted to result from each previous merger, acquisition, or joint venture by Edwards are included in Edwards's production to the Commission.

Edwards is not claiming any cost savings or economies from the Proposed Transaction that rely on a previous merger, acquisition, or joint venture. Through its experience with JC Medical's J-Valve, Edwards expects that it will find ways to improve JenaValve's Trilogy. For example, since Edwards's acquisition of JC Medical in summer 2024, their R&D efforts have already identified areas of improvement for J-Valve. These improvements include ███████ ██████████████████████████████████████████████████████████ ████████████████████████████████████ Edwards's response to Specification 21 provides more detail on the rationale for acquiring both JC Medical and JenaValve.

98

**Confidential**

**Specification No. 25**

Submit all documents relating to:

(a)     allegations by any Person that any Person researching, developing, manufacturing, licensing, or selling any Relevant Product is infringing on any Person's patent, including, but not limited to, such documents related to any patent infringement litigation, settlement of patent infringement litigation, or settlement of threatened patent infringement litigation;

(b)     allegations by any Person that any patent relating to any Relevant Product is invalid and/or unenforceable, including, but not limited to, such documents related to any patent infringement litigation, settlement of patent infringement litigation, or settlement of threatened patent infringement litigation;

(c)     the competitive impact of unexpired patents, patent term extensions, patents pending, patents that have expired within the last five years, and significant trade secrets relating to any Relevant Product, including, but not limited to, documents related to the extent to which such patents and trade secrets affect new entry into the research, development, manufacture, license, and sale of any Relevant Products; and

(d)     the competitive impact of any marketing exclusivity period, whether created by statute, patent, settlement of litigation, or FDA process, for any Relevant Product, including, but not limited to, documents related to the extent to which such marketing exclusivity periods affect new entry into the research, development, manufacture, license, and sale of any Relevant Product, or the price of any Relevant Product.

**Response to Specification No. 25**

Documents responsive to this specification are included in the Company's production of the documents to the Commission.

99

**Confidential**

*Specification No. 26*

**Specification No. 26**

Submit, without regard to custodian:

(a)    all documents provided to the Company's Board of Directors relating to any Relevant Product in the Relevant Area; and

(b)    all minutes or other recordings of meetings of the Company's Board of Directors relating to any Relevant Product in the Relevant Area.

**Response to Specification No. 26**

Documents responsive to this specification are included in Edwards's production of documents to the Commission at EW-FTC-11071559—EW-FTC-11071864.

100

**Confidential**

*Specification No. 27*

## Specification No. 27

Identify each prior or ongoing investigation from January 1, 2019 to the present by any state, federal, or international authority related to whether the Company has violated the antitrust or competition laws of any jurisdiction. The Company need not disclose (i) an investigation that has been reported to the federal agencies under the Hart-Scott-Rodino Act, (ii) that an investigation is currently being conducted by a grand jury, or (iii) that an investigation involves a pending leniency application made by the Company to the United States Department of Justice. For each applicable investigation, identify the authority that conducted or is conducting the investigation and describe the conduct being investigated and the status of the investigation (or outcome of the investigation if closed). For each identified investigation, submit:

(a)     all communications between the Company and the authority relating to the investigation (excluding those to/from a grand jury);

(b)     all trial transcripts, deposition transcripts, declarations, and other sworn testimony related to the investigation (excluding grand jury testimony); and

(c)     all documents and information related to the investigation produced by the Company, employees of the Company, and former employees of the Company to the authority.

## Response to Specification No. 27

Edwards has not been the subject of any state or federal investigations from January 1, 2019 to the present related to whether it has violated state or federal antitrust laws.

Edwards is subject to an ongoing informal review by the European Commission (the "EC") to ascertain whether it may have engaged in an abuse of a potential dominant position under Article 102 of the Treaty on the Functioning of the European Union.  Edwards is cooperating fully with the EC's review.

Documents responsive to this specification have been included in Edwards's production of documents to the Commission at EW-FTC-50003301—EW-FTC-50008161.

