PX-2551 - PX-8005
(see exhibit stamps bottom right corner)
PX-2551 (Pgs. 2-89)
PX-8000 (Pgs. 90-279)
PX-8001 (Pgs. 280-354)
PX-8004 (Pgs. 355-381)
PX-8005 (Pgs. 382-431)

Message

**From**: Jan Keltjens [/o=First Organization/ou=Exchange Administrative Group(FYDIBOHF23SPDLT)/cn=Recipients/cn=000640009396F668]
**Sent**: 11/21/2024 3:29:20 PM
**To**: John Kilcoyne [kilcoyne@jenavalve.com]
**CC**: Mike Webber [mwebber@gtclawgroup.com]
**Subject**: RE: Dec 3 BoD Privileged and Confidential
**Attachments**: December 3 2024 DRAFT BoD Deck JKil DRAFT 11 20 24 - comments Jan.pptx

Thanks John,

Please see attached.
I believe in general this is a pretty good and comprehensive draft. We may need some further tailoring of messages re a $20M loan and subsequent steps. We do have time for this though.

Jan

---

**From:** John Kilcoyne <kilcoyne@jenavalve.com>
**Sent:** Thursday, November 21, 2024 02:52
**To:** Jan Keltjens <jankeltjens@hotmail.com>
**Cc:** Mike Webber <mwebber@gtclawgroup.com>
**Subject:** Dec 3 BoD Privileged and Confidential
**Importance:** High

Jan,
Per our discussion, I have attached a draft of the Dec 3 board deck for your review.
I have cc'd Mike Webber to maintain atty client privilege
Best,
John

**John Kilcoyne**
Chief Executive Officer

JENAVALVE

**JenaValve Technology, Inc.**
4 Cromwell
Irvine, California 92618 USA
Office: (949) 767-2110 Ext 1030
E-Mail: kilcoyne@jenavalve.com
www.jenavalve.com

Confidentiality: The information contained in this e-mail transmission is intended only for the use of the individual or entity named above. This e-mail transmission, and any documents, files, previous e-mail transmissions or other information attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient of this e-mail message, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, copying or other use of this transmission or any of the information contained in or attached to it is strictly prohibited. If you have received this e-mail transmission in error, please immediately notify us by return e-mail transmission, and destroy the original e-mail transmission and its attachments without reading, saving, or utilizing it in any manner. Thank you.

# Board of Directors Meeting

December 3, 2024

JENAVALVE

# JenaValve Board of Directors Meeting Agenda

| Section | Topic | Presenter | Time* |
|---|---|---|---|
| 01 | ▪ Opening Of Meeting<br>▪ Approve minutes from August 21, 2024, Board of Directors Mtg<br>▪ Key Topics & 2024 Corporate Goal Review | Jan Keltjens/John Kilcoyne | 8:00am – 8:15am |
| 02 | ▪ Anti Trust Update & Transaction Dynamics | Ropes / John Kilcoyne/ Jan Keltjens | 8:15am – 9:30am |
| 03 | ▪ AWT/DFM Update | Vivian Khalil | 9:30am – 10:00am |
| 04 | ▪ Regulatory Modular Submission Status and Strategy | Jane Metcalf | 10:00am – 10:30am |
| 05 | ▪ Break | All | 10:30am - 10:45am |
| 06 | ▪ Supply Chain (THV & DS) Status, Inventory Build & THV Yield and Efficiency Improvement, Capacity Increase | Perry Payne / Greg Mirigian / Vivian Khalil | 10:45am – 11:45am |
| 07 | ▪ Finance<br>▪ YTD Financials<br>▪ 2025 Budget Proposal | Steve Sloan/John Kilcoyne | 11:45pm – 1:00pm |
| 08 | ▪ Executive Session | Board | 1:00pm - 1:30pm |

* Tine in PST


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.


01
Administration

## Administration

Review and Approve
- September 17, 2024, Board of Directors Meeting Minutes

Key Topics and 2024 Corporate Goals
- Review


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

# Key Topics

Please check suggested edits in RED

**EW Transaction**

- US, Germany & Austria all in second review
- Ongoing ~weekly query responses in each geography
- Certificate of Compliance Submission in all 3 Geographies expected ~mid/end February '25, earliest decision(s) after 30 days
- ~~Deal Certainty Remains A Question from an Anti-Trust perspective~~
- November 12th Meeting at EW was productive in understanding each party's perspective and current thinking
- Bi-Weekly Sweep of Reps/Covenants to Prevent Foot faults.... Gunderson Privileged-Redact

**Regulatory, AWT, Clinical**

[redacted]

**Supply Chain & Resulting Revenue Achievement**

- Trilogy System Inventory
  - Delivery System (sheath) bottleneck will be resolved by EOY & dilator by end Feb. 2025 (3 parallel dilator efforts underway)
  - Valve inventory to meet forecast will be tight in Q1 & early Q2 due to Sept/Oct Litematic equipment issue (resolved) plus loss of 33 valves to NAMSA contamination
- Due to above valve situation Corporate Goal Revenue Achievement of $7.5m (low end of Corp Goal) will not be achieved (Financial Performance Covenant achieved)
- Current revenue projection ~$6m for EOY 2024
- Valve inventory build during calendar year will support clinical, constrained EU commercial forecast and US Pilot commercial launch (Sept). Supply constraints lifted as off mid-year.
- Mfg. (valve) headcount must be added in 2H '25 to support '26 forecast requirements
- Ongoing Valve Yield and Efficiency Improvement Cross functional team (R&D, Ops, Quality) underway provides optimism regarding measurable improvement
- Capacity (Leeds/Irvine) to Support Demand thru '27 will require ~$2m in current facility upgrades, incorporated in BP'25
- Beyond '27 requires new production facility (Costa Rica) decision required x 2H '25 (projected cost ~$15m ~3yrs. w/ yr. 1 spend of ~$4.5m, not in current BP'25

**Finance**

- Expected Cash on Hand – '24 EOY = $12.6m
- 2025 Budget proposal provides adequate cash liquidity (>liquidity covenant) thru Q3 – gear up to launch in Sept. '25 taxes cash position
- Pending feedback from Regulators in Q1 '25– Alternative capital formation and timing must be considered (next slide) for Q2


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Corporate Goals 2024 – Projected Achievement 71%

Is the "H2 40% implant growth" goal indeed achieved?

| Goal | Due D | | | |
|---|---|---|---|---|
| EVIDENCE DEVELOPMENT | | | | |
| FDA Approval of ARTIST IDE Study | Sep 15 | Aug 15 – 120%<br>Oct 15 – 80% | 7.5% | 7.5% |
| Notified body (PCBC) confirmation of submitted EU MDR extension resulting in a CE mark continuation to Dec 2027 | May 26 | Apl 30 – 120% | 10% | 10% |
| European Registry "ARRIVE" Retrospective Reportable Data Collection (150 Captured) and Prospective Data Entry Started | Jun 30 | May 31 – 130%<br>Jul 31 - 60% | 10% | 0% |
| AWT | | | | |
| [redacted] | Jul 31 | Jun 15 – 150%<br>Aug 31 - 50% | 15% | 15% |
| [redacted] | Aug 31 | Jul 31 – 150%<br>Sep 30 50% | 20% | 20% |
| OPERATIONS AND PRODUCT DEVELOPMENT | | | | |
| Large Valve Portfolio Strategy developed, and project plan(s) defined. Size 29 Scope and Data Development Plan Complete. | Oct 31 | Sept 30 – 120%<br>Nov 30 – 80% | 12% | 12% |
| Delivery System Supply of at least [redacted] units to Support CAP, Clinical and Commercial Implant Forecast (Q3-Q4) | Dec 31 | Dec 31 - 2150 DS Inventory – 120%<br>Dec 31 - <150 – 80% | 10% | 0% |
| COMMERCIAL | | | | |
| Achieve 40% growth in H2 of 2024 implants vs. H1 of 2024 actual implants, individually in 3 of 4 highest volume focus accounts which equates to a relative AS share of app. 10 % in Q4'24"<br>• Koln ,Bad O, Mainz, Berlin | Dec. 31 | 130% - all 4 accounts achieve 40%<br>70%- 2 accounts achieve 40% | 10% | 10% |
| [redacted] European/OUS Revenue / Exit non-GAAP revenue run rate Q4 [redacted] incl CAP, excl IDE) | Dec 31 | >$8.5M – 130%<br>$7.5M – 70% | 7.5% | 0% |

Note: Plan Stipulates 60% Achievement to Qualify For Bonus   = Missed   = On Achieved

**Projected Achievement | 71%**

6

© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# 02

# Anti-Trust & Transaction Status & Outlook

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

## Edwards/JenaValve Transaction – Antitrust Status (December 3)

UPDATE

ROPES & GRAY

## Transaction Dynamics

PRIVILEGED AND CONFIDENTIAL

Quite some detail and open ends.
Let's discuss live.

**Privileged-Redact**



© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

## Transaction Dynamics

PRIVILEGED AND CONFIDENTIAL

I do understand the logic of what you propose.

**Privileged-Redact**



© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

# 03

## AWT/DFM Update

## AWT & DFM Executive Summary

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## AWT & DFM Testing Overview

Always tricky in pre-read without voice over. See whether you can add:
- Explain what HSV means (high speed video?)

[redacted] ?

| THV | Annulus | 25M | 50M | | | 75M | 100M | | | 125M | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Size | N=6 each | HSV | Video | Hydro | Inspec | HSV | Video | Hydro | Inspec | HSV | Video |
| [redacted] | | | | | | | | | | | |

Est. End Jan '25 — Est. End Mar '25 — Est. End May '25

**AWT**

- Results: [redacted]
- [redacted]

**DFM**

- At [redacted] cycles

**AWT & DFM On Track**

© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# 04

## Regulatory Modular Submission Update and Strategy

## Regulatory Executive Summary

**US FDA**

- Module 4 submitted; containing Clinical Study, Fatigue Testing, Labeling and Summary of Safety and Effectiveness Data.
- Approval of Module 4 de-risks the few items remaining to be submitted in Module 5, AWT/DFM
- A summary of feasibility testing was presented in Nov. with the purpose of reminding FDA that the Trilogy valve can withstand 200 M cycles, confirming that the root causes from the previously unsuccessful AWT were due to test artifacts. Also laying the groundwork for a possible conditional approval before AWT/DFM testing is complete. Although the probability of conditional approval is low
- FDA favorably responded to the JENA-SIS concept and will perhaps allow a registry study to evaluate size 27 in larger annulus sizes (reduced oversizing). FDA initial feedback at Nov. 22 FDA meeting
- Informal agreement reached to expand the number of JENA-VAD sites, reducing number of Compassionate Use requests.

**PMA modules on-track per plan; Earlier conditional approval strategy has started, but the chances of success are low; JENA-SIS concept is expected to move forward; More sites for JENA-VAD study expected to be approved**

**EU/UK/EEA/ROW**

[redacted]

**MDR certification is on schedule; Several country registrations have been achieved, and more are underway**


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL


PMA Targeted Approval Timeline
PMA
Approval Mod 4
Apr. 30, 2025
Approval Mod 5 & PMA
Aug 31 ,2025
Submitted Mod 4
Nov. 18, 2024
Note: In addition to the module approvals, we must successfully pass FDA facility inspections. We will collaborate with the FDA to complete these inspections by mid-year.
Submit Mod 5
Jun. 30 , 2025
Sep Oct Nov Dec Jan Feb Mar Apr May Jun Jul Aug Sep
AWT Started
Sep 30, 2024
AWT /DFM Report Submitted
Jun. 30, 2025
AWT/DFM
Set-up
AWT Testing
DFM Testing
Confirmatory AWT Testing
Confirmatory testing is not required for Module 5 acceptance
High Confidence for Successful AWT/DFM Report Leading to PMA Approval in August 2025
16
© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.


05
Break

# 06

## Supply Chain (THV & DS) Status, Inventory Build and THV Yield & Efficiency Improvement

## Executive Summary - Supply Chain Constraints

- Might be helpful to remind board of which components we are talking about in the context of the overall DS.
- Can you add perhaps a targeted 3 year outlook. This will comfort the Board in that we are able to support our revenue and therefore valuation projection. Also makes slide #21 easier to position and provides context to slide #25.

[redacted]

**Current Status**

- **Delivery Systems**

  [redacted]

- **Valves**

  [redacted]

**Outlook**

[redacted]

**On Track to Support Balance of '24 and '25 Full System Forecast**

19

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2024 Full System Allocation and Associated Revenu

Is "ROW" Peijia? If so, then designate as such

UNITS

| Segment | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 Actuals | | | | | | | | | | 2024 Forecast | | |
| EU COMM | 25 | 15 | 15 | 20 | 21 | 13 | 22 | 23 | 38 | 37 | 30 | 38 | 298 |
| ROW COMM | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 20 | 0 | 15 | 39 |
| Canada SAP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CAP - CLIN | 8 | 19 | 21 | 22 | 14 | 12 | 20 | 18 | 25 | 18 | 18 | 17 | 210 |
| EM/CU - CLIN | 0 | 2 | 2 | 2 | 1 | 2 | 1 | 0 | 2 | 2 | 1 | 2 | 17 |
| LVAD - CLIN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| ARTIST - CLIN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **33** | **36** | **38** | **44** | **36** | **27** | **44** | **41** | **65** | **77** | **49** | **73** | 565 |
| **Ending Inventory*** | | | | | | | | | | **101** | **94** | **96** | |

**Commercial Revenue Forecast ($000's)**

DOLLARS

| Region | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2024 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024 Actuals | | | | | | | | | | 2024 Forecast | | |
| EU COMM | $ 436 | $ 224 | $ 257 | $ 373 | $ 375 | $ 221 | $ 385 | $ 428 | $ 697 | $ 775 | $ 565 | $ 668 | $5404 |
| ROW COMM | 0 | 0 | 0 | 0 | 0 | 0 | $ 16 | 0 | 0 | $ 330 | 0 | $ 248 | $594 |
| **Totals** | **$ 436** | **$ 224** | **$ 257** | **$ 373** | **$ 375** | **$ 221** | **$ 402** | **$ 428** | **$ 697** | **$ 1105** | **$ 565** | **$ 916** | **$5998** |

**Cumulative Totals** [redacted]

**Full Systems (THV & Delivery) To Close out FY24 Needs**

Achieved [redacted]
Sales Performance Covenant
~Mid October 2024

* Forecasted Ending Inventory as Total Systems

20

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 System Allocation Plan vs. Revenue Projections

**UNITS**

| Segment | 2025 FORECAST Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2025 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US Commercial | [redacted] | | | | | | | | | | | | |
| OUS Commercial | | | | | | | | | | | | | |
| CAP (CLIN) | | | | | | | | | | | | | |
| ARTIST (CLIN) | | | | | | | | | | | | | |
| LVAD (CLIN) | | | | | | | | | | | | | |
| CU/EU | | | | | | | | | | | | | |
| AWT/Large THV | | | | | | | | | | | | | |
| Sustaining (DS) | | | | | | | | | | | | | |
| **Total** | | | | | | | | | | | | | |
| **Ending Inventory** | | | | | | | | | | | | | |

**Commercial Revenue Forecast ($000's)**

**DOLLARS**

| Region | 2025 FORECAST Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2025 Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US Commercial | [redacted] | | | | | | | | | | | | |
| OUS Commercial | | | | | | | | | | | | | |
| **Total Commercial Rev.** | | | | | | | | | | | | | |

[redacted] Run Rate

21

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## THV Global Yield

JENAVALVE




**Global YTD Average Yield = 58% (excl Nov)**

November is a month to date number; yields have been **very** strong in the past few weeks


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## THV Yield per Site: leveraging best practices

JENAVALVE

LEEDS




[redacted]

IRVINE




[redacted]

**Why is there such a difference?**

**Assembly method**
- Irvine uses a modular production line method
- Leeds uses a 1 person 1 valve (single sewer) method
- Feedback in modular production is dynamic, feedback on single sewer is static (at the end).

**Quality acceptance criteria**
- We see significantly more visual defects in Leeds than Irvine
- Visual standards are written the same but interpreted differently

**Collaboration / transparency**
- Continue to execute organization changes
- Why? Leeds and Irvine operate like two different companies – need to harmonize
- Increased Ops. personnel face to face engagement ie Leeds to Irvine and vice versa to break down barriers and harmonize technique and process

Improvements Implemented with Focus on Sustained Gains


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Litematic Issue – Summary

JENAVALVE

[redacted]



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Operations Capacity Strategies

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# THV Yield R&D and Operations Collaboration Projects

## Yield Improvement Projects Executive Summary

JENAVALVE

[redacted]

**Target to Increase Leaflet Yield to 6-9% and Valve Yield to 75% Consistently by End of Q2**


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Patch Elimination

JENAVALVE

[redacted]



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Key THV & Tissue Yield Initiatives thru Q2 2025

JENAVALVE

[redacted]



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Yield Improvement Projects Executive Summary

JENAVALVE

[redacted]

**Improve Yields by End of Q2 2025 without increasing operations burden**


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# 07

## Finance


2024 Actual / Forecast
vs. Budget

## Actuals / Forecast vs. Budget

JENAVALVE

- @Steve: is the mfg reclass treated similar in actual and budget? If so then the $3m not budgeted under C can be a smaller footnote

| ($ in thousands) | Q1 Act | Q2 Act | Bud | Fav/(Unfav) |
|---|---|---|---|---|
| **Revenue** | [redacted] | | | |
| **Cost of revenues** | | | | |
| Clinical and regulatory | | | | |
| Product development | | | | |
| **Total R&D** | | | | |
| Sales and marketing | | | | |
| G&A - normal | | | | |
| Deal expense | | | | |
| **Total SG&A** | | | | |
| **Total OPEX** | | | | |
| **Loss from operations** | | | | |
| Other expense | | | | |
| **Net loss before tax** | | | | |

A. 300 Commercial units vs. 522 budgeted
B. $4M fav product standard on lower volume, $3M fav on reclass to clinical, offset by $5M unfav on yields and spend
C. Patient costs are $3M higher than planned, mfg reclass of $3M not budgeted
D. $1.8M lower spend on outside services, $3.2M lower materials spend
E. $1M of retention bonus and SBC
F. $5M of EW deal expense not budgeted
G. Reduced cash balance/EW interest

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Add comments ABC

# 2025 Budget Proposal

## Executive Summary

Suggest to remove some redundancy on this and next slide

| Topic | Summary |
|---|---|
| *Strategic Focus* | [redacted] |
| *Significant Plan Assumptions* | |
| *What Does Plan Cover* | |
| *What Does Plan NOT cover* | |
| ~~*Concluding Comments*~~ | ~~• Balancing cash constraints with strategic initiatives~~ |


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Assumptions

JENAVALVE

| P&L Item | Summary |
| --- | --- |
| ~~Revenue~~ | • ~~Revenue of $21M; Pilot US Commercial launch in September: 180 un~~<br>• ~~Q4 Revenue of $11M, annualized $44M~~ |
| Manufacturing expansion | • Adding [redacted] headcount in 2025 - All [redacted] are being added in Irvine<br>• [redacted] |
| Clinical and Regulatory Affairs | • [redacted]<br>• Expecting FDA approval in August<br>• [redacted] |
| Product Development | • AWT completion by June<br>• [redacted] |
| Sales and Marketing | • [redacted] |
| General and Administrative | • [redacted] |

- Is all the new headcount in CR/RA additional of also partially backfill?
- Is Large Valve spend external spend (if so, then designate as such)

Note: If PMA delayed, Sales ramp delayed

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Annual Budget

AVALVE

Either in slide or in talking points please have savings (if any) on AWT testing available as well. Expectation is that these cost will come down substantially.

| ($ in thousands) | 2024 Act/Fcst | 2024 % of Rev. | 2025 Bud | 2025 % of Rev. |
|---|---|---|---|---|
| **Revenue** | [redacted] | | | |
| **Cost of revenues** | | | | |
| Pre-commercial manufacturing | | | | |
| Clinical and regulatory | | | | |
| Product development | | | | |
| **Total R&D** | | | | |
| Sales and marketing | | | | |
| G&A - normal | | | | |
| Deal expense | | | | |
| **Total SG&A** | | | | |
| **Total Operating Expenses** | | | | |
| **Loss from operations** | | | | |
| Other expense | | | | |
| **Net loss before tax** | | | | |

units in 2025

[redacted]

37

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 Quarterly Budget

JENAVALVE

| ($ in thousands) | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **Revenue** | | | | |
| **Cost of revenues** | | | | |
| Pre-commercial manufacturing | | | | |
| Clinical and regulatory | | | | |
| Product development | | | | |
| **Total R&D** | | | | |
| Sales and marketing | | | | |
| G&A - normal | | | | |
| Deal expense | | | | |
| **Total SG&A** | | | | |
| **Total OPEX** | | | | |
| **Loss from operations** | | | | |
| Other expense | | | | |
| **Net loss before tax** | | | | |

[redacted]

Note: Exiting Q4 at $11M, annualized $44M run rate



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Monthly Cash On Hand

JENAVALVE

Millions

$50

$40

$30

$20

$10

$-

[redacted]



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# 2025-2027 Plan

## High-level Plan

JENAVALVE

Is all pre-commercial manufacturing expense OpEx or can it be capitalized?

| ($ in thousands) | 2025 |
|---|---|
| **Revenue** | [redacted] |
| **Cost of revenues** | |
| Pre-commercial manufacturing | |
| Clinical and regulatory | |
| Product development | |
| **Total R&D** | |
| Sales and marketing | |
| G&A - normal | |
| Deal expense | |
| **Total SG&A** | |
| **Total Operating Expenses** | |
| **Loss from operations** | |
| Other expense | |
| **Net loss before tax** | |

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# 2025-2027 Plan & Capital Strategy

## High-level Plan

[redacted]

| ($ in thousands) | 2025 Bud | 2025 % of Rev. | 2026 Fcst | 2026 % of Rev. | 2027 Fcst | 2027 % of Rev. |
|---|---|---|---|---|---|---|
| **Revenue** | [redacted] | | | | | |
| **Cost of revenues** | | | | | | |
| Pre-commercial manufacturing | | | | | | |
| Clinical and regulatory | | | | | | |
| Product development | | | | | | |
| **Total R&D** | | | | | | |
| Sales and marketing | | | | | | |
| G&A - normal | | | | | | |
| Deal expense | | | | | | |
| **Total SG&A** | | | | | | |
| **Total Operating Expenses** | | | | | | |
| **Loss from operations** | | | | | | |
| Other expense | | | | | | |
| **Net loss before tax** | | | | | | |

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# Tactical Paths

| | Financing | Innovatus / Interim Funding | Commercial | R&D | Clinical | Operations | HR |
|---|---|---|---|---|---|---|---|
| Deal Closes | Run on Interim Funding | Paid at Closing | Integration into EW team | Continue Ongoing R&D Efforts | Soft ARTIST Launch | Continue with Current Footprint | Continue "As is" |
| Deal Terminates | [redacted] | | Pilot Commercial Launch | [redacted] | Full ARTIST Launch | [redacted] | Significant hires to ramp production and commercial |

*[redacted]before April 23, 2025; [redacted]after April 23, 2025


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Equity Financing and IPO Strawman

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Capitalization Strawman

JENAVALVE

[redacted]

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL


08
Executive Session

# Appendix

# Finance

## 2025 Commercial and Clinical Cases

JENAVALVE

**Commercial**
Europe
US
AsiaPac (Peijia)
Canada

**Clinical**
CAP
Emergency/Compassionate Use
LVAD - Substudy
ARTIST - Clinical Trial

**Total**

[redacted]

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 Headcount

JENAVALVE

| | Q4-2024 | Q1-2025 | Q2-2025 | Q3-2025 | Q4-2025 |
|---|---|---|---|---|---|
| **Total Headcount** | **217** | [redacted] | | | |
| Operations | 101 | [redacted] | | | |
| S&M | 21 | [redacted] | | | |
| R&D - THV | 6 | [redacted] | | | |
| R&D - DS | 9 | [redacted] | | | |
| Clinical | 18 | [redacted] | | | |
| Quality & Regulatory | 41 | [redacted] | | | |
| G&A | 21 | [redacted] | | | |

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 ARTIST Trial

JENAVALVE

| ($ in thousands) | 2025 | 2026 | 2027 | 2028-2036 | Total |
|---|---|---|---|---|---|
| Infrastructure | [redacted] | | | | |
| Patient Enrollment | | | | | |
| Patient Follow ups | | | | | |
| Trial Team | | | | | |
| Vendor Costs | | | | | |
| **Total Study Cost** | | | | | |
| Reimbursement Income | | | | | |
| Device Cost | | | | | |
| **Net Study Cost** | | | | | |
| No. of Sites Activated | | | | | |
| No. of Patients Enrolled | | | | | |
| Headcount | | | | | |

- [redacted]
- [redacted] screen failure rate (300 subjects)
- [redacted] reimbursement in US, [redacted] in EU
- [redacted] total per patient cost over 10 years

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 Large Valve Program

JENAVALVE

| ($ in thousands) | 2025 | 2026 | 2027 | 2028 | Total |
|---|---|---|---|---|---|
| **Resources** | [redacted] | | | | |
| Consulting | | | | | |
| Project Materials | | | | | |
| Testing | | | | | |
| Validation | | | | | |
| Outside services | | | | | |
| Compensation | | | | | |
| **Project Costs** | | | | | |
| Device cost | | | | | |
| **Net Project Cost** | | | | | |

- [redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2025 Operations Spend

JENAVALVE

| ($ in thousands) | 2024 | Q1 | Q2 | Q3 | Q4 | 2025 |
|---|---|---|---|---|---|---|
| Compensation and other | [redacted] | | | | | |
| Direct labor | | | | | | |
| Indirect labor | | | | | | |
| Materials | | | | | | |
| Facilities | | | | | | |
| Outside services | | | | | | |
| Depreciation | | | | | | |
| Other | | | | | | |
| **Total operations** | | | | | | |

**Financials**

- [redacted]

**Key Initiatives**

- [redacted]

**Headcount**

| 2024 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| 80 | 79 | 88 | 101 |

| 2025 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| [redacted] | | | |


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL




Add comments

## 2025 R&D Spend

JENAVALVE

| ($ in thousands) | 2024 | Q1 | Q2 | Q3 | Q4 | 2025 |
|---|---|---|---|---|---|---|
| Compensation and other | [redacted] | | | | | |
| Inventory use non-sale | | | | | | |
| Outside services | | | | | | |
| Materials | | | | | | |
| Other | | | | | | |
| **Total R&D - THV** | | | | | | |

| ($ in thousands) | 2024 | Q1 | Q2 | Q3 | Q4 | 2025 |
|---|---|---|---|---|---|---|
| Compensation and other | [redacted] | | | | | |
| Inventory use non-sale | | | | | | |
| Outside services | | | | | | |
| Materials | | | | | | |
| Other | | | | | | |
| **Total R&D - DS** | | | | | | |

### Key Initiatives

- [redacted]

### Financials

- [redacted]

### Headcount - THV

| 2024 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| 4 | 5 | 6 | 6 |
| 2025 | | | |
| Q1 | Q2 | Q3 | Q4 |
| [redacted] | | | |

### Headcount - DS

| 2024 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| 8 | 8 | 8 | 9 |
| 2025 | | | |
| Q1 | Q2 | Q3 | Q4 |
| [redacted] | | | |


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Add comments

## 2025 Sales & Marketing Spend

JENAVALVE

| ($ in thousands) | 2024 | Q1 | Q2 | Q3 | Q4 | 2025 |
|---|---|---|---|---|---|---|
| Compensation and other | [redacted] | | | | | |
| Travel | | | | | | |
| Conference | | | | | | |
| Outside services | | | | | | |
| Consulting | | | | | | |
| Recruiting | | | | | | |
| Other | | | | | | |
| **Total sales & marketing** | | | | | | |

**Financials**

- US Sales – [redacted]
- EU/UK Sales – [redacted]
- Prof Ed – [redacted]

**Headcount**

| 2024 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| 20 | 17 | 20 | 22 |
| 2025 | | | |
| Q1 | Q2 | Q3 | Q4 |
| [redacted] | | | |

[redacted]

**Key initiatives**

- [redacted]

57 © 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Add comments




Add comments

## G&A Spend

JENAVALVE

| ($ in thousands) | 2024 | Q1 | Q2 | Q3 | Q4 | 2025 |
|---|---|---|---|---|---|---|
| Compensation and other | [redacted] | | | | | |
| Outside services | | | | | | |
| Consulting | | | | | | |
| Travel | | | | | | |
| Professional services | | | | | | |
| Legal | | | | | | |
| Other | | | | | | |
| **Total G&A** | | | | | | |

**Financials**

- [redacted]

**Headcount**

| 2024 | | | |
|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 |
| 23 | 25 | 22 | 21 |
| 2025 | | | |
| Q1 | Q2 | Q3 | Q4 |
| [redacted] | | | |

[redacted]

**Key initiatives**

- [redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Add comments

## 2026 Quarterly Budget

JENAVALVE

| ($ in thousands) | Q1 Fcst | Q2 Fcst | Q3 Fcst | Q4 Fcst | Total |
|---|---|---|---|---|---|
| **Revenue** | [redacted] | | | | |
| **Cost of revenues** | | | | | |
| Pre-commercial manufacturing | | | | | |
| Clinical and regulatory | | | | | |
| Product development | | | | | |
| **Total R&D** | | | | | |
| Sales and marketing | | | | | |
| General and administrative | | | | | |
| **Total SG&A** | | | | | |
| **Total OPEX** | | | | | |
| **Loss from operations** | | | | | |
| Other expense | | | | | |
| **Net loss before tax** | | | | | |

Note: Exiting Q4 at $27M, annualized $109M run rate


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Match circle to green

## 2027 Quarterly Budget

JENAVALVE

| ($ in thousands) | Q1 Fcst | Q2 Fcst | Q3 Fcst | Q4 Fcst | Total |
|---|---|---|---|---|---|
| **Revenue** | [redacted] | | | | |
| **Cost of revenues** | | | | | |
| Pre-commercial manufacturing | | | | | |
| Clinical and regulatory | | | | | |
| Product development | | | | | |
| **Total R&D** | | | | | |
| Sales and marketing | | | | | |
| General and administrative | | | | | |
| **Total SG&A** | | | | | |
| **Total OPEX** | | | | | |
| **Loss from operations** | | | | | |
| Other expense | | | | | |
| **Net loss before tax** | | | | | |

Note: Exiting Q4 at $46M, annualized $183M run rate

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## 2024 Balance Sheet

JENAVALVE

| ($ in thousands) | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **Assets** | [redacted] | | | |
| Current assets: | | | | |
| Cash and cash equivalents | | | | |
| Accounts receivable | | | | |
| Inventory | | | | |
| Prepaid expenses and other current assets | | | | |
| Income tax receivable | | | | |
| Total current assets | | | | |
| Long-term assets | | | | |
| Other assets | | | | |
| **Total assets** | | | | |
| **Liabilities & stockholders' deficit** | | | | |
| Current liabilities: | | | | |
| Accounts payable | | | | |
| Accrued expenses and other liabilities | | | | |
| Operating lease liabilities, current | | | | |
| Total current liabilities | | | | |
| Long-term liabilities | | | | |
| Total liabilities | | | | |
| Convertible preferred stock | | | | |
| Total convertible preferred stock | | | | |
| Stockholders' deficit: | | | | |
| Common stock, par value | | | | |
| Additional paid-in capital | | | | |
| Other comprehensive income (loss) | | | | |
| Accumulated deficit | | | | |
| Total stockholders' deficit | | | | |
| **Total liabilities and stockholders' deficit** | | | | |

62 © 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

Add comments ABC

## New OUS Manufacturing Project Costs

JENAVALVE

| ($ in thousands) | Year 1 | Year 2 | Year 3 | Total |
|---|---|---|---|---|
| Training materials | [redacted] | | | |
| Travel | | | | |
| Lease | | | | |
| Validation costs | | | | |
| Employees expense | | | | |
| Training site | | | | |
| **Total expenses** | | | | |
| | | | | |
| Equipment | | | | |
| Construction costs | | | | |
| **Total CAPEX** | | | | |
| | | | | |
| **Total cost** | | | | |





© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL


Operations

## Delivery System – Sustaining/R&D Projects

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## OUS 2028 - Last calculations from early Q1 2024

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## THV Capacity Key Drivers; Quality Standardization and Sewing Headcount

### Standardization of Critical Quality Operations

- Consistent commissure attachment, tab assembly and AWT free margin lessons
- Above applied to an assembly line effort vs. 1 to 1 mfg.
- Production bottlenecks including testing & specification alignment
- Speed & effectiveness of training / onboarding of new sewers

### Headcount

| | 2024 | | | 2025 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL |
| THV Supply | [redacted] | | | | | | | | | |
| (Total) Fully trained sewers | | | | | | | | | | |
| *Leeds sewers* | | | | | | | | | | |
| *Irvine sewers* | | | | | | | | | | |

Assumptions
- Totals are completed finished valves per month (Leeds & Irvine) entering inventory
- Timing of hiring & training is in line with these projections without delays per plan
- Yields will continue to gradually improve showing improvements in average run rates from 50% to 65% by early 2025.

67 © 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

New slide added to show headcount growth

## THV YTD Site Supply Mix

Passed Valves YTD (Oct Ending)

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | YTD TOTAL | %Split |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Leeds | [redacted] | | | | | | | | | | | |
| Irvine | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | |

**YTD split by site – please note;**

- Irvine did not produce any revenue valves in the first Quarter, was focusing on non-revenue & tissue
- The current split of [redacted] will migrate as yields & new sewers are added to Irvine, progressing to [redacted] then towards [redacted] the manufacturing capacity between the sites.
- Irvine will continue to produce revenue valves, but will also focus on engineering improvements & supporting the non-revenue builds for clinical and R&D.


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## THV Consumption – FY24 YTD Actuals

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# Valves – R&D

## FINAL Holder Design Selected: Key Design Features

[redacted]

© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## AWT/DFM Holder Design Back Up Plan

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

[redacted]

23 © 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL


Regulatory & Quality

## MDR Timeline

JENAVALVE

[redacted]


© 2023 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Executive Summary- Regulatory & Quality

JENAVALVE

**Quality Updates**

- Greenlight Guru, an automated system for document storage , document changes and training, to go live this month
- eIFU program implementation on track to be completed in Q1'25
- Supplier Quality Management and CAPA programs were significantly upgraded to remediate non compliances
- Biannual revalidation of chemical sterilization process nearing completion
- Annual clean room revalidations successfully completed (Leeds and Irvine)

**Quality Organizations**

- For Leeds: New QA leader started, added two quality engineering positions, Searching replacement Chemistry / Biology Lab Mgr.
- For Irvine: Replacements for Supplier Quality Engineer, QE Manager and Leader of Corporate Quality Systems on hold; Additional technicians for in-process inspection, receiving inspection, and chemistry/biology lab on hold. Additional engineer to support complaint system on hold
- Reorganized QA group to establish a 'Corporate Quality Systems' function intended to drive KPIs, efficiencies and best practices

**Upcoming Activities of Note - Quality**

[redacted]

**Regulatory Updates**

- PMA Module 4 (Clinical Study and Fatigue) submitted to FDA
- JENA-VAD requests for more sites sent to FDA
- Live Jena-VAD case for TCT session approved by FDA
- Compassionate/emergency cases submitted to and approved by FDA
- Annual Product Report approved by FDA with no questions
- Vigilance Reports (for adverse event tracking) submitted to Europe
- Final MDR Technical documentation sent to PCBC

**Regulatory Organization**

- Hired Sr. Manager and Sr. Specialist to replacement recent resignations
- Additional Sr. Specialist to support ongoing projects on hold

**Upcoming Activities of Note - Regulatory**

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# Commercial

## Executive Summary Commercial

JENAVALVE

**Sales and Field Updates**

- 5 New sites Opened in past 60 days (Zurich, Imperial , Toulouse, Kiel , Gottingen)
- [redacted]
- 1000th Trilogy implanted on October 8 by Raj Makkar at Cedars
- Peijia Field Team now fully certified /Trilogy to expand in Hong Kong and Taiwan
- U.S. CAP implant demand continues to grow with 24 Active Sites participating

[redacted]

**Organizational Updates**

- Additional JVT Preceptors designated in both U.S. and Europe
- Europe Sales and Clinical Leaders appointed in Q2
- Europe Field Team now all Fully Certified
- New Field Hires in U.S. making progress towards full certification
- TSS Recruiting in Europe and U.S. yielding strong candidates

**Upcoming Activities of Note**

- [redacted]

© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL


US Launch Overview
AR Program Development
[redacted]
Price and Stocking Strategy
[redacted]
Referral Engagement
[redacted]
Targeted Site Approach
[redacted]
Field and Infrastructure Team Recruitment
Scalable Training and Proctor Plan
•VAC, Coverage and Coding Strategies
Focus on Delivering Strong Clinical Outcomes
© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## US Launch Forecast 2025-27

[redacted]



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## Europe Forecast 2025 - 2027

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

# Consolidated Global Commercial Forecast 2025 - 2027

[redacted]


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL

## USA Reimbursement Landscape

JENAVALVE



***CMS:*** *JV Trial Implant Coverage*

JENA-VAD Approved ARTIST In Process

***CODING:*** *Clinical Billing Guides and Commercial Planning*

JENA-VAD Complete ARTIST In Process

***COVERAGE:*** *JV TCET Application Submitted for Commercial Coverage*

Up to 5 years w/ CED Creation of TAVR AR NCD

***POLICY:*** *HR 1691 Breakthrough Device Coverage after FDA approval*

JV Application submission upon Congressional and FDA approval

Coding : Procedure Codes referenced on claims for reimbursement of Trilogy implants



© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

# Clinical Affairs

## Executive Summary Clinical | Medical Affairs

JENAVALVE

### Study/Team Updates

- Clinical Study Report (CSR) submitted for Module 4 PMA
- 337 CAP patients implanted (Nov. 18th)
- Jena-VAD FPI (December) – Cedar's (patient screened November 12th)
- ARTEMIS - OUS Registry (live July 9th) – 196 patients' data are in CASTOR database (newly developed and validated)
- OUS AR Study (CA-0002) Closed Out. CIR report signed off – Prof. Baldus.
- TAVIS closure ongoing
  - Aligning with RA strategy for PMCF submission. Clinical Evaluation Report (which documents the conclusions of a clinical evaluation and the clinical evidence for a medical device) **finalized.**

### Evidence Generation & Dissemination

**London Valves:**

- 'Predictors of permanent pacemaker implantation post-TAVI in patients with aortic regurgitation' – Hendrik Wienemann submitted abstract

**ACC:**

- 500 ALIGN-AR Patients at 30 days – Raj Makkar


© 2024 JENAVALVE TECHNOLOGY, INC. ALL RIGHTS RESERVED. CONTENT IS PROPRIETARY & CONFIDENTIAL.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>EDWARDS LIFESCIENCES CORPORATION,<br><br>and<br><br>JENAVALVE TECHNOLOGY, INC.,<br><br>*Defendants*. | Civil Action No. 1:25-cv-02569-RC |

# EXPERT REPORT OF DR. AARON KESSELHEIM

**October 12, 2025**



PX8000

# TABLE OF CONTENTS

I. QUALIFICATIONS .... 4

II. ASSIGNMENTS AND SUMMARY OF CONCLUSIONS .... 5

III. FACTUAL BACKGROUND .... 8

A. Disease Background .... 9

B. Transcatheter Aortic Valve Replacement .... 10

IV. THE FDA'S APPROVAL PROCESS FOR HIGH-RISK MEDICAL DEVICES IS COMPLEX AND TYPICALLY TAKES SEVERAL YEARS .... 12

A. The FDA's Premarket Approval Process for High-Risk Medical Devices .... 12

*1. Historical Background .... 12*

*2. Device Classification and Regulatory Controls .... 13*

*3. Investigational Device Exemptions and Clinical Trials .... 15*

*4. PMA Submission and the FDA Review Process .... 19*

*5. Post-Approval Device Sponsor Responsibilities .... 21*

B. New High-Risk Medical Devices Are Costly to Develop and Can Take Several Years to Move Through Clinical Testing and PMA Application Review .... 22

C. Expedited and Special Cases .... 25

D. A Combination of Factors Affect FDA PMA Review Time .... 26

E. The Expected FDA Approval Timelines of Trilogy and J-Valve are Consistent with My Analysis .... 27

*1. JenaValve's Trilogy .... 27*

*2. Edwards' J-Valve .... 29*

V. EX-U.S. REGULATION OF HIGH-RISK MEDICAL DEVICES AND USE OF EX-U.S. DATA FOR FDA PREMARKET APPROVAL .... 30

A. A Brief Comparative View on the Standard for Clinical Data Collection Outside the United States .... 30

B. Ex-U.S. Clinical Trial Data Rarely Form the Entire Clinical Basis for High-Risk Device Approvals .... 32

C. It is Likely at Least Several Years before Other TAVR-AR Devices Being Developed Outside the United States Receive FDA Approval .... 34

VI. INNOVATION CONTINUES AFTER PMA APPROVAL, AS EVIDENCED BY CHANGES TO HIGH-RISK DEVICES .... 36

VII. TAVR-AS SHOWS THAT INNOVATION CONTINUED POST-FDA APPROVAL IN THE PRESENCE OF MULTIPLE TAVR-AS DEVICE MANUFACTURERS .... 40

A. TAVR-AS Devices Took Several Years after Pivotal Trials to Obtain FDA Approval ........ 41

B. No PMA Approval for a TAVR-AS Device Relied Solely on Ex-U.S. Data....... 45

C. Post-Approval Device Changes Were Common When Multiple TAVR-AS Devices Were Present ........ 47

D. Post-Approval Device Changes Brought Clinically Relevant Updates to Patients........ 49

VIII. POST-PMA INNOVATION IN TAVR-AR ........ 50

IX. CONCLUSION........ 53

**APPENDIX A**........A-001

**APPENDIX B**........A-112

**APPENDIX C**........A-114

**APPENDIX D**........A-128

## I. QUALIFICATIONS

1. I am a Professor of Medicine at Harvard Medical School and a faculty member in the Division of Pharmacoepidemiology and Pharmacoeconomics in the Department of Medicine at Brigham and Women's Hospital.

2. I graduated summa cum laude from Harvard College and received my M.D. and J.D. degrees concurrently from the University of Pennsylvania. I completed my training in internal medicine at Brigham and Women's Hospital, one of the top internal medicine residency programs in the country. I have practiced internal medicine at Brigham and Women's Hospital consistently since 2002. After residency, I obtained a Master of Public Health degree from Harvard's T. H. Chan School of Public Health as part of the Harvard Medical School fellowship in general medicine.

3. From 2014 to 2015 and 2016 to the present, I have also served as a Visiting Professor of Law at Yale Law School, where I teach an annual course on Food and Drug Administration Law and Policy. Starting in 2019, I have taught a second section of that course for master's degree students at the Yale School of Public Health. When Harvard Medical School founded a Center for Bioethics in 2014, I was one of its original core faculty members. At that time, I developed and still co-teach a core course on health policy, law, and bioethics, and I organize a popular monthly policy and ethics seminar series for medical students.

4. My scholarship combines my training in internal medicine, law, and health services research and covers drug and device development, efficacy, evaluation, regulation, utilization, and cost, as well as the impact of these U.S. Food and Drug Administration ("FDA")-regulated products on patient benefit, risk, and expenditures. In 2012, I founded a research center based in the Harvard Medical School's Division of Pharmacoepidemiology called PORTAL (the Program On Regulation, Therapeutics, And Law). Dedicated to the empirical, non-ideological analysis of topics such as drug and device discovery and development, regulation, availability, and pricing, PORTAL generates rigorous, data-driven research and training in several interrelated aspects of therapeutic product regulation and use and has become one of the nation's largest independent academic research centers studying the interactions among the regulatory, legal, economic, and clinical components of the health care product marketplace. We analyze large databases that track prescribing behavior and patient characteristics and have created numerous novel databases of FDA approvals. We conduct national surveys of patients and physicians, and we analyze the results of that research to identify evidence-based approaches to regulatory science policy.

5. With my PORTAL colleagues, I have published over 800 articles related to these topics in major medical, policy, and law journals, including the *New England Journal of Medicine* (approximately 85 co-authored publications in the last 20 years), the *JAMA* network (220), and *Health Affairs* (60). I regularly participate as a speaker and advisor on regulatory science and policy in a wide array of settings nationally and internationally. I also serve as the editor-in-chief of the *Journal of Law, Medicine, and Ethics*.

6. In 2020, I was elected to the National Academy of Medicine in recognition of my "national leadership in studying how prescription drugs and medical devices interact with

regulatory practices and the law to affect patient health outcomes. Blending rigorous empirical and policy analysis, [Dr. Kesselheim's] research shapes our understanding of how to improve the safety, effectiveness, and affordability of medical products."[1] This is one of the country's highest honors in the fields of health and medicine.

7. In February 2012, I testified before the U.S. House of Representatives Committee on Energy and Commerce on the essential role of the FDA in certifying innovative device safety and effectiveness.[2] In May 2023, I testified before the U.S. House of Representatives Subcommittee on Health of the Committee on Ways and Means in May 2023 on the topic of "[h]ow the government supports meaningful drug and device innovation: funding development of transformative therapies and avoiding excessive prices for new products with limited benefits."[3]

8. My curriculum vitae is attached as Appendix A. A list of all publications that I have authored within the preceding ten years is also included in Appendix A. A list of my testimony from the past ten years is attached as Appendix B to this report.

9. I am being compensated for my time in this matter at a rate of $600 per hour. I am also being reimbursed for the reasonable expenses associated with my work on this case. My compensation is not dependent upon the outcome of this case.

10. I have also undertaken data and document review and analysis. As part of this review and analysis, I have studied investigational hearing and deposition transcripts of the merging parties' employees and other industry participants, third-party and the merging parties' documents and data, as well as information obtained from public sources. The complete list of data, materials, and other information that I have relied on in preparing this report is presented in Appendix C.

## II. ASSIGNMENTS AND SUMMARY OF CONCLUSIONS

11. Edwards Lifesciences Corporation ("Edwards") proposes to acquire JenaValve Technology, Inc. ("JenaValve") in a transaction with a potential value up to $945 million.[4] The

---

[1] NATIONAL ACADEMY OF MEDICINE, *National Academy of Medicine Elects 100 New Members*, (Oct. 9, 2023), https://nam.edu/news-and-insights/national-academy-of-medicine-elects-100-new-members/.

[2] *Reauthorization of MDUFA: What it Means for Jobs, Innovation, and Patients: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.*,112th Cong. 2 (2012) (statement of Aaron S. Kesselheim, Assistant Professor of Medicine, Harvard Medical School, Division of Pharmacoepidemiology and Pharmacoeconomics, Brigham and Women's Hospital) (statement titled "The Essential Role of the FDA in Certifying Innovative Device Safety and Effectiveness").

[3] *Hearing on Examining Policies that Inhibit Innovation and Patient Access: Hearing Before the Subcomm. on Health of the H. Comm. on Ways & Means*, 118th Cong. 16 (2023) (statement of Aaron S. Kesselheim, Assistant Professor of Medicine, Harvard Medical School, Division of Pharmacoepidemiology and Pharmacoeconomics, Brigham and Women's Hospital) (statement titled "How the Gov't Supports Meaningful Drug and Device Innovation: Funding Development of Transformative Therapies and Avoiding Excessive Prices for New Products with Limited Benefits").

[4] *See* PX0010 at 009-010 (EW, 3(b)-1: Agreement and Plan of Merger among Edwards Lifesciences Holding, Inc., Jupiter Merger Sub, Inc., JenaValve Tech., Inc., and S'holder Representative Servs. LLC); PX1157 at 014 (EW, Bd. Presentation, July 10, 2024).

Federal Trade Commission ("FTC" or "Commission") asked me to assess and analyze the following issues, among others, based on my expertise:

a. The timeline for high-risk medical devices to receive FDA approval and whether the expected dates of approval posited by the merging parties is consistent with this timeline;

b. The relevance of clinical data obtained from studies of high-risk medical devices that occur outside the United States ("ex-U.S.") to the FDA approval process and how long it may take devices for transcatheter aortic valve replacement for aortic regurgitation ("TAVR-AR") in ex-U.S. development to obtain FDA approval;

c. The extent to which high-risk medical device innovation continues after FDA approval;

d. The development of transcatheter aortic valve replacement ("TAVR") devices for aortic stenosis ("AS") as a potential guide for the expected regulatory approval timeline of TAVR-AR devices; and

e. Ongoing and expected future innovation in the development of TAVR-AR devices.

12. I have also been asked to evaluate and respond to the merging parties' submissions, as needed.

13. I detail my specific conclusions below. In summary, my conclusions are that:

14. **Moving from preclinical development through early feasibility studies, pivotal trials, and FDA approval of high-risk medical devices is a complicated process that typically takes several years.**

a. The TAVR-AR devices at issue in this matter are classified by the FDA as Class III (also referred to as high-risk) devices. Class III devices require a showing of reasonable assurance of the device's safety and effectiveness to obtain the required FDA approval to be sold in the United States. A high-risk device that is also classified as a significant-risk device generally requires an FDA-approved Investigational Device Exemption ("IDE") to begin clinical studies. Such clinical studies can include early feasibility studies, traditional feasibility studies, and at least one larger pivotal trial to gather the clinical data needed to secure FDA approval. A substantial amount of non-clinical studies and other regulatory components, such as manufacturing facility inspections, can be required as well.

b. Experience from other FDA-approved high-risk devices shows that the time from obtaining an IDE to FDA approval of a Premarket Approval ("PMA") application can take five to ten years, with the early testing

stages lasting about two years, pivotal trials lasting about four to five years, and FDA review and approval taking about six months to two years. There are aspects of the FDA regulatory process that may either expedite or delay a particular device's timeline. A review of the timeframe for FDA approval of existing TAVR-AS devices supports the conclusion that these estimates are reasonable for TAVR-AR.

c. Edwards' and JenaValve's predictions available to me at the time of this report regarding when FDA PMA approval may occur for their TAVR-AR devices are consistent with the aforementioned timeline.

15. **It is rare for high-risk medical devices to rely solely on clinical data obtained outside the United States in proceeding through the FDA approval process.**

a. While the FDA accepts clinical data obtained outside of the United States in support of a PMA application for a high-risk medical device like TAVR-AR, the data must meet applicable FDA regulations and be applicable to U.S. patients.

b. In practice, foreign-obtained clinical data alone almost never form the full basis for high-risk device approval by the FDA. When ex-U.S. data have been considered, such data were generally used in conjunction with data collected from U.S. clinical trials.

c. Based on the available information regarding the clinical status of TAVR-AR devices being developed outside of the United States and the lack of evidence that these devices have taken any meaningful steps to develop complementary U.S. clinical data generally necessary for FDA approval—such as obtaining an IDE that would signal the initiation of human clinical trials in the United States—these devices are likely several years away from having sufficient clinical data to support any PMA application to the FDA.

16. **Innovation of high-risk medical devices continues after PMA approval in ways that can be clinically meaningful.**

a. The FDA provides several supplemental pathways for device manufacturers to update their devices after PMA application approval. Data show that post-approval innovation is common and likely, and my analysis regarding TAVR-AS shows how the process supports clinically meaningful changes for patients.

17. **TAVR-AS devices took several years to receive FDA approval, none were approved solely on the basis of foreign data, and innovation continued post-PMA approval in the presence of multiple TAVR-AS devices from multiple companies.**

a. First, publicly available data regarding TAVR-AS devices show that TAVR-AS devices took numerous years from the start of pivotal trials to

PMA application approval by the FDA. Second, foreign clinical data did not provide the sole basis for any TAVR-AS approval and when such data were considered by the FDA, the approval process was not substantially accelerated. Finally, data show numerous post-PMA device changes, including those that are clinically meaningful for patients and physicians.

18. **Innovation of TAVR-AR devices will likely be similar to the post-FDA experience of TAVR-AS, in which innovation continued and included clinically relevant changes in the presence of multiple TAVR-AS devices from different companies.**

a. Available materials that I have reviewed indicate that, prior to the announcement of the proposed transaction, both JenaValve's Trilogy and then-JC Medical's J-Valve had plans for post-PMA approval innovation intended to improve and iterate on each device. Materials that I have reviewed are also unclear as to whether such plans would go forward post-transaction.

b. Based on my experience, expertise, the analysis done for this report, and the materials available to me, the post-PMA approval experience of TAVR-AS provides a reasonable guide for what we may expect from TAVR-AR in the future.

19. This report provides the details of my analysis to date based on my present factual understandings. Because discovery continues in this matter, my work is ongoing, and I may update or revise my analysis and conclusions based on new information that is produced or becomes available to me during the course of this matter.

## III. FACTUAL BACKGROUND

20. My report begins with an overview of AR, the TAVR procedure, and the parties. In preparing this section of the report, I draw from my own experience, writings, and teachings, as well as my review of available information, including publicly available sources, the testimony of fact witnesses, and the parties' documents.

21. In July 2024, Edwards proposed to acquire JenaValve. The proposed transaction seeks to combine JenaValve and Edwards, which appear to be the only two manufacturers of TAVR-AR devices currently engaged in the extended process of FDA approval in the United States. JenaValve is a medical device company that makes as its sole product a TAVR-AR system called Trilogy, which finished its U.S. clinical trials and is seeking PMA approval to treat severe AR.[5] JenaValve completed submission of its PMA application for FDA approval on June 30, 2025 and expects FDA approval by the first quarter of 2026.[6] Edwards is a global medical

[5] PX0028 at 010 (JVT, 4(b)-1, JenaValve Tech., Inc., Consol. Fin. Statements as of and for the Years Ended December 31, 2023 and 2022 and Rep. of Indep. Auditors); *see also* JENAVALVE, https://jenavalve.com/ (last visited Oct. 10, 2025).

[6] PX7017 (Spadaro (JVT) Dep.) at 18:1-6, 146:10-17; PX0044 at 019 (JVT, Def. JenaValve Tech., Inc.'s Am. Resps. and Objs. to Pl.'s First Set of Interrogs.).

device manufacturer that sells devices to treat structural heart conditions. Also, in July 2024, Edwards acquired JC Medical, Inc. ("JC Medical"), a medical device manufacturer focused on treatments for structural heart disease. JC Medical obtained FDA approval to conduct clinical trials for the J-Valve system, which is also a TAVR-AR system to treat severe AR.[7] Edwards is currently conducting its pivotal clinical trial, called JOURNEY, and is forecast to receive FDA approval by late 2028 or early 2029.[8]

### A. Disease Background

22. The aortic valve is a structure that separates the heart's left ventricle—the heart's main pumping chamber—from the aorta, which is the main artery that carries oxygenated blood to the rest of the body.[9] Its primary purpose is to function as a "one-way door," preventing blood from going back into the heart after it has been pushed out into the aorta.[10] The aortic valve has three leaflets that open when the pressure in the heart is greater than the pressure in the aorta.[11]

23. AR is a type of heart valve disease in which the aortic valve fails to close fully after each heartbeat, causing blood to flow back into the left ventricle.[12] This backward leakage creates an excess volume of blood in the left ventricle that forces the heart to work harder and eventually causes an enlargement of the ventricle.[13] Over time, this can weaken the heart and ultimately lead to heart failure and other adverse cardiovascular outcomes.[14]

24. At present, surgical aortic valve replacement ("SAVR") is the primary treatment for AR in the United States.[15] SAVR is a form of open heart surgery that requires opening the patient's chest, stopping the patient's heart, removing the patient's diseased valve, and sewing in a new mechanical valve or a valve made from the tissue of an animal, typically a pig or cow.[16] It is an invasive procedure that can require a hospital stay of anywhere between three to twelve days, in addition to a recuperation period of at least six weeks.[17] SAVR is not available to all

---

[7] *See* NAT'L INSTITUTE OF HEALTH, *J-Valve Transfemoral Pivotal Study (JOURNEY)*, https://clinicaltrials.gov/study/NCT06455787. Edwards has renamed J-Valve as "Sojourn" though the TAVR-AR device is still widely referred to as J-Valve.

[8] PX1397 at 014 (EW, THV Leadership Team Presentation, Feb. 20, 2025); PX7026 (Bierman (EW) Dep.) at 233:20-24; *see also* PX1157 at 023, (EW, Board Presentation, July 10, 2024); NAT'L INSTITUTE OF HEALTH, *J-Valve Transfemoral Pivotal Study (JOURNEY)*, https://clinicaltrials.gov/study/NCT06455787

[9] PX7011 (McCabe (UW) Dep.) at 20:22-21:19.

[10] *Id.* at 21:8-19.

[11] *Id.* at 21:8-19.

[12] *Id.* at 25:2-26:11; PX7012 (Pinto (JVT) Dep.) at 191:13-192:9; PX7029 (Thourani (Piedmont) Dep.) at 58:8-59:22; CLEVELAND CLINIC, *Aortic Regurgitation*, https://my.clevelandclinic.org/health/diseases/24396-aortic-regurgitation.

[13] PX7011 (McCabe (UW) Dep.) at 25:2-26:11; CLEVELAND CLINIC, *Aortic Regurgitation*, https://my.clevelandclinic.org/health/diseases/24396-aortic-regurgitation.

[14] PX7011 (McCabe (UW) Dep.) at 26:12-21; CLEVELAND CLINIC, *Aortic Regurgitation*, https://my.clevelandclinic.org/health/diseases/24396-aortic-regurgitation.

[15] PX7011 (McCabe (UW) Dep.) at 39:22-40:14; PX5000 (Williams (NYU) Decl.) ¶ 4; PX5001 (Larkin (MDT) Decl.) ¶ 2.

[16] *See id.* at 39:22-42:16; PX7029 (Thourani (Piedmont) Dep.) at 63:18-21; CLEVELAND CLINIC, *Surgical Aortic Valve Replacement*, https://my.clevelandclinic.org/health/treatments/25057-aortic-valve-replacement.

[17] PX7029 (Thourani (Piedmont) Dep.) at 28:12-29:15; PX7020 (Kereiakes (Christ Hospital) Dep.) at 11:14-23; PX7011 (McCabe (UW) Dep.) at 42:21-44:18.

patients, as it is not an option for patients with certain co-morbidities or those who are otherwise at high risk for surgery, including many elderly patients.[18]

### B. Transcatheter Aortic Valve Replacement

25. In contrast with SAVR, TAVR is a minimally invasive procedure used to treat aortic valve disease.[19] In a TAVR procedure, a physician uses a catheter to guide a replacement valve through a patient's blood vessels to the heart and replace the malfunctioning native valve by displacing it with the new valve, without the need to open the patient's chest, stop the heart, or administer general anesthesia, as required with SAVR.[20] Before the availability of TAVR, the only way to replace a malfunctioning heart valve was through SAVR.[21]

26. In the United States, transfemoral access (access via the femoral artery and a small incision in the patient's groin) is the standard of care for TAVR, while other approaches are generally used when transfemoral access is not an option for a particular patient.[22] For example, one such alternative approach is transapical access (access via the left ventricular apex of the heart via an incision in the lower left chest), although I understand this is rarely used in the United States due to its greater invasiveness and worse clinical outcomes compared to transfemoral access.[23] Most TAVR patients spend one day in the hospital, with a typical recuperation period of about seven to ten days.[24]

27. TAVR was first developed to treat AS.[25] AS is a type of heart valve disease characterized by a buildup of calcium on the aortic valve, which stiffens the valve and prevents it from fully opening after each heartbeat.[26] This stiffening obstructs the blood flow from the left ventricle to the aorta, and over time, the amount that the valve opens will decrease.[27] As a result,

---

[18] PX7020 (Kereiakes (Christ Hospital) Dep.) at 23:34-16; PX7029 (Thourani (Piedmont) Dep.) at 66:4-67:43.

[19] MAYO CLINIC, *Transcatheter Aortic Valve Replacement (TAVR)*, https://www.mayoclinic.org/tests-procedures/transcatheter-aortic-valve-replacement/about/pac-20384698.

[20] PX7011 (McCabe (UW) Dep.) at 21:20-22:16; PX5001 (Larkin (MDT) Decl.) ¶ 2; MAYO CLINIC, *Transcatheter Aortic Valve Replacement (TAVR)*, https://www.mayoclinic.org/tests-procedures/transcatheter-aortic-valve-replacement/about/pac-20384698; PX7029 (Thourani (Piedmont) Dep.) at 30:6-33:7.

[21] PX7011 (McCabe (UW) Dep.) at 39:22-40:14; PX5001 (Larkin (MDT) Decl.) ¶ 2; PX7026 (Bierman (EW) Dep.) at 87:14-88:20 (discussing PX1390 which noted that Edwards would be "feeding the starving" with its TAVR device because "there's no alternatives to surgery for these patients.").

[22] *See* Katherine Lutz et al., *Alternative Access for TAVR: Choosing the Right Pathway*, J. OF CLINICAL MED., June 9, 2024 (also noting that up to 5-12% of patients can require an access approach other than transfemoral, including: transcarotid, transaxillary and transsublcavian, transaortic, transcaval, transseptal, and transapical); MAYO CLINIC, *Transcatheter Aortic Valve Replacement (TAVR)*, https://www.mayoclinic.org/tests-procedures/transcatheter-aortic-valve-replacement/about/pac-20384698; *see also* Basel Ramlawi, et al., *Transcatheter Aortic Valve Replacement (TAVR): Access Planning and Strategies*, METHODIST DEBAKEY CARDIOVASCULAR J., 2012, at 22-25; PX7023 (Keltjens (JVT) Dep.) at 24:3-10; PX7029 (Thourani (Piedmont) Dep.) at 38:2-40:9.

[23] PX7029 (Thourani (Piedmont) Dep.) at 38:2-40:9; *see also* PX7031 (Williams (NYU) Dep.) at 15:7-17, 16:13-17:19.

[24] PX7020 (Kereiakes (Christ Hospital) Dep.) at 9:24-10:12; PX7011 (McCabe (UW) Dep.) at 42:21-44:18; PX5000 (Williams (NYU) Decl.) ¶ 5; PX7029 (Thourani (Piedmont) Dep.) at 33:8-35:9.

[25] PX7011 (McCabe (UW) Dep.) at 22:1-16.

[26] *Id.* at 22:17-23:19; PX7031 (Williams (NYU) Dep.) at 9:2-9:14.

[27] PX7020 (Kereiakes (Christ Hospital) Dep.) at 18:9-21; PX7029 (Thourani (Piedmont) Dep.) at 44:10-45:21; PX7011 (McCabe (UW) Dep.) at 22:17-24:7.

the heart must work harder to pump blood to the body.[28] AS is a potentially fatal condition if left untreated.[29]

28. Edwards launched the first TAVR device to treat AS ("TAVR-AS") after combining technology it had acquired from Percutaneous Valve Technologies in 2003 with Edwards' own internal development, which ultimately led to the commercialization of the Sapien valve in November 2011 in the United States.[30] Edwards has since launched several updated versions of its Sapien device: Sapien XT (June 2014), Sapien 3 (June 2015), Sapien 3 Ultra (Dec. 2018), and Sapien 3 Ultra RESILIA (Sept. 2022).[31] In January 2014, Medtronic received FDA approval for its first TAVR-AS device, the CoreValve System. Medtronic's device is now known as Evolut, and Medtronic has since launched several updated versions: Evolut R (June 2015), Evolut PRO (March 2017), Evolut PRO+ (Sept. 2019), Evolut FS (Aug. 2021), and Evolut FX+ (March 2024).[32] In September 2021, Abbott received FDA approval for its first TAVR-AS device, Portico, followed by approval in January 2023 for its next generation device, Navitor.[33] Boston Scientific was briefly in the TAVR-AS market, receiving FDA approval for its TAVR-AS device in 2019 before withdrawing its device from the market in 2020.[34]

29. No TAVR-AS device has been approved by the FDA for the treatment of AR.[35] As noted above, AS is caused by calcium deposits on the aortic valve's leaflets. TAVR-AS uses those calcium deposits to anchor the device. AR patients, however, typically do not have calcium deposits on the aortic valve's leaflets and annulus.[36] As a result, TAVR-AR devices require a mechanism to hold them securely in place within the aortic valve to prevent them from dropping into the left ventricle, a dangerous complication known as embolization.[37] Because it uses the calcium deposits to anchor, TAVR-AS devices may not anchor securely if used for AR; evidence

[28] PX7020 (Kereiakes (Christ Hospital) Dep.) at 18:10-21.
[29] PX7011 (McCabe (UW) Dep.) at 22:17-24:7; *see also* PX5001 (Larkin (MDT) Decl.) ¶ 3; PX5000 (Williams (NYU) Decl.) ¶ 2.
[30] PX0053 at 088 (EW, Resp. of Edwards Lifesciences Corp. to the Request for Additional Information and Documentary Materials); https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P100041. *See also* PX7026 (Bierman (EW) Dep.) at 112:17-113:2.
[31] PX7026 (Bierman (EW) Dep.) at 112:17-113:2; PX1594 at 012.
[32] Medtronic, Medtronic CoreValve System Receives FDA Approval for Patients at High Risk for Surgery (June 12, 2014), https://news.medtronic.com/2014-06-12-Medtronic-CoreValve-R-System-Receives-FDA-Approval-for-Patients-at-High-Risk-for-Surgery; PX5001 (Larkin (MDT) Decl.) ¶ 6; PX1594 at 012.
[33] Abbott, Press Releases, Abbott Receives FDA Approval for Navitor™, a Next-Generation TAVI System Designed to Treat Aortic Stenosis (Jan. 17, 2023),https://abbott.mediaroom.com/2023-01-17-Abbott-Receives-FDA-Approval-for-Navitor-TM-,-a-Next-Generation-TAVI-System-Designed-to-Treat-Aortic-Stenosis.
[34] Boston Scientific, Boston Scientific Receives FDA Approval for LOTUS Edge™ Aortic Valve System (Apr. 23, 2019), https://news.bostonscientific.com/2019-04-23-Boston-Scientific-Receives-FDA-Approval-for-LOTUS-Edge-TM-Aortic-Valve-System; Diagnostic and Interventional Cardiology, Boston Scientific Pulls Lotus Edge TAVR Valve off the Market (Nov. 17, 2020), https://www.dicardiology.com/article/boston-scientific-pulls-lotus-edge-tavr-valve-market).
[35] PX5001 (Larkin (MDT) Decl.) ¶ 9; *see also* PX7019 (Wood (Edwards) Dep.) at 14:19-15:10; PX7026 (Bierman (Edwards) Dep.) at 143:25-144:3.
[36] PX7029 (Thourani (Piedmont) Dep.) at 74:9-76:13; PX5001 (Larkin (MDT) Decl.) ¶ 9.
[37] PX7011 (McCabe (UW) Dep.) at 33:5-35:6, 36:10-21; PX5000 (Williams (NYU) Decl.) ¶ 10; PX7020 (Kereiakes (Christ Hospital) Dep.) at 59:12-60:10; PX7029 (Thourani (Piedmont) Dep.) at 76:14-78:1.

shows that TAVR-AS devices have resulted in embolization approximately 10 to 12 percent of the time when used for AR.[38]

30. TAVR valves are classified by the FDA as Class III (because of their high risk) medical devices, a regulatory device categorization that I will describe in further detail in the next section. Any manufacturer seeking to market a TAVR-AR device in the United States will need to meet the requirements of the FDA's regulatory approval process for Class III medical devices, including demonstration of reasonable assurance of safety and effectiveness.[39] I will use the terms Class III and high-risk interchangeably in the remainder of this report.

## IV. THE FDA'S APPROVAL PROCESS FOR HIGH-RISK MEDICAL DEVICES IS COMPLEX AND TYPICALLY TAKES SEVERAL YEARS

31. Edwards and JenaValve are both pursuing approval from the FDA for their TAVR-AR medical devices and are currently at different stages in the FDA approval process. In this section, I will review the details of the FDA's device approval process for high-risk devices like TAVR-AR devices from pre-approval to post-approval requirements, followed by an analysis of how long the FDA approval process may take for high-risk medical devices.

### A. The FDA's Premarket Approval Process for High-Risk Medical Devices

#### *1. Historical Background*

32. While the Food, Drug, and Cosmetic Act has long required new drugs to obtain FDA approval by first demonstrating safety and efficacy before being marketed, it originally did not impose similar pre-approval requirements on medical devices.[40] The FDA first received statutory authority to regulate the approval of new medical devices for the U.S. market under the 1976 Medical Device Amendments to the Food, Drug, and Cosmetic Act.[41] Until that point, medical devices had no official premarket requirements and were subject to state-level oversight via consumer protection statutes applicable to all commercial products.[42] However, a public health crisis arose when the Dalkon Shield, an intrauterine device originally marketed in the 1970s and used by millions of women in the United States, was found to be associated with an increased risk of pelvic inflammatory disease, sepsis, miscarriage, and death.[43] The Dalkon Shield had been marketed as safe and effective despite the barest of premarket testing and the manufacturer's knowledge of the product's potential dangers.[44] After the Dalkon Shield was

---

[38] PX2326 at 006 (JVT, Pricing Slide Deck, Dec. 5, 2024); PX1151 at 009 (EW, AR Opportunities Analysis Draft, Apr. 2024); PX7029 (Thourani (Piedmont) Dep.) at 74:9-76:10.

[39] *See* PX5000 (Williams (NYU) Decl.) ¶ 11; see also PX5001 (Larkin (MDT) Decl.) ¶ 10; 21 U.S.C. §360c(a)(1)(A)(i) (2025).

[40] Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, CURRENT CARDIOLOGY REP., 489-498 (2014).

[41] *Id.*; *see also* Medical Device Amendments of 1976, PL. 94-295, 90 Stat. 539 (1976), https://www.govinfo.gov/content/pkg/STATUTE-90/pdf/STATUTE-90-Pg539.pdf.

[42] Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, CURRENT CARDIOLOGY REP., 489-498 (2014).

[43] *Id.*; *see also* Institute of Medicine, Medical Devices and The Public's Health: The 510(k) Clearance Process at 35 Years (2011).

[44] Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, CURRENT CARDIOLOGY REP., 489-498 (2014).

ultimately withdrawn from the market, Congress opted to centralize medical device regulatory power in the FDA.[45]

### *2. Device Classification and Regulatory Controls*

33. Under the Medical Device Amendments, all medical devices became subject to "general controls," including proper labeling and adherence to predefined Good Manufacturing Practices, such as a demonstration of adequate packaging and storage.[46] The legislation also created the risk-based classification system with three classes of devices along with the associated regulatory pathways for FDA approval.[47]

34. At present, the Medical Device Amendments require the FDA to obtain a "reasonable assurance of safety and effectiveness" prior to marketing.[48] The degree of FDA oversight over any particular medical device depends on the device's risk to patients.[49] The FDA guidelines assign each device to one of three regulatory classes based on its risk level: I, II, and III (Table 1).[50]

**Table 1. Medical Device Classifications in the United States**

| Class | Risk | Potential Harm | Regulatory Controls | Submission Type or Exemption |
|---|---|---|---|---|
| I | Lowest | Present minimal potential for harm | General | 510(k)<br>510(k) Exempt |
| II | Moderate | Higher risk than class I devices | General and Special (if available) | 510(k)<br>510(k) Exempt |
| III | Highest | Sustain or support life, are implanted, or present potential unreasonable risk of illness or injury | General and PMA | PMA |

*Source: FDA, How to Study and Market Your Device (Oct. 12, 2023), https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/how-study-and-market-your-device#step1.*

35. **Class I Devices:** Class I devices are those with low risk to patients, such as crutches, examination gloves, or stethoscopes. Most Class I devices are exempt from any

---

[45] *Id*.
[46] FDA, General Controls for Medical Devices, (Dec. 15, 2023), https://www.fda.gov/medical-devices/regulatory-controls/general-controls-medical-devices.
[47] FDA, A History of Medical Device Regulation & Oversight in the United States, (Aug. 21, 2023), https://www.fda.gov/medical-devices/overview-device-regulation/history-medical-device-regulation-oversight-united-states.
[48] 21 U.S.C. §360c(a)(1)(A)(i) (2025). The MDA does not define safety or effectiveness further.
[49] William H. Maisel, *Medical Device Regulation: An Introduction for the Practicing Physician*, Annals of Internal Medicine, 296-302 (2004).
[50] *Id.*; *see also* FDA, Classify Your Medical Device (Feb. 7, 2020), https://www.fda.gov/medical-devices/overview-device-regulation/classify-your-medical-device; FDA, How to Study and Market Your Device (Oct. 12, 2023), https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/how-study-and-market-your-device.

premarket submission requirements, meaning they do not require prior FDA review, though sponsors must still register the products.[51]

36. **Class II Devices:** Class II devices are moderate-risk devices, such as mercury thermometers and powered wheelchairs. Most moderate-risk devices come to market via the 510(k) review process, where the FDA evaluates the device based on a standard of substantial equivalence.[52] A finding of substantial equivalence certifies that a device is similar to a previously-cleared device such that it raises no new safety or effectiveness concerns.[53] New devices that do not have a predicate device to which they can be readily compared are automatically considered Class III devices, although a pathway exists for their re-classification to low- or moderate-risk.[54]

37. **Class III Devices:[55]** Relevant to this matter are Class III devices, which are those that pose the highest risk to patients.[56] Examples of Class III devices include replacement heart valves, deep-brain stimulators, implantable cardioverter-defibrillators, renal dialysis catheters, and breast implants.[57] Accordingly, Class III devices receive regulatory oversight commensurate with their risk, and the Medical Device Amendments authorize the FDA to request from a device manufacturer the data it deems necessary to provide a reasonable assurance of safety and effectiveness for the device's intended use.[58]

38. The safety and effectiveness of a Class III device are determined based on the consideration of, "among other relevant factors: (1) [t]he persons for whose use the device is represented or intended; (2) [t]he conditions of use for the device, including conditions of use prescribed, recommended, or suggested in the labeling or advertising of the device, and other intended conditions of use; (3) [t]he probable benefit to health from the use of the device weighed against any probable injury or illness from such use; and (4) [t]he reliability of the device."[59]

39. According to the FDA regulations, reasonable assurance of safety and effectiveness is demonstrated if: 1) the probable benefits to health from use of the device for its intended uses and conditions of use outweigh any probable risks; and 2) in a significant portion

---

[51] FDA, Class I/II exempt devices (July 1, 2025), https://www.fda.gov/medical-devices/classify-your-medical-device/class-i-and-class-ii-device-exemptions.
[52] *Id.*
[53] *Id.*; *see also* FDA, CDRH Preliminary Internal Evaulations – Volume II Task Force on the Utilization of Science in Regulatory Decision Making Preliminary Report and Recommendations (Aug. 2010), https://www.scribd.com/document/242722569/510-K-Working-Group-Volume-II.
[54] FDA, De Novo Classification Request (Sept. 30, 2025), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/de-novo-classification-request.
[55] I will refer to Class III medical devices as high-risk medical devices throughout this report.
[56] According to the FDA, Class III devices are generally those that are "life-supporting or life-sustaining, or for a use which is of substantial importance in preventing impairment of human health, or if the device presents a potential unreasonable risk of illness or injury." 21 C.F.R. §860.3 (2025).
[57] FDA, Product Classification Database, http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm (last visited Oct. 12, 2025).
[58] 21 C.F.R. § 860.7 (2018).
[59] *Id.* § 860.7(c).

of the target population, the use of the device for its intended uses and conditions of use will provide clinically significant results.[60]

40. Class III devices require PMA applications, which represent the most stringent premarket review that the FDA can conduct of a new medical device.[61] The PMA application requires extensive non-clinical data such as biocompatibility, sterility testing, animal data, and details of devices' computing or engineering functions, as well as clinical studies evaluating the effectiveness of the device and its safety profile.[62]

### *3. Investigational Device Exemptions and Clinical Trials*

41. A new medical device starts with an engineer or scientist testing the invention in various laboratory settings, such as academic centers or private companies that conduct research.[63] Promising devices are often tested *in vivo* using animals or other preclinical models to determine how they might work in human patients.[64] Once preclinical laboratory and *in vivo* studies are completed, clinical testing in humans begins. For a Class III device, this usually means an application for an IDE.[65] An IDE allows a medical device to be used in clinical research for the purpose of collecting data on its safety and effectiveness—data that could ultimately help support a PMA application.[66]

42. FDA regulations governing IDEs require an IDE application for significant risk devices, such as TAVR-AR devices.[67] The significant risk descriptor is specific to the type of device study covered by an IDE, and is in addition to the device's classification as, for example, Class III (high-risk).[68] The applicant for an IDE, often the company developing the device—referred to as the "sponsor"—is responsible for initiating the investigation.[69] Significant risk

[60] 21 C.F.R. § 860.7(d)-(e) (2018).
[61] Safe Medical Devices Act. Pub. L. No. 101-629, 104 Stat. 4511 (1990).
[62] *See, e.g.*, Wolf Sapirstein et al., *The Role of Clinical Trials in the Food and Drug Administration Approval Process for Cardiovascular Devices*, 1900-1902 (1994); Daniel B. Kramer et al., *Premarket Clinical Evaluation of Novel Cardiovascular Devices: Quality Analysis of Premarket Clinical Studies Submitted to the Food and Drug Administration 2000-2007*, American Journal of Therapeutics (2010); Sanket S. Dhruva et al., *Strength of Study Evidence Examined by the FDA in Premarket Approval of Cardiovascular Devices*, JAMA 2679-2685 (2009); FDA, PMA Application Contents (April 22, 2025), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-contents.
[63] *See, e.g.*, Shuai Xu, et al., *Origins of Medical Innovation: The Case of Coronary Artery Stents*, Circulation: Cardiovascular Quality and Outcomes 743-749 (Oct. 23, 2012).
[64] FDA, General Considerations for Animal Studies Intended to Evaluate Medical Devices (Mar. 28, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/general-considerations-animal-studies-intended-evaluate-medical-devices.
[65] FDA, Investigational Device Exemption (IDE) (Aug. 22, 2024), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/investigational-device-exemption-ide.
[66] *Id.*
[67] *See* FDA, Information Sheet Guidance For IRBs, Clinical Investigators, and Sponsors: Significant Risk and Nonsignificant Risk Medical Device Studies 5 (Jan. 2006), https://www.fda.gov/media/75459/download; *infra* note 74 and accompanying text; *see also* 21 C.F.R. § 812.20.
[68] *See* FDA, Information Sheet Guidance for IRBs, Clinical Investigators, and Sponsors: Significant Risk and Nonsignificant Risk Medical Device Studies 3 (Jan. 2006), https://www.fda.gov/media/75459/download.
[69] 21 C.F.R. § 812.3(n) (2025) (defining "Sponsor" as "a person who initiates, but who does not actually conduct, the investigation, that is, the investigational device is administered, dispensed, or used under the immediate direction of another individual.").

devices are those that present a potential for serious risk to the health, safety, or welfare of a patient, such as implants, life-sustaining devices, or any device that is substantially important in diagnosing, curing, or treating serious disease.[70]

43. While a sponsor makes an initial assessment of a device's risk, the FDA categorizes devices as significant risk or non-significant risk.[71] Typically, to engage in clinical studies of significant risk devices, a sponsor must obtain FDA approval of an IDE application along with Institutional Review Board ("IRB") approval to cover each study site.[72] An IRB is a committee of experts in science and bioethics who review and approve research on human subjects, and its "primary responsibility is to protect research participants' rights, safety, and welfare."[73]

44. The FDA has classified JenaValve's Trilogy device and Edwards' J-Valve as significant risk devices, and as a result will likely treat any subsequent TAVR-AR devices as significant risk devices since they present the same potential for serious risk to the health, safety, or welfare of a patient.[74] Accordingly, to proceed with human clinical studies in the United States, the FDA would likely require an IDE application; this includes initiation of first-in-human studies of significant-risk Class III devices, which typically require an IDE as well.[75] Indeed, both TAVR-AR devices at issue in this matter received IDEs for their early feasibility studies and clinical trials.[76]

45. IDE applications typically include an investigational plan outlining the study protocol, risk assessment of the device, and prior laboratory or animal studies or other supporting documentation.[77] Once received, the FDA has up to 30 days to review an IDE application.[78] Sponsors are encouraged to engage with the FDA prior to IDE submission to not only better understand the FDA's requirements for study protocols but to educate the FDA on the device in development, particularly if that device is a new technology or has a new use.[79] Once an IDE application is submitted, it can go through multiple rounds of questions and answers with the FDA before being authorized.[80] Issues with IDE applications identified by the FDA include: 1)

---

[70] IDE Approval Process, FDA, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/ide-approval-process (last visited Oct. 10, 2025).
[71] FDA, Information Sheet Guidance for IRBs, Clinical Investigators, and Sponsors: Significant Risk and Nonsignificant Risk Medical Device Studies 3-4 (Jan. 2006), https://www.fda.gov/media/75459/download.
[72] 21 C.F.R. § 812.42.
[73] Bernadette Capili & Joyce K. Anastasi, *Ethical Research and the Institutional Review Board: An Introduction*, 124 AM. J. OF NURSING 3, 50-54 (2024).
[74] *See* PX2499 (Letter from N. Ibrahim, FDA, to J. Correa, JVT, Aug. 31, 2022); PX1595 (Letter from R. Neubrander, FDA, to C. Sloan, JCM, May 29, 2024).
[75] 21 C.F.R. § 812.20(a).
[76] *See* PX2457 at 039-40 (JVT, Trilogy Transcatheter Heart Valve System M230006 PMA Module 4 Clinical and Non-Clinical Testing Part 2, Nov. 18, 2024); PX2500 (JVT, US Regulatory Submission History); PX1171 at 001 (Email from M. Turco, JC Medical, to S. Halverson, JC Medical, et al.); PX1394 at 005 (EW, AR Strategy, July 29, 2024).
[77] 21 C.F.R. § 812.20(b).
[78] *Id.* § 812.30(a).
[79] IDE Approval Process, FDA, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/ide-approval-process (last visited Oct. 10, 2025).
[80] FDA Responses and Meetings for IDE Submissions, NIH Clinical Center, https://www.cc.nih.gov/orcs/ide/fda-responses (last visited Oct. 10, 2025).

inadequate reporting of prior clinical, animal, and/or laboratory testing; 2) inadequate investigational plan that provides the description and purpose of the device, the protocol for the study, a risk analysis to subjects of the study, a plan for how risks will be minimized, a justification for the study, and monitoring procedures; and 3) inadequate and/or incomplete description of the design of the device and manufacturing methods, facilities, and controls.[81] These challenges can add time to the IDE application review process. The FDA can also disapprove or withdraw an IDE for a number of reasons, including if "[t]here is reason to believe that the risks to the subjects are not outweighed by the anticipated benefits to the subjects and the importance of the knowledge to be gained, or informed consent is inadequate, or the investigation is scientifically unsound, or there is reason to believe that the device as used is ineffective."[82]

46. When a sponsor begins clinical trials, registration,[83] or other publicity of these clinical trials, it may be the first time the public learns that a device developer is seeking FDA approval, as the existence of an IDE application is considered non-public information by the FDA.[84] Clinical trials are costly and complicated and can take months or even years to complete depending on the design of the trial and the clinical condition being addressed.[85] Clinical studies of high-risk medical devices generally occur at academic, medical, or other clinical treatment centers. They are usually led by investigators, typically physicians chosen by the sponsor and affiliated with the study centers.[86] In addition to seeking IRB approval, as appropriate, for each study site, investigators must adhere to FDA's Good Clinical Practice standards, which define the proper conduct of clinical trials including obtaining informed consent from all participants.[87] One reason clinical trials can be lengthy is that recruiting patients can take time, particularly if the condition being treated is less common or complicated to diagnose, as well as the need to take time to follow patients for outcomes of interest.[88]

47. Feasibility studies are among the first human clinical studies that can be performed for high-risk medical devices. Sponsors initiate feasibility studies to determine

---

[81] IDE Application, FDA, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/ide-application#compro (last visited Oct. 10, 2025).
[82] 21 C.F.R. § 812.30(b).
[83] In general, interventional device clinical trials in the United States should be registered with ClinicalTrials.gov, although feasibility studies are excluded. 42 C.F.R. § 11.22(b) (2025).
[84] *See, e.g.*, Joshua M. Sharfstein, et al., FDA Transparency Working Group, *Blueprint for Transparency at the U.S. Food and Drug Administration: Recommendations to Advance the Development of Safe and Effective Medical Products*, 45(4 suppl 2) J. LAW, MEDICINE & Ethics 7-23 (2017), https://law.yale.edu/sites/default/files/area/center/crit/blueprint_for_transparency_.pdf (calling for FDA transparency of "investigational notices" like IDEs).
[85] *See, e.g.*, PX1011 (EW 2024 Forecast, Pivotal Trial Cost Tab) (estimating the total of the pivotal clinical trial to be $17.329 million and estimating the total cost of the EFS to be $5.726 million).
[86] 21 C.F.R. § 812.3(i) (2025) (defining "Investigator" as "an individual who actually conducts a clinical investigation, i.e., under whose immediate direction the test article is administered or dispensed to, or used involving, a subject, or, in the event of an investigation conducted by a team of individuals, is the responsible leader of that team.").
[87] FDA, Regulations: Good Clinical Practice and Clinical Trials (Jan. 21, 2021), https://www.fda.gov/science-research/clinical-trials-and-human-subject-protection/regulations-good-clinical-practice-and-clinical-trials.
[88] For example, an Edwards executive and a physician in the space have testified to similar experiences. PX7019 (Wood (Edwards) Dep.) at 39:15-40:24 (describing types of clinical studies that can be difficult to enroll); PX7020 (Kereiakes (JVT) Dep.) at 70:20-71:10 (emphasizing that enrolling patients is "a somewhat arduous process that is pretty well-defined.").

whether devices are worth studying further in larger and more rigorous trials. In 2013, the FDA introduced the Early Feasibility Study ("EFS") program to facilitate clinical evaluations in the United States of devices that are early in development.[89] To initiate an EFS, the sponsor must submit an IDE, which can be based on "less nonclinical data" than the IDE for a larger clinical trial.[90] The EFS could include the "first-in-human" study.[91] However, some devices tested outside of the United States may have already generated their first-in-human clinical data outside of the United States.[92] EFS typically enroll only a small number of patients (sometimes less than ten) and use the results to refine the device design and assess basic functionality and safety.[93] By allowing some initial testing in humans under controlled conditions, the FDA's EFS program aims to help innovators identify necessary device modifications or potential issues sooner, which can theoretically streamline development and increase patient safety. EFS gather preliminary data that sponsors use to guide the design of future clinical studies, such as a traditional feasibility study. A traditional feasibility study may be preceded by an EFS. A traditional feasibility study is generally farther along than an EFS; a traditional feasibility study captures preliminary data about safety and effectiveness of a near-final or final device.[94] If feasibility studies are successful, an investigational device usually proceeds to pivotal studies.

48. After any feasibility studies, sponsors work with investigators to conduct one or more pivotal trials—larger clinical studies—to support a PMA application. Pivotal trials generally refer to the clinical trials designed to collect definitive data demonstrating device safety and effectiveness for use by the FDA in approving a device.[95]

49. FDA regulations require that any clinical investigation supporting a PMA be well-designed and well-conducted in accordance with Good Clinical Practice standards, with scientifically sound protocols, and clearly defined objectives that address the safety and effectiveness of the device.[96] FDA rules define "Good Clinical Practice" as trials that provide "assurance that the data and results are credible and accurate and that the rights, safety, and well-being of subjects are protected."[97] Further, when recommending a clinical trial design that might support a PMA application, the FDA must follow the "least burdensome" approach.[98] That is, the study size and duration must not be greater than necessary to support an approval decision, even if a larger or longer study would provide additional clinical information of interest. For example, instead of a lengthy randomized trial with clinical endpoints (e.g., all-cause mortality), the FDA might accept a shorter study or a surrogate measure (e.g., results of a laboratory test or other

---

[89] FDA, Investigational Device Exemptions (IDEs) for Early Feasibility Medical Device Clinical Studies, Including Certain First in Human (FIH) Studies, Oct. 1, 2013, https://www.fda.gov/media/81784/download.
[90] *Id.*at 8.
[91] *Id.*at 1.
[92] *Id.* at 20.
[93] *Id.* at 7.
[94] As one Edwards executive notes "[m]ost people [conduct an EFS] because you wouldn't want to start a pivotal trial without having that early clinical experience." PX7019 (Wood (EW) Dep.) at 43:12-44:7.
[95] FDA, Investigational Device Exemptions (IDEs) for Early Feasibility Medical Device Clinical Studies, Including Certain First in Human (FIH) Studies 6 (2013), https://www.fda.gov/media/81784/download.
[96] Anna Pisac, et al., *FDA Device Oversight from 1906 to the Present*, AMA J. ETHICS, Sept. 2021, https://journalofethics.ama-assn.org/article/fda-device-oversight-1906-present/2021-09.
[97] 21 C.F.R. 812 § 28(a)(1) (2025).
[98] John J. Smith, et al., *Defining "Least Burdensome Means" under the Food and Drug Administration Modernization Act of 1997*, 55 FOOD & DRUG LAW. J. 435-447 (2000).

biomarker) if that evidence is sufficient to demonstrate the device's benefits and risks. Sponsors and investigators design pivotal studies with input from the FDA, either through direct communication or published guidelines. Direct communications include meetings or submissions to the FDA of formal information packages for feedback before, during, or after the IDE process.[99]

50. Another important characteristic of pivotal trials is that they define the indication for which the sponsor is seeking approval when the FDA approves a high-risk device. These medical devices are not FDA-approved for general use; they are approved for specific indications and potentially for certain populations based on the pivotal trials in which they are tested. If provided new data from subsequent clinical studies, the FDA may subsequently expand the approved indications.

#### *4. PMA Submission and the FDA Review Process*

51. Once the sponsor collects the clinical and other data supporting approval of the device, the sponsor organizes it into a PMA application and submits to the FDA. A PMA application includes a comprehensive data package with detailed information on device design and engineering, results of preclinical laboratory studies (e.g., durability, electrical safety, software validation, biocompatibility testing, animal studies), the manufacturing process and quality controls, proposed labeling, and findings from all clinical studies evaluating the device in humans.[100]

52. The FDA review team—typically consisting of engineers, scientists, medical officers, and statisticians—examines all aspects of the PMA application.[101] The central question that the FDA must answer is whether the evidence provided gives "reasonable assurance" of the device's safety and effectiveness for its intended use.[102] In addition, the FDA may inspect the manufacturing facilities to ensure they comply with Quality System Regulations.[103] The agency

[99] FDA, Requests for Feedback and Meetings for Medical Device Submissions: The Q-Submission Program, May 2025, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/requests-feedback-and-meetings-medical-device-submissions-q-submission-program.
[100] 21 C.F.R. § 814.20(b); FDA, PMA Application Methods (Jan. 13, 2025), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-methods.
[101] FDA, Premarket Approval (PMA) (May 16, 2019), https://www.fda.gov/medical-devices/premarket-submissions/premarket-approval-pma.
[102] 21 U.S.C. §360c(a)(1)(A)(i) (2025); *see also* 21 C.F.R. § 814.20 (b)(3)(vi) (requiring a PMA to include a discussion demonstrating the evidence "provide[s] reasonable assurance that the device is safe and effective for its intended use.").
[103] FDA, PMA Quality System (May 22, 2020), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-quality-system ("In making the determination of the firm's ability to design, manufacture or process the device, OPEQ may issue an inspection assignment to the appropriate FDA district office. The inspection assignment will be issued when OPEQ has determined that the manufacturer has demonstrated in the PMA submission that the design and manufacturing process meets the QS regulation requirements, and the facility is ready for inspection."). Relatedly, if a medical device intended for the U.S. market is made in a jurisdiction where the FDA's inspection cannot be performed, the FDA's inability to inspect those facilities can block approval. For example, if country X does not permit access to FDA inspectors, any high-risk device manufactured in that country would have to have its manufacturing process moved to or duplicated in a different jurisdiction, such as the US or EU, that is amenable to inspection before it likely would be able to receive FDA approval.

also verifies that the clinical trials were conducted in compliance with Good Clinical Practice standards and that data were accurately reported.[104]

53. Upon receiving a PMA, the FDA conducts a preliminary review to ensure the application is complete. The statutory standard review time is 180 days, but several steps can delay the process.[105] First, the FDA does not start the clock until it determines that the PMA application is complete.[106] If the FDA asks for more information, the clock stops until the sponsor's reply is received.[107] Since the 1980s, the average time from PMA submission to PMA approval has varied from about 300 to 1000 days (see Appendix D, Exhibit A).[108] To provide a more recent benchmark, I reviewed 20 therapeutic devices approved between September 1, 2024 and August 31, 2025 (see Appendix D, Exhibit B for methodology), and the time between the submission of a PMA application and FDA approval averaged 370 days.[109]

54. The FDA may review the PMA on its own or request assistance from an independent Advisory Committee; if an applicant requests an Advisory Committee review, the FDA must provide one. Engaging an Advisory Committee for a PMA application, which occurs in a minority of cases,[110] can add time to the PMA process due to the need for scheduling and preparation, but it also provides an extra layer of expert scrutiny and public discussion of any issues. Advisory Committees operate under the Federal Advisory Committee Act and are organized by medical specialty (e.g., cardiovascular devices panel, orthopedic devices panel, etc.).[111] The process involves a public meeting during which the sponsor presents its data, FDA reviewers present their assessment, and an independent panel of clinicians, scientists, and statisticians discusses and votes on questions posed by the FDA.[112] The meeting may include questions about safety and effectiveness, as well as guidance about proposed labeling and post-market requirements. The meetings are open to the public, and transcripts and slide sets are posted on the FDA's website. While the panel's recommendations are non-binding, the FDA follows Advisory Committee recommendations about three-quarters of the time.[113]

---

[104] 21 C.F.R. § 814.45 (a)(5).
[105] *Id.* § 814.40.
[106] FDA, Premarket Approval Application and Humanitarian Device Exemption Modular Review 8 (Jan. 2025), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/FDA/835.pdf ("If FDA decides to file the PMA, the filing date is the date that the application became complete, typically the receipt date of the final module. The 180-day "PMA clock" under 21 CFR 814.40 also begins on that date.").
[107] FDA, FDA and Industry Actions on Premarket Approval Applications (PMAs): Effect on FDA Review Clock and Goals 3 (Oct. 2003), https://www.fda.gov/media/73504/download.
[108] Jonathan J. Darrow, et al., *FDA Regulation and Approval of Medical Devices: 1976-2020,* 326(5) JAMA 420-432 (2021).
[109] I excluded nine diagnostic products, four without SSEDs, and three devices without new clinical data in this calculation.
[110] Amanda Maisel-Campbell, et al., *Voting Behavior during FDA Medical Device Advisory Committee Panel Meetings*, 17 PLoS One e0267134 June 24, 2022 (identifying 49 medical device Advisory Committee meetings from Jan. 2011-June 2016).
[111] FDA, Charter Medical Devices Advisory Committee, http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/ucm124098.htm (last visited Oct. 10, 2025).
[112] C. Joseph Ross Daval, et al., *Building Public Trust in Scientific Decision Making through Expert Advisory Committees: Lessons from the FDA*, IBM Center for the Business of Government, Dec. 2023, at 9.
[113] *Id.* at 9.

55. Ultimately, the FDA can decide to approve the PMA, approve it with conditions, or issue a "deficiency letter," often with an option for the sponsor to amend and resubmit with additional data. Deficiency letters generally include at least one major issue and place the PMA application on hold pending the FDA's receipt of the requested additional information.[114] Sponsors may be asked to correct problems identified in the device manufacturing, clarify aspects of the data collected from clinical trials, or adjust problematic wording in the approved indication or labeling accompanying the device. For example, some devices, like the heart valves at issue in this case, may need to provide data on "accelerated wear testing," in which the devices are tested in laboratory conditions that simulate the chronic wear and tear they may be subjected to when permanently implanted in a human heart.[115] A deficiency letter might point out results from the accelerated wear testing that raise concern with the FDA reviewers, and request additional information or raise questions that require additional testing.[116] If the device is approved on the first review or after correction in response to a deficiency letter, approval may still come with conditions, such as requirements for post-approval studies or specific wording in the device's labeling to address safety issues.[117] Once a PMA is approved, the device may be marketed and sold in the United States for the approved indication.

### *5. Post-Approval Device Sponsor Responsibilities*

56. After devices are approved, sponsors continue to have regulatory responsibilities.[118] For example, all sponsors must provide notifications to the FDA of adverse events related to their devices, such as the dislodging of an implanted mechanical valve.[119] Since 1995, these reports have been stored in a searchable, publicly available database called Manufacturer and User Facility Device Experience ("MAUDE").[120] To assist the post-approval data collection process for medical devices, the FDA also has been actively modernizing its post-market surveillance capabilities by requiring the labeling of medical devices with Unique Device Identifiers, unique codes that identify device make, model, and version.[121] The FDA's default rule is that each device should bear a unique device identifier on its label and packages, and the key characteristics of each device with such an identifier must be submitted to the FDA. This information is then made available to the public.[122] The Unique Device Identifier system

---

[114] FDA, Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions 2 (Oct. 2022), https://www.fda.gov/media/71735/download.

[115] *See* PX7012 (Pinto (JVT) Dep.) at 69:8-70:1 (describing accelerated wear testing for FDA filing).

[116] In this case, JenaValve recently received a deficiency letter and must remedy the issues identified by the FDA before proceeding with its PMA submission. *See infra* notes 164-165 and accompanying text; PX7027 (Sun (JVT) Dep.) at 40:25-43:1.

[117] *See* PX2384 at 009 (JVT, Board of Directors Meeting, July 16, 2025) (discussing the probability of "lag time between FDA 'approval' and FDA approval 'order'" and noting that the "approval 'order' and some internal JVT activities are necessary prior to shipping" Trilogy devices).

[118] John Y. Chai, *Medical Device Regulation in the United States and the European Union: A Comparative Study*. 55 FOOD & DRUG L. J. 57-80 (2000); S. Lori Brown, et al., *Medical Device Epidemiology and Surveillance: Patient Safety is the Bottom Line*, 1 EXPERT REV. OF MED. Devices 1-2 (2024).

[119] William F. Pritchard, et al., *U.S. Food and Drug Administration and Regulation of Medical Devices in Radiology*, 205 RADIOLOGY 27-36 (1997).

[120] FDA, Manufacturer and User Facility Device Experience (MAUDE) Database, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm (last visited Oct. 10, 2025).

[121] FDA, Unique Device Identification, July 25, 2022, https://www.fda.gov/media/110564/download.

[122] *Id.*

facilitates better tracking of devices in use, especially when devices are implanted in patients, so if a problem emerges, affected devices and patients can be quickly identified.[123]

57. In response to new post-approval data providing evidence of safety concerns, the FDA may conduct inspections of a manufacturer's plants, request further information or seek further studies, issue official communications, or revoke approval of a device.[124] After approval, the FDA can also inspect the manufacturing sites of device companies to ensure continued compliance with the Quality System Regulations.[125]

58. The PMA process for Class III medical devices involves the most substantial regulatory oversight that the FDA has for new devices. It begins with premarket evaluation and continues with post-market oversight to ensure ongoing safety. The FDA's approach balances protecting patients—by necessitating the gathering of evidence of safety and effectiveness—with the need for patients to have access to important new high-risk devices. It performs this balancing by establishing processes to prioritize certain devices and by allowing them to be updated after approval. For physicians and patients, the Class III PMA pathway offers a level of assurance that high-risk devices have been vetted—but it also serves as a reminder that medical devices require continuous vigilance even after approval to promptly identify and address any issues that arise.

### B. New High-Risk Medical Devices Are Costly to Develop and Can Take Several Years to Move Through Clinical Testing and PMA Application Review

59. There is a substantial time and cost to developing a novel therapeutic Class III medical device. One industry-funded survey found that manufacturers estimated that the average total cost of developing a Class III device and taking the necessary steps to PMA approval was about $94 million, with 80% ($75 million) spent on activities specifically related to the FDA approval process.[126]

60. Likewise, an analytic model that used both public and proprietary data found that the average cost (using 2018 dollars) of developing such a device was $54 million (excluding post-approval testing) and, after accounting for the cost of failed studies and cost of capital, was $522 million.[127] As summarized in Table 2 below, this investigation used data from

[123] *Id.* ("The UDI system seeks to improve the identification of medical devices by making it possible to rapidly and definitively identify a device and certain key attributes related to a device's safe and effective use.")
[124] Gardiner Harris, F.D.A. Vows to Revoke Approval of Device, N.Y. TIMES, Oct. 14, 2010, available at https://www.nytimes.com/2010/10/15/health/policy/15fda.html.
[125] FDA, Compliance Program Manual: Inspection of Medical Device Manufacturers, Sept. 29, 2023, https://www.fda.gov/media/80195/download.
[126] Josh Makower, *FDA Impact on U.S. Medical Technology Innovation: A Survey of over 200 Medical Technology Companies*, Nov. 2010, at 7, https://www.medtecheurope.org/wp-content/uploads/2015/09/01112010_FDA-impact-on-US-medical-technology-innovation_Backgrounder.pdf.
[127] Aylin Sertkaya, et al., *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US.* 5 JAMA NETWORK OPEN e2231609 (Sept, 14, 2022).

ClinicalTrials.gov as well as from the Summary of Safety and Effectiveness Data ("SSED")[128] documents related to 191 original PMAs approved during the period from January 2013 through September 2018, of which 151 were for complex devices.[129] The investigators estimated that non-clinical development (proof-of-concept, prototype clinical unit development and testing, and FDA IDE application) lasted 5 years and cost $20 million; feasibility study stage lasted over 2 years with $1.4 million cost; pivotal study stage lasted close to 5 years with $30.7 million cost; FDA PMA application review stage lasted almost 1.5 years and cost $1.9 million; and the post-approval study stage lasted almost 7 years with $6 million cost.

**Table 2**

| **Device Development Stage** | **Years** | **Cost ($ Millions)** |
|---|---|---|
| Nonclinical Development | 5 | 20 |
| Feasibility Study | 2 | 1.4 |
| Pivotal Study | 5 | 30.7 |
| FDA PMA Application Review | 1.5 | 1.9 |
| Post-Approval Study | 7 | 6 |

61. To provide another examination of more recent data related to the pre-approval testing and regulatory review process timeline for new high-risk medical devices, I reviewed the FDA's Premarket Approval Database for all original PMAs approved between September 1, 2024 and August 31, 2025 (see **Appendix D, Exhibit B** for methodology). This analysis required the availability of SSED documents and considered only therapeutic devices to represent the clinical studies and marketing histories of products seeking approval for treatment of medical conditions, as is the case for TAVR-AR devices. There were 36 original PMAs with approval decisions in this timeframe, but after excluding diagnostic products and devices that did not have a SSED, 23 products remained for review.

62. **Pivotal trial timeframe:** Of the 23 products available for review, only 14 had treatment start and end dates available in the SSED, which were necessary to assess the timeframe for pivotal trials. Reviewing the median time between the pivotal trial treatment start date and the data collection completion date was 4.1 years (interquartile range [IQR]: 3.2-5.0 years) (see **Appendix D, Exhibit C** for citations).[130]

---

[128] SSEDs are the summary documents that outline the safety and effectiveness data upon which FDA makes its approval decision. These documents contain summaries of the clinical information evaluated in the approval process. FDA, PMA Application Contents, https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-contents (last visited Oct. 10, 2025).

[129] Aylin Sertkaya, et al., *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US.* 5 JAMA NETWORK OPEN e2231609 (Sept, 14, 2022).

[130] An interquartile range represents the spread of the middle 50% of a dataset. Three of the 23 products did not have new clinical data. Of the 20 product SSEDs with primary clinical studies, two pivotal trials did not include start dates. Four pivotal trials only included enrollment dates, with the following years between start and end of enrollment: 1.0, 1.8, 3.6, and 5.8. The remaining 14 included information about of trial treatment start and data collection completion. We used the greatest level of granularity possible (if SSEDs articulated start and end dates by year or month, we compared them accordingly). One set of authors estimated that the time from concept to PMA approval for medical devices was 3-7 years (although they did not provide the methods they used to arrive at that estimate), for which the majority of that time is the clinical trial testing process. *See*, Kyle M. Fargen, *The FDA*

63. **PMA submission to approval timeframe:** The 23 non-diagnostic devices approved between September 1, 2024 and August 31, 2025 had a median of 240 days (IQR: 196-401) between the PMA application submission and decision dates (see **Appendix D, Exhibit C** for citations).

64. Based on these data, the timeframe from the start of a pivotal trial to PMA approval for Class III devices, in general, is approximately four to six years, a timeframe that is consistent with the studies cited above.[131] Accounting for the time required for feasibility studies and preclinical steps, such as the IDE application phase, the total length of development time could be years longer.

65. I also understand that these results are consistent with the testimony from physicians and JenaValve and Edwards executives, who estimate the timeframe for development of a device to PMA approval to be 5 years or more.[132]

66. Further, FDA approval is not a guarantee: the estimated probability of FDA approval from the nonclinical phase is 14%, from feasibility study is 29%, from pivotal study is 61%, and from FDA PMA review is 81% (*see* Figure 1).[133]

**Figure 1. Models of Class III Medical Device Development Stages**




In this flow, these are costs that do not incorporate the cost of capital or failure, or removing the phase probabilities. C indicates phase cost (in $ 2018); CPP, cost per patient (in $ 2018); n, number of patients; NA, not applicable; P, phase transition success probability (%); t, phase duration (in months).

*Source: Aylin Sertkaya, et al., Estimated Cost of Developing a Therapeutic Complex Medical Device in the US, 5 JAMA Network Open e2231609 (Sept. 14, 2022)*

---

*Approval Process for Medical Devices: An Inherently Flawed System or a Valuable Pathway for Innovation*? 5 J. OF NEUROINTERVENTIONAL SURGERY 269-275 (2013).

131 Aylin Setkaya, et al., *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US*, 5 JAMA NETWORK OPEN e2231609 (Sept. 14, 2022).

132 *See*, PX7020 (Kereiakes (Christ Hospital) Dep.) at 30:10-31:21 (estimating that it takes "five to seven years" wind through the FDA approval process); PX2413 at 015 (JTV, JenaValve Talk Track First Half 2024) ("Several new dedicated AR TAVR devices in development, but all are in early clinical stages and will not be available for five-plus years"); PX7027 (Sun (JVT) Dep.) at 11:23-12:6 (describing clinical trial enrollment period starting in 2018 and competed in 2022), PX7019 (Wood (EW) Dep.) at 59:15-61:3 (describing FDA approval in January 2029).

133 Aylin Sertkaya, et al., *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US*, 5 JAMA NETWORK OPEN e2231609 (Sept. 14, 2022), at 2, (estimating success probabilities based on samples from expert opinion [non-clinical to feasibility study], ClinicalTrials.gov [feasibility study to pivotal study and pivotal study to PMA], and the FDA [PMA submission to approval]). Values represent the total success probabilities to FDA approval and therefore are derived from multiplying the probability of success across each phase.

67. Adding in the current status of Edwards' J-Valve and JenaValve's Trilogy to Figure 1—J-Valve is currently at the pivotal study stage and Trilogy has submitted its FDA PMA application—both are over 60% likely to receive FDA PMA approval.[134]




In this flow, these are costs that do not incorporate the cost of capital or failure, or removing the phase probabilities. C indicates phase cost (in $ 2018); CPP, cost per patient (in $ 2018); n, number of patients; NA, not applicable; P, phase transition success probability (%); t, phase duration (in months).

*Original source: Aylin Sertkaya, et al., Estimated Cost of Developing a Therapeutic Complex Medical Device in the US, 5 JAMA Network Open e2231609 (Sept. 14, 2022)*

### C. Expedited and Special Cases

68. Recognizing that certain devices address particularly urgent medical needs, the FDA has developed mechanisms to accelerate aspects of the PMA review or to streamline the evidence generation process, these include the following mechanisms that are relevant to this matter:

69. **Modular PMAs:** The FDA may allow companies to file "modular PMAs" in which sponsors separately submit completed sections of the full PMA application, and the FDA accepts the entire PMA on a rolling basis.[135] The content of the application is broken into well-defined sections or "modules" (e.g., preclinical testing module, manufacturing information module, clinical data module). By the time the clinical data are submitted, much of the review of earlier modules may already be done, potentially shortening the time to a final decision. As further discussed below, it appears that JenaValve submitted its PMA application for the Trilogy device as a modular PMA with its first submission in March 2023 and its last in June 2025.[136]

70. **Humanitarian Device Exemption:** The FDA grants Humanitarian Device Exemptions ("HDEs") for devices that treat conditions that affect fewer than 8,000 people in the United States.[137] The program was established by the Safe Medical Devices Act of 1990 to incentivize device manufacturers to develop products aimed at treating or diagnosing rare diseases, and provides a pathway for the FDA to approve devices that would be hard to bring to market under standard PMA requirements. Among other requirements, the program exempts

---

[134] *See infra* Part IV.E.
[135] PMA Application Methods, FDA, https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-methods (last visited Oct. 10, 2025).
[136] *See* PX2303 at 046 (JVT, Board of Directors Meeting, July 16, 2025).
[137] This patient limit was raised from 4,000 to 8,000 by the 21st Century Cures Act in 2016 to broaden eligibility. Pub. L. No. § 3052, 130 Stat. 1033, 1124-25 (Dec. 13, 2016).

sponsors from providing the sort of effectiveness data prior to approval that would normally be expected of significant risk devices intended for broader populations. However, sponsors must still demonstrate that the device is safe and that the "probable" benefits outweigh the risks from its use and the risks of alternative forms of treatment.[138] Sponsors also do not have to pay the standard user fees.[139] After approval, HDE devices are subject to restrictions; for example, before a physician can use such a device, the use must be approved by the relevant local IRB.[140] The original 1990 legislation stipulated that humanitarian use devices were not allowed to be sold for profit, but this restriction was lifted by legislation passed in 2012.[141] In a study comparing Humanitarian Device Exemption-designated devices to a cohort of PMA-approved medical devices intended for cardiovascular disease, trials of HDE devices for rare diseases were less likely to be randomized (15% vs. 27%), less likely to be double- or single-blinded (2% vs. 14%), and enrolled fewer patients on average (72 vs. 308).[142] As these data show, the FDA applies substantial flexibility in its review of devices with an HDE designation, accepting evidence that is smaller in scale and with less rigorous collection standards.

71. **Breakthrough Devices:** The FDA may label certain devices still in development as Breakthrough Devices if they treat or diagnose a "life-threatening or irreversibly debilitating disease or condition" and represent a breakthrough technology, have no authorized alternatives, promise to offer "significant advantages over existing alternatives," or are in the "best interests of patients," for example by treating an unmet medical need.[143] Though the designation does not formally change the FDA's approval standard, sponsors with qualifying devices receive multiple regulatory advantages intended to expedite approval: increased engagement with FDA staff, use of flexible premarket and post-market clinical study designs, and prioritized FDA review.[144] For example, both devices at issue in the matter were designated as Breakthrough Devices by the FDA. JenaValve's Trilogy received Breakthrough Device designation in 2019, and then-JC Medical's J-Valve received Breakthrough Device designation in 2023.[145]

### D. A Combination of Factors Affect FDA PMA Review Time

72. A first-in-class device may benefit from some of these expedited pathways, but at the same time may also face a longer review time because the FDA does not have prior experience in reviewing that type of device. A second- or later-in-class device may find a more experienced FDA review process, but at the same time may not qualify for expedited programs.

---

[138] *See, e.g.*, 21 C.F.R. §§ 814.100, 814.104.

[139] FDA, Humanitarian Device Exemption Program: Guidance for Industry and Food and Drug Administration Staff 7 (2018), https://www.fda.gov/media/74307/download.

[140] *See* 21 C.F.R. § 814.124.

[141] *See* FDA, Humanitarian Device Exemption Program: Guidance For Industry And Food And Drug Administration Staff 2-3 (2018), https://www.fda.gov/media/74307/download; *see also* 21 U.S.C. § 360j(m)(6)(A)(i); Food and Drug Administration Safety and Innovation Act, Pub. L. 112-144, 126 Stat. 993 (July 9, 2012).

[142] Thomas J Hwang, Daniel Carpenter, & Aaron S Kesselheim, *Assessment of US Pathway for Approving Medical Devices for Rare Conditions*, BMJ (2014).

[143] 21st Century Cures Act of 2016, 21 U.S.C. § 360e-3. The Breakthrough Devices Program supersedes the FDA's Priority Review program, which had "implemented statutory criteria for granting priority review to premarket submissions for medical devices." FDA, Breakthrough Devices Program 5 (Sept. 15, 2023), https://www.fda.gov/media/162413/download.

[144] *See, e.g.*, FDA, Breakthrough Devices Program, §§ II.C-F, FDA (Sept. 15, 2023).

[145] PX1267 at 007 (EW, Competitive Update, Apr. 2025).

Previous studies suggest that FDA review times for first-in-class versus later-in-class products can vary slightly but that overall, a first-in-class device does not have a substantially shorter FDA review time than a later-in-class product. One study focused on high-risk device PMA applications to the FDA between 1977 and 2007.[146] In a sub-analysis of cardiovascular devices, the author examined devices with similar "functional categories," including one category for heart valves, which would encompass TAVR-AS and TAVR-AR.[147] Examining approval times by functional category, the study found no statistically significant differences in review times between first-in-class and subsequent-in-class products.[148] In a more recent study of original PMA devices approved between 2001 and 2018 that considered 40 different device types, half of which were cardiovascular, that faced intraclass competition as of February 2022, the median FDA review time was 14.2 months (IQR 9.1-22.1) for first-in-class, 10.6 months (IQR 7.6-17.1) for second-in-class, and 13.9 months (IQR 11.0-16.0) for third-in-class devices.[149] Together, the results of these studies support the conclusion that there would be no substantial reduction in FDA review time for PMA applications related to later-in-class TAVR-AR devices.

## E. The Expected FDA Approval Timelines of Trilogy and J-Valve are Consistent with My Analysis

73. Also instructive to the foregoing analysis is a brief review of my understanding of the developmental timelines of Trilogy and J-Valve, in particular as both JenaValve and, at the time, JC Medical, began taking steps towards FDA approval. Based on the current status of each device, I believe that Edwards' and JenaValve's respective predictions regarding the expected timing of FDA approval of J-Valve and Trilogy, respectively, are consistent with my foregoing analysis and appear more likely than not to be approved as predicted.

### *1. JenaValve's Trilogy*

74. JenaValve received FDA approval of its IDE for an EFS on October 22, 2015 for its transapical device.[150] JenaValve later supplemented its IDE application with the transfemoral approach, which was approved in January 2016.[151] It then subsequently removed the transapical approach from its IDE in September 2016, due to a lack of physician interest.[152]

---

[146] *See generally* Ariel Dora Stern, *Innovation Under Regulatory Uncertainty: Evidence from Medical Technology*, 145 J. PUBLIC ECONOMICS 181 (2017).
[147] *Id.* at 188-191.
[148] *Id.* at 191. In this paper, another analysis examines devices across "product codes" and finds that the first high-risk device in a new product code has a longer FDA review time than subsequent devices within that product code. But these results are less relevant to the current case, in which TAVR-AR devices are in the same product code (NTP) as TAVR-AS devices and no new product codes are being established.
[149] Vinay K. Rathi et al., *Market Competition Among Manufacturers of Novel High-Risk Therapeutic Devices Receiving FDA Premarket Approval Between 2001 and 2018*, BMJ SURGERY, Interventions, and Health Technologies (2023), at 1.
[150] PX2457 at 039-40 (JVT PMA Module 4, Nov. 18, 2024); *see also* PX7038 (Kilcoyne (JVT 30(b)(6) Dep.) at 66:4-7.
[151] PX2457 at 040 (JVT PMA Module 4, Nov. 18, 2024); *see also* PX7038 (Kilcoyne (JVT 30(b)(6)) at 56:8-57:4.
[152] PX2457 at 040 (JVT PMA Module 4, Nov. 18, 2024); *see also* PX7038 (Kilcoyne (JVT 30(b)(6)) at 67:13-68:14.

75. On January 5, 2017, the EFS study for Trilogy received an HDE.[153] JenaValve enrolled the first patient in the HDE EFS study in November 2018.[154] Given the need for a TAVR device for AR patients, the Trilogy device received Breakthrough Device designation on December 20, 2019.[155]

76. JenaValve submitted an IDE for a pivotal trial under its HDE, which was approved on May 22, 2020.[156] However, the FDA revoked JenaValve's HDE for the Trilogy valve due to new evidence suggesting a treatable patient population of greater than 8,000 individuals, so JenaValve withdrew its HDE designation on May 15, 2021.[157] It subsequently pursued an IDE for its ALIGN-AR pivotal trial to support a future PMA, which was approved on July 28, 2021.[158] The purpose of the ALIGN-AR pivotal trial is to "evaluate the safety and effectiveness of [Trilogy] in a patient population with symptomatic severe AR requiring replacement/repair of their native aortic valve that are at high risk for open SAVR."[159] The last patient in the ALIGN-AR pivotal trial enrolled on August 29, 2022.[160] JenaValve also received an IDE on August 30, 2024 for its ARTIST clinical trial, which seeks to expand the eligible patient population for its device to include low and moderate risk patients.[161] JenaValve continues to innovate and conduct further clinical studies of the Trilogy valve, which I discuss in Section VIII.

77. Based on its ALIGN-AR pivotal trial, JenaValve made its final PMA submission for the approval of the Trilogy valve on June 30, 2025 and expects FDA approval by the first quarter of 2026.[162] JenaValve took the modular PMA approach and made rolling submissions of PMA modules on March 3, 2023, May 26, 2023, August 11, 2023, and November 19, 2024, before making its final submission on June 30, 2025.[163] JenaValve received a deficiency letter from the FDA dated September 26, 2025.[164] My understanding is that JenaValve is in the process of responding to outstanding questions from the FDA regarding its final PMA submission.[165]

78. Overall, it will be nearly 11 years from the time JenaValve received IDE approval for its EFS in 2015 to Trilogy's expected FDA PMA approval in Q1 of 2026. Even if one discounts the time spent solely on JenaValve's transapical device and the three years during which JenaValve was conducting its studies under an HDE, nearly six years will have passed between IDE-EFS approval to expected PMA approval.

---

[153] PX2457 at 039-40 (JVT PMA Module 4, Nov. 18, 2024).
[154] PX0043 at 012 (JVT Response to Request for Additional Information, Oct. 10, 2024).
[155] PX2457 at 021 (JVT PMA Module 4, Nov. 18, 2024).
[156] *Id*. at 040 (JVT PMA Module 4, Nov. 18, 2024).
[157] *Id*. at 040-41 (JVT PMA Module 4, Nov. 18, 2024).
[158] *Id*. at 040-41 (JVT PMA Module 4, Nov. 18, 2024); PX2500 at 006 (JVT US Regulatory Submission History).
[159] PX2487 at 006 (JVT "Protocol Synopsis").
[160] PX2457 at 040 (JVT PMA Module 4, Nov. 18, 2024).
[161] PX0043 at 012 (JVT Response to Request for Additional Information, Oct. 10, 2024); PX7038 (Kilcoyne (JVT 30(b)(6)) at 27:14-28:22; PX7029 (Thourani (Piedmont) Dep.) at 68:19-69:19.
[162] PX0044 at 019, 039 (JVT Responses to FTC's First Set of Interrogatories); PX7038 (Kilcoyne (JVT 30(b)(6)) at 173:1-8; PX7017 (Spadaro (JVT) Dep.) 18:1-6.
[163] PX2303 at 046 (JVT "Board of Directors Meeting," July 16, 2025).
[164] *See generally* PX2491. (FDA Ltr. to JVT, Sept. 26, 2025).
[165] PX7016 (Dearen (JVT) Dep.) at 57:2-14; PX7017 (Spadaro (JVT) Dep.) at 145:24-146:8.

### 2. *Edwards' J-Valve*

79. While JC Medical originally developed the J-Valve as a transapical TAVR-AR device before innovating to a transfemoral system,[166] Edwards appears to be focused on the transfemoral J-Valve system for the United States.[167] Prior to its acquisition by Edwards, J-Valve received IDE approval, completed its EFS, and also received approval for its pivotal trial.[168] Early concept development of the transfemoral J-Valve system began in August 2015,[169] and the first transfemoral implantation of J-Valve occurred in the United States in 2019 as a compassionate use case.[170]

80. J-Valve's IDE was submitted on May 7, 2019,[171] and approved on August 31, 2023.[172] In the interim, J-Valve received Breakthrough Device designation on July 29, 2023.[173] J-Valve's first EFS patient was enrolled on October 16, 2023,[174] and initial enrollment was completed in February 2024; a subsequent increase in EFS enrollment was completed in July 2024.[175] On May 29, 2024, J-Valve was granted IDE approval for the JOURNEY pivotal trial to clinically test the valve for PMA approval.[176] The purpose of the JOURNEY trial is to "assess the safety and efficacy of [J-Valve] in patients with symptomatic, severe . . ., native AR and AR-dominant mixed aortic valve disease, who are judged by a multi-disciplinary heart team to be at high risk for open SAVR."[177]

81. Edwards acquired J-Valve in July 2024. The first patient was enrolled in the JOURNEY pivotal trial on October 17, 2024.[178] [redacted]

---

[166] PX7030 (Turco (EW) Dep.) at 221:2-11.
[167] *Id.* at 218:15-218:18.
[168] PX1171 at 001 (Email from M. Turco to S. Halverson, et. al, JC Medical and Genesis MedTech, Oct. 16, 2023) (IDE approval on Aug. 31, 2023); PX1592 at 017 (IDE Annual Progress Report, Aug. 29, 2024) (initial EFS completed on Feb. 1, 2024); PX1595 at 001 (Letter from FDA to C. Sloan, May 29, 2024) (pivotal approval).
[169] PX1057 at 004 (Presentation on J-Valve History, Dec. 11, 2023); see also PX7005 (Turco (EW) IH) at 139:23-140:4.
[170] Diagnostic and Interventional Cardiology, *JC Medical Announces First U.S. Treatment With J-Valve TAVR Device* (Jan. 7, 2019), https://www.dicardiology.com/content/jc-medical-announces-first-us-treatment-j-valve-tavr-device. The FDA allows compassionate use when the following criteria are met: "The patient has a life-threatening or serious disease or condition; There is no comparable or satisfactory alternative therapy to diagnose, monitor, or treat the disease or condition; and Potential patient benefit justifies the potential risks of the investigational device." Compassionate use can be requested for products with and without an IDE. FDA, Expanded Access for Medical Devices, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/expanded-access-medical-devices (last visited Oct. 10, 2025).
[171] PX1179 at 022 (JC Medical Presentation for pre-submission meeting for IDE G190117, Feb. 7, 2023).
[172] PX1171 at 001 (Email from M. Turco to S. Halverson, et. al, JC Medical and Genesis MedTech, Oct. 16, 2023).
[173] PX1172 at 003 (Letter from FDA to JC Medical, July 28, 2023); *see also* PX7030 (Turco (EW) Dep.) at 238:2-16 (explaining that prior to his arrival in 2023, JC Medical did not set up any clinical trials and instead unsuccessfully tried to bypass the FDA regulatory process using compassionate use cases).
[174] PX1171 at 001 (Email from M. Turco to S. Halverson, et. al, JC Medical and Genesis MedTech, Oct. 16, 2023).
[175] PX1592 at 017 (IDE Annual Progress Report, Aug. 29, 2024).
[176] PX1595 at 001 (Letter from FDA to C. Sloan, May 29, 2024).
[177] PX1590 at 084 (JOURNEY Study Protocol, Nov. 20, 2024).
[178] PX1263 at 001 (Email from J. Wheeler to L. Wood, EW, Oct. 17, 2024).

[redacted] I understand that [redacted] Edwards has [redacted]

82. [redacted] it will be about five or six years from the time J-Valve received IDE approval on August 31, 2023, to its expected FDA PMA approval in late 2028 or early 2029.[184]

## V. EX-U.S. REGULATION OF HIGH-RISK MEDICAL DEVICES AND USE OF EX-U.S. DATA FOR FDA PREMARKET APPROVAL

83. I was next asked to evaluate to what extent availability of ex-U.S. clinical data on high-risk medical devices affects the FDA PMA process. To do so, I will provide an overview of the regulations pertaining to ex-U.S. data submitted to the FDA in a PMA application and present an empirical analysis of recent experience with ex-U.S. data in PMA applications.

84. Clinical data on high-risk medical devices can be available from outside the United States, either because those devices are already available and being used outside the United States and/or because a medical device manufacturer conducts clinical trials of its high-risk medical device in ex-U.S. locations.

### A. A Brief Comparative View on the Standard for Clinical Data Collection Outside the United States

85. High-risk medical devices may become available to patients outside the United States because medical device regulatory systems other than the FDA may have different standards that they use to assess high-risk medical devices. Regulatory standards in ex-U.S. jurisdictions may allow high-risk medical devices to reach those markets based on lower standards of evidence than the FDA typically requires. For example, in the European Union ("EU"), where high-risk devices are also considered Class III devices, there is currently no central medical device review process, as there is in the United States.[185] All classes of medical

---

[179] PX1596 at 003 (JOURNEY Communication Plan, Ma 29, 2025).
[180] PX7022 (Concepcion (EW) Dep.) at 70:9-73:21 (discussing [redacted]) (elaborating on PX1281 (May 2025 email from B. Concepcion)); PX7015 (Sirimanne (EW) Dep.) at 237:1-14.
[181] PX7022 (Concepcion (EW) Dep.) at 76:1-77:4; PX1597 at 002 (Letter from N. Delaney (EW) to FDA, July 21, 2025); *see also* PX7015 (Sirimanne (EW) Dep.) at 102:24-103:17, 108:18-108:24, 237:1-238:9, 238:11-239:23.
[182] PX1597 at 003 (Letter from N. Delaney (EW) to FDA, July 21, 2025); PX7015 (Sirimanne (EW) Dep.) at 104:5-106:14, 109:2-109:18; PX7022 (Concepcion (EW) Dep.) at 76:1-81:19).
[183] PX7026 (Bierman (EW) Dep. at 137:15-138:25).
[184] PX1397 at 014 (Edwards LT Meeting, Feb. 20, 2025); PX7026 Bierman (EW) Dep.) at 233:20-24; *see also* PX7015 (Sirimanne (EW) Dep.) at 101:19-102:22.
[185] While the EU appears to be moving towards a centralized process through a revision to its legislation to medical devices, applicable standards are not yet further defined. *See* European Union, Regulation (EU) 2017/745 of the European Parliament and of the Council of 5 April 2017 on Medical Devices, Apr. 5, 2017, https://eur-lex.europa.eu/eli/reg/2017/745/oj/eng.

devices can be legally marketed in the EU after receiving a Conformité Européenne ("CE") Mark from a Notified Body ("NB"), a private, for-profit organization based in a member state that specializes in evaluating medical devices or other consumer products.[186] A CE mark indicates that a device "conforms" to the relevant EU directives regarding its manufacturing, labeling, and expected performance and safety profiles, and the NB determines whether a device has met these specific requirements.[187]

86. Even for high-risk (Class III) devices, NB approval is commonly based on a "performance" standard, or a demonstration that a device performs in the manner intended, with expected benefits that outweigh expected risks—rather than testing that demonstrates clinical effectiveness.[188] Because meeting a performance standard requires less clinical testing and overall shorter trials, manufacturers may choose to seek market access for high-risk devices in the EU before doing so in the United States.[189]

87. Thus, high-risk devices can enter the EU market sooner than in the United States and on the basis of less stringent review.[190] As noted above, in one industry-funded survey, FDA approval took 54 months through the PMA application pathway from first contact with the FDA to device approval, while in the EU system, the timeline for similar devices took an average of 11 months.[191] In a more recent sample of 379 high-risk devices approved from 2013-2023, the United States was the market of first launch for about 20%, and the median time between international (often EU) and FDA approval was 5.1 years (IQR, 3.4-9.0 years).[192]

88. Availability of high-risk devices in places like Europe years before the United States can lead to the generation of clinical data from routine use of these devices in patients or listing of European patients and their safety and effectiveness outcomes in medical device registries; this is sometimes called "real world data." These data can then be collected and used to support a high-risk device's PMA application to the FDA.[193] However, as the below review of device approvals collected by the FDA demonstrates, such routine clinical use or registry data do not replace the pivotal prospective trials nearly always used in FDA approval of PMA applications, and at most supplement such trials.

---

[186] *See* Daniel B. Kramer, Shuai Xu, and Aaron S. Kesselheim, *Regulation of Medical Devices in the United States and European Union*, 366(9) NEW ENG, J. MED 848-855 (2012). There can be multiple NBs in a European country.
[187] *See id.* The legal structure of medical device regulation in the EU is established by directives that describe the procedures and standards that are binding on member states.
[188] *See id.*
[189] *See* PX1267 at 007 (Edwards Competitive Update, Apr. 2025) (JenaValve received CE mark for AR and AS in 2021).
[190] *See* Daniel B. Kramer, Shuai Xu, and Aaron S. Kesselheim, *Regulation of Medical Devices in the United States and European Union*, 366(9) NEW ENG, J. MED 848-855 (2012).
[191] Josh Makower, Aabed Meer, and Lyn Denend, *FDA impact on U.S. medical technology innovation: A survey of over 200 medical technology companies*, MEDTECH EUROPE, https://www.medtecheurope.org/wp-content/uploads/2015/09/01112010_FDA-impact-on-US-medical-technology-innovation_Backgrounder.pdf.
[192] Kushal T. Kadakia, et al., *Market of First Launch for High-Risk Therapeutic Medical Devices*, 7(12) JAMA NETWORK OPEN (2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2827568.
[193] FDA, Use of Real-World Evidence to Support Regulatory Decision-Making for Medical Devices (Aug. 2017), https://www.fda.gov/media/99447/download?attachment.

### B. Ex-U.S. Clinical Trial Data Rarely Form the Entire Clinical Basis for High-Risk Device Approvals

89. The data submitted as part of a PMA can also come from outside the United States when a manufacturer conducts clinical studies of that device at ex-U.S. locations. When a sponsor would like to include ex-U.S. data in a regulatory application, the FDA has applicable regulations.[194] The FDA generally will consider the information as long as the investigation that produced the data is "well-designed and well-controlled."[195] Sponsors must certify that the investigation was conducted "in accordance with good clinical practice," which includes approval by an independent ethics committee, meeting informed consent standards, and ensuring reliable reporting of data.[196] Importantly, the device under review for approval by the FDA must be identical to the device that generated the data in the foreign country, or the sponsor needs to clearly explain how it differs.[197] In addition to these requirements, if a PMA is supported solely by foreign clinical data "may be approved if: (1) [t]he foreign data are applicable to the U.S. population and U.S. medical practice; (2) [t]he studies have been performed by clinical investigators of recognized competence; and (3) [t]he data may be considered valid without the need for an on-site inspection by the FDA or, if the FDA considers such an inspection to be necessary, the FDA can validate the data through an on-site inspection or other appropriate means."[198]

90. While the FDA technically considers ex-U.S. data in high-risk device approvals, in practice, ex-U.S. data rarely form the entire clinical basis for device approvals. As observed in the data from 2024-2025, if ex-U.S. data are used in support of a device approval, such data generally supplement the data collected from U.S. clinical trial sites (see **Appendix D, Exhibit B for methodology**). Reasons for this include:

a. First, the FDA must be convinced that ex-U.S. data are relevant to a U.S. population for such data to be considered valid for potential regulatory reliance.[199] However, this can be challenging. For example, ex-U.S. patients may differ in physical size from expected U.S. patients, which may be relevant to the functioning of the device.[200] The circumstances in which a device is placed may also differ because of different hospital or health care system practices in non-U.S.

---

[194] The FDA also published a guidance document in 2018 to accompany these regulations. FDA, Acceptance of Clinical Data to Support Medical Device Applications and Submissions: Frequently Asked Questions 2-3 (Feb. 21, 2018) https://www.fda.gov/media/111346/download.
[195] Acceptance of data from clinical investigations conducted outside the United States, 21 C.F.R. § 812.28(a) (2025).
[196] 21 C.F.R. § 812.28(a)(1).
[197] *Id.* § 812.28(b)(5). Waivers of any of these requirements are available with sufficient explanation. 21 C.F.R. § 812.28(c).
[198] Research conducted outside the United States, 21 C.F.R. § 814.15(b) (2025). The FDA "encourages" applicants to arrange a "presubmission" meeting when considering a submission based solely on foreign data. 21 C.F.R. § 814.15(c).
[199] *See* PX7012 (Pinto (JVT) Dep.) at 183:12-184:18.
[200] 21 C.F.R. § 814.15(b)(1) (mandating that foreign clinical data used to support PMA be "applicable to the U.S. population and U.S. medical practice"); *see also* PX7000 (Madrid (Laguna Tech) IH) at 27:4-9).

countries.[201] Such factors may limit the extrapolation of ex-U.S. data to U.S. patients.

b. Second, the trials or other research circumstances in which ex-U.S. data are collected may not be reviewed prospectively by the FDA. As described above, when a Class III device clinical trial is performed in the United States, an IDE precedes it; this means that the FDA reviewed the trial design. Device trials performed outside of the United States do not have the same level of review by the FDA, which means that the FDA may subsequently determine that the trial design or related choices are not valid for use in supporting a PMA application.[202]

c. Third, the goal of FDA approval of a high-risk device is to allow the sponsor to sell it in the United States, which requires U.S. physicians to use the device.[203] Sponsors therefore often choose to test their product at health care sites in the United States so that U.S. physicians gain exposure to the device and even direct experience with it (if they are involved in the trial). A high-risk medical device tested in U.S. sites may therefore experience faster uptake by physicians after FDA approval, and so sponsors may be incentivized to conduct clinical studies in the United States.

91. In this case, Trilogy's PMA submission illustrates the differences and difficulty in collecting foreign data for the purposes of FDA approval.[204] Documents reviewed indicate that JenaValve intended to incorporate data from a EU-based EFS study into its U.S. PMA submission that included patients from Germany and the Netherlands.[205] While a German protocol was similar to that for U.S. EFS patients, the duration of study follow-up was 2 years, compared to the 5 years called for under the U.S. protocol. To conform, JenaValve revised the German protocol to a 5-year follow-up; however, JenaValve was only able to collect "very limited follow-up data beyond 2 years."[206] Consequently, JenaValve chose to exclude the EU EFS patients from its PMA submission "due to lack of follow-up data."[207] This experience shows how clinical trial data collected in ex-U.S. settings may not be fully useful in PMA applications to the FDA.

---

[201] 21 C.F.R. § 814.15(b)(1).

[202] *See generally* 21 C.F.R. § 812.28 (conditioning the acceptance of data from a clinical trial conducted outside the United States that is used to support an IDE of PMA submission, including confirmation that the "investigation was conducted in accordance with Good Clinical Practices" and "a detailed summary of the protocol" among numerous others).

[203] *See e.g.*, PX7023 (Keltjens (JVT) Dep.) at 25:4-15 (noting that "keep[ing] physicians proficient with [a] device and keep[ing] them involved and continue to build up experience" with the device is a benefit of clinical trials) (defining Continued Access Protocol (CAP)).

[204] *Cf.* PX7012 (Pinto (JVT) Dep.) at 183:12-184:6 ("For a variety of reasons, not the least of which is according to FDA rules for clinical trial to get indication, 50 percent or more of your data has to be from the United States.").

[205] *See* PX2501 at 001 (Email from J. Correa, JVT, to K. Soucy, FDA, July 13, 2022); PX2502 at 002 (Email from J. Correa, JVT, to K. Soucy, FDA, July 21, 2022); PX2457 at 047-048 (Email from J. Correa, JVT, to K. Soucy, FDA, Nov. 18, 2024); PX2492 at 008-009 (Email from J. Correa, JVT, to K. Soucy, FDA, Mar. 2, 2022).

[206] PX2457 at 047-048 (Email from J. Correa, JVT, to K. Soucy, FDA, Nov. 18, 2024); *see also* PX2488 at 003 (Email from J. Correa, JVT, to K. Soucy, FDA, May 13, 2022).

[207] *See* PX2457 at 047-048; *see also* PX7023 (Keltjens (JVT) Dep.) at 24:17-25:1 (testifying that "at the end it was only American samples and American patient data that were used for the selection.").

### C. It is Likely at Least Several Years before Other TAVR-AR Devices Being Developed Outside the United States Receive FDA Approval

92. I understand that Edwards and JenaValve have identified around eight companies in various stages of developing TAVR-AR devices and conducting research and development outside of the United States: Laguna Tech's ALPHA and ZETA; INT Medical's (via its subsidiary Healing Medical) Hanchor Valve; Jenscare's Ken-Valve; KOKA Lifesciences's Pioneer; Microport's VitaFlow Liberty; Cuspa Medical's Cuspa; Strait Access Technologies' (SAT) SAT AR Valve System; and Wuhan Vickor's DOCS Valve.[208] With the exception of Laguna Tech, based in the United States, and SAT, based in South Africa, the other six companies are based in China.[209]

93. Upon reviewing the information available about each of these TAVR-AR devices, it does not appear that, as of today, any of these devices have taken obvious steps to seek FDA approval in the United States, such as obtaining an IDE to conduct any clinical studies or trials in the United States or applying for IRB approval for testing in a U.S. site.[210]

94. Only one of these devices appears to have been approved outside of the United States for an indication in AR: Jenscare's Ken-Valve appears to have received registration approval in March 2025 by the National Medical Products Administration ("NMPA") in China

[208] *See* PX1599 at 008-009 (Email from P. Bohan, EW, to H. Haworth et al., EW, Aug. 8, 2025) (listing Laguna Tech (USA), Shanghai Kindly (Healing) (China), Jenscare (China), KOKA Lifesciences (China), and Microport (China)); PX0043 at 019 (JVT Responses to FTC Request for Additional Information and Documentary Material) (also noting Cuspa, Strait Access Technologies, and Wuhan Vickor); *see also* INT Medical, Healing Medical, *About Healing Medical*, https://int-medical.com/en/col209/index (last visited Sept. 28, 2025). The parties also name Biosensors International Group, NewMed Medical Co., Ltd., University College London, and Venus MedTech, however I was unable to identify any information indicating that these companies are currently developing TAVR-AR devices. *See* PX0046 at 023-024 (EW, Def. Edwards Lifesciences' Resps. to Pl.'s First Set of Interrogs.).
[209] *See* PX1599 at 008-009 (Email from P. Bohan, EW, to H. Haworth et al., EW, Aug. 8, 2025); PX0043 at 019.
[210] *See* PX1599 at 008-009 (Email from P. Bohan, EW, to H. Haworth et al., EW, Aug. 8, 2025) (listing the developmental status of devices as of August 2025); PX0043 at 019 (JVT Responses to FTC Request for Additional Information and Documentary Material). PX7013 (Pinto (JVT) Dep.) at 65:6-66:1); PX7034 (Baerenwald (JVT) Dep.) at 127:3-13*; see also* PX1602-001 (Email from S. Halverson, JCM, to D. Cohen, MD et al., Sept. 1, 2023) (showing JC Medical's Senior Director, Clinical Affairs stating that, "we received FDA approval of our IDE submission, opening the gates for first enrollment into the EFS Trial."); PX7034 (Baerenwald (JVT) Dep.) at 57:1-17 (reporting that "We are the only device to have completed the IDE" and that he is unaware of other companies that are "even close to submitting a PMA to the FDA for approval of a TAVR-AR device in the United States").

for an indication of severe AR or combined AS.[211] The other devices appear to be in preclinical stages of development, or are currently engaged in clinical studies outside of the United States.[212]

95. Based on the current status of these devices and the location of all clinical trials to this point outside of the United States, it is likely that these devices still have five to ten years before they may obtain FDA approval in the United States. This estimate is based on evidence collected on the normal timelines for preclinical development, EFS and clinical pivotal trials, and FDA review of a PMA application.[213] The availability of ex-U.S. data may help support the PMA application to the FDA of these products, but these data are unlikely to be able to fully substitute for the need to collect such data from U.S. sites. This is consistent with estimates made by JenaValve in 2024, noting that LagunaTech's Alpha Valve, HanchorValve, KOKA Pioneer Valve, and KenValve are all in early clinical stages and "will not be available for 5+ years."[214]

96. The experience of Edwards's J-Valve may be instructive. Under the ownership of JC Medical, J-Valve received approval in China in 2017 for AR as a transapical TAVR device.[215] JC Medical also developed a transfemoral version of J-Valve for which it received an

---

[211] *See* Jenscare Scientific Co., Ltd., 2025 Interim Report, (Sept. 25, 2025) p 9, https://en.jenscare.com/upload/listedco/listconews/sehk/2025/0925/2025092501489.pdf; Press Release, Jenscare Scientific Co., Ltd., Ken-Valve Obtained Registration Approval From NMPA and Active Progression of Commercialization (Mar. 25, 2025), https://en.jenscare.com/upload/listedco/listconews/sehk/2025/0325/2025032500029.pdf; PX1599 at 009 (Email from P. Bohan, EW, to H. Haworth et al, EW, Aug. 8, 2025); PX1600 at 004 (Email from M. Penjwini, EW, to D. Lippis et al, EW, July 31, 2025); *see also* PX1267 at 009 (Email from P. Bohan, EW, to Elaine Farrell et al., EW, Apr. 30, 2025) (noting that Microport's VitaFlow Liberty is indicated for AS in China and the EU and is pursuing AR indication in China).

[212] *See, e.g.*, O. Sheikh et al., *Innovations in TAVR: The Latest in Device Technology*, 14(4) JOURNAL OF CLINICAL MEDICINE 4906 (2025) (noting Cusper's status as in early clinical development with a first-in-human planned for 2025); PX7000 (Madrid (Laguna Tech) Investigational Hr'g) at 23:12-22; Press Release, *Laguna Tech USA Begins FIH Trial of Alpha TAVR System*, Laguna Tech USA (June 21, 2023), https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system/ (noting that the feasibility trial for the Alpha TAVR system is occurring in Tbilisi, Georgia); *Laguna Tech Reports on Zeta TAVR System's FIH Feasibilty Trial*, Cardiac Interventions Today (Jan. 3, 2024), https://citoday.com/news/laguna-tech-reports-on-zeta-tavr-systems-fih-feasibility-trial (noting that implants occurred in Santiago, Chile); PX1601 at 001 (Email from C. Hartman, HeartBeat Engineering, to L. Sirimanne, Aug. 5, 2025) (indicating that SAT's TAVR valve for AR has received approval to proceed with first-in-human trials in South Africa); Press Release, *Vickor, World's First TAVR Vs. SAVR Trial for Intermediate-to-High Risk Aortic Regurgitation Nears Completion!*, Wuhan Vickor Medical Technology Co., Ltd., (Aug. 15, 2025), https://en.vickor.com.cn/news_xq/47.html (indicating that enrollment nears completion for a DOCS Valve clinical trial in China); W. Pan et al., *Early Results of Multicenter Trial of a Novel Balloon-Expandable Valve with Anchor for Aortic Regurgitation*, 18(6) JACC CARDIOVASCULAR INTERVENTIONS 752-764 (2025) (presenting early clinical trial results for the Hanchor Valve in China); L. Liu L et al., *A Novel Designed TAVR System for Pure Aortic Regurgitation: First-in-Human Experience*, 16(21) JACC CARDIOVASCULAR INTERVENTIONS 2690-2691 (2023) (indicating that KOKA Lifescience's Pioneer valve completed a first-in-human study in April 2023 in China). JenaValve also indicates that the Pioneer valve began a Chinese NMPA special review process in August 2024. PX0043 at 019 (JVT Responses to FTC Request for Additional Information and Documentary Material). MicroPort's VitaFlow Liberty appears to have at least two clinical trials in progress in China, with expected dates of primary completion in Dec. 2025 and in late 2027. *See* S. Chen, MD, *Transcatheter Self-expandable Valve Implantation for the Treatment of Severe Native Aortic Regurgitation (SEASON-AR)*, ClinicalTrials.gov, https://www.clinicaltrials.gov/study/NCT04864145 (last visited Oct. 10, 2025); Zhu zhengbin, *TReanscAtheter TreatMent of PurE Aortic Regurgitation with VitaFlow Liberty System (TRAMPERS)*, ClinicalTrials.gov https://www.clinicaltrials.gov/study/NCT06818084 (last visited Oct. 10, 2025).

[213] *See supra* Part IV.

[214] PX2193 at 015 (JVT, JenaValve Talk Track First Half 2024).

[215] PX1599 at 007 (Email from P. Bohan, EW, to H. Haworth et al, EW, Aug. 8, 2025).

IDE for an EFS in August 2023.[216] At present, Edwards, the current owner of J-Valve, estimates obtaining FDA approval in late 2028 or early 2029.[217] This is approximately five to six years from the time that J-Valve received its first IDE approval.

## VI. INNOVATION CONTINUES AFTER PMA APPROVAL, AS EVIDENCED BY CHANGES TO HIGH-RISK DEVICES

97. In this section, I will discuss how the innovation that leads up to the FDA approval of high-risk devices continues for years beyond approval.

98. After a high-risk device is approved via PMA, manufacturers may make modifications to integral components of the device's design, such as improving how the device is deployed, increasing compatibility with other devices, or upgrading the material used in the device.[218] Manufacturers may also want to update their devices in response to devices made by other manufacturers to make their devices more attractive to physicians or patients. These post-approval improvements can have benefits for patients and physicians including clinical benefits as discussed in Section VII.D.[219]

99. Incremental alterations to device design are an accepted part of the product life cycle.[220] Although the 1976 Medical Device Amendments provided no formal pathway for a device manufacturer to submit changes to a PMA-approved device,[221] the FDA included an ability to supplement the design of existing devices to account for small technological innovations when it published its first broad set of regulations related to PMA in 1986.[222] Congress then codified the PMA supplement process in the FDA Modernization Act in 1997.[223]

100. When Class III device manufacturers update their devices after FDA approval, the process is different from an original PMA application. Post-approval device changes are implemented via a "supplemental" application pathway.[224] Updates may range from relatively minor changes—such as alterations in design, labeling, or manufacturing—to more substantial alterations that require additional clinical data before applying.[225] The more substantial post-approval device changes have the greatest likelihood of making the device better for patients,

---

[216] PX0053-010 (Edwards Responses to FTC Request for Additional Information and Documentary Material).
[217] *See* PX7015 (Sirimanne (EW) Dep.) at 102:1-103:1.
[218] Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, 16 CURRENT CARDIOLOGY REP. 489 (2014).
[219] *See infra* Section VII.C.
[220] Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, 16 CURRENT CARDIOLOGY REP. 489 (2014).
[221] *Id.*
[222] *See infra* Section VII.C; *see also* Premarket Approval of Medical Devices, 21 C.F.R. 814 (1986).
[223] Food and Drug Administration Modernization Act of 1997, Pub. Law 105-115 (1997); *see also* Benjamin N. Rome, et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, 16 CURRENT CARDIOLOGY REP. 489 (2014).
[224] GAO, *FDA Should Take Steps to Ensure That High-Risk Device Types Are Approved Through The Most Stringent Premarket Review Process* (2009), https://www.gao.gov/assets/gao-09-190.pdf; Postapproval Requirements, 21 CFR 814.82(a)(2) (2024).
[225] FDA, *Modifications to Devices Subject to Premarket Approval – The PMA Supplement Decision Making Process* (2008), https://www.fda.gov/media/81431/download.

more convenient for physicians, or less expensive to manufacture, although follow-up is necessary to ensure that such changes do bring the intended outcomes.[226]

101. The FDA categorizes supplements in five distinct pathways,[227] with different data requirements for each type (see **Table 2**):[228]

a. **Panel-Track Supplement**: The most substantial device changes, including new indications for existing devices, are approved through "panel-track" supplements, supported by new clinical data.

b. **180-Day Supplement**: Major changes to a device's design are approved via a 180-day review pathway, in which preclinical testing is often sufficient to assure safety and effectiveness, with "limited confirmatory clinical data" needed in some cases.[229] Major design changes are innovations that significantly change the components, materials, design, specification, software, color additives, or labeling of a device such that it could affect the safety and effectiveness of the device.[230]

c. **Real-Time Supplement**: Minor design changes may qualify for "real-time" review, in which the FDA meets with a sponsor and issues a same-day decision. To qualify for real-time review, a change must not require any new clinical data to assure safety and effectiveness.[231]

d. **Special Supplement**:[232] Changes to a device's labeling to address a newly discovered safety concern (*e.g.*, adding a contraindication) can be approved via a "special supplement" process, during which the sponsor may enact the change prior to formal FDA approval.

e. **30-Day Notice**:[233] Changes to a device's manufacturing that do not alter the device itself require 30-day notice to the FDA. The manufacturer may enact the manufacturing change 30 days after the FDA receives the notice, unless the FDA deems the notice inadequate and requests a more formal 135-day review.

---

[226] *See infra* Section VII.D for examples of this in the TAVR-AS market.
[227] FDA, *Modifications to Devices Subject to Premarket Approval – The PMA Supplement Decision Making Process* (2008), https://www.fda.gov/media/81431/download.
[228] Benjamin N. Rome, et al., *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311 JAMA 385 (2014).
[229] FDA, *Modifications to Devices Subject to Premarket Approval – The PMA Supplement Decision Making Process* (2008), https://www.fda.gov/media/81431/download.
[230] FDA, *PMA Supplements and Amendments* (2019), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-supplements-and-amendments.
[231] FDA, *Real-Time Premarket Approval Application (PMA) Supplements* (2006), https://www.fda.gov/media/73126/download.
[232] A sponsor may temporarily enact the change before the FDA issues approval.
[233] A sponsor may enact the change 30 days after the FDA files the notice if there is no FDA action. Alternatively, the FDA may request a 135-day review if 30-day notice is deemed insufficient.

**Table 2: PMA and PMA Supplement Review Pathways**

| Review Pathway | Description | Data Required |
|---|---|---|
| Original PMA | New device | Clinical and preclinical |
| Panel-Track Supplement | Significant design change; new indication | Clinical; Limited preclinical data in some cases |
| 180-Day Supplement | Significant design change; labeling change | Preclinical; Confirmatory clinical data in some cases |
| Real-Time Supplement | Minor design change | Preclinical only |
| Special Supplement* | Labeling change that enhances device safety | No specific data requirements |
| 30-Day Notice** | Manufacturing change | No specific data requirements |

102. To examine how the supplemental PMA pathway is implemented, I (along with several colleagues) conducted a study examining trends in the approval and supplemental iterations of cardiac implantable electronic devices approved via a PMA between 1979-2012.[234] The study found 77 new PMAs active for a median of 15 years (IQR, 8-20 years)[235] and were associated with 5,829 PMA supplements. Overall, each PMA had a median of 50 approved supplements (IQR, 23-87), or if excluding 30-day notice supplements (the most minor changes), 30 supplements (IQR, 10-50). The study concluded, "the PMA supplement process provides a commonly used review pathway for FDA authorization of changes to existing high-risk devices."[236] Over nearly 25 years, there were 12 manufacturers of cardiac implantable electronic devices represented, including Medtronic (22 PMAs), Boston Scientific (18 PMAs), and St. Jude Medical (12 PMAs).

103. PMA supplements are reasonable indicators of post-approval innovation among high-risk devices because manufacturers use this pathway to alert the FDA to changes in their device manufacturing process, updates to their labeling, or to bring new versions of their device to U.S. patients. In limited cases, manufacturers may choose to seek approval of an iteration of their device through the original PMA application process, which would also provide evidence of innovation, but the most commonly used pathway is the PMA supplemental application. Annual supplemental PMA approvals for cardiac implantable electronic devices adjusted for the number of active PMAs are outlined in **Figure 2**.[237]

---

[234] Benjamin N. Rome, et al., *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311 JAMA, 385 (2014).
[235] *Id*. Length of PMA activity was characterized as the time between initial approval and the PMA's most recent supplement.
[236] *Id*.
[237] An "active PMA" is defined as "the amount of time (in years) between initial approval and the PMA's most recent supplement." This measure is used to account for the addition of new devices over time. *See* Benjamin N. Rome, Daniel B. Kramer & Aaron S. Kesselheim, *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311 J. AM. MED. ASS'N, 385 (2014).

**Figure 2: Annual Approved Supplements for Cardiac Implantable Electronic Devices, 1980-2012**




*Data derived from FDA Premarket Approval Database and adjusted for number of annual active PMAs. The number of panel-track supplements is too small to be observable.*[238]

104. When 30-day notice supplements were excluded, the number of supplements per PMA per year averaged about 2.6.[239] As shown in **Table 3**, major (panel-track, 180-day) and minor (real-time) design changes to the device accounted for over half of cardiac implantable electronic device supplemental approvals. Design changes that could affect the safety and effectiveness of the device (panel-track and 180-day supplements) represented over a quarter of supplemental approvals.[240] In addition to panel-track supplements, we identified the submission of clinical data in about 23% of 180-day supplements, signaling the most likely clinically relevant innovation.[241] This shows that device manufacturers were frequently innovating over time. While not all changes will bring major clinical benefits, changes registered in a PMA supplement will generally be made to increase procedural or device safety, effectiveness, or improve manufacturing processes (e.g., by lowering manufacturing costs).

---

[238] Premarket Approval Database, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm (last visited Oct. 10, 2025).
[239] Benjamin N. Rome, Daniel B. Kramer & Aaron S. Kesselheim, *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311 J. AM. MED. ASS'N, 385 (2014).
[240] FDA, *PMA Supplements and Amendments* (2019), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-supplements-and-amendments.
[241] *Id.*

**Table 3. Supplement types among cardiac implantable electronic devices**

| Panel-Track Supplement | 180-Day Supplement | Real-Time Supplement | Special Supplement | 30-Day Notice | Total |
|---|---|---|---|---|---|
| 15 (0.3%) | 1538 (26%) | 1312 (23%) | 108 (2%) | 2754 (47%) | 5829* |

*Legend: *102 (2%) supplements could not be classified due to missing data.*

105. Since my 2014 study, additional studies have also evaluated clinical evidence used to support supplemental PMA approvals. A 2017 study reviewed the clinical studies affiliated with panel-track supplements representing the most substantial design changes to Class III medical devices approved between April 19, 2006 and October 9, 2015.[242] Of the 78 panel-track supplemental approvals, 91% had only one clinical study. The 83 clinical studies reviewed included 37 (45%) randomized clinical trials and 25 (30%) blinded trials. The clinical studies included a median of 185 patients and 180 days of follow up. This study demonstrates that there can be a substantial amount of new evidence generated for medical devices, resulting in new approvals, even after medical devices have received original approval.[243]

106. Thus, the data and literature show that post-approval improvements are common for Class III medical devices. In the case of panel-track and some 180-day supplements, these post-approval changes can even involve collecting new data from clinical studies, which suggests that the changes being made are most likely to be clinically relevant to the patient using the devices. In the case of cardiac implantable electronic devices, many of the device models being used by clinicians at the time came via the PMA supplement process.[244]

## VII. TAVR-AS SHOWS THAT INNOVATION CONTINUED POST-FDA APPROVAL IN THE PRESENCE OF MULTIPLE TAVR-AS DEVICE MANUFACTURERS

107. In this section, I will describe results from my examination of the development of TAVR-AS devices over the last decade and a half. I understand that Edwards' Corporate Vice President of the TAVR business unit from 2007 to 2025, who helped to launch Edwards' TAVR-AS devices, testified that he expects innovation to play out with TAVR-AR as it has with TAVR-AS.[245] I detail my assessment of the TAVR-AS experience as a comparator to TAVR-AR, which seems like a reasonable model for TAVR-AR innovation given the comparability of the devices and disease processes.[246] One basis for undertaking such a comparison is that, as I will note below, TAVR-AS devices were first studied and approved in the highest surgical risk patients and then, over the subsequent decade and a half, moved forward to studies and FDA approvals for patients who had lower risk levels. Similarly, the first clinical trials of TAVR-AR

---

[242] Sarah Y. Zheng, et al., *Characteristics of Clinical Studies Used for US Food and Drug Administration Approval of High-Risk Medical Device Supplements*, 318 JAMA 619 (2017).
[243] A surrogate measure refers to a study endpoint "that is a substitute, or 'surrogate', for the outcome [investigators] want to study," which is usually a clinical endpoint (how a patient feels, functions, or survives). FDA, *Surrogate Endpoint Resources for Drug and Biologic Development* (2018), https://www.fda.gov/drugs/development-resources/surrogate-endpoint-resources-drug-and-biologic-development.
[244] Benjamin N. Rome, et al., *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311 JAMA, 385 (2014).
[245] PX7019 (Wood (Edwards) Dep.) at 70:1-73:5.
[246] In addition, as described above and below, the FDA classifies them in the same product code.

devices—which treat the same heart valve (the aortic valve)—are being evaluated in patients with aortic regurgitation at high surgical risk.[247] Subsequent research is already underway in patients who have lower surgical risk (*i.e.*, moderate-risk patients).[248]

108. The below analysis shows that it took several years for first-in-class TAVR-AS devices to obtain FDA approval, and the development of second- and third-in-class TAVR-AS devices also took several years to move through clinical testing and PMA approval; because my analysis is based on the publicly available information of pivotal trial and FDA approval dates, my estimated timeframes will be longer were it to take into account the parts of the process that are not readily known to the public. The analysis also shows that foreign clinical data did not provide the sole basis for any TAVR-AS device approvals and that ex-U.S. clinical data does not appear to have meaningfully shortened the approval process for any TAVR-AS devices. Finally, the analysis shows that there have been clinically meaningful post-approval innovations for several TAVR-AS devices.

### A. TAVR-AS Devices Took Several Years after Pivotal Trials to Obtain FDA Approval

109. Four different device manufacturers have received FDA approval for TAVR-AS devices: Edwards, Medtronic, Boston Scientific, and Abbott.[249] The first of these, approved in November 2011, was the Edwards Sapien Transcatheter Heart Valve and Accessories (P100041).[250] The Medtronic CoreValve System (P130021) followed in January 2014 (I understand that Medtronic's TAVR-AS devices are now known under the Evolut name, but I will refer to it as CoreValve in this analysis, as its original PMA was under this name).[251] Boston Scientific and Abbott received approvals for their devices in April 2019 (P180029, LOTUS Edge Valve System)[252] and September 2021 (P190023, Portico Transcatheter Aortic Valve Implantation System).[253] Edwards' initial Sapien device was withdrawn in 2019, and the Boston

[247] Nat'l Inst. Health, Nat'l Library of Med., ClinicalTrials.gov, *The JenaValve ALIGN-AR Pivotal Trial (ALIGN-AR)*, https://clinicaltrials.gov/study/NCT04415047 (last visited Oct. 10, 2025); Nat'l Health Inst., Nat'l Library of Med., ClinicalTrials.gov *ARTIST: Aortic Regurgitation Trial Investigating Surgery Versus Trilogy™ (ARTIST)*, https://www.clinicaltrials.gov/study/NCT06608823 (last visited Oct. 10, 2025).

[248] Nat'l Inst. Health, Nat'l Library of Med., ClinicalTrials.gov, *ARTIST: Aortic Regurgitation Trial Investigating Surgery Versus Trilogy (ARTIST)*, https://www.clinicaltrials.gov/study/NCT06608823 (last visited Oct. 10, 2025).

[249] The FDA's Premarket Approval Database lists seven original PMAs under the product code "NTP," a product code that includes devices "[t]o replace a patient's aortic heart valve. They are different from the classified device (heart valves) in that they are placed percutaneously and do not require open chest surgery or a cardiotomy for placement." U.S. Food and Drug Administration, "Product Classification," https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?id=1147 (last visited Oct. 6, 2025).

[250] FDA, *Premarket Approval (PMA),* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=p100041 (last visited Oct. 10, 2025).

[251] FDA, *Premarket Approval (PMA),* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P130021 (last visited Oct. 10, 2025).

[252] FDA, *Premarket Approval (PMA),* https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P180029 (last visited Oct. 10, 2025).

[253] FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P190023 (last visited Oct. 10, 2025) ("Approval for the Portico Transcatheter Aortic Valve Implantation System).

Scientific device was formally withdrawn in 2021.[254] A timeline of these developments is outlined in **Figure 3**.[255]

[254] FDA policies regarding PMA withdrawals are outlined in 21 CFR 814.46. *See* FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=p100041 (last visited Oct. 10, 2025) ("approval for the Sapien transcatheter heart valve, model 9000tfx, sizes 23mm and 26mm and accessories" PMA P100041, withdrawal date Mar. 18, 2019); FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=p110021 (last visited Oct. 10, 2025) ("approval for the Sapien transcatheter heart valve, model 9000tfx, sizes 23mm and 26mm and accessories" PMA P110021, withdrawal date Mar. 18, 2019); FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P180029 (last visited Oct. 10, 2025) ("approval for the LOTUS Edge Valve System, PMA P190029, withdrawal date Dec. 13, 2021).

[255] TAVR-AS device names refer to those listed on the seven original PMA applications under the product code "NTP." Supplemental iterations reference additional names under the same PMA, including the "Edwards SAPIEN 3 Ultra Transcatheter Heart Valve System" under S074 of P140031, "Edwards SAPIEN 3 Ultra RESILIA Transcatheter Heart Valve" under S141 of P140031, "Evolut PRO+ System" under S059 of P130021, "Medtronic Evolut FX System" under S094 of P130021, Evolut FX+ TAV, Evolut FX DCS, Evolut FX LS under S155 of P130021, Navitor Transcatheter Aortic Valve Implantation System; Navitor Transcatheter Aortic Heart Valve; FlexNav Delivery System under S002 of P190023, among others.

**Figure 3: Timeline of Initial TAVR-AS Device Approvals and Withdrawals in the U.S.**



110. As **Table 4** indicates, the most recent TAVR-AS device to obtain FDA approval, Abbott's Portico Transcatheter Aortic Valve Implantation System, took the longest from the start of its pivotal trial to receiving FDA approval despite numerous TAVR-AS devices having already received approval. The previously approved initial TAVR-AS devices from Edwards, Medtronic, and Boston Scientific all received approval within a timeframe of 3 to 4.5 years from the start of their pivotal trials. The first of the TAVR-AS devices, the Edwards Sapien (P100041), initiated enrollment of its first primary clinical study, a feasibility study, in January 2005 and began randomizing patients for the pivotal study, "Cohort B" of the PARTNER trial, in May 2007. Over six years after the start of the feasibility study and roughly 4.5 years after the start of the pivotal trial, the device received FDA approval on November 2, 2011.[256] Abbott's Portico Transcatheter Aortic Valve Implantation System began enrolling the pivotal study (the PORTICO RCT) in May 2014, over 7 years before receiving FDA approval in September 2021.[257]

**Table 4. TAVR-AS Device Regulatory Timelines from Pivotal Trial to PMA Approval**

| TAVR-AS Device | Pivotal Trial Start Date | FDA PMA Approval Date | Time to Approval |
|---|---|---|---|
| Edwards (Sapien, P100041) | May 2007[258] | November 2011 | ~4.5 years |
| Medtronic (CoreValve System) | December 2010[259] | January 2014 | ~3 years |
| Boston Scientific (LOTUS Edge Valve System) | September 2014[260] | April 2019 | ~4.5 years |
| Abbott Medical (Portico) | May 2014 (PORTICO RCT trial)[261] | September 2021 | ~7 years |

111. Thus, it took several years for initial FDA approval of the first TAVR-AS device of each manufacturer. These timelines are generally consistent with my finding above that it can take Class III devices four to six years from pivotal trial to PMA approval.[262] In addition, this

[256] Edwards Lifesciences, PMA P100041: FDA Summary of Safety and Effectiveness Data, https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf.
[257] Abbott, PMA P190023: FDA Summary of Safety and Effectiveness Data, https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf.
[258] Raj R. Makkar, M.D. et al., *Transcatheter Aortic-Valve Replacement for Inoperable Severe Aortic Stenosis*, 366 N ENGL J MED 1696-1704 (May 3, 2012), https://www.nejm.org/doi/full/10.1056/NEJMoa1202277.
[259] Medtronic, Landmark Medtronic CoreValve(r) U.S. Clinical Trial Begins, Newsroom (Dec. 21, 2010) https://news.medtronic.com/2010-12-21-Landmark-Medtronic-CoreValve-R-U-S-Clinical-Trial-Begins, The IDE was approved in October 2010. *See* Medtronic, Medtronic Clinical Trial Receives FDA Approval to Evaluate New CoreValve(R) System for Aortic Valve Implantation, Newsroom (Oct. 15, 2010) https://news.medtronic.com/2010-10-15-Medtronic-Clinical-Trial-Receives-FDA-Approval-to-Evaluate-New-CoreValve-R-System-for-Aortic-Valve-Implantation.
[260] Boston Scientific, Boston Scientific Enrolls First Patients in U.S. Trial Of the Lotus Valve System, Press Releases (Sept. 23, 2014) https://news.bostonscientific.com/2014-09-23-Boston-Scientific-Enrolls-First-Patients-In-U-S-Trial-Of-The-Lotus-Valve-System.
[261] Abbott, Portico Valve Meets Non-Inferiority Criteria for Safety and Efficacy in Two-Year Analysis, Clinical Insights (2021) https://www.structuralheart.abbott/fileadmin/content/clinical-research/clinical-insights/Clinical_Insights_Portico_IDE-2Yr_Results_US_MAT-2101938_v1.0_FINAL.pdf.
[262] *See supra* Part IV.B.

also shows that the presence of an FDA-approved TAVR-AS device did not markedly speed the development or FDA approval process of the next-in-class device. Based on the expected similarities between the development of TAVR-AS and TAVR-AR, I expect that TAVR-AR devices will experience generally consistent FDA approval timelines.

### B. No PMA Approval for a TAVR-AS Device Relied Solely on Ex-U.S. Data

112. In this section, I replicated my review of the role of ex-U.S. data in the FDA approval of Class III devices, applying the same methodology to TAVR-AS devices. I draw this analysis from seven original PMA applications related to six TAVR-AS devices; one application covered an indication expansion.[263] I focused on original PMA applications, because they cover initial findings of the safety and effectiveness of the device.

113. All six TAVR-AS devices that received FDA PMA approval were first commercialized in European countries. However, none relied solely on ex-U.S. clinical data to gain FDA approval (**Table 5**). Six of the seven original TAVR-AS PMA approvals included both U.S. and ex-U.S. data in the primary and supplemental clinical data sections of their SSEDs, while one, from Medtronic, relied solely on U.S. data.[264] The international data came from locations in Europe, Canada, and Australia. Of these seven, three conducted their device pivotal trials exclusively in the United States, while four cited data from pivotal trials that obtained data from the United States and from international locations.

**Table 5. Use of Ex-U.S. Clinical Data in TAVR-AS Device PMAs**

| TAVR-AS Device (PMA Number), IDE | Pivotal Study Location | Additional Primary Clinical Studies, Location | Supplemental Clinical Data |
|---|---|---|---|
| Sapien Transcatheter Heart Valve and Accessories (P100041),[265] IDE G030069 | PARTNER<br><br>U.S., Germany, Canada | REVIVAL I Location not specified<br><br>REVIVAL II Location not specified | PARTNER EU trial and registry data of European commercial users |

[263] The FDA's Premarket Approval Database lists seven original PMAs under the product code "NTP," a product code that includes devices "[t]o replace a patient's aortic heart valve. They are different from the classified device (heart valves) in that they are placed percutaneously and do not require open chest surgery or a cardiotomy for placement." FDA, Product Classification, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?id=1147 (last visited Oct. 6, 2025).
[264] Medtronic CoreValve System only relied upon U.S. data in its FDA submissions according to its SSED.
[265] Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P100041: FDA (July 20, 2011) https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf.

| **TAVR-AS Device (PMA Number), IDE** | **Pivotal Study Location** | **Additional Primary Clinical Studies, Location** | **Supplemental Clinical Data** |
|---|---|---|---|
| Sapien Transcatheter Heart Valve and Accessories (P110021),[266] IDE G030069<br><br>(indication expansion) | PARTNER<br><br>U.S., Germany, Canada | None | Continued Access Protocol Cohort of IDE study<br>PARTNER EU trial and registry data of European commercial users |
| CoreValve System (P130021),[267] IDE G100012 | CoreValve U.S.<br><br>U.S. | None | None |
| Sapien XT Transcatheter Heart Valve and Accessories (P130009) [268] IDE G090216 | PARTNER II<br><br>U.S. | Nested Registry 5 (U.S.)<br><br>Nested Registries 1, 4, 6 (U.S.)<br><br>Edwards SOURCE XT Registry, international | None |
| Sapien 3 Transcatheter Heart Valve and Accessories (P140031), [269] IDE G090216 | PARTNER II (PIIS3HR cohort and Nested Registry #7)<br><br>U.S. | None | S3OUS study (European Union, Canada) |

[266] Summary of Safety and Effectiveness Data: Medtronic, PMA P130021: (Jan. 17, 2014) https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130021B.pdf (last visited Oct. 10, 2025).
[267] Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P130009, FDA (June 16, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130009B.pdf (last visited Oct. 10, 2025).
[268] Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P140031: FDA (June 17, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf14/P140031B.pdf (last visited Oct. 10, 2025).
[269] Summary of Safety and Effectiveness Data: Edwards SAPIEN 3 N 3™ Transcatheter Heart Valve model 9600TFX, 20, 23, 26, and 29 mm, and accessories, FDA (June 17, 2025) at 21, 34, https://www.accessdata.fda.gov/cdrh_docs/pdf14/P140031B.pdf (last visited Oct. 10, 2025)..

| TAVR-AS Device (PMA Number), IDE | Pivotal Study Location | Additional Primary Clinical Studies, Location | Supplemental Clinical Data |
|---|---|---|---|
| LOTUS Edge Valve System (P180029),[270] IDE G140090 | REPRISE III<br><br>U.S., Canada, Western Europe, Australia | None | REPRISE NG DS (Australia)<br><br>REPRISE Edge (Europe)<br><br>REPRISE III LOTUS Edge Nested-Registry Study (U.S., Australia) |
| Portico Transcatheter Aortic Valve Implantation System (P190023),[271] IDE G120263 | PORTICO RCT<br><br>U.S., Australia | None | FlexNav PMA Analysis Cohort Global FlexNav Cohort (U.S., Australia, Italy, Demark, U.K., Switzerland) |

114. My analysis of the regulatory experience of TAVR-AS devices is consistent with my earlier analysis of the use of ex-U.S. data in the FDA approval of Class III devices showing that ex-U.S. data rarely formed the entire clinical basis supporting PMA applications for significant-risk Class III devices.[272] As a result, I expect that TAVR-AR devices seeking FDA approval will similarly gather U.S. data to support their PMA applications, thus subjecting such devices to the regulatory timelines consistent with those I discussed in Part IV of this report. This further supports my earlier conclusion that any TAVR-AR devices currently in development outside of the United States are likely several years away from FDA PMA approval.

### C. Post-Approval Device Changes Were Common When Multiple TAVR-AS Devices Were Present

115. Following a similar protocol to our 2014 *JAMA* study on cardiac implantable electronic devices discussed in Section VI, I examined post-approval changes to TAVR-AS devices following FDA approval in the United States (methods outlined in **Appendix D, Exhibit D**). I consider these changes to track evidence of innovation because, as discussed earlier in my report, meaningful changes to Class III devices that occur after approval are commonly tracked by filing PMA supplements, and some PMA supplements—particularly those requiring clinical trial data to support their approval—can signal clinically relevant innovation to the PMA-approved Class III device.

[270] Summary of Safety and Effectiveness Data: LOTUS Edge™ Valve System, FDA (Apr. 23, 2019) at 17, 38-39, https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029B.pdf (last visited Oct. 10, 2025).
[271] Summary of Safety and Effectiveness Data: Portico™ Transcatheter Aortic Valve Implantation System, FDA (Sept. 17, 2021) at 15, 42-43, https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf (last visited Oct. 10, 2025).
[272] *See supra* Section V.B.

116. I combined the Sapien product PMAs and supplements for analysis.[273] After excluding duplicate Sapien supplements, the TAVR-AS devices generated 578 supplements, 419 (73%) of which were 30-day notices.[274] Major and minor design innovations (180-day and real-time supplements, respectively) as well as substantial device developments (panel-track supplements) accounted for 114 (20%) approved PMA supplements (**Appendix D, Exhibit D**).[275]

117. Following the approval of Edwards' first TAVR-AS device in November 2011, only one device was marketed in the United States until the approval of the Medtronic CoreValve System in January 2014. During this time, other TAVR-AS devices were in clinical development. For example, it appears that Medtronic's pivotal trial for the CoreValve TAVR-AS device, which began enrolling in December 2010, was nearing completion.[276]

118. Between the approvals of Edwards's first device (Sapien (P100041 and P110021)) and approval of the CoreValve device, covering November 2, 2011 to January 17, 2014, the Edwards device had 43 supplemental PMAs approved, of which 9 (21%) represented major and minor changes to device design: 8 180-day and 1 real-time supplement. Most of the remaining supplemental approvals were 30-day notices (27, 63%). The Edwards device received its last supplemental approvals in 2016. PMA supplements for the Edwards product plateaued around the time that Edwards introduced the Sapien XT (P130009) and Sapien 3 (P140031) products in 2014 and 2015 via original PMA (**Figure 4**); the first Sapien product was withdrawn in 2019.

119. The data show that Edwards then focused on generating supplements for these two new products, with the Sapien 3 product (P140031) and Medtronic product (P130021) generating similar annual numbers of supplements through 2025 (**Figure 4**). The Sapien XT product (P130009) plateaued at 101 total supplements in 2021. Boston Scientific's LOTUS Edge Valve System (P180029) was approved in 2019 and was later withdrawn. Abbott Medical's Portico device (P190023) was approved in September 2021 and has remained active through the date of this report; neither of those generated many supplements. Overall, **Figure 4** shows that PMA supplements have been common, and I expect that TAVR-AR will see similar regular innovation in similar conditions (i.e., with the presence of multiple TAVR-AR manufacturers) as the TAVR-AS market.

---

[273] I reviewed the supplements for the two Sapien devices (P100041 and P110021) and removed any duplicate supplements that were listed for both P100041 and P110021. Supplements were considered "duplicates" if they listed the same "date received," "decision date," "supplement type," and "supplement reason" on the PMA database.

[274] As indicated above, 30-day notice supplements cover changes "to a device's manufacturing that do not alter the device itself" and therefore are least likely of all the PMA supplement pathways to represent clinically meaningful innovation. *See* Benjamin N. Rome, et al., *Approval of High Risk Medical Devices in the US: Implications for Clinical Cardiology*, 16(6) CURRENT CARDIOLOGY REP. 489, 5 (June 2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4080312/pdf/nihms594461.pdf (last visited Oct. 10, 2025).

[275] We calculated average supplements excluding 30-day notices because they do not generally change the device. These methods have been used elsewhere in the literature. *See* Benjamin N. Rome, et al., *FDA Approval of Cardiac Implantable Electronic Devices via Original and Supplement Premarket Approval Pathways, 1979-2012*, 311(4) JAMA 385-91 (Jan. 29, 2014), https://jamanetwork.com/journals/jama/fullarticle/1817796.

[276] NAT'L INSTITUTES OF HEALTH, *Safety and Efficacy Study of the Medtronic CoreValve® System in the Treatment of Symptomatic Severe Aortic Stenosis in High Risk and Very High Risk Subjects Who Need Aortic Valve Replacement*, https://clinicaltrials.gov/study/NCT01240902 (last visited Oct. 11, 2025).

**Figure 4: Annual PMA Supplements for TAVR-AS Devices over Time**




*Annual device supplements. The initial Edwards Sapien devices (P100041 and P110021) are combined, and duplicates are removed. Both Sapien PMAs (P100041 and P110021) were removed from the market in 2019. The Boston Scientific Lotus product was removed from the market in 2021. Each dataset starts at the year of approval and terminates at the date of withdrawal (for the Edwards Sapien devices and Boston Scientific Lotus device) or, if still on the market, through 2025. Data are current as of September 10, 2025.*

### D. Post-Approval Device Changes Brought Clinically Relevant Updates to Patients

120. Panel-track supplements for TAVR-AS devices highlight ongoing innovation in the space and represent clinically relevant changes. In addition, panel-track supplements were observed most often during the time period when the CoreValve and Sapien (XT and 3) products were available for Medtronic and Edwards Scientific.

121. As of September 10, 2025, there have been 15 panel-track supplements for TAVR-AS medical devices—all for Edwards Scientific or Medtronic TAVR-AS devices.[277] The first occurred in June 2014 (for the Medtronic CoreValve System). These panel-track supplements have included expansion to more patients with aortic stenosis: first from inoperable and extreme surgical risk patients to high risk patients to intermediate-risk patients to low-risk patients to asymptomatic patients with aortic stenosis; expansion to patients who have a failing surgical aortic valve bioprosthesis; patients with a dysfunctional, non-compliant right ventricular

[277] Seven panel track supplements were for the Sapien 3 device, five panel track changes were for the Medtronic CoreValve device, and three were for the Sapien XT product.

outflow tract conduit (pulmonic implantation); patients who have a failed mitral valve (a different heart valve, resulting in mitral valve-in-valve); patients with a failed mitral valve with an annuloplasty ring (valve-in-ring); and patients who have a failed transcatheter bioprosthetic aortic valve (transcatheter heart valve-in-transcatheter heart valve).[278] All of these expansions provide more options for patients with valvular heart disease than they would otherwise have had available (and, in some cases, they may not have had any). In many cases, patients would have required surgical procedures and, for some of these cases, repeat surgical procedures; as a repeat cardiac surgery presents higher risk than an initial surgery in nearly all cases, this means more options for patients who otherwise may not have one.

122. Regulatory experience with TAVR-AS devices shows these devices all took several years to obtain FDA approval, despite being available in countries outside the United States. All devices with original approvals for TAVR-AS relied on U.S. data in their PMA applications; none relied entirely on data from non-U.S. trials. The TAVR-AS devices underwent consistent post-approval changes via multiple supplemental PMA applications, including those intended to bring improved clinical benefits to patients. Based on this analysis, my opinion is that a post-approval field with at least two manufacturers will be poised to deliver clinically relevant innovations.

## VIII. POST-PMA INNOVATION IN TAVR-AR

123. Consistent with what one Edwards Scientific executive noted, and based on my prior comments about the similarity of TAVR-AS and TAVR-AR devices, I find it reasonable to use my findings regarding the post-FDA approval development of TAVR-AS devices to evaluate what may be expected from TAVR-AR devices. This is also consistent with documents that I have reviewed,[279] including PX1262, reproduced below:




[278] These data were obtained through the FDA's PMA database. *See* Premarket Approval Database, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm (last visited Oct. 10, 2025).
[279] *See* PX1262 at 033 (Edwards, THV Business Unit Update, Sept. 16, 2024); PX1004 at 031 (Edwards, 2024 Investor Conference, Dec. 4, 2024); PX7019 (Wood (Edwards) Dep. at 70:1-73:5).

124. As noted in the reproduced document, it appears that Edwards Scientific expects TAVR-AR innovation to unfold in a manner similar to TAVR-AS, including device iterations and the generation of clinical evidence.[280] This is further support that my earlier analysis and conclusions regarding the FDA regulatory process, the use of ex-U.S. generated clinical data, and innovation as evidenced by the PMA supplemental process for TAVR-AS devices, should reasonably apply to TAVR-AR.

125. My review of available documents indicates that both Trilogy and J-Valve had planned for post-FDA approval improvements, prior to the proposed transaction.[281] These changes comport with the common practice of Class III medical devices continuing to evolve after FDA approval of their PMA applications and are specifically consistent with changes observed among TAVR-AS devices after FDA approval.

126. I understand that JenaValve has continued to develop its Trilogy device pre-FDA approval, shifting its access approach from transapical to transfemoral, and iterating on its delivery system.[282] In addition, I understand that JenaValve has developed its transfemoral delivery system through several iterations labeled as TF0, TF1, TF2, and TF2-XT. The TF2 and TF2-XT delivery systems were used in the clinical trials supporting Trilogy's PMA application.[283] I understand that JenaValve also has plans for a next generation delivery system, the TF3, which appears to be on hold for now in favor of the TF2.[284]

127. JenaValve's other efforts to develop the Trilogy device appear to include: the ARTIST trial, which seeks to expand Trilogy's indication to reach the larger population of patients not at high-risk for surgery;[285] the Trilogy XL, which appears to be JenaValve's effort to develop a larger valve to match J-Valve's size range;[286] and the JENA-SiS study, a sub-study on the use of Trilogy in larger annuli.[287]

---

[280] PX1262 at 033 (EW, THV Business Unit Update, Sept. 16, 2024).

[281] *See* PX1048 at 035 (JCM, Project Alps, Feb. 2024) (noting indication expansions and a "Gen II J-Valve System in the pipeline with improved delivery device and next generation implant"); PX2503 at 028 (JVT, JenaValve Corporate Presentation, Jun. 2024) (noting the innovation pipeline and indication expansions); PX1279 at 003 (JCM, J-Valve Configuration Scope Overview, Sep. 13, 2024) (detailing Edwards plans to innovate future generations of J-Valve).

[282] *See* PX2457 at 040 (JVT, JenaValve Trilogy Transcatheter Heart Valve System M230006 PMA Module 4, Nov. 18, 2024); *see also* PX7020 (Keltjens (JVT) Dep.) at 23:25-24:10; PX7034 (Baerenwald (JVT) Dep.) at 86:20-87:2.

[283] *See* PX2457 at 039-040 (JVT, JenaValve Trilogy Transcatheter Heart Valve System M230006 PMA Module 4, Nov. 18, 2024); PX0044 at 037-038 (Def. JenaValve Technology, Inc.'s Am. Responses and Objections to Pl. FTC's First Set of Interrogatories).

[284] *See* PX7023 (Keltjens (JVT) Dep.) 48:22-49:6; *see also* PX2381 at 001 (Email from J. Keltjens, JVT, to J. Kilcoyne, JVT, Feb. 21, 2024); PX0044 at 037-038 (Def. JenaValve Technology, Inc.'s Am. Responses and Objections to Pl. FTC's First Set of Interrogatories).

[285] *See* PX7008 (Pinto (JVT) Investigational Hr'g) at 49:11-50:1; PX7027 (Sun (JVT) Dep.) at 151:21-153:5 (discussing PX2041-007).

[286] *See* PX 2190 at -008-010 (JVT, Larger Valve(s) Portfolio – Strategy, Aug. 9, 2024); PX7004 (Sun (JVT) Investigational Hr'g) at 167:15-170:18 (testifying that the fact that "J-Valve makes larger valves" is one of the reasons JenaValve is manufacturing a larger valve); PX2041 at 007 (2024 JenaValve Scenario Planning and Vision, Feb. 15, 2024); PX7012 (Pinto (JVT) Dep.) at 59:13-60:15 (noting that JenaValve continues development of the Trilogy XL with plans to launch in the future).

[287] *See* PX2504 at 014 (JVT, JenaValve FDA Update: Breakthrough Designation Q192463, Jun. 5, 2025).

128. JenaValve is currently conducting the ARTIST pivotal trial to expand Trilogy's indication to patients with severe AR who are eligible for surgery.[288] Specifically, the ARTIST pivotal trial seeks to "demonstrate non-inferiority of [Trilogy] compared with [SAVR] for treatment of subjects with clinically significant native [AR]," which would expand the patient population from those with symptomatic, severe AR who are considered high risk for surgery to include those who are low and intermediate risk for surgery.[289] The FDA granted approval of JenaValve's IDE submission for the ARTIST pivotal trial on August 30, 2024.[290] Patient enrollment began on July 24, 2025.[291]

129. Additionally, it appears that JenaValve has undertaken several projects related to developing larger valve sizes for Trilogy to treat patients who have larger annuli, as well as developing the delivery system for the Trilogy valve.[292] Without these larger valve sizes, JenaValve estimates that it cannot treat about 20% of AR patients.[293] As of May 28, 2025, the development of the larger valve was identified by JenaValve as a high priority project, and it aims to receive FDA approval for its larger valves by early 2028.[294]

130. JenaValve's JENA-SiS project studies whether the current valve size of the Trilogy device may be used for larger annuli.[295] A recent JenaValve list of projects identified this study as a high priority.[296] Prior to its acquisition by Edwards, JC Medical appears to have had plans for the further innovation of J-Valve, including the creation of a "Gen II J-Valve System in the pipeline with improved delivery device and next generation implant."[297] I understand that at least one Edwards executive has testified that with or without JenaValve, Edwards intends to proceed with J-Valve's Gen II device.[298]

131. Thus, prior to the proposed transaction, both JenaValve and then-JC Medical had developed plans for iterating and improving on their devices.

[288] PX2505 at 018-021 (JVT, Board of Directors Meeting, Sep. 25, 2023); PX7017 (Spadaro (JVT) Dep.) at 26:21-27:4; 29:1-4; PX7012 (Pinto (JVT) Dep.) at 178:13-179:8; *see also* PX7023 (Keltjens (JVT) Dep.) at 44:24-45:2. Given that the ARTIST trial seeks to expand Trilogy's indication to reach the larger population of patients not at high-risk for surgery, this type of trial holds potential to follow the path of TAVR-AS devices in providing more options for patients with aortic stenosis.
[289] PX3037 at 395 (Cardiovascular Research Technologies, JenaValve Align AR Trial: Recent Outcomes, Mar. 2024); PX7029 (Thourani (Piedmont) Dep.) at 69:11-19.
[290] PX0043 at 012 (JVT Second Request Narrative Responses)
[291] PX2506 at 001 (Email from D. Sun, JVT, to A. Pandit et al., JVT, Jul. 11, 2025).
[292] PX7017 (Spadaro (JVT) Dep.) at 25:6-9; PX7012 (Pinto (JVT) Dep.) at 59:19-60:7.
[293] PX2139 at 004 (Email from J. Kilcoyne, JVT, to J. Keltjens et. al., JVT, Mar. 19, 2024) ("We now estimate that we are likely not able to treat ~20% of the AR population."); PX7026 (Bierman (EW) Dep.) at 187:5-20.
[294] PX2251 (JVT, Project Portfolio, May 28, 2025); PX2323 at 022 (JVT, 2024 Actual/Forecast vs. Budget, Nov. 19, 2024); PX7017 (Spadaro (JVT) Dep.) at 23:19-25; PX7012 (Pinto (JVT) Dep.) at 60:2-7; 63:5-8 (estimating that it would be a couple of years until Trilogy XL is launched).
[295] *See* PX2507 (JV-LIT-00243476 at -477-478, JVT, JENA-SIS Sizing Increase Sub-study, Pre-Clinical Testing) (JV-LIT-00243479 at -483-493, JenaValve FDA Update, Breakthrough Designation Q192463, Feb. 6, 2025) (Group ID: JV-LIT-00243474); PX7017 Spadaro (JVT) Dep. at 24:1-6.
[296] PX2251 (JVT, Project Portfolio, May 28, 2025).
[297] PX1048 at 035 (JCM, Project Alps, Feb. 2024).
[298] PX7022 (Concepcion (EW) Dep.) at 47:2-48:20; PX7019 (Wood (EW) Dep.) at 88:19-89:15; *see also* PX1279 (JCM, J-Valve Configuration Scope Overview, Sept. 13, 2024).

132. Among TAVR-AS devices, PMA supplement data show that innovations have been consistent, with multiple manufacturers generating changes to their devices. As described in the discussion regarding panel-track changes to TAVR-AS devices, some innovations have occurred that were intended to provide clinical benefits to patients. Based on the foregoing and my analysis, I expect that the post-FDA approval TAVR-AR devices will develop similarly to the TAVR-AS experience with two or more manufacturers present. However, based on the above analysis, other than Trilogy and J-Valve, for which it is reasonable to expect any FDA PMA approval on the timelines predicted by their manufacturers, I do not expect another TAVR-AR device to obtain FDA PMA approval for at least several years.

## IX. CONCLUSION

133. In summary, my analysis shows that it can take five to ten years for a high-risk device to move from preclinical studies through IDE to FDA approval. Based on the information available to me as of the date of this report, the predictions of the parties regarding the expected approval dates of Trilogy and J-Valve are consistent with my evaluation of the FDA approval timeline.

134. In addition, my analysis shows that while ex-U.S. data may be considered as part of the PMA application, it is rarely considered on its own, with sponsors nearly always using ex-U.S. data only to supplement U.S.-gathered clinical data. We can see this in the original PMA applications available for TAVR-AS devices, which show that no device relied solely on ex-U.S. data in receiving PMA approval.

135. Finally, my analysis also shows that innovation continues past original PMA approval by the FDA, with some developments that are clinically relevant to patients. This is also evident in the experience of TAVR-AS devices and my review of their PMA supplement applications, the most clinically relevant of which mostly occurred after multiple TAVR-AS manufacturers received FDA approval. It is my opinion that in the context of multiple TAVR-AR manufacturers, TAVR-AR devices will continue to be updated in ways that will be clinically relevant to patients.

Dated: October 12, 2025

Aaron S. Kesselheim, M.D., J.D., M.P.H.

# APPENDIX A

# DR. AARON S. KESSELHEIM'S CV

**Harvard Medical School**
**Curriculum Vitae**

**Date Prepared:** July 1, 2025
**Name:** Aaron Seth Kesselheim, M.D., J.D., M.P.H.
**Office Address:** Division of Pharmacoepidemiology and Pharmacoeconomics
Department of Medicine, Brigham and Women's Hospital
1620 Tremont Street, Suite 3030
Boston, MA 02120
**Work Phone:** (617) 278-0930
**Work E-mail:** akesselheim@partners.org
**Work Website:** http://www.drugepi.org/faculty-staff-trainees/faculty/aaron-kesselheim/
**Work Fax:** (617) 232-8602
**Place of Birth:** Cherry Hill, NJ

## Education

| | | | |
|---|---|---|---|
| 1996 | A.B. *(summa cum laude)* | History and Science | Harvard University, Cambridge, MA |
| 2002 | M.D. | Medicine | University of Pennsylvania School of Medicine, Philadelphia, PA |
| 2002 | J.D. *(magna cum laude)* | Law | University of Pennsylvania Law School, Philadelphia, PA |
| 2007 | M.P.H. | Clinical Effectiveness | Harvard School of Public Health (HSPH), Boston, MA |

## Postdoctoral Training

| | | | |
|---|---|---|---|
| 6/02-6/03 | Intern | Internal Medicine | Brigham and Women's Hospital (BWH), Boston, MA |
| 7/03-6/05 | Resident | Internal Medicine | BWH |
| 7/05-6/07 | Fellow | General Medicine and Health Care Policy Research | BWH / Harvard Medical School (HMS) / HSPH, Boston, MA |

## Faculty Academic Appointments

| | | | |
|---|---|---|---|
| 7/07-6/10 | Instructor | Medicine | HMS |
| 7/08- | Research Associate | Health Policy and Management | HSPH |
| 7/10-6/14 | Assistant Professor | Medicine | HMS |
| 7/14-4/19 | Associate Professor | Medicine | HMS |
| 5/19- | Professor | Medicine | HMS |
| 7/14-7/15 | Visiting Associate Professor of Law | Law | Yale Law School |
| 7/16-7/19 | Irving S. Ribicoff Visiting Associate Professor of Law | Law | Yale Law School |
| 7/19- | Visiting Professor of | Law | Yale Law School |

| | | | |
|---|---|---|---|
| | Law | | |
| 8/14- | Faculty Member | Center for Bioethics | HMS |
| 7/22- | Director, Health Policy and Bioethics | | |

**Appointments at Hospitals/Affiliated Institutions**

| | | | |
|---|---|---|---|
| 7/05-6/07 | Associate Physician | General Internal Medicine | BWH |
| 7/05-11/13 | Associate Physician | Medicine | Harvard Vanguard Medical Associates |
| 7/05-7/17 | Staff Physician | Medicine | Dana-Farber Cancer Institute, Boston, MA |
| 1/06-7/12 | Courtesy staff | Medicine | Faulkner Hospital, Jamaica Plain, MA |
| 7/07- | Associate Physician (research) | Pharmacoepidemiology and Pharmacoeconomics | BWH |
| 8/10-7/15 | Research Associate | Law, public health, and ethics | Edmond J. Safra Center for Ethics at Harvard University |
| 7/12- | Staff Physician | Medicine | Faulkner Hospital |
| 5/13- | Faculty Supervisor | Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics | Harvard Law School |
| 9/16- | Distinguished Visitor | Solomon Center for Health Law and Policy | Yale Law School |

**Other Professional Positions**

| | | | |
|---|---|---|---|
| 2006-2007 | Expert witness | Testimony in *IMS v. Ayotte* on behalf of state of New Hampshire | Concord, NH |
| 2008-2009 | Expert witness | Testimony on drug promotion | State of Texas |
| 2008-2009 | Expert witness | Testimony in *IMS v. Sorrell* on behalf of state of Vermont | Montpelier, VT |
| 2008-2011 | Consultant | Alosa Foundation | Boston, MA |
| 2010-2011 | Consultant | Robert Wood Johnson Foundation Public Health Law Research program | Temple University, Philadelphia, PA |
| 2011, 2013-2016 | Expert witness | Testimony on expert witness ethics review on behalf of American Academy of Orthopedic Surgeons | Chicago, IL |
| 2016 | Ethics review | Medical Quality Assurance Commission, Department of Health, State of Washington | Olympia, WA |
| 2018 | Outside expert | Northern District of Ohio, Judge Dan Aaron Polster, Multidistrict Litigation 2804: National Prescription Opiate Litigation | Cleveland, OH |
| 2018 | Consultant | Review of Pew Charitable Trusts' drug pricing portfolio | Washington, D.C. |

**Major Administrative Leadership Positions**

**Local**

| | | |
|---|---|---|
| 2003-2005 | Course director, Medico-Legal and Health Policy Curriculum, Internal Med Residents | BWH |
| 2010-2011 | Admissions chair, Law and Public Health Concentration | HSPH |
| 2012- | Site director, HMS Fellowship in General Medicine and Primary Care | Division of Pharmacoepidemiology and Pharmacoeconomics, BWH |
| 2013- | Director, Program On Regulation, Therapeutics, And Law (PORTAL) | Division of Pharmacoepidemiology and Pharmacoeconomics, BWH |
| 2016- | Leader, Health Policy and Bioethics Consortium monthly lecture series | HMS |
| 2018-2019 | Co-director, Harvard-MIT Center for Regulatory Science | HMS |

**National**

| | | |
|---|---|---|
| 2009-2017 | Chair, Council of Recent Graduates | University of Pennsylvania School of Medicine |
| 2011 | Co-organizer, national conference on conflicts of interest in medicine | American Society of Law, Medicine and Ethics, University of Pittsburgh Law School |
| 2013 | Co-organizer, national conference on blinding in biomedical research and the law | Safra Center for Ethics at Harvard University, Harvard Law School Petrie-Flom Center |
| 2014 | Co-organizer, national conference on essential evidence for new drugs and medical devices | Harvard Medical School/Brigham and Women's Hospital, American Association for the Advancement of Science (AAAS), National Center for Health Research (NCHR) |

**International**

| | | |
|---|---|---|
| 2015-2017 | Governance Board | Innovative Medicines Initiative DRIVE-AB |
| 2024- | Contributing Expert | Global Antibiotic Research & Development Partnership (GARD-P)'s REVIVE program |

**Committee Service**

**Local**

| | | |
|---|---|---|
| 2003-2004 | Resident work hours committee, Department of Medicine | BWH<br>Member |
| 2004-2006 | Hospital work committee, Division of Pharmacoepidemiology and Pharmacoeconomics | BWH<br>Member |
| 2004- | Faculty committee, Division of Pharmacoepidemiology and Pharmacoeconomics | BWH<br>Member |
| 2009-2013 | Research Ethics Working Group, Harvard Clinical and Translational Science Center | HMS<br>Member |
| 2011-2013 | Admissions committee, Law and Public Health Concentration | HSPH<br>Member |
| 2011-2012 | Harvard Interfaculty Working Group on Government Management of | Harvard University<br>Member |

| | | |
|---|---|---|
| | Pharmaceutical Products | |
| 2012, 2015, 2019 | Honors thesis program expert reader | HMS<br>Member |
| 2013-2018<br>2018 | Regulatory Science Advisory Board | HMS<br>Deputy Director |
| 2013-2014 | Clinical trial data sharing working groups | Multi-Regional Clinical Trial Center, Harvard Global Health Institute |
| 2016 | Precision Trials Challenge Judge | Harvard Business School |

**Regional**

| | | |
|---|---|---|
| 2011-2012 | Master's thesis overseer, Julia Kay Preis | Harvard-MIT Division of Health Sciences and Technology (HST) Biomedical Enterprise Program |
| 2012-2013 | S.J.D. thesis committee, Jonathan J. Darrow | Harvard Law School |

**National**

| | | |
|---|---|---|
| 2007, 2012 | Alumni reunion committee | University of Pennsylvania School of Med<br>Member |
| 2007-2008 | Expert Advisory Committee | ClinicalTrials.gov<br>Member |
| 2008- | Medical Alumni Advisory Council | University of Pennsylvania School of Med<br>Member |
| 2008- | Penn Law Alumni Society of Boston | University of Pennsylvania Law School<br>Member |
| 2010 | Task Force on Generic Immunosuppressants in Hematopoietic Cell Transplantation | American Society for Blood and Bone Marrow Transplantation<br>Member |
| 2011-2013 | Patents for Humanity | United States Patent and Trademark Office<br>Development Consultant and Judge |
| 2013 | Tenure review committee, Joanna K. Sax | California Western School of Law |
| 2014 | Chatham House working group on antibiotic delinkage | Observer |
| 2015-2018 | American Society of Law, Medicine and Ethics | Board of Directors |
| 2015-2018 | Food and Drug Administration (FDA) Peripheral and Central Nervous System Advisory Committee | Temporary Voting Member |
| 2016-2018 | Drugs and Biologics Committee, Food and Drug Law Institute | Member |
| 2016-2017 | Committee on Pain Management and Regulatory Strategies to Address Prescription Opioid Abuse, National Academies of Sciences, Engineering and Medicine | Member |
| 2018-2021 | Food and Drug Administration (FDA) Peripheral and Central Nervous System Advisory Committee | Permanent Member |
| 2019-2020 | Committee on Clinical Utility of Treating | Member |

| | | |
|---|---|---|
| | Patients with Compounded "Bioidentical Hormone Replacement Therapy," National Academies of Sciences, National Academies of Sciences, Engineering and Medicine | |
| 2025- | deBeaumont Foundation | Board of Directors |

**Professional Societies**

| | | |
|---|---|---|
| 1999-2006 | American College of Legal Medicine<br>2003-2006: Student Awards Committee | Member |
| 2003- | New York State Bar Association | Member |
| 2004-2007, 2011-2013 | Society of General Internal Medicine | Member |
| 2004-2010 | International Society for Pharmacoepidemiology | Member |
| 2009-2017 | AcademyHealth<br>2011-2013: Quality and Value Interest Group Advisory Committee<br>2012-2013: Annual Research Meeting Planning Committee<br>2015-2017: Alice B. Hersh Award selection committee | Member |
| 2011-2012, 2015- | American Society of Law, Medicine & Ethics | Member |
| 2020- | National Academy of Medicine | Elected member |

**Grant Review Activities**

| | | |
|---|---|---|
| 2010, 2013 | Grant proposal reviewer (*ad hoc*) | Robert Wood Johnson Foundation Public Health Law Research Program |
| 2011 | Grant proposal reviewer (*ad hoc*) | Robert Wood Johnson Foundation Investigator Award in Health Policy Research |
| 2013 | Grant proposal reviewer (*ad hoc*) | Alzheimer's Association |
| 2015 | Grant proposal reviewer (*ad hoc*) | Harvard Clinical and Translational Science Center |
| 2017-2022 | External grant proposal reviewer | Greenwall Foundation Making a Difference |

**Editorial Activities**

**Ad hoc peer reviewer**

American Heart Journal
American Journal of Bioethics
American Journal of Respiratory and Critical Care Medicine
American Journal of Tropical Medicine & Hygiene
Annals of Internal Medicine
BioMed Central (BMC) Medical Ethics
BMC Medical Research Methodology
British Medical Journal (BMJ)
BMJ Quality & Safety

Canadian Medical Association Journal Open
Circulation
Clinical Pharmacology and Therapeutics
Current Medical Research and Opinion
Drug Discovery Today
Drug Testing and Analysis
Expert Review of Molecular Diagnostics
Expert Review of Pharmacoeconomics & Outcomes Research
Family Practice Essentials
Genome Biology
Health Affairs
Health Policy
Journal of the American Medical Association (JAMA)
JAMA Cardiology
JAMA Internal Medicine
JAMA Oncology
Journal of General Internal Medicine
Journal of Health Politics, Policy, and Law
Journal of Law and Biosciences
Journal of Law, Medicine & Ethics
Kennedy Institute of Ethics Journal
Medical Letter
Milbank Quarterly
Nature
New England Journal of Medicine (NEJM)
Pharmacoeconomics
Pharmacoepidemiology & Drug Safety
Pharmacy & Therapeutics
Public Library of Science (PLoS) Biology
PLoS Medicine
PLoS One
Science
Science Translational Medicine
Social Science & Medicine
Yale Journal on Regulation

**Other Editorial Roles**

| | | |
|---|---|---|
| 1999-2000 | Associate Editor | University of Pennsylvania Law Review |
| 2000-2002 | Senior Editor | University of Pennsylvania Law Review |
| 2008 | Faculty articles reviewer | Harvard Law Review |
| 2009 | Executive Board, review of antibiotic incentive policy | London School of Economics |
| 2012 | Guest co-editor, Journal of Law, Medicine & Ethics, Volume 40, Issue 3 (title: "Conflict of Interest in the Practice of Medicine") | American Society of Law, Medicine, and Ethics |
| 2012- | Academic Editor, PLoS Medicine | Public Library of Science |
| 2012- | Editorial Board, Expert Opinion on Orphan | Taylor & Francis Online |

| | | |
|---|---|---|
| | Drugs | |
| 2012-2021 | Advisory Board, Perspectives section, New England Journal of Medicine | Massachusetts Medical Society |
| 2013-2015 | Editorial Board, working paper series | Edmond J. Safra Center for Ethics at Harvard University |
| 2013-2016 | Health Policy Brief external editor, Health Affairs | Project Hope |
| 2014 | Co-editor, Journal of General Internal Medicine, Volume 29, Suppl 3 (title: "Research Methods for Evaluating Patient Health Outcomes in Rare Diseases") | Society for General Internal Medicine, Agency for Healthcare Research and Quality |
| 2014- | Editorial Board, Clinical Pharmacology and Therapeutics | American Society for Clinical Pharmacology and Therapeutics |
| 2014, 2017 | Faculty reviewer | Yale Journal of Health Policy Law and Ethics |
| 2017 | Prescription Drug Pricing Health Policy Brief series external editor, Health Affairs | Project Hope |
| 2017 | External editor, "Promoting Value, Affordability, and Innovation in Cancer Drug Treatment" | President's Cancer Panel, National Institutes of Health |
| 2017- | Editor-in-Chief, Journal of Law, Medicine & Ethics | American Society of Law, Medicine, and Ethics |
| 2018 | Co-editor, Journal of Law, Medicine & Ethics, Volume 45, Suppl 2 (title: "Transparency at the US Food and Drug Administration") | American Society of Law, Medicine, and Ethics |
| 2018 | Invited contributor, annual editorial board meeting | JAMA |
| 2021- | Advisory Board | Yale Journal of Health Policy Law and Ethics |
| 2025- | Expert Opinion Panel | Cornell Health Policy Center |

**Honors and Prizes**

| | | | |
|---|---|---|---|
| 1992 | Detur Book Prize | Harvard College | Academic excellence |
| 1992 | National Scholar | Harvard College | Academic excellence |
| 1995 | Harvard / Ford Foundation Samuel H. Abramson Memorial Fellowship | Harvard College | Thesis research proposal |
| 1996 | Phi Beta Kappa honor society | Harvard College | Academic excellence |
| 1996-2002 | Ben Franklin Fellow | University of Pennsylvania School of Medicine | Academic excellence |
| 1998 | History of Medicine Prize | University of Pennsylvania School of Medicine | History of science writing competition |
| 1998-2002 | James Wilson Scholar | University of Pennsylvania Law School | Academic excellence |
| 2000 | William Osler Medal | American Association of the | History of science writing |

| | | | |
|---|---|---|---|
| | | History of Medicine | competition |
| 2001 | Alpha Omega Alpha honor society | University of Pennsylvania School of Medicine | Academic excellence |
| 2002 | Order of the Coif honor society | University of Pennsylvania Law School | Academic excellence |
| 2002 | Burton Award | The Burton Foundation | National excellence in legal writing |
| 2002 | Schwartz Award | American College of Legal Medicine | Health law writing competition |
| 2002 | First Place | Epstein, Becker, and Green Health Law Writing Competition | Health law writing competition |
| 2005 | Karen Kaufman Memorial Book Award | BWH | Excellence in delivery of primary care |
| 2008 | Young Alumnus of the Year | University of Pennsylvania School of Medicine | Career excellence, dedication to school |
| 2009, 2010, 2013, 2015, 2020, 2022 | Top peer reviewer | Annals of Internal Medicine | Excellence in contributions to editorial decisions |
| 2010 | Alice S. Hersh New Investigator Award | AcademyHealth | Exceptional promise for future contributions to health policy research |
| 2011 | Top peer reviewer | Pharmacoepidemiology and Drug Safety | Excellence in contributions to editorial decisions |
| 2013 | 30th Anniversary Award | Center for Excellence in Education's Research Science Institute | Excellence and achievement in science, technology, engineering, math and business |
| 2013 | Second place prize | Eighth Annual Massachusetts Medical Society Research Poster Symposium (health policy/medical education category) | Senior author of research poster |
| 2014 | Chair's Research Award | BWH Department of Medicine | Skill in obtaining grant funding |
| 2015-16 | Young Mentor Award | HMS | Excellence in developing quality mentoring relationships that lead to professional development and career advancement in basic/clinical medicine |
| 2016 | Research Leadership Award | BWH | Awarded to investigators who have demonstrated outstanding research leadership of new or existing programs |
| 2017 | Power List 100: Masters of the Bench | The Medicine Maker | National trade publication list of top individuals "involved in bettering the pharma industry" |

| | | | |
|---|---|---|---|
| 2017 | Leonard M. Rosen Memorial Research Award | Children's Cause Cancer Advocacy | Outstanding contribution of research to childhood cancer policy and advocacy |
| 2018 | Thought Leader | NEJM Catalyst | Demonstrating credentials, expertise, and knowledge related to the health care marketplace |
| 2018 | #2 Most-Cited Health Law Scholar, 2013-17 | Web of Science | Acknowledgement of wide impact of research on field |
| 2018 | #8 Most-Cited Health Law Scholar, 2013-17 | WestLaw | Acknowledgement of wide impact of research on field |
| 2020 | Elected to membership | National Academy of Medicine | Outstanding professional achievement and commitment to service |
| 2021 | #3 Most-Cited Health Law Scholar, 2016-20 | WestLaw | Acknowledgement of wide impact of research on field |
| 2021 | #2 Most-Cited Health Law Scholar, 2016-20 | GoogleScholar | Acknowledgement of wide impact of research on field |
| 2023 | Senator Joseph I. Lieberman Award | Center for Excellence in Education | Excellence in science, technology, engineering and mathematics leadership |
| 2024 | Top tier peer reviewer of 2023 | JAMA, JAMA Internal Medicine, JAMA Health Forum, Annals of Internal Medicine | Excellence in contributions to editorial decisions |
| 2025 | Top tier peer reviewer of 2024 | JAMA Internal Medicine | Excellence in contributions to editorial decisions |
| 2025 | REVIVE Expert | Global Antibiotic Research & Development Partnership | Expertise in antibiotic R&D policy |
| 2025 | Publication-of-the-Year Award (*Research Investigations #405)* | AcademyHealth | Recognizing the best and most relevant peer-reviewed scientific work in the fields of health services research and health policy |

**Report of Funded and Unfunded Projects**

**Funding Information**

**Past**

1999 Health care delivery systems for terminal cancer patients
National Cancer Policy Board, Washington, DC / Research fellowship
Co-investigator
Review of current state of end-of-life care for cancer patients, including trials, physician education and patient knowledge about care options.

2000-2001 Adapting the 25th Amendment to provide for presidential health oversight
Philadelphia College of Physicians and Surgeons, Philadelphia, PA / Research project
Co-principal investigator
Organization of expert working panel to develop recommendations for health of President of

the United States and role of 25th Amendment in ensuring proper oversight. Studied history of presidential health.

2003-2005 Developing a health policy curriculum for medical residents
Brigham and Women's Hospital Support for Excellence in Educational Development / Educational project
Principal investigator
Organization of curriculum of guest lectures to expose internal medicine residents to pressing national health policy issues; empirical analysis of reaction to curriculum.

2004-2005 Investigation of health policy issues in the U.S. Senate Health, Education, Labor, and Pensions Committee
Martin P. Solomon Medical Education Scholarship / Educational project
Principal investigator
Full-time externship with office of Sen. Christopher Dodd (D-CT) to contribute to considerations of current health-related legislation and development of national health information technology infrastructure development bill.

2007-2008 Research in drug and health law policy
Agency for Healthcare Research & Quality (AHRQ) Post-Doctoral Fellowship in Health Services Research / Mentored training grant
Principal investigator
Using empirical research techniques, investigated US intellectual property policies and studied how management of intellectual property rights influences worldwide access to essential medications.

2007-2008 Educational outreach to improve prescribing practices
Attorney General Prescriber and Consumer Education Grant Program / Educational project
Co-Investigator (PI: Jerry Avorn, M.D.)
Development of an innovative series of curricula, interactive web-based programs, and educational outreach activities to equip prescribers and prescribers-in-training with the cognitive and attitudinal tools they need to make optimal drug-use decisions.

2007-2010 Design of a national educational curriculum, "Generics are powerful medicines"
Cy pres award distribution from court settlement / Educational project
Program director
Organization of consumer education materials and website describing the safety and efficacy of generic drugs, including developing partnerships with local public health outreach organizations through a national request for proposals.

2008-2009 Assessment of strategies for development of novel antimicrobial products
Resources for the Future / Commissioned study
Co-principal investigator (Co-PI: Kevin Outterson, J.D., LL.M.)
Descriptive analysis of current proposals to encourage antibiotic drug development, and discussion of a novel alternative, the Antibiotic Conservation and Effectiveness program, which would combine incentives for development with reimbursement for rational drug use.

2009 Using market exclusivity incentives to promote pharmaceutical innovation

Robert Wood Johnson Foundation Public Health Law Research / Commissioned study
Principal investigator
Study of the effect on medical innovation of statutes that provide additional intellectual property rights or related incentives to pharmaceutical developers in the US.

2009-2010 Patterns of use of newly approved orphan drugs for rare diseases
Harvard Clinical and Translational Science Center / Individual investigator initiated grant
Principal investigator
Analysis of effectiveness of Orphan Drug Act as means of incentivizing drug development to generate treatments for rare diseases, and expansion of use of those drugs after approval.

2009-2014 Off-label prescribing: Comparative evidence, regulation, and utilization
Agency for Healthcare Research & Quality K-08 Award/Training grant (5K08HS18465-04)
Principal investigator
Investigation of off-label prescribing and time series analysis of how legal, regulatory, and market forces affect these uses.

2010 Current trends in orphan drug development
Institute of Medicine Committee on Rare Disease and Orphan Product Development / Commissioned study
Principal investigator
Study of the characteristics of the drug development and FDA review process for a selection of orphan drugs.

2010-2012 Varying disclosure policy for biomedical journal articles: a randomized controlled trial for remedies for financial disclosure of science
Edmund J. Safra Center for Ethics at Harvard University / Investigator initiated grant
Co-principal investigator ($60,582) [with Christopher Robertson, J.D., Ph.D.]
Randomized controlled study to test solutions to presentations of conflicts of interest in the medical literature.

2010-2014 Researching ways to overcome obstacles to creation of breakthrough new drugs
Robert Wood Johnson Foundation Investigator Award in Health Policy Research / Individual investigator initiated grant (67487)
Principal investigator
Investigation of how basic, translational, and product-development research combine to create breakthrough new drugs and role of patents in facilitating or impeding this process.

2011 Medical device regulation in the US and EU
Center for Devices and Radiological Health, Food and Drug Administration / Commissioned study (HHSF223201111374P)
Principal investigator
Comparative analysis of device approval and post-market surveillance and systematic review of studies of device regulatory outcomes in the US and EU.

2012-2013 Post-market surveillance of medical devices in the US and EU
Pew Charitable Trust / Individual investigator initiated grant
Principal investigator

Cross-national comparison of systems of post-market surveillance for medical devices.

2012-2014 Research methods for evaluating patient health outcomes in rare diseases: symposium and journal supplement Agency for Healthcare Quality and Research/DEcIDE-2 Request for Task Order HHSA290201000006I - TO4
Principal investigator
Organization of expert advisory group, literature review and stakeholder focus group addressing the application of research methods to studying outcomes for patients with rare diseases, and experiences with newly approved orphan drugs

2012-2014 Developing and testing a decision support tool for primary medication adherence
Patient-Centered Outcomes Research Institute (PCORI)/PI-12-001
Contributing investigator (PI: Jennifer Polinski, Ph.D.)
Leading conduct and analysis of patient and provider focus groups intended to inform development of tool to promote patient adherence to antihypertensive medications

2013-2015 Assessing clinical equivalence for generic drugs approved using innovative methods
Food and Drug Administration (1U01FD004856-01)
Principal Investigator
Study of 6 generic drugs approved using non-traditional methods for determining bioequivalence, including surveys of patients and physicians, a secondary data analysis of their use, and a systematic review of published studies of the drugs.

2013-2016 New methods for evaluation of impact of FDA Drug Safety Communications
Food and Drug Administration (HHSF22301001T)
Principal Investigator
Combined methodological approach to understanding the impact of information disseminated by FDA about prescription drug safety using qualitative analyses of traditional and social media, surveys of patients, interview of patients and physicians, and pharmacoepidemiologic analyses of drug prescribing and patient outcome trends.

2013-2016 Access to drugs and devices that have limited supporting data: ethical implications for patients and physicians
Greenwall Foundation Faculty Scholar Program
Principal Investigator
Using orphan drugs for rare diseases and early access programs as empirical studies to build normative ethical conclusions relevant to patients, physicians, manufacturers, and payers when regulators approve experimental drugs and devices on limited premarket data

2013-2017 Does variation in the physical characteristics of generic drugs affect patients' experiences: A survey of pharmacists and patients
Food and Drug Administration (HHSF223201310232C)
Principal Investigator
National surveys of patients and pharmacists to determine their experiences with generic medications that change shape or color during routine refills, and the association of these episodes with nonadherence and confusion.

2014-2021 Examining the Impact of FDA Regulatory Policies on Therapeutic Approval
Harvard-MIT Center for Regulatory Science
Principal Investigator ($1,037,525)
Conduct of research in the field of "regulatory science" evaluating the impact of FDA-imposed Risk Evaluation and Mitigation Strategies and evaluating how the FDA applies its existing rules to novel technologies.

2014-2016 Studying the impact on public health of variations among states in laws regulating substitution of generic for brand-name drugs
Robert Wood Johnson Foundation Public Health Law Research Program
Co-investigator (Principal Investigator: Ameet Sarpatwari, J.D., Ph.D.)
Mapping of state drug product selection laws affecting generic substitution and observational and direct national survey studies assessing the implications of these laws on access to generic drugs

2016 Use of patents and FDA regulatory exclusivities to set and extend brand-name drug market exclusivity: a review of the evidence
Commonwealth Fund
Principal Investigator
Description of the state of the law relating to pharmaceutical market exclusivities and a review of the evidence relating to the strategies used to delay entry of generic drugs.

2016-2017 A Study of Pharmaceutical Pay for Outcomes Contracts in the US and their Implications for Pharmaceutical Spending
Commonwealth Fund
Co-Principal Investigator (with Elizabeth Seeley, Ph.D.)
Qualitative interview-based analysis of payors, policymakers, and pharmaceutical manufacturers involved in pay-for-outcomes contracts of high-priced drugs.

2016-2017 Reviewing the Legal, Political and Public Health Parameters of Increasing Transparency at the Food and Drug Administration
Laura and John Arnold Foundation
Co-investigator (Principal Investigator: Joshua Sharfstein, M.D.)
Review of the current status of the transparency of FDA decision-making and the potential for enhancing the public availability of key regulatory information.

2016-2017 Impact of Drug Innovation Incentive Strategies on Drug Development and Costs
Laura and John Arnold Foundation
Principal Investigator
To examine the outcomes of programs intended to incentivize drug innovation, to identify the most successful aspects of these programs, and to determine how efficiently these programs facilitate the introduction of important new products by grading the innovativeness, efficacy, and safety of the products whose approval they have facilitated

2016-2018 Development of Educational Boot Camp in Methods Used in Empirical Bioethics Research
Greenwall Foundation
Consultant (PI: Eric Campbell, Ph.D.)

To develop a recurring, year-long educational program for Greenwall fellows to introduce them to qualitative and quantitative data collection and analysis, along with pre- and post-testing, and then expand the educational program more broadly to the bioethics community

2017-2020 Creation of the PORTAL Biomarker Research Consortium
Laura and John Arnold Foundation
Principal Investigator
To systematically review and meta-analyze the validity of biomarkers used in drug development and treatment in cardiovascular medicine, cancer, Alzheimer's disease, and tuberculosis, as well as to develop additional studies and reviews of biomarker and surrogate measure policy.

2017-2020 Prescription Drug Innovation, Availability, and Affordability: The Impact of Drug Innovation Incentive Strategies on Drug Development and Costs
Laura and John Arnold Foundation
Principal Investigator
To document the impact of policy levers on innovation, access, and affordability of prescription drugs, identify how they work well, how they work sub-optimally, and what specific policy options could be implemented to improve them, characterize and critically assess key trends at each stage of the drug product life-cycle that impact expense and innovation, and develop and assess specific possible alternatives to existing policies.

2017-2019 The US Government's Contribution to Transformative Drug Development
Open Society Foundation
Co-Principal Investigator (Co-PI: Ameet Sarpatwari, Ph.D., J.D. ($125,000)
To study the amount of support that the US government has provided for the discovery and development of specific highly innovative and clinically important pharmaceutical products.

2017-2019 The Impact of Intra-Class Competition on Drug Prices
Anthem Public Policy Institute
Co-Investigator (PI: Ameet Sarpatwari, Ph.D., J.D.)
To assess the impact of new drug market entry on the prices of older drugs and investigate the conditions needed for prices to fall.

2017-2020 An International Comparison of Regulatory Risk Communication on Medicines
National Health and Medical Research Council (NHMRC)
Co-Investigator (Principal Investigator: Barbara Mintzes, Ph.D.)
To understand of how regulatory warnings are related to medication safety impact health care delivery, and identify a set of 'best practices' contributing to effectiveness, by comparing medication safety advisories in Australia, Canada, the US, and Europe

2019-2020 Evaluating the Modern Generic Drug Market
Anthem Public Policy Institute
Principal Investigator

To assess the uptake and predictors of new generic drug prescribing and to study the effect of drug coupons on generic substitution.

2020-2023 Prescription Drug Innovation, Access, and Affordability: Key Issues in Drug Costs and Development
Arnold Ventures
Principal Investigator
To inform decisions on medication use and access in the public and private sectors by studying drug market exclusivity and competition, improving regulatory approaches throughout a drug's lifecycle, evaluating public and private contributions to drug development, defining value for drugs and gene therapies, and optimizing the role of biosimilars.

2018-2023 Incentivizing the Development of Effective and Safe Antibiotics
Collaborative Research Programme in Biomedical Innovation Law at the University of Copenhagen (supported by grant NNF17SA027784 from the Novo Nordisk Foundation)
Subcontract Principal Investigator ($348,456)
To study effects of intellectual property laws and regulatory policies on pharmaceutical development, drug approval processes, and the costs, availability, and use of prescription drugs, with a particular focus on antibiotic drug development.

2020-2024 Risk Evaluation and Mitigation Strategy (REMS) Programs to Promote Appropriate Medication Use and Knowledge: A Multimodal Analysis
Food and Drug Administration
Co-Principal Investigator (with Ameet Sarpatwari) ($4,418,854)
To understand the impact of REMS, we are conducting observational studies to evaluate trends in the use of REMS-covered drugs, surveys of physicians and structured interviews with patients to understand individual experiences using REMS-covered drugs, and textual analyses of REMS educational materials.

**Current**

2020-2025 Establishing a Process for Evaluating High-Priced Drugs
Massachusetts Health Policy Commission
Principal Investigator ($300,000/yr)
Hired through competitive bidding process to help Commission in its statutory responsibility to set up a system to receive recommendations from MassHealth for drugs that appear to be excessively priced and then evaluate whether those drugs offer clinical benefits that are commensurate to the prices charged.

2021-2025 Development of Prescription Drug Policy Ideas to Inform PDUFA Reauthorization
Kaiser Permanente Institute of Health Policy
Principal Investigator ($600,000)
To review the characteristics of pivotal trials, completion of post-market commitments/requirements, and comparative analysis of drug value for recently approved drugs for inclusion into policy recommendations to inform PDUFA reauthorization.

2022-2025 Interpreting Colorado's Upper Payment Limit Legislation
Colorado Department of Regulatory Agencies
Principal Investigator ($235,000)
Hired through competitive bidding process to help state regulators interpret its new law setting up a prescription drug affordability board and implementing an upper payment limit for qualifying drugs.

2023-2026 Shaping a New Era for US Prescription Drug Policy: Optimizing Evidence, Accessibility, Regulation, and Innovation
Arnold Ventures ($7,500,000)
Principal investigator
A series of research and outreach activities intended to inform policymaking that will improve the functioning of several aspects of the US prescription drug market, including providing incentives for investment in development of useful new medicine; optimizing evidence generation, regulatory review and oversight to ensure generation of high-quality information about drug benefits and risks; and re-thinking drug pricing and access to most effectively benefit the patients who need them.

2023-2024 Interpreting Oregon's Prescription Drug Affordability Board Legislation
State of Oregon
Co-Principal Investigator with Benjamin Rome ($75,000)
Working with state regulators to help interpret and implement its prescription drug affordability board.

2023-2025 Evaluating Policy Options to Improve Patient-Centered, Cost-Effective Drug Prescribing in the US: Patents, Medicare Negotiation, and Pricing Reform
Commonwealth Fund
Principal Investigator ($648,477)
Studies of drug patent reform, outcomes from Medicare drug price negotiation, and investigation into novel pricing and access models.

2024-2025 Interpreting Washington's Prescription Drug Affordability Board Legislation
State of Washington
Co-Principal Investigator with Benjamin Rome, M.D. ($150,000)
Working with state regulators to help interpret and implement its prescription drug affordability board.

2022-2027 REPO4EU: Euro-Global Platform for Drug Repurposing
European Union
Co-Site Principal Investigator (with Joseph Loscalzo, M.D., Ph.D.) ($375,000)
Evaluate regulatory science and health technology assessment implications of drug repurposing innovation.

2024-2026 Ethics and Effects of Individual Patient Testimonies in Public Health Decision Making
Greenwall Foundation
Co-Principal Investigator (with Benjamin Rome, M.D., M.P.H.) ($270,930)

A project evaluating how patients interact with FDA Advisory Committees and what ethical principles regulators should use in evaluating the contributions of patients to drug approvals decisions.

2023-2025 Supporting Prescription Drug Affordability Board Implementation
National Academy for State Health Policy
Co-Principal Investigator (with Benjamin Rome, M.D., M.P.H.) ($450,000)
Using statutory analysis and review of prescription drug data to support state Prescription Drug Affordability Boards in determining which drugs qualify as being excessively priced and how to implement upper payment limits, when available

## Report of Local Teaching and Training

### Teaching of Students in Courses at HMS/HSDM/DMS

| | | |
|---|---|---|
| 2002-2005 | Core Medicine Clerkship I<br>Third- and fourth-year medical students | HMS<br>9 hrs per day for 12 wks per year |
| 2002-2005 | Core Medicine Clerkship II<br>Third- and fourth-year medical students | HMS<br>9 hrs per day for 12 wks per year |
| 2005-2009 | Core Medicine Clerkship I<br>Third- and fourth-year medical students | HMS<br>13 hrs per wk for 4 wks per year |
| 2005-2009 | Core Medicine Clerkship II<br>Medical students | HMS<br>13 hrs per wk for 4 wks per year |
| 2009 | Health Care Policy<br>All second-year medical students | HMS<br>6 hrs per lecture for 1 guest lecture |
| 2009-2014 | Health Care Policy<br>All first-year medical students | HMS<br>3 hrs per lecture for annual guest lecture |
| 2015 | Health Policy Student Interest Group<br>50 first-year medical students | HMS<br>3 hrs per lecture for 1 guest lecture |
| 2016 | BCMP 311qc: Unmet Medical Needs and Translational Solutions<br>25 medical and PhD students | HMS<br>6 hrs per lecture for 1 guest lecture |
| 2017-2019 | Essentials of Professions: Health care policy<br>All first-year medical students | HMS<br>3 hrs per lecture for 1 guest lecture |
| 2018-2019 | Essentials of the Professions II: Everything you need to know about prescription drug policy in 60 minutes<br>25 medical and PhD students | HMS<br>3 hrs per lecture for 1 guest lecture |
| 2019 | AISC 604: Translational Pharmacology<br>60 medical, Masters, and PhD students | HMS<br>3 hrs per lecture for 4 guest lectures |
| 2019-2026 | HST 150: Pharmacoepidemiology<br>30 medical students | HMS<br>3 hrs per lecture for 1 guest lecture |
| 2020-2024 | AISC 624: Medications and Evidence: Understanding the Effectiveness, Risks, Outcomes, Costs, and Regulation of Prescription Drugs [lead faculty with J. Avorn, M.D., S. Schneeweiss, M.D., Sc.D., M.A. Fischer, M.D., N.K. Choudhry, M.D., Ph.D.]<br>24 medical students | HMS<br>1 credit January-term course (2020: offered a second time in May) |

| | | |
|---|---|---|
| 2020-2026 | Essentials of the Professions II: Prescription Drug Regulation and Economics: 5 Key Controversies<br>35 medical and PhD students | HMS<br>3 hrs per lecture for 1 guest lecture |
| 2021 | AISC 626: Sex- and Gender-Informed Medicine | HMS<br>4 hrs for 1 guest lecture |
| 2023-2026 | AISC 600: Cancer Biology | HMS<br>4 hrs for 1 guest lecture |
| 2024 | HST22: Integration and Innovation in Medical Sciences | HMS<br>4 hrs for 1 guest lecture |

**Other Harvard University Courses**

| | | |
|---|---|---|
| 2005 | Public Health Law<br>Masters students | HSPH<br>8 hrs per wk for 1 semester |
| 2006 | Law and Public Health<br>Masters students | HSPH<br>5.5 hrs per lecture for 2 lectures |
| 2007-2009 | Public Health Law<br>Law students | Harvard Law School<br>5.5 hrs for annual guest lecture |
| 2008-2014 | Advanced Pharmacoepidemiology<br>Masters students | HSPH<br>4 hrs for annual guest lecture |
| 2012-2013 | GHHP 91r Seminar<br>Undergraduate student independent study | Harvard Faculty of Arts and Sciences<br>25 hrs per semester for 2 semesters |
| 2013 | Law and Public Health (HPM 213)<br>Masters students | HSPH<br>6 hrs for 1 guest lecture |
| 2014 | EPI 502 Antibiotic Epidemiology<br>Masters students | HSPH<br>4 hrs for 1 guest lecture |
| 2016-2026 | HPM 213 Public Health Law<br>Masters students | HSPH<br>4 hrs for 1 guest lecture |
| 2016-2026 | Navigating the US Pharmaceutical Sector<br>Executive education students | Executive and Continuing Professional Education, Harvard T.H. Chan School of Public Health<br>4 hrs for 1 guest lecture |
| 2016-2026 | Bioethics 706: Health Law, Policy, and Bioethics (Co-taught with H.F. Lynch, J.D., M.B.E. [2016-17]; B. Abel, J.D. [2018-26])<br>Masters students | HMS Center for Bioethics<br>4 credit fall and spring semester-long seminar |
| 2016-2025 | Bioethics 742: Policy & Ethics Consortium<br>Masters students | HMS Center for Bioethics<br>2 credit year-long tutorial |
| 2019 (updated in 2023) | Massive Open Online Course: The FDA and Prescription Drugs: Current Controversies in Context [lead faculty with A. Sarpatwari, J.D., Ph.D., J.J. Darrow, S.J.D., M.B.A.] | HarvardX<br>6 sessions, 3-5 hours per session |
| 2021-2024 | HPM 538: Pharmaceutical Development and Pharmacy Distribution: Markets and Policy<br>Masters students | HSPH<br>4 hrs for 1 guest lecture |
| 2023-2026 | ID503: Global Epidemiology of Vaccines | HSPH |

| | | |
|---|---|---|
| | and Vaccinations<br>Masters students | 4 hrs for 1 guest lecture |
| 2025 | Bioethics 743: Pharmaceutical Ethics (Co-taught with D. Eisenkraft Klein, Ph.D.)<br>Masters students | HMS Center for Bioethics<br>2 credit fall semester-long seminar |

**Courses Taught While Appointed as Visiting Professor of Law at Yale**

| | | |
|---|---|---|
| 2015 | Law 21767 FDA Law<br>Law students | Yale Law School<br>2 credit semester-long seminar |
| 2016 | Law 20616 FDA Law<br>Law students | Yale Law School<br>2 credit semester-long seminar |
| 2017-2026 | Law 20616/HPM 595 FDA Law and Policy<br>Law and School of Public Health students | Yale Law School and separately with Yale School of Public Health<br>2 credit semester-long seminar |

**Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs)**

| | | |
|---|---|---|
| 2004 | Primary care in the White House<br>30-50 residents | BWH and Faulkner Hospital<br>Guest lecture, 5 hrs |
| 2005 | The health care of our political leaders<br>30-50 residents | BWH and Faulkner Hospital<br>Guest lecture, 3 hrs |
| 2004-2009 | Medico-legal issues for medicine residents<br>30-50 residents | BWH and Faulkner Hospital<br>Annual guest lecture, 5 hrs |
| 2005-2008 | Ambulatory care rotation<br>Residents | Massachusetts General Hospital (MGH)<br>4 hrs per wk for 3 wks per year |
| 2011-2017,<br>2019-2020 | Partners Center of Expertise in Health Policy and Management: Health Policy Certificate Course<br>30-50 residents | HMS-affiliated teaching hospitals<br>Guest lecture, 3 hrs |
| 2015 | What do we know about diabetes drugs?<br>60 residents | BWH<br>Guest lecture, 2 hrs |
| 2017-2020 | Understanding Biomarker Science: From Molecules to Images<br>120 graduate students | Harvard Catalyst<br>Guest lecture, 2 hrs |
| 2021 | Drug Prices and Oncology Drug Policy<br>15 oncology fellows | Dana-Farber Cancer Institute<br>Guest lecture, 2 hrs |

**Clinical Supervisory and Training Responsibilities**

| | | |
|---|---|---|
| 2005-2009 | General Medical Service Attending / Brigham and Women's Hospital | 5 hrs per day for 4 wks per year |

**Laboratory and Other Research Supervisory and Training Responsibilities**

| | | |
|---|---|---|
| 2008- | Supervision of college students, medical students, medical and neurology interns/residents, post-doctoral fellows, visiting scholars, and junior faculty members on intersections between law and medicine, pharmaceutical and medical | Varied levels of mentorship, from daily to weekly, lasting from a few months to several years. |

| | | |
|---|---|---|
| | device law and policy, legal research methodology, qualitative data collection, manuscript preparation, career development. Brigham and Women's Hospital | |
| 2013- | Initiated Program On Regulation, Therapeutics, And Law (PORTAL) to bring together post-doctoral fellows trained in law and medicine, along with students with law, public health, and/or public policy interest, to study questions related to regulatory and drug development and delivery. Brigham and Women's Hospital | Close mentorship on daily basis, weekly lab meetings, lasting from a few months to several years. |

**Mentored Trainees and Faculty**

2005-2009 Rahul Rajkumar, M.D., J.D. / Founder and CEO, Accompany Health, Bethesda, MD
Career stage: medical resident (BWH). Oversight of research in intellectual property issues affecting availability of drugs in resource-poor settings, leading to 3 publications.

2006-2012 Dave A. Chokshi, M.D., M.Sc. / Sternberg Family Professor of Leadership, Colin Powell School for Civic and Global Leadership, City College of New York, New York, NY
Career stage: medical student (University of Pennsylvania) and resident (BWH). Oversight of research program in access to and study of drugs and vaccines, leading to 2 publications. Dave served as 2012-2013 White House Fellow and Commissioner of Health of the NYC Department of Health and Mental Hygiene from 2020-2022.

2008-2013 Alex Misono, M.D., M.B.A. / Interventional Radiologist, Newport Harbor Radiology Associates, Newport Beach, CA
Career stage: medical student (HMS). Research on generic and brand-name drug policy, including evidence of relative efficacy of generic and brand-name drugs and study of effect of generic/brand color changes on medication adherence, leading to 3 publications.

2009-2010 Devan D. Bartels, M.D., M.P.H. / Anesthesiolgist, Berkshire Medical Center, Pittsfield, MA
Career stage: medical student (HMS). Oversight of research project in effect of legal, social, and medical market events on off-label use of Neurontin, leading to 1 publication.

2010-2011 Kirsten E. Austad, M.D. / Assistant Professor of Family Medicine, Boston University Chobanian & Avedisian School of Medicine, Boston, MA
Career stage: medical student (HMS). Oversight of Safra Center-funded fellowship on medical school education and changes in attitudes about the pharmaceutical industry, leading to 8 publications.

2010-2012 Julia Kay Preis, S.M., M.B.A. / Partner, K Group, Bedford, NH
Career stage: masters student (HMS). Oversight of honors master thesis on innovation in influenza vaccine development.

2010- Daniel B. Kramer, M.D., M.P.H. / Associate Professor of Medicine, Division of Cardiovascular Medicine, Beth Israel-Deaconess Medical Center, Boston, MA
Career stage: Junior faculty. Supervision of series of projects relating to medical device regulation and ethics, leading to 14 publications.

2011-2012 Adam Licurse, M.D., M.H.S. / Senior Medical Director, Blue Cross Blue Shield of Massachusetts, Boston, MA
Career stage: medical resident (BWH). Oversight of research on conflicts of interest and physician disclosure of industry relationships, leading to 1 publication.

| | |
|---|---|
| 2011-2014, 2016-2022 | Jonathan J. Darrow, J.D., M.B.A., S.J.D. / Medical Student, Baylor University College of Medicine, Houston, TX<br>Career stage: S.J.D. student (Harvard Law School) and post-doctoral fellow and junior faculty (BWH). Supervision of thesis and post-doctoral work on history of drug efficacy study and regulation, leading to S.J.D. thesis and 62 publications. |
| 2011-2014 | Shuai Xu, M.D., M.Sc. / Ruth K. Freinkel MD Professor of Dermatology, Northwestern Feinberg School of Medicine, Chicago, IL<br>Career stage: medical student (HMS). Oversight of HMS/HSDM Scholars in Medicine-funded research and honors thesis on medical device innovation, leading to 5 publications, a *cum laude* medical school thesis, and 2012 Soma Weiss Research Day finalist. |
| 2011-2016 | Bo Wang, M.D., Pharm.D. / Chief Medical Officer, RVO Health, Palo Alto, CA<br>Career stage: medical student (HMS). Oversight of course of research related to drug policy issues, leading to 17 publications. Bo won the 2015 Robert Wood Johnson Foundation Public Health Law Research Program Young Investigator Award. |
| 2012 | Kyle D. Checchi, M.D., M.Sc. / Naval Surgeon, Okinawa, Japan<br>Career stage: medical student (HMS). Oversight of HMS/HSDM Scholars in Medicine-funded research internship on use of pill bottle-related medical device innovation to improve medication adherence, leading to 1 publication. |
| 2012-2013 | Colin Schwartz / Federal Senior Advocacy Advisor, American Heart Association, Washington, D.C.<br>Career stage: masters student (Harvard Kennedy School). Oversight of research on development of transformative HIV drugs (zidovudine and protease inhibitors) |
| 2012-2015 | Yongtian T. Tan, M.D., M.B.A. / Assistant Clinical Professor, Pediatric Emergency Medicine, University of California – San Francisco, CA<br>Career stage: medical student (HMS). Oversight of research on medical device innovation in resource-poor settings and comparison of medical device regulation in China and US, leading to 5 publications. |
| 2012-2015 | Evan S. Caplan, M.D., M.B.A. / Healthcare Venture Capital, OrbiMed<br>Career stage: medical student (HMS). Investigation of sources of innovation leading to development of vascular endothelial growth factor inhibitors for use in ophthalmologic disease, leading to 1 publication. |
| 2012- | Thomas J. Hwang, M.D. / Urology resident, Brigham and Women's Hospital/Dana-Farber Cancer Institute, Boston, MA<br>Career stage: undergraduate (Harvard), research associate (BWH), medical student (HMS). Oversight of coursework and thesis research on Food and Drug Administration rulemaking, regulation, and biopharmaceutical innovation, leading to 46 publications. |
| 2013 | Nathan Shiu, J.D., M.P.H. / Lawyer at FDA<br>Career stage: law student (University of California-Los Angeles). Oversight of summer research fellowship on adjudication of truth and scientific certainty in the federal courts, leading to 2 publications. |
| 2013-2015 | James S. Yeh, M.D. / Instructor in Medicine, MGH, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of post-residency general medicine fellowship in health services research, leading to 6 publications. |
| 2013-2016 | Carolyn Treasure, M.D. / Co-founder, Peachy, New York City, NY<br>Career stage: medical student (HMS) and resident (BWH). Oversight of HMS/HSDM Scholars in Medicine-funded research internship on university patenting and government march-in rights, leading to 4 publications. |
| 2013-2024 | Ameet Sarpatwari, Ph.D., J.D. / Assistant Professor of Medicine, Department of |

| | |
|---|---|
| | Population Medicine, Harvard Pilgram Health Care Institute, Boston, MA<br>Career stage: post-doctoral fellow and junior faculty (BWH). Oversight of research program on law and public health topics, leading to 96 publications. |
| 2013- | Ben Rome, M.D., M.P.H. / Assistant Professor in Medicine, Division of Pharmacoepidemiology and Pharmacoeconomics, BWH, Boston, MA<br>Career stage: medical student (HMS) and resident/fellow/junior faculty (BWH). Oversight of projects on evidence-based medicine use, device regulation, drug pricing, and pharmacoepidemiology, leading to 84 publications. |
| 2014 | Prashant Rajan, M.D. / Assistant Professor of Orthopedic Surgery at University Hospitals/Case Western Reserve University, Cleveland, OH<br>Career stage: medical student (HMS). Oversight of project on current and future prospects for FDA postmarket regulation of medical devices, and the FDA regulation of medical device approval, leading to 2 publications. |
| 2014-2016 | Laura E. Bothwell, Ph.D. / Senior Lecturer in Epidemiology, Yale School of Public Health, New Haven, CT<br>Career stage: post-doctoral fellow (BWH). Oversight of project on adaptive design clinical trials, leading to 2 peer-reviewed publications. |
| 2014-2019 | Jing Luo, M.D., M.P.H. / Associate Professor of Medicine, University of Pittsburgh School of Medicine, Pittsburgh, Pennsylvania<br>Career stage: post-doctoral fellow and junior faculty (BWH). Oversight of post-residency general medicine fellowship in health services research, leading to 19 publications. |
| 2015 | Audrey D. Zhang, M.D. / General Internal Medicine Fellow, Beth Israel Deaconess Medical Center, Boston<br>Career stage: undergraduate (Harvard). Oversight of projects on use of biomarkers in FDA decision-making about investigational drugs, and tracing their conceptual evolution as shaped by academia, industry, and regulatory agencies. |
| 2015 | Vincent C. Capati, J.D., Pharm.D., M.S. / Associate, Wiley Rein LLP, Washington, D.C.<br>Career stage: law student (University of New Hampshire) Oversight of project examining interaction of antitrust law and pharmaceutical manufacturer marketing behavior, leading to 1 publication. |
| 2015-2016 | Nicole L. Tannenbaum, J.D., M.S.P.H. / Director, Faculty Affairs Administration, Emory University, Atlanta, GA<br>Career stage: post-doctoral fellow (BWH). Oversight of project examining characteristics of clinical trials used to evaluate drugs moving through the Accelerated Approval pathway at FDA, leading to 2 publications. |
| 2015-2017 | Dalia M. Deak, J.D., M.P.H. / Associate, Covington & Burling, Washington, D.C.<br>Career stage: masters student (HSPH '16) and law student (Harvard Law School '19). Oversight of projects examining, drug rediscovery and repurposing, the state of antibiotic development, the ethics of FDA approval pathways, and the history of biotechnology innovation, leading to 2 publications. |
| 2015-2017 | Mallika L. Mundkur, M.D., M.P.H. / Medical Officer, FDA, White Oak, MD<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on trends in high-risk medication use, including antibiotics and opioids, leading to 1 peer-reviewed publication. |
| 2015-2020 | Spencer Phillips Hey, Ph.D. / Co-founder, Prism Analytic Technologies<br>Career stage: post-doctoral fellow (BWH) and staff (HMS). Oversight of projects at intersection of ethics and regulation involving personalized medicine and biomarker, leading to 20 peer-reviewed publications. |
| 2016-2017 | Sana Mostaghim, Dr.P.H. / Vaccines Business Unit, Takeda, Cambridge MA |

| | |
|---|---|
| | Career stage: doctoral student (HSPH). Oversight of projects on regulatory approval pathways and prescription drug safety, leading to 2 publications. |
| 2016-2018 | Chana A. Sacks, M.D., M.P.H. / Assistant Professor of Medicine, MGH<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on drug prices and off-label use of drugs for rare diseases, leading to 7 peer-reviewed publications. |
| 2016-2023 | Kerstin N. Vokinger, M.D., J.D., Ph.D., LL.M. / Double Professor University of Zurich & ETH Zurich, Chair for Regulation in Law, Medicine and Technology, Switzerland<br>Career stage: post-doctoral fellow (BWH), junior faculty (Zurich). Oversight of projects on differences between U.S. and European drug regulation, market exclusivity and second-generation brand-name drugs, leading to 21 peer-reviewed publications. |
| 2016-2022 | Michael S. Sinha, M.D., J.D., M.P.H. / Assistant Professor of Law, St. Louis University<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on market exclusivity extensions applied to drugs studied in pediatric trials, use of social media in communicating about drug safety, leading to 20 peer-reviewed publications. |
| 2016-2019 | Emily Jung, M.D. / Ophthalmology resident, Duke University, Durham NC<br>Career stage: undergraduate (Harvard). Oversight of projects on racial, ethnic, and gender diversity in pivotal clinical trials used for FDA drug approval, leading to 9 peer-reviewed publications. |
| 2016-2018 | Nina Jain, M.D., M.B.A., M.Sc. / Medical director of value-based care, BWH, Boston, MA<br>Career stage: medical student (HMS) and resident (BWH). Oversight of projects on incentives for drug innovation, leading to 5 peer-reviewed publications. |
| 2016-2018 | Michael Fralick, M.D., Ph.D. / Clinician Scientist and Assistant Professor, Department of Medicine, University of Toronto, Canada<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on drug safety monitoring and evaluation of drug clinical trials, leading to 18 peer-reviewed publications. |
| 2017-2018 | Reed F. Beall, M.A., Ph.D. / Associate Professor, University of Calgary, Alberta, Canada<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on impact of patents and exclusivity on availability of medical products, leading to 8 peer-reviewed publications. |
| 2017-2019 | Chintan Dave, Pharm.D., Ph.D. / Assistant Professor of Pharmacy and Epidemiology, Rutgers University, New Brunswick, NJ<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on drug pricing, generic drug availability, drug shortages, and pharmacoepidemiology, leading to 7 publications. |
| 2017-2019 | Elvira D'Andrea, M.D., M.P.H. / Director, Global Epidemiology, AbbVie, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on biomarkers and their use in drug development, leading to 8 peer-reviewed publications. |
| 2017-2019 | Huseyin Naci, Ph.D., M.H.S. / Associate Professor, London School of Economics, UK<br>Career stage: Harkness fellow (BWH). Oversight of projects on FDA expedited approval pathways and insurance coverage of drugs, leading to 2 peer-reviewed publications. |
| 2017-2019, 2022-2023 | Frazer Tessema / Medical student, University of Chicago, Chicago, IL<br>Career stage: research assistant and medical student (BWH). Oversight of projects on prescription drug pricing, generic drug availability, drug shortages, and pharmacoepidemiology, leading to 14 publications. |
| 2018-2019 | Bishal Gyawali, M.D., Ph.D. / Assistant Professor of Public Health Science, Queen's University Cancer Research Institute, Kingston, Ontario, Canada<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on biomarkers and their use in oncology drug development, leading to 20 peer-reviewed publications. |
| 2018- | William B. Feldman, M.D., Ph.D., M.P.H. / Assistant Professor of Medicine, Division of Pharmacoepidemiology and Pharmacoeconomics, BWH, Boston, MA |

| | |
|---|---|
| | Career stage: medical subspecialty fellow/junior faculty (BWH). Oversight of projects on 'exceptions from informed consent' clinical trials and evidence-based use and cost of pulmonary disease medications, leading to 65 peer-reviewed publications. |
| 2018-2020 | Rachel E. Barenie, Pharm.D., J.D., M.P.H. / Assistant Professor, University of Tennessee, Memphis, TN<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on opioid regulation and use, leading to 13 peer-reviewed publications. |
| 2018-2020 | Sheng Liu, M.Sc., J.D. / Life Sciences and Healthcare Attorney, Baker McKenzie, Washington, DC<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on regulation of new drugs and rules on pharmaceutical promotion, leading to 2 peer-reviewed publications. |
| 2019 | Rick A. Vreman, Pharm.D., Ph.D. / Patient Access manager and policy lead, Roche, Utrecht, The Netherlands<br>Career stage: visiting Ph.D. student (BWH). Oversight of qualitative research project comparing features of the deliberative process of Health Technology Assessment organizations in the US and Europe, leading to 2 peer-reviewed publications. |
| 2019-2020 | Veronı́que Raimond, Ph.D. / Health economist, Agency for Food, Environmental and Occupational Health & Safety, Paris, France<br>Career stage: Harkness fellow (BWH). Oversight of projects on drug pricing and regulation in France and the US, leading to 2 peer-reviewed publications. |
| 2019- | Leah Z. Rand, Ph.D. / Research Scientist, Division of Pharmacoepidemiology and Pharmacoeconomics, BWH, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on ethics and comparative drug evaluation and regulation, leading to 24 peer-reviewed publications. |
| 2019-2024 | Victor van de Wiele, LL.B., LL.M. / Ph.D. candidate, University of Cambridge, UK<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on generic drugs, biosimilars, and state drug regulatory laws, leading to 9 peer-reviewed publications. |
| 2019-2021 | Brooke Raunig, B.S.N., J.D. / Associate Attorney, Fitzgerald Knaier, San Diego, CA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on regulation of addictive medicines and intellectual property law, leading to 1 peer-reviewed publication. |
| 2020-2022 | Bryan Walsh, J.D. / Associate, Hogan Lovells, Washington, DC<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on FDA regulation of generic drugs and health insurance policy, leading to 8 peer-reviewed publications. |
| 2020-2022 | Beatrice Brown, M.Be. / Student, Yale Law School, New Haven, CT<br>Career stage: research assistant (BWH). Oversight of projects on FDA regulation, women's health, drug prices leading to 19 peer-reviewed publications. |
| 2020-2021 | Doni Bloomfield, J.D. / Assistant Professor of Law, Fordham University, New York, NY<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on patents and antitrust policy affecting drugs, leading to 6 peer-reviewed publications. |
| 2021-2022 | Anjali Deshmukh, M.D., J.D. / Assistant Professor of Law, Georgia State University, Atlanta, GA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on FDA regulation and prescription drug use in children. |
| 2021-2023 | Hussain Lalani, M.D., M.P.H., M.Sc. / Medical officer, Center for Medicare and Medicaid Innovation, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on drug pricing, drug development, medical communication, and out-of-pocket spending on prescription drugs leading to 11 peer-reviewed publications. |

| | |
|---|---|
| 2021-2024 | C. Joseph Ross Daval, J.D. / Lawyer, FDA Chief Counsel's Office, White Oak, MD<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on FDA organization, advisory committees, and administrative law, leading to 15 peer-reviewed publications. |
| 2021-2023 | Caroline Horrow, J.D. / Legal associate, Center for Medicare and Medicaid Innovation, Baltimore, MD<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on pharmacogenomics and drug pricing for gene therapies, leading to 4 peer-reviewed publications. |
| 2021- | Alexander Egilman / Research Assistant, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: research trainee (BWH). Oversight of projects on drug pricing, drug evaluation and drug benefits-risk balance, leading to 12 peer-reviewed publications. |
| 2022-2024 | Catherine Hwang, M.D., M.P.H. / Assistant Professor of Medicine, Oregon Health and Science University, Portland, OR<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on medication adherence and impact of regulatory changes on drug use, leading to 6 peer-reviewed publications. |
| 2022- | Dongzhe Hong, Ph.D. / Research Fellow, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on pharmaceutical use and spending using large databases, leading to 6 peer-reviewed publications. |
| 2022- | Adam J. N. Raymakers, Ph.D. / Research Fellow, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on pharmacoeconomics and comparative effectiveness analysis, leading to 9 peer-reviewed publications. |
| 2022-2023 | Jacob Madden, J.D. / Associate, Simpson Thacher, New York City, NY<br>Career stage: post-doctoral fellow (with Boston University School of Law). Oversight with Kevin Outterson, J.D., LL.M., of projects on antibiotic and antiviral pricing, use, and development incentives. |
| 2022-2024 | Edward R. Scheffer Cliff, M.B.B.S., B.Med.Sc., M.P.H. / Hematology Fellow, Peter MacCallum Cancer Centre, Melbourne, Australia<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on cancer drug use and policy leading to 11 peer-reviewed publications. |
| 2022- | Anushka Bhaskar, M.Phil. / Research Assistant, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: undergraduate student (Harvard)/masters student (University of Cambridge)/research assistant (BWH). Oversight of projects on drug innovation, drug pricing, and FDA, leading to 6 peer-reviewed publications. |
| 2022- | Sarah Gabriele, J.D., LL.M., M.Be. / Research scientist, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: research scientist (BWH). Oversight of projects on intellectual property, drug regulation, and international comparative law, leading to 6 peer-reviewed publications. |
| 2023-2024 | Ian T. T. Liu, M.D., J.D., M.P.H. / Resident in Pediatrics, University of Illinois-Chicago<br>Career stage: research fellow (BWH). Oversight of projects on pediatric regulatory science, accelerated approval, leading to 8 peer-reviewed publications. |
| 2023- | Helen Mooney, M.P.H. / Research Assistant, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: research assistant (BWH). Oversight of projects on drug innovation, drug pricing, and conflict of interest, leading to 2 peer-reviewed publications. |
| 2023- | Jihye Han, M.P.H. / Research Scientist, Division of Pharmacoepidemiology and |

| | |
|---|---|
| | Pharmacoeconomics, Boston, MA<br>Career stage: student (HSPH)/research scientist (BWH). Oversight of M.P.H. practicum and projects on pricing and first-in-class drugs, leading to 1 peer-reviewed publication. |
| 2024-2025 | Rosa Ahn-Horst, M.D. / Psychiatry Resident, MGH/McLean Program, Boston, MA<br>Career stage: resident (MGH). Oversight of research projects on characteristics of pivotal trials for psychiatric medications, leading to 1 peer-reviewed publication. |
| 2024- | Daniel Eisenkraft Klein, Ph.D. / Research Fellow, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of qualitative research projects on FDA advisory committees, regulation of marketing, and psychedelics. |
| 2024- | Christopher Cai, M.D. / Research Fellow, Division of Pharmacoepidemiology and Pharmacoeconomics, Boston, MA<br>Career stage: post-doctoral fellow (BWH). Oversight of projects on drug pricing and use, leading to 2 peer-reviewed publications. |

**Local Invited Presentations**

Those presentations below sponsored by outside entities are so noted and the sponsor(s) is (are) identified.

| | |
|---|---|
| 2004 | Two medico-legal cases / Medicine Grand Rounds (with James T. Hilliard)<br>Department of Medicine, BWH |
| 2004 | Patents, academic research, and drug discovery / Research Rounds<br>Division of Pharmacoepidemiology and Pharmacoeconomics, Department of Medicine, BWH |
| 2006 | Characteristics of physicians who frequently act as expert witnesses in neurological birth injury litigation / Research Rounds<br>Department of Medicine, BWH |
| 2007 | Patent extensions and public health: an empirical analysis / Research Rounds<br>Department of Health Care Policy and Management, HSPH |
| 2007 | Patents and public health: balancing innovation and access / Research Rounds<br>Center for Outcomes and Policy Research, Dana-Farber Cancer Institute |
| 2008 | Balancing drug development and public health / Invited Lecture<br>Department of Medicine, Massachusetts General Hospital |
| 2008 | The insiders: a decade of health care whistleblowers and Department of Justice investigations of health care fraud / Research Rounds<br>Department of Medicine, BWH |
| 2008 | Industry sponsorship in medicine and medical research / Grand Rounds<br>Department of Geriatric Medicine, Hebrew Rehabilitation Center, Jamaica Plain, MA |
| 2008 | Patents and public health: balancing access and incentives for innovation / Plenary Talk<br>Harvard Interfaculty Initiative for Medicines and Society conference, Harvard University |
| 2009 | Patents and cancer drug development / Research Rounds<br>Center for Outcomes and Policy Research, Dana-Farber Cancer Institute |
| 2009 | Patents, innovation, and public health / Invited Lecture<br>Department of Medicine, Massachusetts General Hospital |
| 2009 | Intellectual property issues limiting access to essential medicines / Panel<br>Journal of Law and Technology annual symposium, Harvard Law School |
| 2009 | Health metrics evaluation workshop / Panel<br>Petrie-Flom Center for Health Policy, Biotechnology, and Bioethics, Harvard Law School |
| 2010 | Intellectual property and health care delivery / Invited Speaker<br>Harvard Law School Conference on Intellectual Property Law, Cambridge, MA |

| | |
|---|---|
| 2010 | Market exclusivity incentives for drug development: perils and promise / Invited Lecture<br>Department of Medicine, Massachusetts General Hospital |
| 2011 | Legal ecology of resistance / Invited Speaker<br>Antimicrobial resistance: biology, population dynamics and policy options, HSPH Center for Communicable Disease Dynamics annual symposium, Boston, MA |
| 2011 | Patents and public health: what are the limits / Invited Lecture<br>Department of Biostatistics, HSPH |
| 2011 | The Orphan Drug Act and transformative drug development in oncology / Research rounds<br>Center for Outcomes and Policy Research, Dana-Farber Cancer Institute |
| 2011 | Medical malpractice as a health policy issue / Invited Lecture<br>Department of Medicine, Massachusetts General Hospital |
| 2011 | Legislative incentives for pharmaceutical innovation / Invited Lecture<br>Department of Medicine, Massachusetts General Hospital |
| 2011 | Making drug approval and surveillance less scary / Invited Lecture<br>Harvard Interfaculty Initiative on Drug Development, Harvard University |
| 2012 | Legislative incentives for pharmaceutical innovation / Invited Lecture<br>Health Policy Certificate Program, Partners Graduate Medical Education |
| 2012 | Influence of conflict of interest disclosure on physicians' interpretation of clinical research: a randomized controlled trial / Research Rounds<br>Center for Outcomes and Policy Research, Dana-Farber Cancer Institute |
| 2013 | Association for Molecular Pathology v. Myriad Genetics, the Supreme Court, and the ongoing fight over breast cancer patents / Research Rounds<br>Center for Outcomes and Policy Research, Dana-Farber Cancer Institute |
| 2013 | Health law year in p/review: gene patents / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2013 | Legal and ethical issues in therapeutic development and regulation / Invited Speaker<br>Harvard Program in Therapeutic Science, Boston, MA |
| 2013 | Bayh-Dole march-in rights and the public's access to medical products based on federally-funded research / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics Health Law Policy and Bioethics Workshop, Cambridge, MA |
| 2014 | Second Annual Health law year in p/review: breakthrough drugs / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2014 | Patents without patents / Moderator<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2014 | Overview of current issues facing biosimilar regulation / Featured Speaker<br>Mini-Course to Visiting Members of Chinese FDA, Boston, MA (sponsored by Charles Institute of Management) |
| 2014 | Accelerated FDA approval of new drugs and devices: what are the medical, legal, and ethical risks? / Grand Rounds<br>Beth Israel Deaconess Medical Center Department of General Medicine and Primary Care, Boston MA |
| 2014 | Are stem cells patentable? / Invited lecture<br>Harvard Department of Stem Cell and Regenerative Biology-Laboratory of Systems Pharmacology Research Day, Cambridge, MA |

| | |
|---|---|
| 2014 | Studies in regulatory science / Invited lecture<br>Therapeutic Science Advisory Council Meeting, HMS, Boston MA |
| 2014 | Hepatitis C drugs: what price progress? / Medicine Grand Rounds (with Paul E. Sax)<br>Department of Medicine, BWH |
| 2015 | Updating the HMS conflicts of interest policy / Invited speaker<br>HMS Standing Committee on Conflicts of Interest and Commitment, Boston MA |
| 2015 | Brain hacking to boost your A-game: the ethics of cognitive enhancement in gaming and competition / Invited Speaker<br>HMS Center for Bioethics neuroethics seminar series, Boston MA |
| 2015 | FDA in the 21st Century / Invited panelist<br>Harvard Law School, Cambridge MA |
| 2015 | Regulatory science and the 21st Century Cures Act / Invited lecture<br>Therapeutic Science Advisory Council Meeting, HMS, Boston MA |
| 2015 | Specimen science: background and foundations / Invited panel moderator<br>Harvard Law School, Cambridge MA |
| 2015 | Ethical issues in expanded access to investigational drugs / Invited discussant<br>HMS Center for Bioethics, Boston MA |
| 2015 | Institutional corruption and public health: the case of FDA expedited review and development programs/Invited speaker<br>Edmond J. Safra Center for Ethics at Harvard University, Cambridge, MA |
| 2016 | Health law year in p/review: 21st Century Cures Act / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2016 | High-cost drugs: origins, impacts, prospects for reform / Cardiovascular Grand Rounds<br>Division of Cardiovascular Medicine, BWH |
| 2016 | Should cost matter in the care of patients with advanced cancer? / Featured discussant<br>Harvard Center for Bioethics Clinical Ethics Consortium, HMS |
| 2016 | Regulatory environment around cancer drug development / Featured speaker<br>HMS External Education: Cancer Care in 2025, Boston MA |
| 2016 | Current Legal and Ethical Issues Affecting Prescription Drugs / Featured speaker<br>HMS Media Fellowship on Bioethics, Boston MA |
| 2016 | Fostering innovation in early stage bio-pharma / Featured speaker<br>Harvard Business School Health Care Initiative and Harvard Kennedy School Healthcare Policy Program, Cambridge MA |
| 2016 | FDA regulation, innovation, and the 21st Century Cures Act / Featured speaker<br>Pharmaceutical Policy Research Seminar, Department of Population Medicine, HMS and the Harvard Pilgrim Health Care Institute, Boston MA |
| 2016 | Patient involvement with the FDA / Discussant and Moderator<br>Health Policy and Bioethics Consortium, HMS, Boston MA |
| 2016 | Regulatory science and precision medicine: the tale of eteplirsen / Invited lecture<br>Regulatory Science Advisory Council Meeting, HMS, Boston MA |
| 2016 | What is the proper role of patient advocacy in FDA approval decisions? / Grand Rounds<br>Henry Hardy Lecture in Bioethics and Public Policy, Beth Israel Deaconess Medical Center, Boston MA |
| 2017 | Prescription drug policy: The past, present and future / Invited Lecture<br>Harvard Graduate School of Arts and Sciences Science Policy Group, Cambridge, MA |
| 2017 | Looking forward: the next generation of biosimilars / Moderator |

| | |
|---|---|
| | Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2017 | The future of the FDA / Medicine Grand Rounds<br>Department of Medicine, Brigham and Women's Faulkner Hospital, Boston, MA |
| 2017 | Global health challenge: 2017 and beyond / Panelist<br>Harvard Kennedy School Global Development Conference, Cambridge, MA |
| 2017 | Prescription drug prices: controversies and potential solutions / Grand Rounds<br>Department of Medicine, BWH, Boston MA |
| 2017 | The Cost of Medications: Current Realities and the Future of Pharmaceutical Pricing Regulations in the United States / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2017 | Health law year in p/review: Prescription Drug Pricing / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2018 | Prescription Drug Prices and "Value" / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2018 | Patients' Role in FDA Drug Approval Decisions / Ethics Grand Rounds<br>Dana-Farber Cancer Institute, Boston, MA |
| 2019 | Health law year in p/review: Prescription Drug Pricing / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA |
| 2020 | Prescription Drug Pricing: Where We Are and Where We Are Going / Visiting Speaker<br>Richard A. and Susan F. Smith Center for Outcomes Research in Cardiology, Beth Israel Deaconess Medical Center, Boston, MA |
| 2020 | Seeking value in our health care system / Featured speaker<br>Research Fellow Economics Seminar, BWH Division of Hospital Medicine, Boston, MA |
| 2021 | Contribution of Public Funding to the Development of Transformative Drugs and Covid-19 Products / Featured speaker<br>Boston Children's Hospital Department of Pediatrics Grand Rounds, Boston, MA |
| 2024 | Promoting Trust in the FDA / Invited speaker<br>Harvard Medical School Program in Therapeutic Science, Boston, MA |
| 2024 | First Year of Outcomes from the Inflation Reduction Act / Keynote Speaker<br>Brigham and Women's Hospital Annual Meeting of the Medical Staff, Boston, MA |
| 2024 | Health Policy After the Election: The Work of the Next Four Years / Invited Speaker<br>Harvard Law School, Cambridge, MA |

**Report of Regional, National and International Invited Teaching and Presentations**

**Invited Presentations and Courses**

Those presentations below sponsored by outside entities are so noted and the sponsor(s) is (are) identified.

**Regional**

| | |
|---|---|
| 2008 | Pressing issues in health care and pharmaceutical policy / Invited Lecture<br>Massachusetts Attorney General Health Care Division offices, Boston, MA |
| 2009 | Access to human papillomavirus vaccines: human rights and global health / Plenary talk<br>American Journal of Law and Medicine annual symposium, Boston University School of Law, Boston, MA |

| | |
|---|---|
| 2009 | Clinical and policy rationales for legislation banning the commercial sale of physician-identified prescription data / Invited Lecture<br>Massachusetts state legislature Joint Committee on Health Care Financing, Boston, MA |
| 2011 | Public health goals and commercial speech in off-label drug promotion / Plenary talk<br>American Journal of Law and Medicine annual symposium, Boston University School of Law, Boston, MA |
| 2012 | The past, present and future of pay-for-delay settlements between brand-name and generic manufacturers / Invited Speaker<br>Boston Intellectual Property Law Association, Antitrust Division, Boston, MA |
| 2012 | Incentivizing research in rare diseases / Invited Plenary Speaker<br>Pharmaceutical Research and Manufacturers of America Annual Meeting, Boston, MA |
| 2012 | Health policy visiting scholar / Invited Speaker<br>Yale College, Yale School of Management, and Robert Wood Johnson Clinical Scholars Program, New Haven, CT |
| 2013 | Implementing conflicts of interest policies at academic medical centers / Invited Speaker<br>New England Medical School and Academic Medical Center Roundtable, Community Catalyst, Boston, MA |
| 2013 | Public health implications of the Supreme Court's decision in *Federal Trade Commission v. Actavis* / Invited Speaker<br>Boston Intellectual Property Law Association, Antitrust Division, Boston, MA |
| 2013 | Opening up translational research / Featured Speaker<br>Universities Allied for Essential Medicines joint MIT-Harvard conference, Cambridge, MA |
| 2013 | Overview of current issues facing biosimilar regulation in the US / Featured Speaker<br>Days of Molecular Medicine Global Foundation, Boston, MA [sponsored by Sectoral Asset Management] |
| 2013 | Antibiotics: Issues in the Development and Evidence-Based Use / Guest Course Lecture<br>Massachusetts Institute of Technology Introductory Biology 7.015, Cambridge, MA |
| 2013 | Prescription Drugs: Intersections with Patents and Public Health / Guest Course Lecture<br>Boston Univ School of Public Health Epidemiology 748 Masters Seminar, Boston, MA |
| 2014 | Patents and public health / Guest Course Lecture<br>Northeastern University School of Law 7606: Health Law, Boston, MA |
| 2015 | Is there a myth of data exclusivity?/Invited speaker<br>2nd Annual BioIP conference, Boston University School of Law, Boston, MA |
| 2016 | The Future of Drug Promotion and Public Health / Invited Speaker<br>Northeastern Univ Law School Conference on Future of Public Health Law, Boston, MA |
| 2016 | Government Interventions to Address High Drug Prices / Invited Speaker<br>American Society of Law, Medicine, and Ethics' Health Law Professors' Conference, Boston, MA |
| 2016 | Developing Legal and Policy Responses to Drug-Resistant Bacteria / Panelist<br>Yale Global Health Justice Partnership Forum, New Haven, CT |
| 2016 | The Legal Causes of – and Solutions to – High Drug Prices / Panelist<br>Yale Global Health Justice Partnership Forum, New Haven, CT |
| 2017 | Myths and realities of FDA drug regulation / Featured speaker<br>Pharmaceuticals Certificate Program, Global Health Department at Boston University School of Public Health |
| 2017 | Physicians and Their Role in Reducing Drug Costs / Featured speaker<br>Massachusetts Medical Society Ethics Forum, Boston, MA |

2017 Managing High Prescription Drug Prices / Featured speaker
Institute for Healthcare Improvement Leadership Conference, Boston, MA
2019 Current Topics in Prescription Drug Prices / Featured speaker
Department of Economics, University of Massachusetts-Amherst, Amherst, MA
2019 Prescription Drug Prices 2019 / Invited speaker
Innovations and New Practices in Internal Medicine, Boston, MA
2019 Prescription Drug Prices: A Day-Long Symposium / Speaker and Organizer
International Federation of Employee Benefit Plans, Boston, MA
2020 FDA and COVID-19 / Invited panelist
Yale Law School Faculty Symposium, New Haven, CT
2021 Pharmaceutical Competition Policy: What's Next on Patents and Market Entry and Exclusivity Reform / Panelist
Biopharmaceutical Innovation and Pricing Reform Conference, Boston University Institute for Health System Innovation and Policy, Boston, MA (virtual)
2024 Access, Cost-Savings and Value: The State of Pharmaceuticals in the U.S. / Speaker
31st Princeton Conference in Boston, Wellesley, MA

**National**

2000 End-of-life care report: information for patients and families / Invited Lecture
National Cancer Policy Board, Woods Hole, MA
2001 Gleevec (STI-571), a new treatment for chronic myelogenous leukemia: the science of drug discovery and FDA approval / Grand Rounds
M.D./Ph.D. program, University of Pennsylvania School of Medicine
2004 Deoxyribonucleic Acid (DNA) in civil litigation / Invited Lecture
American College of Legal Medicine annual meeting, Las Vegas, NV
2005 Financial impact of current drug patent policy on Medicaid drug spending / Invited Lecture
Society of General Internal Medicine annual meeting, New Orleans, LA
2006 Update on DNA in civil litigation / Invited Lecture
American College of Legal Medicine annual meeting, Las Vegas, NV
2006 The price of innovation: the effect of patents on medical practice / Plenary Lecture
American Association of Pharmaceutical Scientists annual meeting, San Antonio, TX
2007 Presenting truthful information to physicians / Invited Lecture
National State Attorney General Program at Columbia Law School, New York, NY
2008 Local prescribing practices and access to drugs in resource-poor settings / Plenary Talk
American Journal of Law and Medicine symposium, Boston University School of Law
2008 Free speech and pharmaceutical promotion to physicians / Invited Lecture
American University Washington College of Law Conference, Washington, DC
2008 Pharmaceutical policy issues and points of interest for Attorneys General / Invited Lecture
National Teleconference of Attorneys General
2008 Should FDA drug and device regulation bar liability claims? / Congressional Testimony
House of Representatives Committee on Oversight and Government Reform (Rep. Waxman, Chairman), Washington, DC
2008 Global Health Frontiers Workshop / Panel
Center for Global Development, Warrenton, VA
2008 Pharmaceutical development: innovation vs. public health / Invited Lecture
Leonard Davis Institute, University of Pennsylvania
2008 The priority review vouchers: questions and concerns / Invited Lecture
Knowledge Ecology International meeting on incentivizing drug development for

| | |
|---|---|
| | neglected diseases, Washington, D.C. |
| 2008 | The risks and benefits of follow-on biologics legislation for Medicare / Panel<br>Medicare Payment Advisory Commission, Washington, DC |
| 2010 | Constitutional health law: pharmaceutical regulation and commercial speech / Panel<br>Association of American Law Schools Annual Meeting, New Orleans, LA |
| 2010 | Using market exclusivity to incentivize drug development / Invited Speaker<br>University of Pennsylvania Law School Center for Technology, Innovation, and Competition, Philadelphia, PA |
| 2010 | Implementation of and innovation within the Orphan Drug Act / Invited Speaker<br>Committee Accelerating Rare Disease Research and Orphan Product Development, Institute of Medicine, Washington, D.C. |
| 2010 | Legal issues in drug development and drug use / Invited Speaker<br>Robert Wood Johnson Clinical Scholars Policy Speaker Series, Philadelphia, PA |
| 2010 | Methodological issues in comparative effectiveness research / Invited Speaker<br>Health Affairs Comparative Effectiveness Research consortium, Washington, D.C. |
| 2010 | Sources of transformative innovation in drug development / Invited Plenary Speaker<br>Robert Wood Johnson Investigator Award in Health Policy Research Meeting, Itsaca, IL |
| 2011 | Insiders' perspectives on off-label drug promotion / Invited Speaker<br>Food and Drug Administration Drug Safety Oversight Board, White Springs, MD |
| 2011 | Transformative drug and device development / Invited Plenary Speaker<br>Robert Wood Johnson Investigator in Health Policy Research Meeting, Princeton, NJ |
| 2011 | Institutional challenges at the FDA / Invited Plenary Speaker<br>FDA at Crossroads National Meeting, Union of Concerned Scientists and GW School of Public Health, Washington, D.C. |
| 2012 | Asymmetry in the ability to communicate CER findings / Invited Speaker<br>National Pharmaceutical Council, Washington, DC |
| 2012 | Reauthorization of the Medical Device User Fees Amendments: what it means for jobs, innovation and patients / Congressional Testimony<br>House of Representatives Committee on Energy and Commerce Subcommittee on Health (Rep. Pitts, Chairman), Washington, DC |
| 2012 | Restrictions on promoting comparative effectiveness research (CER) / Invited Speaker<br>Health Affairs kick-off symposium on promotion of CER, Washington, D.C. |
| 2012 | The roles of academia, industry, and patents in transformative drug development in oncology / Invited Plenary Speaker<br>Robert Wood Johnson Investigator in Health Policy Research Meeting, Princeton, NJ |
| 2012 | Patents and market exclusivity: a lever for incentivizing drug development? / Keynote<br>18th Annual Thomas Langfitt Symposium on Health Care Policy, College of Physicians of Philadelphia and the University of Pennsylvania, Philadelphia, PA |
| 2013 | Research on COI: results from two national surveys / Invited Keynote Speaker<br>FOCI Academe Meeting, Association of American Medical Colleges, Baltimore, MD |
| 2013 | The Food and Drug Administration in the 21st century / Invited Speaker<br>Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, Cambridge, MA [national attendees] |
| 2013 | Issues and case studies in clinical trial data sharing: lessons and solutions / Invited Panelist<br>Multi-Regional Clinical Trial Center, Harvard Global Health Institute [national attendees] |
| 2013 | Patient-centered outcomes research in rare diseases / Keynote Speaker<br>14th Annual North American Lysosomal Storage Disease Registries Meeting, Chicago, IL |
| 2013 | Effect of drug detailing restrictions on prescribing of antidepressants and antipsychotics in |

| | |
|---|---|
| | children / Invited Lecture<br>AcademyHealth annual meeting, Baltimore, MD |
| 2013 | High Priority Research Topics in Regulatory Science Related to Generic Drugs / Featured Speaker [with William Shrank]<br>FDA Office of Generic Drugs Generic Drug User Fee Act (GDUFA) Regulatory Science Initiatives Public Meeting, Silver Spring, MD |
| 2013 | FDA Safety and Innovation Act (FDASIA) and the breakthrough drug designation: the risks of approving drugs on the basis of limited supporting data / Featured Speaker<br>Briefings for Senate and House of Representative Congressional Staff, Washington, D.C. |
| 2013 | The practices and perils of "non-traditional" drug promotion / Invited Panelist<br>Food and Drug Law Institute Advertising and Promotion for the Pharmaceutical, Medical Device, Biological, and Veterinary Medicine Industries, Washington, D.C. |
| 2013 | Prospects for regulation of off-label drug promotion in an era of expanding commercial speech protection / Featured Speaker<br>University of North Carolina School of Law Annual Symposium, Chapel Hill, NC |
| 2013 | Are biomarkers patentable? / Keynote Speaker<br>Global Biomarkers Consortium 2nd Annual Conference, Boston, MA [national attendees] |
| 2013 | Approval of new drugs on the basis of extremely limited data / Invited Speaker<br>Center for Excellence in Education's 30th Anniversary Celebration, Cambridge, MA [national attendees] |
| 2013 | Ethical implications of approval of drugs on the basis of limited data / Invited Speaker<br>Greenwall Foundation Scholar Annual Meeting, New York City, NY |
| 2013 | Alternative or additional incentives for drug development / Invited Speaker<br>Duke Law School Center for Innovation Policy Annual Meeting, Washington, D.C. |
| 2014 | Lessons for Follow-On Biologics from Generic Small Molecules / Speaker and Panelist<br>Federal Trade Commission Follow-On Biologics Workshop, Washington, D.C. |
| 2014 | Specialty pharmaceuticals / Round table discussant<br>Health Affairs Planning Meeting, Bethesda, MD |
| 2014 | Is sunshine the best disinfectant? Promise and perils of the Sunshine Act / Invited speaker<br>American College of Physicians Internal Medicine 2014 annual meeting, Orlando, FL |
| 2014 | Ethical approaches to expanded access of investigational drugs / Round table discussant<br>Engelberg Center for Health Care Reform, Brookings Institution, Washington, D.C. |
| 2014 | Tackling generic drug safety / Featured Speaker<br>FDA Office of Generic Drugs Generic Drug User Fee Act Regulatory Science Initiatives Public Meeting, Silver Spring, MD |
| 2014 | Using 'big data' to change policy: physician financial relationships and prescribing practices / Invited panelist<br>AcademyHealth Annual Research Meeting, San Diego, CA |
| 2014 | Generating evidence for use of new drugs and devices: what are the issues? / Keynote<br>PORTAL/AAAS/NCHR conference on evidence development and FDA policy, Washington, D.C. |
| 2014 | 21st Century Cures: Modernizing Clinical Trials / Congressional Testimony<br>House of Representatives Committee on Energy and Commerce Subcommittee on Health (Rep. Pitts, Chairman), Washington, DC |
| 2014 | Lessons from the development of the most transformative drugs of the past 25 years / Invited speaker<br>Robert Wood Johnson Foundation Investigator Award in Health Policy Research Annual Meeting, Indianapolis, IN |

| | |
|---|---|
| 2014 | FDA regulation of specialty drugs/ Invited Speaker<br>Health Affairs kick-off symposium on specialty drugs, Washington, D.C. |
| 2014 | Health policy implications of FDA approval of new drugs and devices/ Grand Rounds<br>Department of Health Services, Policy & Practice, Brown University School of Public Health, Providence, RI |
| 2014 | Preparing for biosimilars in the U.S.: what are the controversies?/ Invited Speaker<br>Academy of Managed Care Pharmacy 2014 annual meeting, Boston, MA |
| 2014 | Regulation of off-label drug promotion and the First Amendment/ Invited Speaker<br>Public Health in the Shadow of the First Amendment symposium at Yale Law School, New Haven, CT |
| 2014 | Regulation of new technologies: vaccines for non-communicable diseases/ Invited Speaker<br>Emerging Issues and New Frontiers in FDA Regulation, Food and Drug Law Institute/Petrie-Flom Center Symposium, Washington, D.C. |
| 2014 | Subcommittee Hearing Investigating Generic Drug Prices / Congressional Testimony<br>Senate Committee on Health, Education, Labor and Pensions Subcommittee on Primary Health and Aging (Sen. Sanders, Chairman), Washington, DC |
| 2014 | Ethical and clinical implications of expedited regulatory development and approval of new drugs and medical devices / Invited speaker<br>Arthur & Ilene Dalinka Penn Grand Rounds Series, Hospital of the University of Pennsylvania Department of Medicine, Philadelphia, PA |
| 2015 | Adjusting regulatory standards to promote development of new CNS drugs<br>Financial Incentives to Support Unmet Medical Needs for Nervous System Disorders: A Workshop, Institute of Medicine, Washington, D.C. |
| 2015 | Roles of academia, repurposing and orphan drugs in transformative drug development / Invited Speaker<br>Health Affairs kick-off symposium on innovation, Washington, D.C. |
| 2015 | Expanded access to investigational drugs and other health policy topics / Invited Speaker<br>National Physician's Alliance FDA task force, Boston, MA [national attendees] |
| 2015 | Managing uncertainty and reproductive rights with new technology / Invited speaker<br>Institute of Medicine Workshop: Ethical and Social Policy Considerations of Novel Techniques for Prevention of Maternal Transmission of Mitochondrial DNA Diseases, Washington, D.C. |
| 2015 | Prospects for use of march-in rights to affect pricing of drugs emerging from government-sponsored research/Invited speaker<br>Yale Health Law and Policy Society Guest Lecture Series, New Haven, CT |
| 2015 | Lessons from the most transformative drugs of the past 25 years / Invited speaker<br>Michael M. Davis Lecture Series, Center for Health Administration Studies, University of Chicago School of Social Service Administration, Chicago, IL |
| 2015 | Does controversy during generic drug approval affect outcomes? Results from observational data, a systematic review, and surveys of patients and physicians/Invited speaker [with Joshua Gagne]<br>FDA Office of Generic Drugs (OGD)/Office of Research & Standards, Rockville, MD |
| 2015 | Studying the post-market safety and rational use of generic drugs / Featured Speaker<br>FDA Office of Generic Drugs Generic Drug User Fee Act (GDUFA) Regulatory Science Initiatives Public Meeting, Silver Spring, MD |
| 2015 | Assessing PDUFA 2012: breakthrough therapy and other expedited review and approval designations / Invited Speaker<br>FDA Center for Drug Evaluation and Research PDUFA Reauthorization Public Meeting, |

| | |
|---|---|
| | Silver Spring, MD |
| 2015 | Role of Public Funding in the Development of Transformative Drugs / Invited Speaker<br>Middle Class Prosperity Project Forum, U.S. Senate, Washington, D.C. |
| 2016 | Law and humanities: Blinding images in the law and other disciplines / Panel<br>Association of American Law Schools Annual Meeting, New York, NY |
| 2016 | Innovation, Safety, and Value: The 21st Century Cures Bill / Invited Speaker<br>Center for Drug Safety and Effectiveness, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD |
| 2016 | Prescription Drug Prices: Origins and Options for Reform / Plenary speaker<br>American Heart Association Quality of Care and Outcomes Research Annual Meeting, Phoenix, AZ |
| 2016 | Hospital administration and prescription drug prices / Plenary speaker<br>American Hospital Association Annual Meeting, Washington, D.C. |
| 2016 | Balancing speed vs. evidence in cancer drug development / Grand Rounds speaker<br>Memorial Sloan Kettering Cancer Center Survivorship, Outcomes, and Risk Seminar Series, New York, NY |
| 2016 | Pharma, Science, and Innovation: What Does the Future Hold for the Health Care Industry and for Patients? / Speaker and moderator (with Peggy Hamburg and Ken Frazier)<br>Yale Law School Solomon Health Law and Corporate Law Centers' Craig Wasserman '86/Wachtell, Lipton, Rosen & Katz Alumni Breakfast, New York, NY |
| 2016 | High Drug Prices: Sources and Solutions / Invited Speaker<br>American Medical Association Board of Delegates, Chicago, IL |
| 2016 | Regulatory Review Times and Adverse Event Reports in Cardiovascular Devices / Speaker<br>American Society of Health Economics Biannual Meeting, Philadelphia PA |
| 2016 | Transforming Data to Inform Value: Balancing Innovation with Access / Panelist<br>American Heart Association Corporate Forum Policy Dialogue, Washington, DC |
| 2016 | High Drug Prices and State-Based Solutions / Speaker<br>Council of State Governments Medicaid Leadership Policy Academy, Washington, D.C. |
| 2016 | High-Cost Drugs: Ensuring Access without Hampering Innovation / Speaker<br>Yale Law School, New Haven, CT |
| 2016 | Strategies for Ensuring Patient Access to Affordable Drug Therapies / Speaker<br>National Academies of Science, Engineering and Medicine, Washington, D.C. |
| 2016 | Limiting Off-Label Promotion is Needed to Protect Patients / Speaker<br>Part 15 Public Hearing: Manufacturer Communications Regarding Unapproved Uses of Approved or Cleared Medical Products, Food and Drug Administration, Silver Spring, MD |
| 2016 | Emerging Opportunities to Streamline Cancer Drug Development / Panelist<br>President's Cancer Panel, Arlington, VA |
| 2017 | Expedited FDA approval and stem cell therapies / Keynote speaker<br>International Society for Stem Cell Research Nucleus Forum, Berkeley, CA |
| 2017 | March-In Rights: Experiences and Prospects for Reducing Drug Prices / Speaker<br>Knowledge Ecology International, Washington, D.C. |
| 2017 | Prescription Drug Pricing / Featured Speaker<br>American Medical Association National Advocacy Conference, Washington, D.C. |
| 2017 | Right to Try and Expanded Access to Investigational Drugs / Featured speaker<br>Pew Prescription Project: Framing the Debate on Right to Try, Washington, D.C. |
| 2017 | Ensuring Availability of Innovation and Prescription Drugs to Patients / Featured speaker<br>America's Health Insurance Plans National Health Policy Conference, Washington, D.C. |

| | |
|---|---|
| 2017 | An Overview of the 21st Century Cures Act / Featured speaker<br>National Comprehensive Cancer Network Institutional Review Board Directors Forum, Orlando, FL |
| 2017 | The Future of Prescription Drug Prices / Keynote Speaker<br>Distinguished Lecture Series, Florida Hospital, Orlando, Florida |
| 2017 | Regenerative Medicine and the 21st Century Cures Act / Featured speaker<br>National Academies of Science, Engineering, and Medicine Forum on Regenerative Medicine, Washington, D.C. |
| 2017 | Physicians' Knowledge and Perceptions about FDA Approval Standards / Invited Speaker<br>Committee for Advanced Scientific Education Seminar, FDA, Silver Spring, MD |
| 2017 | Can Importation Address High Generic Drug Prices? / Featured Speaker [with Thomas J. Bollyky]<br>Brookings Institution "Reining in Prescription Drug Prices", Washington, D.C. |
| 2017 | What is the Price of a Drug? / Invited panelist<br>Financial Times US Healthcare & Life Sciences Summit, New York City, NY |
| 2017 | Prescriptions Drug Prices and Policy Reform Options / Keynote Speaker<br>340B Coalition Summer Conference, Washington D.C. |
| 2017 | Generic drug competition: understanding demand, price, and supply / Invited Speaker<br>Federal Trade Commission Workshop, Washington, D.C. |
| 2017 | An Interview with Rep. Henry Waxman / Interviewer<br>Next Steps in Health Reform Conference, Washington College of Law at American University, Washington, D.C. |
| 2018 | FDA's Breakthrough Therapy Designation: Origins, (Early) Outcomes / Guest speaker<br>Stanford Law School Law and Biosciences Workshop, Palo Alto, CA |
| 2018 | Prescription Drug Prices: Problems and Potential Solutions / 2018 Stuart Rome Lecture<br>University of Maryland Francis Carey King School of Law, Baltimore, MD |
| 2018 | Prescriptions for Lowering Drug Prices / 2018 Rodman Lecture<br>St. Jude Children's Research Hospital Grand Rounds, Memphis, TN |
| 2018 | Promoting Competition in the Prescription Drug Market / Invited speaker<br>House of Representatives Antitrust Caucus Briefing, Washington, D.C. |
| 2018 | The Breakthrough Therapy Pathway: Policy Goals and Outcomes / Invited speaker<br>The Commonwealth Fund Harkness Fellow Orientation Meeting, New York City, NY |
| 2018 | Ethical role of patients in FDA approval decisions / Invited speaker<br>Stanford Center for Biomedical Ethics, Palo Alto, CA |
| 2019 | Decoding the drug pricing debate: ask the experts panel / Invited panelist<br>House of Representatives Rayburn Office Building, Washington DC |
| 2019 | Patents and market exclusivity in the pharmaceutical market / Invited speaker<br>National Business Group on Health, Washington, D.C. |
| 2019 | Approaches to accounting for public funding of drug developing in pricing / Speaker<br>Workshop on the Role of NIH in Drug Development Innovation and its Impact on Patient Access, National Academies of Science, Engineering, and Medicine |
| 2019 | Prescription drug prices: issues and solutions<br>Samuel P. Martin Lecture, Leonard Davis Institute, University of Pennsylvania, Philadelphia, PA |
| 2020 | Hacking Coronavirus / Moderator<br>Center for Excellence in Education, Washington, D.C. (virtual, available at: https://youtu.be/46xDGCrKvIg) |

| | |
|---|---|
| 2020 | CDER OND Senior Leadership Retreat: Ideas for Strategic Objectives / Featured Speaker<br>Food and Drug Administration, White Oak, MD (virtual) |
| 2021 | Incentives for Drug Development / Featured Speaker<br>Improving the Evidence Base for Treatment Decision-Making in Older Adults, National Academy of Medicine Symposium, Washington DC (virtual) |
| 2021 | Drug Regulation in the 21st Century: The FDA, Politics, and Policy / Keynote speaker<br>Ray Symposium, Western University of Health Sciences, Pomona, CA (virtual) |
| 2021 | COVID-19 and the Future of Public Health: Respecting Science, Protecting Liberty, and Restoring Trust / Keynote speaker<br>UNLV Annual Health Law Conference, Las Vegas, NV (virtual) |
| 2021 | Prescription Drug Prices: Controversies and Potential Solutions / Invited speaker<br>Federal Employee Health Benefits pharmacy group, Washington, D.C. (virtual) |
| 2021 | Regulation of Off-label Drug Promotion and the Future of Rational Prescribing / Panelist<br>Pharmed Out Biannual Conference, Washington, D.C. (virtual) |
| 2021 | Hot topics: accelerated approval and aducanumab / Panelist<br>Annual Health Law Professors Conference, Northeastern University, Boston, MA (virtual) |
| 2022 | The Inflation Reduction Act and the Future of Pharma / Panelist<br>Council on Foreign Relations, Washington, D.C. (virtual) |
| 2023 | Accelerated approval: regulatory goals vs. real-world experience / Panelist<br>American Society of Cell and Gene Therapy Annual Meeting, Los Angeles, CA (virtual) |
| 2023 | An Overview of US Drug Pricing with Application to Cell and Gene Therapies/ Panelist<br>American Society of Cell and Gene Therapy Annual Meeting, Los Angeles, CA (virtual) |
| 2023 | Public trust and the FDA / Panelist<br>Yale Law School, New Haven, CT |
| 2023 | Uncertainty and the FDA approval process: from safety to efficacy / Invited speaker<br>Harvard Kennedy School, Cambridge MA |
| 2023 | The future of drug pricing / Panelist<br>America's Health Insurance Plans Annual Meeting, Phoenix, AZ |
| 2023 | Giving FDA flexibility to include optimal dosing on drug labels / Keynote speaker<br>Optimal Cancer Care Alliance Annual Meeting, Chicago, IL (virtual) |
| 2023 | Addressing reimbursement for innovative health technologies: considering cost vs. benefits / Invited speaker<br>Congressional Budget Office Panel of Health Advisers Annual Meeting, Washington, DC |
| 2024 | Should FDA advisory committees always vote? Yes / Invited speaker<br>UCSF-Stanford Center for Excellence in Regulatory Science Innovation Annual Meeting, San Francisco, CA |
| 2024 | The Importance of Product Liability Litigation and Litigation Document Repositories in Safe Drug Use / Invited Speaker<br>The Opioid Industry Documents Archive: A National Symposium, Baltimore, MD (virtual) |
| 2024 | Promoting Therapeutic Innovation for Unmet Medical Needs / Invited speaker<br>National Academies of Science, Engineering and Medicine Consensus Committee *Strategies to Better Align Investments in Innovations for Therapeutic Development with Disease Burden and Unmet Needs*, Washington DC (virtual) |
| 2024 | Payment Strategies for High-Cost Cell and Gene Therapies / Invited speaker<br>Covering the Cure: Access and Payment for Cell and Gene Therapies, Leonard Davis Institute of Health Economics, University of Pennsylvania, Philadelphia, PA (virtual) |
| 2024 | Use of March-In Rights and Section 1498 to Improve Access to Drugs / Invited speaker |

| | |
|---|---|
| | Health Care at a Reasonable Cost: The Hatch-Waxman Act at 40 and Beyond, New York University Law School, New York City, NY |
| 2024 | Advisory Committees for the 21st Century / Panelist<br>Federation of American Scientists, Washington, D.C. |

**International**

| | |
|---|---|
| 2005 | Economic impact of patent extension on Medicaid drug expenditures / Invited Lecture<br>International Society for Pharmacoepidemiology 21st annual meeting, Nashville, TN [international attendees] |
| 2007 | The patentability of pharmacoepidemiology methods / Invited Lecture<br>International Society for Pharmacoepidemiology 23rd annual meeting, Quebec City, Canada |
| 2007 | Balancing drug innovation and cost-effective medical treatment in the US / Invited Lecture<br>European Science Foundation semiannual meeting, Kiel, Germany |
| 2009 | Roundtable on delinking research and development incentives from prices: designing innovation inducement prizes for tuberculosis diagnostics and new drugs for tuberculosis and Chagas disease / Invited Panelist<br>Knowledge Ecology International, Geneva, Switzerland |
| 2010 | The prevalence and cost of unapproved and non-evidence-based uses of selected orphan drugs / Invited Lecture<br>International Society for Pharmacoepidemiology 26th annual meeting, Brighton, England |
| 2013 | Five models of incentives for drug innovation: successes, collateral effects, and lessons / Invited Lecture<br>Médecins Sans Frontières, New York City, NY [international attendees] |
| 2013 | Intersection of market exclusivity and access to medicines / Roundtable Participant<br>University of Melbourne-Vanderbilt International Roundtable Meeting, Honolulu, HI |
| 2015 | Eye of the beholder: legal views on drugs risks and causation / Plenary lecture<br>International Society for Pharmacoepidemiology 31st annual meeting, Boston, MA [international attendees] |
| 2015 | Regulatory and legal issues for follow-on biologic drugs / Course faculty speaker<br>International Society for Pharmacoepidemiology 31st annual meeting, Boston, MA [international attendees] |
| 2015 | Rethinking the economics of pharmaceutical innovation / Roundtable participant<br>Open Society Foundations, New York, NY [international attendees] |
| 2017 | Drug regulation in the US: past, present, and future / Keynote speaker<br>London School of Economics International Health Policy Conference, London, England |
| 2018 | Generic Drug Price Changes: Should the US be Looking to Canada? / Guest speaker<br>York University, Toronto, Canada |
| 2018 | FDA's Breakthrough Therapy Designation: Origins, (Early) Outcomes / Keynote speaker<br>University of Toronto Faculty of Law Health Law, Ethics & Policy Seminar, Canada |
| 2018 | Antibiotics and Innovation / Invited speaker<br>Innovation Gaps and Life Sciences Frontiers, University of Copenhagen, Denmark |
| 2019 | Conserving and Producing New Antimicrobials / Keynote speaker<br>CeBIL Annual Symposium: Legal Innovation to Support Antibiotic Development, Cambridge, England |
| 2021 | Placing access conditions on incentives for innovation / Panelist<br>2021 Fair Pricing Forum, World Health Organization, Geneva, Switzerland (virtual) |

| | |
|---|---|
| 2022 | Drug repurposing: legal and regulatory issues in the US / Panelist<br>REPO4EU kick-off meeting, Maastricht, Netherlands (virtual) |
| 2023 | Recent advances in antimicrobial innovation policy / Panelist<br>CEBIL symposium, University of Copenhagen, Denmark |
| 2024 | Price and value for cancer drugs: outcomes in the US and EU / Panelist<br>Spring Seminars on Access and NHT Sustainability, University of Bologna, Italy |
| 2024 | Cancer and Alzheimer's: Can We Prophesize the Future of Program / Panelist<br>Consilium Scientific, London, United Kingdom (virtual) |

## Report of Clinical Activities and Innovations

**Current Licensure and Certification**

| | |
|---|---|
| 2002 | United States Patent and Trademark Office (Patent attorney license) |
| 2004 | National Board of Medical Examiners (Physician license) |
| 2004 | New York State Bar (Attorney license) |
| 2005 | American Board of Internal Medicine (Diplomate) |
| 2005 | Massachusetts Board of Registration in Medicine (License) |

**Practice Activities**

| | | | |
|---|---|---|---|
| 2005-2009 | Attending physician | Internal Medicine Inpatient Ward, BWH | 15 hours per week / 4 weeks per year |
| 2005-2011 | Attending physician | Hospitalist Service, Harvard Vanguard Medical Associates | 20 hours per month / 12 months per year |
| 2005- | Ambulatory Care | Phyllis Jen Center for Primary Care, BWH | 1 half-day session per week / 4 hours per week |
| 2011-2013 | Attending physician | Hospitalist Service, BWH | 20 hours per month / 12 months per year |

## Report of Education of Patients and Service to the Community

**Activities**

No activities or materials below were sponsored by outside entities.

| | |
|---|---|
| 2000-2001 | Pennsylvania Health Law Project / Volunteer |

## Educational Material for Patients and the Lay Community

**Monographs, articles and presentations in other media**

1. **Kesselheim A** and Outterson K. Super bugs call for super changes in drug-sale rules. [Op-Ed] *Boston Globe*, November 15, 2010, at A11.
2. **Kesselheim AS**. Does pharmaceutical industry marketing to medical students affect their prescribing choices as physicians? [Invited commentary] *Robert Wood Johnson Foundation Human Capital Blog*. June 28, 2011. Available on-line at: http://blog.rwjf.org/humancapital/?p=887.
3. **Kesselheim AS**, Shiu N. *FTC v. Actavis*: the Supreme Court issues a reversal on reverse payments. [Invited commentary] *Health Affairs Blog*. June 21, 2013. Available on-line at: http://healthaffairs.org/blog/2013/06/21/ftc-v-actavis-the-supreme-court-issues-a-reversal-on-reverse-payments/#more-32326
4. Lipsitch M, **Kesselheim AS,** Bell B, Levy S. Battling drug-resistant superbugs: can we win? [Webcast] *The Forum at the Harvard T.H. Chan School of Public Health*. February 5, 2014.

Available on-line at: http://theforum.sph.harvard.edu/events/battling-drug-resistant-superbugs/.

5. **Kesselheim AS**, Tan YT. Accelerating Medicines Partnership: a new public-private collaboration for drug discovery. [Invited commentary] *Health Affairs Blog*. April 8, 2014. Available on-line at: http://healthaffairs.org/blog/2014/04/08/accelerating-medicines-partnership-a-new-public-private-collaboration-for-drug-discovery/.
6. Darrow JJ, **Kesselheim AS**. New drug and device approval: what is sufficient evidence? [Invited commentary] *Health Affairs Blog*. July 1, 2014. Available on-line at: http://healthaffairs.org/blog/2014/07/01/new-drug-and-device-approval-what-is-sufficient-evidence/
7. Maggs LR, **Kesselheim AS**. The role of Black Box Warnings in safe prescribing practices. [Invited commentary] *Health Affairs Blog*. August 20, 2014. Available on-line at: http://healthaffairs.org/blog/2014/08/20/the-role-of-black-box-warnings-in-safe-prescribing-practices/
8. Maggs LR, **Kesselheim AS**. The short-term and long-term outlook of drug coupons. [Invited commentary] *Health Affairs Blog*. November 12, 2014. Available on-line at: http://healthaffairs.org/blog/2014/11/12/the-short-term-and-long-term-outlook-of-drug-coupons/
9. Thacker PD, **Kesselheim AS**, Campbell EG. Will a new website empower patients to ask their physicians about financial relationships with industry? *JAMA Forum*. December 17, 2014. Available on-line at: http://newsatjama.jama.com/2014/12/17/jama-forum-will-a-new-website-empower-patients-to-ask-their-physicians-about-financial-relationships-with-industry/
10. Sarpatwari A, **Kesselheim AS**. Ensuring timely approval of generic drugs. [Invited commentary] *Health Affairs Blog*. March 24, 2015. Available on-line at: http://healthaffairs.org/blog/2015/03/24/ensuring-timely-approval-of-generic-drugs/
11. **Kesselheim AS**, Sarpatwari A. To spur innovation, make corporate cheaters pay. [Invited commentary] *Health Affairs Blog*. April 30, 2015. Available on-line at: http://healthaffairs.org/blog/2015/04/30/to-spur-medical-innovation-make-corporate-cheaters-pay/
12. Greene J, **Kesselheim AS**. Selfie-medication: regulation of drug promotion in the Instagram era. *The Atlantic* September 10, 2015. Available on-line at: http://www.theatlantic.com/health/archive/2015/09/fda-drug-promotion-social-media/404563/
13. Carrier MA, **Kesselheim AS**. The Daraprim price hike and a role for antitrust. [Invited commentary] *Health Affairs Blog*. October 21, 2015. Available on-line at: http://healthaffairs.org/blog/2015/10/21/the-daraprim-price-hike-and-a-role-for-antitrust/.
14. Terry NP, Pasquale F, **Kesselheim AS**. Episode 26: EHR gag clauses, ACOs, the state of drug safety & price regulation & Kim Kardashian. [Podcast] *This Week in Health Law Podcast*. September 17, 2015. Available on-line at: http://twihl.podbean.com/e/26-guest-aaron-kesselheim-ehr-gag-clauses-acos-the-state-of-drug-safety-price-regulation-kim-kardashian/
15. Pearson S, **Kesselheim AS,** Rosenthal M, Schnipper L. Drug pricing: public health implications. [Webcast] *The Forum at the Harvard T.H. Chan School of Public Health*. October 23, 2015. Available on-line at: https://theforum.sph.harvard.edu/events/drug-pricing/.
16. Sax PE, Gallant JA, **Kesselheim AS**. Episode 8: Daraprim price hike. [Podcast] *Open Forum Infectious Diseases Podcast*. November 20, 2015. Available on-line at: http://www.oxfordjournals.org/our_journals/ofid/podcasts.html
17. **Kesselheim AS,** Leape L, Gutierrez A, Arnaout R. Medical tests: inaccuracies, risks, and the public's health. [Webcast] *The Forum at the Harvard T.H. Chan School of Public Health*. December 11, 2015. Available on-line at: https://theforum.sph.harvard.edu/events/medical-tests/.
18. **Kesselheim AS**. Why are we years away from a Zika vaccine? [Webcast] Health Affairs. February 11, 2016. Available on-line at: http://healthaffairs.org/blog/2016/02/11/why-are-we-years-away-from-a-zika-vaccine/.

19. Engelberg AB, Avorn J, **Kesselheim AS**. Addressing generic drug unaffordability and shortages by globalizing the market for old drugs. [Invited commentary] *Health Affairs Blog*. February 23, 2016. Available on-line at: http://healthaffairs.org/blog/2016/02/23/addressing-generic-drug-unaffordability-and-shortages-by-globalizing-the-market-for-old-drugs/
20. Sperling R, **Kesselheim A,** Tenaerts P, Goldstein J. Drug trials: challenges for Alzheimer's and other urgent needs. [Webcast] *The Forum at the Harvard T.H. Chan School of Public Health*. April 18, 2016. Available on-line at: https://theforum.sph.harvard.edu/events/drug-trials/.
21. Rizvi Z, Kapczynski A, **Kesselheim A**. A simple way for the government to curb inflated drug prices. [Op-Ed] *Washington Post*. May 13, 2016. Available on-line at: https://www.washingtonpost.com/opinions/a-simple-way-for-the-government-to-curb-inflated-drug-prices/2016/05/12/ed89c9b4-16fc-11e6-aa55-670cabef46e0_story.html.
22. Luo J, **Kesselheim AS**. Setting prescription drug prices: a comparison of strategies in the US, UK, Canada, Australia, and Germany. *Harvard Health Policy Review* 2016;15(2):4-9.
23. **Kesselheim A**, Hey SP, Deak D, Lo B. Ethical tensions in expedited regulatory approval of new prescription drugs. [Invited commentary] *Health Affairs Blog*. June 23, 2016. Available on-line at: http://healthaffairs.org/blog/2016/06/23/four-ways-to-address-the-ethical-tensions-around-expedited-approval-of-new-prescription-drugs/
24. Goldman AS, **Kesselheim AS**, Davis MH, Sachs RE, Singhroy D, Basey M, Maybarduk P. NIH patent policy. [Conference call] *Knowledge Ecology International IP Health Policy Update*. June 29, 2016. Available on-line at: http://keionline.org/node/2608.
25. Pollack HA, Rector B, **Kesselheim AS**, Conti R. Drug pricing: value, affordability, and advocacy. [Webinar] *Doctors for America Expert Policy Webinar*. June 29, 2016.
26. Court E, **Kesselheim AS**. Drugs that could cut billions from health costs. [Podcast] *Wall Street Journal Money, Markets, and More*. July 21, 2016. Available on-line at: http://www.wsj.com/podcasts/drugs-that-could-cut-billions-from-health-costs/CA501FCE-5C22-41B2-A18B-294271722CDA.html
27. **Kesselheim AS**. The newest antibiotics on the block. [Podcast] NEJM Journal Watch. July 15, 2016. Available on-line at: www.audiodigest.org/NEJMJWinterviews.
28. Hey SP, **Kesselheim AS**. Imprecise research threatens precision medicine. [Invited commentary] *STAT: First Opinion*. August 11, 2016. Available on-line at: https://www.statnews.com/2016/08/11/precision-medicine-research/.
29. **Kesselheim AS**. Featured expert: NEJM Group Open Forum "Drug pricing: de-mystifying the power, politics, and practice behind today's pharmaceutical economy." October 12-22, 2016. [Web discussion] Available on-line at: https://medstro.com/groups/nejm-group-open-forum/discussions/300
30. **Kesselheim AS**. Juno trial deaths underscore need for greater transparency by FDA. [Invited commentary] *STAT: First Opinion*. November 24, 2016. Available on-line at: https://www.statnews.com/2016/11/24/deaths-juno-trial-transparency-fda/
31. Darrow J, **Kesselheim A**, Laskey-Su J. The future of precision medicine: great promise, significant challenges. [Invited commentary] *Health Affairs Blog*. February 28, 2017. Available on-line at: http://healthaffairs.org/blog/2017/02/28/the-future-of-precision-medicine-great-promise-significant-challenges/
32. Klitzman RL, **Kesselheim AS**, Holcombe K, Dehoney E. Implications of the 21st Century Cures Act: a webinar. *Columbia University Bioethics Program.* April 20, 2017. Available on-line at: http://sps.columbia.edu/bioethics/events/04-20-2017-webinar-implications-of-the-21st-century-cures-act.

33. Hwang TJ, **Kesselheim AS**. Taxing drug price spikes: assessing the impact. [Invited commentary] *Health Affairs Blog*. May 12, 2017. Available on-line at: http://healthaffairs.org/blog/2017/05/12/taxing-drug-price-spikes-assessing-the-potential-impact/.
34. Sarpatwari A, **Kesselheim AS**. Get generics to market faster. [Op-Ed] *Bloomberg View*. June 20, 2017. Available on-line at: https://www.bloomberg.com/view/articles/2017-06-20/get-generic-drugs-to-market-faster.
35. **Kesselheim AS**, Lacey P. Fast-tracked drugs can save lives, but are they safe? [Televised roundtable] *Greater Boston with Jim Braude*. WGBH News. July 18, 2017. Available on-line at: http://news.wgbh.org/2017/07/18/local-news/fast-tracked-drugs-can-save-lives-are-they-safe
36. Sinha MS, **Kesselheim AS**. The future of American science and medicine. [Blog post] *The Spoke*. July 25, 2017. Available on-line at: http://www.wellesley.edu/albright/about/blog/3516-future-american-science-and-medicine
37. Terry NP, Pasquale F, **Kesselheim AS**, Sarpatwari A. Episode 107: Prescription Drug Price Metrics. [Podcast] *This Week in Health Law Podcast*. August 4, 2017. Available on-line at: https://www.podbean.com/media/share/pb-vjp26-6db941
38. **Kesselheim AS**. The complexities behind high prescription prices: a conversation with Dr Aaron Kesselheim. [Podcast] *Medscape Cardiology: The Bob Harrington Show*. August 14, 2017. Available on-line at: http://www.medscape.com/viewarticle/883281.
39. Redberg RF, **Kesselheim AS** Califf RM. Are they safe? Drugs and devices receiving accelerated approval by the FDA. [Podcast] *JAMA Podcast*. 2017 August 15. Available on-line at: http://jamanetwork.com/learning/audio-player/14650592
40. Darrow J, **Kesselheim A**. Nearly one-third of new drugs are no better than older drugs, and some are worse. [Invited commentary] *Health Affairs Blog*. October 6, 2017. Available on-line at: http://healthaffairs.org/blog/2017/10/06/nearly-one-third-of-new-drugs-are-no-better-than-older-drugs-and-some-are-worse/.
41. Sherman M, Chandra A, **Kesselheim AS**. Navigating Payment Reform for Providers, Payors, and Pharma. [Web series] *NEJM Catalyst*. November 2, 2017. Available on-line at: https://catalyst.nejm.org/events/navigating-payment-reform-providers-payers-pharma/.
42. Kapczynski A, **Kesselheim AS**. Three things Trump can do to bring drug price 'way down.' [Op-Ed] *Washington Post*. November 21, 2017. Available on-line at: https://www.washingtonpost.com/opinions/what-trump-should-do-if-he-actually-wants-to-cut-drug-prices/2017/11/21/f7522422-be4f-11e7-8444-a0d4f04b89eb_story.html?utm_term=.3ef061b32123.
43. Bollyky TJ, **Kesselheim AS**, Sharfstein JM. What Trump should actually do about the high cost of drugs. [Op-Ed] *New York Times*. May 14, 2018. Available on-line at: https://www.nytimes.com/2018/05/14/opinion/trump-costs-drugs-pricing.html.
44. **Kesselheim AS,** Mitchell D, Thomas K. Runaway train: America's drug price problem. [Webcast] *The Center for Health Journalism at the USC Annenberg School of Journalism*. May 17, 2018. Available on-line at: https://www.centerforhealthjournalism.org/content/runaway-train-americas-drug-price-problem.
45. Dafny L, Frank R, **Kesselheim AS,** Pearson S. U.S. drug prices: why are they so high? [Webcast] *The Forum at the Harvard T.H. Chan School of Public Health*. September 26, 2018. Available on-line at: https://theforum.sph.harvard.edu/events/u-s-drug-prices/.
46. Cohen M, Gupta R, Bollyky TJ, Ross JS, **Kesselheim AS**. Policy options for increasing generic drug competition through importation. [Invited commentary] *Health Affairs Blog*. January 7, 2019. Available on-line at: https://www.healthaffairs.org/do/10.1377/hblog20190103.333047/full/.
47. Terry NP, **Kesselheim AS**, Darrow JJ. Episode 155: drug price narratives. [Podcast] *This Week in Health Law Podcast*. 2019 March 15. Available on-line at: http://https//twihl.podbean.com/e/155-

it%E2%80%99s-the-prices-stupid-guests-aaron-kesselheim-and-jonathan-darrow/

48. Jung EH, Engelberg A, **Kesselheim AS**. Do large pharma companies provide drug development innovation? Our analysis says no [Op-Ed] *STAT News: First Opinion*. December 10, 2019. Available on-line at: https://www.statnews.com/2019/12/10/large-pharma-companies-provide-little-new-drug-development-innovation/.
49. **Kesselheim AS**. Improving competition to lower prescription drug costs. [Commentary] *Washington Center for Equitable Growth*. February 18, 2020. Available on-line at: https://equitablegrowth.org/improving-competition-to-lower-u-s-prescription-drug-costs/
50. Alexander GC, **Kesselheim AS**, Moore TJ. Searching for an effective Covid-19 treatment: promise and peril. [Op-Ed] *STAT First Opinion*. April 10, 2020.
51. Frank RG, Avorn J, **Kesselheim AS**. What do high drug prices buy us? [Commentary] *Health Affairs Blog*. April 29, 2020. Available from: https://www.healthaffairs.org/do/10.1377/forefront.20200424.131397
52. Liu M, Feldman WB, Avorn J, **Kesselheim AS**. March-in rights and compulsory licensing—safety nets for access to a COVID-19 vaccine. [Commentary] *Health Affairs Blog.*. May 6, 2020. Available from: https://www.healthaffairs.org/do/10.1377/hblog20200501.798711/full/
53. Bendicksen L, Darrow JJ, **Kesselheim AS**. Challenging Patents to Promote Timely Generic Drug Entry: The Second Look Act and Other Options [Commentary] *Health Affairs Blog*. August 31, 2020. Available from: https://www.healthaffairs.org/do/10.1377/hblog20200827.532806/full/
54. Bendicksen L, Sharfstein JM, **Kesselheim AS**. Increase transparency at the FDA: we need sunlight to fight the pandemic. [Op-Ed] *STAT First Opinion*. September 29, 2020. Available on-line at: https://www.statnews.com/2020/09/29/increase-transparency-at-the-fda-we-need-sunlight-to-fight-the-pandemic/
55. **Kesselheim AS**. How to bring down the price of drugs such as the novel coronavirus therapy remdesivir. [Commentary] *Washington Center for Equitable Growth*. November 20, 2020. Available on-line at: https://equitablegrowth.org/how-to-bring-down-the-price-of-drugs-such-as-the-novel-coronavirus-therapy-remdesivir/
56. Rand LZ**, **Kesselheim AS**. The ethics of million-dollar drugs. [Article] *Scientific American*. Available on-line at: https://www.scientificamerican.com/custom-media/health-ethics-innovation/the-ethics-of-million-dollar-drugs/.
57. Bloomfield D, **Kesselheim AS**. Biden can lower drug prices without Congress doing anything. [Op-Ed] *Washington Post*. January 5, 2021. Available on-line at: https://www.washingtonpost.com/outlook/2021/01/05/drug-prices-patent-office-generics-biden/
58. **Kesselheim AS**. To ensure access to Covid vaccines, demand a fair price. [*Op-Ed*] *Bloomberg Opinion*. January 22, 2021. Available on-line at: https://www.bloomberg.com/opinion/articles/2021-01-22/to-ensure-access-to-covid-vaccines-demand-a-fair-price
59. Kadakia KT, Beckman AL, **Kesselheim AS**. Redeploying Covid-19 payment reforms for biomedical innovation: a new opportunity for the value movement. [Commentary] *NEJM Catalyst*. February 2, 2021. Available on-line at: https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0617.
60. Parasidis E, **Kesselheim AS**. Assessing the legality of mandates for vaccines authorized via an Emergency Use Authorization [Commentary] *Health Affairs Blog*. February 16, 2021. Available on-line at: https://www.healthaffairs.org/do/10.1377/forefront.20210212.410237/full/
    - Named #7 most read *Health Affairs Blog* post of 2021.
61. Bero L, Levine M, Baker D, **Kesselheim A**. Coloradans should pay fair prices for prescription drugs. [Op-Ed] *Colorado Sun.* February 21, 2021. Available on-line at: https://coloradosun.com/2021/02/21/drug-prices-opinion/

62. **Kesselheim AS**. Track the Vax: Is the COVID vaccine safety system for tracking side effects working? [Podcast] *Everyday Health with Serena Marshall and Lara Salahi*. Available on-line at: https://www.everydayhealth.com/coronavirus/track-the-vax-is-the-covid-vaccine-safety-system-tracking-side-effects-working/
63. **Kesselheim AS**, Avorn J. FDA ignores its history. [Op-Ed] *New York Times*. June 16, 2021 at A21. Available on-line at: https://www.nytimes.com/2021/06/15/opinion/alzheimers-drug-aducanumab-fda.html.
64. **Kesselheim AS**, Narula T. FDA adviser who stepped down over Alzheimer's drug approval says there's no "good evidence that it works." [News segment] *CBS This Morning*. June 21, 2021. Available on-line at: https://www.cbsnews.com/news/fda-adviser-alzheimers-drug-aduhelm/
65. **Kesselheim AS**, Karlawish J. A disease of humanity. [Podcast] *Radio Open Source: Arts, Ideas, and Politics with Christopher Lydon*. June 24, 2021. Available on-line at: https://radioopensource.org/a-disease-of-humanity/
66. **Kesselheim AS**. The whistleblower who exposed an FDA scandal. [Podcast] *Daily Poster with David Sirota*. July 2, 2021. Available on-line at: https://player.fm/series/the-daily-poster/the-whistleblower-who-exposed-an-fda-scandal.
67. Big Pharma's big fraud with Dr. Aaron Kesselheim. [Podcast] *America Dissected E94*. July 27, 2021. Available on-line at: https://crooked.com/podcast/big-pharmas-big-fraud-with-dr-aaron-kesselheim/.
68. **Kesselheim AS**, Avorn J. Letting the government negotiate drug prices won't hurt innovation. [Op-Ed] *Washington Post*. September 26, 2021. Available on-line at: https://www.washingtonpost.com/outlook/2021/09/22/drug-pricing-negotiation-biden-bill/.
69. Lalani HS, Rome BN, **Kesselheim AS**. Medicare could have saved $3 billion buying drugs the Mark Cuban way. [Op-Ed] *Washington Post.* July 7, 2022. Available on-line at: https://www.washingtonpost.com/opinions/2022/07/07/medicare-save-three-billion-drugs-mark-cuban/
70. Negotiating drug prices with Prof. Aaron Kesselheim. [Podcast] *America Dissected E148*. August 16, 2022. Available on-line at: https://crooked.com/podcast/negotiating-prescription-drug-prices-with-prof-aaron-kesselheim/.
71. Brennan TA, Kesselheim AS. Accumulators and maximizers: a new front in the battle over drug costs (Part 1) [Op-Ed] *Health Affairs Forefront*. November 17, 2022. Available on-line at: https://www.healthaffairs.org/content/forefront/accumulators-and-maximizers-new-front-battle-over-drug-costs-part-1.
72. Brennan TA, Kesselheim AS. Accumulators and maximizers: a new front in the battle over drug costs (Part 2) [Op-Ed] *Health Affairs Forefront*. November 18, 2022. Available on-line at: https://www.healthaffairs.org/content/forefront/accumulators-and-maximizers-new-front-battle-over-drug-costs-part-2.
73. Tessema F, Walls M, **Kesselheim AS**. Why does Makena remain on the market? Misguided equity claims do not resolve issues with the accelerated approval program. [Op-Ed] *MedPage Today*. December 11, 2022. Available on-line at: https://www.medpagetoday.com/opinion/second-opinions/102177?trw=no
74. Lalani HS, Nagar S, Avorn J, **Kesselheim AS**. Not so fast on COVID vaccine price hike. [Op-Ed] *Boston Globe*. March 21, 2023. Available on-line at: https://www.bostonglobe.com/2023/03/21/opinion/not-so-fast-covid-vaccine-price-hike
75. Egilman AC, **Kesselheim AS**, Rome BN. Is it business as usual for the drug industry? — drugmakers continue to raise prices despite new legislation. [Op-Ed] *MedPage Today*. March 28, 2023. Available on-line at: https://www.medpagetoday.com/opinion/second-opinions/103761?trw=no

76. Feldman WB, **Kesselheim AS**. How the makers of inhalers keep prices so high. [Op-Ed] *Washington Post*. June 1, 2023. Available on-line at: https://www.washingtonpost.com/opinions/2023/06/01/inhaler-cost-drug-company-prices/
77. Nagar S, **Kesselheim AS**, Rome BN. Medicare drug price negotiation: few drugs, big impact? [Op-Ed] *Health Affairs Forefront*. June 9, 2023. Available on-line at: https://www.healthaffairs.org/content/forefront/medicare-drug-price-negotiation-few-drugs-big-impact.
78. Lalani HS, Martin MJ, **Kesselheim AS**. Three key ways to strengthen proposed pharmacy benefit manager regulations. [Op-Ed] *Health Affairs Forefront*. September 26, 2023. Available on-line at: https://www.healthaffairs.org/content/forefront/three-key-ways-strengthen-proposed-pharmacy-benefit-manager-regulation
79. Berwick D, Mate K, **Kesselheim AS**. Why does medicine cost so much? with Aaron S. Kesselheim. [Podcast] *Turn on the Lights Podcast*. September 23, 2023. Available on-line at: https://podcasts.apple.com/us/podcast/why-does-medicine-cost-so-much-with-aaron-s-kesselheim/id1681829836?i=1000627991351
80. Madden J**, Minssen T, **Kesselheim AS**. Putting the Pioneering Antimicrobial Subscriptions to End Upsurging Resistance (PASTEUR) Act under the microscope. [Op-Ed] *REVIVE Viewpoint*. September 27, 2023. Available on-line at: https://revive.gardp.org/putting-the-pioneering-antimicrobial-subscriptions-to-end-upsurging-resistance-pasteur-act-under-the-microscope/
81. Daval CJR**, **Kesselheim AS**. We can't let drug companies get out of negotiating prices. [Op-Ed] *Washington Post*. October 23, 2023. Available on-line at: https://www.washingtonpost.com/opinions/2023/10/23/medicare-negotiations-drug-prices-lawsuit/
82. Dhruva SS, **Kesselheim AS**, Redberg RF. How much do physicians really know about FDA drug and device regulation? [Op-Ed] *MedPage Today*. January 29, 2024. Available on-line at: https://www.medpagetoday.com/opinion/second-opinions/108445?trw=no
83. Avorn J, **Kesselheim AS**. March-in guidance for publicly funded drugs: a necessary safety net for patients. [Op-Ed] *Health Affairs Forefront*. February 20, 2024. Available on-line at: https://www.healthaffairs.org/content/forefront/march-guidance-publicly-funded-drugs-necessary-safety-net-patients
84. **Kesselheim AS**, Rangarajan R, Skinner H, Jung L. What does the future look like if pull incentives to support antibiotic R&D are insufficient. [Webinar] *Global Antibiotic Research and Development Partnership*. February 27, 2024. https://revive.gardp.org/what-does-the-future-look-like-if-pull-incentives-to-support-antibiotic-rd-are-insufficient/#
85. **Kesselheim AS**. The Federal Trade Commission's role in the oversight of drug companies. [Podcast] *JAMA Clinical Reviews*. May 20, 2024. https://edhub.ama-assn.org/jn-learning/audio-player/18881063
86. Bendicksen L**, Cliff ERS**, **Kesselheim AS**. This gene therapy may not work. So why did the FDA fully approve it? [Op-Ed] *Washington Post*. July 22, 2024. Available on-line at: https://www.washingtonpost.com/opinions/2024/07/22/fda-gene-therapy-elevidys/
87. Klein DE**, **Kesselheim AS**. Revisiting the Potential of "Money Blinds": Lessons from Lykos's MDMA Research. [Op-Ed] *Health Affairs Forefront*. August 5, 2024. Available on-line at: https://www.healthaffairs.org/content/forefront/revisiting-potential-money-blinds-lessons-lykos-s-mdma-research.
88. Ravinthiran J, **Kesselheim AS**, Knievel S. How agencies should decide which costly drugs to target with government march-in rights. [Op-Ed] *Health Affairs Forefront*. November 21, 2024. Available on-line at: https://www.healthaffairs.org/content/forefront/agencies-should-decide-which-costly-drugs-target-government-march-rights

89. **Kesselheim AS**. Aaron Kesselheim: Law, Policy and Health. [Podcast] *Health & Veritas with Howard P. Forman and Harlan M. Krumholz*. December 6, 2024. https://insights.som.yale.edu/podcasts/health-veritas/aaron-kesselheim-law-policy-and-health
90. **Kesselheim AS**, Sharfstein JM. Will the new administration's FDA be a threat or an opportunity for the public's health? [Op-Ed] *Health Affairs Forefront*. December 13, 2024. Available on-line at: https://www.healthaffairs.org/content/forefront/new-administration-s-fda-threat-opportunity-public-s-health
91. Bhaskar A, **Kesselheim AS**, Carpenter DP. How to protect HHS, FDA, NIH, and other health agencies from political interference. [Op-Ed] *STAT First Opinion*. January 31, 2025. Available on-line at: https://www.statnews.com/2025/01/31/political-interference-hhs-fda-nih-cdc-trump/
92. Lurie P, **Kesselheim A**, Sharfstein J. It's not hard to see through RFK Jr.'s 'radical transparency' pledge. [Op-Ed] *Washington Post*. April 24, 2025. Available on-line at: https://www.washingtonpost.com/opinions/2025/04/24/robert-kennedy-hhs-transparency/.
93. Cai C, **Kesselheim AS**, Rome BN. Costs of extending the small molecule exemption period in Medicare drug price negotiation. [Op-Ed] *Health Affairs Forefront*. May 8, 2025. Available on-line at: https://www.healthaffairs.org/content/forefront/costs-extending-small-molecule-exemption-period-medicare-drug-price-negotiation
94. Jetelina K, **Kesselheim AS**. Your top 10 FAQ on drug prices. [Substack post] *Your Local Epidemiologist*. May 15, 2025. Available on-line at: ofhttps://yourlocalepidemiologist.substack.com/p/your-top-10-faq-on-drug-prices
95. US COVID vaccine policy by vibes. [Podcast] *America Dissected*. May 22, 2025. Available on-line at: https://podcasts.apple.com/us/podcast/us-covid-vaccine-policy-by-vibes/id1480634141?i=1000709390939.
96. Mooney H, **Kesselheim AS**, Rome BN. Congress should remove the rare disease carve-out from Medicare drug price negotiation, not expand it. [Op-Ed] *Health Affairs Forefront*. June 30, 2025. Available on-line at: https://www.healthaffairs.org/content/forefront/congress-should-remove-rare-disease-carve-out-medicare-drug-price-negotiation-not
97. **Kesselheim AS**, Avorn J. Trump's ongoing tariff chaos will make medications less affordable and harder to find. [Op-Ed] *Health Affairs Forefront*. July 2, 2025. Available on-line at: https://www.healthaffairs.org/content/forefront/trump-s-ongoing-tariff-chaos-make-medications-less-affordable-and-harder-find
98. Tu SS, **Kesselheim AS**, Feldman WB. Combating pharmaceutical patent thickets in the Trump administration. [Op-Ed] *Health Affairs Forefront*. August 13, 2025. Available on-line at: 10.1377/forefront.20250811.410352
99. Jetelina K, **Kesselheim A**. Pharmaceutical ads in the U.S.: top questions answered. [Substack post] *Your Local Epidemiologist*. September 10, 2025. Available on-line at: https://yourlocalepidemiologist.substack.com/p/pharmaceutical-ads-in-the-us-top

**Patient educational materials**

1. **Kesselheim AS**, Avorn J. True or false: common myths about generic drugs. [Patient monograph] September 2008. Available at: http://www.mmcpho.org/resource/d/13754/commonmythsaboutgenericdrugs.pdf.
2. **Kesselheim AS**, Avorn J. What are generic drugs? How can they help me? [Patient monograph] September 2008. Available at: http://www.mmcpho.org/resource/d/60045/whataregenericdrugs.pdf.
3. **Kesselheim AS**, Avorn J. Generics are powerful medicines. [Patient monograph] September 2008. Available at: http://www.mmcpho.org/resource/d/68289/Genericsarepowerfulmeds.pdf.
4. **Kesselheim AS**, Avorn J. Frequently asked questions about generic drugs. [Patient monograph] September 2008. Available at: http://www.mmcpho.org/resource/d/48358/faqgenericdrugs.pdf.

5. **Kesselheim AS**, Avorn J. What brand-name drug companies don't want you to know: how they keep generics off the market. [Patient monograph] September 2008. Available at: http://www.usaindiana.org/document/generics/Dont_want.pdfhttp://www.genericsarepowerful.org/learn?d=0002

There are numerous articles, interviews, and information products in the national and global popular media (on-line, in print, broadcast news, etc.) related to my work or for which I have served as a contributor, including the following selected samples:

1. Press M. Interview with Aaron Kesselheim, M.D., J.D., M.P.H: patent attorney, general internist and health services researcher from Harvard Medical School. *RWJF Clinical Scholars Health Policy Broadcast.* Broadcast May 17, 2010. Available at: http://rwjcsp.unc.edu/resources/podcast/archive.html
2. Rooney E. Antibiotics reform. *The Emily Rooney Show*. Broadcast November 30, 2010. Available at: http://www.wgbh.org/programs/The-Emily-Rooney-Show-Podcast-1162/episodes/Airport-Security-Boston-Accent-Reduction-Antibiotics-Reform-22067.
3. Kolata G. Pills morph as patients try to cope. *New York Times*. July 11, 2011. Available on-line at: http://www.nytimes.com/2011/07/12/health/12pills.html?_r=1&
4. Song S. Lipitor vs. Crestor: cholesterol drugs on a par. *Time Magazine*. November 16, 2011. Available on-line at: http://healthland.time.com/2011/11/16/lipitor-vs-crestor-cholesterol-drugs-are-on-a-par/
5. Understanding how 'the system' can be made to work better for patients. *Health Affairs*. December 2011.
6. Investigator examines path to more affordable and effective drugs. *Robert Wood Johnson Foundation*. January 30, 2012. Available at: http://www.rwjf.org/content/rwjf/en/about-rwjf/newsroom/newsroom-content/2011/12/breaking-new-ground-in-research/investigator-examines-path-to-more-affordable-and-effective-drug.html?cid=XEM_205596
7. National Pharmaceutical Council. *CER & academic detailing: Harvard's Dr. Kesselheim explains*. YouTube. Posted February 16, 2012. Available on-line at http://www.youtube.com/watch?v=e0Xs4dH5F8U.
8. AJMCtv. *Dr. Aaron Kesselheim discusses comparative effectiveness research*. YouTube. Posted April 3, 2012. Available on-line at http://www.youtube.com/watch?v=vTdlZ0d934w.
9. Out of the mire?: The justice department may spoil the drugmaker's fresh start. *The Economist*. April 28, 2012. Available on-line at: http://www.economist.com/node/21553512
10. Krumholz H. A suggestion to restore faith in pharma studies. *Pharmalot*. September 20, 2012. Available at: www.pharmalot.com/2012/09/the-op-ed-a-suggestion-to-restore-faith-in-pharma-studies/
11. Conaboy C. Study: physicians give less credence to studies funded by pharmaceutical industry. *Boston Globe*. September 20, 2012. Available on-line at: http://www.boston.com/whitecoatnotes/2012/09/20/study-physicians-give-less-credence-studies-funded-pharmaceutical-industry/xd8MAnN5SqizUiBO6kTTOJ/story.html
12. Rehman J. Can the source of funding for medical research affect the results? *Scientific American*. September 23, 2012. Available at: http://blogs.scientificamerican.com/guest-blog/2012/09/23/can-the-source-of-funding-for-medical-research-affect-the-results/
13. Chen P. Are doctors too wary of drug companies? *New York Times*. October 18, 2012. Available on-line at: http://well.blogs.nytimes.com/2012/10/18/are-doctors-too-wary-of-drug-companies/
14. Lyons C. What's on your doctor's mind? *Boston Magazine*. December 2012. Available on-line at: http://www.bostonmagazine.com/articles/2012/11/boston-best-doctors-how-doctors-think-top-docs/

15. Tinker B. Don't judge that generic pill by its color. *CNN.com*. December 31, 2012. Available on-line at: http://thechart.blogs.cnn.com/2012/12/31/hfr-123112-4pet-dont-judge-your-generic-pill-by-its-color/
16. Bakalar N. The confusion of pill coloring. *New York Times*. December 31, 2012. Available on-line at: http://well.blogs.nytimes.com/2012/12/31/the-confusion-of-pill-coloring/
17. Conaboy C. Study authors: On medical school conflict of interest policies, more enforcement needed. *Boston Globe*. February 28, 2013. Available on-line at: http://www.boston.com/whitecoatnotes/2013/02/28/study-authors-medical-school-conflict-interest-policies-more-enforcement-needed/q06z6QUFQdyfUq36H8pahK/story.html
18. Britt R. Will drug makers see other nations challenge drug patents? *Wall Street Journal MarketWatch*. April 1, 2013. Available on-line at: http://blogs.marketwatch.com/health-exchange/2013/04/01/will-drug-makers-see-other-nations-challenge-drug-patents/.
19. Conaboy C. 1 in 4 Mass. physicians received industry gifts, payments. *Boston Globe*. May 1, 2013. Available on-line at: http://www.boston.com/lifestyle/health/blogs/white-coat-notes/2013/05/01/mass-physicians-received-industry-gifts-payments/RbxWq4YEevJMwk0Xt6N0QL/blog.html
20. Rabin RC. Doctors' lucrative industry ties. *New York Times*. May 13, 2013. Available on-line at: http://well.blogs.nytimes.com/2013/05/13/doctors-lucrative-industry-ties/
21. Chen P. For med students, love from the drug rep. *New York Times*. October 4, 2013. Available on-line at: http://well.blogs.nytimes.com/2013/10/03/for-med-students-love-from-the-drug-rep/?_r=0
22. Schwarz A. The selling of attention deficit disorder. *New York Times*. December 15, 2013. Available on-line at: http://www.nytimes.com/2013/12/15/health/the-selling-of-attention-deficit-disorder.html?_r=1&
23. New York Times Video. *How drug companies sell A.D.H.D*. New York Times website. Posted December 15, 2013. Available on-line at http://www.nytimes.com/2013/12/15/health/the-selling-of-attention-deficit-disorder.html?_r=1&#videoModal.
24. Rabin RC. The device maker's shortcut. *New York Times*. April 1, 2014, at D4. Available on-line at: http://well.blogs.nytimes.com/2014/03/31/the-device-makers-shortcut/?_php=true&_type=blogs&hpw&rref=health&_r=0
25. Silverman E. Can pharma sales reps influence prescribing for unapproved uses? *Wall Street Journal*. June 9, 2014. Available on-line at: http://blogs.wsj.com/pharmalot/2014/06/09/can-pharma-sales-reps-influence-prescibing-for-unapproved-uses
26. Rosenthal E. Rapid price increases for some generic drugs catch users by surprise. *New York Times*. July 9, 2014 at A16.
27. Dennis B. FDA has free speech, safety issues to weigh in review of 'off-label' marketing rules. *Washington Post*. July 9, 2014. Available on-line at: http://m.washingtonpost.com/national/health-science/2014/07/09/3708dd6a-fbc4-11e3-8176-f2c941cf35f1_story.html
28. Thomas K. Financial ties between doctors and health care firms detailed. *New York Times*. October 2, 2014 at B1.
29. LaPook J [video]. Why some generic drug prices are skyrocketing. *CBS Evening News*. November 12, 2014. Available on-line at: http://www.cbsnews.com/news/generic-drug-prices-skyrocketing/
30. Godman H. Best tips to stay on your medication and stay healthy. *Harvard Health Letter*. 2015;40(6):1,7.
31. Perrone M. Obama nominates Dr. Robert Califf, cardiologist and FDA deputy, to be next FDA commissioner. Associated Press/*US News & World Report*. September 15, 2015. Available on-line at: http://www.usnews.com/news/business/articles/2015/09/15/obama-to-nominate-fdas-no-2-official-to-lead-agency.

32. Tavernise S. F.D.A. nominee Califf's ties to drug makers worry some. *New York Times*. September 19, 2015. Available on-line at: http://www.nytimes.com/2015/09/20/health/fda-nominee-califfs-ties-to-drug-industry-raise-questions.html
33. Flatow I [radio segment]. Why generic doesn't mean cheap. *PRI's The World Science Friday*. September 25, 2015. Available on-line at: http://www.sciencefriday.com/#path/segment/09/25/2015/why-generic-doesn-t-mean-cheap.html
34. Loftus P. Drug firms buy pricey vouchers to speed products to market. *Wall St Journal*. October 20, 2015.
35. Pollack A. Martin Shkreli's arrest gives drug makers cover. *NY Times*. December 18, 2015. Available on-line at: http://www.nytimes.com/2015/12/18/business/martin-shkreli-arrest-gives-drug-makers-cover.html.
36. Span P. A prescription for confusion: when to take all those pills. *NY Times*. December 22, 2015. Available on-line at: http://www.nytimes.com/2015/12/22/health/a-prescription-for-confusion-when-to-take-all-those-pills.html?_r=0.
37. Sweetland Edwards H. Why can't drug costs be reined in? *Time*. May 30, 2016. Available on-line at: http://time.com/4341416/why-cant-drug-costs-be-reined-in/.
38. Timmerman L and Tirrell M [podcast]. The death of a child and a golden ticket for drug makers. *STAT Signal Podcast*. January 18, 2017. Available on-line at: https://www.statnews.com/2017/01/18/cancer-children-priority-review-vouchers/.
39. Dankosky J [radio segment]. Does faster drug approval lead to better medicine? *PRI's The World Science Friday*. November 18, 2017. Available on-line at: https://www.sciencefriday.com/segments/does-faster-drug-approval-lead-to-better-medicine/
40. Burton TM. Tax overhaul looks set to cut credits for drugs targeting rare diseases. *Wall St. Journal*. December 8, 2017. Available on-line at: https://www.wsj.com/articles/tax-overhaul-looks-set-to-cut-credits-for-drugs-targeting-rare-diseases-1512745739.
41. Karlin-Smith S. How Trump's HHS nominee's drug company 'gamed' a patent. *Politico*. January 9, 2018. Available on-line at: https://www.politico.com/story/2018/01/08/trump-azar-patent-drug-company-268942.
42. Green J and Cortez M. Trump is getting a physical. What about your CEO? *Bloomberg News*. January 12, 2018. Available on-line at: https://www.bloomberg.com/news/articles/2018-01-12/the-ceo-president-is-getting-a-physical-what-about-your-ceo.
43. Burton TM. Trump moves to cut costs for prescription drugs. *Wall St. Journal*. February 9, 2018. Available on-line at: https://www.wsj.com/articles/trump-moves-to-cut-costs-for-prescription-drugs-1518187386.
44. Thomas K. Patients eagerly awaited a generic drug. Then they saw the price. *New York Times*. February 24, 2018. Available on-line at: https://www.nytimes.com/2018/02/23/health/valeant-drug-price-syprine.html.
45. Ellis Nutt A. One of America's most popular drugs — first aimed at schizophrenia — reveals the issues of 'off-label' use. *Washington Post*. March 30, 2018. Available on-line at: https://www.washingtonpost.com/national/health-science/one-of-americas-most-popular-drugs--first-aimed-at-schizophrenia--reveals-the-issues-of-off-label-use/2018/03/28/78a538ca-1e27-11e8-b2d9-08e748f892c0_story.html?utm_term=.32ba5b2078d6.
46. Wapner J. Medication just keeps getting more expensive—and big pharma won't explain why. *Newsweek* April 24, 2018. Available on-line at: http://www.newsweek.com/medication-keeps-getting-more-expensive-and-big-pharma-wont-explain-why-897925.
47. Johnson CY. The truth about 'breakthrough' drugs. *Washington Post*. July 17, 2018. Available on-line at: https://www.washingtonpost.com/news/to-your-health/wp/2018/07/17/the-truth-about-breakthrough-drugs/?noredirect=on&utm_term=.6e934aabbacc.

48. Frakt A. Something happened to US drug costs in the 1990s. *NY Times*. November 12, 2018. Available on-line at: https://www.nytimes.com/2018/11/12/upshot/why-prescription-drug-spending-higher-in-the-us.html.
49. Now This News. Reps. Alexandria Ocasio-Cortez and Ro Khanna to Big Pharma. February 1, 2019. Video viewed over 2 million times. Available on-line at: https://twitter.com/AOC/status/1091439100589211648.
50. Kodjak A. Trump administration wants to cut drug prices by eliminating middlemen's rebates. *NPR*. February 1, 2019. Available on-line with audio at: https://www.npr.org/sections/health-shots/2019/02/01/690623616/trump-administration-wants-to-cut-drug-prices-by-eliminating-middlemens-rebates?utm_campaign=storyshare&utm_source=twitter.com&utm_medium=social.
51. Beras E. Pharma executives in the hot seat over drug prices. *Marketplace*. February 26, 2019. Available on-line with audio at: https://www.marketplace.org/2019/02/26/health-care/pharma-executives-in-the-hot-seat-over-drug-prices.
52. Karma R. Alexandria Ocasio-Cortez and the myth of American innovation. *American Prospect*. March 6, 2019. Available on-line at: https://prospect.org/article/alexandria-ocasio-cortez-and-myth-american-innovation.
53. Emanuel G. Insys trial raises questionsa bout what drug sales reps can and cannot do. *WGBH*. March 19, 2019. Available on-line with audio at: https://www.wgbh.org/news/local-news/2019/03/19/insys-trial-raises-questions-about-what-drug-sales-reps-can-and-cannot-do.
54. Entis L. Why does medicine cost so much? Here's how drug prices are set. April 9, 2019. *Time.* Available on-line at: https://time.com/5564547/drug-prices-medicine/
55. Rapaport L. Patients' drug costs surge for some neurologic conditions. May 1, 2019. *Reuters.* Available on-line at: https://www.reuters.com/article/us-health-neurology-drug-costs-idUSKCN1S74P5
56. Ducharme J. The new 'female Viagra' has reignted a debate over drugs and female sexuality. June 25, 2019. *Time*. Available on-line at: https://time.com/5613374/vyleesi-female-viagra-fda-approval/
57. Frakt A. There is no single, best policy for drug prices. July 15, 2019. *New York Times Upshot*. Available on-line at: https://www.nytimes.com/2019/07/15/upshot/lower-drug-prices-no-one-cure.html
58. Burton TM. Senators introduce bill to cap drug-price increases under Medicare. July 23, 2019. *Wall Street Journal.* Available on-line at: https://www.wsj.com/articles/senators-introduce-bill-to-cap-drug-price-increases-under-medicare-11563906451
59. Heredia Rodriguez C. Price of snakebite drug is sky high, but new competitor unlikely to lower costs. *Kaiser Health News.* August 8, 2019. Available on-line at: https://khn.org/news/price-of-snakebite-drug-is-sky-high-but-new-competitor-unlikely-to-lower-costs/
60. Shure N. Force drug companies to lower drug prices. September 26, 2019. *American Prospect*. Available on-line at: https://prospect.org/day-one-agenda/force-drug-companies-to-lower-prices/
61. Gordon S. Why are insulin prices still so high for U.S. patients? November 19, 2019. *Chicago Tribune.* Available on-line at: https://www.chicagotribune.com/lifestyles/health/sc-health-high-insulin-prices-1120-20191119-n7othkojcfcrpaghinmsu4vcuu-story.html
62. Luthra S. Pharma's take on the Pelosi drug-pricing bill: fair warning or fear mongering? December 5, 2019. *Kaiser Health News*. Available on-line at: https://khn.org/news/pharmas-take-on-the-pelosi-drug-pricing-bill-fair-warning-or-fearmongering/
63. Fay Cortez M and Flanagan C. Patients, companies cheer as FDA speedily green-lights drugs. Others are alarmed.. December 6, 2019. *LA Times*. Available on-line at: https://www.latimes.com/business/story/2019-12-06/fda-drugs-approval.

64. Jagannathan M. Harvard Medical School researchers allege 'erosion' of standards at FDA, criticizing shorter drug-review times. *MarketWatch*. January 21, 2020. Available on-line at: https://www.marketwatch.com/story/harvard-medical-school-researchers-allege-erosion-of-evidence-standards-at-fda-2020-01-15
65. Knight V. Warren is right: Presidents have the power to address drug pricing without Congressional help. *PolitiFact.* January 29, 2020. Available on-line at: https://www.politifact.com/factchecks/2020/jan/29/elizabeth-warren/warren-right-presidents-have-power-address-drug-pr/
66. Perrone M and Lardner R. Potential coronavirus treatment granted rare disease. March 24, 2020. *Associated Press*. Available on-line at: https://apnews.com/article/608d4bb9d76bb1077dec5409a7e2459e
67. Luhby T. Here's what we know – and what we don't – about Trump's $200 drug discount cards. *CNN*. September 25, 2020. Available on-line at: https://www.cnn.com/2020/09/25/politics/senior-citizens-drug-discount-cards-trump-health-care/index.html
68. Burton T. FDA's Approval of Alzheimer's Drug Leads to Third Adviser's Resignation: Harvard Medical School Professor Aaron Kesselheim called the decision a 'debacle'. *Wall Street Journal*. June 10, 2021. Available on-line at: https://www.wsj.com/articles/third-member-of-fda-advisory-panel-resigns-over-approval-of-alzheimer-drug-11623370557
69. Belluck P and Robbins R. Three F.D.A. Advisers Resign Over Agency's Approval of Alzheimer's Drug. *New York Times.* June 11, 2021 at A20. Available on-line at: https://www.nytimes.com/2021/06/10/health/aduhelm-fda-resign-alzheimers.html
70. Gardizy A. 'It should send shock waves to the White House': Backlash over FDA approval of Biogen's Alzheimer's drug is spreading. *Boston Globe.* June 11, 2021. Available on-line at: https://www.bostonglobe.com/2021/06/11/business/fda-approval-biogen-alzheimers-drug-comes-under-increasing-fire-after-committee-resignations/
71. Nisen M. The Big Question: Is the FDA's Drug Approval Process Broken? *Bloomberg Opinion*. June 26, 2021. Available on-line at: https://www.bloomberg.com/opinion/articles/2021-06-26/is-the-fda-s-drug-approval-process-broken.
72. McCarthy M. FDA Panel Member Tells Healthline Why He Resigned Over Alzheimer's Drug Approval. *Healthline*. July 1, 2021. Available on-line at: https://www.healthline.com/health-news/qa-with-fda-panel-member-who-resigned#1
73. Toobin J. The road to Aduhelm: What one ex-FDA adviser called 'probably the worst drug approval decision in recent US history' for an Alzheimer's treatment. *CNN.com*. September 27, 2021. Available on-line at: https://www.cnn.com/2021/09/26/politics/alzheimers-drug-aduhelm-fda-approval/index.html

**<u>Report of Scholarship</u>**
*** Indicates mentee as co-author*
**Peer reviewed publications in print or other media**

<u>Research investigations</u>

1. **Kesselheim AS**. Deception and presidential disability: a historical analysis. Trans & Stud Coll Phys Phila 2001;23:87-98.
2. **Kesselheim AS**. What's the appeal? Trying to control managed care medical necessity decisionmaking through a system of external appeals. Univ of Penn Law Rev 2001;149:873-920.
3. **Kesselheim AS**. Privacy versus the public's right to know: presidential health and the White House physician. J Legal Med 2002;23:523-545.
4. Rudnick MR, **Kesselheim A**, Goldfarb S. Contrast-induced nephropathy: how it develops, how to

prevent it. Cleveland Clinic J Med 2006;73:75-80, 83-87.

5. **Kesselheim AS** and Studdert DM. Characteristics of physicians who frequently act as expert witnesses in neurological birth injury litigation. Obstet & Gyn 2006;108:273-279.
    - Stokes RL 3rd. Characteristics of physicians who frequently act as expert witnesses in neurologic birth injury litigation. [Letter to the editor] Obstetrics & Gynecology 2006;108(6):1552-1553.
    - **Kesselheim AS**, Studdert DM. Characteristics of physicians who frequently act as expert witnesses in neurological birth injury litigation. [Author reply] Obstetrics & Gynecology 2006;108:1552-3.
6. **Kesselheim AS**, Fischer MA, Avorn J. Extensions of intellectual property rights and delayed adoption of generic drugs: effects on Medicaid spending. Health Affairs 2006;25:1637-1647.
    - Copeland KR, Boccuzzi SJ. Brand-name versus generic. [Letter to the Editor] Health Affairs 2007;26(4):1198-1199.
    - **Kesselheim AS**, Fischer MA, Avorn J. Brand name versus generic: the authors respond. [Author reply] Health Affairs 2007;26:1199.
7. **Kesselheim AS** and Avorn J. The role of litigation in defining drug risks. JAMA 2007;297:308-311.
8. Shrank WH, Agnew-Blais J, Choudhry NK, Wolf MS, **Kesselheim AS**, Avorn J, Shekelle P. The variability and quality of medication container labels. Archives of Internal Medicine 2007;167:1760-1765.
9. Outterson K and **Kesselheim AS**. Putting patients first: a market-based licensing proposal for HPV vaccines and other patented medical products in developing countries. Health Affairs 2008;27:130-139.
10. **Kesselheim AS** and Studdert DM. Whistleblower-initiated enforcement actions against health care fraud and abuse in the United States, 1996-2005. Annals of Internal Medicine 2008;149:342-349.
11. **Kesselheim AS**, Misono AS**, Lee JL, Stedman MR, Brookhart MA, Choudhry NK, Shrank WH. The clinical equivalence of generic and brand-name drugs used in cardiovascular disease: a systematic review and meta-analysis. JAMA 2009;300:2514-2526.
    - Carter BL. Equivalence of generic and brand-name drugs for cardiovascular disease. [Letter to the Editor] JAMA 2009;301(16):1654.
    - Reiffel JA. Equivalence of generic and brand-name drugs for cardiovascular disease. [Letter to the Editor] JAMA. 2009;301(16):1655.
    - Zema MJ. Equivalence of generic and brand-name drugs for cardiovascular disease. [Letter to the Editor] JAMA. 2009;301(16):1654-5.
    - **Kesselheim AS**, Misono AS, Shrank WH. The clinical equivalence of generic and brand-name drugs used in cardiovascular disease: a systematic review and meta-analysis. [Author reply] JAMA 2009;301:1655-1656.
    - Manns B. ACP Journal Club. Brand-name drugs are not more effective than generic versions for treating cardiovascular disease. [Review] Annals of Internal Medicine 2009;150(8):JC4-6.
    - Manns B. Review: brand-name drugs are not more effective than generic versions for treating cardiovascular disease. [Review] Evidence Based Medicine 2009;14(3):81.
12. **Kesselheim AS** and Studdert DM. Professional oversight of physician expert witnesses: an analysis of complaints to the Professional Conduct Committee of the American Association of Neurological Surgeons, 1992-2006. Annals of Surgery 2009;249:168-172.
13. **Kesselheim AS** and Avorn J. Using patent data to assess the value of pharmaceutical innovation. Journal of Law, Medicine & Ethics 2009;37(2):176-183.

14. **Kesselheim AS**, Stedman MR, Bubrick EJ, Gagne JJ, Misono AS**, Lee JL, Brookhart MA, Avorn J, Shrank WH. Seizure outcomes following use of generic vs. brand-name antiepileptic drugs: a systematic review and meta-analysis. Drugs 2010;70(5):605-621.
15. **Kesselheim AS**, Studdert DM, Mello MM. Whistle-blowers' experiences in fraud litigation against pharmaceutical companies. New England Journal of Medicine 2010;362:1832-1839.
16. Kramer DB**, **Kesselheim AS**, Brock DW, Maisel WH. The ethical and legal views of physicians regarding deactivation of cardiac implantable electrical devices: a quantitative assessment. Heart Rhythm 2010;7(11):1537-1542.
17. **Kesselheim AS**, November MT, Lifford KL, McElrath TF, Puopolo AL, Orav EJ, Studdert DM. Risk factors for neurological impairment among infants following nonreassuring fetal heart rate patterns during labor. Journal of Evaluation in Clinical Practice 2010;16(3):476-483.
18. Shrank WH, Choudhry NK, Agnew-Blais J, Federman AD, Liberman JN, Liu J, **Kesselheim AS**, Brookhart MA, Fischer MA. State generic substitution laws can lower drug outlays under Medicaid. Health Affairs 2010;29(7):1383-1390.
19. Kramer DB**, **Kesselheim AS**, Brock DW, Maisel WH. Ethical and legal views regarding deactivation of cardiac implantable electrical devices in patients with hypertrophic cardiomyopathy. American Journal of Cardiology 2011;107(7):1071-1075.
20. **Kesselheim AS**, Mello MM, Studdert DM. Strategies and practices in off-label marketing of pharmaceuticals: a retrospective analysis of whistleblower complaints. PLoS Medicine 2011;8(4):e1000431.
21. Shrank WH, Liberman JN, Fischer MA, Avorn J, Kilabuk E, Chang A, **Kesselheim AS**, Brennan TA, Choudhry NK. The consequences of requesting "dispense as written." American Journal of Medicine 2011;124(4):309-317.
22. Austad KE**, Avorn J, **Kesselheim AS**. Medical students' exposure to and attitudes about the pharmaceutical industry: a systematic review. PLoS Medicine 2011;8(5):e1001037.
23. **Kesselheim AS**, Myers JA, Avorn J. Characteristics of clinical trials to support approval of orphan vs nonorphan drugs for cancer. JAMA 2011;305:2320-2326.
    - Saltonstall PL. Clinical trials of orphan drugs for cancer. [Letter to the editor] JAMA 2011;306(14):1545.
    - **Kesselheim AS**, Avorn J. Approval of orphan drugs for cancer. [Author reply] JAMA 2011;306:1545-1546.
24. Avorn J and **Kesselheim AS**. The NIH's new drug-development initiative: socialization of risk and privatization of gain? Nature Medicine 2011;17(10):20.
25. **Kesselheim AS**, Darby DL**, Studdert DM, Glynn RJ, Levin RL, Avorn J. False Claims Act prosecution did not deter off-label drug use in the case of Neurontin. Health Affairs 2011;30(12):2318-2327.
    - Greenberg PE, Pike C, Sisitsky T. Confounding factors in off-label drug use. [Letter to the editor] Health Affairs 2012;31(2):460.
    - **Kesselheim AS**, Darby DL, Avorn J. Off-label use of Neurontin. [Author reply] Health Affairs 2012;31(2):460.
26. **Kesselheim AS**. An empirical review of major legislation affecting drug development: past experiences, effects, and unintended consequences. Milbank Quarterly 2011;89(3):450-502.
27. **Kesselheim AS**, Lee JL, Avorn J, Servi A, Shrank WH, Choudhry NK. Conflict of interest in oncology publications. Cancer 2012;118(1):188-195.
28. **Kesselheim AS**, Myers JA, Solomon DH, Winkelmayer WC, Levin R, Avorn J. The prevalence and cost of unapproved uses of top-selling orphan drugs. PLoS One 2012;7(2):e31894.
29. Kramer DB**, Xu S, **Kesselheim AS.** How does medical device regulation perform in the United States and the European Union? A systematic review. PLoS Medicine 2012;9(7):e1001276.

30. **Kesselheim AS**, Wang B, Studdert DM, Avorn J. Conflict of interest reporting by authors involved in promotion of off-label drug use: an analysis of journal disclosures. PLoS Medicine 2012;9(8):e1001280.
31. Greene JA, Choudhry NK, **Kesselheim AS**, Brennan TA, Shrank WH. Changes in direct-to-consumer pharmaceutical advertising following Rx to OTC shift. JAMA 2012;308(10):973-975.
32. **Kesselheim AS**, Robertson CT, Myers JA, Rose SL, Gillet V, Ross KM, Glynn RJ, Joffe S, Avorn J. A randomized study of how physicians interpret research funding disclosures. New England Journal of Medicine 2012;367:1119-1127.
    - Drazen JM. Believe the data. [Editorial] New England Journal of Medicine 2012;367(12):1152-1153.
    - Feuerstein JD, Leffler DA, Cheifetz AS. How physicians interpret research funding disclosures. [Letter to the Editor] New England Journal of Medicine 2012;367(24):2358-2359.
    - Fonseca R. How physicians interpret research funding disclosures. [Letter to the Editor] New England Journal of Medicine 2012;367(24):2358.
    - **Kesselheim AS**, Avorn J. How physicians interpret research funding disclosures. [Author reply] New England Journal of Medicine 2012;367:2360.
    - Reider B. Do We Care? Should We? [Comment] American Journal of Sports Medicine 2016;44(4):835-837.
33. Amin T and **Kesselheim AS**. Secondary patenting of branded pharmaceuticals: a case study of how patents on two HIV drugs could be extended for decades. Health Affairs 2012;31:2286-2294.
34. Robertson CT, Rose SL, **Kesselheim AS**. Effect of financial relationships on the behaviors of health care professionals: a review of the evidence. Journal of Law, Medicine & Ethics 2012;40(3):452-466.
35. Xu S**, Avorn J, **Kesselheim AS**. Origins of medical innovation: the case of coronary artery stents. Circulation: Cardiovascular Quality and Outcomes 2012;5(6):743-749.
    - Tomaselli GF. Origins of medical innovation: the case of coronary artery stents. [Editorial] Circulation: Cardiovascular Quality and Outcomes 2012;5(6):741-742.
36. **Kesselheim AS**, Misono AS**, Shrank WH, Greene JA, Doherty M, Avorn J, Choudhry NK. Variations in pill appearance of antiepileptic drugs and the risk of non-adherence. JAMA Internal Medicine 2013;173(3):202-208.
    - Yu LX, Geba GP. Generic pills from the patient perspective: dressed for success? [Editorial] JAMA Internal Medicine 2013;173(3):208-209.
    - Covinsky KE. Debating effect sizes. [Editorial] JAMA Internal Medicine 2013;173(3):209.
    - Appel K. Einfluss von Tablettenform und -farbe. [Commentary in German] Fortschritte der Neurologie-Psychiatrie 2013;81(6):301.
37. **Kesselheim AS**, Robertson CT, Siri K, Batra P, Franklin JM. Distributions of industry payments to Massachusetts physicians. New England Journal of Medicine 2013;368(22):2049-2052.
38. **Kesselheim AS**, Avorn J. The most transformative drugs of the past 25 years: a survey of physicians. Nature Reviews: Drug Discovery 2013;12(6):425-431.
39. Austad KE**, Avorn J, Franklin JM, Kowal MK, Campbell EG, **Kesselheim AS**. Changing interactions between physician trainees and the pharmaceutical industry: a national survey. Journal of General Internal Medicine 2013;28(8):1064-1071.
    - Ramachandran R, Hams M, Silver-Isenstadt J. Physician trainees' interactions with the pharmaceutical industry. [Letter to the Editor] Journal of General Internal Medicine 2013;28(10):1266.
    - Austad KE**, Avorn J, Franklin JM, **Kesselheim AS**. Physician trainees' interaction with

the pharmaceutical industry. [Author reply] Journal of General Internal Medicine 2013;28:1267.**

40. **Kesselheim AS**, Franklin JM, Avorn J, Duke JD. Speaking the same language?: International variations in the safety information accompanying top-selling prescription drugs. BMJ Quality & Safety 2013;22:727-734.
41. **Kesselheim AS**, Wang B**, Avorn J. Defining 'innovativeness' in drug development: a systematic review. Clinical Pharmacology and Therapeutics 2013;94(3):336-348.
42. Wang B**, Avorn J, **Kesselheim AS**. Clinical and regulatory features of drugs not initially approved by the FDA. Clinical Pharmacology and Therapeutics 2013;94(6):670-677.
43. Ross JS, **Kesselheim AS**. Prescription-drug coupons—no such thing as a free lunch. New England Journal of Medicine 2013;369:1188-1189.
44. Outterson K, Powers JH, Seoane-Vazquez E, Rodriguez-Monguio R, **Kesselheim AS**. Approval and withdrawal of new antibiotics and other antiinfectives in the US, 1980-2009. Journal of Law, Medicine & Ethics 2013;41(3):688-696.
45. Gagne JJ, Polinski JM, **Kesselheim AS**, Choudhry NK, Hutchins D, Matlin OS, Tong A, Shrank WH. Patterns and predictors of generic narrow therapeutic index drug use among older adults. Journal of the American Geriatrics Society 2013;61(9):1586-1591.
46. Hwang TJ**, Carpenter D, **Kesselheim AS**. Assessment of US pathway for approving medical devices for rare conditions. BMJ 2014;348:g217.
47. Rome BN**, Kramer DB**, **Kesselheim AS**. FDA approval of cardiac implantable electrical devices via original and supplement pre-market approval pathways, 1979-2012. JAMA 2014;311(4):385-391.
    - Goodman SN, Redberg RF. Opening the FDA black box. [Editorial] JAMA 2014;311(4):361-363.
    - McCarthy M. Quality of evidence behind FDA approvals varies widely. [Review] BMJ 2014;348:g1075.
48. Hwang TJ,** Avorn J, Carpenter DP, **Kesselheim AS**. Quantifying the Food and Drug Administration's rulemaking delays highlights need for transparency. Health Affairs 2014;33(2):309-315.
49. **Kesselheim AS**, Xu S**, Avorn J. Clinicians' contributions to the development of coronary artery stents: a qualitative study of transformative device innovation. PLoS One 2014;9(2):e88664.
50. Hwang TJ**, **Kesselheim AS**, Bourgeois FT. Postmarketing trials and pediatric device approvals. Pediatrics 2014;133(5):e1197-202.
51. Gellad WF, Choi PC, Mizah M, Good CB, **Kesselheim AS**. Assessing the chiral switch: approval and use of single-enantiomer drugs, 2001-2011. American Journal of Managed Care 2014;20(3):e90-e97.
52. Hwang TJ**, Carpenter D, **Kesselheim AS**. Target small firms for antibiotic innovation. Science 2014;344(6187):967-969.
53. Larkin I, Ang D, Avorn J, **Kesselheim AS**. Restrictions on pharmaceutical detailing reduced off-label prescribing of antidepressants and antipsychotics in children. Health Affairs 2014:33(6):1014-1023.
54. Austad KE**, Avorn J, Franklin JM, Campbell EG, **Kesselheim AS**. Association of marketing interactions with medical trainees' knowledge about evidence-based prescribing: results from a national survey. JAMA Internal Medicine 2014;174(8):1283-1290.
    - Ross JS. Restricting interactions with industry to promote evidence-based prescribing. [Editorial] JAMA Internal Medicine 2014;174(8):1290.
55. Polinski JM, **Kesselheim AS**, Frolkis JP, Wescott P, Allen-Coleman C, Fischer MA. A matter of trust: patient barriers to primary medication adherence. Health Education Research

2014;29(5):755-763.

56. Darrow JJ**, **Kesselheim AS**. Drug development and FDA approval, 1938-2013. New England Journal of Medicine 2014;370(26):e39.
57. **Kesselheim AS**, Bykov K, Tong A, Doherty M, Avorn J, Choudhry NK. Burden of changes in pill appearance for patients receiving generic cardiovascular medications after myocardial infarction: cohort and nested case-control studies. Annals of Internal Medicine 2014;161(2):96-103.
    - Uhl K, Peters JR. Burden of changes in generic pill appearance. [Letter to the Editor] Annals of Internal Medicine 2014;161(11):839.
    - Pauker S. Burden of changes in generic pill appearance. [Letter to the Editor] Annals of Internal Medicine 2014;161(11):839.
    - **Kesselheim AS**, Choudhry NK, Avorn J. Burden of changes in generic pill appearance. [Author reply] Annals of Internal Medicine 2014;161(11):840.
58. Gagne JJ, Choudhry NK, **Kesselheim AS**, Polinski JM, Hutchins D, Matlin OS, Brennan TA, Avorn J, Shrank WH. Comparative effectiveness of generic and brand-name statins on patient outcomes. Annals of Internal Medicine 2014;161:400-407.
59. Checchi KD**, Huybrechts KF, Avorn J, **Kesselheim AS**. Electronic medication packaging devices and medication adherence: A systematic review. JAMA 2014;312(12):1237-1247.
60. **Kesselheim AS**, Tan YT, Darrow JJ, Avorn J. Existing FDA pathways have potential to ensure early access to, and appropriate use of, specialty drugs. Health Affairs 2014;33(10):1770-1778.
61. Yeh JS**, Austad KE, Franklin JM, Chimonas S, Campbell EG, Avorn J, **Kesselheim AS**. Association of medical students' reports of interactions with the pharmaceutical and medical device industries and medical school policies and characteristics: a cross-sectional study. PLoS Medicine 2014;11(10):e1001743.
62. Gagne JJ, Thompson L, O'Keefe K, **Kesselheim AS**. Innovative research methods for studying treatments for rare diseases: methodological review. BMJ 2014;349:g6802.
63. Xu S** and **Kesselheim AS**. Medical innovation then and now: perspectives of innovators responsible for transformative drugs. Journal of Law, Medicine & Ethics 2014;42(4):564-575.
64. **Kesselheim AS**, Huybrechts KF, Choudhry NK, Fulchino LA, Isaman DL, Kowal MK, Brennan TA. Prescription drug insurance coverage and patient health outcomes: A systematic review. American Journal of Public Health 2015;105(2):e17-30.
65. Rajan PV**, Kramer DB**, **Kesselheim AS**. Medical device postapproval safety monitoring: where does the United States stand? Circulation Cardiovascular Quality & Outcomes 2015;8:124-131.
66. **Kesselheim AS**, McGraw S, Thompson L, O'Keefe K, Gagne JJ. Development and use of new therapeutics for rare diseases: views from patients, caregivers, and advocates. The Patient: Patient-Centered Outcomes Research 2015;8(1):75-84.
67. Polinski JM, **Kesselheim AS**, Seeger JD, Connolly JG, Choudhry NK, Shrank WH. A cross-national comparison of 17 countries' insulin glargine drug labels. Pharmacoepidemiology and Drug Safety 2015;24(2):159-165.
68. **Kesselheim AS**, Tan YT, Avorn J. The roles of academia, rare diseases, and repurposing in the development of the most transformative drugs. Health Affairs 2015;34:286-294.
69. Wang B**, Liu J, **Kesselheim AS**. Variations in time of market exclusivity among top-selling prescription drugs in the United States. JAMA Internal Medicine 2015;175(4):635-637.
    - Downing NS. Market exclusivity for top-selling pharmaceuticals: too long, too short, or just right? [Editorial] JAMA Internal Medicine 2015;175(4):637-638.
70. Sarpatwari A**, Franklin JM, Avorn J, Seeger JD, Landon JE, **Kesselheim AS**. Are Risk Evaluation and Mitigation Strategies associated with less off-label use of medications? The case of ITP. Clinical Pharmacology and Therapeutics 2015;97(2):186-93.

71. **Kesselheim AS**, Connolly JC, Rogers J, Avorn J. Despite mandatory disclaimers on dietary supplements, many consumers remain unaware or overlook the information. Health Affairs 2015;34(3):438-446.
72. Wang B**, Choudhry NK, Gagne JJ, Landon J, **Kesselheim AS**. Availability and utilization of cardiovascular fixed-dose combination drugs in the United States. American Heart Journal 2015;169(3):379-386.
73. **Kesselheim AS**, Polinski JP, Fulchino LA, Isaman DL, Gagne JJ. Modified regulatory pathways to approve generic drugs in the US and a systematic review of their outcomes. Drugs 2015;75(6):633-650.
74. **Kesselheim AS**, Campbell EG, Schneeweiss S, Rausch P, Lappin BM, Zhou EH, Seeger JD, Brownstein JS, Woloshin S, Schwartz LM, Toomey T, Dal Pan G, Avorn J. Methodological approaches to evaluate the impact of FDA Drug Safety Communications. Drug Safety 2015;38(6):565-575.
75. Darrow JJ**, **Kesselheim AS.** A new wave of vaccines for non-communicable diseases: what are the regulatory challenges? Food and Drug Law Journal 2015;70(2):243-258.
76. **Kesselheim AS**, Franklin JM, Kim SC, Seeger JD, Solomon DH. Reductions in use of colchicine after FDA enforcement of market exclusivity in a commercially insured population. J Gen Intern Med 2015;30(11):1633-1638.
77. Luo J**, Avorn J, **Kesselheim AS**. Trends in Medicaid reimbursements for insulin from 1991 through 2014. JAMA Internal Medicine 2015;175(10):1681-1686.
    - Bryant J. Inaccurate Reporting of Insulin Reimbursement. [Letter to the Editor] JAMA Internal Medicine 2016;176(3):408.
    - Alatorre CI, Schultz EH. Inaccurate Reporting of Insulin Reimbursement. [Letter to the Editor] JAMA Internal Medicine 2016;176(3):407-408.
    - Luo J, Avorn J, **Kesselheim AS**. Inaccurate reporting of insulin reimbursement. [Author reply] JAMA Internal Medicine 2016;176(3):408-409.**
78. Gagne JJ, **Kesselheim AS**, Choudhry NK, Polinski JM, Hutchins D, Matlin OS, Brennan TA, Avorn J, Shrank WH. Comparative effectiveness of generic versus brand-name antiepileptic medications. Epilepsy & Behavior 2015;52(Pt A):14-18.
79. **Kesselheim AS**, Wang B**, Franklin JM, Darrow JJ**. Trends in utilization of FDA expedited drug development and approval programs, 1987-2014: cohort study. BMJ 2015;351:h4633.
    - Frakt A. JAMA Forum: The risks and benefits of expedited drug reviews. May 23, 2018. Available from: https://newsatjama.jama.com/2018/05/23/jama-forum-the-risks-and-benefits-of-expedited-drug-reviews/.
80. Wang B**, **Kesselheim AS**. Characteristics of efficacy evidence supporting approval of supplemental indications for prescription drugs in the United States, 2005-2014: systematic review. BMJ 2015;351:h4679.
81. Treasure CL**, Avorn J, **Kesselheim AS**. Do march-in rights ensure access to medical products arising from federally funded research? A qualitative study. Milbank Quarterly 2015;93(4):761-787.
82. Luo J**, **Kesselheim AS.** The evolution of insulin patents and market exclusivities in the USA, 2004-2014. Lancet Diabetes & Endocrinology 2015;3(11):835-837.
    - Kaplan W, Laing R, Ewen M, Beran D. Insulin patents and market exclusivities: unresolved issues. [Letter to the Editor] Lancet Diabetes & Endocrinology 2016;4(2):98.
    - Luo J, **Kesselheim AS**. Insulin patents and market exclusivities: unresolved issues. [Author reply] Lancet Diabetes & Endocrinology 2016;4(2):98-99.**
83. **Kesselheim AS**, Hwang TJ**, Franklin JM. Two decades of new drug development for central nervous system disorders. Nature Reviews: Drug Discovery 2015;14(12):815-816.

84. Yeh JS**, Austad KE, Franklin JM, Chimonas S, Campbell EG, Avorn J, **Kesselheim AS**. Medical schools' industry interaction policies are not associated with trainees' self-reported behavior as residents: results of a national survey. Journal of Graduate Medical Education 2015;7(4):595-602.
85. Kim SC, Choi NK, Lee J, Kwon KE, Eddings W, Sung YK, Song HJ, **Kesselheim AS**, Solomon DH. Uptake of the first biosimilar infliximab since its approval in South Korea. Arthritis and Rheumatology 2016;68(5):1076-9.
86. Hwang TJ**, **Kesselheim AS**. Vaccine pipeline has grown during the past two decades with more early-stage trials from small and medium-size companies. Health Affairs 2016;35(2):219-26.
87. **Kesselheim AS**, Gagne JJ, Franklin JM, Eddings W, Fulchino LA, Avorn J, Campbell EG. Variations in patients' perceptions and use of generic drugs: results of a national survey. Journal of General Internal Medicine 2016;31(6):609-14.
    - Kaplan CM. Capsule Commentary on Kesselheim et al., Variations in Patients' Perceptions and Use of Generic Drugs: Results of a National Survey. [Review] Journal of General Internal Medicine 2016;31(6):647.
88. **Kesselheim AS**, Woloshin S, Eddings W, Franklin JM, Ross KM, Schwartz LM. Physicians' knowledge about FDA approval standards and perceptions of the Breakthrough Therapy designation. JAMA 2016;315(14):1516-1518.
89. Wang B**, Franklin JM, Eddings W, Landon J, **Kesselheim AS**. Did FDA decisionmaking affect anti-psychotic drug prescribing in children?: A time-trend analysis. PLoS One 2016;11(3): e0152195.
90. Gagne JJ, Polinski JM, Jiang W, Dutcher SK, Xie J, Lii J, Fulchino LA, **Kesselheim AS**. Switch-backs associated with generic drugs approved using product-specific determinations of therapeutic equivalence. Pharmacoepidemiology and Drug Safety 2016;25(8):944-952.
91. **Kesselheim AS**, Gagne JJ, Eddings W, Franklin JM, Ross KM, Fulchino LA, Campbell EG. Prevalence and predictors of generic drug skepticism among physicians: results of a national survey. JAMA Internal Medicine 2016;176(6):845-847.
    - Chee M, Ngooi S, Arora VM. Prescription Trends-Brand-name Drugs vs Generic. [Letter to the Editor] JAMA Internal Medicine 2016;176(10):1573-1574.
    - **Kesselheim AS**, Gagne JJ. Prescription trends—brand-name drugs vs. generic. [Author reply] JAMA Internal Medicine 2016;176(10):1574-1575.
92. Yeh JS**, Franklin JM, Avorn J, Landon J, **Kesselheim AS**. Association of industry payments to physicians with the prescribing of brand-name statins in Massachusetts. JAMA Internal Medicine. 2016;176(6):763-768.
    - Fagan TC. Payments to physicians, prescribing rates, and more appropriate conclusions. [Letter to the Editor] JAMA Intern Med. 2016;176(10):1576.
    - Feuerstein JD. Payments to Physicians, Prescribing Rates, and more appropriate conclusions. [Letter to the Editor] JAMA Intern Med. 2016;176(10):1576-1577.
    - Yeh JS**, Franklin JM, **Kesselheim AS**. Payments to physicians, prescribing rates, and more appropriate conclusions. [Author reply] JAMA Internal Medicine 2016;176(10):1577.
93. Caplan ES**, **Kesselheim AS**. Anti-VEGF therapy in ophthalmology—a qualitative analysis of transformative drug development. Drug Discovery Today 2016;21(6):1019-1026.
94. Deak DM**, Powers JP, Outterson MK, **Kesselheim AS**. Progress in the fight against multidrug-resistant bacteria?: a review of U.S. Food and Drug Administration-approved antibiotics 2010-2015. Annals of Internal Medicine 2016;165(5):363-372.
    - Weinrauch LA, D'Elia JA. The fight against multidrug-resistant bacteria. [Letter to the Editor] Annals of Internal Medicine 2017;166(1):77-78.

- Boucher HW, Cosgrove SE, Cox E, Talbot GH. The fight against multi-drug resistant bacteria. [Letter to the Editor] Annals of Internal Medicine 2017;166(1):78-79.
- Deak D**, Powers JH, Outterson K, **Kesselheim AS**. The fight against multidrug-resistant bacteria. [Author reply] Annals of Internal Medicine 2017;166(1):79.

95. Hwang TJ**, Sokolov E, Franklin JM, **Kesselheim AS**. Comparison of rates of safety issues and trial outcomes reporting for medical devices approved in EU and US: cohort study. BMJ 2016;353:i3323.**
96. Sarpatwari A**, **Kesselheim AS**. Navigating the dermatologic drug cost curve. JAMA 2016;315(24):2724-2725.
97. Luo J,** Seeger JD, Donneyong M, Gagne JJ, Avorn J, **Kesselheim AS**. Effect of generic competition on atorvastatin prescribing and patients' out-of-pocket spending. JAMA Internal Medicine 2016;176(9):1317-1323.
98. Gupta R, **Kesselheim AS**, Downing N, Greene J, Ross JS. Generic drug approvals since the 1984 Hatch-Waxman Act. JAMA Internal Medicine 2016;176(9):1391-1393.
    - Toufanian M, Peters JR, Uhl K. Prioritization of generic drug review. [Letter to the Editor] JAMA Internal Medicine 2017;177(1):140-141.
    - Gupta R, **Kesselheim AS**, Ross JS. Prioritization of generic drug review. [Author reply] JAMA Internal Medicine 2017;177(1):141-142.
99. Hwang TJ**, Lauffenburger JC, Franklin JM, **Kesselheim AS**. Temporal trends and factors associated with cardiovascular drug development, 1990 to 2012. Journal of the American College of Cardiology: Basic to Translational Science 2016;1(5):301-308.
    - Fiuzat M, Stockbridge N, Califf RM. Resourcing drug development commensurate with its public health importance. [Editorial] JACC: Basic to Translational Science 2016;1(5):309-312.
100. **Kesselheim AS**, Avorn J, Sarpatwari A**. The high cost of prescription drugs in the United States: origins and prospects for reform**.** JAMA 2016;316(8):858-871.
    - Roy V, Hawksbee L, King L. Factors influencing prescription drug costs in the United States. [Letter to the Editor] JAMA 2016;316(22):2431.
    - Arbiser JL. Factors influencing prescription drug costs in the United States. [Letter to the Editor] JAMA 2016;316(22):2430-2431.
    - Sarpatwari A**, Avorn J, **Kesselheim AS**. Factors influencing prescription drug costs in the United States. [Author reply] JAMA 2016;316(22):2431-2432.
    - #41 most-discussed journal article of 2016. Altmetric. Available online at: https://www.altmetric.com/details/10782162.
101. **Kesselheim AS**, Bykov K, Gagne JJ, Wang S, Choudhry NK. Switching generic antiepileptic drug manufacturer not linked to seizures: a case-crossover study. Neurology 2016;87(17):1796-1801.
    - Krauss GL, Privitera M. More data on the safety of generic substitution: yes, the blue tablet is OK? [Editorial] Neurology. 2016;87(17):1754-1755.
102. Hwang TJ**, Carpenter D, Lauffenburger JC, Wang B**, Franklin JM, **Kesselheim AS**. Failure of investigational therapeutics in late-stage clinical development and publication of trial results**.** JAMA Internal Medicine 2016;176(12):1826-1833.
103. **Kesselheim AS**, Eddings W, Raj T, Campbell EG, Franklin JM, Ross KM, Fulchino LA, Avorn J, Gagne JJ. Physicians' trust in the FDA's use of product-specific pathways for generic drug approval. PLoS One 2016;11(10):e0163339.
104. Hwang TJ**, **Kesselheim AS**. Public referendum on drug prices in the US: will it bring relief? BMJ 2016;355:i5657.

105. Luo J**, Gagne JJ, Landon J, Avorn J, **Kesselheim AS**. Comparative effectiveness and safety of thalidomide and lenalidomide in patients with multiple myeloma in the United States of America: a population-based cohort study. European Journal of Cancer 2016;70:22-33.
106. **Kesselheim AS**, Treasure CL**, Joffe S. Biomarker-defined subsets of common diseases: policy and economic implications of Orphan Drug Act coverage. PLoS Medicine 2017;14(1):e1002190.
    - Herder M. What is the purpose of the Orphan Drug Act? PLoS Medicine 2017;14(1):e1002191.
107. Stern AD, Kramer DB**, Ouellet M, **Kesselheim AS**. Review times and adverse events for cardiovascular devices. Nature Biomedical Engineering 2017;1:0013.
108. **Kesselheim AS**, Rome BN**, Sarpatwari A**, Avorn J. Six-month market exclusivity extensions to promote research offer substantial returns for many drug makers. Health Affairs 2017;36(2):362-370.
    - Bronstein M, Kakkis E, Fajgenbaum D, Chambers C. For rare disease patients, a pathway to hundreds of new therapies. [Editorial] Health Affairs Blog. March 21, 2017. Available online at: https://www.healthaffairs.org/do/10.1377/hblog20170321.059289/full/
109. Rathi VK, Wang B, Ross JS, Downing NS, **Kesselheim AS**, Gray ST. Clinical evidence supporting US Food and Drug Administration premarket approval of high-risk otolaryngologic devices, 2000-2014. Otolaryngology Head & Neck Surgery 2017;156(2):285-288.
110. Rathi VK, Wang B, Ross JS, Downing NS, **Kesselheim AS**, Gray ST. Clinical evidence supporting US Food and Drug Administration approval of otolaryngologic prescription drug indications, 2005-2014. Otolaryngology Head & Neck Surgery 2017;156(4):683-692.
111. Gagne JJ, Polinski JM, Jiang W, Dutcher SK, Xie J, Lii J, Fulchino LA, **Kesselheim AS**. Outcomes associated with generic drugs approved using product-specific determinations of therapeutic equivalence. Drugs 2017;77(4):427-433.
112. **Kesselheim AS**, McGraw SA, Dejene SZ, Rausch P, Dal Pan GJ, Lappin BM, Zhou EH, Avorn J, Campbell EG. Patient and physician perceptions of drug safety information for sleep aids: a qualitative study. Drug Safety 2017;40(6):531-542.
113. Woloshin S, Schwartz LM, Dejene SZ, Rausch P, Dal Pan GJ, **Kesselheim AS**. Media coverage of FDA Drug Safety Communications about zolpidem: a quantitative and qualitative analysis. Journal of Health Communication 2017;22(5):365-372.
114. Luo J**, **Kesselheim AS**, Avorn J. Medicaid expenditures and estimated rebates for epinephrine autoinjectors, 2012 to 2016. JAMA Internal Medicine. 2017;177(5):734-736.
115. **Kesselheim AS**, Gagne JJ, Franklin JM, Eddings W, Fulchino LA, Campbell EG. Do patients trust the FDA?: A survey assessing how patients view the generic drug approval process. Pharmacoepidemiology and Drug Safety 2017;26(6):694-701.
116. Wang B**, Studdert DM, Sarpatwari A, Franklin JM, Landon J, **Kesselheim AS**. The effect of federal and state off-label marketing investigations on drug prescribing: the case of olanzapine. PLoS One 2017;12(4):e0175313.
117. Hwang TJ**, **Kesselheim AS**. Effect of US Food and Drug Administration's cardiovascular safety guidance on diabetes drug development. Clinical Pharmacology and Therapeutics 2017;102(2):290-296.
118. Davies BJ, Hwang TJ**, **Kesselheim AS**. Ensuring access to injectable generic drugs—the case of intravesical BCG for bladder cancer. New England Journal of Medicine 2017;376(15):1401-1403.
119. Sacks CA**, Avorn J, **Kesselheim AS**. The failure of solanezumab—how the FDA saved taxpayers billions. New England Journal of Medicine 2017;376(18):1706-1708.
120. Bollyky TJ, **Kesselheim AS**. Can drug importation address high generic drug prices? Brookings Institution White Paper. May 2 2017. Available at: https://www.brookings.edu/research/can-drug-

importation-address-high-generic-drug-prices/.

- Khan J. Elizabeth Warren on drugs. *National Review* January 4, 2019. Available from: https://www.nationalreview.com/2019/01/elizabeth-warren-generic-drugs-proposal-not-serious/

121. Dave C**, **Kesselheim AS**, Fox E, Hartzema AG. High generic drug prices and market competition levels: a retrospective cohort study. Annals of Internal Medicine 2017;167(3):145-151.
122. Fralick M**, Avorn J, **Kesselheim AS**. The price of crossing the border for medications. New England Journal of Medicine 2017;377(4):311-313.
    - Ashley DD. The price of crossing the border for medications. [Letter to the Editor] New England Journal of Medicine 2017;377(17):1699.
    - Fralick M**, Avorn J, **Kesselheim AS**. The price of crossing the border for medications. [Author reply] New England Journal of Medicine 2017;377(17):1699-1700.
123. Jain N**, Hwang TJ**, Franklin JM, **Kesselheim AS**. Association of the priority review voucher with neglected tropical disease drug and vaccine development. JAMA 2017;318(4):388-389.
124. Naci H**, Smalley KR, **Kesselheim AS**. Characteristics of preapproval and postapproval studies for drugs granted accelerated approval by the US Food and Drug Administration. JAMA 2017;318(7):626-636.
    - Califf RM. Balancing the need for access with the imperative for empirical evidence of benefit and risk. [Editorial] JAMA 2017;318(7):614-616.
    - Tanimoto T, Kosugi K, Tsuda K. [Letter to the Editor] Evidence required for drugs granted accelerated approval. JAMA 2017;318(24):2492-2493.
    - Naci H**, **Kesselheim AS**. Evidence required for drugs granted accelerated approval [Author Reply] JAMA 2017;318(24):2493-2494.
125. Mostaghim S**, Gagne JJ, **Kesselheim AS**. Safety-related label changes for new drugs after approval in the US through expedited regulatory pathways: retrospective cohort study. BMJ 2017;358:j3837.
126. **Kesselheim AS**, Donneyong M, Dal Pan GJ, Zhou EH, Avorn J, Schneeweiss S, Seeger JD. Changes in prescribing and healthcare resource utilization after FDA Drug Safety Communications involving zolpidem-containing medications. Pharmacoepidemiology and Drug Safety 2017;26(6):712-721.
127. Alpern JD, Zhang L, Stauffer WM, **Kesselheim AS**. Trends in pricing and generic competition within the oral antibiotic drug market in the United States. Clinical Infectious Diseases 2017;65(11):1848-1852.
128. Hwang TJ**, Darrow JJ**, **Kesselheim AS.** The FDA's expedited pathways and clinical development times for novel therapeutics, 2012-2016. JAMA 2017;318(21):2137-2138.
129. Hey SP**, Franklin JM, Avorn J, **Kesselheim** AS. Success, failure, and transparency in biomarker-based drug development: a case study of Cholesteryl Ester Transfer Protein inhibitors. Circulation Cardiovasc Quality and Outcomes. 2017;10(6):e003121.
130. Darrow JJ**, Avorn J, **Kesselheim AS**. Speed, safety, and industry funding — from PDUFA I to PDUFA VI. New England Journal of Medicine 2017;377(23):2278-2286.
131. Dave CV**, Hartzema A, **Kesselheim AS**. Prices of generic drugs associated with numbers of manufacturers. New England Journal of Medicine 2017;377(26):2597-2598.
132. Hwang TJ**, Sachs RE, **Kesselheim AS**. Public participation in drafting of the 21st Century Cures Act. Journal of Law, Medicine & Ethics 2017;45(2):212-220.
133. Sinha MS**, Freifeld CC, Brownstein JS, Donneyong MM, Rausch P, Lappin BM, Zhou EH, Dal Pan GJ, Pawar AM, Hwang TJ**, Avorn J, **Kesselheim AS**. Social media impact of the Food

and Drug Administration's drug safety communication messaging about zolpidem: mixed-methods analysis. JMIR: Public Health Surveillance 2018;4(1):e1.

134. Fralick M, **Kesselheim AS**, Avorn J, Schneeweiss S. Use of health care databases to support supplemental indications of approved medications. JAMA Internal Medicine 2018;178(1):55-63.
    - Califf RM. Comparison of observational data and the ONTARGET results for telmisartan treatment of hypertension: bull's-eye or painting the target around the arrow? [Editorial] JAMA Internal Medicine 2018;178(1):63-65.
135. Beall RF**, **Kesselheim AS**. Tertiary patenting on drug-device combination products in the United States. Nature Biotechnology 2018;36(2):142-145.
136. Bothwell LE**, Avorn J, Khan N, **Kesselheim AS**. Adaptive design clinical trials: a review of the literature and ClinicalTrials.gov. BMJ Open 2018;8(2):e018320.
137. Fralick M**, Avorn J, Franklin JM, Abdurrob A, **Kesselheim AS**. Application and impact of run-in studies. Journal of General Internal Medicine 2018;33(5):759-763.
138. Fralick M**, Avorn J, Franklin JM, Bartsch E, Abdurrob A, **Kesselheim AS**. Application and impact of run-in studies for the evaluation of statin efficacy and safety. Journal of General Internal Medicine 2018;33(6):792-794.
139. Gupta R, Bollyky T, Cohen M, Ross JS, **Kesselheim AS**. Availability of US off-patent drugs at risk for acute price increases or shortages from manufacturers approved by non-US regulators. BMJ 2018;360:k831.
    - Gupta R, **Kesselheim AS**. Importing drugs—a solution to high priced generics in the US. [Blog] The BMJ Opinion. 2018 Mar 19. Available from: http://blogs.bmj.com/bmj/2018/03/19/ravi-gupta-and-aaron-kesselheim-importing-drugs-a-solution-to-high-priced-generics-in-the-us/
140. Desai RJ, Sarpatwari A**, Dejene S, Khan NF, Lii J, Rogers JR, Dutcher SK, Raofi S, Bohn J, Connolly J, Fischer MA, **Kesselheim AS**, Gagne JJ. Differences in rates of switchbacks after switching from branded to authorized generic and branded to generic drug products: cohort study. BMJ. 2018;361:k1180.
141. Jung E**, Zettler PJ, **Kesselheim AS**. Prevalence of publicly available expanded access policies. Clinical Pharmacology and Therapeutics 2018;104(5):1016-1021.
142. Darrow JJ**, Avorn J, **Kesselheim AS**. The FDA's "Breakthrough Drug" designations: four years of experience. New England Journal of Medicine 2018;378(15):1444-1453.
    - Corrigan-Curay J, McKee AE, Stein P. Breakthrough-therapy designation—an FDA perspective. New England Journal of Medicine 2018;378(15):1457-1458.
    - Allen J. The breakthrough therapy designation for promising cancer drugs is good for patients. STAT: First Opinion. April 27, 2018. Available online at: https://www.statnews.com/2018/04/27/breakthrough-therapy-designation-helps-cancer-patients/
143. Hwang TJ**, Franklin JM, Chen CT, Lauffenburger JC, Gyawali B**, **Kesselheim AS**, Darrow JJ**. Efficacy, safety, and regulatory approval of Food and Drug Administration-designated breakthrough and nonbreakthrough cancer medicines. Journal of Clinical Oncology 2018;36(18):1805-1812
    - Kuderer NM, Lyman GH. Evolving landscape of US Food and Drug Administration Drug approval in the era of precision oncology: finding the right balance between access and safety. Journal of Clinical Oncology 2018;36(18):1773-1776.
    - Rawson NSB. New cancer breakthrough therapies at the United States Food and Drug Administration. Journal of Hospital Management Health Policy 2018;2:43.
144. Sarpatwari A**, Beall R**, Abdurrob A, He M, **Kesselheim AS**. Evaluating the impact of the Orphan Drug Act's seven-year market exclusivity period. Health Affairs 2018;37(5):732-737.

145. Sarpatwari A**, Lee M, Gagne JJ, Lu Z, Dutcher SK, Jiang W, Campbell EG, **Kesselheim AS**. Generic versions of narrow therapeutic index drugs: a national survey of pharmacists' substitution beliefs and practices. Clinical Pharmacology and Therapeutics 2018;103(6):1093-1099.
146. Pregelj L, Hwang TJ**, Siegel E, Barnard R, Hine D, Darrow JJ**, **Kesselheim AS**. Precision medicines have faster approvals based on fewer and smaller trials than other medicines. Health Affairs 2018;37(5):724-731.
147. Mundkur ML**, Franklin J, Huybrechts KF, Fischer MA, **Kesselheim AS**, Linder JA, Landon J, Patorno E. Changes in outpatient use of antibiotics by adults in the United States, 2006-2015. Drug Safety 2018;41(12):1333-1342.
148. Hwang TJ**, **Kesselheim AS**, Gyawali B**. Affordability and price increases of new cancer drugs in clinical guidelines, 2007-2016. JNCI Cancer Spectrum 2018;2(2):pky016.
149. Beall RF**, Darrow JJ**, **Kesselheim AS**. Patent term restoration for top-selling drugs in the USA. Drug Discovery Today 2019;24(1):20-25.
150. Gyawali B**, Hey SP**, **Kesselheim AS**. A comparison of response patterns for progression-free survival and overall survival following treatment for cancer with PD-1 inhibitors: a meta-analysis of correlation and differences in effect sizes. JAMA Network Open 2018;1(2):e180416.
151. Sinha MS**, Jain N**, Hwang T**, **Kesselheim AS**. Expansion of the Priority Review Voucher program under the 21st Century Cures Act: implications for innovation and public health. American Journal of Law and Medicine 2018;44:329-341.
152. Sacks CA**, Lee CC, **Kesselheim AS**, Avorn J. Medicare spending on brand-name combination medications vs their generic constituents. JAMA 2018;320(7):650-656.
153. Hernandez I, Sampathkumar S, Good CB, **Kesselheim AS**, Shrank WH. Changes in drug pricing after drug shortages in the United States. Annals of Internal Medicine 2019;170(1):74-76.
154. Sinha MS**, Najafzadeh M, Rajasingh EK, Love J, **Kesselheim AS**. Labeling changes and costs for clinical trials performed under the US Food and Drug Administration pediatric exclusivity extension, 2007 to 2012. JAMA Internal Medicine 2018;178(11):1458-1466.
    - Ross JS. Clinical trials—we get what we pay for. JAMA Internal Medicine 2018;178(11):1457.
155. Feldman WB**, Hey SP**, **Kesselheim AS**. A systematic review of the Food and Drug Administration's 'exception from informed consent' pathway. Health Affairs 2018;37(10):1605-1614.
156. Sinha MS**, **Kesselheim AS**. The Tax Cuts and Jobs Act of 2017 and the pharmaceutical industry. Journal of Law, Medicine & Ethics 2018;46(3):806-808.
157. Hwang TJ**, Orenstein L, **Kesselheim AS**, Bourgeois FT. Completion rate and reporting of mandatory pediatric postmarketing studies under the US Pediatric Research Equity Act. JAMA Pediatrics 2019;173(1):68-74.
    - Cohen-Wolkowiez M, Benjamin DK Jr. Development of therapeutics for children—a tricky balancing act. JAMA Pediatrics 2019;173(1):18-19.
158. Dave CV**, Pawar A, Fox ER, Brill G, **Kesselheim AS**. Predictors of drug shortages and association with generic drug prices: a retrospective cohort study. Value in Health 2018;21(11):1286-1290.
159. Gyawali B**, **Kesselheim AS**, D'Andrea E**. Does *Helicobacter pylori* eradication therapy to prevent gastric cancer increase all-cause mortality? International Journal of Cancer 2019;144(2):411-412.
160. Beall RF**, Darrow JJ**, **Kesselheim AS**. A method for approximating future entry of generic drugs. Value in Health 2018;21(12):1382-1389.

161. **Kesselheim AS**, Woloshin S, Lu Z, Tessema FA, Ross KM, Schwartz LM. Internal medicine physicians' financial relationships with industry: an updated national estimate. Journal of General Internal Medicine 2019;34(2):195-197.
162. Sarpatwari A**, Gagne JJ, Lu Z, Campbell EG, Carman WJ, Enger CL, Dutcher SK, Jiang W, **Kesselheim AS**. A survey of patients' perceptions of pill appearance and responses to changes in appearance for four chronic disease medications. Journal of General Internal Medicine 2019;34(3):420-428.
163. Rogers JR, Sarpatwari A**, Desai RJ, Bohn JM, Khan NF, **Kesselheim AS**, Fischer MA, Gagne JJ, Connolly JG. Effect of lawyer-submitted reports on signals of disproportional reporting in the Food and Drug Administration's Adverse Event Reporting System. Drug Safety 2019;42(1):85-93.
164. Hwang TJ**, Jain N, Lauffenburger JC, Vokinger KN**, **Kesselheim AS**. Analysis of proposed Medicare Part B to Part D shift with associated changes in total spending and patient cost-sharing for prescription drugs. JAMA Internal Medicine 2019;179(3):374-380.
    - Crosson FJ, Christianson JB. Managing the cost of Medicare Part B drugs: implications for the program and beneficiaries. JAMA Internal Medicine 2019;179(3):380-382.
165. **Kesselheim** AS, Woloshin S, Lu Z, Tessema FA, Ross KM, Schwartz LM. Physicians' perspectives on FDA approval standards and off-label drug marketing. JAMA Internal Medicine 2019;179(5):707-709.
166. Luo J**, Khan NF, Manetti T, Rose J, Kaloghlian A, Gadhe B, Jain SH, Gagne JJ, **Kesselheim AS**. Association between implementation of a health plan program for switching from analog to human insulin with glycemic control among Medicare beneficiaries with type 2 diabetes. JAMA 2019;321(4):374-384.
    - Lipska KJ. Insulin analogues for type 2 diabetes. JAMA 2019;321(4):350-351.
167. Hwang TJ**, Bourgeois FT, Franklin JM, **Kesselheim AS**. Impact of the priority review voucher program on drug development for rare pediatric diseases. Health Affairs 2019;38(2):313-319.
168. Beall RF**, Hwang TJ**, **Kesselheim AS**. Major events in the life course of new drugs, 2000-2016. New England Journal of Medicine 2019;380(11):e12.
169. Darrow JJ**, Beall RF**, **Kesselheim AS**. The generic drug industry embraces a faster, cheaper pathway for challenging patents. Applied Health Economics and Health Policy 2019;17(1):47-54.
170. Desai RJ, Sarpatwari A**, Dejene S, Khan NF, Lii J, Rogers JR, Dutcher SK, Raofi S, Bohn J, Connolly JG, Fischer MA, **Kesselheim AS**, Gagne JJ. Comparative effectiveness of generic and brand-name medication use: A database study of US health insurance claims. PLoS Medicine 2019;16(3):e1002763.
171. Beall RF**, **Kesselheim AS**, Sarpatwari A**. New drug formulations and their respective generic entry dates. Journal of Managed Care and Specialty Pharmacy 2019;25(2):218-224.
172. Bourgeois FT, Graham DA, **Kesselheim AS**, Randolph AG. Cost implications of escalating intravenous acetaminophen use in children. JAMA Pediatrics 2019;173(5):489-491.
173. D'Andrea E**, Hey SP**, Ramirez CL, **Kesselheim AS**. Assessment of the role of niacin in managing cardiovascular disease outcomes: a systematic review and meta-analysis. JAMA Network Open 2019;2(4):e192224.
    - Lyles A. Niacin: time to revisit that FDA indication. Medpage Today April 19 2019. Available from: https://www.medpagetoday.com/cardiology/atherosclerosis/79281
174. Beall RF**, Darrow JJ**, **Kesselheim AS**. Approximating future generic entry for new drugs. Journal of Law, Medicine & Ethics 2019;47(1):177-182.

175. Fischer MA, **Kesselheim AS**, Lu Z, Tessema FA**, Ross KM, Avorn J. Physician perceptions of step therapy prescribing requirements. Journal of Managed Care Pharmacy 2019;25(11):1210-1224.
176. Gyawali B**, Hey SP**, **Kesselheim AS**. Assessment of the clinical benefit of cancer drugs receiving accelerated approval. JAMA Internal Medicine 2019;179(7):906-913.
    - Lehman R, Gross C. An international perspective on drugs for cancer: the best of times, the worst of times. JAMA Internal Medicine 2019;179(7):913-914.
    - DiMagno SSP, Glickman A, Emanuel EJ. Accelerated approval of cancer drugs—righting the ship of the US Food and Drug Administration. JAMA Internal Medicine 2019;179(7):922-923.
177. Dave C**, Brill G, **Kesselheim AS**. Changes in price for generic drugs in the United States, 2008-2016. Journal of General Internal Medicine 2019;34(9):1677-1679.
178. Vokinger KN**, **Kesselheim AS**. Characteristics of trials and regulatory pathways leading to US approval of innovative vs. non-innovative oncology drugs. Health Policy 2019;123(8):721-727.
179. Beall RF**, Hwang TJ**, **Kesselheim AS**. Pre-market development times for biologic versus small-molecule drugs. Nature Biotechnology 2019;37(7):708-711.
180. Stern AD, Pietrulla F, Herr A, **Kesselheim AS**, Sarpatwari A**. The impact of price regulation on the availability of new drugs in Germany. Health Affairs 2019;38(7):1182-1187.
181. Sarpatwari A**, DiBello J, Zakarian M, Najafzadeh M, **Kesselheim AS**. Competition and price among brand-name drugs in the same class: a systematic review of the evidence. PLoS Medicine 2019;16(7):e1002872.
182. Feldman WB**, Hey SP**, Franklin JM, **Kesselheim AS**. Surveying the community in "exception from informed consent" trials. JAMA Network Open 2019;2(7):e197591.
    - Lanspa MJ, Fan E, Morris AH. How should we apply the wisdom of the crowd to clinical trials with exception from informed consent? JAMA Network Open 2019;2(7):e197569.
183. Li DG, Najafzadeh M, **Kesselheim AS**, Mostaghimi A. Spending on WHO essential medicines in Medicare Part D, 2011-2015. BMJ 2019;366:l4257.
184. Growdon MR, Sacks CA**, **Kesselheim AS**, Avorn J. Potential Medicare savings from generic substitution and therapeutic interchange of ACE inhibitors and angiotensin-II-receptor blockers. JAMA Internal Medicine 2019;179(12):1712-1714.
185. Rajan PV**, Holtzman JN, **Kesselheim AS**, Yeh RW, Kramer DB. The landscape of cardiovascular device registries in the United States. Journal of the American Heart Association 2019;8(11):e012756.
186. **Kesselheim AS**, Sinha MS**, Rausch P, Lu Z, Tessema FA, Lappin BM, Zhou EH, Dal Pan GJ, Zwanziger L, Ramanadham A, Loughlin A, Enger C, Avorn J, Campbell EG. Patients' knowledge of key messaging in Drug Safety Communications for zolpidem and eszopiclone: a national survey. Journal of Law, Medicine & Ethics 2019;47:430-441.
187. Gyawali B**, Tessema FA, Jung EH, **Kesselheim AS**. Assessing the justification, funding, success, and survival outcomes of randomized non-inferiority trials of cancer drugs: a systematic review and pooled analysis. JAMA Network Open 2019;2(8):e199570.
188. Luo J**, Kulldorff M, Sarpatwari A**, Pawar A, **Kesselheim AS**. Variation in prescription drug prices by retail pharmacy type: a national cross-sectional study. Annals of Internal Medicine 2019;171(9):605-611.
189. Gyawali B**, Bouche G, Pantziarka P, **Kesselheim AS**, Sarpatwari A**. Lung cancer survival gains: contributions of academia and industry. Journal of Law, Medicine & Ethics 2019;47(3):465-467.

190. Hey SP**, Feldman WB**, Jung EH, D'Andrea E, **Kesselheim AS**. Surrogate endpoints and drug regulation: what is needed to clarify the evidence. Journal of Law, Medicine & Ethics 2019;47(3):381-387.
191. Vokinger KN**, **Kesselheim AS**. Application of orphan drug designation to cancer treatments (2008-2017): a comprehensive and comparative analysis of the US and EU. BMJ Open 2019;9(10):e028634.
192. Jiao K, Gupta R, Fox E, **Kesselheim AS**, Ross JS. Characteristics of recent generic drug approvals by the U.S. Food and Drug Administration. JAMA Network Open 2019;2(10):e1913029.
193. Fralick M**, Schneeweiss S, Wallis CJD, Jung EH**, **Kesselheim AS**. Desmopressin and the risk of hyponatremia: a population-based cohort study. PLoS Medicine 2019;16(10):e1002930.
194. Nayak RK**, Avorn J, **Kesselheim AS**. Public support for late-stage new drug discovery; cohort study. BMJ 2019;367:l5766.
195. Jung EH**, Sarpatwari A**, **Kesselheim AS**, Sinha MS**. FDA and EMA biosimilar approvals. Journal of General Internal Medicine 2019 Dec 2. doi: 10.1007/s11606-019-05408-6.
196. Hwang TJ**, Sinha MS**, Dave CV**, **Kesselheim AS**. Prescription opioid epidemic and trends in the clinical development of new pain medications. Mayo Clinic Proceedings 2019;94(12):2437-2443.
197. Schwartz LM, Woloshin S, Lu Z, Ross KM, Tessema FA**, Peter D, **Kesselheim AS**. Randomized study of providing evidence context to mitigate physician misinterpretation arising from off-label drug promotion. Circulation Cardiovascular Quality and Outcomes. 2019;12(11):e006073.
198. Hey SP**, **Kesselheim AS**, Patel P, Mehrotra P, Powers JH 3rd. US Food and Drug Administration recommendations on the use of surrogate measures as end points in new anti-infective drug approvals. JAMA Internal Medicine 2020;180(1):131-138.
    - Volberding P, Chambers HF. Antimicrobial drug development efficiency and surrogate markers of clinical benefit. JAMA Internal Medicine 2020;180(1):138-139.
199. Feldman WB**, Avorn J, **Kesselheim AS**. Potential Medicare savings on inhaler prescriptions through use of negotiated prices and a defined formulary. JAMA Internal Medicine 2020;180(3):454-456.
200. Rome BN**, **Kesselheim AS**. Transferrable market exclusivity extensions to promote antibiotic development: an economic analysis. Clinical Infectious Diseases 2020;71(7):1671-1675.
    - Boucher HW, File TM, Fowler VG, Jezek A, Rex JH, Outterson K. Antibiotic Development Incentives That Reflect Societal Value of Antibiotics. Clinical Infectious Diseases 2021;72(9):e420-e421.
    - Rome BN**, **Kesselheim AS**. Reply to Boucher, et al. Clinical Infectious Diseases 2021;72(9):e422-e423.
201. Darrow JJ**, Avorn J, **Kesselheim AS**. FDA approval and regulation of pharmaceuticals, 1983-2018. JAMA 2020;323(2):164-176.
    - Sharfstein JM. Reform at the FDA—in need of reform. JAMA 2020;323(2):123-124.
202. Jung EH**, Sarpatwari A**, **Kesselheim AS**. Novelty of active ingredients in high-cost brand-name drugs. Journal of General Internal Medicine 2020;35(7):2219-2221.
203. Gyawali B**, D'Andrea E**, Franklin JM, **Kesselheim AS**. Response rates and durations of response for biomarker based cancer drugs in non-randomized versus randomized trials. Journal of the National Comprehensive Cancer Network 2020;18(1):36-43.
204. Lin KJ, Dvorin E, **Kesselheim AS**. Prescribing systemic steroids for acute respiratory tract infections in US outpatient settings: a nationwide population-based cohort study. PLoS Medicine 2020;17(3): e1003058.

205. Barenie RE**, Gagne JJ, **Kesselheim AS**, Pawar A, Tong A, Luo J, Bateman BT. Rates and costs of dispensing naloxone to patients at high-risk for opioid overdose in the United States, 2014-2018. Drug Safety 2020;43(7):669-675.
206. Fralick M**, Gagne JJ, Patorno E, Levin R, **Kesselheim AS**. Using data from routine care to estimate the effectiveness and potential limitations of value-based agreements for diabetes medications. Value in Health 2020;23(4):434-440
207. Hey SP**, D'Andrea E**, Gyawali B**, Franklin JM, Kanagaraj M, **Kesselheim AS**. A systematic review and meta-analysis of bevacizumab in first-line metastatic breast cancer: lessons for the research and regulatory enterprises. Journal of the National Cancer Institute 2020;112(4):335-342.
208. Hey SP**, Gerlach CV, Dunlap G, Prasad V, **Kesselheim AS**. The evidence landscape in precision medicine. Science Translational Medicine 2020;12(540):eaaw7745.
209. Vokinger KN**, Hwang TJ**, Grischott T, Reichert S, Tibau A, Rosemann TJ, **Kesselheim AS**. Prices and clinical value of cancer drugs in the US and Europe—a cost-benefit analysis. Lancet Oncology 2020;21(5):664-670.
210. Gyawali B**, Hey SP**, **Kesselheim AS**. Evaluating the evidence behind the surrogate measures included in the FDA Table of Surrogate Endpoints as supporting approval of cancer drugs: a cross-sectional study of breast cancer. Eclinicalmedicine 2020;21:100332.
211. Liu M, Caputi TL, Dredze M, **Kesselheim AS**, Ayers JW. Internet searches for unproven COVID-19 therapies in the United States. JAMA Internal Medicine 2020;180(8):1116-1118.
212. Feldman WB**, Rome BN**, Lehman LS, **Kesselheim AS**. Estimation of Medicare Part D spending on insulin for patients with diabetes using negotiated prices and a defined formulary. JAMA Internal Medicine 2020;180(4):597-601.
213. Dave C**, Sinha MS**, Beall RF**, **Kesselheim AS**. Estimating the cost of delayed generic entry to Medicaid. Health Affairs 2020;39(6):1011–1017.
214. Darrow JJ**, Najafzadeh M, Stefanini K, **Kesselheim AS**. Regulatory approval characteristics of antimicrobial vs. non-antimicrobial products, 1984-2018: an evaluation of FDA flexibilities. Lancet Infectious Diseases 2020;20(7):e159-e164.
215. Lauenroth VD, **Kesselheim AS**, Sarpatwari A**, Stern AD, Lessons from the impact of price regulation on the pricing of anticancer drugs in Germany. Health Affairs 2020;39(7):1185-1193.
216. Rome BN**, Tessema FA**, **Kesselheim AS**. US spending associated with transition from daily to three-times-weekly glatiramer acetate. JAMA Internal Medicine 2020;180(9):1165-1172.
    - Claytor JD, Redberg RF. Product-hopping—an expensive and wasteful practice. JAMA Internal Medicine 2020;180(9):1154-1155.
217. Barenie RE**, **Kesselheim AS**, Gagne JJ, Lu Z, Campbell EG, Dutcher SK, Jiang W, Sarpatwari A**. Preferences for and experiences with pill appearance changes: national surveys of patients and pharmacists. American Journal of Managed Care 2020;26(8):340-347
218. Molto C, Hwang TJ**, Andres M, Borrell M, Gich I, Barnadas A, Amir E, **Kesselheim AS**, Tibau A. Clinical benefit and cost of breakthrough cancer drugs approved by the US Food and Drug Administration. Cancer 2020 Jul 22. doi: 10.1002/cncr.33095.
219. Liu M**, MacKenna B, Feldman WB**, Walker AJ, Avorn J, **Kesselheim AS**, Goldacre B. Projected spending on the costliest brand-name drugs in English primary care given US Medicare Part D Prices, 2018. Journal of the Royal Society of Medicine 2020;113(9):350-359.
220. Beall R**, Ronksley P, Wick J, Darrow JJ**, Sarpatwari A**, **Kesselheim AS**. Comparing onset of biosimilar versus generic competition in the United States. Clinical Pharmacology and Therapeutics 2020;108(6):1308-1314.
221. Vreman RA**, Naci H**, Goettsch W, Mantel-Teeuwisse A, Schneeweiss S, Leufkens HGM, **Kesselheim AS**. Decision-making under uncertainty: comparing regulatory and health technology

assessment reviews of medicines in the US and Europe. Clinical Pharmacology and Therapeutics 2020;108(2):350-357.

222. Lee CC**, **Kesselheim AS**, Sarpatwari A**. Clinical development times for US biosimilars. Mayo Clinical Proceedings 2020;95(10):2152-2154.
223. D'Andrea E, **Kesselheim AS**, Franklin JM, Jung E, Hey SP**, Patorno E. Heterogeneity of antidiabetic treatment effect on the risk of major adverse cardiovascular events in type 2 diabetes: a systematic review and meta-analysis Cardiovascular Diabetology 2020;19:154.
224. Rand LZ**, **Kesselheim AS**. An international review of health technology assessment approaches to prescription drugs and their ethical principles. Journal of Law, Medicine & Ethics 2020;48(3):583-594.
225. Naci H**, **Kesselheim AS**, Røttingen J-A, Salanti G, Vandvik PO, Cipriani A. Producing and using timely comparative evidence on drugs: key lessons from more than a thousand clinical trials on COVID-19 therapeutics. BMJ 2020;371:m3869.
226. Fralick M**, Bartsch E, Darrow JJ**, **Kesselheim AS**. Understanding when real world data can be used to replicate a clinical trial: a cross-sectional study of medications approved in 2011. Pharmacoepidemiology and Drug Safety 2020;29(10):1273-1278.
227. Hwang TJ**, Ross JS, Vokinger KN**, **Kesselheim AS**. Association between FDA and EMA expedited approval programs and therapeutic value of new medicines: retrospective cohort study. BMJ. 2020;371:m3434.
228. Druedahl LC, Almarsdóttir AB, Kälvemark Sporrong S, De Bruin ML, Hoogland H, Minssen T, van de Weert M, **Kesselheim AS**, Sarpatwari A**. A qualitative study of biosimilar manufacturer and regulator perceptions on intellectual property and abbreviated approval pathways. Nature Biotechnology 2020;38(11):1253-1256.
229. Sacks CA**, van de Wiele VL**, Fulchino LA, Patel L, **Kesselheim AS**, Sarpatwari A**. Assessing variation in state regulation of generic drug and interchangeable biologic substitution. JAMA Internal Medicine 2021;181(1):16-22.
    - Crosson FJ. Addressing the cost of biologic and specialty drugs. JAMA Internal Medicine 2021;181(1):22-23.
    - Cho SK, Jun H. Substitution of Generic Drugs and Biosimilars. JAMA Internal Medicine 2021;181(4):567-568.
    - Sarpatwari A, **Kesselheim AS**, Sacks CA Substitution of Generic Drugs and Biosimilars—Reply. JAMA Internal Medicine 2021;181(4):568.
230. Barenie RE**, Tessema FA**, Avorn J, **Kesselheim AS**. Public funding for transformative drugs: the case of sofosbuvir. Drug Discovery Today 2021;26(1):273-281.
231. Lee CC**, **Kesselheim AS**, Avorn J. Variations in generic combination opioid use across state Medicaid programs. Journal of General Internal Medicine 2021;36(10):3240-3242.
232. Rome BN**, **Kesselheim AS**. Federal spending on off-patent drugs that lack generic competition. Journal of General Internal Medicine 2021;36(3):821-823.
233. Feldman WB**, Rome BN**, Raimond VC, Gagne JJ, **Kesselheim AS**. Estimating rebates and other discounts received by Medicare Part D. JAMA Health Forum 2021;2(6):e210626.
234. Sarpatwari A**, He M, Tessema FA**, Gagne JJ, **Kesselheim AS**. Changes in erythropoiesis stimulating agent use under a Risk Evaluation and Mitigation Strategy (REMS) program. Drug Safety 2021;44(3):327-335.
235. Sarpatwari A**, LaPidus AK, **Kesselheim AS**. Revisiting the National Institutes of Health fair pricing condition: promoting the affordability of drugs developed with government support. Annals of Internal Medicine 2020;172(5):348-350.

236. **Kesselheim AS**, Darrow JJ**, Kulldorff M, Brown BL**, Mitra-Majumdar M**, Lee CC**, Moneer O, Avorn J. An overview of vaccine development, approval, and regulation, with implications for COVID-19. Health Affairs 2021;40(1):25-32.
237. Sahragardjoonegani B, Beall RF**, **Kesselheim AS**, Hollis A. Repurposing existing drugs for new uses: a cohort study of the frequency of FDA-granted new indication exclusivities since 1997. Journal of Pharmaceutical Policy and Practice 2021;14(1):3.
238. Rome BN**, Lee CC**, **Kesselheim AS**. Market exclusivity length for drugs with new generic or biosimilar competition, 2012-2018. Clin Pharmacology & Therapeutics 2021;109(2):367-371.
239. Beall RF**, Quinn AE, **Kesselheim AS**, Tessema FA**, Sarpatwari A**. Generic competition for drugs treating rare diseases. Journal of Law, Medicine and Ethics 2020;48(4):789-795.
240. Feldman WB**, Gagne JJ, **Kesselheim AS**. Trends in Part D inhaler spending, 2012-2018. Annals of the American Thoracic Society. 2021;18(3):548-550.
241. Barenie RE**, **Kesselheim AS**. Buprenorphine for opioid use disorder: the role of public funding in its development. Drug and Alcohol Dependence 2021;219:108491.
    - O'Keeffe C, Vocci FJ, Leshner A. Letter to the Editor regarding: Buprenorphine for opioid use disorder: The role of public funding in its development (by Barenie and Kesselheim, 2020). Drug and Alcohol Dependence 2021:108644.
    - Barenie RE**, **Kesselheim AS**. Public funding and the importance of reasonable pricing for buprenorphine. Drug and Alcohol Dependence 2021:108643.
242. Fox ER, **Kesselheim AS**. The certainty of uncertainty for a global supply chain. American Journal of Health-System Pharmacy 2021;78(6);5-7.
243. Cherla A, Naci H**, **Kesselheim AS**, Gyawali B**, Mossialos E. Assessment of coverage in England of cancer drugs qualifying for US Food and Drug Administration accelerated approval. JAMA Internal Medicine 2021;181(4):490-498.
    - Prasad V, Kim MS. Approval and coverage of cancer drugs in England, Canada, and the US. JAMA Internal Medicine 2021;181(4):509-510.
244. Barenie RE**, **Kesselheim AS**, Tsacogianis T, Fischer MA. Associations between copays, coverage limits for opioid use disorder medications, and prescribing in Medicaid, 2018. Medical Care 2021;59(3):266-272.
245. Rome BN**, Gagne JJ, Avorn J, **Kesselheim AS**. Non-warfarin oral anticoagulant copayments and adherence in atrial fibrillation: a population-based cohort study. American Heart Journal 2021;233:109-121.
246. Liu S**, Mello MM, **Kesselheim AS**. Prospects for enforcing prohibitions on off-label drug promotion after United States v. Caronia: an analysis of litigated cases. Journal of Health Politics, Policy, and Law 2021:8893571.
247. Gyawali B**, D'Andrea E, Franklin JM, **Kesselheim AS**. A correlation analysis to assess event-free survival as a trial-level surrogate for overall survival in early breast cancer. EClinicalMedicine 2021;32:100730.
248. **Kesselheim AS**, Hwang TJ**, Avorn J. Paying for prescription drugs in the new administration. JAMA 2021;325(9):819-820.
249. Walsh BS**, Sarpatwari A**, Rome BN**, **Kesselheim AS.** Frequency of first generic drug approvals with "skinny labels" in the United States. JAMA Internal Med 2021;181(7):995-997.
250. Gowda V, Beall RF**, **Kesselheim AS**, Sarpatwari A**. Identifying potential prescription drug product hopping. Nature Biotechnology 2021;39(4):414-417.
251. Sarpatwari A**, Mitra-Majumdar M, Bykov K, Avorn J, Woloshin S, Toyserkani GA, LaCivita C, Manzo C, Zhou EH, Pinnow E, Dal Pan GJ, Gagne JJ, Huybrechts KF, Feldman WB**, Chin K, **Kesselheim AS**. A multi-modal approach to evaluate the impact of Risk Evaluation and Mitigation Strategy (REMS) programs. Drug Safety 2021;44(7):743-751.

252. Moneer O**, Lee CC**, Avorn J, **Kesselheim AS**. Characteristics of postmarketing studies for vaccines approved by the US Food and Drug Administration, 2006-2020. JAMA Network Open 2021;4(4):e218530.
253. Sarpatwari A**, Tessema FA**, Zakarian M, Najafzadeh MN, **Kesselheim AS.** Diabetes drugs: list price increases were not always reflected in net price; impact of brand competition unclear. Health Affairs 2021;40(5):772-778.
254. Patel AN, **Kesselheim AS**, Rome BN**. Frequency of generic drug price spikes and impact on Medicaid spending. Health Affairs 2021;40(5):779-785.
255. Rome BN**, Feldman WB**, Desai RJ, **Kesselheim AS**. Correlation between changes in brand-name drug prices and patient out-of-pocket costs. JAMA Network Open 2021;4(5):e218816.
256. Raimond V, Mousquès J, Avorn J, **Kesselheim AS**. Characteristics of clinical trials launched early in the COVID-19 pandemic in the US and in France. Journal of Law, Medicine & Ethics 2021;49(1):139-151.
257. Raimond VC, Feldman WB**, Rome BN**, **Kesselheim AS**. Why France spends less than the United States on drugs: a comparative study of drug pricing and pricing regulation. Milbank Quarterly 2021;99(1):240-272.
258. Kannappan S, Darrow JJ**, **Kesselheim AS**, Beall RF**. The timing of 30-month stay expirations and generic entry: a cohort study of first generics, 2013-2020. Clinical and Translational Science 2021;14(5):1917-1923.
259. Pregelj L, Darrow JJ**, **Kesselheim AS**, Hine D. Assessing the impact of FDA Breakthrough Therapy designation timing on trial characteristics and development speed. Clinical Pharmacology and Therapeutics 2021;110(4):1018-1024.
260. Rome BN**, Gagne JJ, **Kesselheim AS**. Association of California's prescription drug coupon ban with generic drug use. JAMA 2021;325(23):2399-2402.
261. Rome BN**, Lee CC**, Gagne JJ, **Kesselheim AS**. Factors associated with generic drug uptake in the US, 2012-2017. Value in Health 2021;24(6):804-811.
262. Gunter SN**, **Kesselheim AS**, Rome BN**. Market exclusivity and changes in competition and prices resulting from the FDA's Unapproved Drug Initiative. JAMA Internal Medicine 2021;181(8):1124-1126.
263. Vokinger KN**, Hwang TJ**, Reichert S, Grischott T, Tibau A, Rosemann TJ, **Kesselheim AS**. Analysis of launch and post-approval cancer drug pricing, clinical benefit, and policy impact in the US and Europe. JAMA Oncology 2021;7(9):e212026.
264. Lee CC**, Najafzadeh M, **Kesselheim AS**, Sarpatwari A**. Costs to Medicare of delayed adalimumab biosimilar availability. Clinical Pharmacology & Therapeutics 2021;110(4):1050-1056.
    - Arad N, Kroetsch A, McClellan M. Overcoming barriers to biosimilar adoption: commentary on "Cost to Medicare of delayed adalimumab biosimilar availability". Clinical Pharmacology and Therapeutics 2022;112(1):25-27.
265. Nayak R**, Lee CC**, Avorn J, **Kesselheim AS**. Public-sector contributions to novel biologic drugs. JAMA Internal Medicine 2021;181(11):1522-1525.
266. Van de Wiele VL**, **Kesselheim AS**, Sarpatwari A**. Barriers to US biosimilar market growth: lessons from biosimilar patent litigation. Health Affairs 2021;40(8):1198-1205.
267. Bendicksen L**, Rome BN**, Avorn J, **Kesselheim AS**. Pursuing value-based prices for drugs: a comprehensive comparison of state prescription drug pricing boards. Milbank Quarterly 2021;99(4):1162-1197.
268. Darrow JJ**, Avorn J, **Kesselheim AS.** FDA regulation and approval of medical devices: 1976-2020. JAMA 2021;326(5):420-432.

269. Beall RF**, Hollis A, **Kesselheim AS**, Spackman E. Reimagining pharmaceutical market exclusivities: Should the duration of guaranteed monopoly periods be value-based? Value in Health 2021;24(9):1328-1334.
270. Rand LZ**, **Kesselheim AS**. International reference pricing for prescription drugs: a landscape analysis. Journal of Managed Care and Specialty Pharmacy 2021;27(9):1309-1313.
271. Rome BN**, Avorn J, **Kesselheim AS**. Characteristics of US patients and prescribers using hydroxychloroquine during the Covid-19 pandemic. Journal of General Internal Medicine 2021;36(12):3918-3921.
272. Gyawali B**, Rome BN**, **Kesselheim AS**. The regulatory and clinical consequences of negative confirmatory trials of accelerated approval cancer drugs: a retrospective observational study. BMJ 2021;374:n1959.
273. Barenie RE**, Darrow JJ**, Avorn J, **Kesselheim AS**. Discovery and development of pregabalin (Lyrica): the role of public funding. Neurology 2021;97(17):e1653-e1660.
274. Rome BN**, Feldman WB**, **Kesselheim AS**. Medicare spending on drugs with accelerated approval, 2015-2019. JAMA Health Forum 2021;2(12):e213937.
275. Rome BN**, **Kesselheim AS**. Raising Medicaid rebates for drugs with accelerated approval. Health Affairs 2021;40(12):1935-1942.
276. Beall RF**, **Kesselheim AS**, Hollis A. Pre-market development times for innovative vaccines – to what extent are the COVID-19 vaccines outliers? Clinical Infectious Dis 2022;74(2):347-351.
277. Hwang TJ**, Vokinger KN**, **Kesselheim AS.** New treatments for migraine-therapeutic ratings and comparative coverage in the US, Canada, and Europe. JAMA Internal Medicine 2022;182(2):101-102.
278. Feldman WB**, Rome BN**, Brown BL**, **Kesselheim AS.** Payer-specific negotiated prices for prescription drugs at top-performing US hospitals. JAMA Internal Med 2022;182(1):83-86.
279. Walsh BS**, Rome BN**, Sarpatwari A**, **Kesselheim AS**. Indication-specific generic uptake of imatinib demonstrates the impact of skinny labeling. Journal of Clinical Oncology 2022;40(10):1102-1110.
280. Frank RG, Shahzad M, **Kesselheim AS**, Feldman WB**. Biosimilar competition: early learning. Journal of Health Economics 2022;31(4):647-663.
281. Khorrami P, Sinha MS**, Bhanja A, Allen HL, **Kesselheim AS**, Sommers BD. Differences in diabetic prescription drug utilization and costs among patients with diabetes enrolled in Colorado marketplace and Medicaid plans, 2014-2015. JAMA Network Open 2022;5(1):e2140371.
282. Gunter S, **Kesselheim AS**, Rome BN**. Characteristics and Medicaid spending on drugs marketed without US Food and Drug Administration approval in 2020. JAMA Internal Medicine 2022;182(3):342-345.
283. Van de Wiele VL**, **Kesselheim AS**, Sarpatwari A**. The characteristics of patents impacting availability of biosimilars. Nature Biotechnology 2022;40(1):22-25.
284. Sarpatwari A**, Brown BL**, McGraw SA, Dejene SZ, Abdurrob A, Santiago Ortiz AJ, **Kesselheim AS.** Patient and caregiver experiences with and perceptions of Risk Evaluation and Mitigation Strategy programs with elements to assure safe use. JAMA Network Open 2022;5(1):e2144386.
285. Bloomfield D**, D'Andrea E, Nagar S**, **Kesselheim A.** Characteristics of clinical trials evaluating biosimilars in the treatment of cancer: a systematic review and meta-analysis. JAMA Oncology 2022;8(4):537-545.
286. Dhruva SS, Darrow JJ**, **Kesselheim AS**, Redberg RF. Experts' views on FDA regulatory standards for drug and high-risk medical devices: implications for patient care. Journal of General Internal Medicine 2022;37(16):4176-4182.

287. Moneer O, Brown BL, Avorn J, Darrow JJ**, Mitra-Majumdar M, Joyce KW, Ross M, Pham C, **Kesselheim AS.** New drug postmarketing requirements and commitments in the US: a systematic review of the evidence. Drug Safety 2022;45(4):305-318.
288. Van de Wiele VL**, Hammer M, Parikh R, Feldman WB**, Sarpatwari A**, **Kesselheim AS.** Competition law and pricing among biologic drugs: the case of VEGF therapy for retinal diseases. Journal of Law and Biosciences 2022;9(1):lsac001.
289. Vokinger KN**, Hwang TJ**, Carl DL, Laube Y, Ludwig W-D, Naci H, **Kesselheim AS**. Price changes and within-class competition of cancer drugs in the USA and Europe: a comparative analysis. Lancet Oncology 2022;23(4):514-520.
290. Dhruva SS, Darrow JJ**, **Kesselheim AS**, Redberg RF. Strategies to manage drugs and devices approved based on limited evidence: results of a modified Delphi panel. Clinical Pharmacology and Therapeutics 2022;111(6):1307-1314.
291. Vokinger KN**, Hwang TJ**, Glaus CEG, **Kesselheim AS**. Therapeutic value assessments of novel medicines in the US and Europe, 2018-2019. JAMA Network Open 2022;5(4):e226479.
292. Naci H, Kyriopoulos I, Feldman WB**, Hwang TJ**, **Kesselheim AS**, Chandra A. Coverage of New Drugs in Medicare Part D. Milbank Quarterly 2022;100(2):562-588.
293. Feldman DR**, Avorn J, **Kesselheim AS**. The FDA's use of extrapolation in new drug approvals on the basis of disease severity, subtype, and other medication use: a cross-sectional analysis. JAMA Network Open 2022;5(4):e227958.
    - Ramachandran R, Ross JS. FDA indication extrapolations—allowing flexibility while providing greater clarity. JAMA Network Open 2022;5(4):e227961.
294. Rome BN**, Sarpatwari A**, **Kesselheim AS**. State laws and generic substitution in the year after new generic competition. Value in Health 2022;25(10):1736-1742.
295. Feldman WB**, Bloomfield D**, Beall RF**, **Kesselheim AS**. Patents and regulatory exclusivities on inhalers for asthma and COPD, 1986-2020. Health Affairs 2022;41(6):787-796.
    - Hemphill CS, Sampat BN. Fixing the FDA's Orange Book. Health Affairs 2022;41(6):797-800.
    - Feldman R. Understanding 'evergreening': making minor modifications of existing medications to extend protections. Health Affairs 2022;41(6):801-804.
296. Bloomfield D**, Lu Z, **Kesselheim AS.** Improving the quality of US drug patents through international awareness. BMJ 2022;377:e068172.
297. Mitra-Majumdar M**, Gunter SJ, **Kesselheim AS**, Brown BL**, Joyce KW, Ross M, Pham C, Avorn J, Darrow JJ**. Analysis of supportive evidence for US Food and Drug Administration approvals of novel drugs in 2020. JAMA Network Open 2022;5(5):e2212454.
298. Cherla A, Mossialos E, Salcher-Konrad M, **Kesselheim AS**, Naci H. Post-marketing requirements for cancer drugs approved by the European Medicines Agency, 2004-2014. Clinical Pharmacology and Therapeutics 2022;112(4):846-852.
299. Rome BN**, Egilman A**, **Kesselheim AS**. Trends in prescription drug launch prices, 2008-2021. JAMA 2022;327(21):2145-2147.
    - Ybarra M, Weissman R. Recent trends in prescription drug launch prices. JAMA 2022;328(13):1352.
    - Rome BN**, Egilman A**, **Kesselheim AS**. Recent trends in prescription drug launch prices—reply. JAMA 2022;328(13):1352-1353.
300. Lalani HS**, **Kesselheim AS**, Rome BN**. Potential Medicare Part D savings on generic drugs from the Mark Cuban Cost Plus Drug Company. Annals of Internal Medicine 2022;175(7):1053-1055. *Selected Among Best Annals of Internal Medicine Articles in 2022 (Health Care Costs)*

301. Hwang TJ, **Kesselheim AS**, Tibau A, Lee CC, Vokinger KN. Clinical benefit and expedited approval of cancer drugs in the United States, European Union, Switzerland, Japan, Canada, and Australia. JCO Oncology Practice 2022;18(9):e1522-e1532.
302. Brown BL**, Mitra-Majumdar M**, Joyce KW, Ross M, Pham C, Darrow JJ**, Avorn J, **Kesselheim AS**. Trends in the quality of evidence supporting FDA drug approvals: results from a systematic literature review. Journal of Health Politics, Policy, and Law 2022;47(6):649-672.
303. Bendicksen L, **Kesselheim AS**, Rome BN**. The vexing voyage of vasopressin: the consequences of granting market exclusivity to unapproved drugs. Chest 2022;162(2):433-435.
304. van de Wiele VL**, Torrance A, **Kesselheim AS**. Characteristics of key patents covering recent FDA-Approved drugs. Health Affairs 2022;41(8):1117-1124.
305. Feldman WB**, Beall RF**, Bloomfield D**, **Kesselheim AS**. Brand-name market exclusivity for nebulizer therapy to treat asthma and COPD. Nature Biotechnology 2022;40(9):1319-1325.
306. Daval CJR**, Avorn J, **Kesselheim AS.** Holding pharmaceutical and medical device executives accountable as responsible corporate officers. JAMA Internal Medicine 2022;182(11):1199-1205.
    - Elberg JT. Accountability of health care executives for illegal activities of pharmaceutical and medical device companies. JAMA Internal Medicine 2022;182(11):1205-1207.
307. Brown BL**, Mitra-Majumdar M**, Darrow JJ**, Moneer O**, Pham C, Avorn J, **Kesselheim AS**. Fulfillment of post-market commitments and requirements for new drugs approved by the FDA, 2013-2016. JAMA Internal Medicine 2022;182(11):1223-1226.
308. Vokinger KN**, Glaus CEG, **Kesselheim AS**, Hwang TJ**. Therapeutic value of drugs granted accelerated approval or conditional marketing authorization in the US and Europe from 2007 to 2021. JAMA Health Forum 2022;3(8):e222685.
309. Messinger JC, **Kesselheim AS**, Vine SM, Fischer MA, Barenie RE**. Associations between copays, coverage limits for naloxone, and prescribing in Medicaid. Substance Abuse: Research and Treatment 2022;16:11782218221126972.
310. Rome BN**, Egilman AC**, Patel NG, **Kesselheim AS.** Using multiple authorized generics to maintain high prices: the example of entacapone. Value in Health 2022:S1098-3015(22)02181-7.
311. Rand LZ**, **Kesselheim AS**. Getting the price right: lessons for Medicare price negotiation from peer countries. PharmacoEconomics 2022;40(12):1131-1142.
312. Zhai M**, Avorn J, **Kesselheim AS**. Variations in use of diabetes drugs with cardiovascular benefits among Medicaid patients. JAMA Network Open 2022;5(11):e2240117.
313. Beall RF**, Glazer T, Ahmad H, Buell M, Hahn S, Houston AR, **Kesselheim AS**, Nickerson JW, Kaplan W. Patent "evergreening" of medicine-device combination products: a global perspective. Healthcare Policy 2022;18(2):14-26.
314. Mitra-Majumdar M, Powers JP III, **Kesselheim AS**. Evidence at time of regulatory approval and cost of new antibiotics, 2016-2019. BMJ Medicine 2022;1:e000227.
315. Egilman AC**, van de Wiele VL**, Rome BN**, Darrow JJ**, Tu SS, **Kesselheim AS**, Sarpatwari A**. Frequency of approval and marketing of biosimilars with a skinny label and associated Medicare savings. JAMA Internal Medicine 2023;183(1):82-84.
316. Egilman AC**, **Kesselheim AS**, Rome BN**. Estimated Medicare Part B savings from inflationary rebates. JAMA 2023;329(1):89-92.
317. Feldman WB**, Tu SS, Alhiary R, **Kesselheim AS**, Wouters OJ. Manufacturer revenue on inhalers after expiration of primary patents, 2000-2021. JAMA 2023;329(1):87-89.
318. Wang J, Lee CC**, **Kesselheim AS**, Rome BN**. Estimated Medicaid spending on original and citrate-free adalimumab, 2014-2021. JAMA Internal Medicine 2023;183(3):275-276.
319. Rome BN**, Nagar S**, Egilman AC**, Wang J, Feldman WB**, **Kesselheim AS**. Simulated Medicare drug price negotiation under the Inflation Reduction Act, 2018-2020. JAMA Health Forum 2023;4(1):e225218. *One of top 10 most-read articles in JAMA Health Forum in 2023.*

320. Patel N**, Hwang TJ**, Woloshin S, **Kesselheim AS**. Therapeutic value of drugs frequently marketed using direct-to-consumer television advertising, 2015-2021. JAMA Network Open 2023;6(1):e2250991.
321. Walsh BS**, **Kesselheim AS**, Rome BN**. Medicaid spending on antiretrovirals from 2007-2019. Clinical Infectious Diseases 2023;76(5):833-841.
322. Feng K, **Kesselheim AS**, Russo M, Rome BN**. Patient out-of-pocket costs following the availability of biosimilar versions of infliximab. Clinical Pharmacology and Therapeutics 2023;113(1):90-97.
323. Clemans-Cope L, Epstein M, Banthin J, **Kesselheim AS**, Hwang TJ**. Estimates of Medicaid and non-Medicaid net prices of top-selling brand-name drugs incorporating best price rebates, 2015 to 2019. JAMA Health Forum 2023;4(1):e225012.
324. van de Wiele VL**, **Kesselheim AS**, Beran D, Darrow JJ**. Insulin products and patents in the USA in 2004, 2014, and 2020: a cross-sectional study. Lancet Diabetes & Endocrinology 2023;11:73-75.
325. Roberts TJ, **Kesselheim AS**, Avorn J. Variation in use of lung cancer targeted therapies across state Medicaid programs, 2020-2021. JAMA Network Open 2023;6(1):e2252562.
326. Rome BN**, Gunter SJ, **Kesselheim AS.** Market dynamics of authorized generics in Medicaid from 2014 to 2020. Health Services Research 2023;58(4):953-959.
327. Naci H, Forrest R, Zhai M, Stofesky AR, **Kesselheim AS.** Characteristics of prior authorization policies for new drugs in Medicare Part D. JAMA Health Forum 2023;4(2):e225610.
328. Rahman S, **Kesselheim AS**, Hollis A. Persistence of resistance: a panel data analysis of the effect of antibiotic usage on the prevalence of resistance. Journal of Antibiotics 2023:1-9.
329. Demkowicz BJ, Tu SS, **Kesselheim AS**, Carrier MA, Feldman WB**. Patenting strategies on inhaler delivery devices. Chest 2023;164(2):450-460.
330. Lalani HS**, Nagar S**, Sarpatwari A**, Barenie RE**, Avorn J, Rome BN**, **Kesselheim AS**. US Public investment in the development of mRNA COVID-19 vaccines: retrospective cohort study. BMJ 2023;380:e073747. *One of the top downloaded BMJ articles of 2023.*
    - Roy V. Financing COVID-19 mRNA vaccines. BMJ 2023;380:p413.
331. Reddy S, Beall RF**, Tu SS, **Kesselheim AS**, Feldman WB**. Patent challenges and litigation on inhalers for asthma and COPD. Health Affairs 2023;42(3):398-406.
332. Brown BL**, **Kesselheim AS**, Sarpatwari A**. Analysis of Risk Evaluation and Mitigation Strategies for teratogenic drugs: variation in primary and secondary prevention measures. PLOS Medicine 2023;20(3):e1004190.
333. Reynolds G, Cliff ERS**, Mohyuddin GR, Popat R, Midha S, Liet Hing MN, Harrison SJ, **Kesselheim AS**, Teh BW. Infections following bispecific antibodies in myeloma: a systematic review and meta-analysis. Blood Advances 2023;7(19):5898-5903.
334. Deshmukh AD**, **Kesselheim AS**, Rome BN**. Timing of confirmatory trials for drugs granted accelerated approval based on surrogate measures from 2012 to 2021. JAMA Health Forum 2023;4(3):e230217.
335. Cliff ERS**, **Kesselheim AS**, Rome BN**, Feldman WB**. Trends in Medicare spending on oral drugs for chronic lymphocytic leukemia from 2014 to 2020. JAMA Network Open 2023;6(4):e237467.
336. Egilman AC**, Rome BN**, **Kesselheim AS.** Added therapeutic benefit of top-selling brand-name drugs in Medicare. JAMA 2023;329(15):1283-1289.
    - Daifotis AG. Gauging the value of top-selling drugs in Medicare. JAMA 2023;330(7):665.
    - Egilman AC**, Rome BN**, **Kesselheim AS**. Gauging the value of top-selling drugs in Medicare—reply. JAMA 2023;330(7):665-666.

337. Tessema FA**, Barenie RE**, Avorn J, **Kesselheim AS.** Federal funding for discovery and development of costly HIV drugs was far more than previously estimated. Health Affairs 2023;42(5):642-649.
338. Tu SS, Nagar S**, **Kesselheim AS**, Lu Z, Rome BN**. Five-year sales for newly marketed prescription drugs with and without initial Orphan Drug Act designation. JAMA 2023;329(18):1607-1608.
339. Feldman WB**, Avorn J, **Kesselheim AS**, Gagne JJ. Chronic obstructive pulmonary disease exacerbations and pneumonia hospitalizations among new users of combination maintenance inhalers. JAMA Internal Medicine 2023;183(7):685-695.
340. Dhruva SS, **Kesselheim AS**, Woloshin S, Ji RZ, Lu Z, Darrow JJ, Redberg RF. Physician perspectives on FDA's decision to grant accelerated approval to aducanumab for Alzheimer's disease. Clinical Pharmacology and Therapeutics 2023;114(3):614-617.
341. Rome BN**, Patel AN, **Kesselheim AS**. Inflationary rebates for generic drugs sold through Medicaid saved billions during 2017-2020. Health Affairs 2023;42(6):770-778.
342. Kar S, Bessette LG, Wyss R, **Kesselheim AS**, Lin KJ. The impact of electronic health record discontinuity on prediction modeling. PLoS One 2023;18(7):e0287985.
343. Sarpatwari A**, Brown BL**, McGraw SA, Dejene SZ, Abdurrob A, Santiago Ortiz AJ, **Kesselheim AS**. Physician experiences with and perceptions of Risk Evaluation and Mitigation Strategy Programs with Elements to Assure Safe Use. PLoS One 2023;18(7):e0288008.
344. Vokinger KN**, Glaus CEG, **Kesselheim AS**, Serra-Burriel M, Ross JS, Hwang TJ**. Therapeutic value of first versus supplemental indications of drugs in US and Europe (2011-20): retrospective cohort study. BMJ 2023;382:e074166.
345. Daval CJR**, Teng TW, Russo M, **Kesselheim AS.** Association of advisory committee votes with US Food and Drug Administration decision-making on prescription drugs, 2010-2021. JAMA Health Forum 2023;4(7):e231718.
346. Sharpless LK**, **Kesselheim A**, Orr SL, Darrow J. Variation in endpoints in FDA medication approvals: a review of acute and preventive migraine medications. Neurology 2023;101(10):e989-e1000.
347. van de Wiele VL**, **Kesselheim AS**, Nagar S, Tu SS. The prevalence of drug patent term extensions in the United States, 2000-2018. Nature Biotechnology 2023;41(7):903-906.
348. Alhiary R, **Kesselheim AS**, Gabriele S**, Beall RF**, Tu SS, Feldman WB**. Patents and regulatory exclusivities on GLP-1 receptor agonists. JAMA 2023;330(7):650-657.
349. Tu SS, **Kesselheim AS**, Wetherbee K, Feldman WB. Changes in the number of continuation patents on drugs approved by the FDA. JAMA 2023;330(5):469-470.
350. Feldman WB**, **Kesselheim AS**, Avorn J, Russo M, Wang SV. Comparative effectiveness and safety of generic versus brand-name fluticasone-salmeterol to treat COPD. Annals of Internal Medicine 2023;176(8):1047-1056.
    - Clerman A, Luke M. Comparative effectiveness and safety of generic versus brand-name fluticasone-salmeterol to treat chronic obstructive pulmonary disease. Annals of Internal Medicine 2024;177(1):eL230428.
    - Feldman WB**, **Kesselheim AS**, Avorn J, Russo M, Wang SV. Comparative effectiveness and safety of generic versus brand-name fluticasone-salmeterol to treat chronic obstructive pulmonary disease. Annals of Internal Medicine 2024;177(1):eL230429.
351. Vokinger KN**, Serra-Burriel M, Glaus CEG, Rohr UP, Hwang TJ**, Dalla Torre di Sanguinetto S, **Kesselheim AS**. Regulatory review duration and differences in submission times of drugs in the United States and Europe, 2011 to 2020. Annals of Internal Medicine 2023;176(10):1413-1418.

352. Hwang CS**, **Kesselheim AS**, Sarpatwari A**, Huybrechts KF, Brill G, Rome BN**. Changes in induced medical and procedural abortion rates in a commercially insured population, 2018 to 2022: an interrupted time-series analysis. Annals of Internal Medicine 2023;176(11):1508-1515.
353. Horrow C**, **Kesselheim AS.** Confronting high costs and clinical uncertainty: innovative payment models for gene therapies. Health Affairs 2023;42(11):1532-1540.
354. Tu SS, Leadmon C, Daval CJR**, **Kesselheim AS.** Inequitable conduct and invalidation of patents related to FDA-regulated products. JAMA 2023;330(21):2119-2121.
355. Rand LZ**, Carpenter DP, **Kesselheim AS**, Bhaskar A, Darrow JJ**, Feldman WB**. Securing the trustworthiness of the FDA to build public trust in vaccines. Hastings Center Report 2023;53(5):S60-S68.
    - **Berger M.** Additional steps for maintaining public trust in the FDA. Hastings Center Report 2024;54(2):44.
    - Rand LZ**, Carpenter DP, **Kesselheim AS**, Bhaskar A, Darrow JJ**, Feldman WB**. Hastings Center Report 2024;54(2):44-45.
356. Olsen A, Beall RF**, Knox RP, Tu SS, **Kesselheim AS**, Feldman WB**. Patents and regulatory exclusivities on FDA-approved insulin products: A longitudinal database study, 1986-2019. PLoS Medicine 2023;20(11):e1004309.
357. Knox RP, Wang J, Feldman WB**, **Kesselheim AS**, Sarpatwari A**. Outcomes of the 340B drug pricing program: a scoping review. JAMA Health Forum 2023;4(11):e233716.
358. Barenie RE**, Bateman BT, Connery HS, Tsacogianis T, **Kesselheim AS.** Rates and costs of drug testing practices for private payors in the outpatient setting in the United States, 2015-2019. Journal of Substance Use and Addiction Treatment 2023:209243.
359. Bendicksen L**, **Kesselheim AS**, Daval CJR**. FDA and *Chevron* deference: a case review. Food and Drug Law Journal 2023;78(4):371-390.
360. Dhruva SS, **Kesselheim AS**, Woloshin S, Ji RZ, Lu Z, Darrow JJ**, Redberg RF. Physician perspectives on FDA regulation of drugs and medical devices: a national survey. Health Affairs 2024;43(1):27-35.
361. Kim J, **Kesselheim AS**, Bove R, Avorn J, Rome BN**. Potential Medicare and Medicaid savings on anti-CD20 therapy for multiple sclerosis. JAMA Neurology 2024;81(1):85-87.
362. Lalani HS**, Russo M, Desai RJ, **Kesselheim AS**, Rome BN**. Association between changes in prices and out-of-pocket costs for brand-name clinician-administered drugs. Health Services Research 2024;59(6):e14279.
363. Daval CJR**, **Kesselheim AS**, Sharpless L**, Sarpatwari A**. Independent advice on drug approvals: an investigation of EMA practices. Journal of General Internal Medicine 2024;39(2):345-347.
364. Hong D**, Avorn J, Wyss R, **Kesselheim AS.** Characteristics of patients receiving novel muscular dystrophy drugs in trials vs routine care. JAMA Network Open 2024;7(1):e2353094.
365. Raymakers AJN**, **Kesselheim AS**, Mostaghimi A, Feldman WB**. Estimated spending on beremagene geperpavec for dystrophic epidermolysis bullosa. JAMA Dermatology 2024;160(3):297-302.
    - Chen MKY, Tatian A, Sebaratnam DF. Estimating costs in beremagene geperpavec for dystrophic epidermolysis bullosa. JAMA Dermatololgy 2024;160(11):1254-1255.
    - Raymakers AJN**, **Kesselheim AS**, Feldman WB**. Estimating costs in beremagene geperpavec for dystrophic epidermolysis bullosa—reply. JAMA Dermatology 2024;160(11):1255.
366. Vogel M, Zhao O, Feldman WB**, Chandra A, **Kesselheim AS**, Rome BN**. Cost of exempting sole orphan drugs from Medicare negotiation. JAMA Internal Medicine 2024;184(1):63-69.

367. Davey S, Costello K, Russo M, Davies S, Lalani HS**, **Kesselheim AS**, Rome BN**. Changes in Use of Hepatitis C Direct-Acting Antivirals After Access Restrictions Were Eased by State Medicaid Programs. JAMA Health Forum 2024;5(4):e240302.
368. Alhiary R**, Gabriele S**, **Kesselheim AS**, Tu SS, Feldman WB**. Delivery device patents on GLP-1 Receptor Agonists. 2024;331(9):794-796.
369. Lalani HS**, Tessema FA**, **Kesselheim AS**, Rome BN**. Availability and cost of expensive and common generic prescription drugs: a cross-sectional analysis of direct-to-consumer pharmacies. Journal of General Internal Medicine 2024;39(12):2187-2195.
    - Gupta R. Direct-to-consumer pharmacies: disruptive innovation or more complexity? Journal of General Internal Medicine 2024;39(12):2131-2132.
370. Sarpatwari A**, Lu Z, Russo M, Zakoul H, Lee SB, Toyserkani G, Zhou E, LaCivita C, Shaw KHH, Zendel L, Dal Pan G, **Kesselheim AS**. How do Risk Evaluation and Mitigation Strategies (REMS) impact clinical practice? A national survey of physicians. Clinical Pharmacology and Therapeutics 2024;115(6):1293-1303.
371. Egilman AC**, **Kesselheim AS**, Avorn J, Raymakers AJN**, Rome BN**. Use of efficiency frontiers to align prices and clinical benefits of biologic therapies for plaque psoriasis. JAMA Dermatology 2024;160(4):409-416.
372. Bendicksen L**, **Kesselheim AS**, Daval CJR**. Federal enforcement of pharmaceutical fraud under the False Claims Act, 2006–2022. Journal of Health Politics, Policy, and Law 2024;49(2):249-268.
373. Sarpatwari A**, Kohli S, Tu SS, **Kesselheim AS.** Patents on Risk Evaluation and Mitigation Strategies for prescription drugs and generic competition. JAMA 2024;331(11):976-978.
374. Bendicksen L**, **Kesselheim AS**, Rome BN**. Spending on targeted therapies for Duchenne muscular dystrophy. JAMA 2024;331(13):1151-1153.
375. Van de Wiele VL**, **Kesselheim AS**, Tu SS. Biologic patent challenges under the America Invents Act. Nature Biotechnology 2024;42(3):374-377.
376. Feng K, Russo M, Maini L, **Kesselheim AS**, Rome BN**. Patient out-of-pocket costs for biologic drugs after biosimilar competition. JAMA Health Forum 2024;5(3):e235429.
    - Mulcahy AW. Revisiting expectations of US biosimilars—panacea or one piece of the puzzle? JAMA Health Forum 2024;5(3):e234778.
377. Liu ITT**, **Kesselheim AS**, Cliff ERS**. Clinical benefit and regulatory outcomes of cancer drugs receiving accelerated approval. JAMA 2024;331(17):1471-1479.
378. Egilman AC, **Kesselheim AS**, Sarpatwari A, Rome BN. Estimated Medicare Part D savings from generic drugs with a skinny label. Annals of Internal Medicine 2024;331(17):1471-1479.
379. Abu-Zahra T, Grimm SE, Scholte M, Raymakers AJN**, **Kesselheim AS**, Joore M. How health technology assessment can help to address challenges in drug repurposing: a conceptual framework. Drug Discovery Today 2024;29(6):104008.
380. Horrow C**, **Kesselheim AS.** Regulating laboratory tests: what framework would best support safety and validity? Milbank Quarterly 2024;102(3):558-576.
381. Horrow C**, Gabriele SME**, Tu SS, Sarpatwari A**, **Kesselheim AS.** Patent portfolios protecting 10 top-selling prescription drugs. JAMA Internal Medicine 2024;184(7):810-817.
382. Mahesri M, Sarpatwari A**, Huybrechts KF, Lii J, Lee SB, Toyserkani GA, LaCivita C, Zhou EH, Pan GJD, **Kesselheim AS**, Bykov K. Trends in Use and Evidence of Adherence to Risk Evaluation and Mitigation Strategy Pregnancy Testing Requirements for Thalidomide, Lenalidomide, and Pomalidomide in the USA, 2000-2020. Drug Safety 2024;47(9):909-919.
383. Feldman WB**, Rand LZ**, Carpenter D, Russo M, Bhaskar A**, Lu Z, Campbell EG, Darrow J**, **Kesselheim AS.** Trust in the Food and Drug Administration: a national survey study. Clinical Pharmacology and Therapeutics 2024;116(2):408-414.

384. Daval CJR**, Egilman AC**, Sarpatwari A**, **Kesselheim AS.** Federal Trade Commission actions on prescription drugs, 2000-2022. JAMA 2024;331(23):2029-2036.
    - Kapczynski A. Federal Trade Commission oversight of the pharmaceutical industry. JAMA 2024;331(23):1995-1996.
385. Rand LZG**, McGraw S, Wang J, Woloshin S, Wang SV, Darrow J**, **Kesselheim AS.** Patient perspectives on evidence supporting drug safety and effectiveness: "What does it mean for me?" Journal of the American Geriatrics Society 2024;72(9):2874-2877.
386. Liu ITT**, Wang J**, Sarpatwari A**, **Kesselheim AS**, Feldman WB**. Commercial markups on pediatric oncology drugs at 340B pediatric hospitals. Pediatr Blood Cancer. 2024:e31158.
387. Wouters OJ, **Kesselheim AS**, Kuha J, Luyten J. Sales revenues for new therapeutic agents approved by the US Food and Drug Administration from 1995 to 2014: a retrospective study. Value in Health 2024:S1098-3015(24)02754-2.
388. Van de Wiele VL**, **Kesselheim AS**, Gleeson D, Lu Z, Tu SS, Rome BN**. Measuring and understanding market exclusivity length for new prescription drugs in France, Australia, and the USA. Pharmaceutical Medicine 2024;38(4):303-310.
389. Tu SS, Cheian D, Gabriele S, Rome BN**, **Kesselheim AS.** The cost of drug patent expiration date errors. Nature Biotechnology 2024;42(7):1024-1025.
390. Feldman WB**, Mahesri M, Sarpatwari A**, Huybrechts KF, Zhu Y, Hwang CS, Lii J, Lee SB, Kattinakere Sreedhara S, Toyserkani GA, Zhou EH, Zendel L, LaCivita C, Manzo C, Dal Pan GJ, **Kesselheim AS**, Bykov K. Removing the FDA's boxed hepatotoxicity warning and liver function testing requirement for ambrisentan. JAMA Network Open 2024;7(7):e2419873.
391. Martin MJ, Rome BN**, **Kesselheim AS**, Lalani HS**. Shortages of essential generic drugs with limited competition. Journal of General Internal Medicine 2024;39(14):2871-2874.
392. Wang S, Hahn G, **Kesselheim AS**. Impact of priority review voucher eligibility on research and development of medical countermeasures. Clinical Pharmacology and Therapeutics 2024;116(6):1554-1559.
393. Liu ITT**, **Kesselheim AS.** Clinical benefit and revenues of drugs affected by rare pediatric disease priority review vouchers, 2017-2023. Journal of Pediatrics 2024;275:114211.
394. Tu SS, **Kesselheim AS**, Chao B. Extent of drug patents with terminal disclaimers and obviousness-type double patenting rejections. JAMA 2024;332(10):837-838.
395. Tibau A, Hwang TJ**, Avorn J, **Kesselheim AS.** Clinical value of guideline recommended molecular targets and genome targeted cancer therapies: cross sectional study. BMJ. 2024;386:e079126.
396. Liu ITT**, **Kesselheim AS.** The RACE Act and pediatric trials of adult cancer drugs. Pediatrics 2024:e2024066920.
397. Syversen ID**, Schulman K, **Kesselheim AS**, Feldman WB**. A comparative analysis of international drug price negotiation frameworks: an interview study of key stakeholders. Milbank Quarterly 2024;102(4):1004-1031.
398. Cai CL**, **Kesselheim AS**, Rome BN**. Estimated savings under the Medicare high-value drug list model. JAMA Internal Medicine 2024;184(11):1390-1392.
399. Feder NM, Hernandez I, Feldman WB, Murali M, **Kesselheim AS**, Elmunzer BJ, Gellad WF. Price and variability in hospital charges for generic indomethacin suppositories. JAMA Network Open 2024;7(9):e2435528.
400. Stoelinga J, Bloem LT, Russo M, **Kesselheim AS**, Feldman WB**. Comparing supplemental indications for cancer drugs approved in the US and EU. European Journal of Cancer 2024;212:114330.
401. Liu ITT**, Hwang TJ**, **Kesselheim AS.** Testing of new drugs approved from 2015 through 2021 under the US Pediatric Research Equity Act. 2024;332(17):1482-1484.

402. Carpenter D, Dardet ME, Bhaskar A, Rand LZ**, Feldman W**, **Kesselheim AS**. Does policy uncertainty boost vaccine hesitancy? Political controversy, the FDA and COVID-19 vaccine hesitancy in fall 2020. Journal of Health Politics, Policy, and Law 2024:11670184.
403. Martin MJ, Gabriele SME, **Kesselheim AS**, Tu SS. Characteristics of academic inventors on government-linked US drug patents. JAMA 2024;332(23):2032-2033.
404. Wouters OJ, Vogel M, Feldman WB**, Beall RF**, **Kesselheim AS**, Tu SS. Differential legal protections for biologics vs small-molecule drugs in the US. JAMA 2024;332(24):2101-2108. *Winner, Publication of the Year Award for 2024, AcademyHealth*
405. Hwang CS**, Desai RJ, **Kesselheim AS**, Levin R, Rome BN**. Primary medication adherence in Medicare beneficiaries prescribed sacubitril-valsartan or renin-angiotensin system blockers for heart failure with reduced ejection fraction. American Heart Journal 2024;281:84-91.
406. Rome BN**, Bhaskar A**, **Kesselheim AS**. Use, spending, and prices of adalimumab following biosimilar competition. JAMA Health Forum 2024;5(12):e243964.
407. Gyawali B**, Jung EH**, Mooney H**, Avorn J, **Kesselheim AS.** Government funding for the development of enzalutamide. JAMA Oncology 2024 Dec 19.
408. Feldman WB**, Suissa S, **Kesselheim AS**, Avorn J, Russo M, Schneeweiss S, Wang SV. Comparative effectiveness and safety of single inhaler triple therapies for chronic obstructive pulmonary disease: new user cohort study. BMJ 2024;387:e080409.
    - Wang M-T, Lin CW. Environmentally friendly inhaler regimens for COPD. BMJ 2024;387:q2825.
409. Darrow JJ**, van de Wiele VL**, Beran DH, **Kesselheim AS**. An empirical review of key glucose monitoring devices: product iterations and patent protection. Journal of Diabetes Science and Technology 2025;19(1):84-90.
410. Bollyky TJ, Nagar SN**, Searchinger C, **Kesselheim AS.** The role of importation in remediating US generic drug shortages. New England Journal of Medicine 2025;392(4):315-318.
411. Hong D**, **Kesselheim AS**, Morlock R, Metlay JP, Powers JH 3rd, Feldman WB**. National survey of factors associated with physician antibiotic prescribing preferences. Journal of General Internal Medicine 2025;40(4):838-846.
412. Dhruva SS, **Kesselheim AS**, Woloshin S, Ji RZ, Lu Z, Darrow JJ**, Redberg RF. Physician-patient communication about novel drugs and high-risk medical devices. Medical Decision Making 2025;45(2):156-167.
413. Feldman WB**, Rand LZ**, Carpenter D, Campbell EG, Darrow JJ, **Kesselheim AS****. Vaccine messaging by the FDA: a national randomized survey study. Journal of General Internal Medicine 2025;40(4):962-966.
414. Ahn-Horst RY**, Turner EH, **Kesselheim AS.** Characteristics of trials preceding FDA approval of novel psychiatric drugs. JAMA Network Open 2025;8(1):e2456588.
415. Raymakers AJN**, Rand LZ**, Feldman WB**, **Kesselheim AS**. An empirical investigation into concerns over quality-adjusted life-years: a review of cost-effectiveness analyses in oncology. Journal of Cancer Policy 2025:100562.
416. Cai CL**, **Kesselheim AS**, Rome BN**. Trends in fills, spending, and prices of doxepin for insomnia. JAMA 2025;333(11):999-1000.
417. Memedovich A, Steele B, Orr T, Chaudhry S, Tadrous M, **Kesselheim AS**, Hollis A, Beall RF. Predicting patent challenges for small-molecule drugs: A cross-sectional study. PLoS Medicine 2025;22(2):e1004540.
418. Sarpatwari A**, Lu Z, Russo M, Zakoul H, Lee SB, Toyserkani GA, Zhou EH, LaCivita C, Hyatt Hawkins Shaw K, Dal Pan GJ, **Kesselheim AS.** Physician experiences with and perspectives on clozapine prescribing. JAMA Network Open 2025;8(2):e2459311.

419. Hwang CS**, Desai RJ, **Kesselheim AS**, Levin R, Kattinakere Sreedhara S, Rome BN**. Health care spending after initiating sacubitril-valsartan vs renin-angiotensin system blockers for heart failure treatment. JAMA Health Forum 2025;6(2):e245385.
420. Mao X, Xu J, Liu X, Kong S, Li Y, Bai X, Yang J, **Kesselheim AS**, Li G. Regulatory flexibilities balancing unmet needs, benefits and risks in the approvals of imported cancer drugs in China: a cohort study from 2012 to 2021. Lancet Regional Health Western Pacific 2025;55:101483.
421. Quinlan CM, Avorn J, **Kesselheim AS**, Singer DE, Zhang Y, Cervone A, Lin KJ. Comparative bleeding risk in older patients with HIV and atrial fibrillation receiving oral anticoagulants. JAMA Internal Medicine 2025;185(4):431-439.
422. Tibau A, Romano A, **Kesselheim AS.** Will I feel better? Raising the bar for quality of life in oncology. Nature Reviews Clinical Oncology 2025;22(4):235-236.
423. Raymakers AJN**, Van de Wiele VL**, **Kesselheim AS**, Tu SS. Changes in biologic drug revenues after administrative patent challenges. Health Affairs 2025;44(3):274-279.
424. Han J**, **Kesselheim AS.** First-in-class drugs experienced different regulatory treatment in the US and Europe. Health Affairs 2025;44(3):265-273.
425. Hogervorst MA, Vreman RA, Oduol TA, Mantel-Teeuwisse AK, Goettsch WG, **Kesselheim AS**. Evolving recommendations for patient populations among oncology medicines: a quantitative and qualitative analysis. Clinical Pharmacology and Therapeutics 2025;118(1):95-105.
426. Liu BY, Russo M, **Kesselheim AS**, Knox R, Sarpatwari A**, Feldman WB**. Expansion of 340B disproportionate share hospitals in the United States from 2010 to 2022. Health Services Research 2025:e14446.
427. Tibau A, Hwang TJ**, Romano A, Borrell M, Gich I, Molto C, **Kesselheim AS.** Factors in time to full approval or withdrawal for anticancer medicines granted accelerated approval by the FDA. JAMA Network Open 2025;8(3):e252026.
428. Freilich J, Price WN 2nd, **Kesselheim AS.** Disappearing data at the U.S. federal government. New England Journal of Medicine 2025;392(24):e55.
429. Freilich J, **Kesselheim AS.** Frequency and nature of generic “design around” of brand-name patents in the United States. Clinical Pharmacology and Therapeutics 2025;118(1):190-194.
430. Ziaks TJ, Akanegbu CM, Egilman AC, **Kesselheim AS.** Frequency of first generic drugs approved through “skinny labeling,” 2021 to 2023. Journal of Managed Care and Specialty Pharmacy 2025;31(4):343-350.
431. Hwang CS**, **Kesselheim AS**, Kelkar AH, Cliff ERS**, Rome BN**. Changes in oncology medication use after withdrawal of accelerated approval. JAMA Oncology 2025;11(6):664-666.
432. Wang S**, Egilman AC**, Hahn G, **Kesselheim AS.** Therapeutic benefit of top-selling oncology drugs in Medicare. JAMA Network Open 2025;8(4):e253323.
433. Freilich J, **Kesselheim AS.** Design patents: a potential threat to drug competition. Applied Health Economics and Health Policy 2025;23(4):531-534.
434. Rome BN**, Han J**, Mooney H**, **Kesselheim AS.** Use and cost of first-line biologic medications to treat plaque psoriasis in the US. JAMA Dermatology 2025;161(6):622-628.
435. Demkowicz BJ, Rader K, Wang SV, **Kesselheim AS**, Feldman WB**. The comparative effectiveness and safety of fluticasone-salmeterol via metered-dose versus dry powder inhalers for COPD: A new user cohort study. PLoS Medicine 2025;22(5):e1004596.
436. Cai CL**, **Kesselheim AS**, Bhaskar A**, Rome BN**. Insurer exits after the Inflation Reduction Act Part D redesign. JAMA. 2025;334(4):360-362.
437. Liu ITT**, Raymakers AJN**, Sarpatwari A**, **Kesselheim AS.** Pediatric exclusivity-associated revenues and labeling changes, 2013 to 2023. Journal of Pediatrics 2025:114660.

438. Tibau A, Cliff ERS**, Romano A, Borrell M, Molto C, **Kesselheim AS.** Predictors of withdrawal of anticancer drug indications granted accelerated approval: a retrospective cohort study. EClinicalMedicine. 2025;84:103088.
439. Rahim H, **Kesselheim AS.** National analysis of the requirements and implementation of state prescription drug price transparency laws. Milbank Quarterly 2025 May 30.
440. Jenei K, Hahn G, **Kesselheim AS**, Tibau A. Trends in time to withdrawal and full approval of accelerated approval cancer drug indications (1992-2024). Journal of Cancer Policy 2025:100597.
441. Kim J, **Kesselheim AS**, Cliff ERS**, Rome BN**. Medicare spending and use of subcutaneous biologic formulations with hyaluronidase. Oncologist 2025;30(6):oyaf149.
442. Freilich J, **Kesselheim AS.** Data manipulation within the US federal government. The Lancet 2025:S0140-6736(25)01249-8.
443. Rand LZ**, McGraw S, Wang J, Darrow JJ**, **Kesselheim AS.** Impostor syndrome: fraudulent participants in qualitative research can skew results. Journal of Law, Medicine, & Ethics 2025:1-6.
444. Goh M**, Outterson K, **Kesselheim AS**. Examining pricing and availability for neglected tropical disease therapies in the US. Open Forum Infectious Diseases 2025:ofaf391.
445. Vokinger KN, Serra-Burriel M, Glaus CEG, Welti L, Ross JS, **Kesselheim AS.** Differences between trial populations and approved label populations of new drugs in the United States and Europe (2012 to 2023): a cross-sectional study. Annals of Internal Medicine 2025 Jul 8.
446. Egilman AC**, **Kesselheim AS**, Rome BN**. Share of sales subject to Medicare inflation rebates and price increases of top-selling drugs. Health Services Research 2025:e70012.
447. Liu ITT**, Reynolds G, **Kesselheim AS**, Cliff ERS**. Regulatory and clinical outcomes of nononcology accelerated approvals. JAMA 2025 Jul 14.
448. Tu SS, **Kesselheim AS**, Ross JS, Gupta R. Revenue, patents, and new generic competition for prescription drugs in the USA. Journal of General Internal Medicine 2025 Jul 14.
449. Bloomfield D, Teng TW, **Kesselheim AS**, Tu SS. Prescription drug method-of-use patent protection, 1991-2018. Journal of General Internal Medicine 2025 Jul 16.
450. Zhu Y, Anand P, Sarpatwari A, Hernández-Díaz S, Bykov K, **Kesselheim AS**, Avorn J, Vine SM, Adomi M, DiCesare EC, Mahesri M, Zakoul H, Mogun H, Toyserkani GA, LaCivita C, Zhou EH, Dal Pan GJ, Huybrechts KF. Isotretinoin Risk Evaluation and Mitigation Strategy and pregnancy incidence. JAMA Internal Medicine 2025 Jul 21.
451. Tibau A, Romano A, Liu ITT**, Han J**, Scheffer Cliff ER**, **Kesselheim AS.** Assessing outcomes emerging after conversion to regular approval for cancer drug indications granted accelerated approval, 1992-2021. Journal of the National Cancer Institute 2025:djaf195.
452. Cai CL**, Bhaskar A, **Kesselheim AS**, Rome BN**. Changes in Medicare Part D plan designs after the Inflation Reduction Act. JAMA Intern Med. 2025 Aug 18.
    - Hoadley J, Fuchs B. Balance of increased costs for some beneficiaries with protections for users of expensive drugs—Medicare Part D reforms. JAMA Intern Med. 2025 Aug 18.
453. Hong D**, Tu SS, Beall RF, Russo M, Rome BN**, **Kesselheim AS**, Sarpatwari A**. Estimating costs of market exclusivity extensions for 4 top-selling prescription drugs in the US. JAMA Health Forum 2025;6(8):e252631.
454. Sangha KK, Redberg RF, **Kesselheim AS**, Woloshin S, Dhruva SS. Health professional students' knowledge about FDA drug and medical device regulation. Academic Medicine 2025 Aug 22.
455. Liu ITT, **Kesselheim AS.** US government spending on new drugs with incomplete and postponed mandatory pediatric trials. JAMA Pediatrics 2025 Sep 2.
456. Mooney H**, Austad K, Campbell EG, Avorn J, Lu Z, **Kesselheim AS.** Physician perspectives on pharmaceutical promotion. JAMA Health Forum 2025;6(9):e253521.

457. Mao X, Li Y, **Kesselheim AS**, Ba Y, Li G. Breakthrough therapy designations in China and the United States. Nature Reviews Drug Discovery 2025 Sep 12.
458. Harvey JP, Raymakers AJN**, Rand LZ**, Goshua G, **Kesselheim AS**, Pandya A. Modeling the budgetary impacts of sickle cell disease gene therapies on state Medicaid programs. J Gen Intern Med. 2025 Sep 17.
459. Goh M**, McEnany M, Freeman R, Newton M, **Kesselheim AS**, Outterson K. Bridging the fair share gap for antibacterial innovation: an observational analysis of antibacterial revenues in the G7 and EU27. EClinicalMedicine 2025;88:103485.

Other peer-reviewed publications

1. Kissick WL and **Kesselheim AS**. Presidential disability: the panel of physicians. Transactions & Studies of the College of Physicians of Philadelphia 2001;23:113-119.
2. **Kesselheim AS**. Perspectives: ode to a short white coat. Pharos 2003;66:35.
3. **Kesselheim AS** and Avorn J. University-based science and biotechnology research: defining the boundaries of intellectual property. JAMA 2005;293:850-854.
    - Sobolski GK. Biotechnology products and university-based science. [Letter to the Editor] JAMA 2005;293(23):2862.
    - Korn D, Heinig SJ. Biotechnology products and university-based science. [Letter to the Editor] JAMA 2005;293(23):2862-3.
    - Lempert P. Biotechnology products and university-based science. [Letter to the Editor] JAMA 2005;293(23):2861-2
    - **Kesselheim AS**, Avorn J. Biotechnology products and university-based science. [Author reply] JAMA 2005;293:2863.
4. **Kesselheim AS** and Brennan TA. The swinging pendulum: the Supreme Court reverses course on ERISA and managed care. Yale Journal of Health Policy, Law, and Ethics 2005;5:451-463.
5. **Kesselheim AS** and Brennan TA. Overbilling vs. downcoding — the battle between physicians and insurers. New England Journal of Medicine 2005;352:855-857.
6. **Kesselheim AS** and Avorn J. Biomedical patents and the public's health: is there a role for eminent domain? JAMA 2006;295:434-437.
7. **Kesselheim AS**, Ferris TG, Studdert DM. Will physician-level measures of clinical performance be used in medical malpractice litigation? JAMA 2006;295:1831-1834.
    - Luft HS. Clinical performance measures and medical malpractice. [Letter to the editor] JAMA 2006;296(13):1589.
    - **Kesselheim AS**, Studdert DM. Clinical performance measures and medical malpractice. [Author reply] JAMA 2006;296:1589-90.
8. **Kesselheim AS**, Fischer MA, Avorn J. The rise and fall of Natrecor for congestive heart failure: implications for drug policy. Health Affairs 2006;25:1095-1102.
9. **Kesselheim AS** and Mello MM. Medical process patents – monopolizing the delivery of health care. New England Journal of Medicine 2006;355:2036-2041.
10. Reese PP, Caplan AL, **Kesselheim AS**, Bloom RD. Creating a medical, ethical, and legal framework for complex living kidney donors. Clinical Journal of the American Society of Nephrology 2006;1:1148-1153.
11. **Kesselheim AS** and Mello MM. Confidentiality laws and secrecy in medical research: improving access to drug safety data. Health Affairs 2007;26:483-491.
12. **Kesselheim AS**. Intellectual property policy in the pharmaceutical sciences: the effect of inappropriate patents and market exclusivity extensions on the health care system. AAPS Journal 2007;9:Article 33.
13. **Kesselheim AS** and Studdert DM. Role of medical professional organizations in regulating

physician expert witness testimony. JAMA 2007;298:2907-2909.

- Larriviere D, Williams MA, Sagsveen M. Regulating physician expert witness testimony. [Letter to the editor] JAMA 2008;299(14):1667.
- Hartz AJ, Green M. Regulating physician expert witness testimony. [Letter to the editor] JAMA 2008;299(14):1667-1668.
- **Kesselheim AS**, Studdert DM. Role of medical professional organizations in regulating physician expert witness testimony. [Author reply] JAMA 2008;299:1667-1668.

14. Dudzinski DM and **Kesselheim AS**. Scientific and legal viability of follow-on protein drugs. New England Journal of Medicine 2008;358:843-849.
15. Chokshi DA** and **Kesselheim AS**. Rethinking global access to vaccines. BMJ 2008;336:750-753.
16. **Kesselheim AS** and Choudhry NK. The international pharmaceutical market as a source of low-cost prescription drugs for U.S. patients. Annals of Internal Medicine 2008;148:614-619.
17. **Kesselheim AS** and Avorn J. Pharmaceutical promotion to physicians and First Amendment rights. New England Journal of Medicine 2008;358:1727-1732.
    - Troy DE, Gottlieb S. Pharmaceutical promotion and First Amendment rights. [Letter to the Editor] New England Journal of Medicine 2008;359(5):536.
    - **Kesselheim AS**, Avorn J. Pharmaceutical promotion and First Amendment rights. [Author reply] New England Journal of Medicine 2008;359:536-537.
18. **Kesselheim AS**. Think globally, prescribe locally: how rational pharmaceutical policy in the U.S. can improve global access to essential medicines. American Journal of Law and Medicine 2008;34:125-139.
19. **Kesselheim AS**. Encouraging drug development for neglected diseases — the trouble with FDA review vouchers. New England Journal of Medicine 2008;359:1981-1983.
    - Moe J, Grabowski H, Ridley D. FDA review vouchers. [Letter to the Editor] New England Journal of Medicine 2009;360(8):837.
    - **Kesselheim AS**. FDA review vouchers. [Author reply] New England Journal of Medicine 2009;360:837-838.
20. **Kesselheim AS** and Avorn J. A national essay contest on the intersection between pharmaceutical marketing and medical student education. Academic Medicine 2009;84:228-235.
21. **Kesselheim AS**. Priority review vouchers: an inefficient and dangerous way of promoting neglected disease drug development. Clinical Pharmacology and Therapeutics 2009;85:373-375.
22. **Kesselheim AS** and Studdert DM. The Supreme Court, preemption, and malpractice liability. New England Journal of Medicine 2009;360:559-561.
    - Hauser RG. Preemption and malpractice liability. [Letter to the Editor] New England Journal of Medicine 2009;360(21):2257-2258.
    - **Kesselheim AS**, Studdert DM. Preemption and malpractice liability. [Author reply] New England Journal of Medicine 2009;360:2257-2258.
23. Outterson MK and **Kesselheim AS**. Evaluating Medicare Part D drug price reform options. Health Affairs 2009;28(5):w832-w841.
24. Amin T, Rajkumar R**, Radhakrishan P, **Kesselheim AS**. Expert participation as a strategy for improving the quality of pharmaceutical patents. Health Affairs 2009;28(6):w948-w956.
25. Engelberg AB, **Kesselheim AS**, Avorn J. Balancing innovation, access, and profits — market exclusivity for biologics. New England Journal of Medicine 2009;361:1917-1919.
    - Pollock A, Zagari M. Market exclusivity for biologics. [Letter to the Editor] New England Journal of Medicine 2010;362(7):661.
    - Wheadon DE. Market exclusivity for biologics. [Letter to the Editor] New England Journal

of Medicine 2010;362(7):661.

- Engelberg AB, **Kesselheim AS**. Balancing innovation, access, and profits. [Author reply] New England Journal of Medicine 2010;362:661-662.

26. **Kesselheim AS**. The Supreme Court, process patents, and medical innovation. New England Journal of Medicine 2009;361:2303-2306.
27. **Kesselheim AS** and Maisel WH. Conflict of interest in health care delivery: protecting patients' interests. American Journal of Therapeutics 2010:17(4):440-443.
28. **Kesselheim AS** and Mello MM. Gene patenting — is the pendulum swinging back? New England Journal of Medicine 2010;362(20):1855-1858.
29. **Kesselheim AS** and Solomon DH. Incentives for drug development: the curious case of colchicine. New England Journal of Medicine 2010;362(22):2045-2047.
    - Woodcock J, Okada S. Incentives for drug development—the curious case of colchicine. [Letter to the Editor] New England Journal of Medicine 2010;363(15):1484.
    - **Kesselheim AS**, Solomon DH. Incentives for drug development—the curious case of colchicine. [Author reply] New England Journal of Medicine 2010;363(15):1484-1485.
30. **Kesselheim AS**. Permitting products-liability litigation for FDA-approved drugs and devices promotes patient safety. Clinical Pharmacology and Therapeutics 2010;87(6):645-647.
31. **Kesselheim AS** and Outterson MK. Fighting antibiotic resistance: marrying new financial incentives to meeting public health goals. Health Affairs 2010;29(9):1689-1696.
32. Chokshi DA**, Avorn J, **Kesselheim AS**. Designing comparative effectiveness research on prescription drugs: lessons from the clinical trial literature. Health Affairs 2010;29(10):1842-1848.
33. **Kesselheim AS**. Using market exclusivity incentives to promote pharmaceutical innovation. New England Journal of Medicine 2010;363:1855-1862.
34. Greene JA and **Kesselheim AS**. Pharmaceutical marketing and the new social media. New England Journal of Medicine 2010;363:2087-2089.
35. Polinski JM and **Kesselheim AS**. Where cost, medical necessity, and morality meet: should US government insurance programs pay for erectile dysfunction drugs? Clinical Pharmacology and Therapeutics 2011;89:17-19.
36. Cutler C, **Kesselheim A**, Gabardi S, Andersson BS, Carpenter P, Khoury HJ, Litzow M, Rowley SD, Lanum S, Leather H, Shih YT, Gale RP, Wingard JR, Appelbaum FR, Anasetti C. Generic immunosuppressants in hematopoietic cell transplantation. Biol Blood Marrow Transpl 2011;17(3):285-290.
37. **Kesselheim AS** and Outterson MK. Improving antibiotic markets for long-term sustainability. Yale Journal of Health Policy Law & Ethics 2011;11:101-167.
38. **Kesselheim AS** and Austad KE. Residents: workers or students in the eyes of the law? New England Journal of Medicine 2011;364:697-699.
39. **Kesselheim AS**. Covert pharmaceutical promotion in free medical publications. CMAJ: Canadian Medical Association Journal 2011;183(5):534-535.
40. Avorn J and **Kesselheim A**. A hemorrhage of off-label use. Annals of Internal Medicine 2011;154:566-567.
    - Karkouti K, Levy JH. A hemorrhage of off-label use. [Letter to the Editor] Annals of Internal Medicine 2011;155(5):339.
    - Avorn J and **Kesselheim AS**. The off-label use of recombinant activated Factor VII. [Author reply] Annals of Internal Medicine 2011;155(5):339-340.
41. **Kesselheim A**. Safety, supply, and suits: litigation and the vaccine industry. New England Journal of Medicine 2011;364:1485-1487.
42. Greene JA and **Kesselheim AS**. Why do the same drugs look different? Pills, trade dress, and public health. New England Journal of Medicine 2011;365:83-89.

43. Carpenter D, **Kesselheim AS**, Joffe S. Reputation and precedent in the bevacizumab decision. New England Journal of Medicine 2011;365(2):e3.
44. **Kesselheim AS**. The backlash against bioequivalence and the interchangeability of brand-name and generic drugs. CMAJ: Canadian Medical Association Journal 2011;183(12):1350-1351.
45. **Kesselheim AS**. Off-label drug use and promotion: balancing public health goals and commercial speech. American Journal of Law and Medicine 2011;37:225-257.
46. Austad KE** and **Kesselheim AS**. Conflict of interest disclosure in early medical education: should medical students stay in the dark? JAMA 2011;306:991-992.
47. **Kesselheim AS** and Rajkumar R**. Who owns federally funded research? The Supreme Court and the Bayh-Dole Act. New England Journal of Medicine 2011;365(13):1167-1169.
48. **Kesselheim AS**, Murtagh L, Mello MM. "Pay-for-delay" settlements of disputes over pharmaceutical patents. New England Journal of Medicine 2011;365(15):1439-1445.
49. **Kesselheim AS**, Cresswell K, Phansalkar S, Bates DW, Sheikh A. Clinical decision support systems could be modified to reduce "alert fatigue" while still minimizing the risk of litigation. Health Affairs 2011;30(12):2310-2317.
50. Cole LW, Kesselheim JC, **Kesselheim AS**. Ethical issues in new drug prescribing. Journal of Bioethical Inquiry 2012;9(1):77-83.
51. Kramer DB**, Xu S**, **Kesselheim AS**. Medical device regulation in the United States and European Union. New England Journal of Medicine 2012;366(9):848-855.
52. **Kesselheim AS**, Karlawish J. Biomarkers unbound — the Supreme Court's ruling on diagnostic-test patents. New England Journal of Medicine 2012;366:2338-2340.
53. **Kesselheim AS**. Ethical considerations in orphan drug approval and use. Clinical Pharmacology and Therapeutics 2012;92:153-155.
54. Truog RD, **Kesselheim AS**, Joffe S. Paying patients for their tissue: the legacy of Henrietta Lacks. Science 2012;337(6090):37-38.
    - Hayflick L. Paying for tissue: the case of WI-38. [Letter to the Editor] Science 2012;337(6100):1292.
    - Kominers SD, Becker GS. Paying for tissue: net benefits. [Letter to the Editor] Science 2012;337(6100):1292-1293.
    - Truog RD, **Kesselheim AS**, Joffe S. Paying for tissue: net benefits – response. [Author reply] Science 2012;337(6100):1293.
55. Kramer DB**, **Kesselheim AS**. User fees and beyond — the FDA Safety and Innovation Act of 2012. New England Journal of Medicine 2012;367:1277-1279.
56. **Kesselheim AS** and Avorn J. The Food and Drug Administration has the legal basis to restrict promotion of flawed comparative effectiveness research. Health Affairs 2012;31:2200-2205.
57. **Kesselheim AS**, Orentlicher D. Insights from a national conference: "Conflicts of Interest in the Practice of Medicine." Journal of Law, Medicine & Ethics 2012;40(3):436-440.
58. **Kesselheim AS**, Avorn J, Greene JA. Risk, responsibility, and generic drugs. New England Journal of Medicine 2012;367(18):1679-1681.
59. **Kesselheim AS**, Mello MM, Avorn J. FDA regulation of off-label drug promotion under attack. JAMA 2013;309(5):445-446.
60. **Kesselheim AS.** Drug company gifts to medical students: the hidden curriculum. BMJ 2013;346:f1113.
61. Kramer DB** and **Kesselheim AS**. Medical device excise tax — over before it begins? [Letter to the Editor] New England Journal of Medicine 2013;368:1767-1769.
    - Sorensen AG. The medical device excise tax—over before it begins? [Letter to the Editor] New England Journal of Medicine 2013;369(10):982-983.

- Prabhakar AM, Harvey HB, Oklu R. The medical device excise tax—over before it begins? [Letter to the Editor] New England Journal of Medicine 2013;369(10):983-984.
- Ubl SJ. The medical device excise tax—over before it begins? [Letter to the Editor] New England Journal of Medicine 2013;369(10):984.
- Kramer DB**, **Kesselheim AS**. The medical device excise tax—before it begins? [Author reply] New England Journal of Medicine 2013;369(10):984-985.

62. **Kesselheim AS**. Rising health care costs and life-cycle management in the pharmaceutical market. PLoS Medicine 2013;10(5):e1001461.
63. Rajkumar R and **Kesselheim AS**. Balancing access and innovation: India's Supreme Court rules on Gleevec. JAMA 2013;310(3):263-264.
64. **Kesselheim AS**, Green MD, Avorn J. Who is now responsible for discovering and warning about adverse effects of generic drugs? JAMA 2013;310(10):1023-1024.
65. **Kesselheim AS**, Cook-Deegan RM, Winickoff DE, Mello MM. Gene patenting—the Supreme Court finally speaks. New England Journal of Medicine 2013;369(9):869-875.
66. Kramer DB**, Tan YT, Sato C, **Kesselheim AS**. Postmarket surveillance of medical devices: a comparison of strategies in the US, EU, Japan, and China. PLoS Medicine 2013;10(9):e1001519.
67. Wang B** and **Kesselheim AS**. The role of direct-to-consumer pharmaceutical advertising in patient consumerism. AMA Journal of Ethics 2013;15(11):960-965.
68. Yeh JS** and **Kesselheim AS**. Same song, different audience: pharmaceutical promotion targeting non-physician health care providers. PLoS Medicine 2013;10(11):e1001560.
69. **Kesselheim AS,** Gagne JJ. Strategies for post-market surveillance of drugs for rare diseases. Clinical Pharmacology and Therapeutics 2014;95(3):265-268.
70. **Kesselheim AS** and Avorn J. New and unproved medical devices. BMJ 2013;347:f7413.
71. Shah AK, Warsh J, **Kesselheim AS**. Ethics of intellectual property rights in an era of globalization. Journal of Law, Medicine & Ethics 2013;41(4):841-851.
72. **Kesselheim AS** and Shiu N**. Evolving role of biomarker patents in personalized medicine. Clinical Pharmacology and Therapeutics 2014;95(2):127-129.
73. Kramer DB**, Tan YT**, Sato C, **Kesselheim AS**. Ensuring medical device effectiveness and safety — a cross-national comparison of approaches to regulation. Food and Drug Law Journal 2014;69(1):1-24.
74. Treasure CL**, Avorn J, **Kesselheim AS**. What is the public's right to access medical discoveries based on federally-funded research? JAMA 2014;311:907-909.
75. **Kesselheim AS** and Mello MM. Prospects for regulation of off-label drug promotion in an era of expanding commercial speech protection. University of North Carolina Law Review 2014;92:1539-1604.
76. Darrow JJ**, Avorn J, **Kesselheim AS**. New FDA breakthrough-drug category—implications for patients. New England Journal of Medicine 2014;370:1252-1258.
    - McClellan M, Sigal E. New FDA breakthrough-drug category—implications for patients. [Letter to the Editor] New England Journal of Medicine 2014;371(1):87-88.
    - Murray BE. New FDA breakthrough-drug category—implications for patients. [Letter to the Editor] New England Journal of Medicine 2014;371(1):88.
    - Velleca M. New FDA breakthrough-drug category—implications for patients. [Letter to the Editor] New England Journal of Medicine 2014;371(1):88-89.
    - Ricart AD. New FDA breakthrough-drug category—implications for patients. [Letter to the Editor] New England Journal of Medicine 2014;371(1):89.
    - Darrow JJ, Avorn J, **Kesselheim AS**. New FDA breakthrough-drug category—implications for patients. [Author reply] New England Journal of Medicine 2014;371(1):89-90.**

77. Sarpatwari A**, Avorn J, **Kesselheim AS**. Using a drug-safety tool to prevent competition. New England Journal of Medicine 2014;370:1476-1478.
78. Rome BN**, Kramer DB**, **Kesselheim AS**. Approval of high-risk medical devices in the US: implications for clinical cardiology. Current Cardiology Reports 2014;16(6):489-498.
79. Hwang TJ**, Avorn J, **Kesselheim AS**. Lifecycle of medical product rules issued by the US Food and Drug Administration. Journal of Health Politics, Policy, and Law 2014;39(4):751-780.
80. Duke J and **Kesselheim AS**. The Food and Drug Administration's role in promoting consistent labels for generic drugs. JAMA Internal Medicine 2014;174(8):1213-1214.
81. Cortez NG, Cohen IG, **Kesselheim AS**. Regulation of mobile health technologies. New England Journal of Medicine 2014;371(4):372-379.
82. **Kesselheim AS** and Gagne JJ. Introduction to a special issue on innovative approaches to studying health outcomes in rare diseases. Journal of General Internal Medicine 2014;29 Suppl 3:709-711.
83. Kirschner N, Sulmasy LS, **Kesselheim AS**. Health policy basics: the Physician Payment Sunshine Act and Open Payments program. Annals of Internal Medicine 2014;161:519-521.
84. **Kesselheim AS** and Rajan PV**. Regulating incremental innovation in medical devices. BMJ 2014;349:g5303.
85. Wang B**, Joffe S, **Kesselheim AS**. Chemotherapy parity laws: a remedy for high drug costs? JAMA Internal Medicine 2014;174(11):1721-1722.
86. Sarpatwari A**, **Kesselheim AS**, Malin BA, Gagne JJ, Schneeweiss S. Ensuring patient privacy in data sharing for post-approval research. New England Journal of Medicine 2014;371(17):1644-1649.
87. Alpern JD, Stauffer WB, **Kesselheim AS**. High-cost generic drugs: implications for patients and policymakers. New England Journal of Medicine 2014;371(20):1859-1862.
    - Uhl K, Peters JR, Flanagan K. High-cost generic drugs—implications for patients and policymakers. [Letter to the Editor] New England Journal of Medicine 2015;372(7):685-686.
    - **Kesselheim AS**, Alpern JD, Stauffer WM. High-cost generic drugs—implications for patients and policymakers. [Author reply] New England Journal of Medicine 2015;372(7):686.
88. Miller FG, Joffe S, **Kesselheim AS**. Evidence, errors, and ethics. Perspectives in Biology and Medicine 2014;57(3):299-307.
89. Darrow JJ**, Sarpatwari A, Avorn J, **Kesselheim AS**. Practical, legal, and ethical issues in expanded access to investigational drugs. New England Journal of Medicine 2015;372(3):279-286.
    - Lurie P, Chan-Tack KM, Woodcock J. [Letter to the Editor] Expanded access to investigational drugs. New England Journal of Medicine 2015;372(15):1473.
    - Sarpatwari AS**, Darrow JJ**, **Kesselheim AS**. Legal, ethical, and practical implications of expanded access to investigational drugs. [Author reply] New England Journal of Medicine 2015;372(15):1473-1474.
90. **Kesselheim AS** and Darrow JJ. FDA designations for therapeutics and their impact on drug development and regulatory review outcomes. Clinical Pharmacology and Therapeutics 2015;97(1):29-36.
91. Hwang TJ**, Carpenter D, **Kesselheim AS**. Paying for innovation: reimbursement incentives for antibiotics. Science Translational Medicine 2015;7(276):276fs9.
92. Kramer DB**, **Kesselheim AS**. The Watchman saga: closure at last? New England Journal of Medicine 2015;372(11):994-995.
93. Sarpatwari A**, Choudhry NK, Avorn J, **Kesselheim AS**. Paying physicians to prescribe generic drugs and follow-on biologics in the United States. PLoS Medicine 2015;12(3):e1001802.

94. Hwang TJ**, Lehmann LS, **Kesselheim AS**. Precision medicine and the FDA's draft guidance on regulating laboratory-developed tests. Nature Biotechnology 2015;33(5):449-451.
95. Sarpatwari A**, Avorn J, **Kesselheim AS**. Progress and hurdles in follow-on biologics. New England Journal of Medicine 2015;372(35):2380-2382.
96. Avorn J and **Kesselheim AS**. The 21st Century Cures Act—will it take us back in time? New England Journal of Medicine 2015;372(36):2473-2475.
    - McClellan MB, Sigal EV. The 21st Century Cures Act. [Letter to the Editor] New England Journal of Medicine 2015;373(17):1677-1678.
    - Kakkis E, Bronstein MG. The 21st Century Cures Act. [Letter to the Editor] New England Journal of Medicine 2015;373(17):1678.
    - Calderwood SB, Murray BE, Chambers HF. The 21st Century Cures Act. [Letter to the Editor] New England Journal of Medicine 2015;373(17):1679.
    - **Kesselheim AS**, Avorn J. The 21st Century Cures Act. [Author reply] New England Journal of Medicine 2015;373(17):1679-1680.
97. Hwang TJ**, Powers JH, Carpenter D, **Kesselheim AS**. Accelerated pathway for rapid diagnostics and targeted antibacterial agents for serious and life-threatening diseases. Nature Biotechnology 2015;33(6):589-590.
98. Sharfstein JM and **Kesselheim AS**. The safety of prescription drugs. JAMA 2015;314(3):233-234.
99. **Kesselheim AS** and Gagne JJ. Product-specific regulatory pathways to approve generic drugs: the need for follow-up studies to ensure safety and effectiveness. Drug Safety 2015;38(10):849-853.
100. Sarpatwari A** and **Kesselheim AS**. The 21st Century Cures Act: opportunities and challenges. Clinical Pharmacology and Therapeutics 2015;98(6):575-577.
101. Luo J** and **Kesselheim AS**. The Trans-Pacific Partnership Agreement and implications for access to essential medicines. JAMA 2015;314(15):1563-1564.
102. **Kesselheim AS** and Darrow JJ**. Hatch-Waxman turns 30: do we need a re-designed approach for the modern era? Yale J Health Policy Law Ethics 2015;15(2):293-347.
103. Avorn J, Sarpatwari A**, **Kesselheim AS**. Forbidden and permitted statements about medications—rules in evolution. New England Journal of Medicine 2015;373(10):967-973.
104. Ross JS and **Kesselheim AS**. FDA policy and cardiovascular medicine. Circulation 2015;132:1136-1145.
105. **Kesselheim AS**, Maggs LR, Sarpatwari A. Experience with the priority review voucher program for drug development. JAMA 2015;314(16):1687-1688.
    - Ridley DB, Dent J, Egerton-Warburton C. Efficacy of the priority review voucher program. [Letter to the Editor] JAMA 2016;315(15):1659-1660.
    - Sarpatwari A**, **Kesselheim AS**. Efficacy of the priority review voucher program. [Author reply] JAMA 2016;315(15):1659-1661.
106. **Kesselheim AS**, Sinha MS**, Joffe S. Physicians and insider trading. JAMA Internal Medicine 2015;175(12):1955-1959.
107. Luo J**, Sarpatwari A, **Kesselheim AS**. Regulatory solutions to the problem of high generic drug costs. Open Forum Infectious Diseases 2015;2(4):ofv179.
108. **Kesselheim AS** and Hwang TJ. Breakthrough medical devices and the 21st Century Cures Act. Annals of Internal Medicine 2016;164(7):500-502.
109. Podolsky SH and **Kesselheim AS**. Regulating homeopathic products — a century of dilute interest. New England Journal of Medicine 2016;374(3):201-203.
110. Sarpatwari A** and **Kesselheim AS**. The case for reforming drug naming: should brand-name trademark protections expire upon generic entry? PLoS Medicine 2016;13(2):e1001955.
111. Wang B** and **Kesselheim AS**. Promoting therapeutic innovation: what do we do about drug-device combinations? JAMA 2016;315(9):857-858.

112. Rathi V, **Kesselheim AS**, Ross JS. The FDA 515 Initiative: addressing the evidence gap for high-risk cardiovascular devices? JAMA Cardiology 2016;1(2):117-118.
113. Hey SP** and **Kesselheim AS**. An uninformative truth: the logic of Amarin's off-label promotion for prescription fish oil. PLoS Medicine 2016;13(3):e1001978.
114. Yeh JS**, Sarpatwari A, **Kesselheim AS**. Ethical and practical considerations in removing Black Box Warnings from drug labels. Drug Safety 2016;39(8):709-714.
115. Capati VC** and **Kesselheim AS**. Drug product life-cycle management as anticompetitive behavior: the case of memantine. Journal of Managed Care & Specialty Pharmacy 2016;22(4):339-344.
116. Kapczynski A and **Kesselheim AS**. Government 'patent use': a legal approach to reduce drug spending. Health Affairs 2016;35(5):791-797.
    - Grabowski H. Government appropriation of breakthrough drug patent rights would deter biopharmaceutical R&D and innovation. [Commentary] Health Affairs Blog. June 20, 2016. Available on-line at: https://www.healthaffairs.org/do/10.1377/hblog20160620.055440/full/
    - Kapczynski A, **Kesselheim AS**. Why government patent use to lower drug costs won't stifle innovation. [Author response] Health Affairs Blog. July 28, 2016. Available at: http://healthaffairs.org/blog/2016/07/28/why-government-patent-use-to-lower-drug-costs-wont-stifle-innovation/
117. Treasure CL** and **Kesselheim AS**. How patent troll legislation can increase timely access to generic drugs. JAMA Internal Medicine 2016;176(6):729-30.
118. Engelberg AB and **Kesselheim AS**. Use the Bayh-Dole Act to lower drug prices for government healthcare programs. Nature Medicine 2016;22(6):576.
119. Sarpatwari A**, Avorn J, **Kesselheim AS**. State initiatives to control medication costs — can transparency legislation help? New England Journal of Medicine 2016;374(24):2301-2304.
120. Luo J** and **Kesselheim AS**. Protecting pharmaceutical patents and data: How the Trans-Pacific Partnership Agreement could affect access to medicines in the US and abroad. AMA Journal of Ethics 2016;18:727-735.
121. Hwang TJ** and **Kesselheim AS**. Leveraging novel and existing approval pathways to combat antimicrobial resistance. American Journal of Law & Medicine 2016;42:429-450.
122. Hey SP** and **Kesselheim AS**. Countering imprecision in precision medicine. Science 2016;353(6298):448-449.
123. Hey SP** and **Kesselheim AS**. The FDA, Juno Therapeutics, and the ethical imperative of transparency. BMJ 2016;354:i4435.
124. Sinha MS** and **Kesselheim AS**. Regulatory incentives for antibiotic development: a review of recent proposals. Bioorganic & Medicinal Chemistry. 2016;24(24):6446-6451.
125. Kimmelman J and **Kesselheim AS**. Translational research and the U.S. federal elections. Science Translational Medicine 2016;8(361):361ed13.
126. **Kesselheim AS** and Avorn J. Approving a problematic muscular dystrophy drug: implications for FDA policy. JAMA 2016;316(22):2357-2358.
    - Nelson SF, Miceli MC. FDA approval of eteplirsen for muscular dystrophy. [Letter to the Editor] JAMA 2017;317(14):1480.
    - Sackner-Bernstein J. FDA approval of eteplirsen for muscular dystrophy. [Letter to the Editor] JAMA 2017;317(14):1480-1481.
    - **Kesselheim AS**, Avorn J. FDA Approval of eteplirsen for muscular dystrophy. [Author reply] JAMA 2017;317(14):1481-1482.
127. Robertson CT and **Kesselheim AS**. Regulating off-label promotion—a critical test. New England Journal of Medicine 2016;375(24):2313-2315.

128. Sarpatwari A**, Gagne JJ, Levidow NL**, **Kesselheim AS**. Active surveillance of follow-on biologics: a prescription for uptake. Drug Safety 2017;40(2):105-108.
129. Carrier MA, Levidow NL**, **Kesselheim AS**. Using antitrust law to challenge Turing's Daraprim price increase. Berkeley Technology Law Journal 2016;31(2):1379-1408.
130. Mostaghim S** and **Kesselheim AS**. Suitability of expanding the priority review voucher into rare disease drug development. Expert Opinion on Orphan Drugs 2016;4:10:1001-1003.
131. **Kesselheim AS** and Avorn J. New "21st Century Cures" legislation—speed and ease vs. science. JAMA 2017;317(6):581-582.
132. Guo E, Jacobs DB, **Kesselheim AS**. Eliminating coverage discrimination through the essential health benefit's anti-discrimination provisions. American Journal of Public Health 2017;107(2):253-254.
133. Luo J**, **Kesselheim AS**, Greene J, Lipska KJ. Strategies to improve the affordability of insulin in the USA. Lancet Diabetes and Endocrinology 2017;5(3):158-159.
134. Fralick M** and **Kesselheim AS**. Periodic Benefit Risk Evaluation Reports have substantial promise to guide patient care and should be made publicly available. Pharmacoepidemiology and Drug Safety 2017;26(5):597-599.
135. Hey SP** and **Kesselheim AS**. Reprioritizing research activity for the post-antibiotic era: ethical, legal, and social considerations. Hastings Center Report 2017;47(2):16-20.
136. Fralick M** and **Kesselheim AS**. FDA approval of desmopressin for nocturia. JAMA 2017;317(20):2059-2060.
    - Fein S, Herschkowitz S. Low-dose desmopressin nasal spray and FDA approval. [Letter to the Editor] JAMA 2017;318(11):1070-1071.
    - Fralick M**, **Kesselheim AS**. Low-dose desmopressin nasal spray and FDA approval. [Author reply] JAMA 2017;318(11):1071-1072.
137. Kramer DB** and **Kesselheim AS**. Coverage of magnetic resonance imaging for patients with cardiac devices: improving the coverage with evidence development program. JAMA Cardiology 2017;2(7):711-712.
138. Sharfstein JM, Miller JD, Davis AL, Ross JS, Alexander GC, **Kesselheim AS**. FDA Transparency Working Group. Blueprint for Transparency at the U.S. Food and Drug Administration: Recommendations to Advance the Development of Safe and Effective Medical Products. Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):7-23. Available at http://jhsph.edu/BlueprintFDA.
    - Califf RM. Transparency at the U.S. Food and Drug Administration. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):24-28.
    - Carpenter D. FDA transparency in an inescapably political world. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):29-32.
    - Kapczynski A and Kim J. Clinical trial transparency: the FDA should and can do more. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):33-38.
    - Cortez N. FDA and the marketplace of ideas for medical products. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):39-41.
    - Doshi P and Jefferson T. Disclose data publicly, without restriction. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):42-45.
    - Almashat S and Carome M. Withholding information on unapproved drug marketing applications: the public has a right to know. [Commentary] Journal of Law, Medicine & Ethics 2017;45(4 suppl 2):46-49.
139. Sinha MS** and **Kesselheim AS**. The effects of the Sunshine Act: what can and should we expect? American Journal of Bioethics 2017;17(6):22-24.
140. Chen CT and **Kesselheim AS**. The journey of generic imatinib: a case study in oncology drug

pricing. Journal of Oncology Practice 2017;13(6):352-355.
141. Gellad WF and **Kesselheim AS**. Accelerated approval and expensive drugs — a challenging combination. New England Journal of Medicine 2017;376(21):2001-2004.
142. Hwang TJ** and **Kesselheim AS**. Challenges in the development of novel cardiovascular therapies. Clinical Pharmacology and Therapeutics 2017;102(2):194-196.
143. Hwang TJ**, **Kesselheim AS**, Sarpatwari A. Value-based pricing and state reform of prescription drug costs. JAMA 2017;318(7):609-610.
144. Bonnie RJ, **Kesselheim AS**, Clark DJ. Both urgency and balance needed in addressing opioid epidemic. JAMA 2017;318(5):423-424.
145. Sarpatwari A**, Sinha MS, **Kesselheim AS**. The opioid epidemic: fixing a broken pharmaceutical market. Harvard Law and Policy Review 2017;464(11):463-484.
146. Hey SP**, Cohen IG, Adashi EY, **Kesselheim AS**. Influence, integrity, and the FDA: an ethical framework. Science 2017;357(6354):876-877.
147. **Kesselheim AS**, Sinha MS**, Avorn J. Determinants of market exclusivity for prescription drugs in the United States. JAMA Internal Medicine 2017;177(11):1658-1664.
148. Vokinger KN**, **Kesselheim AS**, Avorn J, Sarpatwari A**. Strategies that delay market entry of generic drugs. JAMA Internal Medicine 2017;177(11):1665-1669.
149. Seeley E, **Kesselheim AS**. Outcomes-based pharmaceutical contracts: an answer to high U.S. drug spending? Commonwealth Fund Issue Brief. 2017 Sep:1-8. Available from: http://www.commonwealthfund.org/publications/issue-briefs/2017/sep/outcomes-based-contracts-high-drug-spending
150. Bothwell LE**, **Kesselheim AS**. The real-world ethics of adaptive-design clinical trials. Hastings Center Report 2017;47(6):27-37.
151. Darrow JJ**, Beall RF**, **Kesselheim AS**. Will inter partes review speed US generic drug entry? Nature Biotechnology 2017;35(12):1139-1141.
152. Sinha MS**, **Kesselheim AS**, Darrow JJ. Pharmaceutical advertising in medical journals: revisiting a long-standing relationship. Chest 2017;153(1):9-11.
153. Sommers BD, **Kesselheim AS**. Massachusetts' proposed Medicaid reforms — cheaper drugs and better coverage? New England Journal of Medicine 2018;378(2):109-111.
154. Darrow JJ**, Fuse Brown EC, **Kesselheim AS**. The Regulatory Accountability Act of 2017 — implications for FDA regulation and public health. New England Journal of Medicine 2018;378(5):412-414.
155. Hey SP**, Weijer C, Taljaard M, **Kesselheim AS**. Research ethics for emerging trial designs: does equipoise need to adapt? BMJ 2018;360:k226.
156. Lee TT, **Kesselheim AS**, Kapczynski A. Legal challenges to state drug pricing laws. JAMA 2018;319(9):865-866.
157. Powers JH, Evans SR, **Kesselheim AS**. Studying new antibiotics for multidrug resistant infections: are today's patients paying for unproved future benefits? BMJ 2018;360:k587.
158. Darrow JJ**, **Kesselheim AS**. Promoting competition to address pharmaceutical prices. Health Affairs Health Policy Brief March 15, 2018. DOI:10.1377/hpb20180116.967310
    - Lott R. Three new *policy options* papers examine factors driving prescription drug prices. Health Affairs Blog. March 15 2018. Available from: https://www.healthaffairs.org/do/10.1377/hblog20180313.644056/full/
    - Inserro A. Health policy experts voice ways to tame rising drug costs, protect patients. AJMC. April 3, 2018. Available at: http://www.ajmc.com/newsroom/health-policy-experts-voice-ways-to-tame-rising-drug-costs-protect-patients.
159. Lee TT, **Kesselheim AS**. U.S. Food and Drug Administration's PreCertification Pilot Program for digital health software: weighing the benefits and risks. Annals of Internal Medicine

2018;168(10):730-732.
160. Sinha MS**, **Kesselheim AS**. The next forum for unraveling FDA off-label marketing rules: state and federal legislatures. PLoS Medicine 2018;15(5):e1002564.
161. Sacks CA**, **Kesselheim AS**, Fralick M**. The shortage of normal saline in the wake of Hurricane Maria. JAMA Internal Medicine 2018;178(7):885-886.
162. Luo J**, **Kesselheim AS**. Delayed generic market saturation after patent expiration—a billion-dollar problem. JAMA Internal Medicine 2018;178(5):721-722.
163. Sarpatwari A**, Avorn J, **Kesselheim AS**. An incomplete prescription: President Trump's plan to address high drug prices. JAMA 2018;319(23):2373-2374.
164. Zettler PJ, Foster Riley M, **Kesselheim AS**. Implementing a public health perspective in FDA drug regulation. Food and Drug Law Journal 2018;73(2):221-256.
165. Gyawali B**, **Kesselheim AS**. Reinforcing the social compromise of accelerated approval. Nature Reviews Clinical Oncology 2018;15(10):596-597.
166. Wang A, **Kesselheim AS**. Government patent use to address the rising cost of naloxone: 28 U.S.C. § 1498 and Evzio. Journal of Law, Medicine & Ethics 2018;46(2):472-484.
167. Hey SP**, **Kesselheim AS**. Defining "true and non-misleading" for pharmaceutical promotion. Journal of Law, Medicine & Ethics 2018;46(2):552-554.
168. Avorn J, **Kesselheim A**, Sarpatwari A**. The FDA Amendments Act of 2007—assessing its effects a decade later. New England Journal of Medicine 2018;379(12):1097-1099.
169. Darrow JJ**, Sinha MS**, **Kesselheim AS**. When markets fail: patents and infectious disease products. Food & Drug Law Journal 2018;73:361-382.
170. Bonnie RJ, Schumacher MA, Clark JD, **Kesselheim AS**. Pain management and opioid regulation: continuing public health challenges. American Journal of Public Health 2019;109:31-34.
171. Sarpatwari A**, Barenie R**, Curfman G, Darrow JJ**, **Kesselheim AS**. The US biosimilar market: stunted growth and possible reforms. Clinical Pharmacology and Therapeutics 2019;105(1):92-100.
172. Minssen T, **Kesselheim AS**, Darrow JJ**. An export-only exception to pharmaceutical patents in Europe: should the United States follow suit? Nature Biotechnology 2019;37(1):21-22.
173. Sarpatwari A**, **Kesselheim AS**. Tepid steps on drug pricing. JAMA Internal Medicine 2019;179(3):439-441.
174. Liu S**, **Kesselheim AS**. Experiences with and challenges afforded by expedited regulatory pathways. Clinical Pharmacology and Therapeutics 2019;105(4):795-797.
175. Gyawali B**, **Kesselheim AS**. The promise of ESCAT: a new system for evaluating cancer drug-target combination. Nature Reviews Clinical Oncology 2019;16(3):147-148.
176. Gyawali B**, **Kesselheim AS**. FDA approval of new drugs based on non-inferiority trials in oncology: a dangerous precedent? JAMA Oncology 2019;5(5):607-608.
177. Seeley E, **Kesselheim AS**. Pharmacy benefit managers: practices, controversies, and what lies ahead. Issue Brief: Commonwealth Fund. 2019:1-11.
178. Bollyky T, **Kesselheim AS**. Pharmaceutical protections in U.S. trade deals—what do Americans get in return? New England Journal of Medicine 2019;380(21):1993-1995.
179. Kramer DB**, **Kesselheim AS**. Trust and transparency in medical device regulation. BMJ 2019;365:l4166.
180. Sarpatwari A**, **Kesselheim AS**. Reforming the Orphan Drug Act for the 21st century. New England Journal of Medicine 2019;381(2):106-108.
181. Hong P**, Sarpatwari A**, **Kesselheim AS**. Orphan drug designation and exclusivity for "same drugs." Journal of Law, Medicine & Ethics 2019;47(2):347-349.
182. Hwang TJ**, Dusetzina SB, Feng J, Maini L, **Kesselheim AS**. Price Increases of protected-class

drugs in Medicare Part D, relative to inflation, 2012-2017. JAMA 2019;322(3):267-269.
183. **Kesselheim AS**, Sinha MS, Campbell EG, Schneeweiss S, Rausch P, Lappin BM, Zhou EH, Avorn J, Dal Pan GJ. Multimodal analysis of FDA Drug Safety Communications: lessons from zolpidem. Drug Safety 2019;42(11):1287-1295.
184. Zhai MZ, Sarpatwari A**, **Kesselheim AS**. Why are biosimilars not living up to their promise in the US? AMA Journal of Ethics 2019;21(8):E668-678.
185. Bourgeois FT, **Kesselheim AS**. Promoting pediatric drug research and labeling—outcomes of legislation. New England Journal of Medicine 2019;381(9):875-881.
186. Lee TT, Solomon DH, **Kesselheim AS**. Fool me twice? The reemergence of rofecoxib and the Orphan Drug Act. Annals of Internal Medicine 2019;171(8):578-579.
187. Hey SP**, D'Andrea E**, Jung EH**, Tessema F**, Luo J**, Gyawali B**, **Kesselheim AS**. Challenges and opportunities for biomarker validation. Journal of Law, Medicine & Ethics 2019;47(3):357-361.
188. Fralick M**, **Kesselheim AS**. The U.S. insulin crisis—rationing a lifesaving medication discovered in the 1920s. New England Journal of Medicine 2019;381(19):1793-1795.
189. **Kesselheim AS**, Sinha MS**, Avorn J**, Sarpatwari A. Pharmaceutical policy in the United States in 2019: an overview of the landscape and avenues for improvement. Stanford Law and Policy Review 2019;30:421-480.
190. Hwang TJ**, **Kesselheim AS**, Vokinger KN**. Lifecycle regulation of artificial intelligence and machine learning-based software in medicine. JAMA 2019;322(23):2285-2286.
191. Morten CJ, **Kesselheim AS**, Ross JS. The Supreme Court's latest ruling on drug liability and its implications for future failure-to-warn litigation. Journal of Law, Medicine & Ethics 2019;47(4):783-787.
192. Darrow JJ**, **Kesselheim AS**. Incentivizing antibiotic development: why isn't the Generating Antibiotic Incentives Now (GAIN) Act working? Open Forum Infectious Diseases 2020;7(1):ofaa001.
193. Egilman AC, **Kesselheim AS**, Krumholz HM, Ross JS, Kim J, Kapczynski A. Confidentiality orders and public interest in drug and medical device litigation. JAMA Internal Medicine 2020;180(2):292-299.
194. Kurzrock R, Kantarjian HM, **Kesselheim AS**, Sigal EV. New drug approvals in oncology. Nature Reviews Clinical Oncology 2020;17(3):140-146.
195. Luo J**, **Kesselheim AS**, Sarpatwari A**. Insulin access and affordability in the USA: anticipating the first interchangeable insulin product. Lancet Diabetes & Endocrinology 2020;8(5):360-362.
196. Sarpatwari A**, Brown D, **Kesselheim AS** Development of a national public pharmaceutical research and development institute. Journal of Law Medicine and Ethics 2020;48(1):225-227.
197. Fralick M**, **Kesselheim AS**. Using real-world safety data in regulatory approval decisions: sotagliflozin and the risk of diabetic ketoacidosis. Pharmacoepidemiology and Drug Safety 2020;29(10):1322-1324.
198. Naci H**, Salcher-Konrad M, **Kesselheim AS**, Wieseler B, Rochaix L, Redberg RF, Salanti G, Jackson E, Garner S, Stroup TS, Cipriani A. Generating comparative evidence on new drugs and devices before approval. Lancet 2020;395(10228):986-997.
199. Dal-Ré V, **Kesselheim AS**, Bourgeois FT. Irregularities and misconduct in clinical trials: increasing access to FDA inspection reports. JAMA 2020;323(19):1903-1904.
200. Zhai MZ, Lye CT, **Kesselheim AS**. Emergency Use Authorizations for COVID-19 therapies: the need for transparency and reliable evidence. JAMA Internal Medicine 2020;180(9):1145-1146.
201. Darrow JJ**, Chong JE, **Kesselheim AS.** Reconsidering the scope of US state laws allowing pharmacist substitution of generic drugs. BMJ 2020;369:m2236.

202. **Tessema FA****, Kesselheim AS, Sinha MS**. Generic but expensive: why prices can remain high for off-patent drugs. Hastings Law Journal 2020;71(4):1019-1052.
203. Woloshin S, Patel N**, **Kesselheim AS.** False negative tests for SARS-CoV-2 infection—challenges and implications. New England Journal of Medicine 2020;383(6):e38.
204. Naci H**, **Kesselheim AS.** Specialty drugs—a distinctly American phenomenon. New England Journal of Medicine 2020;382(23):2179-2181.
205. Hong P, **Kesselheim AS**, Sarpatwari A**. Transformative models to promote prescription drug innovation and access: a landscape analysis. Yale Journal of Health Policy, Law, and Ethics 2020;19:52-89.
206. Avorn J, **Kesselheim A**. Regulatory decision-making on COVID-19 vaccines during a public health emergency. JAMA 2020;324(13):1284-1285.
207. Bollyky T, **Kesselheim AS**. Reputation and authority: FDA and the fight over US prescription drug importation. Vanderbilt Law Review 2020;73(5):1331-1400.
208. Raunig BL**, **Kesselheim AS**, Darrow JJ**. Drug shortages and the Defense Production Act. American Journal of Public Health 2020;110(10):1504-1505.
209. Vreman RA**, Leufkens HG, **Kesselheim AS**. Getting the right evidence after drug approval. Frontiers in Pharmacology 2020 Sep 9;11:569535.
210. Sarpatwari A**, Kaltenboeck A, **Kesselheim AS**. Missed opportunities on emergency remdesivir use. JAMA 2020;324(4):331-332.
211. Avorn J, **Kesselheim AS**. Up is down—pharmaceutical industry caution vs. federal acceleration of Covid-19 vaccine approval. New England Journal of Medicine 2020;383(18):1706-1708.
212. Sarpatwari A**, Avorn J, **Kesselheim AS**. Accounting for US public funding in drug development: how can we better balance access, affordability, and innovation? BMJ 2020;371:m3841.
213. Lee CC**, Darrow JJ**, Avorn J, **Kesselheim AS**. Origins and ownership of remdesivir: implications for pricing. Journal of Law, Medicine & Ethics 2020;48(3):613-618.
214. Tan YT**, **Kesselheim AS**. Implementing U.S. Covid-19 testing: regulatory and infrastructural challenges. Journal of Law, Medicine & Ethics 2020;48(3):608-612.
215. Minssen T, Outterson K, Rogers Van Katwyk S, Batista PHD, Chandler CIR, Ciabuschi F, Harbarth S, **Kesselheim AS**, Laxminarayan R, Liddell K, Osterholm MT, Price L, Hoffman SJ. Social, cultural and economic aspects of antimicrobial resistance. Bulletin of the World Health Organization 2020;98(12):823-823A.
216. Feldman WB**, Rome BN**, Avorn J, **Kesselheim AS**. The future of drug-pricing transparency. New England Journal of Medicine 2021;384(6):489-491.
217. Gyawali B**, **Kesselheim AS**. FDA approval standards for anticancer drugs—lessons from two recent approvals in breast cancer. Nature Reviews Clinical Oncology 2021;18(7):397-398.
    - Named one of the "most read" articles of 2021 in <u>Nature Reviews Clinical Oncology</u>.
218. Alexander GC, Emerson S, **Kesselheim AS**. Evaluation of aducanumab for Alzheimer Disease: scientific evidence and regulatory review involving efficacy, safety, and futility. JAMA 2021;325(17):1717-1718.
    - Named one of the "<u>most read</u>" articles of 2021 in <u>JAMA</u>.
219. Sinha MS**, Powers JH III, **Kesselheim AS**. The wrong cure: financial incentives for unimpressive new antibiotics. Journal of Infectious Diseases 2021;223(9):1506-1509.
220. Rand LZ**, **Kesselheim AS**. International reference pricing for prescription drugs in the United States: administrative limitations and collateral effects. Value in Health 2021;24(4):473-476.
221. Vokinger KN**, Feuerriegel S, **Kesselheim AS**. FDA's action plan on continual learning in medical devices. Lancet Digital Health 2021;3(6):e337-e338.
222. Gyawali B**, Darrow JJ**, **Kesselheim AS**. Integrating new effectiveness data into US Food

and Drug Administration -approved drug labeling. JAMA Internal Medicine 2021;181(7):897-898.
223. Sarpatwari A**, **Kesselheim AS**. Public sector and non-profit contributions to drug development—historical scope, opportunities, and challenges. Journal of Law, Medicine & Ethics 2021;49(1):6-9.
224. Rome BN**, **Kesselheim AS**. Will ending the Medicaid drug rebate cap lower drug prices? JAMA Internal Medicine 2021;181(8):1034-1035.
225. Gyawali B**, Ross JS, **Kesselheim AS**. Fulfilling the mandate of the US Food and Drug Administration's accelerated approval pathway: the need for reforms. JAMA Internal Medicine 2021;181(10):1275-1276.
226. Walsh BS**, Bloomfield D**, **Kesselheim AS**. A court decision on "skinny labeling": another challenge for less expensive drugs. JAMA 2021;326(14):1371-1372.
227. Alexander GC, Knopman DS, Emerson SS, Ovbiagele B, Kryscio RJ, Perlmutter JS, **Kesselheim AS.** Revisiting FDA approval of aducanumab. New England Journal of Medicine 2021;385(9):769-771.
228. Walsh BS**, **Kesselheim AS**. CAAP rule and prescription drug prices. American Journal of Managed Care 2021;27(8):312-314.
229. van de Wiele VL**, Darrow JJ**, **Kesselheim AS**. No parking here: a review of generic drug 180-day exclusivity and recent reform proposals. Yale Journal of Health Policy, Law, and Ethics 2021;20:1-15.
230. Brown BL**, **Kesselheim AS**. How should clinicians and organizations assess risks and benefits of first-in-human implantation of investigational devices? AMA Journal of Ethics 2021;23(9):E673-678.
231. Vokinger KN**, Feuerreigel S, **Kesselheim AS**. Mitigating bias in machine learning for medicine. Communications in Medicine 2021;1:25.
232. Liu S**, Darrow JJ**, **Kesselheim AS**. Patient Assistance Programs for prescription drugs: charities or kickbacks? American Health Law Association Journal 2021;15(2):68-93.
233. Gardiner J, **Kesselheim AS**. Over-The-Counter Monograph Safety, Innovation, and Reform Act. Journal of Law, Medicine & Ethics 2021;49(2):321-327.
234. Rand LZ**, **Kesselheim AS.** Performance-Linked Reimbursement and the Uncertainty of Novel Drugs. Circulation Cardiovascular Quality and Outcomes 2022;15(1):e008642.
235. Mitra-Majumdar M**, **Kesselheim AS**. Reporting bias in clinical trials: progress toward transparency and next steps. PLoS Med 2022;19(1):e1003894
236. Bloomfield D**, Walsh BS**, **Kesselheim AS.** Extending drug monopolies by patenting safe drug use. JAMA Internal Medicined 2022;386(12):1104-1106.
237. Lalani HS**, Avorn J, **Kesselheim AS**. US taxpayers heavily funded the discovery of COVID-19 vaccines. Clinical Pharmacology and Therapeutics 2022;111(3):542-544.
238. Engelberg AB, Avorn J, **Kesselheim AS.** A new way to contain unaffordable medication costs—exercising the government's existing rights. New England Journal of Medicine 2022;386(12):1104-1106.
239. Walsh BS**, **Kesselheim AS**, Darrow JJ**. Orange and Purple Book legislation suggests a need to bridge drug and biologic patent regimes. Nature Biotechnology 2022;40:167-170.
240. **Kesselheim AS**. Accelerated approved and aducanumab: where do we go from here? Clinical Pharmacology and Therapeutics 2022;111(4):726-727.
241. Vokinger KN**, **Kesselheim AS**. Value-based pricing for drugs with multiple indications or combination therapies – lessons from Europe. Nature Reviews Clinical Oncology 2022;19(1):1-2.
242. Sinha MS**, **Kesselheim AS**, Robertson CT. Patient assistance programs and the Anti-Kickback Statute: charting a pathway forward. JAMA 2022;327(13):1231-1232.

243. Whitehouse P, Gandy S, Saini V, George DR, Larson EB, Alexander GC, Avorn J, Brownlee S, Camp C, Chertkow H, Fugh-Berman A, Howard R, **Kesselheim A**, Langa K, Perry G, Richard E, Schneider L. Making the case for accelerated withdrawal of aducanumab. Journal of Alzheimer's Disease 2022;87(3):1003-1007.
244. Lalani HS**, **Kesselheim AS**, Rome BN**. Direct-to-consumer generic drugs: a maverick approach or another exposure of market failures? Annals of Internal Med 2022;175(6):890-891.
245. Knox RP**, **Kesselheim AS**, Sarpatwari A**. Risks to the 340B drug pricing program related to manufacturer restrictions on drug availability. JAMA 2022;327(17):1647-1648.
    - Daifotis AG. Risks to the 340B Drug Pricing Program. JAMA 2022;328(11):1109.
    - Knox RP, Sarpatwari A. Risks to the 340B Drug Pricing Program—Reply. JAMA 2022;328(11):1109-1110.
246. Bothwell LE**, Tseng LY, Bhattacharya A, Datta A, Rajashekar N, **Kesselheim AS**. Assessing Federal Policies on the Inclusion of Women, Racial and Ethnic Minorities, People of Diverse Ages, People with Disabilities, and Sexual Minorities in Clinical Trials and Clinical Research. In *Improving Representation in Clinical Trials and Research* (Bibbins-Domingo K and Helman A, eds.) National Academies Press: 2022. Available at: https://nap.nationalacademies.org/resource/26479/Bothwell_Assessing_Federal_Policies_on_the_Inclusion_of_Women_and_Minorities-Clinical_Trials.pdf
247. Feldman WB**, Avorn J, **Kesselheim AS**. Switching to over-the-counter availability of Rescue Inhalers for Asthma. JAMA 2022;327(11):1021-1022.
    - May KR, Oppenheimer JJ, Szefler SJ. Over-the-counter availability of rescue inhalers for asthma. JAMA 2022;328(2):215.
    - Gray SE, Press VG. Over-the-counter availability of rescue inhalers for asthma. JAMA 2022;328(2):215-216.
    - Feldman WB**, Avorn J, **Kesselheim AS**. Over-the-counter availability of rescue inhalers for asthma—reply. JAMA 2022;328(2):216-217.
248. Cohen PA, Avorn J, **Kesselheim AS**. Institutionalizing misinformation — the Dietary Supplement Listing Act of 2022. New England Journal of Medicine 2022;387(1):3-5.
249. Woloshin S, **Kesselheim AS.** What to know about the Alzheimer drug aducanumab (Aduhelm). JAMA Internal Medicine 2022;182(8):892.
250. Bendicksen L**, **Kesselheim AS**. Anticipated efficiencies, real costs: Medicaid managed care organizations and the pharmacy benefit. Journal of Managed Care and Specialty Pharmacy 2022;28(3):354-361.
251. Wolitz RE**, **Kesselheim AS**, Darrow JJ**. Government patent use to promote public health in the United States: overcoming nonpatent exclusivities. American Journal of Public Health 2022;112(8):1110-1114.
252. Raymakers AJN, **Kesselheim AS**. Promoting confidence in cost-effectiveness analyses. BMJ 2022;377:o1452.
253. Rand LZ**, **Kesselheim AS**. Payments for research participation: don't tax the Guinea pig. Clinical Trials 2022;1-5.
254. Sarpatwari A**, **Kesselheim AS**, Cook-Deegan R. Bayh-Dole at 40: accomplishments, challenges, and possible reforms. Journal of Health Politics, Policy, and Law 2022;47(6):879-895.
255. Tessema FA**, Sarpatwari A**, Rand LZ**, **Kesselheim AS**. High-priced sickle cell gene therapies threaten to exacerbate US health disparities and establish new pricing precedents for molecular medicine. Journal of Law, Medicine & Ethics 2022;50(2):380-384.
256. Hwang TJ**, **Kesselheim AS**, Dusetzina SB. Reforming patient cost sharing for cancer medications in Medicare Part D. JAMA Oncology 2022;8(10):1398-1400.

257. Fuse Brown EC, **Kesselheim AS**. The history of health law in the United States. New England Journal of Medicine 2022;387(4):289-292.
258. Fuse Brown EC, **Kesselheim AS**, Malina D, Pittman G, Morrissey S. Fundamentals of health law—a new Perspective series. New England Journal of Medicine 2022;387(4):372-373.
259. Hwang TJ**, **Kesselheim AS**, Rome BN**. New reforms to prescription drug pricing in the US: opportunities and challenges. JAMA 2022;328(11):1041-1042.
260. Daval CJR**, **Kesselheim AS**, Sarpatwari A**. Improving the use of FDA Advisory Committees. New England Journal of Medicine 2022;387(8):675-677.
261. Trapani D, Tay-Teo K, Tesch ME, Roitberg F, Sengar M, Altuna SC, Hassett MJ, Genazzani AA, **Kesselheim AS**, Curigliano G. Implications of oncology trial design and uncertainties in efficacy-safety data on health technology assessments. Current Oncology 2022;29(8):5774-5791.
262. **Kesselheim AS.** Variability in global drug prices. Clinical Advances in Hematology and Oncology 2022;20(9):550-551.
263. Amin T, **Kesselheim AS**. A global intellectual property waiver is still needed to address the inequities of COVID-19 and future pandemic preparedness. Inquiry 2022;59:469580221124821.
264. Rand LZ**, **Kesselheim AS.** Limitations on the capability of the FDA to advise. American Journal of Bioethics 2022;22(10):15-17.
265. Hwang TJ**, **Kesselheim AS**, Vokinger KN**. Reforming the World Health Organization's essential medicines list: essential but unaffordable. JAMA 2022;328(18):1807-1808.
266. Teng TW, **Kesselheim AS**, Tu SS. Antibody patent evolution. IEEE Pulse 2022;13(5):33-37.
267. Nagar S**, Rand LZ**, **Kesselheim AS**. What should US policymakers learn from international drug pricing transparency strategies? AMA Journal of Ethics 2022;24(11):E1083-1090.
268. Lindgren L, **Kesselheim AS**, Kramer DB**. The right to repair software-dependent medical devices. Journal of Law, Medicine & Ethics 2022;50(4):857-859.
269. Patel NG**, **Kesselheim AS**. The $5 billion hop: glatiramer acetate and the US patent system. Journal of Law, Medicine & Ethics 2022;50(4):852-856.
270. Beall RF**, Glazer T, Ahmad H, Buell M, Hahn S, Houston AR, **Kesselheim AS**, Nickerson JW, Kaplan W. Patent 'evergreening' of medicine-device combination products: A global perspective. Healthcare Policy 2022;18(2):14-26.
271. Richie CS, **Kesselheim AS**, Jones DS. Climate change and the prescription pad. Lancet 2023;401(10372):178-179.
    - Armitage R. Concerns about climate activism in clinical practice. Lancet 2023;401(10390):1771-1772
    - Richie C, **Kesselheim AS**, Jones DS. Concerns about climate activism in clinical practice—Authors' reply. Lancet 2023;401(10390):1772.
272. Tu SS, Nagar S**, **Kesselheim AS.** Recent patent reform bills and their implications for prescription drugs. JAMA 2023;329(6):459-460.
273. Vokinger KN**, Avorn J, **Kesselheim AS.** Sources of innovation in gene therapies—approaches to achieving affordable prices. New England Journal of Medicine 2023;388(4):292-295.
274. Daval CJR**, Bendicksen L**, **Kesselheim AS**. Eroding judicial deference to the FDA—consequences for public health. New England Journal of Medicine 2023;388(11):963-966.
275. Rand LZ**, Melendez-Torres GJ, **Kesselheim AS**. Alternatives to the quality-adjusted life year: how well do they address common criticisms? Health Services Research 2023;58(2):433-444.
276. Patel NG**, **Kesselheim AS**, Darrow JJ**. Trust and regulation: assuring scientific independence in the FDA's Emergency Use Authorization process. Journal of Health Politics Policy and Law 2023;48(5):799-820.
277. Cliff ERS**, Janakiram M, **Kesselheim AS**. Melflufen: post-hoc subgroup analyses and the US FDA Oncologic Drugs Advisory Committee. Lancet Haematology 2023;10(5):e314-e317.

278. Van de Wiele VL**, Raymakers A**, **Kesselheim AS**, Rome BN**. Transferable exclusivity vouchers and incentives for antimicrobial development in the European Union. Journal of Law, Medicine & Ethics 2023;51(1):213-216.
279. Cliff ERS**, Kelkar AH, Russler-Germain DA, Tessema FA, Raymakers AJN, Feldman WB**, **Kesselheim AS.** High cost of chimeric antigen receptor T-cells: challenges and solutions. American Society of Clinical Oncology Education Book 2023;43:e397912.
280. Messinger JC, Beletsky L, **Kesselheim AS**, Barenie RE**. Moving naloxone over the counter is necessary, but not sufficient. Annals of Internal Medicine 2023;176(8):1109-1112.
281. Kishore S, **Kesselheim AS**, Nayak R. 340B: where do we go from here? JAMA 2023;330(7):593-594.
282. Daval CJR**, **Kesselheim AS.** Authority of Medicare to limit coverage of FDA-approved products: legal and policy considerations. JAMA Internal Medicine 2023;183(9):999-1004.
    - Crosson FX, **Redberg RF**. Statutory authority for Medicare coverage decisions—CMS is an independent federal agency. JAMA Internal Medicine 2023;183(9):910-912.
283. Cliff ERS**, **Kesselheim AS**, Feldman WB**. Ensuring ethical postprogression therapy for patients in randomized trial control arms. Journal of Clinical Oncology 2023;41(24):3984-3987.
284. Bendicksen L**, Zuckerman DM, Avorn J, Phillips S, **Kesselheim AS.** The regulatory repercussions of approving Muscular Dystrophy medications on the basis of limited evidence. Annals of Internal Medicine 2023;176(9):1251-1256.
285. Bendicksen L**, **Kesselheim AS**. Battles over medication abortion threaten the integrity of drug approvals in the U.S. Journal of Law, Medicine & Ethics 2023;51(2):448-449.
286. Daval CJR**, Bendicksen L**, **Kesselheim AS.** Protecting Medicare's discretion to say no to unproven therapies. JAMA 2023;330(12):1133-1134.
287. Gyawali B, **Kesselheim AS**, Ross JS. The accelerated approval program for cancer drugs – finding the right balance. New England Journal of Medicine 2023;389(11):968-971.
288. Vogel M, **Kesselheim AS**, Feldman WB**, Rome BN**. Will Medicare price negotiation delay cancer-drug launches? New England Journal of Medicine 2023;389(17):1546-1548.
289. Singhal U, Horrow C**, **Kesselheim AS**, Morgan TM**.** Modernizing federal oversight of laboratory-developed tests — toward safety, validity, and utility. New England Journal of Medicine 2023;389(19):1735-1737.
    - Peck Palmer OM. Federal oversight of laboratory-developed tests. New England Journal of Medicine 2024;390(5):483.
    - Pierce VM, Humphries RM. Federal oversight of laboratory-developed tests. New England Journal of Medicine 2024;390(5):482-483.
    - Sholl LM, Adem P. Federal oversight of laboratory-developed tests. New England Journal of Medicine 2024;390(5):482.
    - Singhal U, **Kesselheim AS**, Morgan TM. Federal oversight of laboratory-developed tests. Reply. New England Journal of Medicine 2024;390(5):483-484.
290. Vokinger KN, Glaus CEG, **Kesselheim AS.** Approval and therapeutic value of gene therapies in the US and Europe. Gene Therapy 2023;30(10-11):756-760.
291. Chaitoff A, **Kesselheim AS.** Overcoming challenges to implementing new evidence for low-dose anticoagulant use in peripheral artery disease. Circulation 2023;148(24):1929-1931.
292. Mooney H, Martin MJ, Bendicksen L**, **Kesselheim AS**, Rome BN**, Lalani HS**. Identifying therapeutic alternatives in CMS drug negotiation: the case of etanercept. Journal of Managed Care and Specialty Pharmacy 2023:1-14. *Winner, PhRMA Foundation Prize for "Addressing Unanswered Questions in Medicare Drug Price Negotiation" 2023 Contest*

293. Liu ITT**, Lalani HS**, **Kesselheim AS.** Administrative action on drug pricing: lessons and opportunities for the Center for Medicare and Medicaid Innovation. Journal of Managed Care and Specialty Pharmacy 2023:1-27.
294. Bhargava R, Brown N, Kapczynski A, **Kesselheim AS**, Lim SY, Morten CJ. The constitutionality of Medicare drug-price negotiation under the takings clause. Journal of Law, Medicine and Ethics 2023;51(4):961-971.
295. Tu SS, **Kesselheim AS**. Preserving timely generic drug competition with legislation on “skinny labeling.” Clinical Pharmacology and Therapeutics 2024;115(1):22-24.
296. Vogel M, Rome BN**, **Kesselheim AS**, Feldman WB**. Medicare negotiation’s drug reformulation problem. Annals of Internal Medicine 2024;177(6):817-819.
297. Tibau A, **Kesselheim AS.** Global cooperation and early access-clinical outcomes matter. Lancet Oncology 2024;25(6):687-688.
298. Hwang CS**, **Kesselheim AS**, Rome BN**. Medicare should cover weight loss drugs as long as the prices are affordable. Journal of Law, Medicine & Ethics 2024;52(1):188-190.
299. Cliff ERS**, Hilal T, **Kesselheim AS**. Complicated regulatory decision-making following inconsistent trial results: the issue of ibrutinib for mantle cell lymphoma. Nature Reviews Clinical Oncology 2024;21(1):1-2.
300. Crosson FJ, **Kesselheim AS**. Why some patients overpay for specialty generic drugs. JAMA Internal Medicine 2024 Jan 1;184(1):105-106.
    - *Commentary on:* Dusetzina SB. Medicare Part D Payments for generic imatinib from 2017 to 2023. JAMA Internal Medicine 2024;184(1):104-105.
301. Wouters OJ, **Kesselheim AS.** Quantifying research and development expenditures in the drug industry. JAMA Network Open 20247(6):e2415407.
302. Daval CJR**, **Kesselheim AS.** The origins of “confidential commercial information” at the FDA. 2024;332(7):533-534.
303. Cliff ERS**, Russler-Germain DA, Daval CJR**, **Kesselheim AS.** US Food and Drug Administration's directive to deal with delayed confirmatory trials: lessons from pralatrexate and belinostat for T-cell lymphoma. Journal of Clinical Oncology 2024;42(33):3901-3904.
304. Liu ITT**, **Kesselheim AS**. Drug repurposing via the Best Pharmaceuticals for Children Act. JAMA Pediatrics 2024;178(9):855–856.
305. Daval CJR**, **Kesselheim AS.** Patient assistance programs—a new era of law and policy. JAMA 2024;332(13):1047-1048.
306. Fernandez Lynch H, **Kesselheim AS.** The FDA in the crosshairs—science, politics, and abortion. JAMA 2024;331(15):1269-1270.
307. Bendicksen L**, **Kesselheim AS**, Feldman WB**. Seeking a better paper trail of federal research funding. JAMA 2024;332(13):1049-1050.
308. Freilich J, **Kesselheim AS.** The Patent Trial and Appeals Board: a target for prescription drug patent reform? JAMA 2024;332(15):1237-1238.
309. Hong D**, **Kesselheim AS**. Enhancing health care affordability: strategies for accelerating biosimilar uptake. Arthritis and Rheumatology 2024;76(12):1702-1704.
    - *Commentary on* Roberts ET, Li J, Bansback N, Tseng CW, Shiboski S, Schmajuk G, Yazdany J. Patterns of infliximab biosimilar uptake for Medicare, Medicaid, and private insurance from 2016 to 2022. Arthritis and Rheumatology 2024;76(12):1739-1742.
310. Daval CJR**, **Kesselheim AS**, Cliff ERS**. Confirmatory trials of accelerated approval drugs – will imposing fines reduce delays? New England Journal of Medicine 2024;391(14):1273-1275.
311. Rome BN**, **Kesselheim AS**, Feldman WB**. Medicare’s first round of drug-price negotiation – measuring success. New England Journal of Medicine 2024;391(20):1865-1868.

312. Lalani HS**, Hwang CS**, **Kesselheim AS**, Rome BN**. Strategies to help patients navigate high prescription drug costs. JAMA 2024;332(20):1741-1749.
   - Walter KL. Strategies to help patients afford their medicines in the US. JAMA 2024;332(20):1767-1768.

313. Bloomfield D**, **Kesselheim AS**. Patent claim scope and biosimilar competition in the US and EU. Journal of Law, Medicine & Ethics 2024;52(2):439-442.
   - *Commentary on* Chao B. USPTO's lax policy leads to Humira formulation thicket. Journal of Law, Medicine & Ethics 2024;52(2):429-438.

314. Scholte M, Grimm SE, Pauly B, Verbeeck F, Pasmooij AMG, Bouma B, van Duijn-Wiersma J, Guney E, **Kesselheim AS**, Schmidt HHHW, Joore MA. Revising EU pharmaceutical legislation: will it foster drug repurposing? Drug Discovery Today 2025;30(1):104286.

315. Scholte M, Bendicksen L**, Grimm SE, Abu-Zahra T, Pauly B, Joore M, **Kesselheim AS.** A regulatory roadmap for repurposing: comparing pathways for making repurposed drugs available in the EU, UK, and US. Journal of Law, Medicine, and Ethics 2024;52(4):940-949.

316. Ubel PA, Grouls A, **Kesselheim AS.** Out of pocket getting out of hand—reducing the financial toxicity of rapidly approved drugs. New England Journal of Medicine 2025;392(8):729-731.

317. Feldman WB, Wang SV, **Kesselheim AS.** Real-world evidence is a vital tool for informing treatment strategies in chronic obstructive pulmonary disease. BMJ 2025;388:r427.

318. Ratain MJ, **Kesselheim AS.** Sotorasib's accelerated approval: wrong dose and indication. JAMA Oncology 2025 Mar 13.

319. Feldman WB, **Kesselheim AS**. Active postmarketing surveillance as a legislative priority. BMJ 2025;388:r484.
   - *Commentary on* Everhart AO, Karaca-Mandic P, Redberg RF, Ross JS, Dhruva SS. Late adverse event reporting from medical device manufacturers to the US Food and Drug Administration: cross sectional study. BMJ 2025;388:r484.

320. Lindgren L, **Kesselheim AS**, Tu SS. Certification marks for supporting generic drug quality. Journal of Law, Medicine & Ethics 2025:1-3.

321. Hong D**, **Kesselheim AS**. Strategies to advance drug repurposing for rare diseases. JAMA Network Open 2025;8(5):e258339.
   - *Commentary on* Nijim S, Korsunska A, Zinski J, Bolden SE, Zuccato M, Repasky M, Fajgenbaum DC. Rare disease drug repurposing. JAMA Network Open 2025;8(5):e258330.

322. Daval CJR**, **Kesselheim AS.** The Advisory Committee on Immunization Practices—legal roles, challenges, and guardrails. JAMA 2025 Jun 26.

323. Eisenkraft Klein D**, **Kesselheim AS**, Rand LZ**. The limits of physician-level interventions for cost-related nonadherence: a case for structural reform. American Journal of Bioethics 2025;25(8):123-125.
   - *Commentary on* Ghinea N, Hutchison K, Lotz M, Rogers WA. Cost-related non-adherence to prescribed medicines: what are physicians' moral duties? American Journal of Bioethics 2025;25(8):111-122.

324. Lalani HS**, **Kesselheim AS**, Rome BN**. Benefits and limitations of direct-to-consumer pharmacies in the US. JAMA Network Open 2025;8(8):e2527484.
   - *Commentary on* Gusovsky Chevalier AV, Lin A, Kerber K, Reynolds EL, Callaghan B, Burke JF. Neurologic medication costs in direct-to-consumer drug plan vs commercial insurance plans. JAMA Network Open 2025;8(8):e2527476

325. Nagar S**, Cacodcar A, **Kesselheim AS.** Advance market commitments and their role in public innovation. Journal of Law, Medicine & Ethics 2025 Aug 26:1-4.

326. Park J**, **Kesselheim AS**, Tu SS. Overlapping method of use patents to prevent generic entry. Journal of Law, Medicine & Ethics 2025 Sep 16:1-3.
327. **Kesselheim AS.** FDA regulatory pathways for expedited drug development and approval. Clinical Advances in Hematology Oncology 2025;23(6):382-384.
328. Goh M**, Viens AM, Abdool Karim S, **Kesselheim AS**, Outterson K. Whose burden, whose benefit? Revisiting ethical trade-offs in the WHO guidelines on scaling up mass azithromycin administration. PLoS Medicine 2025;22(9):e1004736.

Scholarship without named authorship

1. Wiske CP, Ogbechie OA, Schulman KA. Options to promote competitive generics markets in the United States. JAMA 2015;314(20):2129-2130.
2. Stanic Benic M, Milanic R, Monnier AA, Gyssens IC, Adriaenssens N, Versporten A, Zanichelli V, Le Maréchal M, Huttner B, Tebano G, Hulscher ME, Pulcini C, Schouten J, Vlahovic-Palcevski V; DRIVE-AB WP1 group. Metrics for quantifying antibiotic use in the hospital setting: results from a systematic review and international multidisciplinary consensus procedure. Journal of Antimicrobial Chemotherapy 2018;73(suppl_6):vi50-vi58.
3. Monnier AA, Schouten J, Le Maréchal M, Tebano G, Pulcini C, Stanic Benic M, Vlahovic-Palcevski V, Milanic R, Adriaenssens N, Versporten A, Huttner B, Zanichelli V, Hulscher ME, Gyssens IC; DRIVE-AB WP1 group. Quality indicators for responsible antibiotic use in the inpatient setting: a systematic review followed by an international multidisciplinary consensus procedure. Journal of Antimicrobial Chemotherapy 2018;73(suppl_6):vi30-vi39.

**Non-peer reviewed scientific or medical publications/materials in print or other media**

Proceedings of meetings or other non-peer reviewed research publications

1. **Kesselheim AS**. Should FDA drug and medical device regulation bar state liability claims? Hearing before the House of Representatives Committee on Oversight and Government Reform (Rep. Waxman, Chairman). 14 May 2008. United States Congressional Record. Serial No. 110-112. Available on-line at: http://www.gpo.gov/fdsys/pkg/CHRG-110hhrg56191/pdf/CHRG-110hhrg56191.pdf.
2. Carpenter DM, **Kesselheim AS**, Avorn J, Law MT, Polsky D. State failure-to-warn litigation plays a critical role in ensuring drug safety. Amicus curiae brief to the Supreme Court in the case of Wyeth v. Levine. Aug 2008.
3. Coukell AG, Avorn J, **Kesselheim AS**, Psaty B, Nissen S, Turner E, Dickersin K, Ross J, Mann H, Caplan A, Maschke K. Comments to the FDA Transparency Task Force. 24 June 2009.
4. **Kesselheim AS**. The essential role of the FDA in certifying innovative device safety and effectiveness. Hearing before the House of Representatives Committee on Energy and Commerce Subcommittee on Health (Rep. Pitts, Chairman). 15 Feb 2012. United States Congressional Record. Serial No. 112-116. Available on-line at: http://www.gpo.gov/fdsys/pkg/CHRG-112hhrg76255/pdf/CHRG-112hhrg76255.pdf.
5. **Kesselheim AS**, Avorn J, Engelberg AB. Comments on draft guidance: 'Size, Shape, and Other Physical Attributes of Generic Tablets and Capsules' (FDA-2013-B-1434-0001). 2014 Mar 10. Available on-line at: http://www.regulations.gov/#!documentDetail;D=FDA-2013-N-1434-0022.
6. **Kesselheim AS**, Avorn J, Duke J. Comments on proposed rule: 'Supplemental Applications Proposing Labeling Changes for Approved Drugs and Biologic Products' (RIN 0910-AG94). 2014 Mar 10. Available on-line at: http://www.regulations.gov/#!documentDetail;D=FDA-2013-N-0500-0023
7. **Kesselheim AS**. 21st century cures: modernizing clinical trials. Hearing before the House of Representatives Committee on Energy and Commerce Subcommittee on Health (Rep. Pitts,

Chairman). 9 Jul 2014. United States Congressional Record. Serial No. 113-157. Available on-line at: https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg91847/html/CHRG-113hhrg91847.htm.

8. **Kesselheim AS**. Why are generic drugs suddenly skyrocketing in price? Hearing before the Senate Committee on Health, Education, Labor and Pensions Subcommittee on Primary Health and Aging (Sen. Sanders, Chairman). 20 Nov 2014. United States Congressional Record. Senate Hearing 113-859. Available on-line at: https://www.gpo.gov/fdsys/pkg/CHRG-113shrg24459/html/CHRG-113shrg24459.htm.
9. Alpern JD, Stauffer WB, **Kesselheim AS**. Comments on proposed rule: 'Proposed Criteria for "First Generic" Submissions for Purposes of Abbreviated New Drug Application Review Prioritization Under the Generic Drug User Fee Amendments' (RIN FDA-2014-N-1741). 2014 Dec 7. Available on-line at: http://www.regulations.gov/#!documentDetail;D=FDA-2014-N-1741-0003.
10. Sarpatwari A**, **Kesselheim AS**. Further comments on proposed rule: 'Supplemental Applications Proposing Labeling Changes for Approved Drugs and Biologic Products' (Docket FDA-2013-N-0500). 2015 Apr 8. Available on-line at: https://www.regulations.gov/document?D=FDA-2013-N-0500-0106.
11. Shachar C, Greenwald R, Sarpatwari A, **Kesselheim AS**, et al. All Payer Claims Databases are important for public health and are not preempted by ERISA. Amicus curiae brief to the Supreme Court in the case of <u>Gobeille v. Liberty Mutual</u>. 2015 Sept.
12. Sarpatwari AS**, **Kesselheim AS**, Avorn J. Comments to CMS re: follow-on biologics reimbursement policy. 2015 Sept 8. Available on-line at: http://freepdfhosting.com/660d337b8f.pdf.
13. **Kesselheim AS**. S.1048: A Bill to Improve Transparency of Drug Research and Development Costs. Hearing before the Massachusetts Legislature Joint Committee on Health Care Financing (Rep. Sanchez and Sen. Welch, Co-Chairman). 2016 Apr 11.
14. Constitutional, Administrative, Contracts, and Health Law Scholars. In support of respondents. Amicus curiae brief to the Supreme Court in the case of <u>Expressions Hair Design v. Schneiderman</u>. 2016 Dec. Available on-line at: http://www.scotusblog.com/wp-content/uploads/2016/12/15-1391-amicus-respondents-Constitutional-Administrative-Contracts-and-Health-Law-Scholars.pdf.
15. Sharfstein JM, Anderson G, Ballreich JM, Brennan HW, Greene JA, Jackson MR, Kapczynski A, **Kesselheim AS**, Lee JJ, Sen AP, Trujillo AJ. Hepatitis C in Louisiana: recommendations on drug availability. Memo to Secretary of Health of Louisiana. May 4, 2017. Available on-line at: http://ldh.la.gov/assets/docs/HepatitisC/ResponsememotoSecretaryGeeHCV.pdf.
16. Sinha MS**, **Kesselheim AS**. Re: FDA-2013-N-0402-0029, Generic Drug User Fee Amendments of 2012; Regulatory Science Initiatives; Public Workshop; Request for Comments. 2017 June 5. (Docket FDA-2013-N-0402-0034). Available on-line at: https://www.regulations.gov/document?D=FDA-2013-N-0402-0034.
17. **Kesselheim AS**. The public health implications of reducing restrictions on off-label promotion. Hearing before the House Committee on Energy and Commerce Subcommittee on Health (Rep. Burgess, Chairman). 12 July 2017. United States Congressional Record. Available on-line at: https://energycommerce.house.gov/events/examining-medical-product-manufacturer-communications
18. **Kesselheim AS**. Strategies that delay timely entry of generic drugs and potential policy solutions: the CREATES Act and beyond. Hearing before the House Committee on the Judiciary Subcommittee on Regulatory Reform, Commercial and Antitrust Law (Rep. Marino, Chairman). 27 July 2017. United States Congressional Record. Available on-line at: https://www.congress.gov/event/115th-congress/house-event/106333

19. Sarpatwari A**, Sinha MS**, **Kesselheim AS**. Administering the Hatch-Waxman Amendments: Ensuring a Balance Between Innovation and Access; Public Meeting; Request for Comments. November 10, 2017. (Docket FDA-2017-N-3615-0001). Available on-line at: https://www.regulations.gov/document?D=FDA-2017-N-3615-0001.
20. **Kesselheim AS**. Origins of and solutions to high drug prices in the US. Hearing before the House Committee on Oversight and Reform (Rep. Cummings, Chairman). 29 January 2019. United States Congressional Record. Available on-line at: https://www.congress.gov/event/116th-congress/house-event/108817
21. **Kesselheim AS**. S.706/H. 1333: An Act to Ensure Prescription Drug Cost Transparency and Affordability. Hearing before the Massachusetts Legislature Joint Committee on Health Care Financing (Rep. Benson and Sen. Friedman, Co-Chairs). 2019 April 11.
22. Bonnie RJ, **Kesselheim AS**, Riley MF, Zettler PJ. Re: Opioid Analgesic Drugs: Considerations for Benefit-Risk Assessment Framework; Draft Guidance for Industry; Availability; Request for Comments. August 20, 2019 (Docket FDA-2019-D-1536). Available on-line at: https://www.regulations.gov/document?D=FDA-2019-D-1536-0027
23. Fernandez Lynch H, Joffe S, Zettler PJ, Caplan AL, Darrow JJ, Bateman-House A, Sarpatwari A, Snyder J, Naci H, Robertson CT, Andrews JA, **Kesselheim AS**. Re: Conditional Approval Act; Request for Comments to Hon. Bruce Westerman, Hon. Mike Gallagher, Hon. Tim Burchett, Hon. Mike Braun, Hon. Lisa Murkowski. February 3, 2020.
24. **Kesselheim AS**. More cures for more people. Hearing before the House Committee on Ways and Means Subcommittee on Health (Rep. Doggett, Chairman). 5 February 2020. United States Congressional Record. Available on-line at: https://www.congress.gov/event/116th-congress/house-event/110445
25. **Kesselheim AS**. Congress Should Support Development of New Treatments for Pediatric Rare Diseases, But Not with Priority Review Vouchers. Hearing before the House Committee on Energy and Commerce Subcommittee on Health (Rep. Eshoo, Chairwoman). July 29, 2020. https://www.congress.gov/congressional-report/116th-congress/house-report/551/1
26. **Kesselheim AS**. High drug prices in the US: what we can learn from other countries (and some US states). Hearing before the Senate Committee on Health, Education, Labor and Pensions (Sen. Sanders, Chairman). 23 March 2021. United States Congressional Record. Available on-line at: https://www.help.senate.gov/hearings/why-does-the-us-pay-the-highest-prices-in-the-world-for-prescription-drugs
27. **Kesselheim AS**. Addressing pharmaceutical patent abuses could lower drug spending and improve patient outcomes. Hearing before the House Committee on Oversight and Reform (Rep. Maloney, Chairwoman). 18 May 2021. United States Congressional Record. Available on-line at: https:// https://www.congress.gov/117/meeting/house/112631/witnesses/HHRG-117-GO00-Wstate-KesselheimA-20210518.pdf
28. Hwang TJ, **Kesselheim AS**. Reducing prescription drug costs: Policy options for a public plan. Research report for the Urban Institute. December 1, 2020. Available on-line at: https://www.urban.org/research/publication/reducing-prescription-drug-costs
29. **Kesselheim AS**, Brinton EA, Doyle MS, Avorn J, Arnold Ventures, National Center for Health Research. Amicus curiae brief to the Supreme Court in support of Respondents in the case of Amgen v Sanofi (21-757). February 10, 2023.
30. Epstein M, Clemans-Cope L, Banthin J, **Kesselheim A**, Hwang T. A methodology for estimating Medicaid and non-Medicaid net prices using top brand-name drugs, 2015-2019. Brief for the Urban Institute. March 15, 2023. Available on-line at: https://www.urban.org/research/publication/methodology-estimating-medicaid-and-non-medicaid-net-prices-using-top-brand-name-drugs

31. **Kesselheim AS**. How the government supports meaningful drug and device innovation: funding development of transformative therapies and avoiding excessive prices for new products with limited benefits. Hearing before the House Subcommittee on Health of the Committee on Ways and Means (Rep. Buchanan, Chairman). 11 May 2023. United States Congressional Record. Available on-line at: http://waysandmeans.house.gov/wp-content/uploads/2023/05/Kesselheim-Testimony.pdf
32. Frank RG, Scott Morton FM, **Kesselheim AS**, Anderson GF, Conti R, Cutler DM, Hoadley J. Brief of economists and scholars of health policy as amici curiae in support of defendants and in opposition to plaintiff's motion for summary judgment in the US District Court for the District of Columbia in the case of Merck v. Xavier Becerra, et al. (1:23-CV-01615). September 18, 2023.
33. **Kesselheim AS**. The Inflation Reduction Act of 2022: reducing excessive spending and Supporting patient access to brand-name drugs while promoting meaningful innovation. Hearing before the House Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce (Rep. Griffith, Chairman). 20 September 2023. United States Congressional Record. Available on-line at: https://energycommerce.house.gov/events/oversight-and-investigations-subcommittee-hearing-1
34. **Kesselheim AS**. Supporting drug innovation and fair prices for patients with rare diseases: why Congress should not undermine the Inflation Reduction Act, let the priority review voucher program sunset, and fix the Catalyst loophole. Hearing before the House Subcommittee on Health of the Committee on Energy and Commerce (Rep. Guthrie, Chairman). 29 February 2024. United States Congressional Record. Available on-line at: https://democrats-energycommerce.house.gov/sites/evo-subsites/democrats-energycommerce.house.gov/files/evo-media-document/Aaron%20Kesselheim_Witness%20Testimony_02.29.2024.pdf
35. Kapczynski A, Morten CJ, **Kesselheim AS**, Sarpatwari A. Brief of law scholars as amici curiae in support of defendants and in opposition to plaintiff's motion for summary judgment in the US District Court for the District of New Jersey in the case of BMS and Janssen v. Xavier Becerra, et al. (3:23-CV-03818-ZNQ-JBD). October 23, 2023.
36. **Kesselheim AS**, Bhaskar A. Comments in Response to the NIST RFI Regarding the Draft Interagency Guidance Framework for Considering the Exercise of March-in Rights. February 6, 2024. Available on-line at https://www.regulations.gov/comment/NIST-2023-0008-0767
37. Feldman WB, **Kesselheim AS**, Tu SS. Amicus curiae brief of 14 professors of medicine and law as amicus curiae in support of defendants-appellees in the case of Teva v Amneal (23-cv-20964). September 6, 2024.
38. Ratain MJ, **Kesselheim AS**. Comments on FDA Draft Guidance, Expedited Program for Serious Conditions – Accelerated Approval of Drugs and Biologics, Docket Number FDA-2024-D-2033. January 17, 2025. Available on-line at https://www.regulations.gov/comment/FDA-2024-D-2033-0009.
39. Tibau Martorell A, Martin MJ, **Kesselheim AS**. Comments on FDA Draft Guidance, Expedited Program for Serious Conditions – Accelerated Approval of Drugs and Biologics, Docket Number FDA-2024-D-2033. January 30, 2025. Available on-line at https://www.regulations.gov/comment/FDA-2024-D-2033-0012.
40. **Kesselheim AS**. National Institutes of Health funding, drug price negotiaton, and biosimilars: three factors essential for patients and pharmaceutical innovation. Hearing before the House Subcommittee on Health of the Committee on Ways and Means (Rep. Buchanan, Chairman). 8 April 2025. United States Congressional Record. Available on-line at: https://waysandmeans.house.gov/wp-content/uploads/2025/04/Kesselheim-Testimony-1.pdf
41. Frank RG, Scott Morton FM, **Kesselheim AS**, Anderson GF, Conti RM, Cutler DM, Hoadley J. Amicus curiae brief of 14 professors of medicine and law as amicus curiae in support of

defendants-appellees Brief of Economists and Scholars of Health Policy as *Amici Curiae* in Support of Defendants' Motion for Summary Judgment in the case of Teva, et al. v Robert F. Kennedy, Jr., et al. (1:25-cv-00113-SLS). May 5, 2025.

42. Kim J, **Kesselheim AS**, Rome BN. Comments related to the May 12, 2025 Draft Guidance on the Medicare Drug Price Negotiation Program. June 23, 2025.

Reviews, chapters, monographs and editorials

1. Gelband H, Greene A, **Kesselheim AS**, Kidd E. High quality end-of-life care for individuals dying from cancer: current beliefs and barriers. [White Paper] National Cancer Policy Board; January 2000. Available at http://www4.nationalacademies.org/iom/iomhome.nsf/WFiles/ncpbeol/$file/ncpbeol.pdf
2. **Kesselheim AS**. Ensuring quality end-of-life cancer care: an analysis of the current state of patient and family information about end-of-life care issues, its deficiencies, and recommendations for the future. [Textbook chapter] In: Gelband H & Foley KM, eds. Excellent end-of-life care for cancer patients: a policy agenda for action and research. Washington, D.C.: National Academy Press; 2001. Pp. 132-152.
3. **Kesselheim AS**. Patents and intellectual property in medicine. [Textbook chapter] In: Sanbar SS and Firestone MH, eds. Legal Medicine, 7th ed. Philadelphia, PA: Mosby Press; 2007. Pp. 151-158.
4. **Kesselheim AS** and Avorn J. Patents and public health. [Book chapter] In: Galea S, ed. Macrosocial Determinants of Health. New York, NY: Springer Science; 2007. Pp. 233-246.
5. **Kesselheim AS**. An idea takes root: hold expert witnesses accountable. OBG Management 2007;19(11):30-36.
6. **Kesselheim AS**. Resident supervision and patient safety. CRICO/RMF Insight Summer 2008;1.
7. Gagne JJ and **Kesselheim AS**. Experimenting with the consumer: the mass testing of risky products on the American public (Shapo, 2008). Journal of Law Medicine & Ethics 2010;38(2):432-435.
8. **Kesselheim AS**. Innovation and the Orphan Drug Act, 1983-2009: the regulatory and clinical characteristics of approved orphan drugs. [Book chapter] In: Field MJ & Boat TF, eds. Accelerating rare diseases research and orphan product development. Washington, D.C.: National Academy Press, 2010. Pp. 291-308.
9. Licurse A and **Kesselheim AS**. Conflicts of Interest and the Future of Medicine (Rodwin, 2011). Journal of Bioethical Inquiry 2011;8(4):383-386.
10. **Kesselheim AS**. Pharmacoepidemiology and the law. [Textbook chapter] In: Strom B, Kimmel S, Hennessy S, eds. Pharmacoepidemiology, 5th ed. Chichester, UK: John Wiley & Sons, 2012. Pp. 117-134.
11. **Kesselheim AS**. Institutional corruption and perceptions of methodological rigor. [Book chapter] In: Lessig L and Somos M, eds. Research in Action: Lab Dispatches, Vol. 1. Cambridge, MA: Harvard University, 2013. Pp. 19-21.
12. Avorn J, Mo J, Reynolds RF, Dal Pan GJ, Arlett P, **Kesselheim AS**. Views from academia, industry, regulatory agencies, and the legal system. [Textbook chapter] In: Strom BL, Kimmel SE, Hennessy S, eds. Textbook of Pharmacoepidemiology, 2nd ed. Chichester, UK: John Wiley & Sons, 2013. Pp. 63-97.
13. **Kesselheim AS**. The pharmaceutical market's adverse effects (Bad Pharma (Goldacre, 2012)). Health Affairs 2014;33:179-180.
14. **Kesselheim AS**, Mello MM. Prospects for regulation of off-label drug promotion in an era of expanding commercial speech protection. [Textbook chapter] In: Lynch HF and Cohen IG, eds. FDA in the 21st Century: The Challenges of Regulating Drugs and New Technologies. New York,

NY: Columbia University Press, 2015. Pp. 184-203.

15. **Kesselheim AS**, Yeh JS. Interactions with Pharmaceutical and Medical Device Industry Representatives [Textbook chapter]. ACP Smart Medicine. http://smartmedicine.acponline.org/content.aspx?gbosId=393. Updated May 7, 2015. doi 10.7326/el057.
16. Sarpatwari AS, Choudhry NK, Avorn J, **Kesselheim AS**. Using behavioral economics to promote physicians' prescribing of generic drugs and follow-on biologics: what are the issues? [Textbook chapter] In: Cohen IG, Lynch HF, Robertson CT, eds. Behavioral Economics, Law, and Health Policy. Baltimore, MD: Johns Hopkins University Press, 2016. Pp. 158-171.**
17. **Kesselheim AS**. Behavioral economics and the doctor-patient relationship [Textbook chapter introduction] In: Cohen IG, Lynch HF, Robertson CT, eds. Behavioral Economics, Law, and Health Policy. Baltimore, MD: Johns Hopkins University Press, 2016. Pp. 219-221.
18. Kapczynski A, **Kesselheim AS**, Ezer T. Submission to the Department of Trade and Industry on the intellectual property consultative framework. Oct 28 2016. Available on-line at: http://media.wix.com/ugd/148599_721218272a1c43cbaee5ff8fda3a00cf.pdf.
19. **Kesselheim AS**. Background and foundations: Introduction [Textbook chapter introduction] In: Lynch HF, Bierer BE, Cohen IG, Rivera SM, eds. Specimen Science: Ethics and Policy Implications. Cambridge, MA: MIT Press, 2017. Pp. 21-23.
20. Gagne JJ, Avorn J, Gatto NM, Mo J, Dal Pan GJ, Raine J, Uzu S, **Kesselheim AS**, Vokinger KN. Views from academia, industry, regulatory agencies, and the legal system. [Textbook chapter] In: Strom BL, Kimmel SE, Hennessy S, eds. Textbook of Pharmacoepidemiology, 3rd ed. Hoboken, NJ: Wiley-Blackwell, 2022. Pp. 73-112.
21. Vokinger KN, Hwang TJ, **Kesselheim AS**. Lifecycle regulation and evaluation of artificial intelligence and machine learning-based medical devices. [Textbook chapter] In: Cohen IG, Minssen T, Price II WN, Robertson C, Shachar C eds. The Future of Medical Device Regulation: Innovation and Protection. Cambridge, UK: Cambridge University Press, 2022. Pp. 13-21.
22. Dhruva SS, Darrow JJ, Redberg RF, **Kesselheim AS**. Ensuring patient safety and benefit in use of medical devices granted expedited approval. [Textbook chapter] In: Cohen IG, Minssen T, Price II WN, Robertson C, Shachar C eds. The Future of Medical Device Regulation: Innovation and Protection. Cambridge, UK: Cambridge University Press, 2022. Pp. 217-228.
23. Rand L, **Kesselheim AS**, Raymakers A**.** Comments on proposed rule "Discrimination on the Basis of Disability in Health and Human Service Programs or Activities". November 6, 2023. https://www.federalregister.gov/documents/2023/09/14/2023-19149/discrimination-on-the-basis-of-disability-in-health-and-human-service-programs-or-activities#h-21
24. Daval CJR, **Kesselheim AS**. Building public trust in scientific decision making through expert advisory committees: lessons from the FDA. [Monograph] IBM Center for the Business of Government. 2023. Available from: https://www.businessofgovernment.org/report/building-public-trust-scientific-decision-making-through-expert-advisory-committees.

Books/Textbooks for the medical or scientific community

1. Robertson CT, **Kesselheim AS**, eds. Blinding as a Solution to Bias: Strengthening Biomedical Science, Forensic Science, and Law. London, UK: Elsevier Academic Press, 2016.
2. National Academies of Sciences, Engineering, and Medicine Committee on Pain Management and Regulatory Strategies to Address Prescription Opioid Abuse (Bonnie RJ, Amaro H, Burnes Bolton L, Caulkins JP, Clark D, Eliav E, FitzGerald G, Green TC, Hernan M, Hoffer LD, Jarris PE, Kaltenbach K, **Kesselheim AS**, Mackenzie-Brown AM, Moron-Concepcion J, Paltiel AD, Schumacher M, Reyna V). Pain Management and the Opioid Epidemic: Balancing Societal and Individual Benefits and Risks of Prescription Opioid Use. Washington, D.C.: National Academies

Press, 2017.

3. National Academies of Sciences, Engineering, and Medicine Committee on the Clinical Utility of Treating Patients with Compounded "Bioidentical Hormone Replacement Therapy". (Mattison DR, Parker RM, Curtis L, Ellenberg S, Fishman J, Karara AH, **Kesselheim AS**, MacArthur R, Manautou J, Reame NK, Rubinow DR, Tamimi R). The clinical utility of compounded bioidentical hormone therapy: A review of the safety, effectiveness, and use. Washington, D.C.: National Academies Press, 2020.

Letters to the Editor

1. Stedman MR, Elbourne DR, Curtain F, **Kesselheim AS**, Brookhart MA. Meta-analyses involving cross-over trials: methodological issues. [Letter to the Editor] International Journal of Epidemiology 2011;40(6):1732-1734.
2. Outterson K, Powers III JH, Gould IM, **Kesselheim AS**. Questions about the 10 x '20 initiative. [Letter to the Editor] Clinical Infectious Diseases 2010;51(6):751-752.
3. **Kesselheim AS**. Adalimumab pricing and market exclusivity for biologics. [Letter to the Editor] New England Journal of Medicine 2010;363(24):2374.
4. **Kesselheim AS**, Avorn J. Drug labels: a flawed source of data for studying orphan drug approvals. [Letter to the Editor] Clinical Pharmacology and Therapeutics 2012;92(6):694.
5. Luo J**, **Kesselheim AS**. Underrepresentation of older adults in cancer trials [Letter to the Editor] JAMA 2014;311:965-967.
6. Luo J**, **Kesselheim AS**. Transparency in drug costs may improve cost-effectiveness studies. [Letter to the Editor] JAMA 2015;314(20):2191.
7. Fralick M**, **Kesselheim A**, Avorn J. Applying academic detailing and process change to promote Choosing Wisely. [Letter to the Editor] JAMA Internal Medicine 2017;177(2):282.
8. Fralick M**, **Kesselheim AS**. Three design aspects for high quality post-marketing cohort studies. [Letter to the Editor] BMJ 2017;357:j1851.
9. Rome BN**, Feldman WB**, **Kesselheim AS.** Drug prices, rebates, and discounts. [Letter to the Editor] JAMA 2020;324(4):399.
10. Scheffer Cliff ER**, Reynolds G, Popat R, Teh BW, **Kesselheim AS**, Mohyuddin GR**.** Acknowledging infection risk in bispecific antibody trials in the treatment of multiple myeloma. [Letter to the Editor] Journal of Clinical Oncology 2023;41(10):1949-1951.
11. Lalani H**, **Kesselheim AS**. Fairer returns on public investment. [Letter to the Editor] Issues in Science and Technology 2023;XL(1):10-11. Available on-line at: https://issues.org/fairer-returns-on-public-investments/
12. Liu ITT, **Kesselheim AS.** Letter to the Editor: Re: "Life Years Gained from the FDA Accelerated Approval Program in Oncology: A Portfolio Model." Journal of the National Comprehensive Cancer Network 2024;22(7):e247043.

**Professional educational materials or reports, in print or other media**

1. Zerden M, Avorn J, **Kesselheim AS**. Pharmaceutical marketing practices towards physicians. Written for Improvehealthcare.org; 2008.
2. Gold L, Avorn J**, Kesselheim AS**. Postmarketing review and analysis of new drugs. Written for Improvehealthcare.org; 2008.
3. Wheeler LA, Avorn J, **Kesselheim AS**. The FDA and the drug approval process. Written for Improvehealthcare.org; 2008.
4. Rivara M, Mello MM, **Kesselheim AS**. Medical malpractice: Current issues and policies. Written for Improvehealthcare.org; 2008.
5. Song Z and **Kesselheim AS**. Conflicts of interest policies and federal antikickback and fraud laws.

Written for Improvehealthcare.org; 2008.
Teaching cases
All written for medical students affiliated with Improvehealthcare.org, a student-run organization based at Harvard Medical School, with 19 affiliated chapters, that uses case-based learning to teach physicians-in-training about health policy issues. At the time it was developed, it was available to all interested medical students on integrated website.

**Clinical guidelines and reports**

1. **Kesselheim AS**, Stevenson LW, Nohria A, Fischer MA, Avorn J. Assessing patients with decompensated congestive heart failure. Brigham and Women's Hospital medication use guidelines. Feb 2005.
   Clinical algorithm
   Written for cardiologists, emergency department physicians, intensive care physicians and house officers in the Partners healthcare system.
2. Choudhry NK, Fischer MA, Hoge E, **Kesselheim AS**, Parikh S, Shrank WH. The pursuit of happiness: management of depression in the elderly. Independent Drug Information Service; 2008: available at: www.rxfacts.org.
   Evidence-based care guidance document
   Written for physicians caring for elderly patients, for use in academic detailing programs in Pennsylvania and available via Internet website for all interested clinicians. Academic detailing program extending to other states, including New York, South Carolina, Washington D.C., and other countries including Canada and Brazil.
3. Jackowski L, Avorn J, Choudhry NK, Fischer M, **Kesselheim A**, May F, Parikh S, Rowett D, Shrank W. Preventing falls and enhancing mobility in the community dwelling elderly. Independent Drug Information Service; 2009: available at: www.rxfacts.org.
   Evidence-based care guidance document
   Written for physicians caring for elderly patients, for use in academic detailing programs in Pennsylvania and available via Internet website for all interested clinicians. Academic detailing program extending to other states, including New York, South Carolina, Washington D.C., and other countries including Canada and Brazil.
4. Jackowski L, Avorn J, Choudhry NK, Fischer M, **Kesselheim A**, Parikh S, Shrank W. Maximizing function in the patient with impaired cognition and behavior: What the primary care physician needs to know to help patients and caregivers. Independent Drug Information Service; 2009: available at: www.rxfacts.org.
   Evidence-based care guidance document
   Written for physicians caring for elderly patients, for use in academic detailing programs in Pennsylvania and available via Internet website for all interested clinicians. Academic detailing program extending to other states, including New York, South Carolina, Washington D.C., and other countries including Canada and Brazil.

**Thesis**

1. **Kesselheim AS**. A method to their madness: Greek Methodism in its social context. [Honors undergraduate thesis]. On file, Department of History of Science, Cambridge, MA: Harvard University, 1996.

**Abstracts, Poster Presentations, and Exhibits Presented at Professional Meetings**

1. Cliff ERS**, McGuire M, Mohyuddin GR, **Kesselheim AS**, Feldman WB**. Trends in Medicare

spending on multiple myeloma drugs, 2013 to 2021. The 65th ASH Annual Meeting Abstracts. Blood 2023;142:5086-5087.

2. Ge AY, Feldman WB**, Kaiser MF, Rejeski K, Iacoboni G, Dickinson MJ, **Kesselheim AS**, Cliff ERS**. Global Access to Chimeric Antigen Receptor (CAR) T-Cell Therapies: Health Technology Assessment (HTA) of CAR T in G7 Countries and Australia. The 66th ASH Annual Meeting Abstracts. December 8, 2024.

**Narrative Report**

I have established a program of research within the Division of Pharmacoepidemiology and Pharmacoeconomics at BWH and as a faculty member at HMS that combines the fields of medical practice, law and regulation, pharmacoepidemiology, and health services research. My work analyzes how prescribing and other aspects of medication use – and their resulting clinical outcomes – are shaped by drug and device policies, laws, and ethical norms. This work has four interrelated areas of focus.

The first is studying how laws and regulations affect access to and use of therapeutic interventions, as well as drug approval and promotion. This work has led to grant funding from the Laura and John Arnold Foundation to develop empirical research on drug development and the effects of patents and other forms of market exclusivity on medication access, prices, and utilization. Another component of this work studies the role of biomarkers and other surrogate measures in FDA drug approval. The FDA has implemented several policy proposals related to our work through these grants, including a) expediting the review of generic drugs when there are 3 or fewer manufacturers in the field to enhance competition and control costs; b) increasing generic drug competition by issuing guidances on generic drug interchangeability for complex products soon after their initial approval; and c) allowing greater therapeutic substitution across drugs within the same drug class when clinically appropriate.

Second, drawing on my training as a patent attorney, I have studied the effects of market exclusivity on drug innovation, development and use. I have reviewed the impact of patents and legislative incentive programs including the Orphan Drug Act to analyze their strengths and weaknesses in contributing to the discovery and approval of new drugs. Through this work, we have documented the strategies used to delay generic drug availability, and described the role that Orphan Drug Act and other incentives play in the development, evaluation, and approval of new drugs. In work funded by an Investigator Award in Health Policy Research from the Robert Wood Johnson Foundation, I examined the origins and development of the most transformative drugs and devices of the past 25 years. By mapping patents and conducting interviews with key inventors, I described the roles played by academic and private-sector researchers in moving innovation forward, and defined the contribution of patents and other incentives to this work. My studies on the contribution of government-funded research to the development of transformative drugs has been widely cited in the national debate on the proper level of public funding of science in the US.

Third, I have analyzed the clinical, ethical, and economic consequences of regulatory decisions that are based on limited pre-approval clinical studies, and considered the implications for patients, physicians, and payors of making such drugs and devices widely available. This work has examined the increasing use of expedited drug development and regulatory review pathways in the US as well as issues in post-approval followup and the risk-benefit tradeoffs for patients that these products and procedures can pose. In 2013, I was selected to join the Greenwall Faculty Scholar program in Bioethics to study the ethical considerations involved in regulatory determinations about new medications. I have continued pursuing this work through the Program On Regulation, Therapeutics, And Law (PORTAL) that I developed within the Division, which now encompasses a team of junior faculty members, post-doctoral fellows, and students focused on this area and a $1 million annual budget.

Finally, I have conducted empirical research into other intersections of public health, law, and medication use and outcomes, including showing that disclosures about funding directly influence the

interpretation of clinical trial data, often counterproductively (*New England Journal of Medicine*, 2012), and how conflict of interest disclosure policies such as state and federal open payments legislation influence physician reporting and brand-name drug prescribing.

My administrative and institutional leadership has included several novel contributions to the BWH and HMS communities. The PORTAL program, which is among the largest independent research centers in the US focusing on drug policy issues, has attracted numerous talented trainees and faculty and is widely known as a center for expertise on drug regulatory science and policy. PORTAL was recognized with a Pillar Award for research leadership in 2016. In 2020, I was elected as a member of the National Academy of Medicine in recognition of my "national leadership in studying how prescription drugs and medical devices interact with regulatory practices and the law to affect patient health outcomes. Blending rigorous empirical and policy analysis, his research shapes our understanding of how to improve the safety, effectiveness, and affordability of medical products."

The impact of my research has been broad. I was recognized as one of the top 3 most cited health law scholars in the US from 2013-2020 in Web of Science, Westlaw, and GoogleScholar. I have been invited to speak at numerous national and international meetings, and to consult for expert bodies such as the US Patent and Trademark Office and ClinicalTrials.Gov. In 2016, I was appointed to a committee of the National Academies of Science, Engineering, and Medicine and contributed expertise on prescription drug regulation to help shape recommendations on how FDA oversight of opioid medications can best promote public health goals. I currently serve as a Deputy Director of the HMS Regulatory Sciences Advisory Group, as a member of the *New England Journal of Medicine* Perspectives Advisory Board, as a faculty affiliate of the Harvard Law School Petrie-Flom Center for Health Law Policy, Biotechnology, and Bioethics, and as a core faculty member of the HMS Center for Bioethics. In 2015, I was invited to serve on an FDA Advisory Committee and to join the Board of Directors of the American Society of Law, Medicine, and Ethics. In 2017, I was appointed editor-in-chief of its *Journal of Law, Medicine & Ethics*.

Clinically, I practice internal medicine in the Phyllis Jen Center for Primary Care at BWH, where I manage a panel of primary care patients with a wide range of acute and chronic primary care problems. I have cared for many of these patients since my residency, and the ways that they have benefitted from new drug treatments, as well as struggled with issued related to drug costs and side effects, has inspired my work.

Finally, I have been committed to teaching throughout my career. As founder and director of PORTAL, I have been directly responsible for the oversight of numerous post-doctoral fellows, who have gone on to academic and government positions, as well as HMS students interested in prescription drug policy and law. I have consistently taught in the HMS Health Policy course as well as lectured on prescription drug policy issues in annual seminars for medical residents and fellows across the Harvard teaching hospitals. In 2015-2016, I originated a class on Health Law, Policy, and Bioethics for the HMS Center for Bioethics which I now co-lead, and in 2016-2017 I initiated a monthly health policy and bioethics seminar for the entire Harvard community that is also offered for class credit for Bioethics Masters students. In 2014-2015, I was first invited by Yale Law School to teach a class on FDA law. Receiving top student reviews, I was re-appointed as Irving S. Ribicoff Visiting Associate Professor of Law and have continued to teach there yearly since then. Because of growing demand, since 2020, I now teach another version of the class at the same time for the Yale School of Public Health.

## APPENDIX B

## DR. AARON S. KESSELHEIM TESTIMONY (PAST 10 YEARS)

**APPENDIX B**

Dr. Aaron Kesselheim Prior Testimony
Date prepared: October 12, 2025

This list includes all of the cases in which I have testified in the previous ten years.

1. *In re: Amgen Inc. Securities Litigation*, C.D. Cal., Civil Action No. CV 07-2536 PSG (PLAx) (2016 deposition)

2. *United States ex rel. Yoash Gohil v. Sanofi US Services Inc., et al.*, E.D. Pa., Civil Action No. 02-2964 (2019 deposition)

3. In RE: Opioid Litigation, Civil Action No. 21-C-9000 MFR State of West Virginia Opioid Manufacturer Proceedings (Civil Action Nos. 19-C-104 BNE, 19-C-105 BNE and 19-C-151 BNE) (2021 deposition, 2022 trial testimony)

4. Gilead Tenofovir cases, Judicial Council Coordination Proceeding No. 5043 (CJC-19-0050043) Superior Court of the State of California for the County of San Francisco (2022 deposition)

5. IN RE: AVANDIA MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (Civil Action No. 07-MD-1871, USDC, ED PA) (2023 deposition)

6. *State of Connecticut et al. v. Sandoz et al*., E.D. Pa., Civil Action No. 2:20-CV-03539 (MDL 2724, 16-MD-2724) (2024 deposition)

7. *CareFirst of Maryland v. Johnson and Johnson*, E.D. Va., Civil Action No. 2:23-cv-00629-JKW-LRL (2025 deposition)

# APPENDIX C

# DR. AARON S. KESSELHEIM LIST OF MATERIALS RELIED UPON

# APPENDIX C
# LIST OF MATERIALS RELIED UPON

## I. Defendants' Materials

### a. Documents Produced by Edwards and JenaValve[1]

| PX No. | Bates No. |
|---|---|
| PX1004 | EW-FTC-10755495 |
| PX1011 | EW-FTC-11027676 |
| PX1048 | EW-FTC-10165340 |
| PX1057 | EW-FTC-10189314 |
| PX1157 | EW-FTC-11071685 |
| PX1171 | EW-FTC-10137269 |
| PX1172 | EW-FTC-10143001 |
| PX1179 | EW-FTC-10217497 |
| PX1262 | EW-FTC-11038082 |
| PX1263 | EW-FTC-11064810 |
| PX1267 | EW-LIT-00112741 |
| PX1279 | EW-FTC-10339737 |
| PX1281 | EW-LIT-00025920 |
| PX1390 | EW-FTC-10753333 |
| PX1394 | EW-FTC-10999828 |
| PX1397 | EW-LIT-00168342 |
| PX1590 | EW-FTC-10371115 |
| PX1592 | EW-FTC-10015250 |
| PX1594 | EW-LIT-00104461 |
| PX1595 | EW-FTC-10005425 |
| PX1596 | EW-LIT-00045128 |
| PX1597 | EW-LIT-00131143 |
| PX1599 | EW-LIT-00115054 |
| PX1600 | EW-LIT-00069338 |
| PX1601 | EW-LIT-00114505 |
| PX1602 | EW-FTC-10149209 |
| PX2041 | JenaValve-2R-00402862 |
| PX2139 | JenaValve-2R-00209065 |
| PX2190 | JenaValve-2R-00424451 |
| PX2193 | JenaValve-2R-00012728 |
| PX2251 | JV-LIT-00019513 |
| PX2303 | JenaValve-2R-01393703 |

[1] Including associated document family members where applicable.

| PX No. | Bates No. |
|---|---|
| PX2323 | JenaValve-2R-00218604 |
| PX2326 | JenaValve-2R-00512441 |
| PX2381 | JenaValve-2R-00207472 |
| PX2384 | JV-LIT-00084946 |
| PX2413 | JenaValve-2R-00342325 |
| PX2457 | JenaValve-2R-01076485 |
| PX2487 | JenaValve-2R-00001541 |
| PX2488 | JenaValve-2R-00898027 |
| PX2491 | JV-LIT-00307285 |
| PX2492 | JenaValve-2R-00059339 |
| PX2499 | JenaValve-2R-00031715 |
| PX2500 | JenaValve-2R-01076473 |
| PX2501 | JenaValve-2R-00450671 |
| PX2502 | JenaValve-2R-00450812 |
| PX2503 | JenaValve-2R-00601386 |
| PX2504 | JV-LIT-00249018 |
| PX2505 | JenaValve-2R-00198315 |
| PX2506 | JV-LIT-00116229 |
| PX2507 | JV-LIT-00243474 |

**b. Defendants' Submissions and Correspondences**

| PX No. | Bates No. |
|---|---|
| PX0010 | Edwards HSR Filing Exhibit 3(b)-1: Agreement and Plan of Merger among Edwards Lifesciences Holding, Inc., Jupiter Merger Sub, Inc., JenaValve Technology, Inc., and Shareholder Representative Services LLC |
| PX0028 | JenaValve HSR Filing Exhibit 4(b)-1: JenaValve Consolidated Financial Statements as of and for the Years Ended December 31, 2023 and 2022 and Report of Independent Auditors |
| PX0043 | JenaValve Responses to FTC Request for Additional Information and Documentary Material |
| PX0044 | JenaValve Responses and Objections to FTC's First Set of Interrogatories |
| PX0046 | Edwards Lifesciences' Resps. to Pl.'s First Set of Interrogatories |
| PX0053 | Edwards Responses to FTC Request for Additional Information and Documentary Material |

## II. Investigational Hearing and Deposition Transcripts[2]

| PX No. | Description |
|---|---|
| PX7000 | Investigational Hearing Transcript of Gilbert Madrid (Laguna Tech) (May 21, 2025) |
| PX7004 | Investigational Hearing Transcript of Daniel Sun (JenaValve) (July 1, 2025) |
| PX7005 | Investigational Hearing Transcript of Mark Turco (Edwards) (July 14, 2025) |
| PX7008 | Investigational Hearing Transcript of Duane Pinto (JenaValve) (July 8, 2025) |
| PX7011 | Deposition Transcript of James M. McCabe (UW) (September 19, 2025) |
| PX7012 | Deposition Transcript of Duane Pinto (JenaValve) (September 23, 2025) |
| PX7013 | Deposition Transcript of Duane Pinto (JenaValve 30(b)(6)) (September 23, 2025) |
| PX7015 | Deposition Transcript of Laksen Sirimanne (Edwards) (September 24, 2025) |
| PX7016 | Deposition Transcript of Dan Dearen (JenaValve) (September 25, 2025) |
| PX7017 | Deposition Transcript of Peter Spadaro (JenaValve) (September 25, 2025) |
| PX7019 | Deposition Transcript of Larry Wood (Edwards) (September 26, 2025) |
| PX7020 | Deposition Transcript of Dean J. Kereiakes (Christ Hospital) (September 25, 2025) |
| PX7022 | Deposition Transcript of Blessie Concepcion (Edwards) (September 30, 2025) |
| PX7023 | Deposition Transcript of Jan Keltjens (JenaValve) (September 30, 2025) |
| PX7026 | Deposition Transcript of Jeremy Bierman (Edwards) (October 1, 2025) |
| PX7027 | Deposition Transcript of Daniel Sun (JenaValve) (October 2, 2025) |
| PX7029 | Deposition Transcript of Vinod Thourani (Piedmont) (October 3, 2025) |
| PX7030 | Deposition Transcript of Mark Turco (Edwards) (October 3, 2025) |
| PX7031 | Deposition Transcript of Matthew Williams (NYU) (October 3, 2025) |
| PX7034 | Deposition Transcript of Devin Baerenwald (JenaValve) (October 3, 2025) |
| PX7038 | Deposition Transcript of John Kilcoyne (JenaValve 30(b)(6)) (October 6, 2025) |

## III. Third-Party Materials

### a. Third-Party Documents[3]

| PX No. | Bates No. |
|---|---|
| PX3037 | FTC-THOURANI000122 |

### b. Third-Party Declarations

| PX No. | Description |
|---|---|
| PX5000 | Dr. Mathew Williams Declaration (NYU) |
| PX5001 | Gregory Larkin Declaration (MDT) |

[2] Including Exhibits.
[3] Including associated document family members where applicable.

## IV. Scholarly Articles, Publicly Available Documents, and Other Materials

| Description |
| --- |
| Abbott Medical. Summary of Safety and Effectiveness Data. May 23, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240042B.pdf |
| Abbott, PMA P190023: FDA Summary of Safety and Effectiveness Data, https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf |
| Abbott, Portico Valve Meets Non-Inferiority Criteria for Safety and Efficacy in Two-Year Analysis, Clinical Insights (2021) https://www.structuralheart.abbott/fileadmin/content/clinical-research/clinical-insights/Clinical_Insights_Portico_IDE-2Yr_Results_US_MAT-2101938_v1.0_FINAL.pdf |
| Abbott, Press Releases, Abbott Receives FDA Approval for Navitor™, a Next-Generation TAVI System Designed to Treat Aortic Stenosis (Jan. 17, 2023), https://abbott.mediaroom.com/2023-01-17-Abbott-Receives-FDA-Approval-for-Navitor-TM-,-a-Next-Generation-TAVI-System-Designed-to-Treat-Aortic-Stenosis |
| Agilent Technologies. Summary of Safety and Effectiveness Data. August 15, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250004B.pdf |
| Amanda Maisel-Campbell, et al., *Voting Behavior during FDA Medical Device Advisory Committee Panel Meetings*, 17 PLOS ONE e0267134 June 24, 2022 |
| Anna Pisac, et al., *FDA Device Oversight from 1906 to the Present*, AMA J. ETHICS, Sept. 2021, https://journalofethics.ama-assn.org/article/fda-device-oversight-1906-present/2021-09 |
| Ariel Dora Stern, *Innovation Under Regulatory Uncertainty: Evidence from Medical Technology*, 145 J. PUBLIC ECONOMICS 181 (2017) |
| Aylin Sertkaya, et al., *Estimated Cost of Developing a Therapeutic Complex Medical Device in the US. 5 JAMA Network Open* e2231609 (Sept, 14, 2022) |
| Basel Ramlawi, et al., *Transcatheter Aortic Valve Replacement (TAVR): Access Planning and Strategies*, METHODIST DEBAKEY CARDIOVASCULAR J., 2012 |
| Bausch & Lomb. Summary of Safety and Effectiveness Data. October 10, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240005B.pdf |
| Benjamin N. Rome et al., *Approval of High-Risk Medical Devices in the US: Implications for Clinical Cardiology*, CURRENT CARDIOLOGY REP. (2014). |
| Benjamin N. Rome, Anushka Bhaskar & Aaron S. Kesselheim, *Use, Spending, and Prices of Adalimumab Following Biosimilar Competition*, JAMA HEALTH FORUM, Dec. 13, 2024, 2024;5(12):e243964, https://jamanetwork.com/journals/jama-health-forum/fullarticle/2827711 |
| Benjamin N. Rome, et al., *Approval of High Risk Medical Devices in the US: Implications for Clinical Cardiology*, 16(6) CURRENT CARDIOLOGY REP. (June 2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC4080312/pdf/nihms594461.pdf |
| Benjamin N. Rome, et al., *FDA Approval of Cardiac Implantable Electronic Devices Via Original and Supplement Premarket Approval Pathways,* 1979-2012, 311 JAMA, 385 (2014). |
| Bernadette Capili & Joyce K. Anastasi, *Ethical Research and the Institutional Review Board: An Introduction*, 124 Am. J. of Nursing 3 (2024) |

| Description |
|---|
| Biocartis US. Summary of Safety and Effectiveness Data. August 15, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250005B.pdf |
| Biosense Webster. Summary of Safety and Effectiveness Data. November 06, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240006B.pdf |
| Boston Scientific, Boston Scientific Enrolls First Patients in U.S. Trial Of the Lotus Valve System, Press Releases (Sept. 23, 2014) https://news.bostonscientific.com/2014-09-23-Boston-Scientific-Enrolls-First-Patients-In-U-S-Trial-Of-The-Lotus-Valve-System |
| Boston Scientific, Boston Scientific Receives FDA Approval for LOTUS Edge™ Aortic Valve System (Apr. 23, 2019), https://news.bostonscientific.com/2019-04-23-Boston-Scientific-Receives-FDA-Approval-for-LOTUS-Edge-TM-Aortic-Valve-System |
| C. Joseph Ross Daval et al., *Building Public Trust in Scientific Decision Making through Expert Advisory Committees: Lessons from the FDA*, IBM Center for the Business of Government, Dec. 2023 |
| Caris Life Sciences. Summary of Safety and Effectiveness Data. November 5, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240010B.pdf |
| Cerapedics. Summary of Safety and Effectiveness Data. June 18, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240001B.pdf |
| Cleveland Clinic, *Aortic Regurgitation*, https://my.clevelandclinic.org/health/diseases/24396-aortic-regurgitation |
| Cleveland Clinic, *Surgical Aortic Valve Replacement*, https://my.clevelandclinic.org/health/treatments/25057-aortic-valve-replacement |
| Contego Medical. Summary of Safety and Effectiveness Data. October 11, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240009B.pdf |
| Daniel B. Kramer et al., *Premarket Clinical Evaluation of Novel Cardiovascular Devices: Quality Analysis of Premarket Clinical Studies Submitted to the Food and Drug Administration 2000-2007*, American Journal of Therapeutics (2010) |
| Daniel B. Kramer, Shuai Xu, and Aaron S. Kesselheim, *Regulation of Medical Devices in the United States and European Union*, 366(9) NEW ENG, J. MED (2012) |
| Diagnostic and Interventional Cardiology, *Boston Scientific Pulls Lotus Edge TAVR Valve off the Market* (Nov. 17, 2020), https://www.dicardiology.com/article/boston-scientific-pulls-lotus-edge-tavr-valve-market) |
| Diagnostic and Interventional Cardiology, *JC Medical Announces First U.S. Treatment With J-Valve TAVR Device* (Jan. 7, 2019), https://www.dicardiology.com/content/jc-medical-announces-first-us-treatment-j-valve-tavr-device |
| EBR Systems. Summary of Safety and Effectiveness Data. April 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240028B.pdf |
| Edwards Lifesciences, PMA P100041: FDA Summary of Safety and Effectiveness Data, https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf |
| European Union, Regulation (EU) 2017/745 of the European Parliament and of the Council of 5 April 2017 on Medical Devices, Apr. 5, 2017, https://eur-lex.europa.eu/eli/reg/2017/745/oj/eng |

| Description |
|---|
| Exact Sciences Corporation. Summary of Safety and Effectiveness Data. October 3, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230043B.pdf |
| FDA Responses and Meetings for IDE Submissions, NIH Clinical Center, https://www.cc.nih.gov/orcs/ide/fda-responses |
| FDA, A History of Medical Device Regulation & Oversight in the United States. (Aug. 21, 2023), https://www.fda.gov/medical-devices/overview-device-regulation/history-medical-device-regulation-oversight-united-states |
| FDA, Acceptance of Clinical Data to Support Medical Device Applications and Submissions: Frequently Asked Questions, (Feb. 21, 2018), https://www.fda.gov/media/111346/download |
| FDA, Breakthrough Devices Program: Guidance For Industry and Food and Drug Administration Staff (Sept. 15, 2023), https://www.fda.gov/media/162413/download |
| FDA, CDRH Preliminary Internal Evaluations – Volume II Task Force on the Utilization of Science in Regulatory Decision Making Preliminary Report and Recommendations (Aug. 2010), https://www.scribd.com/document/242722569/510-K-Working-Group-Volume-II |
| FDA, Charter Medical Devices Advisory Committee, http://www.fda.gov/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/ucm124098.htm |
| FDA, Class I/II exempt devices (July 1, 2025), https://www.fda.gov/medical-devices/classify-your-medical-device/class-i-and-class-ii-device-exemptions |
| FDA, Classify Your Medical Device (Feb. 7, 2020), https://www.fda.gov/medical-devices/overview-device-regulation/classify-your-medical-device |
| FDA, Compliance Program Manual: Inspection of Medical Device Manufacturers, Sept. 29, 2023, https://www.fda.gov/media/80195/download |
| FDA, De Novo Classification Request (Sept. 30, 2025), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/de-novo-classification-request |
| FDA, Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions (Oct. 2022), https://www.fda.gov/media/71735/download |
| FDA, Expanded Access for Medical Devices, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/expanded-access-medical-devices |
| FDA, FDA and Industry Actions on Premarket Approval Applications (PMAs): Effect on FDA Review Clock and Goals (Oct. 2003), https://www.fda.gov/media/73504/download |
| FDA, General Considerations for Animal Studies Intended to Evaluate Medical Devices (Mar. 28, 2023), https://www.fda.gov/regulatory-information/search-fda-guidance-documents/general-considerations-animal-studies-intended-evaluate-medical-devices |
| FDA, General Controls for Medical Devices, (Dec. 15, 2023), https://www.fda.gov/medical-devices/regulatory-controls/general-controls-medical-devices |

| Description |
|---|
| FDA, How to Study and Market Your Device (Oct. 12, 2023), https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/how-study-and-market-your-device |
| FDA, Humanitarian Device Exemption Program: Guidance for Industry and Food and Drug Administration Staff, (2018), https://www.fda.gov/media/74307/download |
| FDA, IDE Approval Process, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/ide-approval-process . |
| FDA, Information Sheet Guidance for IRBs, Clinical Investigators, and Sponsors: Significant Risk and Nonsignificant Risk Medical Device Studies (Jan. 2006), https://www.fda.gov/media/75459/download |
| FDA, Investigational Device Exemption (IDE) (Aug. 22, 2024), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/investigational-device-exemption-ide |
| FDA, Investigational Device Exemptions (IDEs) for Early Feasibility Medical Device Clinical Studies, Including Certain First in Human (FIH) Studies, Oct. 1, 2013, https://www.fda.gov/media/81784/download |
| FDA, Manufacturer and User Facility Device Experience (MAUDE) Database, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm |
| FDA, *Modifications to Devices Subject to Premarket Approval – The PMA Supplement Decision Making Process* (2008), https://www.fda.gov/media/81431/download |
| FDA, PMA Application Contents (April 22, 2025) https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-contents |
| FDA, PMA Application Methods, Jan. 13, 2025, https://www.fda.gov/medical-devices/premarket-approval-pma/pma-application-methods |
| FDA, PMA Quality System, May 22, 2020, https://www.fda.gov/medical-devices/premarket-approval-pma/pma-quality-system |
| FDA, *PMA Supplements and Amendments* (2019), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-supplements-and-amendments |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=p100041 |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=p110021 |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P130021 |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P180029 |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P190023 |
| FDA, *Premarket Approval (PMA)*, May 16, 2019, https://www.fda.gov/medical-devices/premarket-submissions/premarket-approval-pma |

| Description |
|---|
| FDA, Premarket Approval Application and Humanitarian Device Exemption Modular Review (Jan. 2025), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/FDA/835.pdf |
| FDA, Product Classification Database, http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm |
| FDA, *Real-Time Premarket Approval Application (PMA) Supplements* (2006), https://www.fda.gov/media/73126/download |
| FDA, Regulations: Good Clinical Practice and Clinical Trials, Jan. 21, 2021, https://www.fda.gov/science-research/clinical-trials-and-human-subject-protection/regulations-good-clinical-practice-and-clinical-trials |
| FDA, Requests for Feedback and Meetings for Medical Device Submissions: The Q-Submission Program, May 2025, https://www.fda.gov/regulatory-information/search-fda-guidance-documents/requests-feedback-and-meetings-medical-device-submissions-q-submission-program |
| FDA, *Surrogate Endpoint Resources for Drug and Biologic Development* (2018), https://www.fda.gov/drugs/development-resources/surrogate-endpoint-resources-drug-and-biologic-development |
| FDA, Unique Device Identification, July 25, 2022, https://www.fda.gov/media/110564/download |
| FDA, USE OF REAL-WORLD EVIDENCE TO SUPPORT REGULATORY DECISION-MAKING FOR MEDICAL DEVICES (Aug. 2017), https://www.fda.gov/media/99447/download?attachment |
| GAO, *FDA Should Take Steps to Ensure That High-Risk Device Types Are Approved Through The Most Stringent Premarket Review Process (2009), https://www.gao.gov/assets/gao-09-190.pdf* |
| Gardiner Harris, F.D.A. Vows to Revoke Approval of Device, N.Y. TIMES, Oct. 14, 2010, available at https://www.nytimes.com/2010/10/15/health/policy/15fda.html |
| *Hearing on Examining Policies that Inhibit Innovation and Patient Access: Hearing Before the Subcomm. on Health of the H. Comm. on Ways & Means*, 118th Cong. 16 (2023) |
| IDE Application, FDA, https://www.fda.gov/medical-devices/investigational-device-exemption-ide/ide-application#compro |
| InspireMD. Summary of Safety and Effectiveness Data. June 23, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240029B.pdf |
| Institute of Medicine, Medical Devices and The Public's Health: The 510(k) Clearance Process at 35 Years (2011) |
| INT Medical, Healing Medical, About Healing Medical, https://int-medical.com/en/col209/index |
| JENAVALVE, https://jenavalve.com/ |
| Jenscare Scientific Co., Ltd., 2025 Interim Report, (Sept. 25, 2025), https://en.jenscare.com/upload/listedco/listconews/sehk/2025/0925/2025092501489.pdf |

| Description |
|---|
| John J. Smith et al., *Defining "Least Burdensome Means" under the Food and Drug Administration Modernization Act of 1997*, 55 FOOD & DRUG LAW. J. 435-447 (2000) |
| John Y. Chai, *Medical Device Regulation in the United States and the European Union: A Comparative Study*. 55 FOOD & DRUG L. J. 57-80 (2000) |
| Jonathan J. Darrow, et al., FDA Regulation and Approval of Medical Devices: 1976-2020, 326(5) JAMA 420-432 (2021) |
| Josh Makower, Aabed Meer, and Lyn Denend, *FDA impact on U.S. medical technology innovation: A survey of over 200 medical technology companies*, MEDTECH EUROPE, https://www.medtecheurope.org/wp-content/uploads/2015/09/01112010_FDA-impact-on-US-medical-technology-innovation_Backgrounder.pdf |
| Josh Makower, *FDA Impact on U.S. Medical Technology Innovation: A Survey of over 200 Medical Technology Companies*, Nov. 2010, https://www.medtecheurope.org/wp-content/uploads/2015/09/01112010_FDA-impact-on-US-medical-technology-innovation_Backgrounder.pdf |
| Joshua M. Sharfstein et al., FDA Transparency Working Group, *Blueprint for Transparency at the U.S. Food and Drug Administration: Recommendations to Advance the Development of Safe and Effective Medical Products*, 45(4 suppl 2) J. LAW, MEDICINE & Ethics 7-23 (2017), https://law.yale.edu/sites/default/files/area/center/crit/blueprint_for_transparency_.pdf |
| Katherine Lutz et al., *Alternative Access for TAVR: Choosing the Right Pathway*, J. OF CLINICAL MED., June 9, 2024 |
| Keri Medical SA. Summary of Safety and Effectiveness Data. July 10, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240020B.pdf |
| Kushal T. Kadakia, et. al, *Market of First Launch for High-Risk Therapeutic Medical Devices*, 7(12) JAMA NETWORK OPEN (2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2827568 |
| Kyle M. Fargen, *The FDA Approval Process for Medical Devices: An Inherently Flawed System or a Valuable Pathway for Innovation?* 5 J. OF NEUROINTERVENTIONAL SURGERY 269-275 (2013) |
| L. Liu L et al., *A Novel Designed TAVR System for Pure Aortic Regurgitation: First-in-Human Experience*, 16(21) JACC CARDIOVASCULAR INTERVENTIONS 2690-2691 (2023) |
| *Laguna Tech Reports on Zeta TAVR System's FIH Feasibilty Trial*, Cardiac Interventions Today (Jan. 3, 2024), https://citoday.com/news/laguna-tech-reports-on-zeta-tavr-systems-fih-feasibility-trial |
| Life Technologies Corporation. Summary of Safety and Effectiveness Data. July 2, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240040B.pdf |
| Lungpacer Medical USA. Summary of Safety and Effectiveness Data. December 4, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240012B.pdf |
| ManaMed. Summary of Safety and Effectiveness Data. January 17, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/P210016B.pdf |

| Description |
|---|
| MAYO CLINIC, *Transcatheter Aortic Valve Replacement (TAVR)*, https://www.mayoclinic.org/tests-procedures/transcatheter-aortic-valve-replacement/about/pac-20384698 |
| Mayookha Mitra-Majumdar et al., *Analysis of Supportive Evidence for US Food and Drug Administration Approvals of Novel Drugs in 2020*, JAMA Network Open 2022;5(5):e2212454, May 17, 2022, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2792372 |
| MediBeacon. Summary of Safety and Effectiveness Data. January 17, 2025 Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230019B.pdf |
| Medical Device Amendments of 1976, PL. 94-295, 90 Stat. 539 (1976), available at https://www.govinfo.gov/content/pkg/STATUTE-90/pdf/STATUTE-90-Pg539.pdf |
| Medtronic MiniMed. Summary of Safety and Effectiveness Data. August 6, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250012B.pdf |
| Medtronic, Landmark Medtronic CoreValve(r) U.S. Clinical Trial Begins, Newsroom (Dec. 21, 2010) https://news.medtronic.com/2010-12-21-Landmark-Medtronic-CoreValve-R-U-S-Clinical-Trial-Begins |
| Medtronic, Medtronic Clinical Trial Receives FDA Approval to Evaluate New CoreValve(R) System for Aortic Valve Implantation, Newsroom (Oct. 15, 2010) https://news.medtronic.com/2010-10-15-Medtronic-Clinical-Trial-Receives-FDA-Approval-to-Evaluate-New-CoreValve-R-System-for-Aortic-Valve-Implantation |
| Medtronic, Medtronic CoreValve System Receives FDA Approval for Patients at High Risk for Surgery (June 12, 2014), https://news.medtronic.com/2014-06-12-Medtronic-CoreValve-R-System-Receives-FDA-Approval-for-Patients-at-High-Risk-for-Surgery |
| Medtronic. Summary of Safety and Effectiveness Data. April 22, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240036B.pdf |
| Medtronic. Summary of Safety and Effectiveness Data. October 24, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240013B.pdf |
| Merit Medical Systems. Summary of Safety and Effectiveness Data. December 19, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240023B.pdf |
| MicroVention. Summary of Safety and Effectiveness Data. November 20, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/P210030B.pdf |
| Motiva. Summary of Safety and Effectiveness Data. September 26, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230005B.pdf |
| Nat'l Health Inst., Nat'l Library of Med., ClinicalTrials.gov *ARTIST: Aortic Regurgitation Trial Investigating Surgery Versus Trilogy™ (ARTIST)*, https://www.clinicaltrials.gov/study/NCT06608823 |
| Nat'l Inst. Health, Nat'l Library of Med., ClinicalTrials.gov, *The JenaValve ALIGN-AR Pivotal Trial (ALIGN-AR)*, https://clinicaltrials.gov/study/NCT04415047 |
| NAT'L INSTITUTE OF HEALTH, *J-Valve Transfemoral Pivotal Study (JOURNEY)*, https://clinicaltrials.gov/study/NCT06455787 |

| Description |
|---|
| NAT'L INSTITUTE OF HEALTH, *Safety and Efficacy Study of the Medtronic CoreValve® System in the Treatment of Symptomatic Severe Aortic Stenosis in High Risk and Very High Risk Subjects Who Need Aortic Valve Replacement,* https://clinicaltrials.gov/study/NCT01240902 |
| NATIONAL ACADEMY OF MEDICINE, *National Academy of Medicine Elects 100 New Members*, (Oct. 9, 2023), https://nam.edu/news-and-insights/national-academy-of-medicine-elects-100-new-members/. |
| Neuspera Medical. Summary of Safety and Effectiveness Data. June 17, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240031B.pdf |
| Novocure GmbH. Summary of Safety and Effectiveness Data. October 15, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230042B.pdf |
| Nyxoah S.A. Summary of Safety and Effectiveness Data. August 8, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240024B.pdf |
| O. Sheikh et al., *Innovations in TAVR: The Latest in Device Technology,* 14(4) JOURNAL OF CLINICAL MEDICINE 4906 (2025) |
| Phraxis. Summary of Safety and Effectiveness Data. May 15, 2025. Available at:https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240004B.pdf |
| Pramand. Summary of Safety and Effectiveness Data. February 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240027B.pdf |
| Premarket Approval Database, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm |
| Press Release, Jenscare Scientific Co., Ltd., Ken-Valve Obtained Registration Approval From NMPA and Active Progression of Commercialization (Mar. 25, 2025), https://en.jenscare.com/upload/listedco/listconews/sehk/2025/0325/2025032500029.pdf |
| Press Release, *Laguna Tech USA Begins FIH Trial of Alpha TAVR System*, Laguna Tech USA (June 21, 2023), https://lagunatechmed.com/laguna-tech-usa-begins-fih-trial-of-alpha-tavr-system/ |
| Press Release, *Vickor, World's First TAVR Vs. SAVR Trial for Intermediate-to-High Risk Aortic Regurgitation Nears Completion!*, Wuhan Vickor Medical Technology Co., Ltd., (Aug. 15, 2025), https://en.vickor.com.cn/news_xq/47.html |
| Quest Diagnostics Nichols Institute. Summary of Safety and Effectiveness Data. July 24, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250002B.pdf |
| Raj R. Makkar, M.D. et al., *Transcatheter Aortic-Valve Replacement for Inoperable Severe Aortic Stenosis,* 366 N ENGL J MED 1696-1704 (May 3, 2012), https://www.nejm.org/doi/full/10.1056/NEJMoa1202277 |
| *Reauthorization of MDUFA: What it Means for Jobs, Innovation, and Patients: Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Com.,*112th Cong. 2 (2012) |
| S Lori Brown, et al., *Medical Device Epidemiology and Surveillance: Patient Safety is the Bottom Line*, EXPERT REV. OF MED. Devices 1-2 (2024) |

| Description |
|---|
| S. Chen, MD, *Transcatheter Self-expandable Valve Implantation for the Treatment of Severe Native Aortic Regurgitation* (SEASON-AR), ClinicalTrials.gov, https://www.clinicaltrials.gov/study/NCT04864145 |
| Sanket S. Dhruva et al., *Strength of Study Evidence Examined by the FDA in Premarket Approval of Cardiovascular Devices*, JAMA 2679-2685 (2009) |
| Sarah Y. Zheng, et al., *Characteristics of Clinical Studies Used for US Food and Drug Administration Approval of High-Risk Medical Device Supplements*, 318 JAMA 619 (2017). |
| Sequana Medical NV. December 20, 2024. Summary of Safety and Effectiveness Data. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230044B.pdf |
| Shuai Xu et al., *Origins of Medical Innovation: The Case of Coronary Artery Stents*, Circulation: Cardiovascular Quality and Outcomes 743-749 (Oct. 23, 2012) |
| Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P100041: FDA (July 20, 2011) https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf |
| Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P130009, FDA (June 16, 2014) https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130009B.pdf |
| Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P140031: FDA (June 17, 2015) https://www.accessdata.fda.gov/cdrh_docs/pdf14/P140031B.pdf |
| Summary of Safety and Effectiveness Data: Edwards SAPIEN 3 N 3™ Transcatheter Heart Valve model 9600TFX, 20, 23, 26, and 29 mm, and accessories, FDA (June 17, 2025), https://www.accessdata.fda.gov/cdrh_docs/pdf14/P140031B.pdf |
| Summary of Safety and Effectiveness Data: LOTUS Edge™ Valve System, FDA (Apr. 23, 2019), https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029B.pdf |
| Summary of Safety and Effectiveness Data: Medtronic, PMA P130021: (Jan. 17, 2014) https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130021B.pdf |
| Summary of Safety and Effectiveness Data: Portico™ Transcatheter Aortic Valve Implantation System, FDA (Sept. 17, 2021), https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf |
| Symatese. Summary of Safety and Effectiveness Data. February 13, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240022B.pdf |
| Thomas J Hwang, Daniel Carpenter, & Aaron S Kesselheim, *Assessment of US Pathway for Approving Medical Devices for Rare Conditions*, BMJ (2014) |
| Ventana Medical Systems. October 18, 2024. Summary of Safety and Effectiveness Data. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230018B.pdf |
| Ventana Medical Systems. Summary of Safety and Effectiveness Data. May 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240037B.pdf |
| Vinay K, Rathi et al., *Market Competition Among Manufacturers of Novel High-Risk Therapeutic Devices Receiving FDA Premarket Approval Between 2001 and 2018*, BMJ SURGERY, Interventions, and Health Technologies (2023) |
| W. Pan et al., *Early Results of Multicenter Trial of a Novel Balloon-Expandable Valve with Anchor for Aortic Regurgitation*, 18(6) JACC CARDIOVASCULAR INTERVENTIONS 752-764 (2025) |

| Description |
|---|
| William F. Pritchard, et al., *U.S. Food and Drug Administration and Regulation of Medical Devices in Radiology*, RADIOLOGY 27-36 (1997) |
| William H. Maisel, *Medical Device Regulation: An Introduction for the Practicing Physician*, Annals of Internal Medicine, 296-302 (2004). |
| Wolf Sapirstein et al., *The Role of Clinical Trials in the Food and Drug Administration Approval Process for Cardiovascular Devices*, 1900-1902 (1994) |
| Zhu zhengbin, *TReanscAtheter TreatMent of PurE Aortic Regurgitation with VitaFlow Liberty System (TRAMPERS)*, ClinicalTrials.gov https://www.clinicaltrials.gov/study/NCT06818084 |

# APPENDIX D

# METHODS AND DATA

## APPENDIX D

**Exhibit A: Mean Number of Days from FDA Receipt of Submission to FDA Decision**




*Source: Jonathan J. Darrow, Jerry Avorn & Aaron S. Kesselheim, FDA Regulation and Approval of Medical Devices: 1976-2020, 326(5) JAMA 426 (2021). The mean time from receipt of a submission to an FDA decision for PMAs was 661 days from 1986–1995, 507 days from 1996–2005, 561 days from 2006–2015, and 399 days from 2016–2020.*[1]

**Exhibit B: September 1, 2024 to August 31, 2025 Data Analysis Methodology**

My report includes analysis of data from the FDA's Premarket Approval Database for the timeframe between September 1, 2024 and August 31, 2025. This methodology supports data analysis in the Report found in:

- Part IV.A.4 (PMA Submission and the FDA Review Process); and
- Part V.B (Ex-U.S. Regulation of High-Risk Medical Devices and Use of Ex-U.S. Data for FDA Premarket Approval)

I selected this one year timeframe to take a random sampling of recent regulatory experience, and due in part to the very limited timeframe in which to run this analysis. This was based on my knowledge that the FDA approves about 20 to 30 devices per year, which I determine may be sufficient to provide insight into recent regulatory practices around Class III devices. FDA

---

[1] Jonathan J. Darrow, Jerry Avorn & Aaron S. Kesselheim, *FDA Regulation and Approval of Medical Devices: 1976-2020*, 326(5) JAMA 420-432 (2021).

records of Class III medical devices show that an annual average of 35.5 devices were approved between 2014 to 2024.[2]

Given the consistency between my analysis of the selected year-long timeframe and past studies that have covered more years, I am confident that my analysis based on this one year of data is reliable and accurate. I have previously conducted studies based on one year of regulatory or prescribing data on prescription drugs, which are approved akin to devices based on FDA review of clinical trials.[3]

To provide some insight into how long the pre-approval testing and regulatory review process might take for new high-risk medical devices, I searched the FDA's Premarket Approval Database for all original PMAs approved between September 1, 2024 and August 31, 2025.

For each original PMA, I collected, when available, the device name, applicant, date of application, decision date, clinical trial NTC number (the ClinicalTrials.gov registration number), and the Summary of Safety and Effectiveness Data (SSED). For each product SSED, I reviewed the "Marketing History" to determine whether and where a product was approved prior to FDA approval. I also reviewed the "Summary of Primary Clinical Studies" and, if applicable, the "Summary of Supplemental Clinical Information" to collect the study type, trial treatment start and data collection completion dates, date of final data collection, and the number and percentages of patients and trial sites in the United States and outside the United States for all clinical studies in each SSED. To most closely track the clinical studies and marketing histories for products seeking approval for treatment of medical conditions, like TAVR-AR devices, I limited my analysis to therapeutic products. Accordingly, I excluded diagnostic products and products without available SSED documents.

There were 36 original PMAs with approval decisions between September 1, 2024 and August 31, 2025. After excluding diagnostic products (9 products), devices without SSEDs available for review (4 devices), and three devices that did not cite primary clinical data, there were 20 therapeutic medical devices available for review. Thirteen (65%) were marketed outside the U.S. prior to FDA approval. Six (30%) only included U.S. primary clinical studies, and 13 (65%) included both U.S. and non-U.S. primary clinical studies. Only one product referenced only non-U.S. data in the primary clinical study section of the SSED.[4]

---

[2] Records of Class III medical devices approved by the FDA are documented in the FDA's PMA Database. A total of 390 original PMAs were approved from 2014-2024, with an annual average of 35.5 new devices (range: 22 approvals in 2022 to 48 approvals in 2017). Premarket Approval Database, FDA, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm (last visited Oct. 12, 2025).

[3] *See, e.g.*, Mayookha Mitra-Majumdar et al., *Analysis of Supportive Evidence for US Food and Drug Administration Approvals of Novel Drugs in 2020*, JAMA NETWORK OPEN, May 17, 2022, 2022;5(5):e2212454; Benjamin N. Rome, Anushka Bhaskar & Aaron S. Kesselheim, *Use, Spending, and Prices of Adalimumab Following Biosimilar Competition*, JAMA HEALTH FORUM, Dec. 13, 2024, 2024;5(12):e243964.

[4] The primary clinical study for P240020, the TOUCH CMC 1 Prosthesis, was a retrospective clinical study using historical data from Switzerland. This product was originally approved as a joint replacement device for patients with symptomatic Eaton-Littler stage II or III osteoarthritis.

**Exhibit C: Citations - Original PMA Approvals Assessed for 9/1/2024-8/31/2025 Analysis**

| Device | PMA Number | Applicant | Decision Date | Citation |
|---|---|---|---|---|
| ManaFuse* | P210016 | ManaMed, Inc. | 1/17/25 | ManaMed. Summary of Safety and Effectiveness Data. January 17, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/P210016B.pdf |
| Roadsaver/CASPER Carotid Stent Device | P210030 | MicroVention, Inc. | 11/20/24 | MicroVention. Summary of Safety and Effectiveness Data. November 20, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf21/P210030B.pdf |
| Motiva SmoothSilk Round Ergonomix Silicone Gel-Filled Breast Implants, Motiva SmoothSilk Round Silicone Gel-Filled Breas | P230005 | Motiva USA, LLC | 9/26/24 | Motiva. Summary of Safety and Effectiveness Data. September 26, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230005B.pdf |
| VENTANA CLDN18 (43-14A) RxDx Assay** | P230018 | Ventana Medical Systems Inc. | 10/18/24 | Ventana Medical Systems. October, 18 2024. Summary of Safety and Effectiveness Data. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230018B.pdf |
| MediBeacon® Transdermal GFR Measurement System (TGFR)** | P230019 | MediBeacon Inc. | 1/17/25 | MediBeacon. Summary of Safety and Effectiveness Data. January 17, 2025 Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230019B.pdf |
| Jewel Patch Wearable Cardioverter Defibrillator (P-WCD) (Jewel), Jewel P-WCD Firmware, Device Accessories Skin Preparati | P230022 | Element Science, Inc. | 4/30/25 | SSED not available for review. |

| Device | PMA Number | Applicant | Decision Date | Citation |
|---|---|---|---|---|
| Optune Lua | P230042 | Novocure GmbH | 10/15/24 | Novocure GmbH. Summary of Safety and Effectiveness Data. October 15, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230042B.pdf |
| Multi-Target Stool DNA (mtsDNA) Test, Cologuard Plus™** | P230043 | Exact Sciences Corporation | 10/3/24 | Exact Sciences Corporation. Summary of Safety and Effectiveness Data. October 3, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230043B.pdf |
| alfapump System | P230044 | Sequana Medical NV | 12/20/24 | Sequana Medical NV. December 20, 2024. Summary of Safety and Effectiveness Data. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf23/P230044B.pdf |
| PearlMatrix™ Bone Graft | P240001 | Cerapedics, Inc. | 6/18/25 | Cerapedics. Summary of Safety and Effectiveness Data. June 18, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240001B.pdf |
| EndoForce Connector for Endovascular Venous Anastomosis | P240004 | Phraxis, Inc. | 5/15/25 | Phraxis. Summary of Safety and Effectiveness Data. May 15, 2025. Available at:https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240004B.pdf |
| enVista Envy™ hydrophobic acrylic intraocular lens (IOL), enVista Envy™ toric hydrophobic acrylic intraocular lens (IOL) | P240005 | Bausch & Lomb, Inc. | 10/10/24 | Bausch & Lomb. Summary of Safety and Effectiveness Data. October 10, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240005B.pdf |
| VARIPULSE™ Platform (VARIPULSE™ Catheter; TRUPULSE™ | P240006 | Biosense Webster, Inc | 11/6/24 | Biosense Webster. Summary of Safety and Effectiveness Data. November 06, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240006B.pdf |

| Device | PMA Number | Applicant | Decision Date | Citation |
|---|---|---|---|---|
| Generator; Sterile Interface Cable; nGEN™ Pump) | | | | |
| Neuroguard IEP® 3-in-1 Carotid Stent, Post-Dilation Balloon System with Integrated Embolic Protection | P240009 | Contego Medical Inc. | 10/11/24 | Contego Medical. Summary of Safety and Effectiveness Data. October 11, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240009B.pdf |
| MI Cancer Seek** | P240010 | Caris Life Sciences | 11/5/24 | Caris Life Sciences. Summary of Safety and Effectiveness Data. November 5, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240010B.pdf |
| AeroPace® System | P240012 | Lungpacer Medical USA, Inc. | 12/4/24 | Lungpacer Medical USA. Summary of Safety and Effectiveness Data. December 4, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240012B.pdf |
| Sphere-9 Catheter and Affera Ablation System | P240013 | Medtronic Inc. | 10/24/24 | Medtronic. Summary of Safety and Effectiveness Data. October 24, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240013B.pdf |
| TOUCH® CMC 1 Prosthesis | P240020 | Keri Medical SA | 7/10/25 | Keri Medical SA. Summary of Safety and Effectiveness Data. July 10, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240020B.pdf |
| EVOLYSSE™ SMOOTH and EVOLYSSE™ FORM | P240022 | Symatese | 2/13/25 | Symatese. Summary of Safety and Effectiveness Data. February 13, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240022B.pdf |
| WRAPSODY® Cell-Impermeable Endoprosthesis | P240023 | Merit Medical Systems, Inc. | 12/19/24 | Merit Medical Systems. Summary of Safety and Effectiveness Data. December 19, 2024. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240023B.pdf |
| Genio® System 2.1 | P240024 | Nyxoah S.A. | 8/8/25 | Nyxoah S.A. Summary of Safety and Effectiveness Data. August 8, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240024B.pdf |

| Device | PMA Number | Applicant | Decision Date | Citation |
|---|---|---|---|---|
| SpineSeal Spine Sealant* | P240027 | Pramand, LLC | 2/14/25 | Pramand. Summary of Safety and Effectiveness Data. February 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240027B.pdf |
| WiSE® (Wireless Stimulation of the Endocardium Technology) CRT System | P240028 | EBR Systems, Inc. | 4/11/25 | EBR Systems. Summary of Safety and Effectiveness Data. April 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240028B.pdf |
| CGuard Prime Carotid Stent System | P240029 | InspireMD, Ltd. | 6/23/25 | InspireMD. Summary of Safety and Effectiveness Data. June 23, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240029B.pdf |
| Neuspera Sacral Neuromodulation System | P240031 | Neuspera Medical Inc | 6/17/25 | Neuspera Medical. Summary of Safety and Effectiveness Data. June 17, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240031B.pdf |
| OmniaSecure™ MRI SureScan™ Lead Model 3930M | P240036 | Medtronic, Inc. | 4/22/25 | Medtronic. Summary of Safety and Effectiveness Data. April 22, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240036B.pdf |
| VENTANA MET (SP44) RxDx Assay** | P240037 | Ventana Medical Systems Inc (Roche Tissue Diagnostics) | 5/14/25 | Ventana Medical Systems. Summary of Safety and Effectiveness Data. May 14, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240037B.pdf |
| SetPoint System | P240039 | SetPoint Medical | 7/30/25 | SSED not available for review. |
| Oncomine Dx Express Test** | P240040 | Life Technologies Corporation | 7/2/25 | Life Technologies Corporation. Summary of Safety and Effectiveness Data. July 2, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240040B.pdf |
| Tendyne Transcatheter Mitral Valve System | P240042 | Abbott Medical | 5/23/25 | Abbott Medical. Summary of Safety and Effectiveness Data. May 23, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf24/P240042B.pdf |

| Device | PMA Number | Applicant | Decision Date | Citation |
|---|---|---|---|---|
| Globe® Pulsed Field System | P240044 | Kardium Inc. | 8/27/25 | SSED not available for review. |
| Quest Diagnostics AAVrh74 Antibody ELISA CDx** | P250002 | Quest Diagnostics Nichols Institute | 7/24/25 | Quest Diagnostics Nichols Institute. Summary of Safety and Effectiveness Data. July 24, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250002B.pdf |
| Embrace(TM) Hydrogel Embolic System | P250003 | Instylla Inc. | 8/5/25 | SSED not available for review. |
| MMR IHC Panel pharmDx (Dako Omnis) ** | P250004 | Agilent Technologies, Inc. | 8/15/25 | Agilent Technologies. Summary of Safety and Effectiveness Data. August 15, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250004B.pdf |
| Idylla CDx MSI Test** | P250005 | Biocartis US, Inc. | 8/15/25 | Biocartis US. Summary of Safety and Effectiveness Data. August 15, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250005B.pdf |
| Simplera Sync Sensor, Guardian 4 Sensor* | P250012 | Medtronic MiniMed Inc. | 8/6/25 | Medtronic MiniMed. Summary of Safety and Effectiveness Data. August 6, 2025. Available at: https://www.accessdata.fda.gov/cdrh_docs/pdf25/P250012B.pdf |

*No new primary clinical studies for review.
**Diagnostic, excluded.

**Exhibit D: TAVR-AS Supplemental Approvals**

To examine iterations of TAVR-AS devices following approval in the United States, I searched the FDA's PMA Database for original PMA approvals under the Product Code NPT.[5] I reviewed the clinical data supporting original PMA approval and the supplements approved for each original device. For each original PMA, I searched for all affiliated PMA supplements as of September 10, 2025. For each supplemental PMA, I collected the web address, PMA number, device name, applicant, and date the application was received and decided upon. I also collected the supplement reason and supplement type. Each supplement type falls into one of the following six categories: panel-track, 180-day, real-time, special, 30-day notice, and 135-day review track for 30-day notice. The 30-day notice and 135-day review track for 30-day notice supplements contain the least substantial device changes, so I examined the results including and excluding these supplement types.

As outlined in **Exhibit E**, I examined the supplements of each original TAVR-AS device in detail. I collected the years between the approval of the original PMA and the most recently approved supplement and calculated the average, minimum, and maximum number of annual supplements for each device excluding and including 30-day track and 135-day review track for 30-day notice supplements. I also calculated the total number of supplements for each device.

**Exhibit E: TAVR-AS Device Supplements**

| Device name PMA, manufacturer | Years: original approval to final supplement | Total supplements | Annual supplements (avg, min, max) | Annual supplements excluding 30-Day and 135-Day Review Track For 30-Day Notice (avg, min, max) |
|---|---|---|---|---|
| Sapien Transcatheter Heart Valve and Accessories (P100041),* Edwards Lifesciences | 2011-2016 | 64 | Avg: 10.7<br>Min: 0 (2011)<br>Max: 23 (2013) | Avg: 2.5<br>Min: 0 (2011, 2015, 2016)<br>Max: 7 (2013) |
| Sapien Transcatheter Heart Valve and Accessories (P110021*), Edwards Lifesciences | 2012-2016 | 51 | Avg: 10.2<br>Min: 2 (2012, 2016)<br>Max: 25 (2013) | Avg: 2.2<br>Min: 0 (2012, 2015, 2016)<br>Max: 9 (2013) |

[5] This product code was used to collect all relevant TAVR-AS devices. Devices classified under the product code "NPT" include devices "[t]o replace a patient's aortic heart valve. They are different from the classified device (heart valves) in that they are placed percutaneously and do not require open chest surgery or a cardiotomy for placement." FDA, Product Classification Database, Product Code: NPT, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfPCD/classification.cfm?id=1147 (last visited Oct. 12, 2025).

| **Device name PMA, manufacturer** | **Years: original approval to final supplement** | **Total supplements** | **Annual supplements (avg, min, max)** | **Annual supplements excluding 30-Day and 135-Day Review Track For 30-Day Notice (avg, min, max)** |
|---|---|---|---|---|
| Medtronic CoreValve System (P130021), Medtronic | 2014-2025 | 172 | Avg: 14.3<br>Min: 8 (2014, 2015)<br>Max: 24 (2022) | Avg: 3.7<br>Min: 1 (2024, 2025)<br>Max: 7 (2021) |
| Edwards Sapien XT Transcatheter Heart Valve and Accessories (P130009), Edwards Lifesciences | 2014-2021 | 101 | Avg: 12.6<br>Min: 1 (2021)<br>Max: 23 (2016) | Avg: 2.3<br>Min: 0 (2018, 2021)<br>Max: 10 (2016) |
| Sapien 3 Transcatheter Heart Valve and Accessories (P140031), Edwards Lifesciences | 2015-2025 | 183 | Avg: 16.6<br>Min: 1 (2015)<br>Max: 31 (2017) | Avg: 4.3<br>Min: 0 (2015)<br>Max: 8 (2017, 2018) |
| LOTUS Edge Valve System (P180029),** Boston Scientific | 2019-2021 | 28 | Avg: 9.3<br>Min: 1 (2021)<br>Max: 18 (2019) | Avg: 1.7<br>Min: 1 (2020, 2021)<br>Max: 3 (2019) |
| Portico Transcatheter Aortic Valve Implantation System (P190023), Abbott Medical | 2021-2025 | 25 | Avg: 5<br>Min: 3 (2021, 2025)<br>Max: 7 (2022, 2023) | Avg: 1.4<br>Min: 1 (2021, 2022, 2024)<br>Max: 2 (2023, 2025) |

*withdrawn 3/18/2019
**withdrawn 12/13/2021

*Legend: Annual TAVR-AS supplements by type adjusted for the number of active TAVR-AS devices. 2025 data include supplements approved through September 10, 2025.*

*Privileged*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>EDWARDS LIFESCIENCES, CORP.<br><br>AND<br><br>JENAVALVE TECHNOLOGY INC.<br><br>Defendants. | No.: 1:25-cv-02569-RC<br><br>Hon. Rudolph Contreras |

# Expert Report of Dr. Nathan E. Wilson

## October 12, 2025

*Privileged*

# TABLE OF CONTENTS


**I. QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF OPINIONS ................1**

A. QUALIFICATIONS ....................1

B. ASSIGNMENT ....................2

C. SUMMARY OF OPINIONS ....................2

**II. FACTUAL BACKGROUND ....................4**

A. THE ECONOMICS OF MEDICAL DEVICES ....................4

B. MEDICAL DEVICE DEVELOPMENT PROCESS ....................6

C. AORTIC REGURGITATION ....................8

D. TRANSCATHETER AORTIC VALVE REPLACEMENT ....................10

E. THE PARTIES ....................11

F. OTHER POTENTIAL AR TREATMENTS ....................15

**III. THE RELEVANT MARKET TO CONSIDER THE MERGER'S EFFECTS IS THE SUPPLY OF TAVR-AR DEVICES TO AMERICAN CONSUMERS ........17**

A. PRINCIPLES OF MARKET DEFINITION ....................17

B. THE RELEVANT PRODUCT MARKET INCLUDES ONLY TAVR-AR PRODUCTS.........20

C. THE UNITED STATES IS THE RELEVANT GEOGRAPHIC MARKET ....................24

**IV. THE MERGER WOULD DRAMATICALLY INCREASE CONCENTRATION IN AN ALREADY CONCENTRATED MARKET................25**

A. THE ECONOMIC SIGNIFICANCE OF MARKET STRUCTURE ....................26

B. DOCUMENTS AND TESTIMONY INDICATE THAT THE TRANSACTION WOULD CREATE A MONOPOLY FOR A MEANINGFUL PERIOD OF TIME ....................27

C. A VARIETY OF DATA SHOW THAT THE MERGER WOULD DRAMATICALLY INCREASE CONCENTRATION IN A CONCENTRATED MARKET....................28

D. ORDINARY COURSE MARKET PROJECTIONS SHOW THAT THE MARKET FOR TAVR-AR DEVICES IN THE UNITED STATES WOULD BE LIMITED TO THE PARTIES FOR THE FORESEEABLE FUTURE....................30

**V. THE MERGER OF EDWARDS AND JENAVALVE WOULD LIKELY HARM COMPETITION AND CONSUMERS ....................31**

A. ECONOMIC THEORY AND CASE-SPECIFIC EVIDENCE INDICATE THAT EDWARDS' ACQUISITION OF JENAVALVE WOULD RAISE PRICES AND LOWER ACCESS TO TAVR-AR PRODUCTS....................32

1. *Economic Theory Establishes that the Elimination of Head-to-Head Competition Harms Consumers* ......32
2. *Real World Evidence Shows that the Elimination of Competition Between Edwards and JenaValve Is Likely to Harm Consumers* ......34
   (a) *JenaValve and Edwards' TAVR-AR Products Are Close Competitors and Will Continue to Compete Upon Commercialization* ......34
   (b) *JenaValve and Edwards' TAVR-AR Products Will Not Be Constrained by Rivals for Many Years* ......36
   (c) *Real-World Evidence from the Parties Shows that the Merger Would Have Anticompetitive Effects on Patients' Access to TAVR-AR Devices* ......37

B. ECONOMIC THEORY AND CASE-SPECIFIC EVIDENCE PREDICT THAT THE TRANSACTION WOULD REDUCE INNOVATION IN THE TAVR-AR MARKET ......40

1. *Economic Theory Shows When and How Competition Benefits Innovation* ......40
2. *Edwards Would Have Less Incentive to Innovate after Acquiring Both JC Medical and JenaValve* ......43
   (a) *The Rivalry Between the Parties' TAVR-AR Products Has Motivated Innovative Activities* ......43
   (b) *There Is No Evidence that Appropriability Concerns Meaningfully Constrain Edwards' and JenaValve's Innovation Investments* ......44
   (c) *There Is No Evidence that Innovation Complementarities Are Probable* ......45
   (d) *Real-World Evidence Confirms that Edwards' Acquisition of JenaValve Would Reduce Innovation* ......47

C. THE PRO-CONSUMER EFFECTS OF COMPETITION ON PRICES AND INNOVATION ARE DEMONSTRATED IN THE TAVR-AS MARKET ......49

D. ECONOMIC THEORY AND A VARIETY OF EVIDENCE SHOW THAT THE MERGER WOULD LIKELY HARM CONSUMERS ......51

**VI. THE MERGER IS NOT NECESSARY FOR JENAVALVE TO CONTINUE TO COMPETE IN THE TAVR-AR MARKET ......52**

A. JENAVALVE HAS RATIONALLY FOCUSED ON COMPLETING CLINICAL TRIALS IN THE UNITED STATES, WHICH MAY HAVE AFFECTED SHORT-TERM PROFITABILITY WHILE INCREASING ITS LONG-TERM VALUE ......52

B. ORDINARY COURSE MATERIALS INDICATE JENAVALVE HAS OPTIONS FOR RAISING THE CAPITAL NEEDED TO PURSUE ADDITIONAL INNOVATION AND PRODUCT COMMERCIALIZATION ......54

**VII. NEITHER MERGER-SPECIFIC EFFICIENCIES NOR ENTRY, EXPANSION, AND REPOSITIONING ARE LIKELY TO OFFSET THE ANTICOMPETITIVE EFFECTS OF THE TRANSACTION .....56**

A. PARTIES HAVE NOT PROVIDED EVIDENCE OF COGNIZABLE EFFICIENCIES .............56

B. POTENTIAL ENTRANTS ARE FAR BEHIND THE PARTIES AND COULD NOT CONSTRAIN THE MERGED FIRM FROM EXERCISING MARKET POWER .....................58

**VIII. CONCLUSION .....61**

**APPENDIX A: TIMELINES OF PARTIES' FDA APPROVAL PROCESS AND REACTIONS TO EACH OTHER .....62**

**APPENDIX B: DESCRIPTION OF OTHER POTENTIAL TAVR-AR DEVELOPERS .....67**

**APPENDIX C: SOURCES AND NOTES FOR FIGURES .....69**

# I. QUALIFICATIONS, ASSIGNMENT, AND SUMMARY OF OPINIONS

## A. QUALIFICATIONS

1. I am a Founding Partner of Econic Partners, an economic consultancy, which began operations in early 2025. Previously, I was an Executive Vice President at Compass Lexecon, another economic consulting firm. I joined Compass Lexecon in 2021 after working at the Federal Trade Commission ("FTC") for 11 years. At the FTC, I served as a Deputy Assistant Director in the Bureau of Economics, Commissioner Terrell McSweeny's economic advisor, and a staff economist. I received my PhD from the University of Michigan Ross School of Business in 2010. I taught undergraduate and graduate courses covering topics including microeconomic theory, industrial organization economics, law and economics, and financial economics while at the University of Michigan and during my tenure at the FTC. I am a Senior Editor of the *Antitrust Law Journal*.

2. Since my doctoral work, I have specialized in the field of economics known as industrial organization, which considers the nature and implications of competition in imperfectly competitive markets. I have spoken on industrial organization topics and their relevance to antitrust work to academic, business, and government audiences around the world, and I have written several dozen articles related to antitrust policy, competition economics, and applied econometrics, multiple of which specifically concern the healthcare sector. My research has been published in leading scholarly journals including *The RAND Journal of Economics*, *The Review of Economics and Statistics*, *The International Journal of Industrial Organization*, *The Journal of Industrial Economics*, *The Journal of Health Economics*, and *The Review of Industrial Organization*.

3. Since I received my PhD, I have focused on the application of economic theory and econometric methods to the competitive analysis of mergers and potentially anticompetitive conduct. In my 15 years as an antitrust economist, I estimate that I have worked on well over 100 mergers, many in the health care sector. I have previously testified as an economic expert on behalf of the FTC in U.S. District Court and have also given testimony before a state health department on behalf of a private party.

4. My curriculum vitae, which details my professional experience, including a list of all publications I have authored and a list of matters in which I have provided testimony, is attached as Exhibit A.

### B. Assignment

5. I have been retained by the FTC to conduct an economic analysis of the likely effects on competition and consumer welfare of Edwards' proposed acquisition of JenaValve. As needed, I have also been asked to evaluate and respond to the critiques from the parties' expert(s) and/or other submissions.

6. My billing rate on this matter is $800 per hour. I have been assisted in my analysis by colleagues at Econic Partners. My compensation for this matter does not depend on its outcome. A list of materials relied upon is attached as Exhibit B.[1]

### C. Summary of Opinions

7. My fundamental conclusion is that the proposed transaction is likely to substantially lessen competition, which will harm American consumers. This opinion is based on the following findings.

8. **First**, the relevant market in which to consider the effects of the transaction is the supply of TAVR-AR devices to American consumers. The parties' own documents, as well as the testimony of key opinion leaders, confirm that for a large group of patients suffering from AR there are no realistic alternatives to TAVR-AR. Especially for the tens of thousands of patients with high surgical risk, TAVR-AR devices provide a unique and beneficial means of treating a grave illness. For many patients, the choice is likely to be between a treatment with a TAVR-AR device and foregoing treatment entirely. Given the starkness of the choice, it is clear that a hypothetical monopolist of all TAVR-AR devices would be able to profitably increase the price of at least one of the parties' devices by a small but significant and non-transitory amount or profitably forego some costly efforts to develop new or better TAVR-AR devices. See Section III for details.

---

[1] Discovery in this matter is ongoing, and I reserve the right to amend or update my report if additional information becomes available to me.

9. **Second**, the proposed transaction would dramatically increase concentration in the relevant antitrust market. The parties' ordinary course documents and the sworn testimony of their executives and other key opinion leaders establish that the parties are currently competing in clinical activities and are the firms that are closest to commercializing TAVR-AR devices in the United States. Based on my review of the evidence, JenaValve's device is likely to commercialize by early 2026, while documents indicate that Edwards' J-Valve product could do so in late 2028 or early 2029. No other potential rival is likely to become commercially available to U.S. patients for many years owing to the time required by the FDA's regulatory process. Indeed, pre-merger ordinary course documents contemplate that Edwards and JenaValve would be a duopoly through at least 2035. Thus, for an economically meaningful period, the transaction would constitute a merger to monopoly. See Section IV for details.

10. **Third**, the loss of competition caused by the merger of JenaValve and Edwards would likely harm consumers. The economic literature shows that when suppliers of close substitutes merge in the absence of other similarly situated competitors it generally harms consumers. A review of the parties' documents and the sworn testimony of relevant stakeholders confirms that we can expect this result in the TAVR-AR market. Economists have also shown that direct competition is associated with greater innovation except in limited circumstances, which do not apply to the proposed merger. Rather, I anticipate that the merger would negatively impact innovation. These anticipated harms result from Edwards' control of both JenaValve and JC Medical. If one of the two devices were to remain independent instead, consumers would continue to benefit from competition in TAVR-AR. See Section V for details.

11. **Fourth**, the proposed transaction is not necessary for JenaValve to commercialize its TAVR-AR product. While JenaValve may not currently be profitable, it can commercialize its Trilogy valve without being acquired by its only competitor. JenaValve's documents, sworn testimony, and Edwards' own willingness to pay so much for JenaValve reveal that if the merger does not proceed, JenaValve can still commercialize Trilogy effectively. Fundamentally, it is a false choice to suggest that the only options are limited access to the Trilogy valve or Edwards as a monopolist for the foreseeable future. See Section VI for details.

12. **Fifth**, neither merger-specific efficiencies nor rapid responses from other potential TAVR-AR suppliers are likely to offset the anticompetitive effects of the transaction. The

purported synergies enumerated by the parties are not specific to a partnership with Edwards. There is thus no articulation for why consumers must bear the costs of monopoly to achieve them. Moreover, the regulatory approval process defines hurdles that must be cleared before new competitors can begin to supply American patients. The fact that potential rivals have not obtained regulatory clearance to pursue the clinical trials needed for FDA approval ensures that they cannot meaningfully constrain the actions of the merged firm for at least the next several years. See Section VII.

## II. FACTUAL BACKGROUND

### A. The Economics of Medical Devices

13. Medical devices are instruments or machines that are not absorbed into patients' bodies that contribute to the prevention, diagnosis, or treatment of diseases.[2] Their sales in the United States are expected to exceed $200 billion in 2025.[3]

14. Healthcare markets, including those involving medical devices, differ in some ways from typical markets where there are sellers who choose prices and customers who purchase a product if it has the combination of attributes and price they prefer. In medical device and other healthcare markets, there are multiple actors whose preferences and interests influence the purchase and consumption of products. The direct purchasers of medical devices are usually health care providers, such as hospitals.[4] However, hospitals are not directly involved in decisions about whether to use a specific device at any given time. Instead, physicians decide whether to use a given medical device on a patient. The choice will be influenced by the set of

---

2 Medicare Payment Advisory Commission (MedPAC), "Report to the Congress: Medicare and the Health Care Delivery System", June 2017 (*hereinafter* "MedPAC (2017)"), p. 209, accessed October 11, 2025. Available from https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun17_reporttocongress_sec.pdf.

3 Statista, "Medical Devices - United States," accessed September 30, 2025. Available from https://www.statista.com/outlook/hmo/medical-technology/medical-devices/united-states.

4 Hospitals may purchase the product directly from the device manufacturer or via a group purchasing organization. More complex items like valves are often purchased directly. MedPac (2017), p. 220.

*Privileged*

devices stocked by their hospitals, but the patient may be able to influence the choice of device through their physician.[5]

15. As direct purchasers, hospitals focus on the costs of devices, factoring in the preferences of the physicians that perform procedures and patients' demand for particular devices. Physicians do not directly face the financial consequences of their choices, but often consider, to some degree, the financial implications for the hospital and patient.[6] Because of the important role played by physicians in influencing hospitals' demand for devices, research shows that medical device manufacturers promote their products to physicians.[7]

16. Notwithstanding the differences, competition is an important force to promote consumer welfare in medical device markets. Economic principles teach that monopolists will typically charge higher prices than firms in competitive markets. This is true in medical device markets. Absent competition, device suppliers lack an important incentive to lower their prices when negotiating with hospitals so as to gain or preserve market share from rivals.[8] Research demonstrates that an increase in the number of competing products is associated with lower prices in medical device and pharmaceutical markets.[9] Higher prices, on the other hand, can lead

---

5 Patients may also seek to influence the choice of device by contacting Edwards' "Patient Support Center." *See*, PX1481-001.

6 Econometric studies show that physicians do internalize prices but "relatively little." Matthew Grennan, "Price Discrimination and Bargaining: Empirical Evidence from Medical Devices", *American Economic Review*, No. 103(1), 2013: 145-177 (*hereinafter* "Grennan (2013)"), p. 164.

PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 36:10-16) ("[Medical device pricing matters to physicians because] if devices cost too much hospitals don't put them on the shelf. This has been true for almost every technology.").

7 Alon Bergman *et al.*, "Lobbying Physicians: Payments from Industry and Hospital Procurement of Medical Devices", *National Bureau of Economic Research*, Working Paper 29583, 2021:1-58, p. 1.

8 MedPAC (2017), p. 222 (explaining that hospitals leverage the availability of alternatives to secure more favorable pricing).

9 *See*, *e.g.*, Grennan (2013), Figure 1 (showing that the introduction of a new stent led to price declines and increased volumes); Fiona Scott Morton and Margaret Kyle, "Markets for Pharmaceutical Products", *Handbook of Health Economics* (2), 2012: 763-823, Figures 12.5 and 12.6 (showing the connection between number of competing generic drugs, prices, and branded drug share).

to lower use of health care services.[10] Competition can also spur the development of new products to better treat patients at lower cost. Overall, competition can lead to increased access to lifesaving products as well as lower prices.

### B. MEDICAL DEVICE DEVELOPMENT PROCESS

17. Replacement heart valves are Class III medical devices.[11] They require pre-market approval ("PMA") from the U.S. Food and Drug Administration ("FDA") prior to commercialization in the United States.[12] Before beginning this process, medical device manufacturers must apply for an FDA Investigational Device Exemption ("IDE"), which permits clinical investigation of devices to determine safety and effectiveness. After receiving an IDE, medical device manufacturers take steps to gather data to support a PMA application, including a "first-in-human" ("FIH") implantation, small clinical studies to first test the feasibility of the devices (called "early feasibility studies" ("EFS"), followed by a large-scale "pivotal trial" to establish safety and efficacy endpoints in the patient population of interest. [13]

---

10 Aviva Aron-Dine *et al.*, "The RAND Health Insurance Experiment, Three Decades Later", *The Journal of Economic Perspectives*, 27(1), 2013: 197-222, p. 220 ("… one of the central contributions of the RAND experiment is robust: the rejection of the null hypothesis that health spending does not respond to the out-of-pocket price.").

11 Class III devices pose the highest risk and include devices such as ventilators, pacemakers, and heart valves. U.S. Food and Drug Administration, "Overview of Medical Device Classification and Reclassification", December 19, 2017, accessed October 10, 2025. Available from https://www.fda.gov/about-fda/cdrh-transparency/overview-medical-device-classification-and-reclassification; Qualio, "The 3 FDA medical device classes: differences and examples explained", January 14, 2025, accessed September 30, 2025. Available from https://www.qualio.com/blog/fda-medical-device-classes-differences.

12 *See,* U.S. Food and Drug Administration, "The Device Development Process", accessed September 30, 2025. Available from https://www.fda.gov/patients/learn-about-drug-and-device-approvals/device-development-process; Nazar Hembara, PhD, "Phases of Clinical Trials for Medical Devices", *All Clinical Trials*, September 24, 2024, accessed September 30, 2025. Available from https://www.allclinicaltrials.com/blog/phases-of-clinical-trials-for-medical-devices.

13 National Institute of Health Clinical Center, "What is an IDE?", accessed September 30, 2025. Available from https://www.cc.nih.gov/orcs/ide/what-is-an-ide; Nazar Hembara, PhD, "Phases of Clinical Trials for Medical Devices", *All Clinical Trials*, September 24, 2024, accessed September 30, 2025. Available from https://www.allclinicaltrials.com/blog/phases-of-clinical-trials-for-medical-devices; *see also*, PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 24:17-21).

18. As part of a PMA application, medical device manufacturers might be required to submit information to the FDA to demonstrate that the materials they plan to use in their device can be safely used in the human body. An example of such information is results from tests that evaluate the potential for wear/corrosion of a specific device, such as the Accelerated Wear Test ("AWT").[14]

19. Besides participating in the clinical trials required for a PMA, patients can access heart valves prior to their commercialization through (a) the expanded access program (in compassionate use and emergency use cases) or (b) the post-trial continued access protocol/program ("CAP").[15] For expanded access, subject to FDA approval, a physician might use the device if the patient is in a life-threatening situation and needs immediate treatment ("emergency use"), or if the patient has a serious disease or condition with no available alternative options and does not qualify for the clinical trial ("compassionate use").[16] A continued access program can give patients access to the investigational device after the clinical trials have been completed, but before the device is commercialized.[17] There can, however, be limits on device manufacturers' ability to supply investigational devices to patients prior to commercialization.

---

14 U.S. Food and Drug Administration, "Safety of Metals and Other Materials Used in Medical Devices", February 18, 2022, accessed October 3, 2025. Available from https://www.fda.gov/medical-devices/products-and-medical-procedures/safety-metals-and-other-materials-used-medical-devices.

TAVR valves' durability is currently evaluated by Accelerated Wear Test (AWT), in which they were tested in a simulated environment where heart valves were repeatedly opened and closed in 200 million cycles. Sailahari V. Ponnaluri *et al.*, "The Accelerated Transcatheter Heart Valve Testing Environment: Loading, Motion, and Fluid Dynamics", *J Biomechanical Eng'g*, 145(3), 2023:031005-1-10, p. 031005-9.

15 PX7023 (Keltjens (JenaValve) Dep. 25:11-15).

16 U.S. Food and Drug Administration, "Expanded Access for Medical Devices", February 23, 2018, accessed September 30, 2025. Available from https://www.fda.gov/medical-devices/investigational-device-exemption-ide/expanded-access-medical-devices.

17 Geisinger, "Guidance – IDE Early/Expanded Access for Devices", February 23, 2018, p. 6, accessed October 2, 2025. Available from https://www.geisinger.org/-/media/onegeisinger/pdfs/ghs/research/research-at-geisinger/hrpp/guidance/guidance-ide-early-expanded-access-for-devices-2-23-18.

*Privileged*

20. Devices that have only completed clinical trials outside of the United States ("OUS") cannot generally rely on such evidence in the FDA's pre-market approval application.[18] I understand that Dr. Kesselheim will opine on the extent to which OUS data can be used to obtain FDA approval for Class III medical devices.

### C. AORTIC REGURGITATION

21. Aortic regurgitation ("AR") is a condition where the aortic valve tissue is enlarged and weakened, resulting in the valve not closing tightly and blood leaking back from the aorta to the left ventricle.[19] It is a different condition from aortic stenosis ("AS"), which is when the aortic valve's leaflets are damaged, often due to calcium buildup, resulting in the obstruction of blood flow from the left ventricle to the aorta.[20] To simplify, AS involves aortic leaflets that do not fully *open*; AR involves leaflets that do not *close* properly.

22. Each patient's aortic valve is different. Specifically, the size of the aortic annulus, which is the fibrous ring-shaped structure at the junction between the left ventricle and the aortic root where the aortic leaflets attach, may differ from patient to patient.[21] Getting the size of the valve correct so that it fits the aortic annulus appropriately is crucial to avoid potentially life-threatening complications.[22]

---

18 U.S. Food and Drug Administration, "Acceptance of Clinical Data to Support Medical Device Applications and Submissions Frequently Asked Questions", February 21, 2018, p. 1, accessed October 11, 2025. Available from https://www.fda.gov/regulatory-information/search-fda-guidance-documents/acceptance-clinical-data-support-medical-device-applications-and-submissions-frequently-asked.

19 Cleveland Clinic, "Aortic Regurgitation", November 20, 2024, accessed September 30, 2025. Available from https://my.clevelandclinic.org/health/diseases/24396-aortic-regurgitation.

20 Cleveland Clinic, "Aortic Stenosis", September 4, 2024, accessed September 30, 2025. Available from https://my.clevelandclinic.org/health/diseases/23046-aortic-valve-stenosis; PX1482-003 (Edwards, Draft TAVR Messaging, July 22, 2024) (noting that "[a]ortic regurgitation is a deadly disease that is distinct from Aortic Stenosis and requires different therapy solutions - today, surgery is the only option for these patients and we estimate that at least 75% of patients go untreated").

21 PCR Online, "Anatomy of the so-called 'Aortic Annulus'", accessed September 30, 2025. Available from https://www.pcronline.com/Cases-resources-images/Tools-and-Practice/Anatomy-of-the-aortic-valvar-complex/Aortic-annulus.

22 Victoria Delgado *et al.*, "Measuring Aortic Valve Annulus Size for Transcatheter Aortic Valve Implantation - 2D or 3D Imaging Techniques?", *Interventional Cardiology*, 6(2), 2011:161-164; Penn Medicine, "Paravalvular leak closure", accessed September 30, 2025. Available from

23. Both parties view AR as a serious and undertreated disease. JenaValve has estimated that about 116,000 patients suffer from severe symptomatic AR ("ssAR") in the United States.[23] JC Medical, prior to Edwards' acquisition, estimated that 145,000 ssAR patients are inoperable and have high surgical risk AR.[24] The annual mortality rate of patients with ssAR is more than 24%.[25] However, a majority (74%) of severe, symptomatic AR patients do not receive treatment within a year of diagnosis.[26]

24. At present, the most common treatment for AR in the United States is a form of open-heart surgery known as Surgical Aortic Valve Replacement ("SAVR").[27] In this type of surgery, the patient's chest is cracked open, and the diseased aortic valve is surgically cut out and replaced with an FDA-approved artificial valve. However, open-heart surgery is invasive and difficult for patients. It is not an option for some older patients or those with certain comorbidities, for whom open-heart surgery carries a significant health risk.[28] As a result of this and other benefits of non-surgical treatments, AR represents a significant and untapped market

https://www.pennmedicine.org/treatments/paravalvular-leak-closure; Miralem Pasic *et al.*, "Annular Rupture During Transcatheter Aortic Valve Replacement: Classification, Pathophysiology, Diagnostics, Treatment Approaches, and Prevention", *JACC: Cardiovascular Interventions*, 8(1), 2015: 1-9.

23 PX0033-003 (JenaValve, Corporate Presentation, August 2023). Some documents in the record use the acronym "ssAR". Others refer to the diseases without or with fewer qualifiers, such as "aortic regurgitation" or "severe aortic regurgitation." I understand that stakeholders generally mean the same condition with these different references. Going forward I use "AR" except where quoting documents that specifically use alternate terminology in which case I use the underlying document's terms.

24 PX1048-013 (JC Medical, Project Alps, February 2024).

25 PX1048-011 (JC Medical, Project Alps, February 2024) (24% mortality even for patients under "Medical Management"); PX0033-005 (JenaValve, Corporate Presentation, August 2023) ("What is the annual MORTALITY of your patients with ssAR? >30%").

26 PX0029-003 (JenaValve, Aortic Regurgitation Market Opportunity, December 2023).

27 PX1194-026 (Edwards, Board of Directors Strategy Sessions, Transcatheter Aortic Valve Replacement, September 11, 2024) (74% of diagnosed AR are untreated within one year of diagnosis, 26% are treated with SAVR).

28 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 23:12-16) ("Surgery could be an option, but [the patients] were deemed high-risk for morbidity and mortality and most of these patients were elderly and frail and really the last thing that they wanted was open-heart surgery.").

opportunity in the United States. In 2024, Edwards estimated a [redacted] near-term opportunity in the United States.[29]

### D. TRANSCATHETER AORTIC VALVE REPLACEMENT

25. Transcatheter aortic valve replacement ("TAVR") is a less invasive technology that can be used to treat aortic valve diseases such as AS and AR in lieu of SAVR.[30] The TAVR procedure involves inserting a catheter into a patient's blood vessel, guiding it to the aortic valve, placing the replacement valve into the aorta, and then removing the catheter. The new valve then takes over the task of regulating blood flow.[31] The aortic valves used in TAVR are Class III medical devices because they are life-sustaining and critical in preventing impairment of human health.[32]

26. At present, TAVR devices are mainly utilized in the treatment of AS. Current TAVR-AS devices are unsuitable treatments for patients with AR. For example, current TAVR-AS devices are designed to rely on the calcium deposits in stenotic valves to anchor themselves and, therefore, may not anchor securely to patients with AR if those patients do not have similar calcium buildup.[33]

27. There are two common access points for TAVR-AR procedures: (1) the femoral artery (transfemoral), and (2) the left ventricular apex of the heart (transapical). Transfemoral access is the preferred access point in the United States; other access points are generally only used if transfemoral implantation is not viable for a particular patient.[34] Transapical access is "much

---

29 PX0020-009 (Edwards, Strategy & Corporate Development Update, May 7, 2024).

30 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 9:11-23).

31 American Heart Association, "What is TAVR? (TAVI)", June 7, 2024, accessed October 7, 2025. Available from https://www.heart.org/en/health-topics/heart-valve-problems-and-diseasse/understanding-your-heart-valve-treatment-options/what-is-tavr.

32 PX7027 (Sun (JenaValve) Dep. 66:4-7); U.S. Food and Drug Administration, "Regulatory Controls", March 27, 2018, accessed October 11, 2025. Available from https://www.fda.gov/medical-devices/overview-device-regulation/regulatory-controls. I understand Dr. Kesselheim will opine on medical device classification.

33 PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 29:14-30:20).

34 PX7027 (Sun (JenaValve) Dep. 66:4-7); U.S. Food and Drug Administration, "Regulatory Controls", March 27, 2018, accessed October 11, 2025. Available from https://www.fda.gov/medical-devices/overview-device-regulation/regulatory-controls.

more invasive" than transfemoral access, and requires incisions in the chest and heart, while transfemoral access only requires a small incision in the groin.[35] Henceforth, when I discuss TAVR-AR products, I am referring to transfemoral ones unless specifically noted.

### E. THE PARTIES

28. Edwards is a global medical device company focused on heart disease treatments. For the year ended December 31, 2024, Edwards had total net sales of over $5.4 billion, $3.2 billion of which were in the United States.[36] Most of Edwards' sales are for TAVR products, for which it is the leading device company.[37]

29. In the TAVR-AS market, Edwards manufactures and sells the Sapien valve system.[38] Edwards has not successfully developed a TAVR-AR device internally. However, Edwards acquired JC Medical from Genesis MedTech in July 2024.[39] JC Medical has been developing TAVR products under the J-Valve product name to treat severe AR and AR-dominant mixed

---

35 PX0053-011 (Response of Edwards Lifesciences Corporation to the Request for Additional Information and Documentary Materials, May 23, 2025, (*hereinafter* "Edwards 2R (2025)")) ("The legacy system is designed for transapical implantation (i.e., access via the left ventricular apex), whereas the J-Valve TF System being designed and tested by Edwards is designed for transfemoral implantation (i.e., access via the femoral artery). Transfemoral implantation is the preferred access point in the United States and other markets. Transapical and other access points are generally only used in the United States where transfemoral implantation is not viable for a particular patient."); PX0053-059-60 (Edwards 2R (2025), Response to Specification No. 16); PX2457-040 (JenaValve PMA Module 4, November 18, 2024); PX1198-009 (Response to Austrian Federal Competition Authority and Federal Cartel Prosecutor, November 25, 2024); PX1292-001 (Email from J. Kilcoyne, JenaValve, to I. Darmali, Edwards, March 28, 2025); PX7027 (Sun (JenaValve) Dep. 26:8-19); PX7023 (Keltjens (JenaValve) Dep. 24:3-10); PX7029 (Thourani (Piedmont Heart Institute) Dep. 42:1-44:7); PX7031 (Williams (NYU Langone Medical Center) Dep. 16:13-17:7).

36 Edwards, "2024 Annual Report", p. 31, accessed October 1, 2025. Available from https://s27.q4cdn.com/788244549/files/doc_financials/2024/ar/EW-2024-Annual-Report-1.pdf.

37 PX1137-018-19 (Edwards, Senior Leadership Team Meeting, Financial and Valuation Update, August 28, 2024) (TAVR devices contribute approximately [redacted] of Edwards' total sales in 2025); PX1070-001 (Email from B. Zovighian, Edwards, to L. Wood, Edwards, August 7, 2024) ("having [redacted] share in the US we are the market."); PX7026 (Bierman (Edwards) Dep. 115:19-25); PX7019 (Wood (Edwards) Dep. 121:25-122:3).

38 PX0055-003 (Edwards Lifesciences / JenaValve Presentation to FTC, September 6, 2024).

39 PX0053-044 (Edwards 2R (2025)) ("JC Medical was acquired by Edwards in July 2024.").

*Privileged*

aortic valve disease.[40] Edwards agreed to pay a maximum of $315M for JC Medical, including a $115M upfront payment and [redacted].[41]

30. A transapical version of J-Valve received Chinese regulatory approval in 2017. However, I understand that JC Medical has taken no steps towards bringing this product to either the European or U.S. markets.[42] In contrast, JC Medical has been pursuing FDA approval for a transfemoral version of the J-Valve since 2023.[43]

31. In October 2024, JC Medical started its pivotal trial (JOURNEY) for the transfemoral J-Valve, expecting to complete enrollment in 2025.[44] In 2024, Edwards projected J-Valve commercialization by the end of 2026.[45] However, in 2025, Edwards revised its estimates of commercialization, anticipating it to happen in 2028.[46] Since acquiring JC Medical, Edwards made changes to the J-Valve [redacted].[47] Edwards discovered issues with the new "Gen 1.1" [redacted] in the summer of 2025, after which Edwards paused the J-Valve pivotal

---

40 PX2042-002 (Email from R. Polzin, JenaValve, to D. Sun *et al*., February 8, 2024); PR Newswire, "Genesis MedTech Completes Enrollment in its United States Early Feasibility Study Utilizing the J-Valve™ Transfemoral System for Patients with Severe Aortic Regurgitation", February 5, 2025, accessed October 11, 2025. Available from https://www.prnewswire.com/news-releases/genesis-medtech-completes-enrollment-in-its-united-states-early-feasibility-study-utilizing-the-j-valve-transfemoral-system-for-patients-with-severe-aortic-regurgitation-302052608.html.

41 PX1191-006 (Edwards, Strategy & Corporate Development Update, Board of Directors, July 10, 2024).

42 *See*, PX1197-008-9 (Austrian Precautionary Merger Notification, September 11, 2024).

43 PX1048-007 (JC Medical, Project Alps, February 2024).

44 PX7019 (Wood (Edwards) Dep. 106:22-107:11).

45 PX0018-010 (Edwards, Strategic Investments Update, April 17, 2024).

46 PX0059-003 (Edwards, Presentation to Federal Trade Commission Front Office, July 24, 2025). *But see,* PX0053-012 (Edwards 2R (2025)) (noting that the Premarket Approval for the J-Valve Transfemoral System would "likely be submitted in 2028," but that "such timelines are frequently extended if there are any unforeseen developments during the clinical trials").

47 PX1485-028 (Edwards 2025-31 TAVR Strategic Plan, September 10, 2025) (describing the Gen 1.1 device as one of Edwards' "Technology Enhancements").

trial to troubleshoot the problem.[48] Edwards' recent projections anticipate FDA approval and commercialization by late 2028 or early 2029.[49]

32. JenaValve, established in 2006,[50] is a medical device company specializing in the development and manufacturing of TAVR-AR devices, specifically the Trilogy system.[51] JenaValve initiated the regulatory approval process for Trilogy, seeking an indication for severe AR with the ALIGN-AR EFS.[52] The ALIGN-AR early feasibility study trial started in 2018.[53] The ALIGN-AR pivotal study began in May 2020.[54] By October 2023, the company had

---

48 PX1265-002 (Email from J. Wheeler, Edwards, to L. Wood *et al*., May 20, 2025) (Edwards "will be notifying FDA tomorrow of an Enrollment Hold on the JOURNEY clinical trial while R&D reviews several cases of delayed deployment seen with the newly implemented 1.1 version of the SOJOURN [i.e., J-Valve] valve system." [emphasis omitted]); PX1484-001 (Email from B. Concepcion, Edwards, to J. Wheeler *et al*., May 21, 2025) (providing timeline of pause); PX1281-001 (discussing delivery system release issues); *see also,* PX1485-028 (Edwards 2025-31 TAVR Strategic Plan, September 10, 2025) (describing the Gen 1.1 system as one of Edwards' "Technology Enhancements"); PX1487-005 (Letter from B. Concepcion, Edwards, to JOURNEY Trial Investigators, July 18, 2025) (informing recipients of the enrollment hold); PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 26:5-29:7) (noting that problems commenced after Edwards' acquisition of JC Medical).

49 PX1397-014 (Edwards, LT Meeting, February 20, 2025) (projecting SOJOURN approval for Q3 2028); PX7026 (Bierman (Edwards) Dep. 233:20-24); *see also*, PX0021-009 (Edwards, Strategy & Corporate Development Update, Board of Directors, July 10, 2024) (projecting revenues based on a commercial launch in 1H 2028); *see also*, JC Medical, "J-Valve Transfemoral Pivotal Study (JOURNEY)", *ClinicalTrials.gov* Identifier: NCT06455787, updated September 26, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06455787.

50 JenaValve, "About Us", accessed October 1, 2025. Available from https://JenaValve.com/about-us/ ("JenaValve officially established to develop an innovative new transcatheter valve to treat AR").

51 PX0055-003 (Edwards Lifesciences / JenaValve Presentation to FTC, September 6, 2024).

52 JenaValve's IDE for its EFS was approved in October 2015. *See*, PX0043-036 (Responses of JenaValve Technology, Inc. to the Request for Additional Information and Documentary Material Issued by the Federal Trade Commission on October 10, 2024, April 25, 2025 (*hereinafter* "JenaValve 2R (2025)").

53 JenaValve, "THE ALIGN-AR TRIAL: Safety and Effectiveness/Performance of the Transfemoral JenaValve Pericardial TAVR System in the Treatment of Patients With Symptomatic Severe Aortic Regurgitation (AR)", *ClinicalTrials.gov* Identifier: NCT02732704, updated November 18, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT02732704.

54 JenaValve, "A Study to Assess Safety and Effectiveness of the JenaValve Trilogy™ Heart Valve System in the Treatment of High Surgical Risk Patients With Symptomatic, Severe Aortic Regurgitation (AR)", *ClinicalTrials.gov* Identifier: NCT04415047, updated September 13, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT04415047.

*Privileged*

completed its pivotal trial and met primary safety and efficacy endpoints.[55] JenaValve also conducted an AWT to test valve durability around early to mid-2023.[56] The FDA found problems during the AWT, prompting JenaValve to troubleshoot and restart its AWT in mid-2024,[57] likely delaying its PMA approval to early 2026.[58] JenaValve has since applied for a PMA and is engaging with the FDA regarding its new AWT data.[59] Meanwhile, JenaValve is "continuing plans for commercial launch."[60] Trilogy is expected to be the first commercialized TAVR-AR device in the United States.[61] Edwards agreed to acquire JenaValve for as much as $945M with a guaranteed $500M upfront payment, [redacted], [redacted].[62]

33. Besides the ALIGN-AR trial, JenaValve is also conducting the ARTIST trial, which aims to compare the safety and effectiveness of Trilogy valves versus surgical valve replacements in lower surgical-risk AR patients. If successful, this will expand the indication for Trilogy beyond

---

55 CardiovascularNews Advertorial, "TAVI offers promise in the 'underdiagnosed and undertreated' aortic regurgitation population," March 13, 2024, accessed October 11, 2025. Available from https://cardiovascularnews.com/jenavalve-aortic-regurgitation-advertorial-2024/ (Announcing the "results from the ALIGN-AR pivotal trial, presented at the 2023 TCT meeting (23-26 October…)"). The same article also indicates that JenaValve also received the CE mark, a milestone in the EU medical device development process which signifies that the device is safe, effective, and meets essential health and safety standards. *See,* Nectar, "Understanding CE Mark in Medical Devices," accessed October 1, 2025. Available from https://nectarpd.com/an-overview-of-ce-mark-for-medical-devices-2023/.

56 PX7007 (Kilcoyne (JenaValve) IH 255:1-19) (Around February 2024, JenaValve failed the AWT test "in the midst of [their] acquisition discussions with Edwards." The AWT test was conducted for nine months. Thus, the AWT was probably commenced in early to mid-2023.).

57 PX2186-007 (JenaValve, Board of Directors Meeting, March 20, 2024)).

58 *Id.*; *see also*, note 235.

59 PX2142-007 (JenaValve, Board of Directors Meeting, March 20, 2024); PX2303-047 (JenaValve, Board of Directors Meeting, July 16, 2025).

60 PX7027 (Sun (JenaValve) Dep. 43:8-22).

61 PX0020-011(Edwards, Strategy & Corporate Development Update, May 7, 2024).

62 PX1166-010, 022-25 (Agreement and Plan of Merger among Edwards Lifesciences Holding, Inc., Jupiter Merger Sub, Inc., JenaValve Technology, Inc., and Shareholder Representative Services LLC, July 23, 2024); PX1191-015 (Edwards, Strategy & Corporate Development Update, July 10, 2025).

high-risk AR patients, presenting JenaValve with a "massive market expansion opportunity."[63, 64] JenaValve enrolled the first patients in their ARTIST trial in June 2025[65] and expects to finish the trial in June 2026.[66] However, I understand that the trial is experiencing delays, possibly in part as a result of the proposed merger with Edwards.[67]

34. JenaValve and Edwards currently provide valves to patients through compassionate use, emergency use, and continued access programs. JenaValve's continued access program is limited to approximately 150 patients every 6 months.[68]

### F. **Other Potential AR Treatments**

35. The Parties identified a number of TAVR-AR devices in various stages of development around the world.[69] Appendix B summarizes the products that have initiated a clinical trial process at some point somewhere in the world.

---

63 PX3059-020 (JenaValve, Corporate Overview, June 2025); *see,* PX7001 (Spadaro (JenaValve) IH 68:10-14) ("The ARTIST trial will enroll low- and moderate-risk patients, severe patients but low and moderate risk to surgery, and it's a randomized trial. So it will randomize against surgical aortic valve replacement one-to-one.").

64 PX2142-023 (JenaValve, Board of Directors Meeting, March 20, 2024) (JenaValve describes the ARTIST trial as scheduled to start in the second half of 2024 to counter competitive threats from J-Valve, "[to] prevent J-Valve overtaking JVT High Ground," "Prevents Loss of JVT credibility customers/account," "Along w/ CAP – Slows J-Valve Enrollment," and "Block J-Valve From JVT Site Penetration").

65 PX3059-020 (JenaValve, Corporate Overview, June 2025).

66 JenaValve, "ARTIST: Aortic Regurgitation Trial Investigating Surgery Versus Trilogy™ (ARTIST)," *ClinicalTrials.gov* Identifier: NCT06608823, updated October 7, 2025, accessed October 11, 2025. Available from https://clinicaltrials.gov/study/NCT06608823.

67 PX2227-001-2 (Email from D. Pinto, JenaValve, to S. Sloan, JenaValve, *et al.*, March 18, 2025); PX7021 (Kilcoyne (JenaValve) Dep. 188:18-189:1) ("Q. And so it is fair to say that your understanding was that EW was delaying the ARTIST study trial? [] THE WITNESS: I thought that it was taking longer than it should to get approval."); *see also*, PX7035 (Zovighian (Edwards) Dep. 98:22-99:9).

68 PX0044-022 (Defendant JenaValve Technology, Inc.'s Amended Responses and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories, October 1, 2025 (*hereinafter* "JenaValve Amended Responses (2025)")).

69 PX0018-008 (Edwards, Strategic Investments Update, April 17, 2024); PX0044-017-18 (JenaValve Amended Responses (2025)); PX0046-015-16 (Defendant Edwards Lifesciences' Responses To Plaintiff's Interrogatories, September 20, 2025 (*hereinafter* "Edwards Responses (2025)")).

*Privileged*

36. U.S.-based Laguna Tech had plans to start U.S. clinical trials for its Zeta product but has paused that process indefinitely until it can secure external funding—which it has not done to date.[70] Various international firms may be working on AR devices, but none have advanced to the stage of conducting the types of clinical trials required for use in the United States. To my understanding, no firm other than Edwards and JenaValve has an IDE for their device, an important step for conducting clinical trials in the U.S. Clinical trials and the related FDA PMA applications are expensive and time-consuming processes and are therefore significant hurdles to commercializing a medical device in the United States.[71]

37. Though other devices may be in-development, the parties' documents and sworn testimony consistently describe J-Valve and Trilogy as the only real options for U.S. patients in the near to medium term.[72] No other TAVR-AR products have obtained FDA IDE approval, a process that can take many years;[73] no other products have started trials in the United States,

---

70 PX7000 (Madrid (Laguna Tech) IH 26:1-5) ("Q. Is it fair to say that that Laguna Tech's recent funding issues is delaying Zeta's approval timeline or putting it at risk? A. Yes, delaying – yeah, absolutely. Putting the timeline at risk. A hundred percent."); *see also*, PX7023 (Keltjens (JenaValve) Dep. 33:12-14) ("[M]y understanding is Laguna Tech is one of the corpses. So they will not bring it to the market unless somebody else acquires [the] technology or [IP].").

71 *See,* ¶ 17 above. *See also,* Appendix A.

There is also one non-TAVR solution for AR disease in development, Cusper by Cuspa Medical ( Cuspa, "The CUSPER," accessed October 1, 2025. Available from https://cuspamedical.com/). This device still needs first in-human trials, which I understand were planned for 2025. However, both JC Medical and Edwards have cast doubt on Cusper's effectiveness and safety. *See*, PX1189-001 (Email from B. Walsh, JC Medical, to J. Zhang, JC Medical, February 3, 2023); PX2482-001 (Email from G. Mirigian, JenaValve, to V. Podichetty, JenaValve, *et al*., May 27, 2022) (described Cuspa's device "like sort of a band-aid for AR …"); PX1190-005 (Edwards, THV Innovation Opportunities, June 25, 2024) ("Opinion: [redacted]) (emphasis in original).

72 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 30:10-31:21) (noting that "almost assuredly…there will only be [Trilogy and J-Valve] in [U.S. TAVR-AR] any time in the next, I would say, five to seven years, at least"); PX7029 (Thourani (Piedmont Heart Institute) Dep. 97:4-98:1); PX1140-001 (Edwards mentioned that J-Valve and Trilogy are the two "[l]eading AR [t]echnologies"); PX1020-014 (Edwards, Internal Deal Announcement, July 26, 2024) ("JenaValve and JC Medical are the most advanced companies in the AR space"); PX2413-015 (JenaValve, "Talk Track," March 7, 2024); PX1049-012 (Edwards, JC Medical Valuation, January 25, 2024) (depicting J-Valve and JenaValve splitting the TAVR-AR market through 2035); *see also,* Appendix B.

73 For example, I understand it took JC Medical more than four years from applying for its IDE in May 2019 to obtaining it in August 2023 (see Appendix A); PX7038 (Kilcoyne (JenaValve

which can also take many years, even for companies with an existing device.[74] Commercialization of any potential alternative product would occur at least five years from now.[75] In their notes to physicians attending a key industry conference, JenaValve included under the category "competition" that "TAVR-AR devices in development … will not be available [for] 5+ years" and then discussed J-Valve as a separate item.[76] Consistent with this, a valuation model developed in relation to the sale of JC Medical predicts no product other than the Trilogy and J-Valve will penetrate the U.S. market until after at least 2035.[77]

## III. THE RELEVANT MARKET TO CONSIDER THE MERGER'S EFFECTS IS THE SUPPLY OF TAVR-AR DEVICES TO AMERICAN CONSUMERS

### A. PRINCIPLES OF MARKET DEFINITION

38. Market definition is a tool that can help clarify where relevant competition is taking place.[78] A properly defined antitrust market should include the set of products and services that, by virtue of being close substitutes, constrain the ability to raise the price or degrade the quality

---

30(b)(6)) Dep. 77:11-19). I understand Dr. Kesselheim will opine on the timeline for medical device development.

74 PX7027 (Sun (JenaValve) Dep. 21:8-15). For example, I understand it took JenaValve from October 2015 to November 2018 to go from obtaining their IDE to enrolling their first patient in their EFS trial (see Appendix A). *See also*, PX7038 (Kilcoyne (JenaValve 30(b)(6)) Dep. 56:8-58:2). I understand Dr. Kesselheim will opine on the timeline for medical device development.

75 Gail A Van Norman, "Drugs, Devices, and the FDA: Part 2: An Overview of Approval Processes: FDA Approval of Medical Devices", *JACC Basic Transl Sci*, 1(4), 2016:277-287; *see also,* PX7000 (Madrid (Laguna Tech) IH 27:23-28:3) ("Q. How long does the process take from I guess initial prototypes to FDA approval? A. So a fast process would be – let's see, one, two – fast process would be about four to five years. I guess more typical would probably be about seven to 10 years."); PX7019 (Wood (Edwards) Dep. 33:1-36:2); PX7038 (Kilcoyne (JenaValve 30(b)(6)) Dep, 77:11-19). I understand Dr. Kesselheim will opine on the timeline for medical device development.

76 PX2413-015 (JenaValve, Talk Track, March 7, 2024).

77 PX1066 at sheet "Market Size" (In this workbook, Edwards refers to US TAVR-AR as a separate market from the TAVR-AS market. In the US TAVR-AR market, Edwards only consider two players, J-Valve of JC Medical and JenaValve).

78 Gregory Werden, "Why (Ever) Define Markets? An Answer to Professor Kaplow," *Antitrust Law Journal,* 78, 2012: 729-746, p. 732 ("The relevant market is … the metaphoric arena in which in which the competition at issue occurs.").

of the focal product or service.[79] Put simply, the market should include alternatives that are reasonably close substitutes from the perspective of consumers for the focal products, while excluding more distant substitutes.

39. To define this set of products or services, economists typically rely on a tool called the Hypothetical Monopolist Test ("HMT"), which the Merger Guidelines issued jointly by the FTC and U.S. Department of Justice in 2023 ("Merger Guidelines") define as follows:

> ***When evaluating a merger of sellers, the HMT asks whether a hypothetical profit-maximizing firm, not prevented by regulation from worsening terms, that was the only present and future seller of a group of products ("hypothetical monopolist") likely would undertake at least a small but significant and non-transitory increase in price ("SSNIP") or other worsening of terms ("SSNIPT") for at least one product in the group.***[80]

40. The HMT seeks to define the smallest set of products that would make a SSNIP (typically considered to be a 5% price increase) profitable for at least one of the products in the market if a hypothetical monopolist owned them all. Therefore, it may be the case that not all products or services that a consumer may be willing to substitute for the products in the candidate market would be part of the market.[81] It is sufficient that the relevant market includes those products that are collectively close enough substitutes to make a SSNIP profitable if a single hypothetical firm controlled them all.

41. The implementation of the HMT in a merger context typically proceeds as follows. First, one considers whether a product associated with one party (Product B) is a close enough substitute to prevent the other party from profitably increasing the price of a focal product

---

79 Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010, (*hereinafter* "Davis and Garces (2010)"), p. 201 ("…one way to think about market definition is as a set of products which, if a firm were a monopolist, the constraints arising from weaker substitutes outside the market would be insufficient to restrict the monopolist's incentive to increase prices. An antitrust market is then conceived as a collection of products 'worth monopolizing.'").

80 U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, (*hereinafter* "Merger Guidelines"), pp. 41-42, accessed September 22, 2025. Available from https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

81 Merger Guidelines, p. 40 ("However, a relevant market cannot meaningfully encompass that infinite range of substitutes.").

(Product A) by a SSNIP.[82] If a sufficient number of customers would switch from Product A to Product B in the event of SSNIP, such that a hypothetical monopolist controlling just Product A and Product B would find it profitable to institute the price increase, then Product B alone imposes a sufficient competitive constraint that the two products constitute a relevant antitrust market by themselves. If, however, enough consumers would switch from Product A to products other than Product B that the price increase would not be profitable for a hypothetical monopolist controlling just Products A and B, then the market needs to be broadened. In this case, the exercise would continue with products steadily being added to the market based on their substitutability with Product A until a hypothetical monopolist of all of them could profitably demand a SSNIP. In the language of antitrust economics, one can stop adding products to the candidate market when the *actual loss* (the sales that would no longer be made on any product in the relevant market in response to a 5% price increase) becomes less than the corresponding *critical loss* (the proportion of sales that would have to be lost to make the 5-10% price increase unprofitable).[83]

42. The HMT may be conducted empirically.[84] However, quantitative analysis is not the only way to draw conclusions about whether a given candidate market passes the HMT.[85] Indeed, in some circumstances, market data indicative of consumers' likely switching patterns are unavailable. The inability to conduct econometric analysis does not prohibit the application of economic logic to understand whether a hypothetical monopolist in control of a set of products and services could profitably demand a small price increase. Instead, in matters such as this one, where the relevant products are still in the pre-commercial stage and, as a result, there is little data on customer preferences or economic margins, inferences about likely demand substitution patterns should be drawn from available qualitative information (e.g., documents, testimony of

---

82 As an economist, I assume that each product is initially priced at its profit-maximizing level.

83 Davis and Garces (2010) at § 4.6.2 ("Critical Loss Analysis").

84 Merger Guidelines at § 4.3.

85 *See*, Davis and Garces (2010), p. 166 ("it is worth emphasizing that much of the time market definition relies at least in part on qualitative assessment"); Jeremy Sandford *et al.*, "Economics in the 2023 Merger Guidelines: Three Areas of Concern," in *US Merger Guidelines: A Review*, S. Sulliven (ed.), Concurrences, 2024, (*hereinafter* "Sandford *et al.* (2024)"), p. 128 ("courts and practitioners sometimes additionally turn to qualitative evidence on demand substitution patterns in applying it").

businesspersons, etc.).[86] The Merger Guidelines identify a number of qualitative factors or "practical indicia" that can inform market definition. These include public recognition of the product(s) as a distinct locus of competition and the product(s) having distinct characteristics and/or uses, distinct customers, and greater sensitivity to the prices or behavior of like products.[87] In what follows, I consider the evidence available in the record to define the relevant product and geographic markets.

### B. The Relevant Product Market Includes Only TAVR-AR Products

43. TAVR-AR devices is a relevant product market in which to analyze the potential effects of this merger.

44. To demonstrate this using the HMT, I begin by asking what products and services impose a competitive constraint on the parties' products.[88] For example, consider JenaValve's Trilogy valve for treating AR. JenaValve has reacted and shifted its innovation activities in response to current and anticipated competition from the Edwards-owned J-Valve, indicating that J-Valve is a constraint and should be included in this set.[89] The same story applies when considering J-Valve. As noted above, it is possible to define a relevant market of just the parties' products, where – as here – there is evidence that they are predominantly constrained by each other. While the evidence supports this approach, a conservative alternative would be to include other products that would treat the same condition in the same way, i.e., other TAVR-AR devices to the extent they are identifiable, in a candidate market.

45. The next step in the HMT is to consider whether a hypothetical monopolist of all products in the candidate market would be able to profitably demand a price increase on at least

---

86 *See*, Jeremy Sandford *et al.*, "Common Ground or Political Football: The Role of Guidelines in Merger Analysis," *The Antitrust Source*, February 2025, (hereinafter "Sandford *et al.* (2025)"), p. 4 ("Although practical indicia may at times be the best available evidence on demand substitution and thus for market definition, such evidence is best used in service of the HMT and not in place of it.").

Davis and Garces (2010), p. 201 ("In practice, the HMT is often applied quite informally when data or reliable estimates of relevant elasticities are not available.").

87 Merger Guidelines, pp. 40-41.

88 Jonathan B. Baker, "Market Definition: An Analytical Overview," *Antitrust Law Journal*, 74(1), 2007: 129-173 at § III.C (on applying the "algorithm" laid out in the merger guidelines).

89 See discussion below in Section V.B for details.

one product. For the candidate market of TAVR-AR devices to *not* pass the HMT, it must be the case that patients and their physicians would choose alternative forms of treatment rather than bear a SSNIP on at least one TAVR-AR product in numbers sufficient to render the price increase unprofitable. Framed in this light, it is clear that a hypothetical monopolist of all TAVR-AR devices would be able to profitably demand at least a SSNIP on at least one of those devices.

46. Documents and testimony show that TAVR-AR is recognized as a distinct market. Indeed, the parties anticipate the market for TAVR-AR devices being large and attractive,[90] reflecting their understanding both that many patients suffer from AR and that they lack adequate therapeutic alternatives.[91] As explained in Section II, the most common alternative treatment for AR is open-heart surgery for surgical valve replacement,[92] but it is "too invasive for high-risk surgical patients."[93] Testimony from key opinion leaders confirms that SAVR is a highly undesirable alternative, particularly for patients "deemed high-risk for morbidity and mortality and most [high-risk patients are] elderly and frail and really the last thing that they wanted was open-heart surgery."[94] Consistent with this, JenaValve's Chief Commercial Officer testified that "TAVR has become the predominant choice for patients" because in traditional open heart surgery, the patient "has their chest cracked."[95] The high surgical risk population is substantial, plausibly amounting to almost 33,000 AR patients in 2025, which is equivalent to 37% of

---

90 *See*, PX0030-005, 007 (JenaValve, JenaValve Market Opportunity, January 2024)) (shows that the "near-term" (comprised of "Extreme/High Risk ssAR") U.S. market opportunity is $1.146 billion).

91 PX0039-021 (JenaValve, Discussion Materials, December 2023) (Centerview evaluation that JenaValve is a "highly scarce asset within the cardiovascular space" because of the low number of competitors and higher growth prospects. Centerview evaluated that JenaValve and generally TAVR-AR market is worth $1bn and has expected market growth through the late 2020's of around 25%).

92 See discussion in section II.C; *see also,* PX0033-006 (JenaValve Presentation, August 2023) ("Today: No Viable Solution for ssAR Patients").

93 PX0033-006 (JenaValve, Corporate Presentation, August 2023).

94 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 9:24-10:12, 23:3-16).

95 PX7001 (Spadaro (JenaValve) IH 49:17-50:4).

patients with AR.[96, 97] Like SAVR, valve replacements and valve surgical kits require open-heart surgery. Therefore, they too cannot substitute for TAVR-AR products for, at the very least, the high surgical risk population targeted by the parties.[98] Accordingly, SAVR is sufficiently distinct in ways that make it inappropriate for many AR patients that a hypothetical monopolist of TAVR-AR devices would be able to profitably impose a SSNIP.

47. Other methods of dealing with AR include "Medical Management," which treats the symptoms but not the disease itself.[99] Given the potential consequences of AR, it is unreasonable to anticipate a meaningful fraction of patients and physicians would forego all TAVR-AR treatments in response to a SSNIP on one of the merging parties' devices to substitute to medical management.

48. Documents and testimony also recognize that "off-label" use of TAVR-AS devices is not a reasonable substitute for TAVR-AR devices.[100] Sworn testimony indicates that AS and AR are two distinct diseases, necessitating different design choices for their treatment. Current TAVR-AS devices are designed to rely on the calcium deposits in stenotic valves to anchor themselves and, therefore, may not anchor securely to patients with AR if those patients do not have a similar calcium buildup.[101] Thus, the off-label use of the TAVR-AS device for AR patients is

---

[96] PX0030-007 (JenaValve, JenaValve Market Opportunity, January 2024) (showing that JenaValve estimates the U.S. addressable market is 32,736 patients above age 50 who have "Extreme and High" surgical risk); *see also,* PX1066 at sheet "Patient Pool" (showing JC Medical estimating that there are 137,947 ssAR patients who are "SAVR Inoperable" or "SAVR High Risk," estimating ssAR patient population based on U.S. population greater than or equal to 18 years old).

[97] PX0035-001 (JenaValve U.S. TAM Model) (projecting the number of extreme and high surgical risk patients to increase from 30,136 in 2025 to 39,701 in 2033).

[98] PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 40:4-14 (explaining that "surgical valve replacement means open heart surgery."), 44:19-45:2).

[99] PX0033-006 (JenaValve, Corporate Presentation, August 2023).

[100] PX1197-011-12 (summarizing severe consequences); *see also*, PX7027 (Sun (JenaValve) Dep. 38:6-16).

[101] PX7007 (Kilcoyne (JenaValve) IH 21:21-25) ("[AR and AS] are completely separate diseases. They have the same valve, but valves designed for the treatment of AS do not work well in the environment of an AR patient.").

only permitted when "there are overwhelming mitigating circumstances."[102] In line with this conclusion, JenaValve's Senior Director of Global Marketing testified that "[p]atients can die from a TAVR valve designed for AS being placed in an AR patient."[103] Similarly, when asked whether he would switch to off-label TAVR-AS devices if the price of TAVR-AR valves went up by 5-10%, Dr. Kereiakes of Christ Hospital answered, "[n]ot willingly."[104] Moreover, Edwards has consistently advised against the use of its Sapien TAVR-AS devices for treatment of AR.[105]

49. Due to the lack of alternatives, patients and their physicians have been interested in taking advantage of the parties' TAVR-AR products even when they have not yet completed clinical testing. They have done this by seeking, for example, compassionate use exemptions when the patient cannot become part of a clinical trial; or, as JenaValve puts it, when "there is no other alternative treatment."[106] Moreover, the parties' documents show that they do not anticipate compelling substitutes for TAVR-AR products, allowing them to demand high prices that reflect their devices' unique ability to deliver more "quality-adjusted life years" to AR sufferers.[107]

---

102 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 31:1-15) (explaining that off-label use can "…do harm. It's listed in red that we're not supposed to do unless there are overwhelming mitigating circumstances").

103 PX7004 (Sun (JenaValve) IH 23:9-11).

104 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 61:6-9).

105 PX1197-011 ("Edwards has always advised against off-label use of its SAPIEN TAVR device for the treatment of AR, not only because of its legal obligations but also given the severe risks that are attached to it.").

106 Compassionate use exemptions require "prior FDA approval" and "[a]llow[] planned treatment with the investigational product for serious medical conditions where there is no other alternative treatment." PX0044-022 (JenaValve Amended Responses (2025)).

PX0044-021 (JenaValve provided 27 valves for compassionate use cases between January 2022 and August 2025); PX0046-028 (Edwards Responses, September 13, 2025) and PX7030 (Turco (Edwards) Dep. 238:2-16) (JC Medical provided 38 TAVR-AR devices for implant procedures associated with compassionate use in the United States between May 2018 and August 2025).

107 PX2326-006 (JenaValve, Pricing, December 5, 2024) "Trilogy's price increase… is justified by Trilogy's offsetting the economic burden of untreated chronic heart failure, due to the potential for cost savings through reduced rehospitalization rates, and the procedure's value proposition in terms of clinical efficacy and healthcare innovation in life years gained and the quality of life of those years.").

50. The lack of realistic alternatives for a meaningful number of patients and their clinical support teams means the choice is clear: TAVR-AR or forgoing treatment. Consequently, a hypothetical monopolist of TAVR-AR devices would find it profitable to raise prices and/or lower quality from the competitive level.[108] This is the case because few, if any, physicians, especially those who treat high surgical risk AR patients, would choose to forego all TAVR-AR options in response to a SSNIP – it would risk the patient's death. It is, therefore, reasonable to conclude that a hypothetical monopolist of all TAVR-AR products would be able to profitably impose a SSNIP on at least one TAVR-AR product. In short, the sales that would no longer be made on any TAVR-AR product in response to a SSNIP would be less than the amount of sales that would have to be lost for a SSNIP to be unprofitable.[109] Thus, the relevant product market in which to assess the proposed transaction is TAVR-AR devices.

### C. The United States Is the Relevant Geographic market

51. Like relevant product markets, economists can analyze geographic markets using the HMT. The evidence in this matter shows that consumers in the United States have different options than those in other parts of the world, owing to the FDA's role as regulator.[110] The FDA must approve all TAVR-AR devices that are sold in the United States. Medical device products sold outside the United States that have not received FDA approval for clinical use are therefore not competitive alternatives for U.S. consumers, who cannot turn to these products even if the price for all relevant medical devices currently available in the United States increases

[108] All else equal, consumers will be better off with products that are both better and cheaper. A monopolist may seek to increase profits either by raising the prices of existing products or failing to make expenditures that would improve quality.

[109] Davis and Garces (2010) at § 4.6.2 ("Critical Loss Analysis").

[110] PX7025 (Darby (JenaValve) Dep. 35:10-36:1) ("…Each country has their own logistics of how that's conducted, including timing, thresholds, standards for performance that equate to pricing discounts that they'll require, things that are, again, very specific to that nation. So we'd have to go into nation by nation."); *see also*, PX7023 (Keltjens (JenaValve) Dep. 23:12-20) ("So the regulatory system in Europe is different…So you'll see E system, MER system. It was faster to get approval [in Europe]."); PX7030 (Turco (JC Medical) Dep. 85:6-86:12); PX7024 (Walls (Edwards) Dep. 104:7-10).

Matthew Grennan and Robert J. Town, "Regulating Innovation with Uncertain Quality: Information, Risk, and Access in Medical Devices," *American Economic Review*, 110 (1), 2020: 120–161.

significantly. The relevant firms in this market are those that can provide their products to U.S. patients.

52. For this geographic market to fail the HMT, either a sufficient number of patients would travel overseas for treatment of their AR or U.S. hospitals could acquire equipment overseas to be brought back and used in the United States. Neither is plausible. First, there is no evidence of which I am aware that suggests that patients in the United States are routinely willing to engage in "medical tourism" to address their AR.[111] Second, U.S. patients can only receive TAVR-AR devices sold in the United States,[112] which requires FDA approval.[113] As discussed in Section II.F, no other devices have even initiated this process, putting them years behind the parties.

## IV. THE MERGER WOULD DRAMATICALLY INCREASE CONCENTRATION IN AN ALREADY CONCENTRATED MARKET

53. As shown in Section III, the relevant market is TAVR-AR devices available to U.S. patients. Documents, data, and projections by the parties show that there are no material competitors in this relevant antitrust market beyond JC Medical (owned by Edwards) and JenaValve. As a result, using a variety of different approaches, I find that the transaction would increase concentration dramatically, effectively making Edwards a monopolist in a relevant market. Standard economics, as well as the Merger Guidelines, predict that this will harm consumers; monopolies are associated with higher prices and less efficient economies.[114]

---

111 PX7035 (Zovighian (Edwards) Dep. 119:8-120:16) (In response to a question about devices legally used overseas: "[they] could kill patients. And by killing patients, yes, you know, people are going to be lost about which technology to use, and so it is important to remind everyone about choose carefully your technology. We are not talking about the next iPhone here or the next watch. It's very different. It is a valve in a heart.").

112 I recognize that medical tourism occurs, but I have not seen in the record any evidence of medical tourism for heart-related conditions, let alone that it occurs in such significant numbers as to represent a restraint on approved devices. *See*, *e.g.*, CDC, "Medical Tourism: Travel to Another Country for Medical Care," June 1, 2023, accessed October 2, 2025. Available from http://wwwnc.cdc.gov/travel/page/medical-tourism.

113 See Section II.B.

114 Jean Tirole, "The Theory of Industrial Organization", *The MIT Press,* 1988, (*hereinafter* "Tirole (1988)"), p. 65 (monopoly "behavior leads to a price that is too high and to a 'dead-weight' welfare loss for society"); Merger Guidelines at § 2.1.

*Privileged*

### A. THE ECONOMIC SIGNIFICANCE OF MARKET STRUCTURE

54. Analyses of market concentration – metrics that summarize the number and relative sizes of firms – are "central" to merger analysis.[115] Merger investigations typically consider two concentration-related elements: how the merger changes market concentration and the level of a market's concentration. Both connect to economic theory and are recognized as probative by the Merger Guidelines.[116]

55. Economic theory demonstrates that in well-defined markets where firms compete by choosing either prices or quantities, the anticipated harm from a horizontal merger is directly related to how much the transaction increases concentration. The nature and extent of harm may be affected by the particularities of different markets, but all else equal, mergers that cause larger increases in concentration tend to lessen competition more and require larger efficiencies to offset the post-merger incentive to raise price and withhold quantity.[117] Concentration is typically measured using the Herfindahl-Hirschman Index ("HHI"), which is defined as the sum of the squares of the market shares of the firms in a market. A wholly monopolized market would have an HHI of 10,000—the maximum amount. Markets with an HHI greater than 1,800 are considered highly concentrated.[118] For concentration changes ("deltas") exceeding 100-200 HHI points, substantial efficiencies would generally be required to avoid a loss in consumer welfare.[119]

56. In addition to examining how much market concentration would change as a result of a merger, antitrust analyses also consider the level of existing concentration in a market. When markets are highly concentrated, it can be more likely that firms can credibly agree to compete less aggressively with each other. For example, in an influential article, Nobel laureate George

[115] Volker Nocke and Michael Winston, "Concentration Thresholds for Horizontal Mergers," *American Economic Review*, 112(6), 2022: 1915-1948, (*hereinafter* "Nocke and Winston (2022)"), p. 1915 ("Concentration measures play a central role in merger analysis.").

[116] *See*, Merger Guidelines at § 2.1 ("Market concentration and the change in concentration due to the merger are often useful indicators of a merger's risk of substantially lessening competition.").

[117] Nocke and Winston (2022) at § II (on theoretical analysis).

[118] Merger Guidelines at § 2.1.

[119] Nocke and Winston (2022) at § II (*see*, especially, Tables 1-3).

Stigler used a simple model to show that with greater concentration can come a greater ability to successfully coordinate.[120]

### B. DOCUMENTS AND TESTIMONY INDICATE THAT THE TRANSACTION WOULD CREATE A MONOPOLY FOR A MEANINGFUL PERIOD OF TIME

57. JenaValve and Edwards (through JC Medical) are direct competitors because they serve as competitive constraints on each other. Party documents and physician assessments indicate that Trilogy and J-Valve are functionally similar devices aimed at the same patients.[121]

58. As the two firms have worked to develop the Trilogy and J-Valve devices, respectively, for commercialization, they have competed to offer their valves to patients via clinical trial programs and to establish relationships with principal investigators and sites in anticipation of their future commercial rivalry.[122] Such rivalry is expected for two companies that, as industry participants characterize them, have similar products and are "the most significant competitors in the TAVR-AR space in the United States."[123]

59. There are no meaningful competitors in the TAVR-AR space to JenaValve and Edwards because no other therapies for AR are far enough along in development; "the other parties are

120 Herbert Hovenkamp and Carl Shapiro, "Horizontal mergers, market structure, and burdens of proof," *The Yale Law Journal,* 127(7), 2018: 1996-2025, p. 2012 ("Under the 1982 Merger Guidelines, the predicted competitive effects of a proposed merger were generally evaluated based on whether that merger would make cartel-like coordination more likely or more effective. That approach fit well with the structural presumption, applying George Stigler's theory that the HHI metric of market concentration also measures the risk of collusion.").

*See also*, Dennis Carlton and Sam Peltzman, "Introduction to Stigler's Theory of Oligopoly," *Competition Policy International*, 6(2), 2010: 237-251; George Stigler, "A Theory of Oligopoly." *Journal of Political Economy*, 72(1) 1964: 44-61.

121 PX1191-016, 024. (Edwards' JVT deal valuation assumes JenaValve's [redacted]" whereas the JCM deal valuation [redacted]); PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 82:12-14) ("[D]o J-Valve and Trilogy treat a similar patient cohort? A. Yes.").

122 *See*, discussion and references in Section V below.

123 PX7000 (Madrid (Laguna Tech) IH 34:25-35:2); PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 110:19-111:5) (Trilogy valve sizes have fit all but 4-5% of McCabe's patients, in his experience).

irrelevant because they're not in [the parties'] universe."[124] Only Trilogy and J-Valve have initiated clinical trials in the United States. To my understanding none of the foreign competitors have even initiated the process of seeking FDA approval, while Laguna Tech has been described by a JenaValve board member as a "corpse[]."[125]

60. Given potential rivals' development status, there will be no other meaningful constraint on JenaValve and Edwards in the near- to mid-term.[126, 127] As a result, the merger would constitute a merger to monopoly in a relevant antitrust market.

### C. A Variety of Data Show that the Merger Would Dramatically Increase Concentration in a Concentrated Market

61. As discussed, market shares and concentration indices can provide intuition about the effect of a merger. I consider several approaches, which consistently affirm the conclusion reached by JenaValve executives upon learning that Edwards had committed to acquiring them as well as JC Medical, "Edwards just bought the AR market."[128] In a draft presentation discussing its acquisitions of JenaValve and JC Medical, Edwards effectively concurs, stating it has acquired "both dedicated AR Technologies."[129]

62. Figure 1 shows concentration based on the number of test sites that the parties have convinced to participate in their respective clinical trials and the number of valves implanted as part of their trials. Even prior to receiving PMA, it is worthwhile to use sites and units to

---

124 PX7007 (Kilcoyne (JenaValve) IH 78:12-19) ("Q. To your knowledge, has JenaValve created site messaging and engagement related to any other TAVR AR product in development other than J-Valve? A. To my knowledge, no other product is in clinical trial in the geographies that we are engaged in. So it would not make sense, because it's irrelevant. The other companies are irrelevant because they're not in our universe.").

125 PX7000 (Madrid (Laguna Tech) IH 16:2-6, 23:15-22; *see also*, PX7023 (Keltjens (JenaValve) Dep. 33:12-15) ("So my understanding is Laguna Tech is one of the corpses. So they will not bring it to market unless somebody else acquires technology or IB [sic]. But I am not aware of an active program in that area."); *see also,* PX7029 (Thourani (Piedmont Heart Institute) Dep. 97:4-98:1).

126 PX7026 (Bierman (Edwards) Dep. 94:15-22) ("Q. At this time, Edwards anticipated acquiring both JenaValve and JC Medical, right? A. Yes. Q. Edwards would be the only company in the TAVR AR space with –then, right? A. It's what we were assuming, yes.").

127 *See also*, Appendix A for the parties' timelines.

128 PX2188-002 (Text exchange between D. Sun and D. Baerenwald, JenaValve, July 24, 2024).

129 PX1027-007 (Edwards, TAVR Strat Plan Portfolio, June 20, 2024).

compute shares since, as I explain in Section V, part of the competition between the parties has been for access to trial facilities where units also can be implanted under compassionate use and CAP (subject to regulatory constraints). After PMA has been granted, I understand that these same facilities tend to become key centers for commercialization.[130] For both metrics I consider, the market is highly concentrated, with the merger causing a dramatic increase in concentration.

**Figure 1: Pre- and Post-Merger HHIs in a Market with JC Medical/Edwards and JenaValve**




Figure includes U.S. clinical trial sites and units only. See Appendix C for sources and notes.

63. Focusing on trial sites, Edwards (JC Medical) lists 21 locations for the J-Valve TF early feasibility study and the JOURNEY pivotal trial, while JenaValve lists 33 locations in the United States for the ALIGN-AR early feasibility study, the ALIGN-AR pivotal study, the ALIGN-AR

130 PX2462-017 (JenaValve, Market Development and Assessment, March 7, 2023) ("JC Medical is targeting current JVT clinical sites and positioning EFS in ten sites and then expanding to 30 for High -Risk IDE" "JVT Plan" is, among other items, to "Limits JC Medical access to Top Tier Centers and JVT initiated AR Awareness.").

LVAD Registry trial, and the ARTIST trial. Nine locations are used by both Edwards (JC Medical) and JenaValve. The shares (assuming a 50% split of common locations) are therefore 37% for Edwards (JC Medical) and 63% for JenaValve.[131] This implies a pre-merger HHI of 5,356. This is well above the Merger Guidelines' HHI threshold for a highly concentrated market.[132] To compute the HHI using units of TAVR-AR devices implanted, I consider the total across clinical trials as well as CAP and Compassionate Use. This amounts to 84 for Edwards (JC Medical) and 689 for JenaValve. These figures imply shares of 11% and 89%, which mean the pre-merger HHI is even higher at around 8,000.[133]

64. Because there are no competitors to the parties, the HHI deltas are the difference between 10,000 (the HHI of a monopoly) and the pre-merger HHI. Thus, the merger would be associated with HHI changes in the thousands of HHI points. The aforementioned economic literature predicts this would have anticompetitive effects.[134]

65. To summarize, current metrics reflecting the state of the TAVR-AR market today show that the market is highly concentrated and that the merger would lead to a substantial increase in concentration as it makes Edwards a monopolist.

### D. Ordinary Course Market Projections Show That the Market for TAVR-AR Devices in the United States Would Be Limited to the Parties for the Foreseeable Future

66. An alternative approach to evaluating the proposed merger's impact on concentration would make use of the parties' ordinary course market projections. For example, JC Medical estimated how TAVR-AR sales would evolve until 2035, identifying third-party competition and market shares.[135]

67. Table 11 shows an extract of that analysis. It indicates that JC Medical predicted a maximum of two sellers through at least 2035: JC Medical (J-Valve) and JenaValve (Trilogy). Their cumulative share adds up to 100% in every single year of the projection. Thus, the parties'

---

131 *See*, notes and sources in Appendix C.

132 Merger Guidelines, p. 5.

133 *See*, Appendix C for details.

134 *See also*, note 119.

135 *See also*, ¶ 61.

own documents confirm that the merger would lead to a monopoly, which their executives recognized. In addition, between 2028 and 2035 prices were projected to decrease from $30,000 to $26,800, or a 10.7% reduction in price.

**Table 1: JC Medical Projections for the TAVR-AR Market in 2024**

| | | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **JC Medical (J-Valve)** | Revenue ($ millions) | - | - | $24.3 | $68.3 | $148.6 | $269.4 | $441.7 | $617.0 | $802.8 | $975.3 | $1,162.7 |
| | Cases | - | - | 811 | 2,275 | 5,004 | 9,161 | 15,175 | 21,409 | 28,428 | 35,240 | 43,311 |
| | Market Share (%) | 0.0% | 0.0% | 15.0% | 25.0% | 35.0% | 45.0% | 55.0% | 60.0% | 65.0% | 67.5% | 70.0% |
| | ASP ($ thousands) | | | 30.0 | 30.0 | 29.7 | 29.4 | 29.1 | 28.8 | 28.2 | 27.7 | 26.8 |
| | Price Drop (%) | | | | | -1.0% | -1.0% | -1.0% | -1.0% | -2.0% | -2.0% | -3.0% |
| **JenaValve (Trilogy)** | Revenue ($ millions) | $53.3 | $96.3 | $137.8 | $204.8 | $276.0 | $329.2 | $361.4 | $411.3 | $432.3 | $469.6 | $498.3 |
| | Cases | 1,776 | 3,210 | 4,594 | 6,825 | 9,294 | 11,196 | 12,416 | 14,273 | 15,307 | 16,967 | 18,562 |
| | Market Share (%) | 100.0% | 100.0% | 85.0% | 75.0% | 65.0% | 55.0% | 45.0% | 40.0% | 35.0% | 32.5% | 30.0% |
| | ASP ($ thousands) | 30.0 | 30.0 | 30.0 | 30.0 | 29.7 | 29.4 | 29.1 | 28.8 | 28.2 | 27.7 | 26.8 |
| | Price Drop (%) | | | | | -1.0% | -1.0% | -1.0% | -1.0% | -2.0% | -2.0% | -3.0% |
| | Total Market Share | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

See Appendix C for sources and notes.

## V. THE MERGER OF EDWARDS AND JENAVALVE WOULD LIKELY HARM COMPETITION AND CONSUMERS

68. A core tenet of microeconomics is that firms are profit-maximizing. Given this assumption, economic theory shows that competitive markets maximize the benefits available to society.[136] In markets with less competition, individual suppliers may have "market power," which is the ability to profitably price their goods or services above their economic costs of production. This harms consumers and can reduce the overall benefit captured by society. The economic concern with mergers is that combining the parties will lead to an increase in market power, providing an incentive to raise prices, reduce output, diminish innovation, and/or otherwise harm customers.[137]

136 This is referred to as the first fundamental welfare theorem, which "says that a competitive equilibrium is Pareto optimal (that is, a benevolent and fully informed social planner could not replace the competitive allocation of goods with another feasible allocation that would increase all the consumers' welfare)…" (Tirole (1988), p. 6).

137 *See*, Merger Guidelines at § 2.2 ("Competition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition. This can include competition to research and develop products or services, and the elimination of such competition may result in harm even if such products or services are not yet commercially available.")

69. To evaluate whether and how Edwards' acquisition of JenaValve would cause harm, I draw on lessons gleaned from the economic literature considering how horizontal competition affects firms' incentives.[138] In general, this literature emphasizes that mergers that combine close substitutes tend to harm consumers, often by denying them access to low cost, high quality products.[139] The evidence in this matter consistently shows that the parties are particularly close competitors whose rivalry has already had pro-competitive effects. A merger between the parties would eliminate this competition and likely lead to higher prices and less innovation.[140]

## A. Economic Theory and Case-Specific Evidence Indicate that Edwards' Acquisition of JenaValve Would Raise Prices and Lower Access to TAVR-AR Products

### 1. Economic Theory Establishes that the Elimination of Head-to-Head Competition Harms Consumers

70. Standard microeconomic theory implies that when two firms that offer products in the same market merge, it changes the combined firm's incentives.[141] An independent firm chooses its profit-maximizing price based on an understanding that too high a price will cause too many consumers to choose alternatives while too low a price leaves money on the table. After a merger, the combined firm *internalizes* the impact of its price on the sales of its merger partner. This means that when evaluating what price optimizes its profits, the combined firm considers

---

138 Tirole (1988), Chapters 5, 7, 10 (describing seminal theories of oligopolistic competition); John Asker and Volker Nocke, "Collusion, Mergers, and Related Antitrust Issues," in *Handbook of Industrial Organization*, 5, 2021: 177-279, (*hereinafter* "Asker and Nocke (2021)").

139 *See*, *e.g.*, Giulio Federico *et al.*, "Antitrust and Innovation: Welcoming and Protecting Disruption," *Innovation Policy and the Economy*, 20(1), 2020: 125-190, (*hereinafter* "Federico *et al.* (2020)"), p. 125 ("Effective rivalry spurs firms to introduce new and innovative products, as they seek to capture profitable sales from their competitors and to protect their existing sales from future challengers. In this fundamental way, competition promotes innovation.").

140 *See*, *e.g.*, Federico *et al.* (2020), pp. 162-163 ("A merger between rival innovators gives rise to both unilateral price effects (in relation to both existing and innovative products) and unilateral innovation effects. Each of these effects, taken alone, is likely to cause a lessening of current and future competition and concomitant harm to customers. The antitrust review of a merger between rival innovators will naturally seek to capture the combined impact on consumer welfare of both types of effects.").

141 *See*, *e.g.*, Asker and Nocke (2021) at § 3.3.1; *see also,* Merger Guidelines at § 2.2 ("If evidence demonstrates substantial competition between the merging parties prior to the merger, that ordinarily suggests that the merger may substantially lessen competition… This can include competition to research and develop products or services, and the elimination of such competition may result in harm even if such products or services are not yet commercially available.").

the possibility that customers would switch from its product to that of the merger partner in response to a higher price. In that circumstance, it would "recapture" customers, making the costs of a price increase lower. Thus, when a merger increases the set of products owned by a single firm that customers could "divert" to in the event of a price increase, that merger gives rise to upward pricing pressure.[142] A very similar relationship applies to innovation. An independent firm may spend money in the hopes of developing a new, high-quality product that will take sales from others on the market. However, if an incumbent acquires that firm, it will internalize the fact that the innovative product may cannibalize its own sales, muting the incentive to invest.[143]

71. Intuitively, the anticompetitive impact of a merger of substitutes is larger when the merging parties' products are close substitutes because a higher percentage of customers switch between the products if the price of one of the products increased. This enables the combined firm to recapture more sales that it would have otherwise lost by raising prices or refraining from innovating. Diversion between products with similar characteristics will generally be higher than between products that are less similar. All else equal, diversion between the parties' products is also more likely to be high when the parties' products have few potential rivals—more customers would be forced to use the combined firm's products rather than outside options.

---

142 Joseph Farrell and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," *The BE Journal of Theoretical Economics*, 10(1), 2010: 1-39, p. 20 ("… by internalizing the cannibalization of sales of the former rival's product, a merger introduces an opportunity cost. Taking this idea one step further, the price effects of a merger can be thought of as the passthrough of that new cost.").

143 Tirole (1988), p. 391-392 (For example, Tirole notes that a "monopolist gains less from innovating than does a competitive firm, because the monopolist "replaces himself" when he innovates… a monopolist tends to 'rest on his laurels.'").

Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?," in *The Rate & Direction of Inventive Activity Revisited*, Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012: 361-404 (*hereinafter* "Shapiro (2012)"), p. 364 ("The Contestability principle focuses on the extent to which a firm can gain profitable sales from its rivals by offering greater value to customers. Sales are contestable in the relevant sense if profitable sales shift toward the successful innovator. This in turn depends on the nature of ex post product market competition.").

*Privileged*

### 2. Real World Evidence Shows that the Elimination of Competition Between Edwards and JenaValve Is Likely to Harm Consumers

72. As described in Section II, the parties are close to the point of commercialization, having started or completed their pivotal trials. This helps explain their mutual focus on each other and underscores the importance of maintaining them as rivals.

73. In this subsection, I detail the evidence showing that the parties' products already are recognized as being close substitutes for treating patients with AR and, therefore, are likely to remain so once they are commercially available. Then I discuss the evidence showing that the parties lack—and will continue to lack for many years to come—other rivals that could discipline the combined firm's incentive to increase prices or reduce access to new TAVR-AR products. Finally, I describe the evidence directly consistent with the merger being likely to lead to higher prices and lower access to TAVR-AR devices.

#### *(a) JenaValve and Edwards' TAVR-AR Products Are Close Competitors and Will Continue to Compete Upon Commercialization*

74. I understand that the merging parties contend that their TAVR-AR products would not be close substitutes.[144] While there may be elements of differentiation between current versions of the Trilogy and J-Valve products, clinical experts view them as substitutable for meaningful numbers of patients.[145] Ordinary course documents further confirm that the parties' products are close substitutes for patients. Moreover, this view, that the parties are vigorous competitors, is consistent from early 2023 until well after Edwards committed to acquiring both JC Medical and JenaValve in the summer of 2024.[146]

---

144 Defendant Edwards Lifesciences Corporation's Answer, August 29, 2025 (*hereinafter* "Edwards Answer (2025)"), p. 1 (Describing JenaValve and JC Medical as engaging in "…complementary research-and-development efforts").

145 PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 82:11-14) ("Despite these differences, do J-Valve and Trilogy treat a similar patient cohort? A Yes.").

146 *See*, *inter alia*, PX2480-002 (Text exchange among R. Polzin, JenaValve, et. al., August 1, 2023); PX1066 at sheet "Market Size"; PX2139-003-4 (Email from J. Kilcoyne, JenaValve, to Y. Yu, Andrea Partners, March 19, 2024); PX2188-002 (Text exchange between D. Sun, JenaValve, and D. Baerenwald, JenaValve, July 24, 2024); PX2191-003 (Email from P. Spadaro, JenaValve, to A. Miyake, JenaValve, *et al.*, August 10, 2024) ("The only real competition is J-valve, and they are now part of Edwards…"); [redacted].

75. For example, in an October 2023 email, Mark Turco (then-CEO of JC Medical) explained, "You are obviously familiar with Jena data coming out of TCT. We have opportunity [*sic*] to close the gap and be a very fast follower with a likely better valve."[147] JenaValve appeared to fear this was correct. In a March 2024 email providing a pre-board meeting summary, the CEO of JenaValve discusses plans to pursue the ability to treat larger annuli, which the J-Valve would be able to do. He notes, "[w]e are currently not able to treat pts with perimeters >90mm – JValve is using this to their advantage as they can treat up to 104mm." [148] Later in the email, he notes that "[w]e now estimate that we are likely not able to treat ~20% of the AR population," and that "[c]ompetitors will use this as a beach head to challenge our leadership position."[149]

76. Consistent with the parties' documents, the sworn testimony of scholars and key opinion leaders knowledgeable on AR and TAVR products confirms that the parties' products are and will be close substitutes for many patients.[150] For example, in his declaration, Gregory Larkin, Vice President of Business Development and Strategy for the Cardiovascular Portfolio at Medtronic, says of the parties' products:

> ***Trilogy and J-Valve are similar products. They both are designed to treat the same cohort of patients, namely, people with severe AR. While the two valves might have slight differences in design, their overall functions are the same, that is, to treat patients with AR via TAVR…***
>
> ***If Edwards acquires JenaValve, it will own the only two TAVR-AR devices in development for near-term use in the United States—JenaValve's Trilogy and JC Medical's J-Valve.***[151]

---

147 PX1038-001 (Email from M. Turco, JC Medical, to Peter Fitzgerald, Meditrial, October 30, 2023).

148 PX2139-004 (Email from J. Kilcoyne, JenaValve, to Y. Yu, Andera Partners, March 19, 2024).

149 *Id.*

150 [redacted]; PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 82:12-21); PX7021 (Kilcoyne (JenaValve) Dep. 161:1-10); PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 55:12-56:5, 58:17-59:11, 61:6-9); PX7017 (Spadaro (JenaValve) Dep. 90:9-24); PX7027 (Sun (JenaValve) Dep. 17:6-18:8); PX7012 (Pinto (JenaValve) Dep. 218:9-25) (discussing PX2187); PX7035 (Zovighian (Edwards) Dep. 98:22-9, 101:6-10).

151 [redacted].

77. Cumulatively, the parties' own documents, as well as the testimony of subject matter experts, demonstrate that the parties' TAVR-AR products would be direct and close substitutes for many patients. As discussed, all else equal, standard economic theory implies that mergers of products exhibiting this closeness of competition raise the risk of significant anticompetitive effects, and I have not observed any evidence in this case that would contradict this theory.

*(b) JenaValve and Edwards' TAVR-AR Products Will Not Be Constrained by Rivals for Many Years*

78. The parties have suggested that Edwards' acquisition of JenaValve poses no concerns, owing to the presence of competitors.[152] These arguments are in tension with the parties' own views as recorded in the ordinary course of business, as well as those of knowledgeable thought leaders and experts.

79. Each party's ordinary course documents emphasize the threat posed by the other, placing less weight on other potential competitors.[153] For example, in a valuation model for JC Medical, market shares in a TAVR-AR market were allocated to different competitors through 2035. Throughout this period, the total TAVR-AR market is completely divided between J-Valve and Trilogy. No sales are expected for other competitors, let alone specifically identified ones.[154] Similarly, the sworn testimony of a principal investigator confirms that it, "would be five to seven years before there's another, quote, valve on the playing field."[155] Other sworn testimony affirms this perspective.[156]

152 Edwards Answer (2025), p. 2 ("Several other companies are engaging in R&D in non-surgical AR treatments, and strong competitors are well-positioned to follow once Edwards incurs the substantial costs required to successfully launch a brand-new medical device and therapy option for AR patients.").

153 *See*, *inter alia*, PX1048-020 (JC Medical, Project Alps, February 2024); PX1066 at sheet "Market Size"; PX2188-002 (Text exchange between D. Sun, JenaValve, and D. Baerenwald, JenaValve, July 24, 2024); PX1482-003 (Edwards, TAVR Messaging, July 22, 2024); PX1501-001 (Email from P. Sharma, Edwards, to J. Bierman, Edwards, July 22, 2024); PX1120-001 (Email from B. Zovighian, Edwards, to L. Wood, Edwards, *et al.,* May 1, 2024).

154 PX1066 at sheet "Market Size".

155 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 30:10-25).

156 [redacted]; PX7013 (Pinto (JenaValve 30(b)(6)) Dep. 65:6-66:1); PX7018 (Sloan (JenaValve) Dep. 25:14-26:2); PX7017 (Spadaro (JenaValve) Dep. 123:13-17).

80. Thus, the parties' own documents as well as the testimony of subject matter experts establish that the parties' TAVR-AR products would lack meaningful competition for years to come. During this time, there would be no rivals to impose any discipline Edwards' behavior.

*(c) Real-World Evidence from the Parties Shows that the Merger Would Have Anticompetitive Effects on Patients' Access to TAVR-AR Devices*

81. Consistent with the economic literature showing that mergers that combine close substitutes when consumers lack alternatives often have anticompetitive effects, documents and testimony often directly support the inference that the transaction will have adverse effects on consumers.[157] For example, in a text exchange on July 25, 2024, a JenaValve executive described Edwards' purchase of both JC Medical and JenaValve as "…incredible for Edwards, but they're going to be sure to figure out whose technology is better and then kill the other."[158] Consistent with this, an Edwards document revealed that part of its AR strategies is to "[d]ecide whether or not to move forward with [J-Valve] IDE."[159] Eliminating expenditures on one product might save Edwards money, but the "killing" of one of the parties' products would deny consumers the benefits of price-lowering competition in addition to the benefits of being able to choose between differentiated alternatives.[160, 161]

82. Other evidence of the transaction's potential impact on new product development can be seen in Edwards' hesitation to pursue the ARTIST trial.[162] JenaValve's executives corroborate this. For example, Steve Sloan had to repeatedly ask Edwards for approval of the ARTIST trial,

---

157 *See*, *inter alia*, PX2189-002 (Text exchange between D. Sun, JenaValve, and D. Baerenwald, JenaValve, July 25, 2024); PX2062-002 (Text exchange between S. Kim, JenaValve, and D. Sun, JenaValve, July 25, 2024); PX1500-002 ((Email from J. Bierman, Edwards, to P. Sharma, Edwards, July 20, 2024); PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 98:5-20); PX7017 (Spadaro (JenaValve) Dep. 121:5-19).

158 PX2189-002 (Text exchange between D. Sun, JenaValve, and D. Baerenwald, JenaValve, July 25, 2024).

159 PX1461-008 (Edwards, TAVR Strat Plan Portfolio: Follow-Up Discussion, June 20, 2024).

160 PX7027 (Sun (JenaValve) Dep. 89:2-15 and 90:21-91:6).

161 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 54:23-55:11) (explaining the benefits to having multiple devices available).

162 PX1280-001 (Email from B. Concepcion, Edwards, to J. Wheeler, Edwards, August 1, 2024) (states one of Edwards' "Key Priorities for 2024 – 2025" as of August, 2024, was "Not [to] proceed with the ARTIST…RCT").

noting that patients were waiting.[163] Duane Pinto stated that "[w]e will never recover this momentum" after ARTIST contracting delays and that he "wish[ed] we were independent[.]"[164] To the extent that Edwards may have come to a conclusion that it preferred to focus on J-Valve in the long-run, it has less incentive to invest in a product that would cannibalize J-Valve sales. Edwards also has less incentive to pursue the trial to continue to be front of mind with principal investigators when it owns the competing product.[165]

83. The complete elimination of one product is not the only manner in which the transaction could harm consumers. Even if Edwards elects to commercialize both products, it will market them differently than two independent companies would. Economic theory predicts that consumers would suffer as a result.[166] For example, in a JC Medical valuation model, JC Medical's future sales were predicted as it penetrated the commercial TAVR-AR market in the United States. As part of this forecast, average selling prices are assumed for both the J-Valve and Trilogy products. The valuation model assumes that prices *fall* more the longer that both parties' products are both on the market relative to what they were when only the JenaValve product was available.[167] Economic theory is consistent with this finding, as head-to-head competition incentivizes price undercutting by rivals to gain share, which leads to lower prices in the market.[168] However, if Edwards were to own both devices, this incentive disappears, and higher prices can be expected.[169] Consistent with this, when JC Medical was independently developing its product, it made the J-Valve available for free for use in clinical trials, while

---

163 PX2311-002 (Email from S. Sloan, JenaValve, to F. Haley, Edwards, *et al*., March 13, 2025).

164 PX2227-001-2 (Email from D. Pinto, JenaValve, to S. Sloan, JenaValve, *et al.,* March 18, 2025).

165 PX2381-001 (Email from Jan Keltjens, JenaValve, to John Kilcoyne, JenaValve, February 21, 2024) ("Run the ARTIST IDE study asap. We need this to stay ahead of competitors and keep investigators engaged.").

166 *See*, discussion above in Section V.B.1.

167 PX1066 at sheet "Market Size".

168 Davis and Garces (2010), p. 239 ("In particular, in the case of price competition among substitute products, the prediction of the effect of an increased concentration of ownership on the price level of all competing products is unambiguously that price will rise.").

169 PX1500-002 ("We are first to market and we have one shot at setting the bar on commercial price…similar to when we launched SAPIEN in the US, we are going to have a period of time where it is only us playing in this space and we aren't going to have to deal with low-cost alternatives").

JenaValve charged over $30,000. After Edwards acquired JC Medical and contracted to purchase JenaValve, Edwards raised the price of a J-Valve to roughly the same as JenaValve's Trilogy.[170] Higher prices negatively impact patients' access to medical devices and treatments, even during trials. Dr. Dean Kereiakes testified that "if devices cost too much hospitals don't put them on the shelf," and "they don't give the doctors access to the technology if the hospital's going to lose money."[171]

84. Other evidence also shows that the presence of independent rivals would likely lower prices. For example, in its 2025 TAM Model, JenaValve anticipates a constant price for Trilogy from 2025 to 2027 when it would face no competitors. From 2028—the year J-Valve is expected to commercialize—through 2030, JenaValve estimates a 1% reduction in Trilogy's average price each year. JenaValve further estimates a 2% reduction in Trilogy's price each year from 2031 to 2033.[172] JenaValve's predicted pricing for Trilogy is consistent with price competition upon J-Valve's commercial launch.[173]

---

170 *See*, PX1250 (Email from B. Concepcion to D. Kereiakes, December 4, 6, 2024) (Dr. Kereiakes asks whether J-Valve can offer a "free" device, relative to the $35,000 that JenaValve charges, in the trials to "catalyze rapid enrollment [in the J-Valve registry] and effectively close down the JenaValve registry." Concepcion replies that [redacted] This would position us in parity with the JenaValve trials.").

*See*, PX1046-003 (refers to The Christ Hospital receiving the J-Valve device for free in December 2024). Consistent with this, JC Medical's CEO testified that its strategy was to offer J-Valve for free for clinical use. *See*, PX7005 (Turco (JC Medical) IH 57:1-19) ("But our -- our plan was to offer the -- the J-Valve for our clinical trials […] free of charge.").

171 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 36:10-25, 37:17-38:20).

172 PX2463 at sheet "TAM Summary."

173 PX2326-004 (JenaValve, Pricing, December 5, 2024) (providing "Erosion Estimates" of Trilogy price from $39,500 upon FDA approval to $25,000 in Q2 2028 attributing erosion to "successive risk approval and competitor introduction").

*See also*, PX7025 (Darby (JenaValve) Dep. 132:2-133:20); PX2414-002 (Email from Daniel Sun: "Strategically, I think we should launch ARTIST and commercialize at all JOURNEY sites and get creative in an effort to get them to prioritize Trilogy implants over J-Valve. (Stack cases, consider pricing rebates, etc.)").

85. The JC Medical projections shown in Table 1 confirm the price-lowering impact of competition. It indicates that, after J-Valve commercializes, prices cumulatively decline by over 10% from their level in the last year when Trilogy was the only commercially available option.

### B. Economic Theory and Case-Specific Evidence Predict That The Transaction Would Reduce Innovation in the TAVR-AR Market

86. Competition between Edwards and JenaValve to improve their devices in anticipation of future commercialization is fundamental for consumer welfare. Economic literature focused on dynamic competition has emphasized that rivalry commonly enhances innovation incentives and benefits consumers.[174] Likewise, the Merger Guidelines have recognized that the elimination of "competition to research and develop products … may result in harm even if such products or services are not yet commercially available."[175]

87. While competition is often innovation-enhancing, economists have identified several factors that *could* make it more plausible that there are synergies sufficient to counterbalance the general presumption that competition increases innovation. In this subsection, I first discuss how economic theory relates competition to the incentive to innovate. Then, I assess whether real-world evidence suggests the TAVR-AR market is one of the rare cases in which a loss of a competitor could actually benefit innovation and consumers. As described below, I find that it is not.

#### 1. Economic Theory Shows When and How Competition Benefits Innovation

88. When firms seek to innovate, they make choices that impact what products they will market in the future. Economists have developed many models of such dynamic competition, seeking an understanding of the different ways that markets may evolve.[176] The literature offers

---

174 Federico *et al.* (2020), p. 125 ("Effective rivalry spurs firms to introduce new and innovative products, as they seek to capture profitable sales from their competitors and to protect their existing sales from future challengers. In this fundamental way, competition promotes innovation.").

175 Merger Guidelines at § 2.2.

176 *See*, *e.g.*, Kevin A. Bryan and Heidi L. Williams, "Innovation: Market Failures and Public Policies," *Handbook of Industrial Organization*, 5, 2021: 281-388; Ulrich Doraszelski and Ariel Pakes, "A Framework for Applied Dynamic Analysis in IO," *Handbook of Industrial Organization,* 3, 2007: 1887-1966.

several general takeaways when it comes to the impact of competition. The first and most important is that competition in innovative markets usually enhances innovation and benefits consumers.[177] However, economic theory has also identified several characteristics that make it more likely that a merger that eliminates competition can nevertheless increase firms' incentives to innovate.[178] These factors are as follows.

89. First, as discussed above, if two firms have products that will "contest" with each other for sales, economic theory predicts that their merger will generally lower innovation. Fundamentally, the combined firm has less incentive to incur costs to develop products that will compete with each other.[179] If the innovative products largely would address the same customers as another product already under a firm's umbrella, the incentive to reduce or even abandon investments can be significant. Prior research has suggested that such "killer acquisitions" are a real concern in biomedical markets.[180] By contrast, "bolt on" acquisitions that combine products that would not be in competition for final consumers are less likely to raise concerns about merely "replacing" sales of one affiliated product with those of another.

90. Second, economic theory shows that the incentive to invest in innovative activities may increase following a merger if it increases the firm's ability to capture or "appropriate" the value of the successful innovation.[181] If other firms can observe and then freeride on a firm's

---

177 Shapiro (2012), p. 401 ("The unifying principle, richly supported by the empirical literature, is that innovation, broadly defined, is spurred if the market is contestable; that is, if multiple firms are vying to win profitable future sales.").

Richard J. Gilbert, "Competition, Mergers, and R&D Diversity," *Review of Industrial Organization,* 54(3), 2019: 465-484 (*hereinafter* "Gilbert (2019)"), pp. 465-466 ([Multiple authors have shown] "that mergers can have unilateral effects for investment in research and development (R&D) that are conceptually similar to the unilateral effects from mergers for price competition…").

178 Tommaso Valletti and Hans Zenger, "Mergers with Differentiated Products: Where Do We Stand?," *Review of Industrial Organization*, 58(1), 2021: 179-212 (*hereinafter* "Valletti and Zenger (2021)"), p. 200 ("Finally, there is no unique presumption that mergers are bad for innovation and consumers.").

179 Tirole (1988), p. 392; Shapiro (2012), p. 364 (the contestability principle).

180 Colleen Cunningham *et al.*, "Killer Acquisitions," *Journal of Political Economy,* 129(3), 2021: 649-702.

181 Tirole (1988), p. 390 ("Any innovation created by one firm provides usable information to other firms at little or no cost. While all firms stand prepared to use such information, no one firm is

innovation, that attenuates the incentive to pursue the innovation in the first place. For example, if competitors can quickly copy a firm's innovation, the firm would reap minimal benefits from the innovation and lack sufficient incentive to invest. It is, therefore *theoretically* plausible that high appropriability concerns could cause a merger of competitors to increase innovation.

91. Third, if a merger integrates complements, it could spur innovation.[182] Complements are things that deliver more value when used or consumed in conjunction. For example, hammers and nails can be seen as complementary inputs as they make each other more valuable in the achievement of tasks. Together they are more likely to help build a new fence, for example. Similarly, hot dogs and buns are complements, because the utility we get as consumers is greater when we eat them together. By contrast, one might think about substitutes as things that do essentially the same thing. If I need to power a device requiring a single battery, I do not benefit more from having both Energizer and Duracell batteries compared to just one. Often mergers that integrate complements involve firms focused on different levels of the production chain or parts of a system (and hence not substitutes)—for example, a wholesale bun supplier and a hot dog stand. That is because the combined firm internalizes the business-creating effect an improvement in one part of the system has on other parts of the system.[183] By contrast, in a merger of substitutes, an improvement to one offering is likely to cannibalize the other, reducing the incremental benefits of the innovation.

92. Below, I consider what the evidence indicate as to whether any of these factors suggest that Edwards' proposed acquisition of JenaValve is likely to increase innovation. Overall, I find that the consummated transaction would likely reduce innovation relative to what would occur in the merger's absence.

willing to pay the sums of money (often huge) necessary to produce it without compensation."); Shapiro (2012), p. 364 ("Increased appropriability spurs innovation.").

182 Shapiro (2012), p. 365 ("Combining complementary assets enhances innovation capabilities and thus spurs innovation.").

183 *See*, *e.g.*, Daniel P. O'Brien and Mark A. Israel, "Vertical Mergers with Bilateral Contracting and Upstream and Downstream Investment." Available from https://ssrn.com/abstract=4331084.

### 2. Edwards Would Have Less Incentive to Innovate after Acquiring Both JC Medical and JenaValve

#### *(a) The Rivalry Between the Parties' TAVR-AR Products Has Motivated Innovative Activities*

93. As discussed in Section V.A.2(a), a variety of evidence indicates that Edwards' and JenaValve's TAVR-AR products are seen as direct substitutes for each other. Moreover, the competitive constraint they impose on each other is relatively unique, given their significant lead time relative to other potential product developers. It is also worth noting that innovation occurs both before and after commercialization.[184] Thus, the "contestability" or "replacement" principle implies that the transaction would be likely to result in diminished innovation both in the short term and long term, as new versions of the parties' products are developed. Consistent with this, ordinary course documents and sworn testimony highlight the parties' rivalry as *motivating* innovative efforts.[185]

94. One major theme has been both parties' focus on competing for testing sites.[186] For example, in February 2023, JenaValve's Chief Commercial Officer laid out a strategy that would keep JC Medical out of its sites, saying that JenaValve should:

---

184 I understand that Dr. Kesselheim will opine on the extent to which medical device innovation occurs after commercialization.

185 *See*, *inter alia*, PX2180-003 (Text exchange between D. Sun, JenaValve, and R. Polzin, JenaValve, February 27, 2023); PX2057-001 (Email from D. Sun, JenaValve, to P. Spadaro, JenaValve, March 1, 2023); PX2042-001 (Email from R. Polzin to D. Sun *et al*., February 8, 2024); PX2143-012 (JenaValve 2024 Budget Review, February 27, 2024); PX2186-023-25 (JenaValve, Board of Directors Presentation, March 20, 2024); PX2132-001 (Email from D. Pinto to J. Kilcoyne, JenaValve, June 27, 2024); PX2189-002-3 (Text exchange between D. Sun, JenaValve, to D. Baerenwald, JenaValve, July 25, 2024); PX2062-002 (Text exchange between D. Sun, JenaValve, and S. Kim, JenaValve, July 25, 2024); PX1196-001 (Email from B. Concepcion, Edwards, to T. Rumbaugh, Edwards, September 28, 2024); PX1192-001 (Email from P. Sharma, Edwards, to R. Moriyama, Edwards, August 1, 2024); PX2190-008-9 (JenaValve, Larger Valve(s) Portfolio-Strategy, August 9, 2024); PX1078-054 (Edwards, Board of Directors Strategy Sessions, TAVR, September 11, 2024) ("Rapid learning to inform. Gen 2: Decide whether or not to move forward with J-Valve IDE"); PX2323-012 (JenaValve, 2024 Actual / Forecast vs. Budget); PX1300-001 (Email from K. Spear, Edwards, to A. Walls, Edwards, *et al*., January 10, 2025); PX2277-001-3 (JenaValve, 2024-2025 Budget); PX7027 (Sun (JenaValve) Dep. 141:21-142:7, 202:2-8); PX2041-007 (2024 JenaValve Scenario Planning and Vision).

186 *See*, *inter alia,* PX2097-001 (Email from P. Spadaro, JenaValve, to J. Kilcoyne, JenaValve, *et al*., February 4, 2023); PX2181-002 (Email from J. Kilcoyne, JenaValve, to A. Hack, Bain Capital,

> ***…leverage our strength, leadership and relationships in a professional way and to present the practical reality of multiple AR trials in one site. We need to craft precise messaging as to show zero concern or fear, but to proactively partner with our sites and indicate our desire for long term partnership (trials, early commercial, etc).***[187]

95. Similarly, in a February 2024 email, JenaValve's Director of Strategy and Field Operations reacts to learning that J-Valve is focused on high surgical risk as opposed to "all-comers" by saying, "[i]f that's how it pans out, moving fast on the next trial for Trilogy will be of huge strategic importance to stay ahead of them. Let's go baby! Bring it on!"[188]

*(b) There Is No Evidence that Appropriability Concerns Meaningfully Constrain Edwards' and JenaValve's Innovation Investments*

96. Mergers may increase innovative activity when firms cannot stop rivals from appropriating the benefits of new discoveries. Such a situation might prevail in a hypothetical market where intellectual property protections such as patents are not available.[189] However, the medical device sector does not resemble this hypothesized world. To the contrary, protecting

---

March 5, 2022); PX2194-002 (Text exchange between P. Spadaro, Edwards, *et al*., September 25, 2024); PX1176-001 (Email from C. Yang, Edwards, to D. Kereiakes, The Christ Hospital *et al*., April 11, 2023); PX2143-012 (2024 Budget Review, February 27, 2024); PX2137-002 (Email from J. Kilcoyne, JenaValve, to A. Hack, Bain Capital, March 5, 2023); PX1502-001 (Email from J. Wheeler, Edwards, to B. Concepcion, Edwards, August 11, 2025); PX2111-002 (Email from D. Sun, JenaValve to D. Pinto *et al*. February 2, 2024); PX2462-017 (JenaValve, Market Development and Assessment, JVT Board Meeting, March 7, 2023); PX2069-002 (Text exchange from P. Spadaro, February 4, 2023); PX7023 (Keltjens (JenaValve) Dep. 48:13-21, 54:10-55:21); PX7028 (Larkin (Medtronic) Dep. 42:12-22); PX7027 (Sun (JenaValve) Dep. 160:24-161:12); PX2283-003 (Email from D. Sun, JenaValve to P. Spadaro, Edwards, March 11, 2025).

187 PX2097-001 (Email from P. Spadaro, JenaValve, to J. Kilcoyne, JenaValve, February 4, 2023) ("J valve is targeting all of our sites and are currently making the rounds telling them they have a formula to enroll quickly and have plenty of product availability, unlike us...").

188 PX2042-001 (Email from R. Polzin, JenaValve, to D. Sun, JenaValve, *et al.* February 8, 2024); *see also*, PX2178-025 (JenaValve Board of Directors Meeting, March 20, 2024) (noting one of the reasons for starting the ARTIST trial is to "[block] J-Valve [f]rom JVT [s]ite [p]enetration"); PX2277-009 (JenaValve 2024 Budget Presentation) ("Why Large Valve Now? Competitor J-Valve Already Has a Large Valve Size in Portfolio; Prevents Loss of Customers Who Only Want One AR Valve Manufacturer; Blocks J-Valve From JVT Site Penetration").

*See also*, PX7027 (Sun (JenaValve) Dep. 141:21-142:7, 155:12-155:21).

189 Tirole (1988), p. 390 ("In practice, such compensation [for costly innovation] often comes through the granting of a patent that provides the innovating firm with a temporary monopoly and, consequently, allows it to recoup its R&D costs.").

intellectual property is an important part of competing in the medical device space.[190] This very much includes Edwards and JenaValve.[191] Given the presence and utilization of intellectual property, it is implausible that appropriability concerns constitute a sufficient impediment for investment as to cause a merger of competitors to increase innovation.

97. Thus, fundamentally, there is no reason to anticipate that appropriability concerns constitute a meaningful *restraint* on the parties' innovative activities that can only be alleviated through their merger. To the contrary, as noted above in Section V.B.2(a) the parties' documents repeatedly highlight how the other constitutes a threat that necessitates an increased focus on innovation. Moreover, there is evidence indicating that Edwards plans to accelerate the development of the J-Valve if the merger with JenaValve fails.[192] This is precisely contrary to what concerns about a lack of appropriability absent the transaction would predict.[193]

#### *(c) There Is No Evidence that Innovation Complementarities Are Probable*

98. Mergers that integrate complementary assets can spur innovation. One way this may occur is if the combining firms control different products that are consumed in tandem. In such circumstances, an investment in one creates value in the other. This cross-product value creation is not internalized when the firms are separate, causing both to hold off pursuing overall efficient investments. A merger can thus, in some circumstances, help alleviate a "hold-up" problem that

---

190 *See*, *e.g.*, MedPac (2017), p. 212 ("Like the pharmaceutical industry, medical device companies frequently obtain patents to prevent other companies from copying their products for a period of time").

191 *See*, PX1390-006 (Email from J. Bierman, Edwards, to P. Sharma, Edwards, July 20, 2024) ("… it would be very difficult to build a best-in-class AR technology without violating [JenaValve or JC Medical] patents"); *see also*, PX2327-013 (JenaValve April 2024 Corporate Presentation) ("Strong JenaValve IP Picket Fence Creates Competitive Moat.").

192 PX1489-014 (Edwards, The Future is Ours Presentation) (Describing Edwards' strategy as "Complete JENA Acquisition 2H 2025 or close the gap"); PX1116-001 (Email from L. Wood, Edwards, to B. Zovighian, Edwards, October 17, 2024) ("With the drama around Jena, it is super critical that we move this [J-Valve pivotal] trial as quickly as we safely can.").

193 Concerns about appropriability also are in tension with the argument that the parties face a myriad of other competitors in the TAVR-AR space. If that were true, then the combination of JenaValve and JC Medical in isolation would not alleviate the constraint imposed by their inability to fully capture the benefits of innovation.

reduces investment below what would maximize overall welfare.[194] In such circumstances, an economist would want to consider, at a minimum, whether the specifically identified benefits of any innovation outweigh the competitive costs of the transaction.

99. However, the proposed merger of Edwards and JenaValve does not resemble this hypothetical scenario. There is no sense that either party's current investments are curtailed because they do not capture the value that investment could create in the other's product. As discussed, JenaValve and Edwards are developing *substitutable* TAVR-AR devices, not economically complementary ones. They track each other and form business decisions in response to one another.

100. A second type of complementarity could arise if the merger leads the combined firm's innovative assets to be more productive.[195] This might occur if the parties' approaches are differentiated and neither could independently match each other's capabilities except through a merger. The evidence does not suggest that the parties' innovative assets are unique and complementary. For example, an initial point of differentiation, relevant for a small share of potential patients, is the J-Valve's ability to treat patients with large annuli.[196] However, JenaValve's executives made plans to independently develop equivalent capabilities.[197]

101. Similarly, the evidence does not support a hypothesis that neither J-Valve nor Trilogy could reach the market without input from Edwards. The testimony in this case suggests that Edwards, despite its size and experience in TAVR-AS,[198] was not able to develop in-house its own valve for AR.[199] Moreover, as described above, [redacted]

---

194 *See*, *e.g.*, Sanford Grossman and Oliver Hart, "The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration," *Journal of Political Economy*, 94(4), 1986: 691-719, p. 691 ("When it is costly to list all specific rights over assets in the contract, it may be optimal to let one party purchase all residual rights.").

195 Federico *et al.* (2020), p. 134 ("…combining the two firms' development teams will enable them to be more efficient in developing new products.").

196 *See*, Section II.E

197 *See*, PX2186-059 (JenaValve, Board of Directors Meeting, March 20, 2024); *see also,* ¶ 75.

198 *See*, Section II.E.

199 *See,* PX7009 (Zovighian (Edwards) IH 140:1-4) ("Can we develop an internal self-expanding valve for AR. They came back and they said it's going to take us years. Edwards doesn't have ability, the capability of doing so.").

[redacted].[200] To the extent it has expertise in the distribution or commercialization of developed products, the same is true for other mature biomedical companies.[201]

102. Finally, if the combination of JC Medical and JenaValve were likely to lead to greater innovation, one would expect that news of Edwards' acquisition of both TAVR-AR developers would be welcomed by stakeholders within JenaValve and JC Medical. A review of the parties' ordinary course documents indicate that the reverse was true. For example, a July 2024 chat that took place after news of both transactions broke, JenaValve's Devin Baerenwald stated, "[i]t's incredible for Edwards, but they're going to be sure to figure out whose technology is better and then kill the other." He goes on to ask, "…how do you think this will all shake out as far as attrition goes?" JenaValve's Daniel Sun responds, "…we will for sure lose some people."[202] These predictions—killed products, laid off staff—do not support the theory that the transaction would better leverage existing assets to expand output.

*(d) Real-World Evidence Confirms that Edwards' Acquisition of JenaValve Would Reduce Innovation*

103. The foregoing sections show that the mechanisms that could increase innovation incentives are not present in Edwards' proposed acquisition of JenaValve. To the contrary, the parties' ordinary course documents repeatedly highlight the likelihood that the acquisition would diminish innovation incentives relative to the counterfactual world of the JC Medical and JenaValve assets remaining in independent hands.[203] The balance of evidence indicates that the

---

200 *See*, ¶ 31*; see also*, [redacted] and PX7015 (Sirimanne (Edwards) Dep. [redacted], 107:4-13).

201 *See*, PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 95:12-16) ("But to be honest with you, before the purchase by Edwards, I was perfectly happy for any partner to be involved [with JenaValve] and just help them get to commercialization. That was my desire.").

202 PX2189-002-3 (Text exchange between D. Baerenwald, JenaValve, and D. Sun, JenaValve, July 25, 2024).

203 *See*, note 185 for details.

*Privileged*

TAVR-AR market—like the majority of those studied empirically by economists—is one where a merger of substitutes would decrease innovation.[204]

104. For example, reflecting on the acquisition, an Edwards executive wrote, "JCM was supposed to be tech transfer only with no pivotal trial per the diligence team."[205] In other words, rather than continue to pursue the launch of the J-Valve as an alternative to JenaValve's Trilogy, Edwards anticipated mining the J-Valve intellectual property for new products on an alternative timeline. The decision not to move forward with the J-Valve would deprive patients with larger annuli of any TAVR treatment until after what would be expected if Trilogy and J-Valve were owned by separate entities. Similarly, an internal Edwards email with subject "JC Medical for THV Strat 2025" noted that Edwards' "[Transcatheter Heart Valve unit] won't want a JCM Gen 2 launching in 2028 if we have Jena 2027."[206] Elsewhere, Edwards discussed advancing J-Valve over Trilogy.[207] Regardless of which valve Edwards prioritizes, its strategy fits the "replacement" theory in the economic literature: a monopolist has less incentive to launch a new product if that product's sales will come at the expense of its existing products.[208]

105. Moreover, evidence shows that Edwards has not always commercialized multiple products for the same patients. For example, Edwards was developing a self-expanding valve

---

204 Shapiro (2012), p. 376 ("There is a very substantial body of empirical evidence supporting the general proposition that 'more competition,' meaning greater contestability of sales, spurs firms to be more efficient and to invest more in R&D.").

205 PX1196-001 (Email from B. Concepcion, Edwards, to T. Rumbaugh, *et al.*, Edwards, September 28, 2024).

206 PX1300-001 (Email from K. Spaar, Edwards, to A. Walls, *et al.*, Edwards, January 10, 2025) ("Jena already has EU commercial so should be prioritized… Targeting Dec 2025 US PMA submission… 2H 2026 to early 2027 US launch… THV won't want a JCM Gen 2 launching in 2028 if we have Jena 2027… EW Gen 2 AR will combine best of Jena and JCM tech"); *see also*, PX1016-001 (Email from J. Bierman, Edwards, to P. Sharma, Edwards, November 4, 2024) ("If JV Acquisition Fails – how do we accelerate JC commercialization?").

207 PX1280-001 (Email from B. Concepcion, Edwards, to J. Wheeler, *et al.*, Edwards, August 1, 2024) (Noting as "Key Priorities for 2024-2025": (1) "Gen1/JenaValve FDA approval and commercial launch in 2025" and (2) "JCM: proceed with Gen 2 over JenaValve."); PX1302-025 (Edwards, GSCQ Acquisitions and Integration Alignment, October 4, 2024) ("Overlap to ramp down Jena to ramp up JC"); PX7026 (Bierman (Edwards) Dep. 190:24-191:4, 193:7-18) (Testifying that the AR strategy for future generations of Trilogy and plans regarding the development of Trilogy XL are "undetermined").

208 *See*, ¶ 93 and note 143.

called Centera that would have been an alternative to Edwards' Sapien valve for TAVR-AS.[209] In July 2019, however, Edwards announced that it was discontinuing the Centera valve and shutting down the pivotal trial.[210] Some stakeholders understood the decision to reflect a concern over the cost of developing a product that would compete with others in the Edwards portfolio.[211] The decision not to develop Centera is inconsistent with a claim that the transaction will spur innovation by giving Edwards two products to develop for the same indication.[212]

### C. THE PRO-CONSUMER EFFECTS OF COMPETITION ON PRICES AND INNOVATION ARE DEMONSTRATED IN THE TAVR-AS MARKET

106. When analyzing the potential effects of a merger, economists may draw insights from the competitive dynamics in similar markets. TAVR-AS, for example, is a more mature market that shares many relevant characteristics of TAVR-AR,[213] including a similar regulatory framework and barriers to entry. The history of TAVR-AS products helps to show the benefits of competition, which the merger could eliminate in the TAVR-AR market.

---

209 Centera is said to have demonstrated excellent clinical outcomes and performed well for AS patients. Edwards received CE mark for its Centera valve to treat severe AS in early 2017. In October 2018, Centera was actually expecting approval for patients at low risk. *See,* MDDI, "Edwards Drops Centera to Focus on Sapien 3 Ultra," July 24, 2019, accessed October 11, 2025. Available from https://www.mddionline.com/cardiovascular/edwards-drops-centera-to-focus-on-sapien-3-ultra.

210 Medtech Dive, "Edwards discontinues Centera valve, goes all in on Sapien 3 TAVR line," July 24, 2019, accessed October 11, 2025. Available from https://www.medtechdive.com/news/edwards-discontinues-centera-valve-goes-all-in-on-sapien-3-tavr-line/559430/; *see also*, PX7014 (Ullem (Edwards) Dep. 112:9-113:5) (Edwards decided not to fund Centera because Edwards "…had these two competing platforms…[a]nd we were trying to kind of internally compete to see which one could do better for patients, which one is more safe and which one is more effective." SAPIEN also had a broader indication than Centera.).

211 PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 60:5-10) ("I only know kind of what my local representative said. I don't -- and I don't know if they really knew or they're just kind of speculating. But the conversation centered around competing with themselves and the cost of developing the product.").

212 PX0056-004-005 ("Economic theory shows that a firm contemplating R&D decisions faced with uncertainty about the likelihood of success and potential payout from potential innovation pathways has an incentive to reduce the risk of its R&D investments by pursuing multiple paths to innovation in parallel.").

213 PX7019 (Wood (Edwards) Dep. 56:13-57:3) ("Q Do you view TAVR AS as a sort of analog to the potential of TAVR AR? …THE WITNESS: It's by no means a perfect analog, but I think there are a number of directional similarities.")

*Privileged*

107. Edwards is the market leader in TAVR-AS. But as a June 2024 Edwards document shows, it faces competition from Medtronic and Abbott.[214] Edwards has released multiple Sapien devices over time. Documents suggest this reflects a need to protect its market share and premium price. For example, a 2024 TAVR Portfolio strategic plan notes under "Share Protection" and "Price Protection" that "[w]ithout innovation in 2027, 7-10% of position loss is worth … ~$340M - $490M" in the United States.[215]

108. Similarly, in a June 2024 presentation, Edwards depicted the dates of different manufacturers' introductions of new TAVR-AS products. The steady accumulation of competitors in different geographic markets where Edwards operates led to its conclusion that "Globally We See Increased Competitive Pressure with Entrants and Innovation Accelerating."[216]

109. Party documents show that the increasing competition benefited consumers. For example, in an April 2024 presentation, Edwards describes the competitive pressure created by Medtronic, Abbott, and Boston Scientific launching new products and showing clinical results. Medtronic is said to be using "severe pricing tactics" to gain market share by offering a new rebate structure to the second-largest hospital in the United States Edwards states "pricing sensitivities have

---

214 PX1021-006; PX7019 (Wood (Edwards) Dep. 120:11-121:9); *see also*, PX7009 (Zovighian (Edwards) IH 126:10-16) (discussing Edwards' share in the TAVR-AS market); PX7026 (Bierman (Edwards) Dep. 115:19-25).

215 PX1021-008; *see also*, PX1588-032 (noting "Technology Wins Long Term" and "best technology is needed to maintain leadership"); PX1589-045 ("Edwards Remains Well-Positioned in Competitive TAVR Space […] Our continual product innovation and launch cadence is key to long-term leadership."); PX1275-007 (Stating that to "Maintain[] Price," "[d]ifferentiated products portfolio with superior clinical outcomes are critical"); PX1277-024 (Stating Edwards' position and price erosion strategy "is built on a portfolio that maximizes product differentiation and executing clinical trials that expand indications"); PX1535-014 ("We Must Maintain our Highly Differentiated Portfolio and High-value Service Model which Requires Increased Investment […] If there is accelerated price erosion, the position loss is worse."); PX1535-021 ("There is an Opportunity for Portfolio Innovation Beyond the Product that is Increasingly Important as the Competitive Landscape Intensifies."); PX1535-023 (Noting that "Headwinds" to "Growing the Market while Fortifying our Leadership Remains our Focus" include "Increasing share and price pressure"); *see also,* PX7019 (Wood (Edwards) Dep. 122:18-123:17) ("[T]he only reason they [Abbott] sell any of those [valves] is because they sell it at a discount. If they charged the same price as me, they would sell exactly zero.").

216 PX1021-005; *see also*, PX7019 (Wood (Edwards) Dep. 121:10-20); PX1229; PX7028 (Larkin (Medtronic) Dep. 176:19-177:11) ("[C]ontinued iteration on the platform is required in a space where others are continuing to introduce new features and benefits of their platform.").

driven customers to prioritize economics over clinical outcomes."[217] Documents show that Edwards offered rebates in response to Medtronic's presence in the TAVR-AS space.[218, 219] Similarly, Edwards' attempts to maintain its market share by offering lower prices to those customers who were willing to guarantee Edwards the majority of their business.[220] Consistent with Edwards' documents showing how competition drives innovation and lowers prices, physician testimony confirms that patients benefit from the availability of multiple TAVR devices.[221]

### D. Economic Theory and a Variety of Evidence Show that the Merger Would Likely Harm Consumers

110. Overall, I conclude that the merger would harm consumers due to Edwards' control of both J-Valve and Trilogy. If, instead, either device were left to compete independently, then consumers would benefit from the competition between multiple options to address AR. Economic theory, empirical studies, and even the example of the TAVR-AS market show that this would likely lead to better outcomes for consumers than if all TAVR-AR devices were controlled by the same firm.

---

217 PX1491-022-023; *see also*, PX7019 (Wood (Edwards) 121:21-25, 132:14-133:8).

218 *See*, PX1276-007 ("After Medtronic CoreValve entry, we will increase pricing flexibility up to 15% off list in a structured and defensible way."); PX1492-001 ("When we were anticipating Corevalve approval into the market in 2014 our strategy was to pre-emptively and offer rebates which were effectively a price discount.").

219 *See*, PX1492-001 ("[The Edwards sales team] has fought tooth and nail but [were] struggling and over the course of time and Portico entering at an even lower price, $8k less, there has clearly been a negative effect on our business." Moreover, "… accounts that have Portico [Abbott] in them (Portico hasn't been launch at all accounts) and it has had a real effect on our volumes and market share." The document also shows that Edwards has responded to competition in 2014 as well, stating that when they were "…anticipating Corevalve approval into the market in 2014 our strategy was to pre-emptively and offer [sic] rebates which were effectively a price discount. I had Jenny pull three of our top Prov accounts that have Portico [Abbott] in them (Portico hasn't been launched at all accounts) and it has had a real effect on our volumes and market share.").

220 PX1494 ("[T]his proposal would allow both accounts to grow volume and market share as MDT has been very competitive in their discounting. […] In this proposal we are capping them at $2,500/unit with an 80% market-share commitment at each site (both must hit 80% market-share or no aggregation).").

221 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 22:3-14).

111. As I have laid out, there is no reason to believe that the deal would be accompanied by significant innovation synergies.[222] To the contrary, the evidence I have reviewed shows the opposite. Moreover, even accepting *arguendo* that the merger might have some beneficial effects on innovation in the future, that does not establish that the deal benefits consumers overall. Any beneficial impact on innovation in years to come would have to be substantial to overturn the clear and dramatic effect that would be expected in the product market in the near term, when the parties' own documents indicate they believe they would be a monopoly until at least 2035.[223] I see no basis for concluding that any hypothetical long run benefits could offset the immediate harms.[224]

## VI. THE MERGER IS NOT NECESSARY FOR JENAVALVE TO CONTINUE TO COMPETE IN THE TAVR-AR MARKET

112. The parties have argued that the transaction does not create competition concerns because JenaValve's lack of profitability shows that it will be unable to compete vigorously as an independent company.[225] As I explain below, this argument does not hold.

### A. JenaValve Has Rationally Focused on Completing Clinical Trials in the United States, Which May Have Affected Short-Term Profitability While Increasing Its Long-Term Value

113. A company's profitability in the short-term need not predict its future success nor indicate that it will be meaningfully constrained in the ability to access capital. Examples of firms that did not earn profits for many years only to eventually flourish abound. To wit,

---

222 For example, party executives have not laid out specifics of what Edwards would do differently than JenaValve. *See*, *e.g.*, PX1118; PX7014 (Ullem (Edwards) Dep. 71:15-19) (Testifying that "Edwards hasn't formally assessed the extent to which it plans to fund JenaValve's R&D or SG&A initiatives").

223 *See*, PX1066 at sheet "Market Size"; *see also,* Valletti and Zenger (2021), p. 200 ("while innovation is important, it should not be forgotten that ultimately it is the impact on consumers that needs to be evaluated.").

224 Gilbert (2019), p. 481 ("A merger to monopoly typically has dramatic adverse impacts on the probability of discovery and consumer welfare if there are no technological spillovers that a monopolist can internalize.").

225 In a December 10, 2024 presentation, the parties contended that JenaValve was forecasted to lose $70.1 million in 2024 (using actual numbers up to Q3 2024 and forecasted numbers for Q4 2024). *See*, PX0058-004 (JenaValve Presentation, JenaValve Standalone Considerations, December 10, 2024); *see also*, Edwards Answer (2025), p. 2.

Amazon and Moderna did not begin earning profits until many years after beginning operations.[226]

114. For a firm to access capital, investors must expect to earn a return. To expect a return, investors must believe that the firm's prospects are good. While good present-day returns can be an indicator of the future, they are not necessary. In particular, a firm may be very valuable if its growth prospects are good. Amazon and Moderna were able to attract investors who believed that they would eventually be profitable.

115. Companies may balance short-term profits against investments likely to increase value over the long run.[227] Companies without other revenue streams may forego short-term profits entirely to pursue risky R&D to bring new products to market. Fundamentally, during their early years, opportunities for revenue generation may be few while costs are material. This logic applies particularly to medical devices.

116. As explained in Section II, even if a medical device is allowed to obtain reimbursement while undergoing clinical trials, it is not a priority for the firm to maximize profits in these trials. Instead, the firm focuses on running a successful trial and encouraging principal investigators at prestigious hospitals to participate and use its product. Though there may technically be "sales"

---

226 Amazon started in July 1994 and was not profitable for nine years. It reported its first full profitable year in 2003. (Amazon.com, Inc., "2003 Annual Report," *U.S. Securities and Exchange Commission*, February 24, 2004, accessed October 1, 2025. Available from https://www.sec.gov/Archives/edgar/data/1018724/000119312504029488/d10k.htm); *see also*, Jeannine Mancini, "Jeff Bezos Says 'All Overnight Success Takes 10 Years' – Amazon Didn't Turn A Profit For Almost A Decade," *Yahoo! Finance*, October 9, 2024, accessed October 1, 2025. Available from https://finance.yahoo.com/news/jeff-bezos-says-overnight-success-164517288.html.

Similarly, Moderna was founded in 2010 and became a public company in 2018. It did not earn a profit until 2021. *See,* (Moderna, Inc., "Annual Report For the Fiscal Year Ended December 31, 2018," *U.S. Securities and Exchange Commission*, March 13, 2019, accessed October 1, 2025. Available from https://irp.cdn-website.com/f4bfabcc/files/uploaded/Chasen-Richter-Moderna-Annual-Report-2018.pdf; *see also,* Moderna, Inc., "2020 Annual Report," January 4, 2021, p. 35, accessed October 1, 2025. Available from https://irp.cdn-website.com/f4bfabcc/files/uploaded/Chasen-Richter-Moderna-Annual-Report-2020.pdf; *see also,* Moderna, Inc., "2021 Annual Report," January 4, 2022, p. 33, accessed October 1, 2025. Available from https://irp.cdn-website.com/f4bfabcc/files/uploaded/Moderna-2021-Annual-Report.pdf).

227 *See*, *e.g.*, PX7014 (Ullem (Edwards) Dep. 119:20-120:10) (describing Edwards' need to "balance … delivering positive short-term results while also investing for alternative growth. So there is always this tradeoff").

of devices during this phase, the prices chosen are not selected based on what will maximize contemporaneous profits. Upon commercialization, firms are expected to select prices that maximize profits.

117. Here, the record is consistent with the prioritization of trial completion and expanded capabilities as opposed to short-run revenue generation. For example, one of JenaValve's top focuses as of December 2024 was to obtain PMA approval in August 2025.[228] JenaValve also wished to expand the population that Trilogy could treat by developing a 29mm valve for strategic reasons though resources were strained.[229] And it chose to run the ARTIST IDE study as soon as possible to "stay ahead of competitors and keep investigators engaged" though the costs might not be recouped for some time.[230] Such behavior is consistent with prioritizing the firm's future post-commercialization in the large and lucrative U.S. market.

### B. Ordinary Course Materials Indicate JenaValve Has Options for Raising the Capital Needed to Pursue Additional Innovation and Product Commercialization

118. The record in this matter shows that JenaValve is valuable and able to attract capital from parties other than Edwards. The evidence indicates that JenaValve has a variety of options for raising capital to pursue additional innovation, if needed, and product commercialization.[231] It

---

228 *See, e.g.,* PX0058-008-25 (JenaValve Presentation, JenaValve Standalone Considerations, December 10, 2024) (The section is titled "Additional Investments and Actions Are Required to Achieve Standalone Viability," with -009 titled "Commercialization on a Standalone Basis in Late 2025-2027 Requires Substantial Investments Immediately" showing "Continue ~$105 Million in Clinical Development on ARTIST trial" and -015 titled "Uptake and Adoption of Trilogy in AR Requires Substantial Investments to Drive Awareness and Trial (September 2023 Board Presentation)").

229 PX2381-001 (Email from J. Keltjens, JenaValve, to J. Kilcoyne, JenaValve, February 21, 2025) ("It would be great to forge ahead with a 29mm valve again for strategic reasons. Not sure what this would take and whether we have the valve R&D resources for this…").

230 *See,* note 165.

231 PX7033 (Hack (Bain Capital Life Sciences) Dep. 87:12-88:2) ("if not acquired, [JenaValve] would also have the option – it has afforded the company the option to commercialize the technology as a standalone company if it can raise sufficient money in order to go and do that.")

could pursue an initial public offering ("IPO"), obtain funding from other sources, or sell to another buyer.[232]

119. The credibility of these options is best demonstrated by Edwards' decision to purchase JenaValve in 2024 for $500 million (with the possibility of additional payments worth $445 million).[233] This decision took place at a time when JenaValve was not making profits, FDA approval for Trilogy was over a year away, and when it was facing delays due to AWT requirements to address valve quality (see Section II.E).

120. Economic logic implies that Edwards would not have made such a commitment if it did not believe in the value of JenaValve's assets. In part, Edwards had to pay so much because JenaValve had credible alternative options. Consistent with this, JenaValve's documents show that its investment banker, Piper Sandler, suggested that because of JenaValve's growth potential, it should push Edwards for a premium valuation, especially if JenaValve was going to enter the exclusivity agreement with Edwards regarding the acquisition.[234] If a lack of profitability indicated poor prospects and/or an absence of alternative options, it would not be rational for Edwards to have been willing to spend at least $500M to acquire JenaValve.

---

232 PX2464-001 (Email from J. Kilcoyne, JenaValve, to D. Dearen, JenaValve, *et al.*, February 20, 2025) ("Spoke with Amir re going forward scenarios, basically in chronological order (below) 1. Close w/ EW […] 2. Emergency Financing[…] 3. Identify alternative buyer […] 4. Crossover Financing […] 5. IPO").

Medtronic has noted its willingness to consider acquiring JenaValve. *See*, *e.g.*, PX7028 (Larkin (Medtronic) Dep. 172:8-173:9) ("Q. As it relates to JenaValve, if JenaValve was available today and reached out about a potential deal with Medtronic, would Medtronic still consider acquiring them? … A: We would consider -- consider that."); PX2282-001 (Email from D. Dearen, JenaValve, to J. Kilcoyne, JenaValve, August 8, 2025) ("Bain Capital and others are backing the company and everything is fine financially…if EW isn't allowed to acquire there are paths that are valuable. The investment bankers are praying IPO is the path… Things are about to be really positive and fun and it's not the time to leave.").

233 I understand that Medtronic also made an offer to JenaValve in 2024, which was rejected by JenaValve. *See,* PX7027 (Sun (JenaValve) Dep. 95:3-20); Medtronic made another offer in 2022. *See*, PX2479 (Chat exchange between J. Keltjens, JenaValve, and J. Kilcoyne, JenaValve, December 1, 2023) (discussing proposal from Medtronic). I understand the 2022 offer to have been for $650 million. *See,* PX0038-007 (JenaValve, Materials Prepared for JenaValve Board of Directors Presentation, January 4, 2024).

234 PX0037-002 (JenaValve, Presentation to the Board of Directors, January 2024) ("We need to continue to push with Edwards the idea that exclusivity requires a premium valuation").

*Privileged*

121. The fact that JenaValve has now completed its pivotal trials, and JenaValve executives expect it to commercialize by Q1 2026,[235] implies that its value is now *higher* than when Edwards agreed to acquire it. Consequently, it would be more attractive to potential investors or buyers. JenaValve's ordinary course documents demonstrate that its executives agree with this conclusion.[236]

## VII. NEITHER MERGER-SPECIFIC EFFICIENCIES NOR ENTRY, EXPANSION, AND REPOSITIONING ARE LIKELY TO OFFSET THE ANTICOMPETITIVE EFFECTS OF THE TRANSACTION

### A. Parties Have Not Provided Evidence of Cognizable Efficiencies

122. The Merger Guidelines note that the parties sometimes argue a merger will generate "procompetitive efficiencies" that can eliminate the competitive harm. However, the scope for those efficiencies to be cognizable is limited because "the Agencies will not credit vague or speculative claims."[237]

123. The Merger Guidelines further note that merger efficiencies are only accepted if they show *each* of the following attributes:

> ***Merger Specificity. The merger will produce substantial competitive benefits that could not be achieved without the merger under review…Verifiability. These benefits are verifiable, and have been verified, using reliable methodology and evidence not dependent on the subjective predictions of the merging parties or their agents…Prevents a***

---

235 PX7012 (Pinto (JenaValve) Dep. 117:2-14) ("Q. When does JenaValve anticipate commercializing Trilogy valve? … A. I anticipate sometime in the next one to three months."); PX7018 (Sloan (JenaValve) Dep. 95:10-16) ("Q Okay. And have you adjusted any timelines to commercialization based on this update from the FDA?... A. We did a high-level adjustment… Q And what was that high-level adjustment? A. We moved approval from Q4 of '25, to Q1 of 2026.").

236 PX2465-002 (Chat exchange between A. Miyake, JenaValve, and G. Mirigian, JenaValve, August 6, 2025) ("Can we get out and go for bigger bidders now? We are worth more today than we were a year ago…"); PX2466-001 (Email from E. Tansky, Oppenheimer & Co. Inc. to J. Kilcoyne, JenaValve, August 6, 2025) (responding to FTC challenge and stating that, "[I]'ve assumed if the deal got blocked Boston, Medtronic or J&J step up, but in the event the company goes down an IPO path we still think it would make a tremendous story in the public markets, could even be some ways to enhance the story further through some opportunistic M&A. In any event, I wanted to make sure you knew we're still thinking about JenaValve and if it makes sense from your perspective it would be great to set an update call").

237 Merger Guidelines, p. 32.

> ***Reduction in Competition. To the extent efficiencies merely benefit the merging firms, they are not cognizable…Not Anticompetitive. Any benefits claimed by the merging parties are cognizable only if they do not result from the anticompetitive worsening of terms for the merged firm's trading partners.***[238]

124. As I have written elsewhere, "… it is reasonable for the Agencies to be wary of such [efficiency] claims" and for the parties to bear the burden of showing they are grounded enough to offset the expectation of harm.[239] As my analysis in Section V showed, there is reason to expect that the proposed transaction will negatively impact patients through higher prices and a reduction in innovation. Therefore, to take seriously the proposition that the merger should go unchallenged, there must be compelling evidence—concrete and verifiable—that there are countervailing effects sufficient to ameliorate the likely harm from the substantial loss of competition. The parties have not provided evidence meeting these criteria.

125. Indeed, as part of its response to the FTC's Second Request, Edwards states, "[b]ecause JenaValve's Trilogy is not yet approved by the FDA for sale in the United States and Edwards does not have detailed information regarding JenaValve's costs, Edwards has not been able to precisely model the cost savings that will result from the Proposed Transaction."[240] Similarly, Edwards has not advanced clear plans for how the combination of Trilogy and J-Valve will lead to a clearly superior next generation TAVR-AR product nor how it can expedite the commercialization of JenaValve's current devices.[241] Even recognizing that the pre-commercial

238 Merger Guidelines, pp. 32-33.

239 Sandford *et al.* (2024), p. 143 ("Agency doubts about merging parties' efficiency claims are not new. Merging parties have incentives to make self-serving efficiency claims, and thus it is reasonable for the Agencies to be wary of such claims. Moreover, it is often more difficult for the Agencies to gain information on likely merger efficiencies than it is to gain information on likely competitive effects. Hence, the 2023 Guidelines are not the first iteration of the Guidelines to treat merger efficiencies with a healthy dose of skepticism.").

240 PX0053-095 (Edwards 2R (2025)).

241 PX7003 (Woods (Edwards) IH 317:15-17) ("… until I have JenaValve in my hands, it's impossible for me to assess its role in a Gen 2 technology"); PX7034 (Baerenwald (JenaValve) Dep. 216:10-18) ("Q. And sitting here today, sir, you cannot specify how much faster Edwards would be able to get FDA approval for Trilogy compared to JenaValve doing so alone, correct? A. No. It would be purely speculative. Q. And you don't have specific knowledge as to what resources Edwards will devote to JenaValve postacquisition, right? A. Correct.").

nature of the parties' products makes forecasting challenging, it is impossible to credit intentions that do not seem supported by any analysis.[242]

126. In its Second Request filing, JenaValve emphasized the likelihood of both innovation and cost-reducing efficiencies.[243] However, as discussed above in Section V.B, the weight of evidence contradicts an expectation that Edwards' ownership of both the J-Valve and Trilogy valves would lead to as much innovation in the TAVR-AR market as the non-merger counterfactual, let alone innovation that would offset the other competitive harms likely from this merger. Moreover, given Edwards' lack of concrete analysis of any possible cost savings, JenaValve's arguments about synergies also are not cognizable.

127. Finally, given the discussion in Section VI, there is no basis to presume that but for the merger JenaValve would not be able to access the capital needed to drive innovation and compete in the TAVR-AR market on the merits of its technology, making the alleged efficiencies from an Edwards acquisition not merger-specific.[244] Moreover, none of these efficiencies are unique to the combination of the Trilogy and J-Valve assets. If Edwards had a truly unique capacity to develop the Trilogy valve, it could quickly pursue that after divesting the J-Valve, which would solve the competition problem that currently exists.[245]

### B. Potential Entrants Are Far Behind the Parties and Could Not Constrain the Merged Firm from Exercising Market Power

128. As explained in Sections II.F and IV, no firm is as far along in developing a TAVR-AR product for U.S. patients as the parties. To the contrary, I understand competing treatments are likely years away from U.S. clinical trials to say nothing of commercialization.[246] The parties

242 For example, Larry Wood testified that no one at Edwards knows how or whether the J-Valve and Trilogy products can be combined. *See*, PX7019 (Wood (Edwards) Dep. 79:25-80:3) ("Q So there was a plan to have a Gen 2, but there wasn't enough information to know what that design would look like. Fair? A Correct").

243 PX0043-056-58 (JenaValve 2R (2025)).

244 In fact, JenaValve will move forward with commercialization regardless of the outcome of the merger. *See*, *e.g.*, PX7027 (Sun (JenaValve) Dep. 38:24-39:3) ("Q. JenaValve is planning to move forward with commercialization of Trilogy regardless of whether the proposed acquisition from Edwards closes, right? A. Right.").

245 Medtronic would also consider acquiring JC Medical. *See,* PX7028 (Larkin (Medtronic) Dep. 172:16-21).

246 *See,* Section II.F.

have recognized that they may be the only providers of TAVR-AR devices until at least 2035.[247] Therefore, as explained in Section IV.B, the transaction would create a monopoly for a meaningful period of time. In the event of a SSNIP or a diminution of investment in innovation, there are no potential entrants who could react sufficiently quickly to prevent a loss in consumer welfare.

129. The regulatory process, which includes IDE applications and clinical trials that must occur *prior* to the commercialization of the device, constitutes a large barrier to entry.[248] Based on JenaValve's documents, JC Medical did not become a serious focus until the J-Valve achieved such steps as receiving breakthrough device designation on route to seeking out clinical trial sites for the EFS.[249] As discussed above in Section II.F, the other potential AR treatments are not at this stage, meaning they will not be able to constrain the parties from exercising market power for years to come. Their route may be even slower than those of JenaValve and JC Medical as breakthrough status can be more difficult to receive if cleared alternatives exist.[250] Moreover, according to JC Medical's former CEO, if the Trilogy (or J-Valve) became the standard of care, the FDA would require a head-to-head trial against it.[251]

130. In addition to a lengthy regulatory process, medical device development is a highly technical and sophisticated field, involving patents to protect participants' intellectual

---

247 *See, e.g.,* PX1066 (JC Medical Projections for the TAVR-AR Market in 2024 at sheet "Market Size"). This is consistent with the timeline of JenaValve's approval for Trilogy, which started its Early Feasibility Study clinical trial in 2018 and is expected to receive PMA in early 2026. *See,* Section II.E. I understand Dr. Kesselheim will opine on the likely timeframe for FDA approval for other TAVR-AR devices.

248 Davis and Garces, *Quantitative Techniques for Competition and Antitrust Analysis,* (2010), p. 256. *See also*, Section II.F and Appendix A.

249 PX2480-002 (August 2023 text exchange suggesting competition between JenaValve and J-Valve ramped up once J-Valve received a breakthrough device designation. In response to the J-Valve announcement, one JenaValve employee writes, "Let the battle begin baby! A little competition is good!").

250 U.S. Food and Drug Administration, "Breakthrough Devices Program," August 20, 2025, accessed October 9, 2025. Available from https://www.fda.gov/medical-devices/how-study-and-market-your-device/breakthrough-devices-program.

251 PX7030 (Turco (JC Medical) Dep. 293:1-294:7).

*Privileged*

property.[252] Due to this, any entrant would need to consider the risk of patent infringement during the development process, which could reduce their incentives to try to enter into the TAVR-AR market for U.S. patients.[253]

131. JC Medical's history provides an illustration of the barriers to entry in this market. JC Medical created a prototype for a transfemoral version of the J-Valve in 2015.[254] At the time, JC Medical had a transapical version for which it was pursuing regulatory approval in China.[255] JC Medical published the results of its first-in-human transfemoral J-Valve implantation in 2017.[256] However, I understand that during this period JenaValve took little notice of JC Medical, and it was only after JC Medical received a breakthrough device designation *in the United States* (four years after it received its IDE) and began ramping up its early feasibility study, that JenaValve

---

252 PX3059-024 (JenaValve Corporate Overview, June 2025); *see also*, PX0053-095 (Edwards 2R Responses (2025)), Annex to 2(f), (showing a list of patents filed by JC Medical in the United States and worldwide).

253 PX7000 (Madrid (Laguna Tech) IH 29:19-30:12) ("Q: That's fair. Let me rephrase. Do you have any concerns about Edwards amassing a significant number of patents related to TAVR AR valves? A: Yes. Q: What are those concerns? A: Well, so they -- Edwards is extremely IP heavy on its own. JenaValve is extremely IP aggressive, they have a huge trove of IP as well they've been building for the last 13 years. And JC Medical, with the J-Valve, has also added to that as well. So with the IP that Edwards has added to the JenaValve IP and the JC Medical IP, it's going to be a very, very difficult landscape, IP landscape, to deal with. That even -- even with two approved patents, here for Laguna, we're still very concerned. Q: So I guess that's putting too fine a point on it, but are your concerns that Edwards will use its intellectual property to sue Laguna at some point? A: Yes. It's almost -- it's almost a known fact.").

Further, I understand that Dr. Kesselheim will opine on the breakthrough device criteria, which may increase FDA engagement where no alternative devices are available. All else equal, this means that once JenaValve's Trilogy is commercialized, potential entrants will be less likely to receive breakthrough status.

254 PX7005 (Turco (JC Medical) IH 137:21-138:6); PX1057-004-6 (J-Valve History: Brandon).

255 Diagnostic and Interventional Cardiology (DAIC), "JC Medical TAVI System Implanted First Time Outside China," March 1, 2016. Available from https://www.dicardiology.com/content/jc-medical-tavi-system-implanted-first-time-outside-china ("JC Medical Inc. announced that it has successfully completed an implantation of its J-Valve bioprosthesis using the Ausper transapical delivery device in Vancouver, Canada. The J-Valve Ausper system represents the next generation of transcatheter aortic valve implantation (TAVI) systems and has been previously used in more than 100 patients in China. This operation is the first implantation of the J-Valve Ausper system outside of China.").

256 Ulrich Schäfer *et al.*, "First-in-Human Implantation of a Novel Transfemoral Selfexpanding Transcatheter Heart Valve to Treat Pure Aortic Regurgitation," *EuroIntervention,* 13(11), 2017: 1296-1299.

began to change behavior in response to JC Medical's competitive pressure. (See Appendix A for a timeline of key events.)

## VIII. CONCLUSION

132. Based on the information available to me at this time, the proposed merger is likely to result in a loss of price and non-price competition in a relevant antitrust market. Merger-specific synergies are unlikely to offset the harm that the loss of competition would cause consumers, and the nature of the market make it impossible for rapid entry or repositioning to discipline the combined firm post-merger.



Dr. Nathan E. Wilson

*Privileged*

## APPENDIX A: TIMELINES OF PARTIES' FDA APPROVAL PROCESS AND REACTIONS TO EACH OTHER



*Privileged*

*Sources*:

- JC Medical:

  PX1363-001 (Email from M. Turco to D. Kereiakes, *et al*., October 11, 2023).

  PX1038-001 (Email from M. Turco to M. Tocchi, October 29, 2023).

  PX1066 at sheet "Market Size".

  PX0053-044 (Edwards 2R Response (2025)). ("JC Medical was acquired by Edwards in July 2024.").

  PX1171-001 (Email from M.Turco to S. Halverson *et al*., October 16, 2023) ("We have now enrolled our first EFS case October 16, 2023.").

  PX0053-011 (Edwards 2R Response (2025)) (EFS "completed enrollment in July 2024" and "the JOURNEY pivotal trial [saw] the first patient being enrolled in October 2024").

  JC Medical, "J-Valve TF Early Feasibility Study (JVTF EFS)," *ClinicalTrials.gov* Identifier: NCT06034028, updated July 11, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06034028.

  JC Medical, "J-Valve Transfemoral Pivotal Study (JOURNEY)", *ClinicalTrials.gov* Identifier: NCT06455787, updated September 26, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06455787.

- JenaValve:

  PX2324-002 (Email from V. Podichetty to JenaValve Senior Staff, May 8, 2022).

  PX2324-001 (Email from J. Kilconyne to G. Mirigian, May 9, 2022).

  PX2057-001 (Email from D. Sun to P. Spadaro, *et al*., March 1, 2023).

  PX2181-002 (Email from J. Kilcoyne to J. Keltjens, *et al*., March 3, 2023).

  PX2462-017 (JenaValve, Market Development and Assessment, March 7, 2023).

  PX2480-002 (JenaValve, Short Message Report, August 1, 2023).

  PX2322-005, 009, 011 (JenaValve, US Commercial Delay Strategic Planning, February 2024).

  PX2139-004 (Email from J. Kilcoyne to J. Keltjens, *et al*., March. 19, 2024).

  PX2186-024, 025 (JenaValve, Board of Directors Meeting, March 20, 2024).

  PX2327-013 (JenaValve, Corporate Presentation, April 2024).

  PX2188-002 (Text exchange between D. Sun, JenaValve, and D. Baerenwald, JenaValve, July 24, 2024).

  PX2457-038 (JenaValve, Jena Valve Trilogy Transcatheter Heart Valve System, November 18, 2024) ("Enrollment is complete for the ALIGN-AR trial, with the 180th subject treated on August 29, 2022").

  Edwards, "Edwards Lifesciences Expands Structural Heart Portfolio With Acquisitions of JenaValve and Endotronix," July 24, 2024, accessed October 3, 2025. Available from

*Privileged*

https://www.edwards.com/newsroom/news/2024-07-24-edwards-lifesciences-expands-structural-heart-port ("Edwards has entered into an agreement to acquire JenaValve Technology").

JenaValve, "The JenaValve ALIGN-AR Pivotal Trial (ALIGN-AR)," *ClinicalTrials.gov* Identifier: NCT04415047*,* updated September 13, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT04415047.




*Sources*:

- JC Medical:

PX7005 (Turco (JC Medical) IH 139:23-140:8) ("Q. Thank you for clarifying that. When did JC Medical first create a prototype of the transfemoral J-Valve? A. I don't have the exact date, but if you look at PX1057-004, you see a date here of August 2015. And so this is probably the very early concept development of the transfemoral valve. Q. Okay. So the early concept of what would ultimately become the transfemoral J-Valve was created approximately ten years ago? A. Correct.").

PX1197-008 (Edwards Lifesciences Corporation Merger Notification to Austrian Federal Competition Authority, September 11, 2024) ("The J-Valve transapical device was approved as a TAVR-AR device by the Chinese regulator in May 2017").

Genesis MedTech, "Genesis MedTech announces FDA Breakthrough Device designation for the J-Valve™ Transfemoral System," *PR Newswire*, August 1, 2023, accessed October 11, 2025. Available from

https://www.prnewswire.com/news-releases/genesis-medtech-announces-fda-breakthrough-device-designation-for-the-j-valve-transfemoral-system-301889867.html.

PX1171-001 (Email from M.Turco to S. Halverson *et al*., October 16, 2023) ("FDA IDE approval was August 31, 2023. We have now enrolled our first EFS case October 16, 2023."); PX0053-011 (Edwards 2R Response (2025)) ("In August 2023, JC Medical received an Investigational Device Exemption ("IDE") from the FDA to conduct an Early Feasibility Study ("EFS").").

PX2042-002 (Email from R. Polzin, JenaValve, to D. Sun *et al*., February 8, 2024); PR Newswire, "Genesis MedTech Completes Enrollment in its United States Early Feasibility Study Utilizing the J-Valve™ Transfemoral System for Patients with Severe Aortic Regurgitation," February 5, 2024, accessed October 11, 2025. Available from https://www.prnewswire.com/news-releases/genesis-medtech-completes-enrollment-in-its-united-states-early-feasibility-study-utilizing-the-j-valve-transfemoral-system-for-patients-with-severe-aortic-regurgitation-302052608.html.

PX1157-020 (Edwards, Strategy & Corporate Development Update, July 10, 2024) ("Received IDE pivotal trial approval").

PX0053-044 (Edwards 2R Response (2025)) ("JC Medical was acquired by Edwards in July 2024.").

PX0053-011 (Edwards 2R Response (2025)) ("After the EFS, the J-Valve TF System received an IDE from the FDA on May 29, 2024, to conduct the JOURNEY pivotal trial […] In late 2024, Edwards commenced the JOURNEY pivotal trial for the J-Valve TF System in the United States, with the first patient being enrolled in October 2024").

PX1397-014 (Edwards, LT Meeting, February 20, 2025) (projecting SOJOURN approval for Q3 2028); PX7026 (Bierman (Edwards) Dep. 233:20-24) ("Q3 is best guess" for SOJOURN); PX7015 (Sirimanne (Edwards) Dep. 101:23-102:22 ("Q And that would be approval by the FDA for PMA? A That's correct. Q Okay. And that's projecting it sometime in, I think it looks like, Q3 2028? […] THE WITNESS: At the time of the creation of this slide, yes. […] It will probably get pushed out a couple of quarters.").

JC Medical, "J-Valve Transfemoral Pivotal Study (JOURNEY)", *ClinicalTrials.gov* Identifier: NCT06455787, updated September 26, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06455787.

JC Medical, "J-Valve TF Early Feasibility Study (JVTF EFS)," *ClinicalTrials.gov* Identifier: NCT06034028, updated July 11, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06034028.

- JenaValve:

PX0043-036 (JenaValve 2R Response (2025)) (describing JenaValve's IDE approval in October 2015).

PX2457-039 (JenaValve, JenaValve Trilogy Transcatheter Heart Valve System, November 18, 2024) (On October 22, 2015 "Original IDE approved by FDA[,] Early Feasibility Study", and on January 5, 2017,

"Humanitarian Use Device (HUD) designation received for the JenaValve TAVR System and aortic regurgitation").

PX0043-059 ("JenaValve enrolled its first patient into IDE-HDE in November 2018").

Cardiac Interventions Today, "JenaValve Pericardial TAVR System Receives FDA Breakthrough Device Designation," January 8, 2020, accessed October 11, 2025. Available from https://citoday.com/news/jenavalve-pericardial-tavr-system-receives-fda-breakthrough-device-designation.

PX2457-040 (JenaValve, JenaValve Trilogy Transcatheter Heart Valve System, November 18, 2024) (On May 15, 2021 "JenaValve Withdraws HUD Designation").

PX2457-040 (JenaValve, JenaValve Trilogy Transcatheter Heart Valve System, November 18, 2024) ("The ALIGN-AR trial later transitioned to a pivotal trial; first as pivotal trial to support a humanitarian device exemption ([…] approved May 22, 2020) and then as pivotal IDE-AR pivotal trial ([…] approved July 28, 2021). Enrollment is complete for the ALIGN-AR trial, with the 180th subject treated on August 29, 2022.").

PX7007 (Kilcoyne (JenaValve) IH 255:1-19) (Around February 2024, JenaValve failed the AWT test "in the midst of [their] acquisition discussions with Edwards." The AWT test was conducted for nine months. Working backwards from February 2024, the AWT was probably commenced in early to mid-2023.).

PX2186-007 (JenaValve, Board of Directors Meeting, March 20, 2024) ("AWT test will start in May with an anticipated completion and FDA Submission in February 2025"; "PMA Approval September 2025").

Edwards, "Edwards Lifesciences Expands Structural Heart Portfolio With Acquisitions of JenaValve and Endotronix," July 24, 2024, accessed October 3, 2025. Available from https://www.edwards.com/newsroom/news/2024-07-24-edwards-lifesciences-expands-structural-heart-port ("Edwards has entered into an agreement to acquire JenaValve Technology").

PX0043-012 (JenaValve 2R Response (2025)) ("On August 16, 2021, the FDA approved JenaValve to commence its Investigational Device Exemption trial — ALIGN-AR — for the treatment of aortic

regurgitation. On August 30, 2024, the FDA similarly approved JenaValve to commence another Investigational Device Exemption trial – ARTIST").

PX0044-008 (JenaValve Amended Responses (2025)) ("… whereby the final [PMA] Module #5 […] was submitted on June 30, 2025.").

PX0044-019 (JenaValve Amended Responses (2025)) ("JenaValve expects to receive FDA approval for Trilogy by the end of 2025 or in the first quarter of 2026.").

JenaValve, "THE ALIGN-AR EFS TRIAL: JenaValve Pericardial TAVR Aortic Regurgitation Study," *ClinicalTrials.gov* Identifier: NCT02732704, updated November 18, 2022, Accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT02732704.

JenaValve, "The JenaValve ALIGN-AR Pivotal Trial (ALIGN-AR)," *ClinicalTrials.gov* Identifier: NCT04415047, updated September 13, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT04415047.

JenaValve, "ARTIST: Aortic Regurgitation Trial Investigating Surgery Versus Trilogy™ (ARTIST)," *ClinicalTrials.gov* Identifier: NCT06608823, updated October 7, 2025, accessed October 11, 2025. Available from https://clinicaltrials.gov/study/NCT06608823.

## APPENDIX B: DESCRIPTION OF OTHER POTENTIAL TAVR-AR DEVELOPERS

133. Besides JenaValve and JC Medical, several manufacturers are developing TAVR-AR solutions outside of the United States. However, they are mostly in the early stages of the medical device development process, and none have started clinical trials in the United States. I collect information from PX0046-023-24 (Edwards Responses (2025)), PX0044-016-18 (JenaValve Amended Responses (2025)), and my own desk research and provide a summary below on each TAVR-AR solution, its manufacturer, and its development status.

134. Laguna Tech has two transfemoral valves, Zeta and Alpha,[257] and expects to start EFS in the United States and EU in Q1 2025.[258] However, the development process has been paused indefinitely until external funding is secured.[259]

---

[257] GlobeNewswire, "Laguna Tech USA Announces Newly Designed Heart Valves with Advanced Engineering Successfully Implanted in First-in-Human Clinical Trial," October 24, 2023, accessed October 11, 2025. Available from https://www.globenewswire.com/news-release/2023/10/24/2765560/0/en/Laguna-Tech-USA-Announces-Newly-Designed-Heart-Valves-with-Advanced-Engineering-Successfully-Implanted-in-First-in-Human-Clinical-Trial.html.

[258] PX0044-017 (JenaValve Amended Responses (2025)).

[259] PX7000 (Madrid (Laguna Tech) IH 26:1-5) ("Q. Is it fair to say that Laguna Tech's recent funding issues is delaying Zeta's approval timeline or putting it at risk? A. Yes, delaying – yeah, absolutely. Putting the timeline at risk. A hundred percent.").

*Privileged*

135. MicroPort CardioFlow developed Vitaflow Liberty, a transfemoral valve,[260] which has received the CE mark in Europe in 2024.[261] It is currently undergoing a multi-center study in China to test its suitability for the treatment of AR.[262] Shanghai INT Medical Instruments Co. Ltd developed HanchorValve, a transfemoral valve, and completed clinical trials in China in November 2023.[263] Koka also developed a transfemoral valve named Pioneer,[264] and started clinical trials in 2023.[265] It entered the Chinese NMPA's special review process in August 2024.[266] Wuhan Vickor developed DOCS Valve (with an unknown access point) and is conducting a clinical trial in China.[267] None of these developers has indicated plans to conduct clinical trials in the United States.[268]

---

260 CardioFlow MedTech, "MicroPort CardioFlow's VitaFlow has Excellent Long-Term Clinical Outcomes, 7-Year Follow-up Data Presented at PCR London Valves," November 25, 2023, accessed October 11, 2025. Available from https://en.cardioflowmedtech.com/en/news/253.html.

261 MicroPort, "MicroPort Cardio Flow Receives Approval for VitaFlow Liberty in the EU," May 9, 2024, accessed October 3, 2025. Available from https://microport.com/news/microport-cardioflow-receives-approval-for-vitaflow-liberty-in-the-eu.

262 PX0044-017 (JenaValve Amended Responses (2025)).

263 Wenzhi Pan *et al.*, "Early Results of Multicenter Trial of a Novel Balloon-Expandable Valve With Anchor for Aortic Regurgitation", *J Am Coll Cardiol Intv*, 18(6), 2025: 752–764.

264 Lulu Liu *et al.*, "A Novel Designed TAVR System for Pure Aortic Regurgitation: First-in-Human Experience", *J Am Coll Cardiol Intv*, 16(21), 2023: 2690 2691.

265 PX0044-018 (JenaValve Amended Responses (2025)).

266 *Id.*

267 Vickor, "World's First TAVR vs. SAVR Trial for Intermediate-to-High Risk Aortic Regurgitation Nears Completion!" August 15, 2025, accessed October 11, 2025. Available from https://en.vickor.com.cn/news_xq/47.html.

268 *See*, PX7027 (Sun (JenaValve) Dep. 33:4-15) ("Q. Do you know whether Hanchor Valve is available in the United States currently? A. They are not. Q. And Hanchor Valve has not sought FDA approval in the United States yet; is that correct? A. Correct. Q. Hanchor Valve does not have an IDE, correct? A. Correct. Q. Hanchor Valve has not begun any clinical trials in the United States, right? A. Correct."); *Id.* 34:19-35:11 ("Q. Are you aware of a device in China called Pioneer that is seeking approval for AR? A. Yes. Q. Do you know the name of the company that owns Pioneer? A. I think it's KOKA. Q. Is KOKA a Chinese company? A. As far as I know. Q. Is KOKA available in the United States? A. No. Q. KOKA has not sought FDA approval in the United States at this point; is that correct? A. Correct. Q. KOKA does not have an IDE? A. Correct. Q. And KOKA has not begun clinical trials in the United States? A. Correct.").

*Privileged*

136. Several medical device manufacturers have developed transapical valves. Strait Access Technologies ("SAT") developed SAT AR Valve System,[269] and received approval from the health regulator in South Africa to begin the FIH implantation.[270] Jenscare developed Ken-Valve,[271] and received approval in China in March 2024, with initial commercial implantations in July 2025.[272] Similar to the transfemoral TAVR-AR solutions, none of these transapical solutions has indicated plans for clinical trials in the United States.[273]

## APPENDIX C: SOURCES AND NOTES FOR FIGURES

- Figure 1: Pre- and Post-Merger HHIs in a Market with JC Medical/Edwards and JenaValve
  - Sources:
    - Number of units:
      PX0046-028 (Edwards Responses (2025));

      PX7030 (Turco (JC Medical) Dep. 238:2-16);

      PX0044-020-022 (JenaValve Amended Responses (2025)).
    - Number of sites:
      JenaValve, "THE ALIGN-AR TRIAL: Safety and Effectiveness/Performance of the Transfemoral JenaValve Pericardial TAVR System in the Treatment of Patients With Symptomatic Severe Aortic Regurgitation (AR)," *ClinicalTrials.gov* Identifier: NCT02732704, updated November 18, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT02732704;

---

269 Strait Access Technologies, "TAVR System," accessed October 3, 2025. Available from https://straitaccesstechnologies.com/tavr-system/.

270 PX0044-018 (JenaValve Amended Responses (2025)).

271 Jenscare, "Transcatheter Aortic Valve Interventional Treatment," accessed October 9, 2025. Available from https://en.jenscare.com/product/244.html.

272 PR Newswire, "Jenscare Announces 2025H1 Interim Results," August 31, 2025, accessed October 3, 2025. Available from https://www.prnewswire.com/news-releases/jenscare-announces-2025h1-interim-results-302542553.html.

273 PX7027 (Sun (JenaValve) Dep. 23:24-24:9) ("Q. Is it your understanding that Ken-Valve is not FDA approved in the United States? A. Yes. Q. Ken-Valve has not sought FDA approval in the United States at this point; is that correct? A. To the best of my knowledge, yes. Q. Ken-Valve does not have an IDE? A. It does not. Q. And Ken-Valve has not begun any clinical trials in the United States? A. Yes. It has not.").

*Privileged*

JenaValve, "A Study to Assess Safety and Effectiveness of the JenaValve Trilogy™ Transcatheter Heart Valve System Versus Surgical Valve Replacement in Patients With Aortic Regurgitation," *ClinicalTrials.gov* Identifier: NCT06608823, updated August 20, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06608823;

JenaValve, "A Study to Assess Safety and Effectiveness of the JenaValve Trilogy™ Heart Valve System in the Treatment of High Surgical Risk Patients With Symptomatic, Severe Aortic Regurgitation (AR)," *ClinicalTrials.gov* Identifier: NCT04415047, updated September 13, 2022, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT04415047;

JenaValve, "Transcatheter Aortic Valve Replacement Using the JenaValve TrilogyTM Heart Valve System for Clinically Significant Aortic Regurgitation in Patients With Left Ventricular Assist Devices (LVAD)," *ClinicalTrials.gov* Identifier: NCT06594705, updated July 4, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06594705;

JC Medical, Inc., "J-Valve TF Early Feasibility Study," *ClinicalTrials.gov* Identifier: NCT06034028, updated July 11, 2025, accessed October 1, 2025. Available from https://clinicaltrials.gov/study/NCT06034028;

JC Medical, Inc., "J-Valve to Treat Aortic Regurgitation Via Transcatheter Therapy," *ClinicalTrials.gov* Identifier: NCT06455787, updated September 26, 2025, accessed October 1, 2025. Available from https://www.clinicaltrials.gov/study/NCT06455787;

PX7000 (Madrid (Laguna Tech) IH 23:12-14).

- Notes:
  - Site counts are as displayed on the respective ClinicalTrials.gov webpages as of October 1, 2025;
  - There are nine sites that are common between JC Medical trials and JenaValve trials. For the purposes of calculating shares and HHIs, I distribute them equally between the two firms;
  - JC Medical number of units include TAVR-AR devices used during implant procedures for clinical use in trials (early feasibility study and the JOURNEY trial), and compassionate use cases between May 2018 and July 2024 in the United States;
  - JenaValve number of units includes the number of Trilogy devices provided for clinical use in trials (ALIGN-AR, ARTIST, Continued

Access Program, JENA-VAD), compassionate use cases, and emergency use cases from January 2022 to August 2025 in the United States;

- JC Medical's and JenaValve's number of units are cumulative counts for the lifetime of the product development. As a sensitivity, when restricting the period to the most recent 12 months from September 2024 to August 2025, JenaValve's number of units is 311, and JC Medical's number of units is 23. Therefore, the shares are 93% for JenaValve and 7% for JC Medical;
- PX7000 (Madrid (Laguna Tech) IH 23:12-14) states that Laguna Tech has not begun their early feasibility study for the Zeta valve ("Q: So Laguna Tech has not yet begun its early feasibility study for Zeta. Is that correct? A. Correct.").

- Table 1: JC Medical Projections for the TAVR-AR Market in 2024
    - Replicated from PX1066 at sheet "Market Size".

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>*Plaintiff*,<br><br>v.<br><br>EDWARDS LIFESCIENCES CORPORATION,<br><br>and<br><br>JENAVALVE TECHNOLOGY, INC.,<br><br>*Defendants*. | Civil Action No. 1:25-cv-02569-RC |

**REPLY EXPERT REPORT OF DR. AARON KESSELHEIM**

**November 2, 2025**

**TABLE OF CONTENTS**


I. QUALIFICATIONS AND MATERIALS CONSIDERED ............ 1

II. ASSIGNMENT ............ 1

III. SUMMARY OF CONCLUSIONS ............ 1

IV. DEFENDANTS DO NOT ADDRESS SEVERAL KEY POINTS IN MY INITIAL REPORT ............ 2

V. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN MISSTATEMENTS IN THEIR DESCRIPTIONS OF THE HIGH-RISK MEDICAL DEVICE FDA APPROVAL PROCESS ............ 3

VI. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN FLAWED ANALYSIS OF THE COMPLEXITY AND UNCERTAINTY IN THE FDA APPROVAL PROCESS FOR HIGH-RISK MEDICAL DEVICES ............ 5

VII. COMPLEX FDA REGULATIONS DICTATE THE APPROVAL OF HIGH-RISK DEVICES USED IN THE UNITED STATES ............ 5

VIII. DEVELOPMENTAL TIMELINES SHOW THAT J-VALVE AND TRILOGY ARE NOT SIMILARLY SITUATED TO OTHER FOREIGN DEVELOPERS OF TAVR-AR ............ 8

- A. J-Valve and Trilogy Are Most Advanced in the FDA Approval Process ............ 9

IX. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN FAULTY ASSERTIONS ABOUT "FAST FOLLOWER" TAVR-AR DEVICES ............ 10

- A. No TAVR-AR Device Developer Other than Edwards and JenaValve is Approaching FDA Approval ............ 10
- B. The Bailey and McWilliams Reports Suggest that Acquisitions Create "Fast Followers;" However, TAVR-AS Timelines Do Not Show that Acquisitions Accelerated FDA Approval ............ 12

X. THE MCWILLIAMS REPORT MISINTERPRETS FIGURE 4 FROM THE KESSELHEIM REPORT ............ 14

XI. THE MCWILLIAMS AND BAILEY REPORTS MISSTATE EVIDENCE OF INNOVATION ............ 15

**APPENDIX A** ............ A-1

**APPENDIX B** ............ A-3

## I. QUALIFICATIONS AND MATERIALS CONSIDERED

1. I previously provided an initial expert report in this matter on October 12, 2025 (the "Kesselheim Report"). My background and qualifications are summarized in the Kesselheim Report, and a copy of my curriculum vitae is attached to that report as Appendix A. I have also included in Appendix A of this reply report an updated list of publications to supplement the list I provided in Appendix A of the Kesselheim Report.

2. In preparing this report, I have relied on the materials identified in Appendix C of the Kesselheim Report, as well as the additional materials identified in Appendix B of this reply report.

## II. ASSIGNMENT

3. The FTC has asked me to review and, where appropriate, respond to certain topics addressed by the reports submitted by experts retained by Defendants in this matter. I understand that the FTC has also asked Dr. Nathan Wilson to review and respond to certain topics addressed in these reports.

4. In this report, I provide the details of my analysis to date. Discovery in this matter has been conducted at a rapid pace and remains ongoing.

## III. SUMMARY OF CONCLUSIONS

5. **The Expert Reports of Dennis McWilliams ("McWilliams Report") and Elizabeth Bailey ("Bailey Report") contain misstatements in their descriptions of the high-risk medical device FDA approval process.**

6. **The McWilliams and Bailey Reports contain flawed analysis of the complexity and uncertainty in the FDA approval process for high-risk medical devices.**

    a. The emphasis by Mr. McWilliams and Dr. Bailey on JenaValve's missed forecasts and approval dates for Trilogy is misplaced, as the FDA regulatory approval process is naturally complex. This is evidenced by both J-Valve's missed forecasts as well as delays to other Edwards medical devices (and other non-Edwards medical devices) in the FDA approval process.

7. **The McWilliams and Bailey Reports inaccurately equate the developmental status of TAVR-AR devices abroad with TAVR-AR devices in the United States, as the requirements of the FDA regulatory process are unique to the United States.**

8. **It is likely that TAVR-AR devices that seek FDA approval in the United States will require U.S. clinical data, which in turn requires an approved IDE and participation in the FDA regulatory process.**

a. The emphasis by Mr. McWilliams and Dr. Bailey on certain ex-U.S. TAVR-AR developers is misplaced, as none of these manufacturers have yet taken meaningful steps toward FDA approval of their devices in the United States.

9. **The developmental timelines of J-Valve and Trilogy show that they are not similarly situated to other TAVR-AR devices in development outside of the United States and are most advanced in the FDA approval process.**

10. **The McWilliams and Bailey Reports contain faulty assertions about "fast follower" TAVR-AR devices.**

a. No TAVR-AR device developer, other than Edwards or JenaValve, is approaching FDA approval, and neither the McWilliams nor the Bailey Report disclose any steps related to initiating the FDA regulatory process for any of the other device manufacturers identified.

b. Timelines show that acquisitions do not necessarily accelerate the FDA approval process. As seen in the context of TAVR-AS devices, the time between acquisition and FDA approval of each TAVR-AS device was approximately six years.

11. **The McWilliams Report misinterprets Figure 4 from the Kesselheim Report.**

12. **The McWilliams and Bailey Reports misstate evidence of innovation.** Contrary to the Bailey Report, counting the number of patients enrolled in clinical trials and the overall number of trials are not measures of innovation. Likewise, Mr. McWilliams presents an overly limited view of medical device innovation. The development of new generations of devices is not the only way that manufacturers can innovate their devices.

## IV. DEFENDANTS DO NOT ADDRESS SEVERAL KEY POINTS IN MY INITIAL REPORT

13. Defendants served two expert reports from Elizabeth Bailey, Ph.D. and Dennis McWilliams. After reviewing the expert reports, it appears that Dr. Bailey and Mr. McWilliams do not respond to or refute the following points made in the Kesselheim Report. I do not list all of the points that they did not respond to; however, I highlight certain key subjects that were not refuted in either report.

a. It is rare for high-risk medical devices to rely solely on clinical data obtained outside the United States in proceeding through the FDA approval process.[1] In practice, foreign-obtained clinical data alone almost never form the full basis for high-risk device approval by the FDA. When ex-U.S. data have been

[1] Kesselheim Report Section V.B and ¶ 15.

considered, such data were generally used in conjunction with data collected from U.S. clinical trials.[2]

b. The parties in this case proffer TAVR-AS as a model for how development might proceed for TAVR-AR. Publicly available data regarding TAVR-AS devices show that TAVR-AS devices took numerous years from the start of pivotal trials to PMA application approval by the FDA. In addition, foreign clinical data did not provide the sole basis for any TAVR-AS approval, and when such data were considered by the FDA, the approval process was not substantially accelerated.[3]

c. A review of TAVR-AS regulatory data shows numerous device changes after FDA approval of the original PMA, including those likely to be clinically meaningful for patients and physicians.[4] There are reasons to expect continued innovation of TAVR-AR devices after FDA approval to be comparable to the experience of TAVR-AS devices in the context of multiple manufacturers.[5]

## V. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN MISSTATEMENTS IN THEIR DESCRIPTIONS OF THE HIGH-RISK MEDICAL DEVICE FDA APPROVAL PROCESS

14. Defendants' expert reports reference the regulation of medical devices by the FDA. Some of their remarks require clarification.

15. In ¶ 35 of the McWilliams Report, Mr. McWilliams claims that pivotal studies organized for medical device approval are designed to show "statistically significant safety and efficacy." However, stating both "safety and efficacy" is incorrect.[6] Pivotal studies are usually powered to show statistically significant changes to primary effectiveness endpoints, such as clinical outcomes or surrogate measures.[7] Rarely, pivotal studies for high-risk devices may be designed to test primary safety endpoints, although safety information is routinely collected during these trials.[8]

16. In ¶ 37 of the McWilliams Report, Mr. McWilliams claims that the FDA will often convene advisory committees for "first-in-class Class III devices requiring a real risk-

---

[2] Kesselheim Report Section V.B. and ¶ 15.b.
[3] Kesselheim Report ¶¶ 17.a., 107.
[4] Kesselheim Report Section VII and ¶ 111.
[5] Kesselheim Report Section VIII and ¶ 18.
[6] Technically, the FDA does not apply the term "efficacy" to medical devices; the proper regulatory term is "effectiveness."
[7] "Powered" refers to the number of patients who must be enrolled based on the effect size on the primary endpoint to which the clinical trial is powered, and the amount of certainty in that primary endpoint which is desired. Statistical considerations for clinical trials and scientific experiments. David A. Schoenfeld, et al., *Statistical Considerations for Clinical Trials and Scientific Experiments*, https://hedwig.mgh.harvard.edu/sample_size /size.html
[8] *See* Vinay K. Rathi et al., *Characteristics of Clinical Studies Conducted over the Total Product Life Cycle of High-Risk Therapeutic Medical Devices Receiving FDA Premarket Approval in 2010 and 2011*, JAMA (Aug. 11, 2015), https://jamanetwork.com/journals/jama/fullarticle/2425742.

benefit assessment." The FDA historically was required to convene Advisory Committees for all PMA applications until that requirement was relaxed in 1990.[9] Currently, the FDA generally takes PMA submissions to Advisory Committees at the request of the applicant,[10] or, it may initiate an Advisory Committee meeting itself, in cases of "novel technology expected to have a significant impact on clinical practice" or when data certainty or quality is in question.[11] The decision to convene an Advisory Committee is not based on the need for a "real risk-benefit assessment."[12]

17. In ¶ 38 of the McWilliams Report, Mr. McWilliams claims that after approval of a PMA application, the FDA "requires the device developer to continue conducting post-approval studies to assess the product's safety continuously." However, post-approval studies are not consistently required of device developers after PMA approval. In one study of high-risk devices approved for otorhinolaryngology conditions between 2000 and 2014, I (along with my colleagues) found that about 70% of the approved devices had formal post-approval studies attached to their approval; meaning that 30% of such devices were approved with no post-approval requirement.[13] In another study of all devices with original PMAs approved between 2010 and 2011, approximately 80% had any post-approval studies required, and 46% of devices had three or fewer post-approval studies.[14] In a more recent study of all FDA-approved PMAs from 2015 to 2019 (71 devices), 69% required post-approval studies.[15] Although there are no definitive criteria for mandating a post-approval study, in general FDA will require one if doing so "can reduce the extent of premarket data collection and directly impact when patients will have access to high-quality, safe and effective medical devices" and to provide additional information about the benefits or risks of devices.[16]

18. In ¶ 39 of the Bailey Report, Dr. Bailey states that "JenaValve submitted its PMA package, starting the FDA approval process, on June 30, 2025." In fact, JenaValve

---

[9] Institute of Medicine (US) Committee to Study the Use of Advisory Committees; FDA Advisory Committees, *Historical Evolution of FDA Advisory Committees*, Washington National Academies Press (US) (1992), https://www.ncbi.nlm.nih.gov/books/NBK236081/.

[10] *See* 21 U.S.C. § 360e (c), 21 CFR § 814.44(a). The FDA can forgo the request if the information submitted by the applicant for Advisory Committee review "substantially duplicates information which has previously been reviewed by a panel." 21 U.S.C. § 360e (c)(3)(B).

[11] FDA, *Procedures for Meetings of the Medical Devices Advisory Committee: Guidance for Industry and Food and Drug Administration Staff*, (Sept. 1, 2017), https://www.fda.gov/media/91429/download.

[12] McWilliams Report ¶ 37.

[13] Vinay K. Rathi, Aaron S. Kesselheim, et al., *Clinical Evidence Supporting US Food and Drug Administration Premarket Approval of High-Risk Otolaryngologic Devices, 2000-2014*, OTOLARYNGOL HEAD AND NECK SURGERY, Feb. 2017.

[14] *See* Vinay K. Rathi et al., *Characteristics of Clinical Studies Conducted over the Total Product Life Cycle of High-Risk Therapeutic Medical Devices Receiving FDA Premarket Approval in 2010 and 2011*, JAMA (Aug. 11, 2015), https://jamanetwork.com/journals/jama/fullarticle/2425742.

[15] Danelle Hidano, *US Food and Drug Administration–Mandated Postmarketing Studies for High-risk Cardiovascular Devices Approved 2015-2019*, JAMA INTERN MED. (Mar. 14, 2022), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2790061.

[16] *Balancing Premarket and Postmarket Data Collection for Devices Subject to Premarket Approval Guidance for Industry and Food and Drug Administration Staff*, U.S. DEPT OF HEALTH & HUM. SERVS., at 5, Apr. 13, 2015, https://www.fda .gov/media/88381/download.

began submitting its PMA application for the Trilogy device much earlier as part of the modular PMA review process, with its first submission in March 2023. Its submission in June 2025 was the final submission in the modular process. Importantly, the modular review process allows the PMA review to be more efficient because the FDA will review (and, if necessary, respond) as modules are received "potentially shortening the time to a final decision."[17] Thus, a more accurate characterization of the timeline would be that the FDA PMA application review process for Trilogy started in March 2023, and the final step was taken in June 2025.

## VI. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN FLAWED ANALYSIS OF THE COMPLEXITY AND UNCERTAINTY IN THE FDA APPROVAL PROCESS FOR HIGH-RISK MEDICAL DEVICES

19. As explained in Section IV of the Kesselheim Report, the FDA regulatory approval process is complex, and occasions exist for both expediting and delaying the FDA regulatory timeline. Both Dr. Bailey and Mr. McWilliams emphasize missed forecasts and moving approval dates for JenaValve's Trilogy in their reports.[18] However, this is simply indicative of the complexities of the FDA regulatory process, and any other TAVR-AR device manufacturer may likewise encounter unforeseen delays as it proceeds through the same FDA process.[19] For example, similar to JenaValve's shifting forecasts for Trilogy's FDA approval, Edwards initially forecast an early 2028 FDA PMA approval for J-Valve, but now predicts that approval will not occur until early 2029.[20] As another example, the Watchman device—which Mr. McWilliams refers to in ¶¶ 58-60 of his report—was approved by the FDA nearly two years after its application was received by the agency (application received on May 14, 2013 and application decision on March 13, 2015).[21] This 22-month review period was after the FDA required the sponsor to conduct a second clinical trial because the first clinical trial did not provide sufficient evidence for the FDA to approve the device, in large part due to adverse events.[22]

## VII. COMPLEX FDA REGULATIONS DICTATE THE APPROVAL OF HIGH-RISK DEVICES USED IN THE UNITED STATES

20. Dr. Bailey's assertion that there are no differences between TAVR-AR innovation in the United States and abroad does not address the impact of the FDA's regulatory requirements on device development.[23] "[B]roaden[ing] . . . clinical implants to US sites" is not simply a matter of choosing to start a clinical trial in the United States.[24]

[17] Kesselheim Report ¶ 69.
[18] *See* Bailey Report ¶ 38, Ex. 8; McWilliams Report ¶ 81.
[19] *See e.g.,* Kesselheim Report ¶ 81 (noting that [redacted]).
[20] *See* PX7019 (Wood (EW) Dep.) at 59:15-61:6.
[21] FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P130013.
[22] Arezu Sarvestani, *Boston Scientific's Watchman misses 1 of 2 efficacy goals in PREVAIL trial*, MASSDEVICE, (July 1, 2014), https://www.massdevice.com/boston-scientifics-watchman-misses-1-2-efficacy-goals-prevail-trial/.
[23] Bailey Report ¶ 90.
[24] Bailey Report ¶ 90.

First, as explained in the Kesselheim Report, there are regulatory requirements that must be met before a device manufacturer can begin a clinical trial in the United States; and it takes time to apply for and meet these requirements.[25] Second, while device manufacturers may take developmental steps abroad, I described in the Kesselheim Report why it is likely that TAVR-AR devices will need clinical study data from the United States to support any application for FDA approval.[26]

21. First, as explained in Section IV of the Kesselheim Report, a device manufacturer seeking to begin U.S. clinical trials for a device like TAVR-AR must first apply for and receive an IDE.[27] This process will likely take some time and begins even before submission of the IDE application itself: from gathering the necessary information for an IDE application to organizing the application for the IDE. A number of requirements must be met to receive an IDE, and sponsors typically engage with the FDA prior to IDE application submission.[28] I understand that both JC Medical and JenaValve have engaged with the FDA in the process of submitting IDE applications.[29] In addition, while the FDA has up to 30 days to review an IDE application, I discuss in the Kesselheim Report how a variety of factors can add time to the IDE application review process, ranging from rounds of questions and answers to a hold on the application.[30]

22. JC Medical's experience with J-Valve provides a good example of what could happen in the IDE application process. Prior to the submission of its IDE, JC Medical was developing J-Valve in China. As noted in the Kesselheim Report, JC Medical originally developed the J-Valve as a transapical TAVR-AR device before innovating it to a transfemoral system.[31] Early concept development of a transfemoral J-Valve began in August 2015,[32] and the transapical version of J-Valve received approval from China's National Medical Products Administration in 2017.[33] The first-in-human implantation of transfemoral J-Valve occurred in Canada in 2018.[34] The first implantation of transfemoral J-Valve in the United States occurred as a

[25] Kesselheim Report Section IV.
[26] *See* Kesselheim Report ¶¶ 89-91, 112-114.
[27] *See* Kesselheim Report ¶¶ 41-45.
[28] *See* Kesselheim Report ¶ 45.
[29] *See, e.g.*, PX2543 at 001-002, 006 (JVT, Email and Attachments, Q230831/S003 Pre-Submission: Next Generation JVT AR Trial, July 30, 2024); PX2544 at 001 (Email from K. Soucy, FDA, to G. Taschner, JVT, Mar. 22, 2024) (confirming the conversion of JenaValve's IDE for its ARTIST RCT to a pre-submission); PX1630 at 003 (JC Medical, Regulatory/Clinical Plan Project 08, J-Valve Prime) (noting plan to "collaborate with FDA on a study design and strategy for an Early Feasibility study and the IDE application for the study."); PX1631 at 001-004 (Email chain between M. Turco, JCM and H. Tashman, FDA, and S. Aloyan, Consultant, May 26, 2023-June 8, 2023) (discussing pre-submission meetings with the FDA regarding J-Valve's EFS).
[30] *See* Kesselheim Report ¶ 45; *see also* PX7019 (Wood (EW) Dep.) at 35:1-36:2 (noting that the IDE review process could take much longer than 30 days).
[31] Kesselheim Report ¶ 79; PX7030 (Turco (EW) Dep.) at 221:2-11.
[32] Kesselheim Report ¶ 79; PX1057 at 004 (JCM, Presentation on J-Valve History, Dec. 11, 2023); *see also* PX7005 (Turco (EW) Investigational Hr'g) at 139:23-140:4.
[33] *See* PX1179 at 022 (JCM, J-Valve Transfemoral System Pre-Submission Meeting IDE G190117, Feb. 7, 2023).
[34] *JC Medical Announces First-in-Human Treatment with the Unique Transfemoral J-Valve TAVI Device for Aortic Regurgitation*, BIOSPACE (May 31, 2018), https://www.biospace.com/jc-medical-announces-first-in-human-treatment-with-the-unique-transfemoral-j-valve-tavi-device-for-aortic-regurgitation.

compassionate use case in early 2019.[35] After several years of development, much of it abroad, JC Medical submitted its FDA IDE application for J-Valve on May 7, 2019.[36] One month later, on June 7, 2019, the FDA did not approve the application.[37] It appears that JC Medical then engaged with the FDA regarding the decision in 2019, and engaged again beginning in 2021.[38] In 2021, the FDA recommended a pre-submission discussion given the amount of time that had passed since initial submission of the IDE.[39] J-Valve ultimately received approval of its IDE on August 31, 2023.[40]

23. Approval of an IDE is the first step for initiating an in-human clinical study of high-risk medical devices in the United States and is just one piece of a complex and demanding FDA regulatory process. The IDE application process may take longer than expected and there is no guarantee that the IDE will be approved.

24. Second, as I found in the Kesselheim Report, it is likely that a device like TAVR-AR will need clinical study data from the United States in support of its application for FDA approval.[41] Section V.B of the Kesselheim Report explained how ex-U.S. clinical trial data rarely form the entire clinical basis for high-risk device approvals.[42] As a more specific comparison to TAVR-AR, Section VII.B of the Kesselheim Report analyzed the location of data used to support the FDA approval of TAVR-AS devices, and I found that no TAVR-AS device's PMA approval relied solely on ex-U.S. data.[43] Accordingly, I expect that TAVR-AR devices seeking FDA approval will similarly need to gather U.S. data to support their PMA applications and thus need an IDE to begin collecting those clinical data.[44]

25. To the extent that a TAVR-AR device seeks to include ex-U.S. clinical data in support of a future FDA approval, we can already see from JenaValve's experience that it may not be as simple as just importing the data. As discussed in Section V.B. of the Kesselheim Report, JenaValve was unable to include EU-based early feasibility study (EFS) data in Trilogy's PMA application, even after it revised part of the study's protocol to conform to the protocol of its U.S. EFS.[45] In addition, in ¶ 90 of the Kesselheim Report, I explain several reasons why ex-U.S. data rarely comprise

---

[35] *JC Medical Announces First U.S. Treatment With J-Valve TAVR Device*, DIAGNOSTIC AND INTERVENTIONAL CARDIOLOGY (Jan. 7, 2019), https://www.dicardiology.com/content/jc-medical-announces-first-us-treatment-j-valve-tavr-device; *see also* Kesselheim Report ¶ 80.
[36] PX1632 at 005.
[37] *Id*. at 005.
[38] *Id*. at 004-005.
[39] *See Id*. at 004.
[40] *See* PX1633 at 003.
[41] *See* Kesselheim Report ¶¶ 89-91, 112-114.
[42] *See* Kesselheim Report ¶¶ 89-91.
[43] *See* Kesselheim Report ¶¶ 112-114 & Table 5.
[44] Kesselheim Report ¶ 114.
[45] *See* Kesselheim Report ¶ 91.

the sole clinical basis for FDA approval, including relevance of the patient population and trial design.[46]

26. Dr. Bailey and Mr. McWilliams's reports appear to equate the developmental status of devices abroad with the development status of devices—specifically Trilogy and J-Valve—that are already being reviewed and regulated by the FDA.[47] For the reasons noted above and in the Kesselheim Report, it is incorrect to equate these developmental stages. As I explained in the Kesselheim Report, the FDA has regulatory requirements for clinical studies and the steps leading up to any PMA application.[48] Achieving developmental milestones abroad does not necessarily allow a sponsor to skip any steps in the FDA regulatory process. For example, although JenaValve's Trilogy received a CE mark in Europe around May 25, 2021, around the same time, JenaValve was between withdrawing its Humanitarian Use Device designation and seeking an IDE for its pivotal trial in support of a PMA application.[49] JenaValve's experience shows that regardless of achieving major developmental milestones abroad, the Trilogy device still had to make its way through the steps of the FDA regulatory approval process.[50] Moreover, based on my finding that ex-U.S. data rarely form the entire clinical basis for high-risk device approvals, achieving foreign developmental milestones generally has not allowed sponsors to skip any steps in the FDA's PMA approval process.[51] As explained above, I expect that TAVR-AR devices in development abroad will need to follow the same FDA regulatory steps as J-Valve and Trilogy that begin with an IDE and clinical studies in the United States.

## VIII. DEVELOPMENTAL TIMELINES SHOW THAT J-VALVE AND TRILOGY ARE NOT SIMILARLY SITUATED TO OTHER FOREIGN DEVELOPERS OF TAVR-AR

27. The McWilliams Report asserts that many of the TAVR-AR devices in development outside of the United States "are in a similar situation to J-Valve."[52] However, Mr. McWilliams appears to conflate the developmental status of J-Valve occurring under the FDA regulatory process with the developmental status of devices occurring in other jurisdictions. As explained above and in the Kesselheim Report, the FDA has specific requirements in its regulatory pathway to PMA approval, which do not presume an equivalence between development abroad and development in the United States.[53] Once we take into account that J-Valve is currently in the FDA regulatory process, and at what point J-Valve is in that process, it becomes clear that TAVR-AR

[46] *See* Kesselheim Report ¶ 90; *cf.* PX7035 (Zovighian (EW) Dep.) at 112:8-113:3 (noting concerns with the quality of Chinese clinical data for FDA approval).
[47] *See* Bailey Report ¶¶104-106 & Exs. 27-28; McWilliams Report ¶¶ 122-126.
[48] *See* Kesselheim Report Section IV.
[49] *JenaValve Technology Receives CE Mark for its Trilogy™ TAVI System for the Treatment of Aortic Regurgitation and Aortic Stenosis*, JENAVALVE (May 25, 2021), https://jenavalve.com/jenavalve-receives-ce-mark/; Kesselheim Report ¶ 76.
[50] *See* Kesselheim Report ¶¶ 74-78.
[51] *See* Kesselheim Report Section V.B.
[52] McWilliams Report ¶ 129.
[53] *See supra* Section IX; *see also* Kesselheim Report at Section IV, Section V.A-B.

devices in development outside of the United States and outside of the FDA regulatory process are not similarly situated to J-Valve.

28. In addition, the McWilliams Report misapplies and mischaracterizes the findings from my initial report regarding the timeline of approval for J-Valve and Trilogy.[54] Mr. McWilliams notes that TAVR-AR devices in ex-U.S. development may need "perhaps five years, according to numbers reported in the Kesselheim Expert Report" for PMA approval and references my evaluation of J-Valve and Trilogy's expected approval timelines.[55] However, given the regulatory milestones already achieved by J-Valve and Trilogy, they are not an accurate indicator for devices being developed outside the United States. In my report, I found that if Edwards resumes the JOURNEY trial in the first half of 2026 and it enrolls patients in a timely fashion, it will be about five or six years from the time J-Valve received IDE approval to its expected FDA PMA approval date in late 2028 or early 2029.[56] I also found that for Trilogy, nearly six years will have passed between IDE-EFS approval to expected PMA approval, if one discounted the time spent solely on JenaValve's transapical device and the years during which JenaValve conducted its studies under a Humanitarian Use Device designation.[57] These timeframes are only from IDE to expected approval for each of these devices.[58] I found in the Kesselheim Report that that the TAVR-AR devices in development outside of the United States likely have five to ten years before they may obtain FDA approval in the United States.[59]

### A. J-Valve and Trilogy Are Most Advanced in the FDA Approval Process

29. Despite the assertions made in the Bailey Report, there is a strong likelihood that Edwards and JenaValve will receive FDA approval for their TAVR-AR devices in the near- and medium-term.[60] Both manufacturers are further ahead in the development timeline than the other TAVR-AR manufacturers listed in the Bailey Report.[61] In addition, the balance of evidence does not indicate that JenaValve will be in the minority of sponsors that do not receive FDA PMA approval, which is expected in the first quarter of 2026.[62] Though JenaValve received a deficiency letter from the FDA in September 2025, this is a normal occurrence during the PMA approval

[54] *See* McWilliams Report ¶ 130 & n.268.
[55] McWilliams Report ¶ 130.
[56] Kesselheim Report ¶ 82.
[57] Kesselheim Report ¶ 78. Note that while my initial report used the acronym "HDE" in Section IV.E.1., this referred to Trilogy's efforts to conduct clinical studies under a Humanitarian Use Device designation to support a potential application for a Humanitarian Device Exemption.
[58] As indicated in my initial report, it took J-Valve four years to receive approval of its IDE application. *See* Kesselheim Report ¶ 80.
[59] *See* Kesselheim Report ¶ 95.
[60] *See* Bailey Report ¶ 54.
[61] *See infra* Section IX.A.
[62] PX0044 at 019 (JVT Responses to FTC's First Set of Interrogatories); PX7038 (Kilcoyne (JVT 30(b)(6)) Dep.) at 173:1-8; PX7017 (Spadaro (JVT) Dep.) 18:1-23.

process.[63] JenaValve has achieved many key milestones in the FDA PMA approval process, including IDE approval, the completion of the pivotal trial, and the initiation of modular approval in 2023. Even the acceptance of JenaValve's PMA application in June 2025 is notable. The FDA will not file the full PMA application for review if it does not meet a minimum threshold of acceptability, including if information is incomplete or the data are unlikely to withstand rigorous scientific review.[64]

30. Similarly, the balance of evidence does not indicate that Edwards will be in the minority of sponsors that do not receive FDA PMA approval after starting a pivotal trial. It is a major hurdle to receive IDE approval for a pivotal trial, because the FDA must review prior data collected and organized from laboratory and animal studies, assess the risk of the device, and approve the study protocol.[65] This process can involve responding to many rounds of questions from the FDA, during which time the FDA develops an understanding of the device and contours of the future clinical study.[66] While I understand that the JOURNEY trial is paused, Edwards has said that it plans to resume the trial in the first half of 2026.[67]

## IX. THE MCWILLIAMS AND BAILEY REPORTS CONTAIN FAULTY ASSERTIONS ABOUT "FAST FOLLOWER" TAVR-AR DEVICES

### A. No TAVR-AR Device Developer Other than Edwards and JenaValve is Approaching FDA Approval

31. As I stated in ¶¶ 92-93 of the Kesselheim Report, I reviewed the information available for the eight device manufacturers, other than Edwards and JenaValve, that Defendants have identified in various stages of developing TAVR-AR devices, and it does not appear that any of these manufacturers have yet taken any obvious steps toward approval of their devices in the United States.[68] Although Dr. Bailey and Mr. McWilliams call out some of these companies and devices in their respective reports, neither Report discloses any steps related to initiating the FDA regulatory process.[69]

---

[63] *See* FDA, *PMA Review Process* (May 5, 2025), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-review-process*; see also* PX7016 (Dearen (JVT) Dep.) at 62:2-19 ("In my experience, regardless of what your PMA or 510k application and data is to the FDA, they are going to ask questions. And those questions come in a letter which is referred to as a deficiency letter.").
[64] FDA, *PMA Review Process* (May 5, 2025), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-review-process.
[65] *See* 21 C.F.R. § 812.20(b). Kesselheim Report ¶ 45.
[66] *FDA Responses and Meetings for IDE Submissions*, NIH CLINICAL CENTER, https://www.cc.nih.gov/orcs/ide/fda-responses.
[67] PX7026 (Bierman (EW) Dep.) at 137:15-138:25.
[68] *See* Kesselheim Report ¶ 93 (explaining obvious steps to seek FDA approval include "obtaining an IDE to conduct any clinical studies or trials in the United States or applying for IRB approval for testing in a U.S. site.").
[69] *See* Bailey Report ¶ 91 (and materials cited); McWilliams Report ¶ 128 & Ex. 7; Kesselheim Report ¶¶ 93-95 (also noting it is likely that these devices still have five to ten years before they may obtain FDA approval in the United States); PX2193 at 015 (JVT, JenaValve Talk Track First Half 2024) (noting that LagunaTech's Alpha Valve, HanchorValve, KOKA Pioneer Valve, and KenValve are in early clinical stages and "will not be available for 5+ years.").

32. As I discuss above, meaningful engagement with the FDA regulatory process provides the most useful indicator of seeking high-risk device approval in the United States.[70] The appearance of companies such as Peijia Medical, INT/Hanling Medical, and Jenscare at conferences, such as the 2025 Transcatheter Cardiovascular Therapeutic ("TCT") Conference—as Dr. Bailey highlights—is not one of these steps, since it is common for manufacturers of all types to attend medical conferences. Such conferences are not intended for manufacturers with a plan to commercialize their devices imminently in the United States; research at any stage may be presented at these scientific meetings.[71] While companies may share information regarding development outside of the United States at conferences or through academic publications, generally the most reliable public indicator of device development in the United States is a U.S.-based clinical study.[72]

33. As Dr. Bailey recognizes in her **Exhibit 27** (Worldwide TAVR-AR R&D Products), INT/Hanling Medical's Hanchor Valve has reached pivotal trial status only in China, and Jenscare's Kenvalve is commercialized only in China.[73] As Dr. Bailey correctly points out in her backup materials, Peijia Medical uses the intellectual property it licenses from JenaValve to develop and commercialize a version of JenaValve's Trilogy exclusively in China.[74] This suggests it is unlikely that Peijia Medical would commercialize that device in the United States.

34. JenaValve and Edwards are the only manufacturers that currently have approved IDEs for U.S. clinical studies evaluating their respective TAVR-AR devices. Based on the above and the information in the Kesselheim Report, no other company is approaching PMA approval.[75]

35. Both the Bailey Report and the McWilliams Report suggest that high-risk devices, like TAVR-AS or TAVR-AR devices, may have an expedited path to FDA approval if similar devices have already received FDA approval.[76] However, as I explained in the Kesselheim Report, this is not necessarily the case.[77] Unlike generic versions of brand-name pharmaceutical products, which can receive FDA approval quickly after market exclusivity of the brand-name version ends, there is no formal expedited FDA approval process for high-risk medical devices. The amount of clinical testing required for certain generic drugs to achieve FDA approval is substantially less than the initial pharmaceutical product. The regulation of high-risk medical devices, however, works differently. The FDA generally requires all new high-risk devices to follow consistent steps, including securing IDE approval, conducting feasibility

[70] *See supra* ¶ 21.
[71] *See* Bailey Report ¶ 91; CARDIOVASCULAR RESEARCH FOUNDATION, *About TCT 2025*, https://www.tctconference.com/about-tct.
[72] *See* Bailey Report ¶¶ 98-99 & Ex. 25-26. As noted in my initial report, information regarding IDEs and their approval is not publicly released by the FDA. *See* Kesselheim Report ¶ 46.
[73] *See* Bailey Report ¶ 105 & Ex. 27. Dr. Bailey does not include Peijia Medical in Exhibit 27.
[74] JENAVALVE, *JenaValve Announces Strategic Investment and Licensing Agreement with Peijia Medical Limited* (Jan. 18, 2022), https://jenavalve.com/agreement-w-peijia-medical-ltd/.
[75] *See* Bailey Report ¶ 82.
[76] *See* Bailey Report ¶¶ 48-51; McWilliams Report ¶ 104.
[77] *See* Kesselheim Report Section IV.A-B, E, Section V.C, Section VII.

studies and pivotal trials, and obtaining FDA approval of a PMA application demonstrating reasonable assurance of safety and effectiveness. The weight of the evidence—available in the literature and described in the case of TAVR-AS in the Kesselheim Report—shows that follow-on high-risk medical device manufacturers are overall not appreciably faster in their development times.[78]

### B. The Bailey and McWilliams Reports Suggest that Acquisitions Create "Fast Followers;" However, TAVR-AS Timelines Do Not Show that Acquisitions Accelerated FDA Approval

36. The Bailey Report describes "fast followers" in the context of U.S. TAVR-AS products "who acquired firms to enter or strengthen their R&D pipeline products."[79] Similarly, the McWilliams Report asserts that a fast follower effect exists in the structural heart space.[80] However, as analyzed and discussed in the Kesselheim Report, I found that the regulatory timelines from pivotal trial to PMA approval for the initial devices from Edwards, Medtronic, Boston Scientific, and Abbott were consistent with the general timeline for Class III devices.[81] In addition, I found that the presence of an FDA-approved TAVR-AS device did not markedly speed the development or FDA approval process of the next-in-class device.[82]

37. Consistent with these findings from the Kesselheim Report, the TAVR-AS timeline from acquisition to approval does not show an accelerated FDA approval process. As demonstrated in **Table 1**, the time between acquisition and FDA approval of each TAVR-AS device was approximately six years. Notably, PORTICO had already begun its U.S. pivotal trial three years prior to its acquisition.

**Table 1: TAVR-AS Acquisition to FDA Approval**

| Device | Date of Acquisition | Pivotal Trial Start Date | Date of FDA Approval | Time from Acquisition to Approval |
|---|---|---|---|---|
| Edwards Sapien[83] | Jan. 2004[84] | May 2007[85] | Nov. 2011[86] | ~8 years |

[78] *See* Kesselheim Report Section VII.A.
[79] *See* Bailey Report ¶¶ 48, 50-51.
[80] *See* McWilliams Report Section VI.A.
[81] *See* Kesselheim Report ¶¶ 110-111, Section IV.B.
[82] Kesselheim Report ¶ 111.
[83] Footnote 39 of Dr. Bailey's expert report states that "Edwards acquisition of PVT in combination with Edwards research stream jumpstarted Edwards' innovation in TAVR-AS."
[84] EDWARDS, *Edwards Lifesciences Completes Acquisition of Percutaneous Valve Technologies for $125 Million*, (Jan. 27, 2004), https://ir.edwards.com/news/news-details/2004/Edwards-Lifesciences-Completes-Acquisition-of-Percutaneous-Valve-Technologies-for-125-Million/default.aspx.
[85] Raj R. Makkar, M.D. et al., *Transcatheter Aortic-Valve Replacement for Inoperable Severe Aortic Stenosis*, 366 N ENG, J. MED 1696-1704 (May 3, 2012), https://www.nejm.org/doi/full/10.1056/NEJMoa1202277.
[86] FDA, *Summary of Safety and Effectiveness Data: Edwards SAPIEN Transcatheter Heart Valve*, (Nov. 2, 2011), https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf.

| Device | Date of Acquisition | Pivotal Trial Start Date | Date of FDA Approval | Time from Acquisition to Approval |
|---|---|---|---|---|
| Medtronic CoreValve[87] | April 2009[88] | Dec. 2010[89] | Jan. 2014[90] | ~5 years |
| Boston Scientific LOTUS[91] | Nov. 2010[92] | Sept. 2014[93] | April 2019[94] | ~8.5 years |
| Abbott Medical PORTICO[95] | Jan. 2017[96] | May 2014[97] | Sept. 2021[98] | ~4.5 years |

38. No such acquisitions have yet occurred in the TAVR-AR market. JenaValve's Trilogy device has finished PMA submission, and J-Valve is in pivotal trials. No other TAVR-AR devices have received IDE approval as of the date of this reply report. Given my findings in the Kesselheim Report, the timelines in **Table 1**, and reasons noted above regarding the status of devices developed outside of the United

[87] *See* Bailey Report ¶ 21.
[88] *See* Bailey Report n.34; *see also Medtronic Acquires Corevalve, Ventor Technologies*, MANUFACTURING.NET (April 10, 2009), https://www.manufacturing.net/supply-chain/news/13068879/medtronic-acquires-corevalve-ventor-technologies.
[89] MEDTRONIC, *Landmark Medtronic CoreValve(r) U.S. Clinical Trial Begins*, NEWSROOM (Dec. 21, 2010), https://news.medtronic.com/2010-12-21-Landmark-Medtronic-CoreValve-R-U-S-Clinical-Trial-Begins.
[90] FDA, *Summary of Safety and Effectiveness Data: Medtronic* (Jan. 17, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130021B.pdf.
[91] *See* Bailey Report ¶ 50. The Bailey Report also notes the purchase of Symetis by Boston Scientific in 2017. *See id.* However, I understand that this acquisition has not resulted in FDA regulatory approval, even though eight years have passed since the acquisition. *See Boston Scientific to buy TAVR upstart Symetis for $435M days ahead of IPO*, BIOWORLD (March 31, 2017), https://www.bioworld.com/blogs/2-bioworld-medtech-perspectives/post/672-boston-scientific-to-buy-tavr-upstart-symetis-for-435m-days-ahead-of-ipo. Boston Scientific appears to have discontinued efforts to seek FDA approval earlier this year. *See* BOSTON SCIENTIFIC, *The ACURATE™ Aortic Valve Platform*, https://www.bostonscientific.com/en-US/medical-specialties/structural-heart/acurate-ide-trial/acurate-neo2-for-physicians.html (last visited Oct. 31, 2025); *Boston Scientific Discontinues Acurate Neo2 and Acurate Prime TAVR Systems*, CARDIAC INTERVENTIONS TODAY (May 28, 2025), https://citoday.com/news/boston-scientific-discontinues-acurate-neo2-and-acurate-prime-tavr-systems.
[92] *See* Bailey Report n.108; BOSTON SCIENTIFIC, *Boston Scientific to Acquire Sadra Medical* (Nov. 19, 2010), https://news.bostonscientific.com/sadra-medical-acquisition-agreement.
[93] BOSTON SCIENTIFIC, *Boston Scientific Enrolls First Patients in U.S. Trial Of the Lotus Valve System* (Sept. 23, 2014), https://news.bostonscientific.com/2014-09-23-Boston-Scientific-Enrolls-First-Patients-In-U-S-Trial-Of-The-Lotus-Valve-System.
[94] FDA, *Summary of Safety and Effectiveness Data: LOTUS Edge™ Valve System* (Apr. 23, 2019), https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029B.pdf
[95] *See* Bailey Report ¶ 50.
[96] *See* Bailey Report n.110; ABBOTT, *Abbott Completes the Acquisition of St. Jude Medical* (Jan. 4, 2017), https://abbott.mediaroom.com/2017-01-04-Abbott-Completes-the-Acquisition-of-St-Jude-Medical.
[97] Raj R. Makkar et al., *Portico Valve Meets Non-Inferiority Criteria for Safety and Efficacy in Two-Year Analysis, Clinical Insights* (2021), https://www.structuralheart.abbott/fileadmin/content/clinical-research/clinical-insights/Clinical_Insights_Portico_IDE-2Yr_Results_US_MAT-2101938_v1.0_FINAL.pdf.
[98] FDA, *Summary of Safety and Effectiveness Data: Portico™ Transcatheter Aortic Valve Implantation System* (Sept. 17, 2021), https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf

States, it seems likely that a similar acquisition of a TAVR-AR device would be faced with the FDA regulatory timelines described in the Kesselheim Report.[99]

## X. THE MCWILLIAMS REPORT MISINTERPRETS FIGURE 4 FROM THE KESSELHEIM REPORT

39. The McWilliams Report duplicates Figure 4 of the Kesselheim Report. Mr. McWilliams asserts that "Edwards continued to innovate through updates to its product *before* Medtronic introduced CoreValve" and states that Figure 4 "is consistent with competition from devices not commercialized in the U.S. spurring innovation."[100] To be clear, Figure 4 shows the continuing innovation of TAVR-AS devices, as evidenced by original PMA applications and their supplements.[101] In drawing his conclusions in ¶ 127, Mr. McWilliams appears to overlook the U.S. developmental status of Medtronic's CoreValve that I had noted in the Kesselheim Report and expand upon below.[102]

40. If you overlay Figure 4's evidence of continuing innovation—focusing on Sapien, Sapien XT, and CoreValve, highlighted in the McWilliams Report[103]—with known dates of FDA milestones and available information from Edwards, it appears that Edwards was aware of CoreValve's U.S. development long before CoreValve was approved by the FDA, and even before Sapien's approval.[104] The following information also suggests that Edwards was already aware that Medtronic was taking clear steps towards FDA approval at least four years prior to the 2014 approval of the CoreValve TAVR-AS device.[105]

41. Edwards appears to have been aware of the U.S. development of Medtronic's CoreValve at least as early as September 2010.[106] This predates both Medtronic's October 2010 press release announcing the FDA's approval of its IDE for CoreValve and its pivotal clinical trial protocol, in addition to the beginning of the pivotal trial in December 2010.[107] As outlined in Sections IV and V of the Kesselheim Report,

---

[99] *See supra* Section IX.A; Kesselheim Report Sections IV, V.C, VII.A.
[100] *See* McWilliams Report ¶127.
[101] *See* Kesselheim Report ¶¶ 115-119 & Fig. 4.
[102] *See* Kesselheim Report ¶ 117.
[103] *See* McWilliams Report ¶ 127.
[104] *See* PX1276 at 006 (EW, THV Presentation, 2011) ("It is critical for Edwards to reach all viable sites within ~2 years to ensure site independence prior to Medtronic CoreValve market entry").
[105] PX1276 at 028 (EW, THV Board Presentation, Sept. 2010) (estimating the timeline for Medtronic's CoreValve to conduct its clinical trials, file its PMA application and receive PMA approval).
[106] *See* PX1276 at 021, 024, 028 (EW, THV Board Presentation, Sept. 2010).
[107] MEDTRONIC, *Medtronic Clinical Trial Receives FDA Approval to Evaluate New CoreValve(R) System for Aortic Valve Implantation* (Oct. 15, 2010), https://news.medtronic.com/2010-10-15-Medtronic-Clinical-Trial-Receives-FDA-Approval-to-Evaluate-New-CoreValve-R-System-for-Aortic-Valve-Implantation (noting that a co-principal investigator of the trial stated that the study was a "first step in bringing this important transformational therapy to patients in the United States"); MEDTRONIC, *Landmark Medtronic CoreValve(R) U.S. Clinical Trial Begins*, (Dec. 21, 2010), https://news.medtronic.com/2010-12-21-Landmark-Medtronic-CoreValve-R-U-S-Clinical-Trial-Begins.

applying for an IDE is a clear indication of a manufacturer's intention to seek FDA approval for a high-risk medical device.

42. The McWilliams Report also cites the 2014 approval of the Edwards Sapien XT product as evidence of innovation prior to FDA approval of the CoreValve product. Mr. McWilliams states that "[approval of the Sapien XT product] could not have been done unless it was being developed years in advance of that Medtronic approval."[108] The Sapien XT product was in development prior to 2014, but the Sapien XT PMA cohort began treatment in April 2011, *after* Medtronic announced the approval of the CoreValve IDE and the start of the CoreValve U.S. trial in 2010.[109] In addition, to the extent that Mr. McWilliams is using Figure 4 to suggest that Edwards developed Sapien XT unaware of CoreValve's development, that is incorrect. An Edwards document from September 2010 states that "The U.S. Launch Strategy is to Launch SAPIEN XT in the U.S. Market Before Medtronic CoreValve Enters."[110]

43. Indeed, Mr. McWilliams's opinion, properly understood in light of the information and FDA regulatory milestones outlined above, only underscores that Figure 4 is consistent with the effect of pre-approval innovation on medical device development in the United States.

## XI. THE MCWILLIAMS AND BAILEY REPORTS MISSTATE EVIDENCE OF INNOVATION

44. The Bailey Report counts the number of patients enrolled in clinical trials and the overall number of trials in the five years following FDA approval of an original PMA application as indicators of high-quality innovation.[111] Without further details, these are not clear measures of innovation. Large clinical trials and small clinical trials can both be rigorous and lead to important findings. Moreover, even if we consider Dr. Bailey's analysis—setting aside the unsupported use of these numbers as measures of innovation—her methodology is flawed. Dr. Bailey claims that her methodology considers only the TAVR-AS clinical trials that began *after* FDA PMA approval of each manufacturer's initial TAVR-AS device.[112] This necessarily excludes the clinical trials that provided data to support initial PMA applications and thus ignores the development and innovation that occurred prior to FDA approval.

45. The McWilliams Report makes an erroneous assertion about innovation when it suggests that JenaValve will have a hard time bolstering uptake of its device after FDA approval because "only a small fraction (<5%)" of the 800 centers that could potentially implement a TAVR procedure in the United States were involved in the

[108] *See* McWilliams Report ¶127.
[109] FDA, *Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P130009* (June 16, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130009B.pdf.
[110] PX1276 at 028 (EW, THV Board Presentation, Sept. 2010); *see also* PX1618 at 033 (EW 2011 Strategic Plan, 2011).
[111] *See* Bailey Report ¶¶ 27-28.
[112] *Id*. Of note, Dr. Bailey does not even follow her own methodology in Exhibits 4 and 5 in the case of Boston Scientific, when she includes a trial (NCT03618095) that listed its start date in January 2019, approximately three months *before* PMA approval of the device by the FDA.

clinical trials.[113] But it is natural for medical device manufacturers to involve only a small number of sites in a clinical trial before wider dissemination occurs after FDA approval. Indeed, the FDA can expressly limit the number of institutions that a medical device manufacturer may involve in its clinical studies. For example, in May 2024, the FDA limited JC Medical to 25 institutions when conducting J-Valve's JOURNEY study,[114] and in July 2021, the FDA limited JenaValve to 30 institutions when conducting Trilogy's pivotal study.[115] Thus, JenaValve is no different from any other medical device manufacturer in its position. Likewise, the clinical trial that supported the first PMA application for TAVR-AS in the United States enrolled patients at just 21 sites (17 in the United States).[116]

46. The McWilliams Report also appears to present an overly narrow view of medical device innovation. Mr. McWilliams suggests that JenaValve will be "slower to achieve" long-term innovation and appears to present testimony that JenaValve is not considering a second-generation device in support of this point.[117] However, development of a second-generation device is not the only way that a manufacturer can express innovation in a device. As demonstrated in the Kesselheim Report, updates and improvements happen regularly for devices after FDA approval and can lead to changes that are useful for patients or physicians without requiring a new or next generation device.[118] In addition, as noted in the Kesselheim Report, the information available shows that JenaValve does have plans to innovate Trilogy, including the currently ongoing ARTIST trial and efforts to develop larger valve sizes.[119]

Dated: November 2, 2025



Aaron S. Kesselheim, M.D., J.D., M.P.H.

---

[113] McWilliams Report ¶ 55.
[114] *See* PX1595 at 001 (Letter from R. Neubrander, FDA, to C. Sloan, JCM, May 29, 2024).
[115] *See* PX2542 at 003 (Letter from N. Ibrahim, FDA, to J. Correa, JVT, July 28, 2021).
[116] M.B. Leon et al., *Transcatheter Aortic-Valve Implantation for Aortic Stenosis in Patients Who Cannot Undergo Surgery*. 363 New Eng. J. Med 1597-1607 (2010).
[117] McWilliams Report ¶ 116.
[118] *See* Kesselheim Report Section VI ("After a high-risk device is approved via PMA, manufacturers may make modifications to integral components of the device's design, such as improving how the device is deployed, increasing compatibility with other devices, or upgrading the material used in the device.").
[119] *See* Kesselheim Report Section VIII.

# APPENDIX A

## UPDATED LIST OF PUBLICATIONS

# APPENDIX A

Dr. Aaron Kesselheim Additional Publications
Date prepared: November 2, 2025

This list provides recent publications to supplement the list provided in Appendix A to the Kesselheim Report.


1. Sarpatwari A, Lee SB, Zakoul H, Tekle W, Freedman A, Belitkar S, Toyserkani GA, LaCivita C, Zhou EH, Oswell KH, Dal Pan GJ, **Kesselheim AS.** Patient Perceptions of and Experiences with Risk Evaluation and Mitigation Strategies. Clinical Pharmacology and Therapeutics 2025 Oct 11.

2. Ruas CM, Portela R, Acurcio F de A, Alvares-Teodoro J, Guerra Junior AA, **Kesselheim AS**. Pharmaceutical access in Brazil: challenges and opportunities. Globalization and Health 2025;21:57.

3. Vogel M, Feldman WB, Cowan Z, Rome BN, Chandra A, **Kesselheim AS**, Wouters OJ. Revenue Differences Between Top-Selling Small-Molecule Drugs and Biologics in Medicare. JAMA Health Forum 2025;6(10):e254720.

4. Mao X, Yin H, Bai X, **Kesselheim AS**, Li G. Therapeutic value and regulatory characteristics of breakthrough therapy drugs in the USA and China (2021-2023): a retrospective cohort study. Drug Discovery Today 2025 Oct 23:104508.

5. Carpenter D, Hwang TJ, **Kesselheim AS.** Flaws in the FDA's New Priority Voucher Program. New England Journal of Medicine 2025 Oct 25.

6. **Kesselheim AS**. Public funding of R&D and fair drug prices are essential to support innovation in biotechnology. Hearing before the Senate Committee on Health, Education, Labor and Pensions Subcommittee on The Future of Biotech: Maintaining U.S. Competitiveness and Delivering Lifesaving Cures to Patients (Sen. Cassidy, Chairman). 29 Oct 2025. United States Congressional Record.

7. Eisenkraft Klein D, Zenone M, **Kesselheim AS**. Glucagon-Like Peptide-1 Receptor Agonists and Pay-Per-Click Direct-to-Consumer Advertising. JAMA Netw Open. 2025 Oct 1;8(10):e2538718. doi: 10.1001/jamanetworkopen.2025.38718. PMID: 41171279

8. Kim J, **Kesselheim AS**, Rome BN. Halting hyaluronidase hopping to maintain the integrity of Medicare drug price negotiation. J Manag Care Spec Pharm. 2025 Nov;31(11):1107-1109. doi: 10.18553/jmcp.2025.31.11.1107. PMID: 41171065

# APPENDIX B

# ADDITIONAL MATERIALS RELIED UPON

# APPENDIX B
# LIST OF MATERIALS RELIED UPON

## I. Defendants' Materials

### a. Documents Produced by Edwards and JenaValve[1]

| PX No. | Bates No. |
|---|---|
| PX1057 | EW-FTC-10189314 |
| PX1179 | EW-FTC-10217497 |
| PX1276 | EW-FTC-10745933 |
| PX1595 | EW-FTC-10005425 |
| PX1618 | EW-FTC-10745953 |
| PX1630 | EW-FTC-10043986 |
| PX1631 | EW-FTC-10150946 |
| PX1632 | EW-FTC-10209535 |
| PX1633 | EW-FTC-10840996 |
| PX2193 | JenaValve-2R-00012728 |
| PX2542 | JenaValve-2R-00060435 |
| PX2543 | JenaValve-2R-00100664 |
| PX2544 | JenaValve-2R-00484207 |

### b. Defendants' Submissions and Correspondences

| PX No. | Description |
|---|---|
| PX0044 | JenaValve Responses and Objections to FTC's First Set of Interrogatories |

## II. Investigational Hearing and Deposition Transcripts[2]

| PX No. | Description |
|---|---|
| PX7005 | Investigational Hearing Transcript of Mark Turco (Edwards) (July 14, 2025) |
| PX7016 | Deposition Transcript of Dan Dearen (JenaValve) (September 25, 2025) |
| PX7017 | Deposition Transcript of Peter Spadaro (JenaValve) (September 25, 2025) |
| PX7019 | Deposition Transcript of Larry Wood (Edwards) (September 26, 2025) |
| PX7026 | Deposition Transcript of Jeremy Bierman (Edwards) (October 1, 2025) |
| PX7030 | Deposition Transcript of Mark Turco (Edwards) (October 3, 2025) |
| PX7035 | Deposition Transcript of Bernard Zovighian (Edwards) (October 3, 2025) |
| PX7038 | Deposition Transcript of John Kilcoyne (JenaValve 30(b)(6)) (October 6, 2025) |

[1] Including associated document family members where applicable.
[2] Including Exhibits.

## III. Expert Reports

| Description |
|---|
| Dr. Aaron Kesselheim Expert Report, October 12, 2025 |
| Mr. Dennis McWilliams Expert Report, October 23, 2025 |
| Dr. Elizabeth Bailey Expert Report, October 23, 2025 |

## IV. Scholarly Articles, Publicly Available Documents, and Other Materials

| Description |
|---|
| ABBOTT, *Abbott Completes the Acquisition of St. Jude Medical*, (Jan. 4, 2017), https://abbott.mediaroom.com/2017-01-04-Abbott-Completes-the-Acquisition-of-St-Jude-Medical. |
| Arezu Sarvestani, *Boston Scientific's Watchman misses 1 of 2 efficacy goals in PREVAIL trial*, MASSDEVICE, (July 1, 2014), https://www.massdevice.com/boston-scientifics-watchman-misses-1-2-efficacy-goals-prevail-trial/. |
| *Balancing Premarket and Postmarket Data Collection for Devices Subject to Premarket Approval Guidance for Industry and Food and Drug Administration Staff*, U.S. DEPT OF HEALTH & HUM. SERVS., at 5, Apr. 13, 2015, https://www.fda .gov/media/88381/download. |
| *Boston Scientific Discontinues Acurate Neo2 and Acurate Prime TAVR Systems*, CARDIAC INTERVENTIONS TODAY (May 28, 2025), https://citoday.com/news/boston-scientific-discontinues-acurate-neo2-and-acurate-prime-tavr-systems. |
| *Boston Scientific to buy TAVR upstart Symetis for $435M days ahead of IPO*, BIOWORLD (March 31, 2017), https://www.bioworld.com/blogs/2-bioworld-medtech-perspectives/post/672-boston-scientific-to-buy-tavr-upstart-symetis-for-435m-days-ahead-of-ipo. |
| BOSTON SCIENTIFIC, *Boston Scientific Enrolls First Patients in U.S. Trial Of the Lotus Valve System*, (Sept. 23, 2014), https://news.bostonscientific.com/2014-09-23-Boston-Scientific-Enrolls-First-Patients-In-U-S-Trial-Of-The-Lotus-Valve-System. |
| BOSTON SCIENTIFIC, *Boston Scientific to Acquire Sadra Medical*, (Nov. 19, 2010), https://news.bostonscientific.com/sadra-medical-acquisition-agreement. |
| BOSTON SCIENTIFIC, *The ACURATE™ Aortic Valve Platform*, https://www.bostonscientific.com/en-US/medical-specialties/structural-heart/acurate-ide-trial/acurate-neo2-for-physicians.html (last visited Oct. 31, 2025) |
| CARDIOVASCULAR RESEARCH FOUNDATION, *About TCT 2025*, https://www.tctconference.com/about-tct. |
| Danelle Hidano, *US Food and Drug Administration–Mandated Postmarketing Studies for High-risk Cardiovascular Devices Approved 2015-2019*, JAMA INTERN MED. (Mar. 14, 2022), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2790061. |
| David A. Schoenfeld, et al., *Statistical Considerations for Clinical Trials and Scientific Experiments*, https://hedwig.mgh.harvard.edu/sample_size /size.html. |

| Description |
|---|
| EDWARDS, *Edwards Lifesciences Completes Acquisition of Percutaneous Valve Technologies for $125 Million*, (Jan. 27, 2004), https://ir.edwards.com/news/news-details/2004/Edwards-Lifesciences-Completes-Acquisition-of-Percutaneous-Valve-Technologies-for-125-Million/default.aspx. |
| *FDA Responses and Meetings for IDE Submissions*, NIH CLINICAL CENTER, https://www.cc.nih.gov/orcs/ide/fda-responses. |
| FDA, *PMA Review Process* (May 5, 2025), https://www.fda.gov/medical-devices/premarket-approval-pma/pma-review-process. |
| FDA, *Premarket Approval (PMA)*, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma. cfm?id=P130013. |
| FDA, *Procedures for Meetings of the Medical Devices Advisory Committee: Guidance for Industry and Food and Drug Administration Staff* (Sept. 1, 2017), https://www.fda.gov/media/91429/download. |
| FDA, *Summary of Safety and Effectiveness Data: Edwards Lifesciences, PMA P130009* (June 16, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130009B.pdf. |
| FDA, *Summary of Safety and Effectiveness Data: Edwards SAPIEN Transcatheter Heart Valve*, (Nov. 2, 2011), https://www.accessdata.fda.gov/cdrh_docs/pdf10/P100041B.pdf. |
| FDA, *Summary of Safety and Effectiveness Data: LOTUS Edge™ Valve System* (Apr. 23, 2019), https://www.accessdata.fda.gov/cdrh_docs/pdf18/P180029B.pdf. |
| FDA, *Summary of Safety and Effectiveness Data: Medtronic* (Jan. 17, 2014), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130021B.pdf. |
| FDA, *Summary of Safety and Effectiveness Data: Portico™ Transcatheter Aortic Valve Implantation System* (Sept. 17, 2021), https://www.accessdata.fda.gov/cdrh_docs/pdf19/P190023B.pdf. |
| Institute of Medicine (US) Committee to Study the Use of *Advisory Committees; FDA Advisory Committees, Historical Evolution of FDA Advisory Committees*, Washington National Academies Press (US) (1992), https://www.ncbi.nlm.nih.gov/books/NBK236081/. |
| *JC Medical Announces First U.S. Treatment With J-Valve TAVR Device*, DIAGNOSTIC AND INTERVENTIONAL CARDIOLOGY (Jan. 7, 2019), https://www.dicardiology.com/content/jc-medical-announces-first-us-treatment-j-valve-tavr-device. |
| *JC Medical Announces First-in-Human Treatment with the Unique Transfemoral J-Valve TAVI Device for Aortic Regurgitation*, BIOSPACE (May 31, 2018), https://www.biospace.com/jc-medical-announces-first-in-human-treatment-with-the-unique-transfemoral-j-valve-tavi-device-for-aortic-regurgitation. |
| *JenaValve Technology Receives CE Mark for its Trilogy™ TAVI System for the Treatment of Aortic Regurgitation and Aortic Stenosis*, JENAVALVE (May 25, 2021), https://jenavalve.com/jenavalve-receives-ce-mark/. |
| JENAVALVE, *JenaValve Announces Strategic Investment and Licensing Agreement with Peijia Medical Limited* (Jan. 18, 2022), https://jenavalve.com/agreement-w-peijia-medical-ltd/. |
| M.B. Leon et al., *Transcatheter Aortic-Valve Implantation for Aortic Stenosis in Patients Who Cannot Undergo Surgery*. 363 New Eng. J. Med 1597-1607 (2010). |

| Description |
|---|
| *Medtronic Acquires Corevalve, Ventor Technologies*, MANUFACTURING.NET (April 10, 2009), https://www.manufacturing.net/supply-chain/news/13068879/medtronic-acquires-corevalve-ventor-technologies. |
| MEDTRONIC, *Landmark Medtronic CoreValve(r) U.S. Clinical Trial Begins*, NEWSROOM (Dec. 21, 2010), https://news.medtronic.com/2010-12-21-Landmark-Medtronic-CoreValve-R-U-S-Clinical-Trial-Begins. |
| MEDTRONIC, *Medtronic Clinical Trial Receives FDA Approval to Evaluate New CoreValve(R) System for Aortic Valve Implantation* (Oct. 15, 2010), https://news.medtronic.com/2010-10-15-Medtronic-Clinical-Trial-Receives-FDA-Approval-to-Evaluate-New-CoreValve-R-System-for-Aortic-Valve-Implantation. |
| Raj R. Makkar et al., *Portico Valve Meets Non-Inferiority Criteria for Safety and Efficacy in Two-Year Analysis, Clinical Insights* (2021), https://www.structuralheart.abbott/fileadmin/content/clinical-research/clinical-insights/Clinical_Insights_Portico_IDE-2Yr_Results_US_MAT-2101938_v1.0_FINAL.pdf. |
| Raj R. Makkar et al., *Transcatheter Aortic-Valve Replacement for Inoperable Severe Aortic Stenosis*, 366 N Eng, J. Med 1696-1704 (May 3, 2012), https://www.nejm.org/doi/full/10.1056/NEJMoa1202277. |
| Vinay K. Rathi et al., *Characteristics of Clinical Studies Conducted over the Total Product Life Cycle of High-Risk Therapeutic Medical Devices Receiving FDA Premarket Approval in 2010 and 2011*, JAMA (Aug. 11, 2015), https://jamanetwork.com/journals/jama/fullarticle/2425742. |
| Vinay K. Rathi, Aaron S. Kesselheim, et al., *Clinical Evidence Supporting US Food and Drug Administration Premarket Approval of High-Risk Otolaryngologic Devices*, 2000-2014, OTOLARYNGOL HEAD AND NECK SURGERY, Feb. 2017. |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2025, I caused the foregoing document to be served via electronic mail to:

Joshua Lipton
Michael J. Perry
Jamie E. France
Stephanie Pearl
Logan Billman
Connor Leydecker

GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
(202) 955-8226
jlipton@gibsondunn.com
mjperry@gibsondunn.com
jfrance@gibsondunn.com
spearl@gibsondunn.com
lbillman@gibsondunn.com
cleydecker@gibsondunn.com

D. Bruce Hoffman
Ryan A. Shores
Jeremy J. Calsyn
Jacob M. Coate
Kelton Anderson

CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
202-974-1500
rshores@cgsh.com
bhoffman@cgsh.com
jcalsyn@cgsh.com
jcoate@cgsh.com
keanderson@cgsh.com

*Counsel for Defendant Edwards Lifesciences Corporation*

Jonathan Klarfeld
Michael S. McFalls
Samer M. Musallam
Elizabeth McInerney

ROPES & GRAY LLP
2099 Pennsylvania Ave., NW
Washington, D.C. 20006
202-508-4600
Jonathan.Klarfeld@ropesgray.com
Michael.McFalls@ropesgray.com
Samer.Musallam@ropesgray.com
Elizabeth.McInerney@ropesgray.com

Matthew L. McGinnis

ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
617-951-7000
Matthew.McGinnis@ropesgray.com

*Counsel for Defendant JenaValve Technology, Inc.*

Respectfully submitted,

*/s/ Laura R. Hall*
Laura R. Hall
*Counsel for Plaintiff Federal Trade Commission*

*Confidential*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

EDWARDS LIFESCIENCES, CORP.

AND

JENAVALVE TECHNOLOGY INC.

Defendants.

No.: 1:25-cv-02569-RC

Hon. Rudolph Contreras

# Expert Reply Report of Dr. Nathan E. Wilson

## November 2, 2025

# TABLE OF CONTENTS


**I. INTRODUCTION AND SUMMARY OF OPINIONS .......... 1**

A. OVERVIEW AND ASSIGNMENT .......... 1

B. SUMMARY OF OPINIONS .......... 1

**II. DR. BAILEY AND MR. MCWILLIAMS DO NOT DISPUTE KEY POINTS FROM MY REPORT .......... 2**

A. TAVR-AR IS A RELEVANT MARKET .......... 2

B. PRODUCTS CAN BE COMPETITIVE CONSTRAINTS PRIOR TO COMMERCIALIZATION .......... 2

C. IT TAKES A LONG TIME TO COMMERCIALIZE A TAVR-AR PRODUCT .......... 3

D. TRILOGY AND J-VALVE ARE SUBSTITUTES FOR THE MAJORITY OF AR PATIENTS .......... 3

E. EDWARDS HAS INNOVATED IN THE TAVR-AS MARKET .......... 3

**III. DR. BAILEY'S CRITICISMS OF MY ANALYSIS OF COMPETITION IN THE TAVR-AR MARKET ARE UNFOUNDED .......... 4**

A. DR. BAILEY IS WRONG TO IGNORE THE IMPORTANCE OF PRESERVING COMPETITION'S EXPECTED VALUE .......... 4

B. DR. BAILEY ERRS IN DISMISSING MY CONCLUSION THAT THE MERGER WOULD RESULT IN A MONOPOLY .......... 6

C. DR. BAILEY'S CRITIQUE OF MY FORECAST OF PRICE EFFECTS IS UNCONVINCING .......... 9

D. DR. BAILEY CHERRY PICKS FROM THE ECONOMIC LITERATURE TO ARGUE THAT THE MERGER WOULD INCREASE INNOVATION .......... 11

E. DR. BAILEY IS WRONG IN DISMISSING THE LIKELIHOOD THAT EDWARDS WOULD REDUCE INNOVATION .......... 14

F. DR. BAILEY IS WRONG TO ASSERT THAT THERE IS A "WIDE" INNOVATION MARKET FOR TAVR-AR .......... 17

**IV. JENAVALVE DOES NOT HAVE TO BE ACQUIRED BY EDWARDS TO COMPETE .......... 19**

A. ORDINARY COURSE MATERIALS INDICATE JENAVALVE HAS OPTIONS FOR RAISING THE CAPITAL NEEDED TO PURSUE PRODUCT COMMERCIALIZATION AND ADDITIONAL INNOVATION .......... 19

*1. Other Companies Have Demonstrated an Interest in Acquiring or Partnering with JenaValve and Could Do So in the Future .......... 19*

*2. JenaValve Could Raise Capital from Investment Funds or the Public Markets* ........ *22*

B. JENAVALVE'S CURRENT FINANCIAL AND COMMERCIAL CONDITION IS CONFOUNDED WITH THE DECISION TO BE ACQUIRED BY EDWARDS ........ 25

C. JENAVALVE IS IMPROVING MANUFACTURING AND HAS GROWN ITS REVENUE IN RECENT MONTHS ........ 26

D. DELAYS DO NOT INDICATE A COMPANY WILL NOT SUCCEED IN RECEIVING FDA APPROVAL AND ACHIEVING COMMERCIAL SUCCESS ........ 28

**V. DEFENDANTS' EXPERTS' EFFICIENCIES ANALYSES ARE FLAWED AND UNCONVINCING ........ 30**

A. EDWARDS HAS NO COGNIZABLE PLANS FOR EFFICIENCIES ........ 30

B. EDWARDS HAS NO NEAR-TERM PLANS TO MANUFACTURE JENAVALVE'S DEVICES IN ITS FACILITIES ........ 32

C. EDWARDS HAS MADE NO PLANS TO UTILIZE EDWARDS' SALESFORCE TO SELL JENAVALVE DEVICES ........ 34

D. DR. BAILEY'S PURPORTED EFFICIENCIES ARE NOT MERGER SPECIFIC ........ 35

**VI. ADDITIONAL PROBLEMS WITH DR. BAILEY'S ANALYSIS ........ 36**

A. THE TAVR-AS MARKET SHOWCASES THE IMPORTANCE OF COMPETITION, NOT THE DESIRABILITY OF EDWARDS AS A MONOPOLIST ........ 36

B. JENAVALVE'S EXPERIENCE IN EUROPE IS NOT REPRESENTATIVE BECAUSE JENAVALVE ACTIVELY MOVED OUTPUT TO THE UNITED STATES IN AN EFFORT TO FINISH ITS CLINICAL TRIALS ........ 37

**VII. CONCLUSION ........ 38**

# I. INTRODUCTION AND SUMMARY OF OPINIONS

## A. Overview and Assignment

1. On October 12, 2025, I filed a report ("Wilson Report") that stated and explained my conclusion that the proposed acquisition of JenaValve Technology Inc. ("JenaValve") by Edwards Lifesciences ("Edwards") would substantially lessen competition in the supply of TAVR-AR devices to American consumers. On the same day, Dr. Aaron Kesselheim filed a report ("Kesselheim Report") explaining the important role played by the Food and Drug Administration ("FDA") in regulating medical devices.

2. On October 23, 2025, Dr. Elizabeth Bailey and Mr. Dennis McWilliams (collectively, "Defendants' Experts") filed reports on behalf of Defendants ("Bailey Report" and "McWilliams Report," respectively). Dr. Bailey's report addressed the conclusions reached in my affirmative report, while Mr. McWilliams' report focused on the process of developing medical devices.

3. Attorneys for the Federal Trade Commission ("FTC") have asked me to review Defendants' Experts' reports to determine whether the evidence and analysis in these reports affects the conclusions laid out in my initial report. This reply report contains my assessment of the material in Defendants' Experts' reports that address issues relevant to the Wilson Report. Any statement by Dr. Bailey or Mr. McWilliams that I do not rebut directly should not be misconstrued as agreement. A list of materials relied upon is attached as Exhibit A.

## B. Summary of Opinions

4. Based on my review of Defendants' Experts' reports, I find no reason to alter the conclusions reached in my initial report. These were:

a. The relevant market in which to consider the effects of the transaction is the development and provision of TAVR-AR devices to American consumers.

b. The proposed transaction would dramatically increase concentration in this already concentrated relevant market.

c. The loss of competition caused by the merger of Edwards and JenaValve would likely harm consumers. I expect this harm to manifest through both higher prices and reduced innovation relative to what would be expected if the merger did not occur.

d. The proposed merger is not necessary for JenaValve to commercialize TAVR-AR products for American consumers.

e. Neither merger-specific efficiencies nor rapid actions by other TAVR-AR suppliers are likely to offset the anticompetitive effects of the transaction.

## II. DR. BAILEY AND MR. MCWILLIAMS DO NOT DISPUTE KEY POINTS FROM MY REPORT

### A. TAVR-AR IS A RELEVANT MARKET

5. In my initial report, I explained why the relevant product market included only TAVR-AR devices.[1] Dr. Bailey does not contest that Surgical Aortic Valve Replacement ("SAVR") or off-label use of TAVR-AS devices are not a realistic alternative to TAVR-AR devices.[2] Dr. Bailey also does not contest that the relevant geographic market for the sale of TAVR-AR devices is the United States.[3]

### B. PRODUCTS CAN BE COMPETITIVE CONSTRAINTS PRIOR TO COMMERCIALIZATION

6. Dr. Bailey states that "…a firm does not need to enter into commercialized TAVR-AR device sales in order to be capable of providing competitive pressure."[4] This is consistent with my characterization of the pre-commercialization competition between Edwards and JenaValve: "[a]s the two firms have worked to develop the Trilogy and J-Valve devices, respectively, for commercialization, they have competed to offer their valves to patients via clinical trial programs and to establish relationships with principal investigators and sites in anticipation of their future commercial rivalry [notes omitted]."[5]

---

1 Wilson Report, § III.B.

2 *See, e.g.,* Bailey Report, ¶¶ 8, 18, 19.

3 Bailey Report, ¶ 55. Dr. Bailey does suggest that there is a different, wider market for innovation (Bailey Report, ¶¶ 89-90). As I discuss below, this is not consistent with the evidence.

4 Bailey Report, ¶ 55.

5 Wilson Report, ¶ 58.

*Confidential*

### C. It Takes A Long Time To Commercialize a TAVR-AR Product

7. Dr. Bailey states that the "average time to FDA approval," from a feasibility study to FDA PMA Approval, equals 8.5 years.[6] This timeframe is consistent with my initial report.[7] Moreover, it bears mentioning that this does not include the timeline to develop a product and obtain an IDE to begin an early feasibility study—each of which can take several years—which can push the timeline out further.[8]

### D. Trilogy and J-Valve Are Substitutes for the Majority of AR Patients

8. Dr. Bailey states that "Edwards' valuation model for JenaValve assumes Trilogy is only able to serve 70% of the patient population with moderate to severe aortic regurgitation while Edwards' valuation model for JC Medical assumes J-Valve is able to serve 100% of that same patient population [notes omitted]."[9] This accords with my report's characterization that for the vast majority of patients, the two products are close substitutes.[10]

### E. Edwards Has Innovated in the TAVR-AS Market

9. Contrary to what Dr. Bailey claims,[11] I do agree that Edwards has innovated in TAVR-AS.[12]

---

6 Bailey Report, Exhibit 22.

7 Wilson Report, ¶ 37.

8 Kesselheim Report, ¶ 60 and Table 2 ("Nonclinical Development").

9 Bailey Report, ¶ 77.

10 Wilson Report, § V.A.2.a; PX2139-004 (Email from J. Kilcoyne, JenaValve, to Board of Directors, JenaValve, March 19, 2024) (JenaValve estimating that "we are likely not able to treat ~20% of the AR population").

11 Bailey Report, ¶ 20.

12 Wilson Report, ¶ 107.

## III. DR. BAILEY'S CRITICISMS OF MY ANALYSIS OF COMPETITION IN THE TAVR-AR MARKET ARE UNFOUNDED

### A. DR. BAILEY IS WRONG TO IGNORE THE IMPORTANCE OF PRESERVING COMPETITION'S EXPECTED VALUE

10. Dr. Bailey's report appears to assume that uncertainty in outcomes—such as a less than 100% chance that a device will receive FDA approval—invalidates my competitive analysis.[13] This is incorrect. The fact that outcomes are uncertain does not preclude policy interventions that protect people.

11. Merger analysis is a necessarily forward-looking exercise. Accepting *arguendo* the probabilities of successful commercialization given in the Bailey Report, Dr. Bailey's argument seems to be that Edwards' acquisition of JenaValve is not problematic because it would only deprive American consumers of the benefits of competition between commercialized TAVR-AR products around 50% of the time. There is no basis in economics for this view. Economic models focus on expected (i.e., probability-weighted) outcomes.[14] Moreover, the case for accepting the possibility of a costly monopoly is even harder to make when – as here – the probability that certain products are developed may be negatively impacted by the merger. As I discuss below,

---

13 Bailey Report, ¶ 17, § 4.1.1.

14 *See, e.g.,* Walter Nicholson and Christopher Snyder, *Microeconomic Theory*, 10th Ed., South-Western, 2008, p. 206 ("we can show that a 'rational' individual will choose among gambles based on their expected 'utilities'"); Avinash Dixit and Robert Pindyck, *Investment Under Uncertainty*, Princeton University Press, 1994.

Notably, the literature that Dr. Bailey cites addresses the fact that uncertainty does not immunize transactions, particularly in relation to pipeline-to-pipeline overlaps of products in the last phase of clinical trials. *See, e.g.,* Michael A. Carrier, "Two Puzzles Resolved: Of the Schumpeter–Arrow Stalemate and Pharmaceutical Innovation Markets," *Iowa Law Review*, 93, 2008: 393-450, p. 421 ("To be sure, it is not certain that each of the merging firms in Phase III would have reached the market absent the merger. But there is a reasonable likelihood that they would have done so. And if the dangers of suppression apply anywhere, it is in this case.").

*See also*, Pierre Régibeau and Katharine E. Rockett, "Mergers and Innovation," *The Antitrust Bulletin*, 64(1), 2019: 31-53, p. 47 ("If two pharmaceutical companies, for example, have one drug each that is targeted at the same condition at some stage of the pipeline, competition authorities fear that a merged entity would simply decide to drop the less promising of these two research programs... This type of concern is greater if both programs are in the later stage of development since the possible loss of competition is both more probable (as each project has a significant probability of succeeding) and would take place within a shorter-term horizon.").

*Confidential*

Defendants' Experts' arguments that the deal could actually increase innovation are unconvincing.[15]

12. Similarly, Dr. Bailey incorrectly attempts[16] to suggest a tension between my initial report and my prior writing.[17] In 2020, I co-authored an article on different types of "pre-emptive" mergers. That article appropriately notes that where "neither firm is yet selling some form of the product of interest," analysts should bear in mind that a variety of outcomes can be possible.[18] As a threshold matter, it is not entirely clear that this characterization applies to Edwards' potential acquisition of JenaValve, given that the parties' products have been developed enough to be sold to hospitals for clinical use and there is robust evidence of competition.[19] Moreover, even under Dr. Bailey's assumptions, each product is more likely than not to be commercialized.[20]

13. In any event, standard economic tools enable analysts to evaluate competitive effects in uncertain situations. As described in my initial report, there is extensive evidence of ongoing competition between the parties that has already spurred them to innovate and take steps towards receiving FDA approval. I anticipate that, absent the merger, price competition would likely continue once the parties' products receive their respective PMAs. Even if one assumed that one of the parties' products did not ultimately receive FDA approval, Dr. Bailey's report ignores that this merger would still harm competition. Consumers would benefit if Trilogy obtains FDA approval, for example, and continues to innovate and offer price rebates in response to the competitive pressure imposed by a pre-FDA approval J-Valve. Dr. Bailey expressly acknowledges this form of competition.[21]

---

15 As I discuss in my initial report and expand upon below, there is evidence to suggest that the merger would lower the likelihood that new TAVR-AR products are developed. *See,* Wilson Report § V.B; Section III.E below.

16 Bailey Report, ¶ 57.

17 Andrew Sweeting *et al.*, "Not All Pre-emptive Mergers are Alike: A Classification of Recent Cases," *CPI Antitrust Chronicle*, October 2020 (*hereinafter* "Sweeting *et al.* (2020)").

18 Sweeting *et al.* (2020), pp. 6-7.

19 Wilson Report, §§ V.A.2, V.B.2(a); *see also,* Wilson Report, *note* 170.

20 Bailey Report, Exhibit 1.

21 Bailey Report, ¶ 55.

14. Furthermore, both parties' revealed preferences show that they think they will receive PMA with meaningful probability. This can be seen from the fact that both firms are investing in the clinical process, which they would not do absent an expectation that the costs would be justified. JenaValve is confident that Trilogy will secure FDA approval soon.[22] Similarly, although uncertainty exists, Edwards executives have confirmed that they expect J-Valve to receive FDA approval in 2028 or 2029.[23]

15. Fundamentally, the existence of some level of uncertainty does not change the economic logic for preserving the benefits of competition, particularly as there are no likely merger-specific efficiencies that would be expected to offset the likely impact on both prices and innovation.[24] Nor is there indication that other firms are likely to pose meaningful competitive constraints in the near future.[25]

### B. Dr. Bailey Errs in Dismissing My Conclusion that the Merger Would Result in a Monopoly

16. Dr. Bailey criticizes my assertion that Edwards' acquisition of JenaValve would constitute a merger to monopoly,[26] arguing I have "cherry-picked" the market structure.[27] This is incorrect.

---

22 *See,* Wilson Report, *note* 235. [redacted].

23 *See,* Wilson Report, ¶ 31.

24 *See,* discussion below in Section V.

25 Wilson Report, § VII.B.

26 *See, e.g.,* Wilson Report, ¶ 9.

27 Bailey Report, § 4.1.

*Confidential*

17. As discussed in my initial report, there is abundant evidence that JenaValve and Edwards have competed with each other for principal investigators, clinical trial sites, and on device features.[28] This competition ramped up after Edwards' JC Medical secured a Breakthrough Device designation from the FDA,[29] which no other TAVR-AR manufacturer has done (besides JenaValve). Such direct evidence shows that Edwards and JenaValve belong in the same market together.[30]

18. Dr. Bailey provides no evidence that either party saw, or sees, other TAVR-AR device companies in the same light. In particular, she provides no basis for disputing the views of party executives, which affirm that the parties are in close competition.[31] Nor does she explain why party executives' sworn testimony about the problems with other TAVR-AR devices should be dismissed.[32]

---

28 *See,* Wilson Report, § V.A-B and materials cited therein; *see also*, Wilson Report, Appendix A, where I provide examples of the parties reacting to each other.

29 PX2480-002 (Text exchange among R. Polzin, JenaValve, et. al., August 1, 2023) (In response to JC Medical's announcement, JenaValve's Senior Director of Strategy and Field Operations writes, "Let the battle begin baby! A little competition is good!"); PX2532-003 (Text exchange between R. Polzin, JenaValve, and D. Sun, JenaValve, August 1, 2023) ("If this doesn't force us to get our shit together I dunno what will."); PX2533-002 (Text exchange between D. Baerenwald, JenaValve, and D. Sun, JenaValve, August 1, 2023) ("Hopefully the leadership realizes it's time to get ready for launch").

30 U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," December 18, 2023, § 4.3 (on using direct evidence to define markets).

31 PX2191-003 (Email from A. Miyake, JenaValve, to V. Khalil, *et al.*, JenaValve, August 9, 2024) ("The only real competition is J-valve, and they are now part of Edwards…"); PX7035 (Zovighian (Edwards) Dep. 101:6-10) ("Q. And how would Edwards update its strategy if you lose the litigation against the FTC for the JenaValve acquisition? A. I don't know that today, but we will have to complete with JenaValve."); PX7012 (Pinto (JenaValve) Dep. 218:9-25) (discussing PX2187) ("Q. Dr. Pinto, is that the video that you intended to share with that email? A. Yes. Q. So that's Conan the Barbarian talking about crushing his enemies and seeing them driven before him and hearing the lamentations of their women? That's the right quote? A. That's the right quote. … THE WITNESS: That's what Conan -- or Arnold had to say. Q. You sent that in reference to crushing J-Valve? … THE WITNESS: Yes.").

32 *See, e.g.,* PX7035 (Zovighian (Edwards) Dep. 119:8-120:16) (Discussing devices approved for use in the European Union: "Q. You believe that these technologies with lack of rigorous evidence and manufacturing in China or India put patients at risk? A. In a big way. Patient now dying… And by killing patients, yes, you know, people are going to be lost about which technology to use, and so it is important to remind everyone about choose carefully your technology. We are not talking about the next iPhone here or the next watch. It's very different. It is a valve in a heart."); PX7023 (Keltjens (JenaValve) Dep. 33:12-14) ("[M]y understanding is

19. In addition to citing to sworn testimony and ordinary course documents, I present data showing that JenaValve and Edwards are unique in having products in clinical trials in U.S. hospitals and in having had their devices implanted in U.S. patients.[33] It is unclear exactly why Dr. Bailey believes these metrics are not informative of market importance, for she and Mr. McWilliams reference analogous ones in emphasizing Edwards' competitiveness in the TAVR-AS market.[34] Moreover, I show that the parties' modeling assumes that they will face no commercialized competitors through at least 2035.[35] Given that Dr. Bailey states that it takes on average 8.5 years to commercialize once a product has begun U.S. clinical trials,[36] and Dr. Bailey provides no evidence that any products besides Trilogy and J-Valve have begun those trials, Dr. Bailey's own report suggests that the merging parties could have a monopoly for over five years.

---

Laguna Tech is one of the corpses. So they will not bring it to the market unless somebody else acquires [the] technology or [IP].").

33 Wilson Report, § IV.C.

34 Bailey Report, Exhibits 4 and 5; McWilliams Report, Exhibit 4.

Similarly puzzling is Dr. Bailey's emphasis on the parties' number of trial sites relative to the total number of sites allegedly capable of conducting TAVR-AR trials (Bailey Report, ¶¶ 58-59). Dr. Bailey appears to argue that a more sensible approach to measuring shares would be to include all available TAVR sites in the United States in the denominator. Specifically, Dr. Bailey calculates shares using 800 (number of TAVR centers in the United States), 238 (number of medical institutions that are participating in clinical trials involved with TAVR, aortic regurgitation, or aortic stenosis), and 217 (number of medical institutions participating in clinical trials relating to TAVR interventions) as the denominators without explaining which number is the correct one (Bailey Report, Exhibit 11 and *note* 126). That many hospitals may exist where TAVR-AR devices are not implanted but conceivably could be does not change the point that, right now, a patient with AR can only receive a TAVR-AR device at one of the 45 Edwards or JenaValve sites. The fact that the parties are not present in many potential trial sites is immaterial to the assessment of concentration unless other competitors are active in those hospitals, which they are not.

35 Wilson Report, § IV.D.

36 Bailey Report, Exhibit 22.

*Confidential*

### C. Dr. Bailey's Critique of My Forecast of Price Effects Is Unconvincing

20. Dr. Bailey claims that my conclusion that the merger would likely harm consumers by increasing prices relative to what would occur if the merger did not take place is not well supported.[37] This is not correct.

21. First, my prediction is grounded in fundamental economic theory, which shows that mergers of close substitutes give rise to upward pricing pressure.[38] Moreover, mergers to monopoly are especially strongly associated with the incentive to raise prices.[39] The theoretical literature is relevant as my initial report documents the substitutability of, and close competition between, the parties as well as the absence of other competitors.[40]

22. Second, I connect the theoretical prediction with real-world evidence regarding price increases. For example, consistent with what economic theory (and common sense) predicts, the parties' own internal forecasts and strategic plans correlate the entry of J-Valve with downward pricing pressure.[41]

---

37 Bailey Report, ¶ 61.

38 Wilson Report, § V.A.

39 The intuition is straightforward. When firms merge to monopoly, they internalize the fact that they will control customers' only options in the market. Customers' only alternative to paying the merged firm's prices is opting out of the market entirely. As a result, a standard modeling approach – calculating the compensating marginal cost reduction required to preserve consumer welfare – for assessing the unilateral effects of mergers shows that when profit-maximizing firms merge to monopoly, welfare-enhancing effects beyond just efficiencies that lower production costs may be required to preserve consumer welfare. *See, e.g.,* Gregory J. Werden and Luke M. Froeb, "Choosing Among Tools for Assessing Unilateral Merger Effects," *European Competition Journal*, 7(2), 2011: 155-178, p. 160 (suggesting that no plausible/possible reduction in marginal costs would be sufficient to offset the incentive to raise prices above pre-merger levels). As explained in my initial report and further below, Edwards' acquisition of JenaValve would likely be accompanied by lower innovation in addition to higher prices.

40 Wilson Report, § V.A.2.

41 *See, e.g.,* PX1066 at sheet "Market Size"; PX2463 at sheet "TAM Summary"; PX2530-002 (JenaValve, Pricing, April 4, 2024). Dr. Bailey casts doubt on this evidence, noting that prices are forecast [redacted] two years after J-Valve entry in the document reproduced as Table 1 of the Wilson Report (Bailey Report, ¶ 68). This ignores the fact that PX2326-004 (JenaValve, Pricing, December 5, 2024) indicates that prices are expected [redacted] because they "[redacted] by successive risk approval and *competitor introduction*" (emphasis added). Moreover, PX2463 at sheet "TAM Summary" forecasts a [redacted] in 2028, which meets Dr. Bailey's apparent

*Confidential*

23. Third, contrary to Dr. Bailey's assertions, the record suggests price competition during the parties' clinical trials.[42] Dr. Bailey argues that if the parties competed then JenaValve should have lowered its price when J-Valve began clinical trials at the same hospital. This prediction is wrong for multiple reasons.

a. Economic theory shows that when a supplier has limited capacity, changes in competition may not impact pricing.[43]

b. It is not clear why price competition should only matter when both valves are already in trials in the same hospital. Hospitals where J-Valve is not in trials could nevertheless reference the possibility in order to secure different prices. This means that Dr. Bailey's approach to identifying effects is problematic.

c. JC Medical's J-Valve clinical trials commenced and were conducted around the time of the Edwards' acquisitions of both JC Medical and JenaValve in July 2024.[44] As discussed in my initial report, Edwards' acquisitions were associated with an increase in J-Valve's

---

criteria for being able to infer competitive effects. *See also,* PX7001 (Spadaro (JenaValve) IH 183:13-184:5).

Fundamentally, even if Dr. Bailey is correct that *some* of the [redacted] shown in the parties' ordinary course documents stem from other factors, the balance of evidence for TAVR-AR is that facing competitors is likely to lead to lower prices. This is consistent with the evidence shown for the TAVR-AS market (Wilson Report, § V.C) and medical device markets overall (Wilson Report, ¶ 16).

42 PX7020 (Kereiakes (The Christ Hospital, Cincinnati) Dep. 34:23-36:4, 58:12-16, 95:21-96:6) (Discussing incentives and cost considerations for participating in trials); PX2414-002 (Email from D. Sun, JenaValve, to P. Spadaro, JenaValve, *et al.*, JenaValve, March 11, 2025) (Suggesting JenaValve will "get creative" on a pricing issue); PX2232-002 (Email from B. Harper, The Christ Hospital, to L. Boyle, JenaValve, *et al.*, November 27, 2024) (Indicating disagreement about cost); PX1046-002 (Email from D. Kereiakes, The Christ Hospital, to M. Turco, JC Medical, December 4, 2024) (Noting J-Valve pricing may help it take patients from JenaValve); PX2342-024 (JenaValve, Board of Directors Meeting, March 20, 2024) (Discussing J-Valve's ability to compete on price).

43 Daniel Greenfield and Jeremy A. Sandford, "Upward pricing pressure in mergers of capacity-constrained firms," *Economic Inquiry*, 59(4), 2021: 1723-1747.

44 *See*, Wilson Report, Appendix A.

prices.[45] Dr. Bailey does not consider or account for how the change in J-Valve's price would impact JenaValve's unilateral incentives.[46]

### D. Dr. Bailey Cherry Picks from the Economic Literature To Argue that the Merger Would Increase Innovation

24. Dr. Bailey and I agree that economic theory shows that the relationship between competition and innovation can be nuanced.[47] The economic literature indicates there may be circumstances where a merger of competitors *can* increase innovation. However, neither the theoretical nor the empirical literature indicate that these circumstances are common, and nothing in the record indicates these circumstances apply to this merger.[48] To the contrary, multiple published papers have highlighted that mergers are associated with diminished

---

45 Wilson Report, ¶ 83, *note* 170.

46 Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010 (*hereinafter* "Davis and Garces (2010)"), p. 53.

Using Dr. Bailey's backup materials, I calculate that 22 out of 29 sites saw [redacted] in Trilogy's reimbursement rate per unit (ignoring changes starting at a reimbursement rate per unit of zero). For all 22 sites, the [redacted] happened after Edwards' acquisition of JC Medical on July 22, 2024. *See,* backup materials.

Further, Dr. Bailey claims that "the parties' clinical trials for Trilogy and J-Valve were largely conducted over different time periods and their going-forward trials cover different patient populations [notes omitted]" (Bailey Report, ¶ 67). This is inaccurate. While JenaValve's ALIGN-AR pivotal trial, which "evaluated the safety and effectiveness of the JenaValve Trilogy system in high-risk patients with symptomatic, severe aortic regurgitation," completed enrollment in August 2022, the same high-risk patients with symptomatic, severe aortic regurgitation were still able access the Trilogy device under the Continued Access Program (CAP). In fact, JenaValve provided 553 Trilogy devices under CAP between December 2022 and August 2025 PX0044-021, 022 (Defendant JenaValve Technology, Inc.'s Amended Responses and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories, October 1, 2025).

47 Bailey Report, § 4.3.1; Wilson Report, § V.B.1.

48 In particular, the empirical literature provides no basis for concluding that mergers of substitutes tend to increase innovation. For example, one article concludes, "[t]here is a very substantial body of empirical evidence supporting the general proposition that 'more competition,' meaning greater contestability of sales, spurs firms to be more efficient and to invest more in R&D." Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?," *The Rate & Direction of Inventive Activity Revisited*, Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012: 361-404, p. 376. Another text notes that studies that employ sophisticated statistical techniques "do not support a conclusion that mergers generally promote R&D investment or innovation." Richard Gilbert, *Innovation Matters: Competition Policy for the High-Technology Economy*, MIT Press, 2020, Chapter 1, p. 8.

innovation efforts in the life sciences sector.[49] Moreover, papers that Dr. Bailey cites highlight that mergers like this one pose a threat to competition and innovation. For example, one notes that in the merger control context:

> ***The greatest concern applies when the number of competitors is low and the parties are at an advanced stage of FDA review. This occurs when a merger is proposed between the only two firms in clinical studies, both of which are in Phase III. In this case, no potential entry is anticipated for the foreseeable future, and the firms are reasonably likely to reach the market.***[50]

25. The economics literature suggests that whether a merger is likely to increase innovation depends on a number of factors.[51] For this reason, in my initial report, I examined the evidence relating to the factors that the economic literature correlates with mergers having a greater likelihood of positive innovation effects. I showed that ordinary course documents and sworn testimony do not support the hypothesis that there are complementarities the merger will allow the combined firm to internalize.[52] Dr. Bailey argues that the difference in valve sizes available

---

49 *See, e.g.,* Colleen Cunningham *et al.*, "Killer Acquisitions," *Journal of Political Economy*, 129(3), 2021: 649-702 ("…we show that acquired drug projects are less likely to be developed when they overlap with the acquirer's existing product portfolio, especially when the acquirer's market power is large due to weak competition or distant patent expiration."); Carmine Ornaghi, "Mergers and innovation in big pharma," *International Journal of Industrial Organization*, 27, 2009: 70-79 ("…merged companies have on average, worse performances than the group of non-merging firms."); Justus Haucap *et al.*, "How mergers affect innovation: Theory and evidence," *International Journal of Industrial Organization*, 63, 2019: 283-325 ("…we find that average patenting and R&D of the merged entity and its rivals declines substantially in post-merger periods.").

50 Michael A. Carrier, "Two Puzzles Resolved: Of the Schumpeter–Arrow Stalemate and Pharmaceutical Innovation Markets," *Iowa Law Review*, 93, 2008: 393-450, pp. 420-421.

*See also*, Michael L. Katz and Howard A. Shelanski, "Mergers and Innovation," *Antitrust Law Journal*, 74(1), 2007: 1-85, p. 77 ("We find the evidence to support a very limited presumption that a reduction in the number of competing innovators reduces innovation in the absence of any efficiency effects. Specifically, the presumption of harm to innovation would apply only in the case of *merger to monopoly*." (emphasis added)).

51 *See, e.g.,* Bailey Report, ¶ 71 (Citing Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and The Economy*, 6, 2006: 159-215, p. 162).

52 Wilson Report, § V.B.2.c. Though Dr. Bailey highlights the possibility of benefits stemming from "de-duplicating" investments (Bailey Report, ¶¶ 72-73), she does not identify what such investments would be in this case. Nor does she attempt to square this argument with her view that the parties' products are differentiated (Bailey Report, ¶¶ 76-77), which would tend to be associated with less duplication.

*Confidential*

from Trilogy and J-Valve is a complementarity that Edwards could internalize,[53] but fails to address the fact that *competition* between the two has already prompted JenaValve to start developing its own larger valve size.[54] Nor is there evidence that innovation efforts have been limited owing to concerns about involuntary spillovers between Edwards and JenaValve.[55] To the contrary, the evidence indicates that the substitutability of Edwards' and JenaValve's TAVR-AR products has motivated innovation efforts.[56]

26. Dr. Bailey also argues that it may make sense for a firm to have a differentiated research portfolio as a way of addressing the riskiness inherent in innovation.[57] This is orthogonal to whether Edwards' ownership of both the J-Valve and Trilogy products would likely benefit consumers.[58] Moreover, it is incorrect to treat Trilogy and J-Valve as mere R&D pipeline projects. Both devices have already been sold to cardiology clinics and implanted in patients.[59] By Dr. Bailey's own assessment, each is more likely than not to obtain FDA approval.[60]

27. Fundamentally, the relevant question is the net effect from the change in incentives from the reduction in competition caused by the merger, which would have implications for both pricing and innovation. There is no reason that Edwards could not initiate its own parallel

---

53 Bailey Report, ¶ 85.

54 PX2277-009 (JenaValve, 2024-2025 Budget, March 15, 2024) ("Why Large Valve Now? Competitor J-Valve Already Has a Large Valve Size in Portfolio"; "Prevents Loss of Customers Who Only Want One AR Valve Manufacturer"; "Blocks J-Valve From JVT Site Penetration").

55 Wilson Report, § V.B.2.b. For example, Dr. Bailey provides no assessment, let alone evidence, to suggest that intellectual property protections for medical device innovations are insufficient to protect investments.

56 Wilson Report, §§ V.A.2 and V.B.2.a.

57 Bailey Report, ¶ 87.

58 It may also be somewhat in tension with Dr. Bailey's arguments over the desirability of de-duplicating investments.

Moreover, Dr. Bailey ignores that the literature she cites advocates for parallel pathways "*if* there is considerable uncertainty regarding the best way to achieve a particular objective, and *if* it is possible to reduce uncertainty substantially in the *early stages* of the development effort…" (emphasis added). Richard R. Nelson, "The Economics of Parallel R and D Efforts: A Sequential-Decision Analysis," *RAND Corporation,* 1959: 1-40, p. 31; Bailey Report, ¶ 87, *note* 198. This characterization does not fit the current circumstance where the two products are undergoing or have completed pivotal clinical trials.

59 Wilson Report, Figure 1.

60 Bailey Report, ¶ 13.

product track to pair with J-Valve as opposed to buying JenaValve. Alternatively, Edwards could purchase a non-U.S. ("OUS") TAVR-AR technology that is truly a pipeline project to develop it in anticipation of initiating the FDA process.

28. Fundamentally, taken to its logical conclusion, Dr. Bailey's argument would suggest that innovation and consumer welfare could consistently be improved if single firms controlled all product pipelines in different innovative areas. This idea flies in the face of both common sense and economics.

### E. Dr. Bailey Is Wrong in Dismissing the Likelihood that Edwards Would Reduce Innovation

29. In my initial report, I highlighted the possibility that Edwards would reduce innovation, either by "killing" certain products or by slowing their advancement.[61] Dr. Bailey argues that this view is unreliable.[62] Dr. Bailey's critique is unpersuasive for several reasons.

30. First, and most importantly, Dr. Bailey ignores the ordinary course evidence on which my conclusion was based. I do not rely simply on economic literature positing reduced innovation as an implication of mergers. Rather, I connect this theoretical prediction to real-world evidence that stakeholders inside both Edwards and JenaValve anticipated that the transaction would lead to one of Trilogy or J-Valve being killed.[63] Other ordinary course evidence is also consistent with the likelihood that the transaction would diminish innovation:

a. Edwards has hesitated to support efforts to expand Trilogy's indication, a choice that would be difficult to rationalize absent its ownership of the J-Valve, which it may see as offering greater long-term promise.[64]

b. Edwards' Vice President of Global Strategy and Analytics drafted an agenda for a Strategic Meeting, writing "If JV Acquisition success - what is our commercial strategy?

---

61 Wilson Report, § V.A.2.c.

62 Bailey Report, § 4.3.2.

63 Wilson Report, ¶ 81 and cites therein.

64 Wilson Report, ¶ 82 and cites therein; *see also,* PX1611-001 (Email from B. Concepcion, Edwards, to J. Wheeler, *et al.*, Edwards, July 31, 2024) (characterizing "JCM" as a "Gen 2 device: manufacturable ([redacted]), better valve [redacted]").

If JV Acquisition fails - how do we *accelerate* JC Commercialization?"[65] This shows that Edwards is not pressing as hard as it can to commercialize J-Valve at present. As a result, a second TAVR-AR device might be commercialized more quickly if the merger does not take place.

c. JenaValve plans to increase its efforts to pursue the XL valve and ARTIST trial if the acquisition does not go forward,[66] contrary to the McWilliams' Report that JenaValve will need to cut spending. Again, that JenaValve would increase innovative efforts cuts against the proposition that Edwards is uniquely positioned to bring TAVR-AR devices to market.

31. Second, Dr. Bailey's "data analyses" of Edwards' incentives are flawed and unpersuasive.[67] In these analyses, Dr. Bailey limits herself to considering Edwards' incentive to pursue the J-Valve, ignoring its incentives as regards Trilogy and any subsequent innovations to either device. The economic literature I cited in my initial report shows that a monopolist's returns from advancing a new product or developing additional product features are lower than those of an independent firm facing competition.[68] This may cause it to not pursue projects that an independent innovator would pursue. As noted in my initial report, Edwards has considered the possibility of abandoning the J-Valve pivotal trial.[69] Moreover, evidence indicates that Edwards is reducing the intensity with which it is pursuing J-Valve's commercialization as well

---

65 PX1016-001 (Email from J. Bierman, Edwards, to P. Sharma, Edwards, November 4, 2024) (emphasis added).

66 PX2004-068 (JenaValve, Board of Directors Meeting, December 3, 2024) ("Deal Closes – Soft ARTIST Launch; Deal Terminates – Full ARTIST Launch"); PX7026 (Bierman (Edwards) Dep. 193:7-9) ("undetermined" whether Edwards would continue developing larger valve sizes for Trilogy).

*See also*, PX2211-006 (Email from J. Calle Gordo, Valliance Asset Management, to D. Dearen, JenaValve, February 10, 2024) (JenaValve board member Calle Gordo writes, "If Edwards would want us to [redacted], they could provide us with a Loan to support this [sic] forward looking activities.").

67 Bailey Report, ¶¶ 78-81.

68 Wilson Report, *note* 143.

69 Wilson Report, ¶ 81, 104. *See also*, PX1042-001 (Email from D. Bobo, Edwards, to N. Olson and T. Mahajan, Edwards, June 3, 2024) ("[JC Medical] includes a pivotal trial (which we may not run at this point).").

as the JenaValve ARTIST trial and XL valve project.[70] Separately, Dr. Bailey makes multiple errors that bias her analysis towards finding that Edwards would have an incentive to keep pursuing the product, making her work unreliable.

a. Notwithstanding other parts of her report,[71] Dr. Bailey ignores that the J-Valve's successful commercialization is not guaranteed. In other words, some of the time (39% according to Dr. Bailey), Edwards will earn no money from trying to advance the J-Valve despite the investments it would have to make. This distinction between uncertain profits and certain costs is a key element of the analysis. Dr. Bailey ignores it.

b. Dr. Bailey's assumptions about variable and fixed operating costs are inconsistent and do not make economic sense. While she assumes all operating costs are sunk and fixed between 2025 and 2027,[72] she assumes, without providing an explanation, that *all* operating costs are variable after 2028 and thus scales them down to 30% (or 20%) of the original level. This would not likely be the case. For example, it is not obvious why a largely fixed cost like R&D would decline by 70% (or 80%) simply because fewer unit sales are made (especially when Dr. Bailey argues Edwards would "maintain both R&D streams" in "parallel" after acquiring Trilogy).[73] Dr. Bailey's assumptions likely lead to an underestimation of costs.

c. Dr. Bailey uses a model of the long-run value of J-Valve that assumes its sales are never eroded through competition or displacement by superior technologies.[74]

32. Moreover, Dr. Bailey's modeling framework implies that Edwards would have no incentive to invest in a version of the Trilogy capable of serving patients with large annuli if it commercialized the J-Valve. That is because the product would serve no incremental patients beyond those capable of being served by the J-Valve, which is how she identifies the sales

---

70 *See, notes* 64-66; Wilson Report, ¶ 82.

71 Bailey Report, Exhibit 1.

72 [redacted]

73 Bailey Report, ¶¶ 84-87.

74 Bailey Report, Exhibit 21 and backup materials.

available to J-Valve in her modeling. This is an exact demonstration of the "replacement effect" argument for why a monopolist is unlikely to seek innovations when those products would simply take sales it would already make, which I highlighted in my initial report.[75]

33. Third, as described in my initial report, Edwards has shut down products that compete with others in its portfolio before.[76] Specifically, in 2019, Edwards discontinued development efforts for the Centera valve, which would have been an alternative to its Sapien TAVR-AS products.[77]

### F. DR. BAILEY IS WRONG TO ASSERT THAT THERE IS A "WIDE" INNOVATION MARKET FOR TAVR-AR

34. Economists believe that strategic competition in markets with a limited set of firms involves competitors focusing on each other's actions, recognizing that each individual firm's profits are heavily impacted by the choices of others.[78] In my initial report, I noted considerable evidence of JC Medical and JenaValve reacting to each other's actions, specifically in the context of innovation.[79] For example, JenaValve decided it had to make plans to invest in larger valves, fearing that J-Valve would steal its customers.[80]

35. In contrast, Dr. Bailey notes that various products are featured in conferences and publications.[81] Her report cites no evidence that either Edwards or JenaValve ever shifted posture

---

75 *See, e.g.,* Wilson Report, ¶ 70 and *note* 143.

76 Wilson Report, ¶ 105.

77 PX7014 (Ullem (Edwards) Dep. 111:15-113:5); PX7040 (Bobo (Edwards) Dep. 62:8-63:8); PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 17:1-14, 58:18-62:2).

78 *See, e.g.,* Davis and Garces (2010), p. 37 ("The primary lesson of game theory for firms is that they should spend as much time thinking about their rivals as they spend thinking about their own preferences and decisions. When firms do that, we say that they are interacting strategically. Evidence for strategic interaction is often quite easy to find in corporate strategy and pricing documents.").

79 *See,* Wilson Report, Appendix A, where I discuss examples of the parties reacting to each other.

80 PX2139-003, 004 (Email from J. Kilcoyne, JenaValve, to Board of Directors, JenaValve, March 19, 2024); PX2190-008, 009 (JenaValve, Larger Valve(s) Portfolio - Strategy, August 9, 2024); PX2277-009 (JenaValve, 2024-2025 Budget, March 15, 2024) ("Why Large Valve Now? Competitor JValve Already Has a Large Valve Size in Portfolio; Prevents Loss of Customers Who Only Want One AR Valve Manufacturer; Blocks J-Valve From JVT Site Penetration").

81 Bailey Report, § 4.4.3.

in reaction to these firms as my report showed they did with each other. Nor does she cite to sworn testimony or documents that trumpet the need to compete with these firms as the parties did with each other.[82] To the contrary, as I have noted, party executives have been dismissive of the "competitors" she identifies.[83] Even if these firms did have clear promise, the fact remains that they will be largely inaccessible to American patients until the firms achieve significant milestones in the FDA approval process, and there is no evidence they have started that process.[84]

---

Beyond those I previously described (Wilson Report, Appendix B), Dr. Bailey names several additional alleged competitors, including Peijia Medical's TaurusNXT device (Bailey Report, ¶ 91) and Venus MedTech, a Chinese firm working to develop a TAVR-AR device (Bailey Report, Appendix 4). JenaValve's Senior Director of Global Marketing testified that Venus MedTech's device is not being studied in the U.S. and the company has no U.S. employees (PX7004 (Sun (JenaValve) IH 108:8-109:8)). As recently as October 2025, Peijia Medical's TaurusNXT presentation makes no reference to the path for U.S. commercialization (Wenzhi Pan, "The Transfemoral TaurusNXT TAVR System (Peijia Medical): Two-Year Results of the NXT-DURA Trial," TCT 2025, October 27, 2025, accessed October 29, 2025. Available from https://www.tctmd.com/slide/transfemoral-taurusnxt-tavr-system-peijia-medical-two-year-results-nxt-dura-trial). *See also*, PX0044-017, 018 (Defendant JenaValve Technology, Inc.'s Amended Responses and Objections to Plaintiff Federal Trade Commission's First Set of Interrogatories, October 1, 2025); PX0046-023, 024 (Defendant Edwards Lifesciences' Responses To Plaintiff's Interrogatories, October 1, 2025).

82 *See, note* 29.

83 *See, note* 32 in regard to Laguna Tech and foreign device manufacturers generally; *see also,* Wilson Report, *note* 71 with respect to Cuspa.

84 It would seem there should be little dispute that these products will not be available to Americans in the near future. Indeed, it took JC Medical more than four years from applying for its IDE to obtaining it (Wilson Report, *note* 73). With respect to commercialization, Dr. Bailey's report suggests that FDA approval could take even longer than Dr. Kesselheim's estimate of "five to ten" years (Bailey Report, Exhibit 22; Kesselheim Report, ¶ 95). Interestingly, despite Dr. Bailey's emphasis on the possibilities that JenaValve and J-Valve never complete the process of FDA approval (Bailey Report, ¶¶ 12-13), she does not appear to attribute any material level of uncertainty to purported OUS potential entrants ever seeking or obtaining an IDE, let alone completing the FDA approval process.

## IV. JENAVALVE DOES NOT HAVE TO BE ACQUIRED BY EDWARDS TO COMPETE

### A. Ordinary Course Materials Indicate JenaValve Has Options for Raising the Capital Needed to Pursue Product Commercialization and Additional Innovation

36. Besides being acquired by Edwards, sworn testimony and ordinary course evidence indicate that JenaValve could raise any needed capital in a variety of ways.[85] As stated in my initial report, but for the credibility of JenaValve's alternative options for financing, Edwards would not have had an incentive to pay as much as they did for JenaValve.[86] For the sake of convenience, I discuss the various approaches to raising capital separately. However, in practice, JenaValve might take advantage of multiple of them in sequence.[87]

#### 1. Other Companies Have Demonstrated an Interest in Acquiring or Partnering with JenaValve and Could Do So in the Future

37. Many companies in the medical devices space have shown interest in JenaValve. That is consistent with JenaValve having identified an important area in need of new device development and taken steps to bring a responsive product to market.[88] Indeed, in December 2023, Centerview, an independent consulting firm, studied the M&A opportunity for JenaValve and concluded that many companies would have interest in JenaValve, including Medtronic, Abbott, and Boston Scientific.[89] Similarly, in a presentation to JenaValve's Board of Directors in

---

85 *See,* PX2211-001 (Email from J. Kilcoyne, JenaValve, to D. Dearen, JenaValve, February 11, 2024) (Showing a list of "Capitalization and Strategic Scenarios", including "1. Trade Sale of JenaValve to Edwards or Other Strategic by ~June 2024; 2. Johnson and Johnson Leads Large Equity Investment of [redacted] at premium to Series C; 3. Crossover Investors of [redacted] – No Later Start Then [sic] June/July.").

86 Wilson Report, ¶¶ 119-120.

87 PX2020-009 (JenaValve, Board of Directors Meeting, January 21, 2025) ("If EW fails to close, JVT will have approved products that are recognized as best-in-class for AR and will be ramping up revenue in the US, as well as Europe. Under the non-EW scenario, the goal is [redacted]).

88 PX0039-021 (JenaValve, CenterView Partners Discussion Materials, December 2023) (Slide titled "JenaValve Is a Highly Scarce Asset Within the Cardiovascular Space", stating that the TAVR-AR $1 billion estimated 2030 market size is "based on JenaValve near-term U.S. opportunity of $1.1bn TAM").

89 PX0039-022 (JenaValve, CenterView Partners Discussion Materials, December 2023) (Showing the "Potential Buyer Universe").

*Confidential*

January 2024, the investment bank Piper Sandler provided JenaValve a breakdown of different options for partnering with larger medical device manufacturers. Beyond Edwards, the list included [redacted].[90]

38. [redacted] JenaValve's CEO confirmed in a December 2023 email to JenaValve's Board of Directors the "[h]igh degree of interest exhibited by Edwards, [redacted]."[92] Similarly, an August 2024 email from Edwards' CEO to two board members reported that [redacted].[93] Depositions from other JenaValve executives corroborate the interest JenaValve received.[94]

39. The evidence for potential alternative partners does not exclusively date to before the announcement of JenaValve's deal with Edwards. As of February 2025, JenaValve's CEO indicated in an email that [redacted] were potential "alternative" buyers. Although these buyers were flagged as "unlikely" (with [redacted],

---

90 PX0038-006, 007 (JenaValve, Piper|Sandler Materials Prepared for JenaValve Board of Directors, January 4, 2024) (Slides titled "What is the Mindset of Potential Acquirors?").

91 [redacted]

92 PX2537-005 (Email from J. Kilcoyne, JenaValve, to Board of Directors, JenaValve, December 6, 2023).

93 PX1115-001 (Email from B. Zovighian, Edwards, to K. Gallahue, RiverVale Capital, August 20, 2024).

94 *See, e.g.*, PX7002 (Sloan (JenaValve) IH 63:1-64:3) ("Q: And so pursuing a transaction with Edwards was not JenaValve's only path forward; correct? A: No. Q: And so to clarify, JenaValve had other options besides the transaction with Edwards; is that right? A: Certainly there's other options available to JenaValve. Whether they're viable options or not, that can be discussed. Q: And what options did JenaValve have at the time it was considering a transaction with Edwards? A: Certainly sought to another strategic partner, certainly raised money, try to raise money, certainly try and do another deal. I think all those are possibilities. Q: And JenaValve reached out to other potential strategic acquirers; correct? A: I believe they did, but I was not part of that. Q: And to your knowledge, who else was JenaValve reaching out to as a potential acquirer? A: I was not part of any of those discussions, but I heard that they reached out to [redacted], and I heard that they reached out to [redacted]"); *see also*, PX7027 (Sun (JenaValve) Dep. 95:9-13; 97:20-23).

*Confidential*

flagged as "possible"),[95, 96] these buyers may in the future reconsider the prospects of acquiring JenaValve, just as Edwards did after electing not to acquire JenaValve in 2019.[97] [redacted].[99]

40. Therefore, real-world evidence of offers made by [redacted] and ordinary course documents showing interest by other potential partners[100] leads me to conclude it is inappropriate for Defendants' Experts to suggest that JenaValve's only potential partner is Edwards.[101]

---

95 PX2464-001 (Email from J. Kilcoyne, JenaValve, to D. Dearen and S. Sloan, JenaValve, February 20, 2025) (Showing five "going forward scenarios" that include [redacted]).

96 *See,* Johnson & Johnson Innovation LLC, "Driving innovation through venture investing," *Johnson & Johnson*, accessed October 23, 2025. Available from https://jnjinnovation.com/venture-investing-jjdc ("Introducing Johnson & Johnson's corporate venture capital organization, JJDC").

97 PX7036 (Zia (Edwards) Dep. 148:5-19) ("Q: And the first bullet point, it says (as read): "In 2019, Edwards conducted robust diligence and passed on the opportunity." Do you see that? A Yes. Q: So is it fair to say that Edwards considered acquiring JenaValve back in 2019? A: That was information that was shared during this diligence by corporate development. I was not part of that 2019 diligence on JenaValve. Q: Do you have any reason to believe that's untrue? A: No.").

98 [redacted].

[redacted]

99 [redacted]

100 *See,* Wilson Report, ¶ 121.

101 *See, e.g.,* McWilliams Report, § V.B.iii. It is also inappropriate to suggest that JC Medical lacks alternative partners as [redacted] Wilson Report, *note* 245.

Furthermore, the argument that there are "no alternative acquirers" seems inconsistent with Defendants' Experts' position that Edwards' demonstrated interest in TAVR-AR would generate interest from other strategics. If other strategics focus so much on Edwards' decision-making, it is unclear why they would not be interested in partnering with companies that Edwards would have acquired but for antitrust enforcement.

*Confidential*

### 2. JenaValve Could Raise Capital from Investment Funds or the Public Markets

41. Partnering with another strategic medical device manufacturer is not JenaValve's only alternative to being acquired by Edwards. It could also secure financing through either the private markets (i.e., venture funds), as it has in the past (e.g., it raised $100 million in its Series C round led by Bain Capital in 2022) or the public markets.

42. Indeed, JenaValve is preparing alternative financing arrangements if the deal fails.[102] In July 2025, as seen in Figure 1, JenaValve anticipated it could raise capital in the private markets with a valuation of [redacted]. The plausibility of this can be partly inferred from its past track record attracting investors like Bain Capital. J.P. Morgan, a source that Mr. McWilliams relies upon,[103] further supports the plausibility that JenaValve could raise money from private investors. Its reports indicate that although venture capital funds often exited their investments through mergers and acquisitions, it was also very common that venture funds and investors saw investments or licensing deals with "Medtech" startups as attractive. For example, in the first quarter of 2025, JP Morgan indicates that 117 rounds of financing raised $3.7 billion for Medtech firms. Over the course of 2024, 691 rounds raised $19.1 billion. Similarly, there were 286 licensing deals in the first quarter of 2025, raising $3.7 billion, while the total value of licensing deals in 2024 was $7.2 billion.[104]

---

102 PX2536-004 (JenaValve, 2025 Budget Proposal, January 8, 2025) ("Under the non-EW scenario, [redacted]"); PX2282-001 (Email from D. Dearen, JenaValve, to J. Kilcoyne, JenaValve, August 8, 2025) [redacted]"); *see also,* PX2465-002 (Text exchange between A. Miyake, JenaValve, and G. Mirigian, JenaValve, August 6, 2025) ("Can we get out and go for bigger bidders now? We are worth more today than we were a year ago").

103 McWilliams Report, *notes* 42-43.

104 J.P. Morgan, "Medtech Q1 2025: Strategic shifts and market dynamics," May 2025, p. 2, accessed October 26, 2025. Available from https://www.jpmorgan.com/content/dam/jpmorgan/documents/cb/insights/outlook/jpm-medtech-deck-q1-2025-final-ada.pdf; J.P. Morgan, "2024 Medtech Industry Insights: Investment Trends, M&A Activity, and Market Dynamics," January 2025, p. 2, accessed October 26, 2025. Available from https://www.jpmorgan.com/content/dam/jpmorgan/documents/cb/insights/outlook/jpm-medtech-deck-q4-2024-final-ada.pdf.

*Confidential*

**Figure 1: JenaValve Board of Directors Meeting Notes on Funding**




Source: PX2303-065 (JenaValve, Board of Directors Meeting, July 16, 2025).

43. Besides turning to the private markets, JenaValve could also raise money by pursuing an initial public offering ("IPO"). An IPO is the first time that a private company makes shares of its stock widely available to the investing public on a stock exchange.[105] The sales of the shares raise capital from public investors. JenaValve's internal documents show that throughout 2023-

105 *See, e.g.,* Jason Fernando, "What is an IPO? How an Initial Public Offering Works," *Investopedia,* September 21, 2025, accessed October 23, 2025. Available from https://www.investopedia.com/terms/i/ipo.asp.

*Confidential*

2024, JenaValve was considering an IPO as one of its financing options.[106] JenaValve executives' sworn testimony confirm this fact. [107]

44. Given that JenaValve ultimately elected to be acquired by Edwards, plans around proceeding with an IPO did not continue. However, the viability of this path has not ended.[108] As seen in Figure 1 above, as of July 2025, [redacted].[109] Moreover, the anticipated value JenaValve expects to receive is markedly higher than the guaranteed price that Edwards paid, suggesting that the intervening period of unprofitability has not eroded the underlying value of JenaValve's prospects. Finally, the CEO of JenaValve emailed other senior executives on May 30, 2025, saying:

> ***As you are aware, we are working towards obtaining FTC approval and closing the transaction with Edwards. In the event the FTC doesn't approve the deal, we are planning several contingencies. One of our contingencies*** [redacted] ***[110]***

---

[106] PX0039-023, 024, 025 (JenaValve, CenterView Partners Discussion Materials, December 2023) (Showing slides on "IPO Considerations" and analyses of "Most Recent Medtech IPO Cycle" for 2013-2018 and 2019-2021); PX2181-002 (Email from J. Kilcoyne, JenaValve, to members of Board of Directors, JenaValve, March 5, 2023) (Includes a section on "Capital Formation"); PX2154-001 (Email from J. Kilcoyne, JenaValve, to O. Litzka, Andera Partners, October 13, 2022) (In response to Litzka's email on "IPO preparation" being "the only competing process", Kilcoyne also stated "Agreed… an IPO may indeed be our best competing process and/or an independent way forward.").

[107] PX7002 (Sloan (JenaValve) IH 48:14-20) ("Q: And IPO would raise money for JenaValve operations; correct? A: It would. Q: And as of March 2026 – March 26, 2024, the date of this email, was JenaValve preparing for an IPO? A: The company took steps to prepare, yeah."); PX7002 (Sloan (JenaValve) IH 174:13-15) ("Q: Has JenaValve reached out to any investment banks to potentially pursue an IPO? A: Piper Sandler."); PX7002 (Sloan (JenaValve) IH 175:8-15) ("Q: Right. So you've been on calls with Piper Sandler during the last eight weeks to discuss potential scenarios including a potential IPO; is that right? A: Let me think about that question. I think that's fair to -- to discuss alternatives, which would include IPO as a -- as an alternative that would be discussed.").

[108] PX2032-002 (Email from S. Sloan, JenaValve, to M. Delong, PwC, July 26, 2024).

[109] *See,* Figure 1 ("Funding Strategies Post Merger Agreement Termination" slide includes, "[redacted]" and "[redacted] and a [redacted]).

[110] PX2418-001 (Email from J. Kilcoyne, JenaValve, to P. Spadaro, *et al.*, JenaValve, May 30, 2025).

And he continued saying: "Please make these meetings a top priority."[111]

### B. JENAVALVE'S CURRENT FINANCIAL AND COMMERCIAL CONDITION IS CONFOUNDED WITH THE DECISION TO BE ACQUIRED BY EDWARDS

45. Defendants' Experts argue that the merger benefits consumers because absent Edwards' involvement JenaValve would not be able to deliver its valves to as many patients as quickly; this stems from JenaValve's alleged lack of resources.[112] These arguments overlook that JenaValve's current condition is linked to the acquisition. It has been limited in its ability to fundraise since the Edwards acquisition. Defendants' Experts have not established that JenaValve's current circumstance is indicative of its future ability to compete.

46. Indeed, documents and testimony show that Edwards has a strategic interest in delaying some steps that an independent JenaValve would prefer to take. As discussed in my initial report, Edwards has not been enthusiastic about pursuing the ARTIST trial, which would potentially expand the indications that Trilogy could be used on label for.[113] JenaValve's CEO said in a May 2025 email that "Edwards delayed approval of the [ARTIST] trial commitment spend (covenant requirement) by [redacted] mths, thus, we are [redacted] mths behind 1st patient enrollment. This adversely impacts our ability to meet our Corp. Goal - [redacted] pts enrolled by Dec. 31, 2025."[114] This reflects a monopolist's interest in not cannibalizing itself.[115] With the acquisition facing antitrust scrutiny, Edwards has a separate incentive to slow down JenaValve's progress. If the deal does not close, it will be competing with JenaValve.[116]

---

111 PX2418-001 (Email from J. Kilcoyne, JenaValve, to P. Spadaro, *et al.,* JenaValve, May 30, 2025). On June 3, 2025, JenaValve executives continued to work on forecasting revenue [redacted]. *See,* PX2252-001 (Email from J. Kilcoyne, JenaValve, to P. Spadaro and S. Sloan, JenaValve, June 3, 2025).

112 *See, e.g.,* Bailey Report, §§ 3.2-3; McWilliams Report, § V.A.

113 Wilson Report, ¶ 82.

114 PX2380-002 (Email from J. Kilcoyne, JenaValve, to J. Keltjens, JenaValve, May 2, 2025) (Mentioning "Cedars (Raj) and Columbia (Torsten) fighting for the first case.").

115 *See, e.g.,* PX1611-001, 002 (Email from B. Concepcion, Edwards, to J. Wheeler, *et al.*, Edwards, July 31, 2024).

116 PX7035 (Zovighian (Edwards) Dep. 98:13-99:9), discussing PX1437-001 (Email sent on August 7, 2025).

47. Moreover, to the extent JenaValve had [redacted] in 2024 to early 2025, they were confounded with its decision to pursue a transaction with Edwards rather than staying independent. For example, [redacted].[117]

### C. JENAVALVE IS IMPROVING MANUFACTURING AND HAS GROWN ITS REVENUE IN RECENT MONTHS

48. Notwithstanding Dr. Bailey's characterization,[118] recent evidence shows that JenaValve is increasing output and anticipating a favorable future. Moreover, Dr. Bailey's own Exhibit 7 shows that JenaValve's actual performance in the first half of 2025 is not far off its 2024 forecast.

49. JenaValve's future is anticipated to be bright. For example, in a draft presentation (last modified in August 2025) JenaValve projected that U.S. revenue would increase from [redacted] in 2025 to [redacted] in 2028. Moreover, JenaValve projected that it would increase the "rep headcount" from [redacted] to [redacted] in the same period and that productivity will "align with medtech benchmarks."[119] Other recent internal communications also discuss growth and expansion. For example, a July 2025 email from JenaValve's Vice President of Finance to its board of directors indicated that the firm had hired [redacted] new sewers in 2025 and planned to hire an additional [redacted] employees to prepare for its U.S. launch following FDA approval.[120] In an August 2025 email, the Vice President of Finance noted to JenaValve's CEO that the firm has cash reserves and asks: "Should we add [redacted] more sewers + support (more than Jeff is planning)….to ***blow the production plan out of the water***" (emphasis added).[121] Other forecasts from 2025 confirm JenaValve's optimism about the future. As shown in Table 1 below, JenaValve's forecasts through 2028 show it consistently increasing sold units.

---

117 PX2540-012 (JenaValve, Investment Committee Meeting, February 12, 2024) ("Do Not Take Down New Investor Monies Until EW and JnJ Intentions Confirmed & [redacted]").

118 Bailey Report, § 3.2.

119 PX2272-008 (JenaValve, Executive Summary – Forecast Revision vs. Prior 2025-2028, August 13, 2025); *see also*, PX7017 (Spadaro (JenaValve) Dep. 44:12-21).

120 PX2304-001 (Email from S. Sloan, JenaValve, to Board of Directors, JenaValve, July 20, 2025).

121 PX2306-002 (Email from S. Sloan, JenaValve, to J. Kilcoyne, JenaValve, August 5, 2025).

*Confidential*

**Table 1: JenaValve Forecast from September 15, 2025**

Global Commercial Forecast 2026 - 2028 (Sept. Adjusted)

| | Commercial | Q1-26 | Q2-26 | Q3-26 | Q4-26 | 26 Total | Q1-27 | Q2-27 | Q3-27 | Q4-27 | 27 Total | Q1-28 | Q2-28 | Q3-28 | Q4-28 | 28 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Units | United States | [redacted] | | | | | | | | | | | | | | |
| | Europe | | | | | | | | | | | | | | | |
| | OUS (CA/AP, Etc.) | | | | | | | | | | | | | | | |
| | **Totals - Units** | | | | | | | | | | | | | | | |

| | Commercial | Q1-26 | Q2-26 | Q3-26 | Q4-26 | 26 Total | Q1-27 | Q2-27 | Q3-27 | Q4-27 | 27 Total | Q1-28 | Q2-28 | Q3-28 | Q4-28 | 28 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | United States | [redacted] | | | | | | | | | | | | | | |
| | Europe | | | | | | | | | | | | | | | |
| | OUS (CA/AP, Etc.) | | | | | | | | | | | | | | | |
| | **Totals - Revs.** | | | | | | | | | | | | | | | |

Source: PX2461-003 (JenaValve, Executive Summary – Revised Sales Forecast 2025-2028, 2025).

50. Consistent with the general sense that JenaValve's financial fortunes are improving, in an August 5, 2025 email, JenaValve's Vice President of Finance congratulated a colleague for their "…very good work managing the company's cash and AP [accounts payable]. You got us through a storm!"[122] In another email, JenaValve's Head of Global Economics and Market Access prepared talking points for JenaValve leadership to deliver to CMS. Notes for the CEO included "Operating full steam ahead as an independent company without dependency on the potential acquisition by Edwards" and "Single product company perfecting Trilogy's design and function, in business for many years with high profile board and financial health."[123] Further, as recently as October 11, 2025, JenaValve was conducting job fairs and posting recruiting ads to hire more valve sewers. One of the ads reads "No experience? No problem! We'll train you!"[124]

---

122 PX2305-002 (Email from S. Sloan, JenaValve, to T. Ly and J. Kilcoyne, JenaValve, August 5, 2025); *see also,* PX2307-001 (Email from S. Sloan, JenaValve, to J. Kilcoyne, JenaValve, August 6, 2025) (showing that JenaValve sold enough units in July 2025 to meet their cash requirements in the United States).

123 PX2407-001, 002 (Email from C. Darby, JenaValve, to J. Kilcoyne, JenaValve, January 6, 2025); PX7025 (Darby (JenaValve) Dep. 116:20-123:2) (JenaValve's Head of Global Health Economics and Market Access confirmed these notes were for the JenaValve team to be aligned on narrative to CMS.).

124 *ZipRecruiter*, JenaValve Technology Inc., "Hiring Event : Start Your Career in Medical Device Manufacturing! (HEART VALVE SEWING TECHNICIAN)," October 11, 2025, accessed

51. Fundamentally, JenaValve's recent ordinary course documents show that it is preparing to commercialize Trilogy.[125]

### D. Delays Do Not Indicate a Company Will Not Succeed in Receiving FDA Approval and Achieving Commercial Success

52. Dr. Bailey speculates that "[i]f JenaValve's standalone Trilogy sales forecasts in the United States are unduly optimistic, then the benefits from Edwards' ownership of JenaValve are likely to be even greater compared to JenaValve standalone."[126] Dr. Bailey's unstated and factually incorrect assumptions are that JenaValve is particularly prone to missed forecasts and that Edwards is somehow immune from missing sales projections and development milestones. Dr. Bailey does not conduct any statistical analysis comparing commercial sales forecasts or project timelines delays experienced by JenaValve, Edwards, and other potential strategic acquirers.[127] Nor does Dr. Bailey cite evidence that Edwards has been uniquely successful in these areas.

53. Contrary to Dr. Bailey's assumptions, missed commercial forecasts and missed innovation milestones are common experiences in the medical device field.[128] In fact, Edwards itself repeatedly missed its own forecasted U.S. commercial sales targets during its Sapien TAVR-AS device launch and subsequently experienced product timeline delays in Europe for its

---

October 22, 2025. Available from https://www.ziprecruiter.com/c/JENAVALVE-TECHNOLOGY-INC/Job/Join-Us-at-Our-Hiring-Event-:-Start-Your-Career-in-Medical-Device-Manufacturing!-(HEART-VALVE-SEW.../-in-Irvine,CA?jid=bcb45872eaf9fcde.

125 PX7025 (Darby (JenaValve) Dep. 30:15-31:8) (JenaValve is "preparing for launch" of Trilogy—"that engine is rumbling."); *Id.,* (69:10-15) (stating that Trilogy would be covered by CMS if "launched today.").

126 Bailey Report, ¶ 34.

127 Efficiency claims must be merger-specific to be cognizable. Even if there were evidence that Edwards could somehow accelerate JenaValve's development and sales timelines (which there is not), Edwards would have to be unique in any acceleration ability relative to other strategic buyers who do not pose competitive issues for any such acceleration to be considered merger-specific.

128 *See, e.g.,* Cade Shadbolt *et al.,* "Analysis of rates of completion, delays, and participant recruitment in randomized clinical trials in surgery." *JAMA Network Open*, 6(1), 2023: 1-10, p. 6 ("Our analysis of 2542 studies registered on ClinicalTrials.gov indicates that extensive delays, untimely discontinuation, and incomplete recruitment are commonplace when conducting randomized clinical trials of surgical patients. Although most of the examined trials were completed, fewer than 1 in 6 trials reached their target sample size within their planned timeframe.").

Sapien 3 Ultra TAVR system.[129] Indeed, Edwards' overall track record does not support the notion that the company has a unique ability to meet sales forecasts and development timelines. For example, Edwards experienced slower-than-expected adoption and had to adjust revenue expectations downwards in successive quarters in 2013 after its U.S. launch of Sapien in November 2011.[130] At the time, the managing director of RBC Capital Markets criticized Edwards for "continu[ing] to fumble the U.S. launch of Sapien."[131] Indeed, Edwards' TAVR launch difficulties were so pronounced that the company landed on Medical Device and Diagnostic Industry's MD+DI 2013 "Losers List."[132]

54. In addition to missing its own sales projections, Edwards has also delayed products and experienced serious safety issues with its TAVR systems. For example, in 2018, Edwards delayed the European launch of its Sapien 3 Ultra TAVR system.[133] Edwards has also been forced to issue an urgent field safety notice recalling 1,585 Sapien 3 Ultra delivery systems in 2019 after burst ballons led to one death and 17 injuries.[134] Notwithstanding these setbacks,

---

129 MD+DI, "Medtronic Learns From Edwards Lifesciences' Errors in TAVR Launch," February 19, 2014, accessed October 29, 2025. Available from https://www.mddionline.com/cardiovascular/medtronic-learns-from-edwards-lifesciences-errors-in-tavr-launch; Omar Ford, "Edwards Eyes Delay for its Sapien 3 Ultra TAVR," *MD+DI*, March 22, 2018, accessed October 29, 2025. Available from https://www.mddionline.com/implants/edwards-eyes-delay-for-its-sapien-3-ultra-tavr.

130 MD+DI, "Medtronic Learns From Edwards Lifesciences' Errors in TAVR Launch," February 19, 2014, accessed October 29, 2025. Available from https://www.mddionline.com/cardiovascular/medtronic-learns-from-edwards-lifesciences-errors-in-tavr-launch; *see also,* MD+DI, "Despite Sales Disappointments, Edwards Still Sees Long-Term Wins," April 23, 2013, accessed October 29, 2025. Available from https://www.mddionline.com/business/despite-sales-disappointments-edwards-still-sees-long-term-wins ("The technology leader in transcatheter heart valves seems to be stalling when it comes to product adoption–at least in the short term.").

131 MD+DI, "MedTech Losers of 2013: Edwards Lifesciences," December 17, 2013, accessed October 29, 2025. Available from https://www.mddionline.com/cardiovascular/medtech-losers-of-2013-edwards-lifesciences.

132 *Id.*

133 Omar Ford, "Edwards Eyes Delay for its Sapien 3 Ultra TAVR," *MD+DI*, March 22, 2018, accessed October 29, 2025. Available from https://www.mddionline.com/implants/edwards-eyes-delay-for-its-sapien-3-ultra-tavr.

134 Maria Rachal, "FDA Flags Recall of Edwards TAVR Delivery System Tied to 1 Death, 17 Injuries," *MedTech Dive,* August 22, 2019, accessed October 29, 2025. Available from https://www.medtechdive.com/news/fda-flags-recall-of-edwards-tavr-delivery-system-tied-to-1-death-17-injuri/561504/.

Edwards later received FDA approvals for Sapien 3 Ultra in September 2020 for valve-in-valve procedures.[135]

55. In short, there is no empirical basis to conclude that Edwards is uniquely capable of avoiding missed commercial forecasts, product timeline delays, or serious safety issues associated with the commercialization of TAVR-AR systems. Indeed, Edwards anticipates that its launch of TAVR-AR "will be like it was in the early days of SAPIEN" and "there will be a lot of failure."[136]

## V. DEFENDANTS' EXPERTS' EFFICIENCIES ANALYSES ARE FLAWED AND UNCONVINCING

56. Dr. Bailey opines that the benefits of combining JenaValve with Edwards are "broader, faster" TAVR-AR adoption and increased innovation for TAVR-AR.[137] As I explain below, the evidence shows that Edwards lacks concrete plans to improve JenaValve manufacturing or expand patient access beyond what could be expected if the merger does not take place.[138] Similarly, there are no plans to integrate innovation efforts, and Dr. Bailey provides no quantification of the magnitude of her alleged efficiencies. Overall, the documents she relies on do not change my conclusions; in some cases, they reinforce them.[139]

### A. Edwards Has No Cognizable Plans for Efficiencies

57. As stated in my initial report, Edwards has not advanced clear plans for how the combination of Trilogy and J-Valve will lead to a clearly superior next generation TAVR-AR

135 Bailey Report, ¶ 23.

136 PX1608-001 (Email from J. Bierman, Edwards, to P. Sharma, Edwards, July 17, 2024).

137 Bailey Report, § 3.3.

138 The absence of concrete cost-reducing plans may be consistent with the fact that Edwards increased the price of J-Valve as alluded to above in ¶ 23.c.

139 *See, e.g.*, PX1628-028, 030 (Edwards, Board of Directors Strategy Sessions, Transcatheter Aortic Valve Replacement, September 11, 2024) (Edwards will deliver a single "best Gen 2 dedicated AR system"; impose a "Premium ASP at launch"; and does not consider "[i]ndication expansion and market development"); PX1629-007, 013 (Edwards, Company Profiles, October 2023) (Mentions only a "potential" for revenue synergies. This document also lists JenaValve as the most attractive opportunity at the time, flagging it as "[c]ommercial in the near future" and "[l]ikely first-to-market in aortic regurgitation"); PX1157-016 (Edwards, Strategy & Corporate Development Update, July 10, 2024) (Flags a "[k]ey [r]isk" that there could be "[d]elays in scaling manufacturing to support commercial demand or take out costs").

product nor how it can expedite the commercialization of JenaValve's current devices.[140] This contradicts Dr. Bailey's contention that there are "synergies" in this transaction, which the parties themselves have not been able to identify. For example:[141]

a. Edwards' Vice President of Global Strategy and Analytics acknowledged that there were no plans for integration.[142] Moreover, he stated that it would be "tough to say" that Edwards could "devote more employees than JenaValve to get Trilogy approval."[143]

b. Relatedly, Edwards' Corporate Vice President for Strategy and Corporate Development confirmed in his deposition that Edwards did not make any projections of AR sales past July 2025. Lacking any projections, it is unfeasible to interrogate the plausibility that the merger will expand output, lower costs, or otherwise benefit consumers.[144]

c. Similarly, Edwards' Senior Vice President for Marketing, Strategy, and Program Management confirmed in her sworn testimony that "I'm not aware of information of detail of how we intend to scale either JC Medical or JenaValve's manufacturing."[145]

d. Edwards does not plan to increase R&D expenditures for JenaValve. Edwards' CEO testified that he could not increase Edwards' R&D expenditures above their current level, saying "I'm going to be killed by investors . . . I don't want to increase [R&D expenditures] or the shareholders will kill me."[146] More generally, the former Vice President of TAVR at Edwards did not know how much money was allocated by Edwards to address the development of TAVR-AR in anticipation of the JenaValve acquisition.[147]

---

140 Wilson Report, *note* 241.

141 Bailey Report, ¶ 44.

142 PX7026 (Bierman (Edwards) Dep. 70:20-74:7, 75:8-23).

143 PX7026 (Bierman (Edwards) Dep. 158:19-25).

144 PX7040 (Bobo (Edwards) Dep. 228:5-7); *see also,* PX7038 (Kilcoyne (JenaValve 30(b)(6)) Dep. 142:1-149:17).

145 PX7041 (Sharma Rao (Edwards) Dep. 118:4-9).

146 PX7009 (Zovighian (Edwards) IH 67:7-19).

147 PX7003 (Wood (Edwards) IH 89:3-25).

58. Based on this evidence, I conclude that Edwards has not modeled any meaningful efficiencies that are concrete, verifiable, or merger-specific.[148] Consistent with this, Edwards does not project materially different Trilogy sales under its ownership compared to what JenaValve forecasts.[149] Indeed, Edwards' commercial projections, as presented to its Board of Directors for the JenaValve acquisition, assume the same sales as JenaValve.[150] Moreover, Edwards' anticipated approach mirrors JenaValve's, in which it begins with clinical trial sites and then broadens to other high-volume locations.[151]

### B. Edwards Has No Near-Term Plans To Manufacture JenaValve's Devices in Its Facilities

59. Deposition testimony shows that Edwards has not made any plans to integrate manufacturing between JenaValve and Edwards. Specifically, when asked about plans to move manufacturing of the delivery system from Irvine and Leeds to an Edwards location, Edwards' Corporate Vice President for Strategy and Corporate Development acknowledged that keeping manufacturing at JenaValve's locations was the "strategy" that they would "pursue."[152] Consistent with this, JenaValve CEO John Kilcoyne has stated that he was not aware of any plans to alter the production plan for Trilogy.[153]

---

148 PX1587-005 (Edwards, 2026 Updated Financial Modeling, May 2, 2025) ("No, we should not count on synergies occurring. Any synergies may be offset by additional integration costs…").

149 Mr. McWilliams' comparison between Edwards' TAVR-AS sites and JenaValve's projections is inapt. McWilliams Report, Exhibit 4. As noted in ¶ 66, Edwards estimated that 80% of its volume was driven by approximately 130 sites in TAVR-AS. Using that as an analogue, as Mr. McWilliams does in Exhibit 4, JenaValve could potentially reach more than 80% of the TAVR-AR market within 2 years of commercialization.

150 PX1533-003 (Edwards, AR Model Analysis, June 2024) [redacted]); PX1461-012 (Edwards, TAVR Strat Plan Portfolio: Follow-Up Discussion, June 20, 2024) (Edwards P&L projection for JenaValve [redacted]); PX1159-017 (Edwards, Strategy & Corporate Development Update, July 10, 2024) [redacted]).

151 PX7040 (Bobo (Edwards) Dep. 114:4-115:10) ("'Look, here's the accounts that are super interested in AR. They have been in our trial or another trial. They already have a flow of patients. They have the referral networks that are now referring patients.' Those are going to be better places to go to first…").

152 PX7040 (Bobo (Edwards) Dep. 35:4-20).

153 PX7038 (Kilcoyne (JenaValve 30(b)(6)) Dep. 188:9-190:2) (Explaining that JenaValve has no understanding of any Edwards plans to alter how or where Trilogy is produced).

60. The lack of alternative plans makes sense. The process of sewing valves is a manual process that a machine is not capable of doing. Therefore, there is likely little Edwards can do to leverage their position as a maker of TAVR-AS devices that could, for example, automate the process and increase output.[154]

61. On July 31, 2024, Edwards' VP of THV clinical affairs emailed her colleagues that Edwards planned to "keep manufacturing where it is today under their quality system and scale up ([redacted] facilities building valves with [redacted])."[155] Edwards' integration plan would "[a]llow for [a] fully stand alone operation" where JenaValve would "operate in place" for [redacted] years.[156] During this timeframe JenaValve would use its own "QMS [Quality Management System] with targeted EW oversight."[157] Additionally, JenaValve's "[m]anufacturing focus will be to supply [the] market until an EW next gen AR device is launched from THV NPD [Transcatheter Heart Valve New Product Development] – anticipated timing of launch 2-3 years from Jan 2025."[158] Edwards' Senior Vice President of Corporate Development responds "this is a terrific proposal and I support the approach. We should move forward with this once we have clearance from JVT to share info (fingers crossed this can start Oct 10th after we hear back from FTC)."[159] This is consistent with Edwards' approach to J-Valve's manufacturing, where Genesis' Chinese affiliate "will supply EW for [redacted] while [it] get[s] a [supply] line up and running."[160]

62. In a text chain from February 2024, Edwards' Senior VP of engineering discussed the differences between the porcine tissue used by JenaValve and Edward's [redacted] tissue, writing, "There is an expectation that we could 'easily' incorporate [redacted] tissue. Wouldn't that change the [redacted]?" Another employee

154 PX7038 (Kilcoyne (JenaValve 30(b)(6)) Dep. 184:16-20); *see also,* PX1394-006 (Edwards, AR Strategy, July 29, 2024) (Listing a key risk regarding the acquisitions is "Inability to scale manufacturing").

155 PX1611-002 (Email from B. Concepcion, Edwards, to J. Wheeler, *et al.*, Edwards, July 31, 2024).

156 PX1612-002 (Email from N. Arnim, Edwards, to F. Haley, *et al.*, Edwards, October 2, 2024).

157 *Id.*

158 *Id.*

159 PX1612-001 (Email from F. Haley, Edwards, to N. Armin, *et al.*, Edwards, October 3, 2024).

160 PX1613-001 (Email from J. Salinger, Edwards, to F. Rork, *et al.*, Edwards, August 16, 2024).

involved in integration replied, "I am not excited to lead Jenavalve integration is my opinion."[161] A few months later, Sirimanne confirmed that Edwards would not be "transferring manufacturing in house."[162]

63. Even if Edwards did shift production, it is not clear that this should be expected to lead to stabler, more efficient production. Since Edwards acquired J-Valve, there have been multiple delays of the JOURNEY clinical trial associated with [redacted] to the J-Valve delivery system.[163] Moreover, there is potential for a longer process towards the commercialization of JenaValve if the transaction closes, because integration with Edwards would require a "complete review."[164] Such a review would not be necessary at an independent JenaValve.

### C. Edwards Has Made No Plans To Utilize Edwards' Salesforce to Sell JenaValve Devices

64. As for production facilities, deposition testimony shows that Edwards has no concrete plans for leveraging its salesforce to sell JenaValve's Trilogy valves. Edwards' former Vice President of TAVR recognized that it was a "hope" that Edwards' existing AS sales teams would be able to commercialize the AR product.[165] However, he acknowledged that Edwards did not have a "detailed integration plan yet."[166]

65. In addition, Edwards' TAVR-AS salesforce would need to be trained before it can market TAVR-AR products. This includes, not only the salesforce itself, but also training the clinical support for the product at TAVR sites.[167] As a result, whatever alleged benefits of the transaction would not materialize immediately as the training process could take a long time and would not necessarily be dissimilar to what would be expected if JenaValve had to scale up its own salesforce or if JenaValve partnered with another strategic medical device manufacturer.

---

161 PX1232-001, 02 (Text exchange between L. Sirimanne, Edwards, and S. Chow, *et al*., Edwards, February 1, 2024).

162 PX1223-001 (Email from L. Sirimanne, Edwards, to F. Haley, Edwards, August 26, 2024) ("it's [redacted] and we are not transferring in house.").

163 Wilson Report, ¶ 31.

164 PX7003 (Wood (Edwards) IH 197:18-198:9).

165 PX7003 (Wood (Edwards) IH 32:10-19).

166 PX7003 (Wood (Edwards) IH 40:15-41:4).

167 PX7027 (Sun (JenaValve) Dep. 51:2-53:24).

*Confidential*

66. As seen in Figure 2, Edwards' TAVR-AS documents indicate that 50% of total TAVR-AS volume was driven by around 50 sites and 80% of volume came from around 130 sites.[168] Assuming TAVR-AR demand is similarly distributed, a large salesforce is not likely to be necessary since most volume will be concentrated in a small number of sites.

**Figure 2: Edwards 2013 U.S. TAVR-AS Sales Volume by Percentage of Sites**




Source: PX1589-016 (Edwards, 2014 Strategic Plan – Transcatheter Heart Valves, September 11, 2014).

## D. Dr. Bailey's Purported Efficiencies Are Not Merger Specific

67. Any putative positive impact from the transaction that would benefit JenaValve by facilitating manufacturing, sales, or completing the FDA review process, could be achieved through acquisition by another buyer.

68. [redacted]

[168] PX1589-016 (Edwards, 2014 Strategic Plan – Transcatheter Heart Valves, September 11, 2014).

[redacted]

69. Echoing this sentiment, Dr. James McCabe of Beth Israel Deaconess Medical Center testified that Medtronic, Abbott, and Boston Scientific have already successfully launched structural heart devices nationwide, and "I don't see why they wouldn't be able to roll out a TAVR valve if they have either already done so or rolled out a different product in the same space."[170] Dr. Thorsten Vahl of Columbia University broadly agrees.[171]

70. Outcomes with Edwards are not clearly superior to what might be expected from an independent JenaValve.[172] Therefore, the viability of alternative means of funding like venture investment, licensing deals, or an IPO (or some combination thereof) mean that any notional efficiencies would not be merger specific.

## VI. ADDITIONAL PROBLEMS WITH DR. BAILEY'S ANALYSIS

### A. The TAVR-AS Market Showcases the Importance of Competition, Not the Desirability of Edwards As a Monopolist

71. As indicated above, Dr. Bailey and I agree that Edwards has innovated in the TAVR-AS market. However, I disagree with her conclusion that the "[t]iming of innovations shows that Edwards' source of competitive pressure to innovate comes from sources beyond competitors

[redacted] [redacted]

170 PX7011 (McCabe (Beth Israel Deaconess Medical Center) Dep. 57:8-58:17).

171 PX7043 (Vahl (Columbia University Medical Center) Dep. 211:8-213:25).

172 Indeed, as one of the papers cited by Dr. Bailey says, "[t]he empirical literature does not support a conclusion that large firms promote innovation because they provide large and stable cash flows, economies of scale (above some threshold), or risk diversification." Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and the Economy*, 6, 2006: 159–215, p. 205.

Moreover, to cite another of Dr. Bailey's sources, even if it were true that large firms convey advantages, "courts should put less weight on claimed benefits from a merger when there are alternative acquirers that have incentives to acquire a target and would have much less risk of harm to innovation or future price competition. These less-restrictive alternative acquisitions can preserve innovation incentives for entrepreneurs seeking buyouts without threatening innovation or future price competition." Richard Gilbert, *Innovation Matters: Competition Policy for the High-Technology Economy*, MIT Press, 2020, Chapter 5, p. 105.

trying to keep up with Edwards' innovation."[173] The documents I cite in my report show that Edwards believed its "continual product innovation and launch cadence is key to long-term leadership."[174] Fundamentally, the TAVR-AS market showcases the important benefits that competition can bring to consumers in the form of not just lower prices but also new products.[175]

72. Dr. Bailey argues that her Exhibits 4 and 5 show that Edwards is a uniquely innovative company compared to other suppliers. This characterization owes much to how Dr. Bailey filters the data to focus just on trials with start dates beginning the year of the sponsor's first FDA approval through five years after. Dr. Bailey provides no evidence for why this is the right way to evaluate the data, and I have found that examining things in other ways does not support her point.[176] However, even if Dr. Bailey's argument was correct, the difference could be attributed to Edwards' status as first mover: interventional cardiologists may be reluctant to use alternative valves unless those alternatives clearly surpass the Edwards' valves' benefits.[177]

### B. JenaValve's Experience in Europe Is Not Representative Because JenaValve Actively Moved Output to the United States in an Effort To Finish its Clinical Trials

73. Dr. Bailey states that "JenaValve's commercial experience with Trilogy in Europe suggests there is reason to believe JenaValve's standalone forecasted commercial sales of Trilogy in the United States are also unduly optimistic."[178] However, JenaValve is prioritizing the completion of the clinical trials in the United States over commercial sales in Europe.[179]

---

173 Bailey Report, ¶ 21.

174 PX1589-045 (Edwards, 2014 Strategic Plan – Transcatheter Heart Valves, September 11, 2014). *See,* in general, Wilson Report, § V.C.

175 *See, e.g.,* PX1276-030 (Edwards, Transcatheter Heart Valves, September 9, 2010); PX1619-003 (Edwards, Board of Directors Meeting, 2017 Strategic Plan, Transcatheter Heart Valve, September 15, 2016); PX1492-001 (Email from M. Seethoff, Edwards, to K. Skelton and J. Bierman, Edwards, April 11, 2022).

176 If no restrictions are placed on timing, the data show that Medtronic had almost the same number of trial participants as Edwards. *See,* backup materials.

177 PX7043 (Vahl (Columbia University Medical Center) Dep. 29:5-30:7).

178 Bailey Report, ¶ 34.

179 PX2211-003 (Email from D. Dearen, JenaValve, to J. Kilkoyne, JenaValve, February 11, 2024) ("The most obvious reality is that successful completion of [redacted] FDA approval is what matters and this is the master we're serving.").

*Confidential*

Moreover, it may have elected to sacrifice possible sales for its aortic stenosis product in an effort to avoid scrutiny from European regulators.[180] This confounds the reasonableness of Dr. Bailey's conclusion.[181] Moreover, as I explained in my initial report, JenaValve's behavior is rational, sacrificing short-term profitability to increase its long-term value.[182]

## VII. CONCLUSION

74. My review of Defendants' Experts' reports has not altered my view that the proposed merger is likely to result in a loss of price and non-price competition in a relevant antitrust market.



Dr. Nathan E. Wilson

180 PX2211-002 (Email from D. Dearen, JenaValve, to J. Kilkoyne (with replies capitalized), JenaValve, February 11, 2024) ("[I]f we're committed to selling to Jupiter and not going public then you might cut expenses even more and not spend to sell [redacted] more in Europe."); PX2211-005 (In the email chain, Kilcoyne describes EU labor investments as "WASTED $" and "MAY RUN RISK OF MORE [SCRUTINY] FROM EU REGULATORS" if JenaValve "PUSH[ES] HARDER IN EU TO MAX[IMIZE] SALES").

181 Comparing 2021 forecasts to 2024 actuals is particularly inappropriate when JenaValve's strategy with respect to Europe changed in the interim. PX2307-001 (Email from S. Sloan, JenaValve, to J. Kilcoyne, JenaValve, August 6, 2025) (describes plan to [redacted]); PX2291-005, 006 (JenaValve, Profitability by Sales Channel), March 20, 2025) (Prioritize allocation of valves to "US Commercial" over other geographies).

182 Wilson Report, § VI.A.

*See also,* PX7023 (Keltjens (JenaValve) Dep. 27:14-28:25); PX7033 (Hack (Bain Capital Life Sciences) Dep. 59:17-62:12); PX2441-002 (Email from A. Hack, Bain Capital Life Sciences, to J. Kilcoyne, JenaValve, December 6, 2023).

**EXHIBIT A: MATERIALS RELIED UPON**

**Academic Sources**

Andrew Sweeting *et al.*, "Not All Pre-emptive Mergers are Alike: A Classification of Recent Cases," *CPI Antitrust Chronicle*, October 2020

Avinash Dixit and Robert Pindyck, *Investment Under Uncertainty*, Princeton University Press, 1994

Cade Shadbolt *et al.,* "Analysis of rates of completion, delays, and participant recruitment in randomized clinical trials in surgery." *JAMA Network Open*, 6(1), 2023: 1-10

Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?," *The Rate & Direction of Inventive Activity Revisited*, Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012: 361-404

Carmine Ornaghi, "Mergers and innovation in big pharma," *International Journal of Industrial Organization*, 27, 2009: 70-79

Colleen Cunningham *et al.*, "Killer Acquisitions," *Journal of Political Economy*, 129(3), 2021: 649-702

Daniel Greenfield and Jeremy A. Sandford, "Upward pricing pressure in mergers of capacity-constrained firms," *Economic Inquiry*, 59(4), 2021: 1723-1747

Gregory J. Werden and Luke M. Froeb, "Choosing Among Tools for Assessing Unilateral Merger Effects," *European Competition Journal*, 7(2), 2011: 155-178

Justus Haucap *et al.*, "How mergers affect innovation: Theory and evidence," *International Journal of Industrial Organization*, 63, 2019: 283-325

Michael A. Carrier, "Two Puzzles Resolved: Of the Schumpeter–Arrow Stalemate and Pharmaceutical Innovation Markets," *Iowa Law Review*, 93, 2008: 393-450

Michael L. Katz and Howard A. Shelanski, "Mergers and Innovation," *Antitrust Law Journal*, 74(1), 2007: 1-85

Peter Davis and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010

Pierre Régibeau and Katharine E. Rockett, "Mergers and Innovation," *The Antitrust Bulletin*, 64(1), 2019: 31-53

Richard Gilbert, "Looking for Mr. Schumpeter: Where Are We in the Competition-Innovation Debate?" *Innovation Policy and The Economy*, 6, 2006: 159-215

Richard Gilbert, *Innovation Matters: Competition Policy for the High-Technology Economy*, MIT Press, 2020, Chapters 1, 5

Richard R. Nelson, "The Economics of Parallel R and D Efforts: A Sequential-Decision Analysis," *RAND Corporation,* 1959: 1-40

Walter Nicholson and Christopher Snyder, *Microeconomic Theory*, 10th Ed., South-Western, 2008

**Bates-Stamped Documents**

PX1016, EW-FTC-10738360

PX1042, EW-FTC-10036313

PX1046, EW-FTC-10147019

PX1066, EW-FTC-10879352

PX1115, EW-FTC-10259175

PX1157, EW-FTC-11071685

PX1159, EW-FTC-10431808

PX1223, EW-FTC-10394125

PX1232, EW-FTC-11073096

PX1276, EW-FTC-10745933

PX1394, EW-FTC-10999828

PX1437, EW-LIT-00150003

PX1461, EW-FTC-10096679

PX1492, EW-FTC-10109925

PX1533, EW-FTC-10426472

PX1587, EW-LIT-00119254

PX1589, EW-LIT-00173682

PX1608, EW-FTC-10749517

PX1611, EW-FTC-10362438

PX1612, EW-FTC-10503306

PX1613, EW-FTC-10399205

PX1619, EW-LIT-00160915

PX1628, EW-FTC-11071801

PX1629, EW-FTC-10426339

*Confidential*

PX2004, JenaValve-2R-00000075

PX2020, JenaValve-2R-01189231

PX2032, JenaValve-2R-00707963

PX2139, JenaValve-2R-00209065

PX2154, JenaValve-2R-00186041

PX2181, JenaValve-2R-00191660

PX2187, JenaValve-2R-00371350

PX2190, JenaValve-2R-00424451

PX2191, JenaValve-2R-00049532

PX2211, JenaValve-2R-00207132

PX2232, JenaValve-2R-00438776

PX2252, JV-LIT-00019533

PX2272, JV-LIT-00112422

PX2277, JenaValve-2R-00596276

PX2282, JV-LIT-00134950

PX2291, JV-LIT-00064246

PX2303, JenaValve-2R-01393703

PX2304, JV-LIT-00064626

PX2305, JV-LIT-00000734

PX2306, JV-LIT-00001047

PX2307, JV-LIT-00001062

PX2326, JenaValve-2R-00512441

PX2342, JenaValve-2R-00040794

PX2380, JV-LIT-00056385

PX2407, JenaValve-2R-00513474

PX2414, JV-LIT-00028346

PX2418, JV-LIT-00113243

PX2441, JenaValve-2R-00591466

PX2461, JV-LIT-00307290

*Confidential*

PX2463, JV-LIT-00108931

PX2464, JenaValve-2R-01190877

PX2465, JV-LIT-00067810

PX2480, JV-LIT-00111168

PX2530, JenaValve-2R-00500783

PX2532, JenaValve-2R-01355267

PX2533, JenaValve-2R-00787185

PX2536, JenaValve-2R-00710925

PX2537, JenaValve-2R-01149996

PX2540, JenaValve-2R-00207222

[redacted]

**Deposition Transcripts**

PX7011, Deposition of James McCabe (Beth Israel Deaconess Medical Center)

PX7012, Deposition of Duane Pinto (JenaValve)

PX7014, Deposition of Scott Ullem (Edwards)

PX7016, Deposition of Dan Dearen (JenaValve)

PX7017, Deposition of Peter Spadaro (JenaValve)

PX7020, Deposition of Dean Kereiakes (The Christ Hospital, Cincinnati)

PX7023, Deposition of Jan Keltjens (JenaValve)

PX7025, Deposition of Courtney Darby (JenaValve)

PX7026, Deposition of Jeremy Bierman (Edwards)

PX7027, Deposition of Daniel Sun (JenaValve)

[redacted]

PX7033, Deposition of Andrew Hack (Bain Capital Life Sciences)

PX7035, Deposition of Bernard Zovighian (Edwards)

PX7036, Deposition of Meredith Zia (Edwards)

PX7038, Deposition of John Kilcoyne (JenaValve 30(b)(6))

PX7040, Deposition of Don Bobo (Edwards)

PX7041, Deposition of Pooja Sharma Rao (Edwards)

*Confidential*

[redacted]

PX7043, Deposition of Torsten Peter Vahl (Columbia University Medical Center)

**Discovery Materials**

PX0044, All JenaValve Responses and Objections to FTC's First Set of Interrogatories

PX0046, All Edwards Responses and Objections to FTC's Interrogatories

**Expert Reports**

Expert Report of Dr. Nathan E. Wilson, October 12, 2025

Expert Report of Dr. Aaron Kesselheim, October 12, 2025

Expert Report of Elizabeth M. Bailey, Ph.D., October 23, 2025

Expert Report of Dennis McWilliams, October 23, 2025

**FDA Materials**

U.S. Food and Drug Administration, "Quarterly Update on Medical Device Performance Goals – MDUFA V CDRH Performance Data," August 27, 2025, https://www.fda.gov/media/188841/download?attachment

**Hart-Scott-Rodino Filings**

PX0038, JenaValve HSR Filing Exhibit 4(d)-3: Piper|Sandler Materials Prepared for JenaValve Board of Directors Presentation (January 4, 2024)

PX0039, JenaValve HSR Filing Exhibit 4(d)-4: CenterView Partners Presentation Discussion Materials (December 2023)

**Investigational Hearing Transcripts**

PX7001, Investigational Hearing of Peter Spadaro (JenaValve)

PX7002, Investigational Hearing of Steven Sloan (JenaValve)

PX7003, Investigational Hearing of Larry Wood (Edwards)

PX7004, Investigational Hearing of Daniel Sun (JenaValve)

PX7009, Investigational Hearing of Bernard Zovighian (Edwards)

**Merger Guidelines**

U.S. Department of Justice and the Federal Trade Commission, Merger Guidelines (2023)

**Publicly Available Sources**

J.P. Morgan, "2024 Medtech Industry Insights: Investment Trends, M&A Activity, and Market Dynamics," January 2025, https://www.jpmorgan.com/content/dam/jpmorgan/documents/cb/insights/outlook/jpm-medtech-deck-q4-2024-final-ada.pdf

J.P. Morgan, "Medtech Q1 2025: Strategic shifts and market dynamics," May 2025, https://www.jpmorgan.com/content/dam/jpmorgan/documents/cb/insights/outlook/jpm-medtech-deck-q1-2025-final-ada.pdf

Jason Fernando, "What is an IPO? How an Initial Public Offering Works," *Investopedia,* September 21, 2025, https://www.investopedia.com/terms/i/ipo.asp

Johnson & Johnson Innovation LLC, "Driving innovation through venture investing," *Johnson & Johnson*, https://jnjinnovation.com/venture-investing-jjdc

Maria Rachal, "FDA Flags Recall of Edwards TAVR Delivery System Tied to 1 Death, 17 Injuries," *MedTech Dive,* August 22, 2019, https://www.medtechdive.com/news/fda-flags-recall-of-edwards-tavr-delivery-system-tied-to-1-death-17-injuri/561504/

Maria Rachal, "PMA major deficiency letters tick up, 510(k) asks for info flatline: MDUFA report," *MedTech Dive*, June 4, 2020, https://www.medtechdive.com/news/pma-major-deficiency-letters-tick-up-510k-asks-for-info-flatline-mdufa/579186/

MD+DI, "Despite Sales Disappointments, Edwards Still Sees Long-Term Wins," April 23, 2013, https://www.mddionline.com/business/despite-sales-disappointments-edwards-still-sees-long-term-wins

MD+DI, "MedTech Losers of 2013: Edwards Lifesciences," December 17, 2013, https://www.mddionline.com/cardiovascular/medtech-losers-of-2013-edwards-lifesciences

MD+DI, "Medtronic Learns From Edwards Lifesciences' Errors in TAVR Launch," February 19, 2014, https://www.mddionline.com/cardiovascular/medtronic-learns-from-edwards-lifesciences-errors-in-tavr-launch

Omar Ford, "Edwards Eyes Delay for its Sapien 3 Ultra TAVR," *MD+DI*, March 22, 2018, https://www.mddionline.com/implants/edwards-eyes-delay-for-its-sapien-3-ultra-tavr

Wenzhi Pan, "The Transfemoral TaurusNXT TAVR System (Peijia Medical): Two-Year Results of the NXT-DURA Trial," *TCT 2025*, October 27, 2025, https://www.tctmd.com/slide/transfemoral-taurusnxt-tavr-system-peijia-medical-two-year-results-nxt-dura-trial

*ZipRecruiter,* JenaValve Technology Inc., "Hiring Event : Start Your Career in Medical Device Manufacturing! (HEART VALVE SEWING TECHNICIAN)," October 11, 2025, https://www.ziprecruiter.com/c/JENAVALVE-TECHNOLOGY-INC/Job/Join-Us-at-Our-Hiring-

*Confidential*

Event-:-Start-Your-Career-in-Medical-Device-Manufacturing!-(HEART-VALVE-SEW.../-in-Irvine,CA?jid=bcb45872eaf9fcde

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2025, I caused the foregoing document to be served via email to:

Joshua Lipton
Michael J. Perry
Jamie E. France
Stephanie Pearl
Logan Billman
Connor Leydecker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, DC 20036
Telephone: (202) 955-8226
Email: jlipton@gibsondunn.com
Email: mjperry@gibsondunn.com
Email: jfrance@gibsondunn.com
Email: spearl@gibsondunn.com
Email: lbillman@gibsondunn.com
Email: cleydecker@gibsondunn.com

Ryan A. Shores
D. Bruce Hoffman
Jeremy J. Calsyn
Jacob M. Coate
Kelton Anderson
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500
Email: rshores@cgsh.com
Email: bhoffman@cgsh.com
Email: jcalsyn@cgsh.com
Email: jcoate@cgsh.com
Email: keanderson@cgsh.com

*Counsel for Edwards Lifesciences Corp.*

Jonathan Klarfeld
Michael S. McFalls
Samer M. Musallam
Elizabeth McInerney
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006

Telephone: (202) 508-4600
Email: Jonathan.Klarfeld@ropesgray.com
Email: Michael.McFalls@ropesgray.com
Email: Samer.Musallam@ropesgray.com
Email: Elizabeth.McInerney@ropesgray.com

Matthew L. McGinnis
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Email: Matthew.McGinnis@ropesgray.com

*Counsel for JenaValve Technologies, Inc.*

*s/ Laura R. Hall*
Laura R. Hall
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3282
Email: lhall1@ftc.gov

*Counsel Supporting the Complaint*