101

**Confidential**

*Specification No. 28*

**Specification No. 28**

Identify, and submit documents sufficient to show and, to the extent not reflected in such documents, describe in detail (including when the policy or procedure was last updated or changed, when any updates or changes were made during the period of this Request, and what prompted each update or change):

(a)    Company's policies and procedures relating to the retention and destruction of documents, including:

    (i)    any specific policies on the retention and destruction of email, chats, instant messages, text messages, and other methods of group and individual communication (e.g., Microsoft Teams, Slack);

    (ii)    storage, deletion, and archiving of electronically stored information; or

    (iii)    specific policies for documents in or sent via any Collaborative Work Environments or Messaging Applications;

(b)    Company policies and procedures relating to the use of both Employee-Owned Devices and Company-Owned devices to conduct Company business, including technological feasibility of accessing Company emails, chats, instant messages, text messages, and other methods of group and individual communication (e.g., Microsoft Teams, Slack), documents, and databases; and

(c)    Company policies and procedures relating to installation or use of Messaging Applications on Company and Employee-Owned devices used to conduct Company business, including message retention obligations, suspension of automatic time-based or capacity-based deletion protocols, and use of services to capture or archive messages (e.g., use of Smarsh to archive SMS messages) that could be used to store or transmit documents (as defined in Definition D6) responsive to this Request.

**Response to Specification No. 28**

Documents responsive to this specification have been included in Edwards's production of documents to the Commission at EW-FTC-11071865—EW-FTC-11072035 and EW-FTC-50008210—EW-FTC-50008218.

Response to Subpart (a)

Edwards maintains a written policy regarding the retention and destruction of documents in documents titled Control of Records, Retention Periods for Quality System Records, and Retention Periods for Non-Quality System Records.

102

**Confidential**

*Specification No. 28*

The Retention Periods for Non-Quality System Records policy reflects the most recently updated retention policy for email, voicemail, and instant messaging records. There have been no material changes to the policy since July 2023. At minimum, Edwards policies are reviewed and updated biennially to ensure the content and requirements are consistent with current regulations, standards, and priorities, and updates to this policy were made as part of this standard review.

Edwards does not store or electronically archive instant messages, chats, or text messages.

<u>Response to Subparts (b)-(c)</u>

Edwards maintains written policies regarding the use of Employee-Owned Devices and Company-Owned devices used to conduct Company business and to install and use messaging applications in Edwards's Titanium Book, and in documents titled INFOSEC-STD-0005.2.0, INFOSEC-STD-0008.1.0, INFOSEC-STD-0005.1.0 and INFOSEC-STD-0010.20. There have been no material changes to the Titanium Book since January 2022.

Edwards's Global Acceptable Use Standard, policy INFOSEC-STD-0005.2.0, became effective in July 2024, at which point it replaced the Acceptable Use Security Standard ("The Elementals"), January 2023. The policy was updated as part of Edwards's standard biennial review.

Edwards's Identity and Access Management Standard, policy INFOSEC-STD-0008.1.0, became effective in April 2025, at which point it replaced the ITS-Access-Control-Security Standard-v11. The policy was updated as part of Edwards's standard biennial review.

Edwards's Asset Management & Data Protection Security Standard, policy INFOSEC-STD-0005.1.0, became effective in May 2025, at which point it replaced the ITS-Information

103

**Confidential**

*Specification No. 28*

And Data Classification And Handling Policy Final v1 2018010. The policy was updated as part of Edwards's standard biennial review.

Edwards's System Configuration and Hardening Standard, policy INFOSEC-STD-0010.2.0, became effective in April 2025, at which point it replaced the ITS-Communications Security-Security Standard-Network Configuration Security Standard. The policy was updated as part of Edwards's standard biennial review.

In addition to written policies, Edwards requires all employees to complete a web-based training on Edwards's Global Acceptable Use Standard. The training is required for all new employees, and employees repeat the training bi-annually. There have been no material changes to this training since January 2022.

Edwards employees are issued Company-Owned laptops. Employees use Employee-Owned mobile devices unless they prefer to have an Edwards-issued mobile device for work purposes. Employees who chose to use Employee-owned mobile devices are able to access Company emails, Microsoft Teams messages, and other data in the Company's Microsoft 365 environment on Employee-Owned mobile devices pursuant to the installation and use of Edwards's enterprise mobile management software, Microsoft Intune and Microsoft Intune Company Portal.

PX0053-105

**Confidential**

*Specification No. 29*

**Specification No. 29**

List (a) each federal judicial district (e.g., District of Columbia, Southern District of New York) within the United States in which the Company has an agent to receive service of process, and provide each such agent's name, current business and home addresses, and telephone numbers; (b) each federal judicial district within the United States in which the Company is incorporated or licensed to do business or currently is doing business; and (c) each federal judicial district within the United States in which the Company has an office or a facility, and, for each such office or facility, list the address and the individual in charge (with his or her title).

Alternatively, the Company may respond to this Specification by providing a written stipulation that it agrees to accept service of process, and to subject itself to personal jurisdiction, in all federal judicial districts within the United States.

**Response to Specification No. 29**

Edwards understands that the purpose of Specification 29 is to permit the FTC to determine the districts in which it may obtain personal jurisdiction over the parties to the transaction. Edwards hereby stipulates that, with respect to this Transaction (Transaction Identification Number: 241-0114), it will accept service of process and subject itself to personal jurisdiction in the states or federal districts within the United States in which it has business operations and reserves its right to seek transfer of venue in any proceeding relating to this matter. This stipulation is made solely in connection with this Transaction and shall not be construed as a waiver of, or prejudice to, any rights, claims, or defenses that Edwards may have with respect to any other matter, all of which are expressly reserved.

Edwards further stipulates that service of process upon it shall be deemed sufficient if copies are served upon Edwards by email and (a) first class mail or (b) overnight courier to Jeremy Calsyn, Cleary Gottlieb Steen & Hamilton LLP, 2112 Pennsylvania Avenue, NW, Washington, DC 20037 (telephone: (202) 974-1500; email: jcalsyn@cgsh.com).

105

**Confidential**

*Specification No. 30*

**Specification No. 30**

Identify the Person(s) responsible for preparing the response to this Request and submit a copy of all instructions prepared by the Company relating to the steps taken to respond to this Request. Where oral instructions were given, identify the Person who gave the instructions, describe the content of the instructions, and identify the Person(s) to whom the instructions were given. For each Specification, identify the individual(s) who assisted in the preparation of the response, with a listing of the Persons (identified by name and corporate title or job description) whose files were searched by each.

**Response to Specification No. 30**

Individuals involved in preparing Edwards's responses to the Second Request were provided with a copy of the Second Request (or applicable portions thereof) and copies of applicable correspondence between Cleary, Gottlieb, Steen & Hamilton LLP ("Cleary Gottlieb") and Commission Staff regarding modifications to the Second Request. Other written and oral instructions about responding to the Second Request were given by or at the direction of (a) Edwards's in-house counsel, including Tracey Davies, Senior Vice President, Associate General Counsel, Heather Haworth, Senior Vice President, Associate General Counsel, Gail Katz, Senior Vice President, Chief Intellectual Property Counsel, and Jeffrey Salinger, Vice President, M&A Counsel, and (b) Edwards's counsel, Cleary Gottlieb and Gibson, Dunn & Crutcher LLP ("Gibson Dunn"). The contents of such instructions are protected by the privilege regarding attorney-client communications and/or the attorney work-product doctrine.

Edwards searched twenty-six custodians for documents in response to the Second Request. Edwards identified document custodians in an October 31, 2024 email to the Commission. Cleary Gottlieb engaged in custodian negotiations with Commission Staff. The final correspondence regarding custodial modifications was received from Commission Staff on February 27, 2025. Cleary Gottlieb attorneys were responsible for identifying responsive documents from these collections.

106

**Confidential**

*Specification No. 30*

The names and corporate job titles of the primary persons who participated in organizing, collecting, and processing the information necessary to respond to each specification of the Second Request are listed below in Table 30-1. Attorneys for Edwards, listed above, assisted in the preparation of the entire response.

**Table 30-1**

| Specification | Contributors |
|:---:|:---|
| 1 | Alek Slavuk, Senior Director, IT<br><br>Cleary Gottlieb Steen & Hamilton LLP |
| 2 | Feroze Bilgrami, Vice President, Enterprise Architect<br><br>Ingrid Gluck, Vice President, Clinical Affairs<br><br>Andrew Walls, Vice President, Manufacturing<br><br>Cleary Gottlieb Steen & Hamilton LLP |
| 3 | Andrew Walls, Vice President, Manufacturing<br><br>Cleary Gottlieb Steen & Hamilton LLP |
| 4 | Cleary Gottlieb Steen & Hamilton LLP |
| 5 | Cleary Gottlieb Steen & Hamilton LLP |
| 6 | Cleary Gottlieb Steen & Hamilton LLP |
| 7 | Cleary Gottlieb Steen & Hamilton LLP |
| 8 | Cleary Gottlieb Steen & Hamilton LLP |
| 9 | Cleary Gottlieb Steen & Hamilton LLP |
| 10 | Cleary Gottlieb Steen & Hamilton LLP |
| 11 | Ingrid Gluck, Vice President, Clinical Affairs |

PX0053-108

**Confidential**

*Specification No. 30*

| Specification | Contributors |
|---|---|
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 12 | Irma Darmali, Director, Corporate Development |
|  | Feroze Bilgrami, Vice President, Enterprise Architect |
|  | Blessie Concepcion, Vice President, Clinical Affairs |
|  | Charles River Associates ("CRA") |
|  | Gibson, Dunn & Crutcher LLP |
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 13 | Gibson, Dunn & Crutcher LLP |
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 14 | Cleary Gottlieb Steen & Hamilton LLP |
| 15 | Gibson, Dunn & Crutcher LLP |
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 16 | Andrew Walls, Vice President, Manufacturing |
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 17 | Cleary Gottlieb Steen & Hamilton LLP |
| 18 | Cleary Gottlieb Steen & Hamilton LLP |
| 19 | Cleary Gottlieb Steen & Hamilton LLP |
| 20 | Cleary Gottlieb Steen & Hamilton LLP |
| 21 | Gibson, Dunn & Crutcher LLP |
|  | Cleary Gottlieb Steen & Hamilton LLP |
| 22 | Gibson, Dunn & Crutcher LLP |

108

Confidential

*Specification No. 30*

| Specification | Contributors |
|---|---|
| | Cleary Gottlieb Steen & Hamilton LLP |
| 23 | Gibson, Dunn & Crutcher LLP |
| | Cleary Gottlieb Steen & Hamilton LLP |
| 24 | Gibson, Dunn & Crutcher LLP |
| | Cleary Gottlieb Steen & Hamilton LLP |
| 25 | Cleary Gottlieb Steen & Hamilton LLP |
| 26 | Cleary Gottlieb Steen & Hamilton LLP |
| 27 | Cleary Gottlieb Steen & Hamilton LLP |
| 28 | Cleary Gottlieb Steen & Hamilton LLP |
| 29 | Cleary Gottlieb Steen & Hamilton LLP |
| 30 | Cleary Gottlieb Steen & Hamilton LLP |
| 31 | Karen Napier, Senior Analyst, Legal |
| | Cleary Gottlieb Steen & Hamilton LLP |
| 32 | Cleary Gottlieb Steen & Hamilton LLP |
| 33 | Cleary Gottlieb Steen & Hamilton LLP |

Table 30-2 lists the names and corporate job titles of all the individuals whose files were searched for responsive documents.  Cleary Gottlieb attorneys searched these individuals' files for documents responsive to all specifications.

109

PX0053-110

**Confidential**

*Specification No. 30*

**Table 30-2**

| Name | Title |
|------|-------|
| Bernard Zovighian | Chief Executive Officer |
| Michael Mussallem | Formerly, Chief Executive Officer |
| Scott Ullem | Chief Financial Officer |
| Don Bobo Jr | Corporate Vice President, Strategy & Corporate Development |
| Finn Haley | Senior Vice President, Corporate Development |
| Nick Olson | Senior Director, Corporate Development |
| Irma Darmali | Director, Corporate Development |
| Tarun Mahajan | Vice President, Strategy |
| Larry Wood | Corporate Vice President & Group President, THV & Surgical |
| Kristen Skelton | Senior Vice President, THV Sales (THV) |
| Pooja Sharma | Senior Vice President, Strategy & Marketing & PMO (THV) |
| Wayne Markowitz | Senior Vice President, Surgical Structural Heart ("Surgical") |
| Scott Beggins | Senior Vice President, Regulatory |
| Irene Parker | Vice President, Regulatory Affairs (THV) |
| Laksen Sirimanne | Senior Vice President, Engineering |
| Sean Chow | Vice President, Engineering |
| Jaime Wheeler | Senior Vice President, Clinical Affairs |
| Blessie Concepcion | Vice President, Clinical Affairs |
| Ingrid Gluck | Vice President, Clinical Affairs |
| Heather Prince | Vice President, Clinical Affairs, Strategy (THV) |

PX0053-111

**Confidential**

*Specification No. 30*

| Name | Title |
|------|-------|
| Assaf Bash | Senior Vice President, Discovery and Managing Director |
| Xavier Avat | Formerly, Senior Vice President, Discovery and Managing Director |
| Martyn Thomas | Senior Vice President, Medical Affairs |
| Andrew Walls | Vice President, Manufacturing |
| Mark Turco | President and CEO, JC Medical |
| Brandon Walsh | Chief Engineer, JC Medical |
| Tim Holland | Senior Engineer, Research and Development, JC Medical |
| Lise Lachance | Edwards Consultant |

PX0053-112

**Confidential**

*Specification No. 31*

<u>**Specification No. 31**</u>

Identify the dates on which any document hold notices regarding the Transaction were provided to employees of the Company. Describe any steps taken or that will be taken to collect, preserve, retain, and/or produce documents in connection with any document hold notice regarding this Request.

<u>**Response to Specification No. 31**</u>

Edwards followed well-established protocols, including issuing a backend legal hold, and sending a legal hold memo to Edwards employees likely to have potentially responsive information. Edwards issued its initial hold memo on October 25, 2024. An additional hold memo was distributed to custodians Heather Prince, Ingrid Gluck, Lise Lachance, and Tim Holland on March 4, 2025. During interviews with custodians, Edwards verified that recipients understood their preservation obligations.

In addition to sending out a legal hold instructing recipients to retain potentially relevant communications and information, Edwards employed automated legal holds on Edwards email inboxes. For former JC Medical employees, Edwards coordinated internally with IT personnel to place legal holds on employee JC Medical mailboxes. Lise Lachance and Tim Holland's JC Medical email inboxes were placed on hold on March 7, 2025.

With respect to document collection, Cleary Gottlieb negotiated a list of twenty-six document custodians with Commission Staff. Edwards identified document custodians in an October 31, 2024 email to the Commission. The final correspondence regarding custodial modifications was received from Commission Staff on February 27, 2025. Edwards conducted interviews with each custodian, except for Tim Holland, to identify data sources for collection and analysis. Tim Holland was a Senior Engineer of Research and Development at JC Medical, who departed from his role in January 2025. He was never employed by Edwards. Additional information on document sources may be found in Edwards's response to Specifications 1 and

112

**Confidential**

*Specification No. 31*

28.  Following the identification of relevant data sources, Edwards and its e-discovery vendors

on this matter engaged in document collection and processing.

Edwards's use of TAR and search terms to identify documents relevant to the Second

Request is detailed in Edwards's response to Specification 32.  Documents that could not be

classified using TAR were reviewed manually and produced when responsive to the Second

Request.  Edwards produced responsive documents to the Commission on a rolling basis

beginning May 9, 2025.

PX0053-114

**Confidential**

*Specification No. 32*

**Specification No. 32**

Identify any electronic production tools or software packages utilized by the Company in responding to this Request for: keyword searching, Technology Assisted Review, email threading, de-duplication, and global de-duplication or near-de-duplication (please note that the use of all forms of de-duplication requires advance approval from Commission staff per Instruction I 4(e), and:

(a)     if the Company utilized keyword search terms to identify documents and information responsive to this Request, provide a list of the search terms used for each custodian;

(b)     if the Company utilized Technology Assisted Review software:

(i)     describe the collection methodology, including: (a) how the software was utilized to identify responsive documents; (b) the process the Company utilized to identify and validate the seed set documents subject to manual review; (c) the total number of documents reviewed manually; (d) the total number of documents determined nonresponsive without manual review; (e) the process the Company used to determine and validate the accuracy of the automatic determinations of responsiveness and nonresponsiveness; (f) how the Company handled exceptions ("uncategorized documents"); and (g) if the Company's documents include foreign language documents, whether reviewed manually or by some technology-assisted method; and

(ii)     provide all statistical analyses utilized or generated by the Company or its agents related to the precision, recall, accuracy, validation, or quality of its document production in response to this Request; and

(c)     identify the Person(s) able to testify on behalf of the Company about information known or reasonably available to the organization, relating to its response to this Specification.

**Response to Specification No. 32**

Edwards incorporates by reference its explanation in the letter dated March 4, 2025

("March 4 TAR letter") from C. Mahoney to the Commission which summarized the document

processing and search methodology.

Lighthouse Document Technologies ("Lighthouse") is Edwards's eDiscovery vendor for

this matter. In responding to the Second Request, Edwards used Lighthouse's proprietary

machine learning technology-assisted review ("TAR") software called Lighthouse AI (formerly

called PRISM). This tool uses a version of BERT, a deep learning neural network algorithm, for

114

**Confidential**

*Specification No. 32*

classification of data.  It functions in a manner similar to other TAR tools.  Lighthouse utilizes Nuix Version 8.6.12 for the processing of data.

As part of processing, document collections are globally de-duplicated, standard deNISTed, and data filtered.  Lighthouse utilized global de-duplication to cull data during processing.  This process identified exact duplicate electronic documents on the family level across all custodians.  Duplicates are defined as documents with the same family level has value.  Any email family containing the same generated hash was considered duplicative, and in global de-duplication, the non-suppressed family of documents was the first one processed.  Lighthouse Hash values for emails were generated using an MD5 hash algorithm over the following fields:

- Subject header

- From header

- To header

- CC header

- BCC header

- Email body text tokenized so whitespace and irrelevant characters are removed

- Binary streams of all attachments

- Date sent

For non-email ESI, the MD5-Hash was generated over the entire contents of the file including its internal properties.  Lighthouse did not de-duplicate an email attachment against a loose electronic document, and families of documents were produced intact, except in the case of documents withheld on a claim of privilege.

No documents were removed from the data set through junk domain analysis.

Hard copy documents and text messages and mobile messaging documents were

115

**Confidential**

*Specification No. 32*

analyzed through manual review outside of the TAR process.  Additionally, filetypes that were not amenable to TAR were excluded from the TAR modeling process and where analyzed outside of TAR.  A list of filetypes that were excluded from each of the two TAR models is provided at Exhibit 32-1.xlsx and Exhibit 32-2.xlsx.

Response to Subpart (a)

No search terms were applied to any custodial data prior to the data being analyzed within the TAR model.

Response to Subpart (b)(i)(a)

As described in the March 4 TAR letter, Edwards built two models to identify responsive documents.  For both models, Edwards utilized a simple active machine learning workflow in Lighthouse AI.  Documents were ingested into Lighthouse AI for purposes of classifying the documents.

Once the document set was ingested into Lighthouse AI, groups of documents were reviewed for responsiveness in Relativity, the eDiscovery Review platform utilized by Edwards on this matter, by subject matter expert attorneys from Cleary Gottlieb, outside counsel for Edwards on this matter.  For both models, the simple active machine learning TAR workflow involved reviewing both training document sets, documents used by the predictive model to learn responsiveness and classify documents, and a control set, a random sample of documents independent from the training set and not used to score the model.  The control sets were used to evaluate the progress of the models.

The models were evaluated by measuring precision and depth for recall at 75% recall as training progressed.  Once improvement in precision and depth for recall slowed and scores stabilized, the models were finalized.

116

**Confidential**

*Specification No. 32*

For each model, after the cutoff was established, subject matter expert attorneys from Cleary Gottlieb reviewed a random sample of documents below the chosen cutoff score to confirm the estimated recall had been achieved.

Response to Subpart (b)(i)(b)

Training documents were selected to achieve diversity, representativeness of the data universe, as well as to resolve uncertainty in the model. Early training rounds consisted primarily of exemplars of concretely relevant documents, randomly selected documents, and stratified sampling across different score ranges from each TAR model to ensure that the model is representative of the data in the universe. In later training rounds, documents were sampled from around the cutoff score necessary to achieve 75% recall.

Validation that the training sets were improving model performance and leading to efficient classification of responsive documents was accomplished by measuring the performance of the models against an independent, statistically significant, and randomly sampled control set. Performance of each model was then confirmed by a randomly selected elusion sample of documents below the selected cutoff score.

Response to Subpart (b)(i)(c)

Tar Model 1 – Main model

5,748 documents were manually reviewed to train the model.

10,226 documents were manually reviewed in the control set.

634 documents were manually reviewed in the elusion validation set.

Tar Model 2 – Sirimanne/Skelton/Wood model

4,604 documents were manually reviewed to train the model.

7,653 documents were manually reviewed in the control set.

117

**Confidential**

*Specification No. 32*

639 documents were manually reviewed in the elusion validation set.

No documents above the cutoff score in either TAR model were manually reviewed to classify documents as non-responsive and remove them from production.

Response to Subpart (b)(i)(d)

2,654,614 documents in the main model were in families of documents entirely below the chosen recall level and associated cutoff score. These documents were determined nonresponsive without manual review.

593,755 documents in the Sirimanne/Skelton/Wood model were in families of documents entirely below the chosen recall level and associated cutoff score. These documents were determined non-responsive without manual review.

Response to Subpart (b)(i)(e)

Accuracy of the automatic determinations were first validated through the randomly selected, independent control set.

For the main model, the control set was large enough to estimate the richness of the population with a 95% confidence level and a +/- 0.33% confidence interval. It was large enough to estimate the recall achieved by the model with a 95% confidence level and a +/- 4.75% confidence interval. Accuracy of the automatic determinations was further confirmed through a randomly sampled elusion set of documents below the cutoff score for the selected recall. The elusion set was large enough to estimate the richness of the population with a 95% confidence level and a +/- 0.75% confidence interval. The elusion set validated that the estimated recall had been achieved.

For the Sirimanne/Skelton/Wood TAR model, the control set was large enough to estimate the richness of the population with a 95% confidence level and a +/- 0.43% confidence

118

**Confidential**

*Specification No. 32*

interval. It was large enough to estimate the recall achieved by the model with a 95% confidence level and a +/- 4.80% confidence interval. Accuracy of the automatic determinations was further confirmed through a randomly sampled elusion set of documents below the cutoff score for the selected recall. The elusion set was large enough to estimate the richness of the population with a 95% confidence level and a +/- 0.94% confidence interval. The elusion set validated that the estimated recall had been achieved.

Response to Subpart (b)(i)(f)

Hard copy documents and documents that are uncategorizable (i.e., documents that do not have sufficient text to be categorized using the predictive coding algorithm) were analyzed outside the TAR process. Edwards also determined that mobile device messages should be analyzed outside of the TAR model and updated the process disclosed in the March 4 TAR letter in order to ensure accurate identification of documents responsive to Commission requests.

Analysis of the sets of "not suitable for TAR documents" included identification of file types likely to contain user-created content by reviewing the file extensions and datatype categories of these documents (fields extracted during processing).

Response to Subpart (b)(i)(g)

Edwards's documents subjected to the TAR process did not include substantive volumes of foreign language documents.

Response to Subpart (b)(ii)

Below are the final metrics related to Edwards's Main TAR model:

- TAR Document Population: 3,181,391
- TAR Population Above Cutoff Score: 99,539
- TAR Population Above Cutoff Score, including TAR Family Members: 158,489

119

**Confidential**

*Specification No. 32*

- TAR Population Below Cutoff Score: 2,465,902

- TAR Population Full Family Below Cutoff Score: 2,406,952

- Documents from TAR Population Not Categorized by TAR: 615,950

- Recall: 76.13%

- Precision: 51.18%

- F1 Measure: 59.13%

- Depth for Recall: 3.88%

- Control Set Count: 10,226 documents

    o Responsive: 310 documents

    o Non-Responsive: 9,916 documents

- Estimated Richness: 3.03%

- Control Set Confidence Level and Interval for Estimating Richness: 95%, +/- 0.33%

- Control Set Confidence Level and Interval for Estimating Recall: 95%, +/- 4.75%

- Number of Training Documents: 5,748

- Elusion Sample Count: 634 documents

    o Responsive: 6 documents

    o Non-Responsive: 628 documents

- Elusion Sample Confidence Level and Interval for Estimating Richness: 95%, +/- 0.75%

Below are the final metrics related to Edwards's Sirimanne/Skelton/Wood TAR model:

- TAR Document Population: 593,755

- TAR Population Above Cutoff Score: 24,743

- TAR Population Above Cutoff Score, including TAR Family Members: 39,045

120

**Confidential**

*Specification No. 32*

- TAR Population Below Cutoff Score: 505,920

- TAR Population Full Family Below Cutoff Score: 491,618

- Documents from TAR Population Not Categorized by TAR: 63,092

- Recall: 75.99%

- Precision: 63.58%

- F1 Measure: 66.67%

- Depth for Recall: 4.66%

- Control Set Count: 7,653 documents

    o   Responsive: 304 documents

    o   Non-Responsive: 7,349 documents

- Estimated Richness: 3.97%

- Control Set Confidence Level and Interval for Estimating Richness: 95%,  +/- 0.43%

- Control Set Confidence Level and Interval for Estimating Recall: 95%,  +/- 4.80%

- Number of Training Documents: 4,064

- Elusion Sample Count: 639 documents

    o   Responsive: 8 documents

    o   Non-Responsive: 631 documents

- Elusion Sample Confidence Level and Interval for Estimating Richness: 95%,  +/- 0.94%

    <u>Response to Subpart (c)</u>

    Christian Mahoney, Counsel and Global Head of e-Discovery and Litigation Technology at Cleary Gottlieb, is able to testify on behalf of Edwards about information known or reasonably available to the organization, related to the Edwards's response to this specification.

121

**Confidential**

*Specification No. 33*

<u>**Specification No. 33**</u>

Identify and describe:

(a)      all communication systems or messaging applications on any device in the possession, custody, or control of Company that could be used to store or transmit documents (as defined in Definition D 6) responsive to this Request at any time after January 1, 2021, including, but not limited to, communication systems or messaging applications used to store, discuss, or share information concerning (i) the provision of any Relevant Product in any Relevant Area; (ii) bids; (iii) sales; (iv) prices; (v) margins; (vi) costs, including, but not limited to, standard costs, integration costs, expected costs, and opportunity costs; (vii) patents or other intellectual property; (viii) research or development projects; (ix) customers; (x) third-party partners; (xi) data accessed or acquired by the Company; and (xii) integration work for access to or transaction with regard to any Relevant Product in any Relevant Area; and

(b)      document storage, internal distribution and maintenance practices used by the Company for all communication systems or messaging applications on any device in the possession, custody, or control of Company that could be used to store or transmit documents (as defined in Definition D 6) responsive to this Request at any time after January 1, 2021, including, but not limited to, communication systems or messaging applications used to store, discuss, or share information concerning (i) the provision of any Relevant Product in any Relevant Area; (ii) bids; (iii) sales; (iv) prices; (v) margins; (vi) costs, including, but not limited to, standard costs, integration costs, expected costs, and opportunity costs; (vii) patents or other intellectual property; (viii) research or development projects; (ix) customers; (x) third-party partners; (xi) data accessed or acquired by the Company; and (xii) integration work for access to or transaction with regard to any Relevant Product in any Relevant Area.

<u>**Response to Specification No. 33**</u>

<u>Response to Subpart (a)</u>

Table 33-1 below lists the requested information for each communication system and messaging application used by Edwards to store, discuss, or share information concerning Company business.

<u>**Table 33-1: Communications Systems and Messaging Applications**</u>

| Application | Description | Custodian | Location |
|---|---|---|---|
| Microsoft One Drive | Microsoft file storage system | All custodians | Cloud |

122

**Confidential**

*Specification No. 33*

| | | | |
|---|---|---|---|
| Microsoft Outlook | Microsoft email platform | All custodians | Cloud |
| Microsoft Teams | Microsoft chat | All custodians | Cloud |
| Microsoft Teams Channels | Microsoft group | Andrew Walls<br>Blessie Concepcion<br>Brandon Walsh<br>Finn Haley<br>Heather Prince<br>Ingrid Gluck<br>Irene Parker<br>Irma Darmali<br>Jaime Wheeler<br>Nick Olson<br>Sean Chow<br>Wayne Markowitz | Cloud |
| Microsoft SharePoint | Microsoft file storage and file sharing system | Brandon Walsh<br>Don Bobo<br>Finn Haley<br>Irma Darmali<br>Lise Lachance<br>Mark Turco<br>Nick Olson<br>Tarun Mahajan | Cloud |
| Edwards File Server | On-premises server storage | Irene Parker<br>Scott Beggins | On-prem |
| Text Messages (iMessage and SMS) | Mobile messaging application | Brandon Walsh<br>Don Bobo<br>Laksen Sirimanne<br>Nick Olson<br>Sean Chow | Mobile Devices |

Response to Subpart (b)

In response to this subpart, Edwards incorporates by reference its responses to

Specifications 1(d) and 28, which describe Edwards's IT systems and policies with respect to

123

**Confidential**

*Specification No. 33*

document retention, storage, distribution, and maintenance practices used by Edwards employees

with respect to storing, discussing, or sharing information concerning Edwards business.

PX0053-125